**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| **New England Synod, Evangelical Lutheran Church in America; Greater Milwaukee Synod, Evangelical Lutheran Church in America; Southwest California Synod, Evangelical Lutheran Church in America; Southwestern Texas Synod, Evangelical Lutheran Church in America; Sierra Pacific Synod, Evangelical Lutheran Church in America; San Francisco Friends Meeting of the Religious Society of Friends; Pacific Yearly Meeting of the Religious Society of Friends; North Pacific Yearly Meeting of the Religious Society of Friends; American Baptist Churches USA; Alliance of Baptists; and Metropolitan Community Churches,**<br><br>       Plaintiffs,<br><br>**v.**<br><br>**Department of Homeland Security** and **Kristi Noem**, in her official capacity as Secretary of the Department of Homeland Security,<br><br>       Defendants. | **Civil Case No.**<br><br>**COMPLAINT** |

1.    For over 30 years, the federal government restricted immigration enforcement at houses of worship and other "sensitive locations," recognizing that it could enforce immigration laws without, in its words, "denying . . . people of faith access to their places of worship."

2.    Under that policy, the government barred immigration enforcement in or near sensitive locations "to the fullest extent possible." Agents were allowed to carry out such actions only in exigent circumstances or with prior approval from supervisors who were themselves bound by the government's policy to avoid such actions whenever possible. Where enforcement actions

had to occur at sensitive locations, they were to be done in nonpublic areas and with the aim of minimizing the impact on people's access to the sensitive location.

3.     Soon after taking office, the new administration abruptly reversed course and abandoned these longstanding protections.

4.     In a memorandum issued on January 20, 2025, then-Acting Secretary of the Department of Homeland Security, Benjamine Huffman, rescinded the prior sensitive locations policy. In place of the guardrails that policy provided, Acting Secretary Huffman determined that the decision whether to carry out enforcement actions at or near houses of worship should be left to agents' individual discretion, guided only by "common sense."

5.     Unsurprisingly, the revocation of decades-old protections for churches and other sensitive locations by Defendants Department of Homeland Security ("DHS") and DHS Secretary Kristi Noem has led to a growing number of immigration enforcement actions at or near these formerly protected areas. In recent weeks, as the administration has accelerated its immigration enforcement efforts across the country, federal agents have become an increasingly common presence at houses of worship.

6.     For example, last month alone, agents seized a man in front of a church near Los Angeles and brandished a rifle at a pastor in the process; detained a grandfather in the same city who was dropping his granddaughter off at a church school; arrested a man outside a church in Oregon; and carried out arrests on two Catholic parish properties in Montclair and Highland, California.

7.     As a result, people across the country, regardless of immigration status, reasonably fear attending houses of worship. Churches have seen both attendance and financial giving plummet. Congregations have gone underground to protect their parishioners, eschewing in-person

meetings central to their faith. Baptisms that previously would have been occasions for communal worship and celebration are now being held in private. Families are making hard choices about which parent gets to practice their religion communally and which stays home, so that their children have at least one caregiver should the other be detained at Sunday service. Churches have quietly stopped advertising immigrant-focused ministries and have canceled programming that served immigrant populations who are now too fearful to attend. Congregations whose faith compels them to worship with open doors and open arms have suddenly had to lock those doors and train their staff how to respond to immigration raids. In many places of faith across the United States, the open joy and spiritual restoration of communal worship has been replaced by isolation, concealment, and fear.

8.      For Plaintiffs and their members, the present threat of surveillance, interrogation, or arrest at their houses of worship means, among other things, fewer congregants participating in communal worship; a diminished ability to provide or participate in religious ministries; and interference with their ability to fulfill their religious mandates, including their obligations to welcome all comers to worship and not to put any person in harm's way.

9.      Defendants' rescission of longstanding protections for houses of worship and other sensitive religious locations is not just harmful and un-American; it violates federal law.

10.      By unjustifiably and substantially burdening Plaintiffs' religious exercise and chilling their First Amendment right of expressive association, Defendants' new policy violates the First Amendment and the Religious Freedom Restoration Act ("RFRA"). And, as an unexplained and irrational change in agency policy, it violates the Administrative Procedure Act ("APA"). It is arbitrary and capricious, contrary to constitutional right, and in excess of statutory authority.

11.    The Court should hold the new policy unlawful and order appropriate preliminary and permanent relief.

## JURISDICTION AND VENUE

12.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiffs allege violations of the First Amendment; RFRA, 42 U.S.C. § 2000bb, *et seq.*; and the APA, 5. U.S.C. § 701, *et seq.*

13.    Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this district and no real property is involved in the action.

## PARTIES

14.    Plaintiff **New England Synod** is a regional body of the Evangelical Lutheran Church in America ("ELCA") with territory across New England. It represents 155 congregations and 10 synodically authorized worship communities and has its main offices in Worcester, Massachusetts.

15.    Plaintiff **Greater Milwaukee Synod** is a regional body of the ELCA that includes 115 congregations and other authorized worshipping communities with over 59,000 baptized members across southeast Wisconsin. Its main offices are in Milwaukee, Wisconsin.

16.    Plaintiff **Southwest California Synod** is a regional body of the ELCA that includes 105 congregations across five counties in California: Kern, Los Angeles, San Luis Obispo, Santa Barbara, and Ventura. Its main offices are in Glendale, California.

17.    Plaintiff **Southwestern Texas Synod** is a regional body of the ELCA that includes 113 congregations with over 26,000 worshipping members across southwest Texas. Its headquarters are in Seguin, Texas.

18.     Plaintiff **Sierra Pacific Synod** is a regional body of the ELCA with territory covering Northern California and Northern Nevada. It comprises more than 170 congregations, ministries, and authorized worshipping communities; along with a camp, seminary, and a social service agency. Its main offices are in Berkeley, California.

19.     Plaintiff **San Francisco Friends Meeting of the Religious Society of Friends** is a Quaker religious corporation located in San Francisco, California.

20.     Plaintiff **Pacific Yearly Meeting of the Religious Society of Friends** is the association of the members of 34 local Quaker congregations—Monthly Meetings—in California, Nevada, Hawaii, and Mexico. It was formed in 1947 and legally incorporated as a 501(c)(3) nonprofit organization in 2004.

21.     Plaintiff **North Pacific Yearly Meeting of the Religious Society of Friends** is the formal and legal association of more than 20 local Quaker congregations throughout parts of Washington, Oregon, Idaho, and Montana. It has met continuously since 1972, and is headquartered in Portland, Oregon.

22.     Plaintiff **American Baptist Churches USA** is the formal and legal association of approximately 4,700 congregations across the United States. It was named American Baptist Churches USA in 1972. It is the successor of the American Baptist Convention, which was originally known as Northern Baptist Convention and traces its roots to the first Baptist association formed in 1707. Its main offices are in King of Prussia, Pennsylvania.

23.     Plaintiff **Alliance of Baptists** is a partnership of approximately 5,000 individuals and roughly 155 member congregations mutually supporting one another to pursue God's justice in the world. It was founded in 1987 and has its main offices in Raleigh, North Carolina.

24.     Plaintiff **Metropolitan Community Churches** is the formal and legal association of approximately 90 churches throughout the United States and 27 additional churches globally. It was founded in 1968 and has its principal address in Venice, Florida.

25.     Defendant **Department of Homeland Security** is the federal agency responsible for enforcing United States immigration laws and policies. DHS contains component agencies, including U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP").

26.     Defendant **Kristi Noem** is sued in her official capacity as the Secretary of the Department of Homeland Security.

## FACTUAL BACKGROUND

### *The Government's Longstanding Policy Toward "Sensitive Locations"*

27.     For more than 30 years, it has been the government's policy not to conduct immigration enforcement operations in certain "sensitive locations"—also referred to as "protected areas"—such as houses of worship and other places where religious activities are taking place.

28.     In 1993, the Immigration and Naturalization Service ("INS") adopted a policy "to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." Ex. 1, Memorandum from James A. Puleo, INS Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P (May 17, 1993). Under that policy, the INS required written advance notice of operations that were likely to involve such sensitive locations. *Id.* at 1. It set standards for when such operations were appropriate and required agents to consider ways to "minimize the impact on operation of the …

6

place of worship." *Id.* at 2. And it provided that when exigent circumstances arose that did not permit prior written approval before carrying out operations at a sensitive location, "the matter must be reported immediately" up the chain of command. *Id.*

29.     INS ceased to exist in 2003, when most of its functions were transferred to ICE, USCIS, and CBP. In 2008, ICE reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies," directing ICE personnel to "refrain from conducting enforcement actions or investigative activities" at such locations "except in limited circumstances." Ex. 2, Memorandum from Julie L. Myers, Assistant Secretary, ICE, "Field Guidance on Enforcement Actions or Investigative Activities at or Near Sensitive Community Locations" 10029.1 (Jul. 3, 2008). "Precedent for this approach is clear," the agency noted, citing the 1993 INS policy. *Id.* The memo outlined the extreme situations that might merit enforcement at or near sensitive locations, including "terrorism-related investigations" or "matters of public safety." *Id.*

30.     In 2011, ICE adopted further guidance designed to ensure that enforcement actions neither occurred at nor were focused on sensitive locations absent either exigent circumstances (such as terrorism, imminent risk of death, or pursuit of a dangerous felon) or prior written approval. Ex. 3, Memorandum from John Morton, Director, ICE, "Enforcement Actions at or Focused on Sensitive Locations" 10029.2 (Oct. 24, 2011). Where "extraordinary circumstances" compelled enforcement action at or near a sensitive location, agents were required to "conduct themselves as discre[et]ly as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location." *Id.* at 3.

31.     In 2021, DHS Secretary Alejandro Mayorkas rescinded and superseded the prior memos while reaffirming the government's historic policy of avoiding enforcement at sensitive

locations. *See* Ex. 4, Memorandum from Alejandro N. Mayorkas, Secretary, DHS, to Tae D. Johnson, et al., "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021) ("Mayorkas Memo").

32.    The Mayorkas Memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." *Id.* at 2. The memo recognized that enforcement actions in or around sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at 3.

33.    The Mayorkas Memo thus announced that DHS had an "obligation to refrain, *to the fullest extent possible*, from conducting a law enforcement action in or near a protected area." *Id.* (emphasis added). And it explained that the "enforcement actions" covered by the policy "include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at 4.

34.    The Mayorkas Memo recognized that certain exigent circumstances might require enforcement in or near a sensitive location. Outside of those circumstances, however, it dictated that "an Agent or Officer must seek prior approval" before proceeding. *Id.* And because the Mayorkas Memo applied to all DHS personnel, not just line-level agents, any official asked to provide prior approval of an enforcement action at a sensitive location would themselves be bound by the rule that such actions were to be avoided "to the fullest extent possible." *Id.* at 3.

35.    Consistent with that direction, ICE's website formerly emphasized that "[a]bsent exigent circumstances, DHS officers and agents *must* seek prior approval" before taking

enforcement actions at protected areas. Ex. 5, ICE, Protected Areas Enforcement Actions (accessed Jan. 27, 2025) (emphasis added). And it explained that individuals who believe DHS officers violated the sensitive locations policy should file complaints with ICE, CBP, the Office of the Inspector General, or the DHS Office for Civil Rights and Civil Liberties. *Id.* at 3.

### The Current Administration Abandons Protections for Sensitive Locations

36.     This January, DHS broke with decades of prior practice and removed the guardrails that had long protected houses of worship and other sensitive locations.

37.     In a short memo from then-Acting Secretary Benjamine Huffman, DHS rescinded the Mayorkas Memo and its protections for sensitive locations, effective immediately. Ex. 6, Memorandum from Benjamine C. Huffman, Acting Secretary, DHS, to Caleb Vitello, et al., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Huffman Memo").

38.     The Huffman Memo jettisons the former rule that enforcement at sensitive locations should be avoided "to the fullest extent possible." It contains no replacement constraints on agents' authority. It does not require any internal process before agents may carry out enforcement at these locations. And it does not require that exigent circumstances exist before agents enter sensitive locations, let alone define what exigent circumstances could justify such operations. Instead, the Huffman Memo leaves these decisions to individual agents' "enforcement discretion" and "common sense," specifically disavowing the need for "bright line rules" to cabin that discretion. *Id.*

39.     Although DHS undid more than 30 years of policy, it did not explain why the previous policy had failed. It did not address how people may have come to rely on the policy. It did not address any of the harms it was likely to cause. And it did not outline any alternatives that the agency considered.

40.     In a press release issued the next day, DHS stated of its new policy:

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders [*sic*] and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

Ex. 7, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025).

41.     Following the Huffman Memo, then-Acting ICE Director Caleb Vitello issued further instructions to staff. Ex. 8, Memorandum from Caleb Vitello, Acting Director, ICE, to Russell Hott, et al., "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025) ("Vitello Memo" and, together with the Huffman Memo, the "2025 Policy"). The Vitello Memo applies to ICE personnel but not to CBP personnel. It states in relevant part:

> I have great faith in the judgment of our law enforcement personnel and, accordingly, charge Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area. AFODs and ASACs may provide authorization for such actions either verbally or in writing. Before authorizing an immigration enforcement action at a site where a public demonstration is underway, AFODs and ASACs must consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations.

*Id.* at 2.

42.     ICE agents told Fox News when the new policy was announced that they expected it would "free them up to go after more illegal immigrants, because illegal immigrants have until now been able to hide near schools and churches and avoid arrest." Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://perma.cc/KSC2-MAUR.

*Implementation of the Administration's New Policy*

43.     From the start, the new DHS policy and its abrupt abandonment of decades of protections for sensitive locations "sow[ed] fear within . . . migrant-friendly congregations," and faith leaders reported almost immediately that it has caused many immigrants to fear attending houses of worship. Giovanna Dell'Orto, Luis Andres Henao & Deepa Bharath, *Trump won't ban immigration arrests at churches. Now clergy are weighing how to resist*, Associated Press (Jan. 23, 2025), https://perma.cc/C8GW-R586.

44.     Shortly after it issued, three of the largest Catholic organizations in the United States—the U.S. Conference of Catholic Bishops, the Catholic Health Association of the United States, and Catholic Charities USA—stated that, "[w]ith the mere rescission of the protected areas guidance," they were "already witnessing reticence among immigrants to engage in daily life, including . . . attending religious services." *Human Dignity is Not Dependent on a Person's Citizenship or Immigration Status*, U.S. Conf. of Cath. Bishops (Jan. 23, 2025), https://perma.cc/QP2N-77S6.

45.     The National Association of Evangelicals stated similarly that "[e]ven the announcement of this policy has caused fear, deterring some from attending church." Press Release, Nat'l Ass'n of Evangelicals, *National Association of Evangelicals Responds to New Executive Orders* (Jan. 22, 2025), https://perma.cc/77UB-H7N3.

46.     These fears were quickly borne out. On January 26, for example, the first Sunday following announcement of the 2025 Policy, ICE agents came to Fuente de Vida Church in Tucker, Georgia, while a worship service was ongoing, and arrested the congregant they sought—a father of three whose GPS ankle monitor began alarming mid-service—after he exited the church. Billal

Rahman, *ICE Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025), https://perma.cc/7EJP-Q33G.

47.    The same day, in Washington State, federal agents in unmarked pickups and SUVs surrounded a family in their church parking lot as they were leaving Sunday services. Gustavo Sagrero Álvarez, *Washington family torn apart after father arrested outside of church and deported*, NPR (Mar. 6, 2025), https://perma.cc/L638-43VG. Men in bulletproof vests pulled the father out of his car and arrested him in front of his family and the church pastor. *Id.*; Gustavo Sagrero, *A high schooler stays back as his family, separated by deportation, returns to Guatemala*, NPR (Apr. 26, 2025), https://perma.cc/9T5J-B52T.

48.    These incidents continued over subsequent months, further stoking fear. *See, e.g.*, Myles Harris, '*Wrong on every level' Faith leaders lambast recent ICE operation at Charlotte church during preschool pickup*, WCNC (May 28, 2025), https://perma.cc/NS4W-YBNJ (reporting on an operation by armed ICE agents carried out during preschool pick-up time at a church in Charlotte, North Carolina).

49.    In recent weeks, however, the pace and aggression of immigration enforcement activities at houses of worship appears to have increased substantially.

50.    Last month, a group of armed, masked federal agents arrested a man outside a church in Downey, California, a predominately Latino suburb of Los Angeles. Jesus Jiménez and Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (Jun. 11, 2025), https://perma.cc/M3MQ-KZRF. After a pastor told the masked agents they were on church property, one of them reportedly responded, "The whole country is our property." *Id.* After another pastor shouted instructions to the man being arrested, an agent pointed his rifle at her. *Id.*

51.    That same day in Downey, federal agents stopped a man on the sidewalk in front of Our Lady of Perpetual Help as he was dropping his granddaughter off at the church's school. Karla Rendon, *Immigration raids reported near Downey churches*, NBC News (Jun. 11, 2025), https://perma.cc/W4DV-QPWW. Parishioners at churches in the area told reporters they were concerned that the same could happen elsewhere, and some churches began offering online streaming options for those who were worried about attending in-person service. Mónica De Anda, *Fear looms among immigrant community over church gatherings after ICE raid*, ABC News (Jun. 15, 2025), https://abc7.com/videoClip/16757306/.

52.    Fears have grown to the point that church leadership have given the faithful permission not to attend services if they face a risk of immigration enforcement. During an immigration enforcement sweep in Nashville, Tennessee, the Diocese of Nashville issued a message telling worshippers they are not required to attend Sunday Mass if they fear for their well-being; the diocese reported that Sunday Mass attendance at its two major Spanish-speaking parishes was down about 50%. Gina Christian, *Amid immigration raids, Nashville diocese tells Catholics they don't have to attend Sunday Mass if safety is at risk*, America (May 15, 2025), https://perma.cc/Z8RS-NPEY.

53.    On July 8, the Catholic Bishop of the San Bernadino Diocese was compelled to issue a similar statement, indefinitely lifting the obligation to attend Sunday mass for those "who, due to genuine fear of immigration enforcement actions, are unable to attend." Diocese of San Bernardino, *Decree Dispensing from the Obligation to Attend Sunday Mass* (Jul. 8, 2025), https://perma.cc/7ZSC-WCTH. The diocese reported that "attendance at Spanish-language Masses across its parishes had dropped by at least half." Claire Moses and Orlando Mayorquín, *L.A.-Area*

*Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (Jul. 10, 2025), https://perma.cc/8P2D-8866.

54.     In Chelsea, Massachusetts, some congregants are splitting their families up when attending church, because they are fearful that an ICE raid would leave their children parentless. Kristina Rex, *Some Massachusetts schools see spike in absences amid immigration fears*, CBS News (Feb. 13, 2025), https://perma.cc/Z88D-7T2A (reporting that some families are no longer attending church together so that only one parent would be deported in the event of an ICE raid at church).

55.     These fears are well-supported. In response to criticism of DHS's tactics in Los Angeles, Border Patrol Chief Gregory Bovino recently told reporters, "Better get used to us now, [']cause this is going to be normal very soon." He added: "We will go anywhere, anytime we want in Los Angeles." Kelli Johnson, *ICE in LA: Mayor Bass confronts federal agents in MacArthur Park, demands withdrawal*, Fox 11 Los Angeles (Jul. 7, 2025), https://perma.cc/9GYV-UY85.

56.     DHS has applied that "go anywhere" policy well beyond Los Angeles. It seized a man last month outside St. Michael's Episcopal Church in Oregon, taking him into ICE custody. Celine Stevens, *Vineyard business owner detained by ICE outside Oregon church amid heightened immigration enforcement*, KGW9 (Jun. 15, 2025), https://perma.cc/F8Z6-PY2E. Immediately following that arrest, attendance at the church's Spanish-language service dropped from the typical 40-50 people to just 12 adults and no children. *Id.*

57.     On June 20, ICE agents entered two Catholic parish properties in Montclair and Highland, California, detaining multiple people in the parking lot of St. Adelaide Church and arresting a man at Our Lady of Lourdes Church. Alexandra Crosnoe, *After Reports of ICE at*

*Catholic Churches, California Bishop Denounces Raids*, Mercury News (June 25, 2025) https://perma.cc/G3P2-APWR.

58.    The fears created by Defendants' new policy and the resulting wave of immigration enforcement at houses of worship extend far beyond people without lawful immigration status.

59.    Ample data shows that "[f]ears of detention and deportation are a concern for immigrants across immigration statuses." Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The 2023/KFF LA Times Survey of Immigrants*, KFF (Sep. 17, 2023), https://perma.cc/UHB7-A7VN. A 2023 study described as "the largest and most representative survey of immigrants living in the U.S. to date" found that 26% of all immigrants, regardless of their own legal status, "worry they or a family member could be detained or deported." *Id.*

60.    That finding echoed previous research showing that even those with legal status fear immigration enforcement because they are "fearful for their family members or because their own 'status' might be questioned." Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73(4) Soc. Sci. & Med. 586 (2011), https://perma.cc/DRW9-SB2A.

61.    Such fears are reasonable, particularly given how often ICE operations sweep up citizens or others with legal status. In 2021, the Government Accountability Office reported that ICE "arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020." Ex. 9, U.S. Gov't Accountability Office, GAO-21-487, *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations* (2021).

62.    Similar mistakes are becoming increasingly common as Defendants rush to meet arrest quotas.

63.     In January, ICE agents conducting a warrantless raid in New Jersey detained a U.S. military veteran. *Mayor Ras. J. Baraka's Statement on ICE Raid on Newark Business Establishment*, City of Newark (Jan. 23, 2025), https://perma.cc/H7QX-82G6. ICE arrested and detained a Florida-born U.S. citizen, claiming his REAL ID was fake, while he was working at his construction job in Alabama. Naomi LaChance, *Trump's ICE Detains U.S. Citizen, Claiming His REAL ID Was Fake*, Naomi LaChance, Rolling Stone (May 24, 2025), https://perma.cc/NA6B-6F9M. A U.S.-born citizen was detained at the request of immigration authorities, and, despite demonstrating that he was a citizen, was released only after his case gained widespread media attention. Gisela Salamon, *A US citizen was held for pickup by ICE even after proving he was born in the country*, AP (Apr. 19, 2025), https://perma.cc/T7H9-5Y89. And, infamously, the administration rendered a man living in Maryland to a hellish Salvadoran super-prison by mistake—then fought efforts to secure his return. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).

64.     Indeed, a judge of the U.S. District Court for the Central District of California recently determined, on review of a "mountain of evidence presented," that defendants in that case—federal immigration enforcement authorities, including Secretary Noem—were responsible for carrying out detentive stops in Los Angeles without reasonable suspicion and based solely on race, accents, presence at a particular location, and profession. Order Granting Plaintiffs' *Ex Parte* Applications for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, *Vasquez-Perdomo v. Noem*, No. 2:25-cv-05605, ECF No. 87 (C.D. Cal. July 11, 2025).

65.     The administration has indicated that it will only continue to escalate its efforts. President Trump recently directed ICE agents "to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History" and stated

that "we must expand efforts to detain and deport Illegal Aliens in America's largest Cities, such as Los Angeles, Chicago, and New York." Donald J. Trump, *"Our Nation's ICE Officers have shown incredible strength, determination, and courage as they facilitate a very important mission, the largest Mass De..."* Truth Social (Jun. 15, 2025, 8:43 PM), https://perma.cc/LP22-CR95. This escalation extends to this District. During a recent Massachusetts immigration sweep dubbed "Operation Patriot," immigration authorities arrested more than 1,500 people across the state; a Milford resident described ICE "pounding on the back door" of Catholic Charities Worcester County during a food distribution drive. Isabela Dias, *How ICE's Arrest of a High School Student Activated a Massachusetts Town*, Mother Jones (Jul. 15, 2025), https://perma.cc/GUR9-FE29.

66.    Defendants now have more resources than ever with which to conduct immigration enforcement: Earlier this month, Congress appropriated more than $6 billion dollars for hiring additional CBP personnel and almost $30 billion that can be used for hiring ICE agents. H.R. 1, 119th Cong. §§ 90002, 100052 (2025). The nearly $30 billion in additional funding for ICE is comparable to the annual military budgets of Italy, Israel, and the Netherlands. Brendan Cole and John Feng, *ICE Budget Now Bigger Than Most of the World's Militaries*, Newsweek (Jul. 2, 2025), https://perma.cc/7VKM-979H.

### *Plaintiffs' Religious Beliefs and Their Connections to Immigrant Communities*

**New England Synod, ELCA; Greater Milwaukee Synod, ELCA; Southwest California Synod, ELCA; Southwestern Texas Synod, ELCA; and Sierra Pacific Synod, ELCA**

67.    The New England Synod, Greater Milwaukee Synod, Southwest California Synod, Southwestern Texas Synod, and Sierra Pacific Synod (collectively, "the Synods") are regional bodies of the ELCA with shared religious commitments to welcoming all who wish to worship and seeking to protect the most vulnerable.

68.    The New England Synod includes 165 congregations and authorized worship communities across Massachusetts, Maine, Rhode Island, Connecticut, New Hampshire, Vermont, and a small part of eastern New York. It contains congregations that serve sizable immigrant populations from across the world, including the Dominican Republic, Liberia, China, and Central and South America. These congregations include people both with and without documented legal status.

69.    The Greater Milwaukee Synod includes 115 congregations and other authorized worshipping communities in the greater Milwaukee area. It contains churches with significant Latino memberships, including congregants from El Salvador, Colombia, Venezuela, Guatemala, and Honduras. Some of these congregants have documented status; some do not.

70.    The Southwest California Synod includes 105 congregations in the Southwest region of California. Its territory spans Los Angeles, Kern, Ventura, Santa Barbara and San Luis Obispo counties. It contains churches with significant immigrant membership, including congregants with legal status and without.

71.    The Southwestern Texas Synod consists of 113 congregations in Southwestern Texas. Its territory stretches east from the U.S.-Mexico border and includes Austin, San Antonio, and Corpus Christi. It shares the longest border with Mexico of any synod in the ELCA.

72.    The Sierra Pacific Synod includes more than 170 congregations, ministries, and authorized worshipping communities across Northern California and Northern Nevada. It includes churches with significant memberships from a variety of different immigrant communities, including from the Americas, Asia, and Africa.

73.    Synod members believe that Jesus's command to love God and one's neighbors must guide their actions as they build and nurture just and welcoming communities. The scriptural

mandate in Matthew 25—"I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink, I was a stranger and you invited me in . . ."—is essential to who they are as followers of Christ.

74.     Reflecting that belief, in 2019 the ELCA Churchwide Assembly adopted a resolution declaring the ELCA a sanctuary church body. That resolution affirmed the Synods' and the broader ELCA's religiously-rooted commitment to support and protect immigrants, refugees, and asylum-seekers through actions such as offering physical sanctuary to individuals seeking refuge, advocating for changes in the country's immigration laws and policies, and welcoming all to join in religious worship.

75.     Synod members welcome all people at all times, especially for worship on Sunday morning. They believe that every person is created in the image and likeness of God. They value people from all walks of life and the diversity of people and consider it an experience of the fullness of the body of Christ when they are able to come together. They commune with the Holy Trinity through their sacraments, which they participate in collectively.

76.     Congregations also practice their faith through public works such as, for example, providing housing to migrants and asylum seekers, providing food and support services to people in need, assisting in refugee resettlement, and providing English-as-second-language classes. That these activities may take place outside of Sunday worship services makes them no less an expression of the members' religious faith. Restricting the idea of "religious exercise" to formal sacraments like the Eucharist is inconsistent with their faith as Lutherans who believe that loving one's neighbor has to be something they do in practice.

**San Francisco Friends Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting**

77.    Plaintiffs San Francisco Friends Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting and are regional associations of Quakers—members of the Religious Society of Friends, a religious movement dating to the seventeenth century.

78.    While Quakers have no formal hierarchy, they are generally organized into Yearly Meetings, Quarterly Meetings, and Monthly Meetings. A "meeting" is an association, a gathering held to do business at a certain interval (*i.e.*, yearly, quarterly, or monthly), and a way of describing Quakers within a certain region.

79.    Monthly Meetings are the basic organizational unit in the Quaker religion. They are local congregations that hold weekly worship services and, once a month, hold a meeting for worship with attention to business.

80.    Quaker religious practice is rooted in the belief that anyone can hear the voice of God, and there is part of God in every person.

81.    Different life experiences, backgrounds, and cultures lead people to hear and experience God differently. Having a diversity and richness of human experience yields a fuller understanding of how God speaks to the Quakers, individually and as a community.

82.    Quaker worship generally consists of Spirit-led waiting—gathering in silence and waiting to hear the voice of God. There is no clergy leading worship; rather, anyone who feels called upon by the Spirit/God to speak may do so. Everyone who attends worship meetings is participating in worship, whether they speak or not.

83.    This communal aspect of worship—of gathering as a body to experience spiritual connectedness with the Spirit/God through one another—is central to the exercise of the Quaker faith.

84.     Likewise, welcoming and worshipping with all comers, including by opening meetings to anyone who desires to attend, is an important aspect of the Quaker faith because every individual who attends presents an opportunity for God to speak to worshippers through them.

85.     Pacifism is deeply ingrained in the Quaker faith. The Friends have a religious commitment to oppose violence in all forms. The presence of arms in or around their meeting houses would violate this founding principle of their faith. Knowingly putting a person in harm's way or risking their involvement in a violent encounter likewise violates Quaker religious beliefs.

86.     Quakers practice their faith and live their core testimonies—including community, equality, and stewardship—by carrying out Spirit-led ministries and services in their communities.

87.     Given the Quaker values of welcoming strangers, worshipping with all-comers from diverse backgrounds, community, and service, many Quaker meetings, including Plaintiffs, have built deep and meaningful connections to immigrant communities.

88.     Plaintiffs Pacific Yearly Meeting and North Pacific Yearly Meeting and their constituent Monthly Meetings, including Plaintiff San Francisco Friends Meeting, have members and attenders who are immigrants from around the world. Both Pacific Yearly Meeting and North Pacific Yearly Meeting have special ties to Friends in Latin America who join their in-person annual sessions.

89.     Many of their Monthly Meetings carry out ministries that serve immigrants in their communities. These ministries include: welcoming immigrants into their meeting house for food, shelter, and other services; hosting other organizations that serve immigrant communities; and providing financial and other support for immigrants going through legal proceedings.

**American Baptist Churches USA**

90.    Plaintiff American Baptist Churches USA, so named in 1972, is the successor of the American Baptist Convention and traces its roots to the first Baptist association formed in 1707. Transforming communities, engaging in hands-on ministry, speaking the prophetic Word of Christ in love, and nurturing authentic relations are primary tenets of their ministry.

91.    American Baptist Churches USA represents approximately 4,700 congregations and 1.3 million members across the country, participating in shared mission and ministry. At the core of who American Baptists are, there is a commitment to the Baptist freedoms—soul, church, religious and biblical freedom. As reflected in their mission statement, American Baptist churches are missional congregations that nurture devoted disciples of Jesus Christ who live their lives in mission and ministry for the healing of the world through the love of God.

92.    Since educating freedmen after the Civil War, social outreach and justice have been a core aspect of the tradition of American Baptists and their commitment to promote holistic and healing change.

93.    The American Baptists are one of the most ethnically diverse bodies of Protestants. American Baptist Churches USA includes a vibrant number of congregations representing diverse backgrounds, including Hispanic congregations (e.g., Puerto Rican, Mexican, Dominican, Central and South American), Haitian congregations, African congregations (e.g., Somalian, Congolese), as well as congregations made up of refugees from Burma (e.g., Chin, Kachin, Karen). Many of these churches are bilingual or Spanish-speaking, or speak languages other than English, and are actively engaged in ministries of evangelism, community development, worship, and social justice.

94.    Support and ministry to immigrants and refugees is among the pillars of the American Baptist Churches USA faith. Through its regions and local congregations, American

Baptist Churches USA offers immigration- and refugee-related resources to its member churches, including providing training opportunities and information about changes in immigration law and policy.

95.    American Baptist Churches USA believes that serving and ministering to immigrants, refugees, and asylum seekers is a biblical and moral responsibility. Rooted in Scripture's call to love one's neighbors, show hospitality, and seek justice, the denomination affirms the dignity and rights of all people regardless of immigration status. American Baptists have a long history of advocacy, direct service, and resettlement work in support of immigrant communities.

96.    Serving and ministering to immigrant communities is a core tenet of American Baptists' faith because it reflects the biblical call to love one's neighbors, practice hospitality, seek justice, and care for the vulnerable. Rooted in the teachings of Christ, American Baptists believe that all people are made in the image of God and deserve dignity, compassion, and support. American Baptist Churches USA's longstanding commitment to immigrants and refugees is an expression of their faith in action—offering holistic ministry, advocating for just policies, and partnering in resettlement efforts as they welcome the stranger and serve those in need.

**Alliance of Baptists**

97.    Plaintiff Alliance of Baptists is a group of progressive Baptists and Christians committed to enacting God's love and justice in the world.

98.    As affirmed in its organizational Covenant, the Alliance of Baptists is dedicated to welcoming "all persons with full respect to gender, sexual, racial, and ethnic identities" and "hold[ing] space for all persons with varying abilities, social standing, or economic status."

99.    Guided by the teachings of the Bible, the Alliance of Baptists believes they are called to welcome, clothe, and feed foreigners and immigrants as their neighbors, regardless of their legal status. As Baptists, they have a fundamental obligation to lead with love, show mercy, and walk humbly with God. To the Alliance of Baptists, this means that they must show kindness and compassion to their immigrant neighbors, regardless of their immigration status.

100.    The Alliance of Baptists considers immigrants to be members of their community that they must love as they love themselves. Its members believe that the Bible makes their call to welcome and support immigrants very clear, from the Parable of the Good Samaritan in Luke 10:25-37 to Leviticus 19:34, which teaches Baptists to treat the whole world as their neighbors.

101.    The Alliance of Baptists' member churches have publicly proclaimed their support for immigrants and their belief that immigrants should be safe from governmental action in houses of worship. The Alliance of Baptists has also funded ministry and congregational partners who work closely with immigrant populations to assist them in providing food, legal aid, and other social services.

102.    The Alliance of Baptists has a demonstrated commitment—rooted in its faith and religious practice—to social justice and healing, including with respect to race, immigration, and refugees. In 1990, for example, the Alliance of Baptists offered the first public apology from any Baptist organization in the South for the sins of slavery.

**Metropolitan Community Churches**

103.    Plaintiff Metropolitan Community Churches ("MCC") was founded by Rev. Troy Perry in 1968 in Los Angeles. It is a Christian denomination with approximately 90 member churches in the United States.

104.    Since the start, MCC has had a particular focus on welcoming LGBTQ+ individuals, and many of its members and clergy identify as LGBTQ+. It was the first religious organization to bless same-sex marriages beginning in 1969.

105.    One of MCC's core religious beliefs is that love is the greatest moral value, and resisting exclusion is a primary focus of MCC's ministry. MCC believes that everyone is included in the family of God and that all parts of people's being are welcomed at God's table. Indeed, while the structure of worship is generally not prescribed, all member churches are required to use inclusive language in their services and to maintain an "open table," that is, to welcome all comers to communion, regardless of their religious tradition. MCC has always been and will continue to be welcoming towards immigrants, without regard to immigration status.

106.    MCC's members believe that they are required to make a "house of prayer for all the peoples," as God commands in Isaiah 56:7. Communal worship in a welcoming and inclusive space is central to their faith.

107.    MCC's members further believe, in accordance with Matthew 25:36-40, that when they care for those at the margins—the poor, the sick, the stranger, the prisoner—they serve God. Accordingly, they practice their faith through social justice ministries, including those that serve immigrant communities. MCC believes in the "priesthood of all believers," meaning that every single person is gifted and called by God to serve. Members become involved in the church's ministry as part of their own spiritual growth.

### Defendants' Policy Burdens Plaintiffs' Religious Exercise and Expressive Association

108.    Defendants' rescission of the sensitive locations policy and adoption of the 2025 Policy has substantially harmed and continues to harm the religious exercise and freedom of association of Plaintiffs and their members. Plaintiffs, whose religious beliefs mandate that they

welcome immigrants without regard to immigration status, now face the risk of immigration enforcement actions at or near their places of worship—and some members have already had this happen.

**New England Synod, ELCA**

109.    Congregants across the New England Synod are aware that the administration has changed the rules that once limited immigration enforcement at churches. Congregations are educating themselves and spending time, energy, and money that would otherwise be spent on religious activities to designate "public" and "private" spaces and prepare themselves and others on how to interact with ICE officers if they show up during worship.

110.    Following the administration's change in policy, the Synod has seen a decrease in attendance at some of its churches, including in East Boston. The minister there also had to tell some congregants not to participate in weekly public prayer vigils out of concern that ICE could use the events to detain members.

111.    Decreases in attendance have a ripple effect across the Synod's congregations, impacting those that cannot attend but also those that do attend. Those prevented from attending due to the new policy are robbed of the opportunity to fully experience fellowship with God and the other members of the congregation. The drop in attendance also has a financial impact on the congregations and on the Synod itself.

112.    The Synod's social ministries have seen decreased attendance as well. One member church in Connecticut operates a food pantry as part of their religious mission. It has seen a steady and sustained reduction in the number of families who come to their Sunday meal program, as people in need are now too afraid to come to the church even for food and sustenance.

113.    Operating food pantries is an expression of Synod members' Lutheran Christian faith, as much as praying or gathering on Sundays. The act of feeding the hungry is a direct response to Jesus's teachings, and caring for and feeding our neighbors is part of the process of directly serving Jesus.

114.    For those who stay home as well as those who come to church to attend worship or to provide or receive vital services, Defendants' change in policy has created deep fear and anxiety. It has caused congregations to wonder if outreach ministries to their community, and loving and serving their neighbors in need, puts them on the radar for ICE enforcement.

**Greater Milwaukee Synod, ELCA**

115.    The Greater Milwaukee Synod has long been active on immigration issues and works with immigration attorneys to make sure people understand their rights by holding workshops and providing informational "know your rights" cards and other materials. Congregations within the Synod are aware of the change in policy and the removal of former limits on immigration enforcement at churches and other religious spaces.

116.    The fear engendered by the new policy has caused significant drops in church attendance, with one of the Synod's churches noting a staggering 50 percent drop in attendance.

117.    At Ascension Lutheran Church, for example, following the arrest of a congregation member by ICE in late May, some families were too frightened to attend church service the next Sunday. When the church held a prayer vigil in support of its arrested member, it had to advise Latino members of the congregation not to attend because of fear that ICE might show up. As a result, many members were unable to come together in communal prayer and worship both at regular Sunday service and at the vigil. And even those who were able to attend were denied the

chance to participate in worship and prayer with all of their co-congregants—and, in particular, with the most vulnerable of their co-congregants—as their religious beliefs compel them to do.

118.    Defendants' new policy has affected other aspects of the Synod's religious mission. Many Synod churches run food pantries to fulfill their spiritual obligation to feed the hungry and care for those in need. Yet fear of ICE raids at these pantries has driven down the number of people who come to receive food, directly impairing the ability of Synod members to carry out this important group expression of their faith.

119.    The policy change has even affected how Synod members can gather for baptisms, one of the most central rites of the Christian faith. Before the change, baptisms would happen at a publicly announced service with the community present. Synod members believe in the power and religious significance of having the community in attendance in order to witness and support a child's entrance into the religion. Now, following Defendants' change in policy and the concomitant increase in enforcement at churches, some families have concluded that the risk is too great and have requested private baptisms instead. Others have had baptisms in churches but have had to do so secretly, without the opportunity to celebrate and worship with their full faith community.

120.    Even where congregants and clergy can come to worship services, the fear of immigration enforcement at church has and will continue to have a chilling effect on their expressive association and religious worship. And it puts Synod members to an impossible choice, where to honor their deeply held beliefs in welcoming the stranger and opening their doors to all who would come to worship means violating their equally deeply held beliefs in caring for and ensuring the protection of the vulnerable.

**Southwest California Synod, ELCA**

121.    As a result of the change in policy, the Southwest California Synod's congregations have seen declines in attendance at Sunday worship services, as well as declines in participation at social service ministries. Congregations have dedicated time and resources to protect members from immigration enforcement, including by organizing volunteers to patrol the church perimeter and screen visitors, locking gates and entrances, moving previously outdoor ministries inside, and training congregations on what to do in case of an immigration raid. Fear of and preparation for an immigration enforcement action has substantially chilled congregations' religious expression and disrupted their religious practice.

122.    One congregation with significant immigrant membership from the Middle East, including from Iran, Lebanon, and Palestine, took on non-budgeted construction to seal and fortify a private space in the event that parishioners need protection from immigration enforcement.

123.    Another congregation offers, as part of its ministry, a monthly diaper pantry that provides free diapers to families and primarily serves immigrants. Prior to the rescission of the sensitive locations policy, the program was run in the parking lot, but the change in policy has forced the church to change its distribution protocols. Now, the pantry has moved indoors, and volunteers wear identifying vests that read "safe" to signal that they are a part of the program. Despite these measures, attendance has dropped precipitously, from about 300 families to around 100. Not only has the church's ability to conduct its ministry in the community been seriously impacted, babies and children in the community are losing access to a valuable resource.

124.    Another church is situated close to an ICE headquarters, causing members to fear immigration enforcement at the church. The congregation has had to keep the exterior doors and gates locked to limit access to the building and programs. Locking doors and limiting access to the

church goes against their religious obligation to welcome the stranger and serve their neighbors, but they have to take these measures to protect their congregants.

125.   Another congregation situated in a neighborhood that experienced several ICE sweeps had to cancel its Vacation Bible School program because of the threat of an ICE raid. This program often serves 100 children aged five to twelve with religious education, social skills, and lunch programs. Both immigrant and U.S. citizen parents were not able to provide their children with religious education and formation because of the rescission of the sensitive locations policy.

126.   Another migrant-serving congregation has seen an 80% decline in church attendance and a 40% decline in youth group attendance. Youth groups provide spiritual and social development for the congregation's young people; the rescission of the sensitive locations policy has deprived them of this community and opportunity for faith formation.

127.   In Synod congregations, volunteers have been taken out of education programs or feeding programs to serve as observers and guards on church property. Hours that could be spent on Christian education are now being spent training congregants on what to do if ICE interrupts a worship service or Sunday school. Churches that do not perceive themselves to be at risk of an immigration raid are sending resources to support impacted congregations.

**Southwestern Texas Synod, ELCA**

128.   The unique geography of the Southwestern Texas Synod joins it with individuals and families fleeing horrible circumstances in their home countries to seek asylum and a new life in the United States. Part of its ministry is to offer welcome, safety, and belonging to their migrant neighbors on their journey, through direct service, education, and advocacy.

129.   The Southwestern Texas Synod has been deeply impacted by the adoption of the 2025 Policy. Pastors have seen diminished attendance at worship services, ministries, and church-

sponsored events. Daycare providers in churches focus on what they will do if ICE shows up on church grounds rather than on the joy of teaching Jesus's message to children. Members of the congregations are distracted from their worship by anxieties and fears that they or their neighbors are at risk of being arrested or deported. Food pantries operated by members of the Synod are serving fewer people as compared to 2024 because people feel vulnerable waiting in line outside for food.

130.    Many congregations within the Synod host Vacation Bible Schools. Of those, three that serve predominantly Hispanic communities used to each have, on average, 20 to 25 children in attendance. This year was different. One of those congregations welcomed only four children. Another had ten, and the third, just nine. All three of these congregations have reported that this is not due to lack of interest or poor outreach—the diminished attendance is because families are now afraid. They are unwilling to step foot in a church, worried that ICE might show up. And as a result, activities that were once joyful, hopeful, and sacred opportunities for these churches to nurture the next generation are now marked by hesitation and anxiety.

131.    As part of their efforts to help and welcome the immigrant community, churches within the Synod hold "Know Your Rights" presentations. One church, Iglesia Luterana San Pablo, planned such a presentation for its Spanish-speaking church community in February of 2025. The church had hosted similar events before, and always held them at the church following a worship service. This time, however, the lay leader held the presentation at her house, knowing that the church was no longer a safe space. The pastor spent the evening constantly checking the windows, making sure the curtains were closed, and felt afraid every time the doorbell rang.

132.    In 2019, the Synod announced a new ministry, where the Synod would focus on ministering to migrants along the U.S.-Mexico border. From the inception of that ministry up until

the adoption of the 2025 Policy, the Synod preached, advertised, and fundraised extensively for this ministry. Since the 2025 Policy was implemented, however, the Synod has stopped these activities. It no longer preaches about it, reference to the ministry was removed from the front page of its website, and there is no longer any active fundraising, for fear of making the Synod a target of immigration enforcement efforts.

**Sierra Pacific Synod, ELCA**

133.    As a result of the new policy, the number of people attending church services at congregations within the Sierra Pacific Synod has declined. Congregants are now afraid to come because of visible and increased ICE activity near churches. ICE used the parking lot at one church as a base for carrying out enforcement activity, parking several large unmarked SUVs in the lot while agents donned weapons and law enforcement gear.

134.    The experience of Iglesia Luterana Santa Maria Peregrina, a member congregation located in Stockton, California, exemplifies the harms suffered by Sierra Pacific churches. Santa Maria Peregrina serves a predominantly Spanish-speaking community and includes undocumented members in its congregation. Attendance at the church dropped after the sensitive locations policy was changed and has remained depressed and unsteady ever since.

135.    Congregants at other Sierra Pacific churches have expressed their fear of coming to worship given the possibility of being detained by ICE while at church. Attendance has further suffered because of the fear many mixed-status families have if one of their breadwinners is deported. That in turn has a direct impact on the ability of the churches and other worshipping communities across the Synod to carry out their outreach work and grow their congregations.

136.    Attendance at church-run activities has also declined due to fears of the new policy. One church has had to stop holding its English-language classes entirely after attendance

fell from 14 students to just two. Since the rescission of the sensitive locations policy, another ministry has seen a consistent drop in the number of customers and vendors coming each week to a flea market they sponsor as a way to provide low-income vendors a means to support their families. Since that change, participation is down roughly one third, meaning 40-50 fewer vendors showing up.

137.    Defendants' changed policy has put significant pressure on congregations to abandon their religiously rooted commitment to welcoming all to worship services. One congregation asked their pastor to lock the church doors on Sunday for fear of governmental authorities entering the church. Santa Maria Peregrina, which used to leave its doors open during worship as a message of welcome, has had to begin closing them to reduce the risk of immigration enforcement. Others have had to prepare for a potential encounter with immigration enforcement, including adding signage to designate certain areas as "non-public."

**San Francisco Friends Meeting**

138.    For Plaintiff San Francisco Friends Meeting, the threat of immigration enforcement action at its meeting house has interfered with members' and attenders' ability to welcome all comers to communal worship and to encourage a diversity of worshippers, core aspects of their faith.

139.    Members and attenders have, for example, discussed whether to lock the doors during worship, or to ask those arriving their purpose in doing so, measures that San Francisco Friends Meeting has never taken because closing off the meeting or interrogating attendees would interfere with the Quaker religious commitment to communal worship.

140.    At the same time, knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter with an armed law-enforcement officer would violate Quaker beliefs in peace and nonviolence.

141.    The present threat of immigration enforcement activity also makes it more difficult for members and attenders to engage in waiting worship and Spirit-led listening, which are at the core of Quaker worship. It likewise impedes their ability to carry out their religious and spiritual practice of community ministry in the meeting house.

142.    Quakers have held a religious commitment against violence for hundreds of years. For many Quakers, the presence of a weapon in a Quaker meeting would be absolutely unacceptable.

143.    The presence of armed immigration officers at meeting houses—which the new policy allows—would thus significantly hamper Plaintiffs' ability to exercise their faith. Importantly, even the *threat* of armed government agents at meeting houses—which has existed since the moment DHS announced its new policy—does the same.

**Pacific Yearly Meeting**

144.    Immigration enforcement activities have been carried out in proximity to some of Pacific Yearly Meeting's monthly meetings, including just a block away from one monthly meeting in July 2025.

145.    Not surprisingly, people are afraid to come to weekly worship. At least one family felt unsafe attending the Meeting's annual session this year, which took place in July 2025, and declined to attend.

146.    People are likewise afraid to attend events sponsored by monthly meetings about topics like social action, learning to be bystanders, or any other event in support of immigrants,

documented or undocumented. These activities are part of Pacific Yearly Meeting members' religious practice and exercise.

147.    The threat of immigration enforcement near or inside a Quaker meeting house or any place where a meeting for worship is occurring causes significant harm, including immediate and lasting disruption to Pacific Yearly Meeting members' ability to worship.

**North Pacific Yearly Meeting**

148.    DHS's decision to revoke its sensitive locations policy has put North Pacific Yearly Meeting and its Monthly Meetings under threat of immigration enforcement. As a result, members are reluctant to encourage immigrants to attend worship. Both immigrant and non-immigrant attenders who are worried about DHS's new policy may simply not show up in person for worship services if there is a chance that immigration enforcement actions could happen there.

149.    Some of North Pacific Yearly Meeting's members have virtual attendance options, but some do not. And even when such an option is available, it does not facilitate complete participation in Quaker worship. Some Friends find it is essentially impossible to facilitate a spiritual connection online, as opposed to through in-person worship.

150.    Armed law enforcement showing up in worship rooms or at meeting houses would be massively disruptive to the ability of members to worship. Because Quakers avoid and abhor physical violence, bringing weapons into their places of worship would be an assault on their faith.

**American Baptist Churches USA**

151.    American Baptists openly welcome immigrants and refugees to their services and ministries. American Baptists boast of being one of the most ethnically diverse congregations, including Hispanic congregations (e.g., Puerto Rican, Mexican, Dominican, Central and South

American), Haitian congregations, and African congregations (e.g., Somalian, Congolese), as well as congregations made up of refugees from Burma (e.g., Chin, Kachin, Karen).

152.    While American Baptist Churches USA congregations vary in their experiences based on geography and demographics, churches with significant immigrant populations, particularly those serving undocumented or mixed-status families, have reported increased fear and anxiety among members. Even congregants who have legal status in the United States worry that ICE may enter their church and arrest indiscriminately. Churches in the western United States have reported diminished attendance at worship services, Bible studies, and community programs out of concern for potential encounters with immigration enforcement while taking part in those activities.

153.    Communal worship and fellowship are fundamental to the American Baptists' faith. Many member churches host Bible studies, which are an essential part of spiritual growth for American Baptists, as well as a fellowship hour after the worship service, where congregants can gather as a community. Churches also offer Sunday School to children during the worship services, which forms the basis for the next generation's spiritual formation. The ability of American Baptists to come together for worship and fellowship is significantly burdened when members of the congregations stay home, depriving them and their fellow congregants of their religious community.

154.    Earlier this summer, a member church in New York experienced an incursion by ICE onto their property. This church is heavily involved in resettling refugees who arrive in the United States. Four individuals—one wearing a t-shirt identifying him as an agent of ICE, one wearing a t-shirt labeled "FBI," and two others in plain clothes—came through the privacy gate

into the parsonage of the church property. They indicated that they were looking for someone. The pastor told these individuals that they needed a warrant.

**Alliance of Baptists**

155.    The rescission of the 2025 Policy is substantially burdening the Alliance of Baptists' religious exercise and their ability to come together to worship.

156.    Member congregations and pastors have had to change the way that they act on their religious mandate. Pastors have reported not feeling comfortable preaching freely about their stance on immigration and have removed signage from church windows indicating that they are a place of refuge for undocumented immigrants for fear of becoming a target for immigration enforcement. Churches that declared themselves sanctuary churches under the previous policy are no longer publicizing themselves as such.

157.    Multiple congregations have revisited their security protocols and begun locking church doors during services. Locking the church doors and monitoring who is coming and going are antithetical to the Alliance of Baptists' religious teachings.

**Metropolitan Community Churches**

158.    Many MCC member churches count immigrants, both with legal status and without, among their congregations. The threat of immigration enforcement at worship services inhibits churches' ability to create a safe and inclusive house of prayer. Leadership, clergy, and congregants have expressed anxiety and fear about the possibility of enforcement at a member church.

159.    For example, an MCC member church in California, which has a substantial number of immigrant attendees and offers worship services in Spanish, has seen declines in attendance by immigrant members who have expressed fear of the church being the target of an immigration raid.

160.   The church has been forced to take steps to protect congregants in case of such a raid, including closing off entrances that were left open prior to the rescission, marking previously public areas as private, and dedicating staff and congregation time and resources to developing and training on a plan in the event that immigration authorities enter the church. During Spanish-language services, the church has taken to locking the doors and having volunteers from the congregation screen anyone coming in, only permitting entry to those present for the worship service. The church has been forced to choose between its religious mandate to welcome all comers and its obligation to protect its congregation. Congregants' communal worship experience is diminished by the loss of their co-congregants' presence.

161.   An immigration enforcement action at an MCC member church would seriously harm MCC, its congregants, and community members to whom the church ministers. It would desecrate the sacred, welcoming space and further prevent congregants from coming together in communal worship.

## CLAIMS FOR RELIEF

## COUNT I

### *Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, et seq.*

162.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

163.   RFRA provides that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

164.    Anyone "whose religious exercise has been burdened in violation" of RFRA may raise a RFRA claim and "obtain appropriate relief" against the government. 42 U.S.C. § 2000bb-1(c).

165.    The 2025 Policy frees Defendants and their agents to conduct enforcement operations—including arrests, investigations, interviews, and surveillance—at and near houses of worship and religious ceremonies.

166.    Permitting immigration enforcement operations at and near houses of worship, including those in which Plaintiffs practice, deters people from attending religious services, even if they are lawful permanent residents or citizens.

167.    The 2025 Policy substantially burdens Plaintiffs' free exercise of religion by reducing the number and diversity of worshippers and interfering with their ability to practice communally, as their religious beliefs call them to do.

168.    The 2025 Policy also substantially burdens Plaintiffs' free exercise of religion by rendering Plaintiffs unable to encourage all to join without contradicting their faith.

169.    The 2025 Policy puts Plaintiffs to an impossible choice: either violate their core religious beliefs by failing to welcome all to worship or violate their core religious beliefs by placing others in harm's way.

170.    The 2025 Policy is not the least restrictive means of furthering the government's legitimate interests, including because the government operated for decades, and across multiple administrations, under its previous policy of providing appropriate protections for sensitive locations.

## COUNT II

### *First Amendment—Freedom of Expressive Association*

171.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

172.    The First Amendment to the U.S. Constitution safeguards the freedom of expressive association: the right to associate with others for the purpose of engaging in activities protected by the First Amendment, including the exercise of religion.

173.    Government actions that directly abridge freedom of expressive association, as well as those that chill the exercise of that right, are subject to strict scrutiny. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010).

174.    Plaintiffs and their congregants engage in protected expressive association when they gather for communal religious worship and when they conduct social service ministries, activities that are core aspects of their religious exercise.

175.    The 2025 Policy toward sensitive locations adopted by Defendants burdens and chills the expressive association rights of Plaintiffs and their congregants and is therefore subject to strict scrutiny.

176.    Defendants cannot prevail under that standard, including because for more than three decades they have deployed less restrictive means with respect to enforcement in or near houses of worship and cannot articulate a reason why they are now insufficient.

## COUNT III

### *Violation of the Administrative Procedure Act—§ 706(2)(A)*
### *Arbitrary and Capricious*

177.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

178.    Under the APA, a court shall "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

179.    The 2025 Policy is a final agency action subject to review under the APA because it is "the consummation of the agency's decisionmaking process" and it determines "rights [and] obligations" and creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc*., 578 U.S. 590, 599-600 (2016) (finding final agency action can include the denial or revocation of a safe harbor).

180.    Since at least 1993, federal immigration authorities have adopted a consistent rule restricting their agents' authority to carry out enforcement operations in and around sensitive locations.

181.    Under the APA, agencies cannot depart from prior policies without explaining their reasons for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies must, for example, "examine the relevant data and articulate a satisfactory explanation" for their choice. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). And they must specifically consider the reliance interests of those who may be impacted by a change in their policies. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30-31 (2020).

182.    The 2025 Policy is arbitrary and capricious in numerous respects, including because it undoes decades of prior agency policy without adequate reasoning, it fails to consider alternative approaches, and it leaves unaddressed decades of substantial reliance interests held by Plaintiffs and others.

### COUNT IV

***Violation of the Administrative Procedure Act—§ 706(2)(A), (C)***
***Contrary to Law and In Excess of Statutory Limitation***

183.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

184.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

185.    As set forth above, the 2025 Policy constitutes final agency action subject to review under the APA.

186.    As set forth above, the 2025 Policy substantially burdens Plaintiffs' religious exercise and fails to satisfy strict scrutiny, in violation of RFRA.

187.    Because the 2025 Policy is barred by RFRA, it is both "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations" under the APA, 5 U.S.C. § 706(2)(A), (C).

## COUNT V

### *Violation of the Administrative Procedure Act—§ 706(2)(B)*
### *Contrary to Constitutional Right*

188.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

189.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

190.    As set forth above, the 2025 Policy burdens and chills the First Amendment expressive-association rights of Plaintiffs and their congregants and is subject to strict scrutiny.

191.    As set forth above, the 2025 Policy fails strict scrutiny, including because Defendants cannot show it is the least restrictive means of advancing their asserted interest.

192.    Because the 2025 Policy is contrary to the First Amendment, it is unlawful under § 706(2)(B) and must be set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.    Declare the 2025 Policy unconstitutional and otherwise unlawful;

b.    Vacate and set aside the 2025 Policy;

c.    Preliminarily set aside and stay the 2025 Policy under 5 U.S.C. § 705;

d.    Preliminarily and permanently enjoin Defendants, including DHS's constituent subagencies, from implementing, enforcing, acting according to, or reissuing under another name the 2025 Policy;

e.    Preliminarily and permanently enjoin Defendants, including DHS's constituent subagencies, from carrying out immigration enforcement operations at or near houses of worship absent a judicial warrant or genuinely exigent circumstances;

f.    Award Plaintiffs costs of suit, attorneys' fees, and expenses to the greatest extent authorized by all applicable laws; and

g.    Issue such other relief as the Court deems proper.


July 28, 2025                    Respectfully submitted,

                                /s/
                                Mark B. Samburg (MA Bar No. 680099)
                                Kevin E. Friedl*
                                Sarah Goetz*
                                Andrew Bookbinder*
                                J. Sterling Moore*
                                Audrey Wiggins*
                                DEMOCRACY FORWARD FOUNDATION
                                P.O. Box 34553
                                Washington, DC 20043
                                Phone: (202) 448-9090
                                Fax: (202) 796-4426
                                msamburg@democracyforward.org
                                kfriedl@democracyforward.org
                                sgoetz@democracyforward.org
                                abookbinder@democracyforward.org
                                smoore@democracyforward.org
                                awiggins@democracyforward.org

Ryan Downer*
Madeleine Gates*
Melissa Colon*
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND
    URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org
melissa_colon@washlaw.org

Richard J. Leveridge*
Sonia W. Murphy*
Sarah Sraders*
Brandon A. Levey*
Samone Ijoma*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Sraderss@gilbertlegal.com
Leveyb@gilbertlegal.com
IjomaS@gilbertlegal.com

*Counsel for Plaintiffs*

 * *Seeking admission* pro hac vice