# EXHIBIT 9



**United States Government Accountability Office**

Report to Congressional Requesters

**July 2021**

# IMMIGRATION ENFORCEMENT

## Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations



A Century of Non-Partisan Fact-Based Work

# GAO@100 Highlights

Highlights of GAO-21-487, a report to congressional requesters

**July 2021**

# IMMIGRATION ENFORCEMENT

## Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations

## Why GAO Did This Study

In recent years, some U.S. citizens have claimed that they were mistakenly detained or removed by ICE and held by CBP on administrative immigration charges. Such charges are based on civil violations of U.S. immigration law, but these charges are not applicable to U.S. citizens.

GAO was asked to review issues related to U.S. citizens detained by ICE or held by CBP on administrative immigration charges. This report examines (1) the extent to which ICE and CBP have developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers and agents encounter; (2) ICE and CBP data on U.S. citizens detained by ICE or held by CBP on administrative immigration charges; and (3) the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for detainers. GAO analyzed DHS documents and record-level enforcement data, and interviewed DHS officials at headquarters and in the field.

## What GAO Recommends

GAO recommends that ICE (1) update its training materials to reflect ICE policies regarding potential U.S. citizens, and (2) systematically collect and maintain electronic data of its encounters with individuals for whom there is evidence of potential U.S. citizenship. DHS concurred with the recommendations.

View GAO-21-487. For more information, contact Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov.

## What GAO Found

Department of Homeland Security's (DHS) U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have policies and procedures for investigating citizenship, but some ICE guidance is inconsistent. Specifically, ICE policy requires officers to interview individuals claiming U.S. citizenship in the presence of, or in consultation with, a supervisor, but its training materials direct officers to end questioning if the officer believes the individual and the evidence suggests the individual is a U.S. citizen—without consulting a supervisor. By making its training materials consistent with ICE policy, ICE would have more assurance that all encounters with potential U.S. citizens receive appropriate supervisory review.

Further, while ICE policy requires officers to document citizenship investigations in ICE data systems, it does not require officers to update the citizenship field after identifying evidence that an individual may be a U.S. citizen. As a result, ICE does not know the extent to which its officers are taking enforcement actions against individuals who could be U.S. citizens. By systematically collecting and maintaining electronic data, ICE would have better insight into its officers' enforcement of administrative immigration law.

Available data indicate ICE and CBP took enforcement actions against some U.S. citizens. For example, available data indicate that ICE arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020).



U.S. Immigration and Customs Enforcement (ICE) Enforcement Actions Against Potential U.S. Citizens from Fiscal Years 2015 through 2020 Quarter 2 (March 2020)

Source: GAO analysis of ICE data. | GAO-21-487

ICE has policies and procedures for investigating citizenship of individuals for detainers. Detainers are notices from ICE to other law enforcement agencies that articulate probable cause for removability. They also request for such agencies to inform DHS of a removable individual's pending release date and to maintain custody for up to 48 hours to allow DHS to assume custody. ICE officers are, to the extent feasible, to interview individuals in the custody of another law enforcement agency to aid in assessing the individuals' potential citizenship prior to issuing detainers. Available ICE data indicate ICE issued detainers for at least 895 potential U.S. citizens from fiscal year 2015 through the second quarter of 2020 and cancelled about 74 percent of those detainers.

**United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 6 |
| | ICE and CBP Have Policies and Procedures for Investigating Citizenship, but Some ICE Guidance Is Inconsistent | 11 |
| | Available Data Indicate ICE and CBP Took Enforcement Actions Against Some U.S. Citizens | 18 |
| | ICE Has Policies and Procedures for Investigating Citizenship for Detainers and Issued Detainers for a Small Number of Potential U.S. Citizens | 36 |
| | Conclusions | 42 |
| | Recommendations for Executive Action | 43 |
| | Agency Comments and Our Evaluation | 43 |
| Appendix I | Objectives, Scope, and Methodology | 46 |
| Appendix II | Department of Homeland Security (DHS) Complaint Data | 54 |
| Appendix III | Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens | 60 |
| Appendix IV | Comments from the Department of Homeland Security | 83 |
| Appendix V | GAO Contact and Staff Acknowledgments | 86 |

Tables

| Table 1: Selected Department of Homeland Security (DHS) Components' Roles in Immigration Enforcement | 9 |
|---|---|
| Table 2: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020) | 22 |

Table 3: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    23

Table 4: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from ICE Detention Facilities from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    24

Table 5: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations Removals (ERO) of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    24

Table 6: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    33

Table 7: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operation (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    39

Table 8: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    41

Table 9: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Cancellation Reason from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    42

Table 10: U.S. Department of Homeland Security (DHS) Office of the Inspector General (OIG) Number of Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    55

Table 11: U.S. Department of Homeland Security (DHS) Office of the Inspector General (OIG) Complaints Received

Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    56

Table 12: U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) Number of Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    57

Table 13: U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    58

Table 14: U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) Records Initiated from Media Reports Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    59

Table 15: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    61

Table 16: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    62

Table 17: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Release Reason from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    64

Table 18: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    64

Table 19: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of

Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Release Reason from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    66

Table 20: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    66

Table 21: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Case Status from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    68

Table 22: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    69

Table 23: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Detention Facility Type from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    71

Table 24: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    73

Table 25: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    74

Table 26: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    74

Table 27: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Field Office and Preclearance Operations Locations from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    75

Table 28: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for

U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                                        76

Table 29: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                        77

Table 30: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                                  77

Table 31: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Field Office and Preclearance Operations Locations from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                                  78

Table 32: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Time in Custody from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                        79

Table 33: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                                  79

Table 34: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                        80

Table 35: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                        80

Table 36: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Border Patrol Sector from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                        81

Table 37: U.S. Border Patrol (Border Patrol) Arrests by Time in Custody from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                                                                  82

Figures

Figure 1: U.S. Immigration and Customs Enforcement (ICE) Procedures for Investigating Potential U.S. Citizenship of Individuals Officers Encounter                                                        12

Figure 2: U.S. Customs and Border Protection (CBP) Procedures
for Investigating the Citizenship of Individuals Officers
and Agents Encounter                                                    16

Figure 3: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Arrests,
Detentions, Releases, and Removals of Individuals for
Whom ERO Data Indicate Potential U.S. Citizenship from
Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                    19

Figure 4: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Arrests,
Detentions, Releases, and Removals of Individuals for
Whom ERO Data Indicate Potential U.S. Citizenship by
Gender from Fiscal Year 2015 through 2020 Quarter 2
(March 2020)                                                            20

Figure 5: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Arrests,
Detentions, Releases, and Removals of Individuals for
Whom ERO Data Indicate Potential U.S. Citizenship by
Age Group from Fiscal Year 2015 through 2020 Quarter
2 (March 2020)                                                          21

Figure 6: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)                                     26

Figure 7: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection by Gender from Fiscal
Year 2015 through 2020 Quarter 2 (March 2020)                           27

Figure 8: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection by Age from Fiscal
Year 2015 through 2020 Quarter 2 (March 2020)                           28

Figure 9: U.S. Customs and Border Protection Office of Field
Operations (OFO) Enforcement Actions Processed for
U.S. Citizens from Fiscal Year 2015 through 2020
Quarter 2 (March 2020)                                                  29

Figure 10: U.S. Customs and Border Protection Office of Field
Operations (OFO) Enforcement Actions Processed for
U.S. Citizens by Gender from Fiscal Year 2015 through
2020 Quarter 2 (March 2020)                                             30

Figure 11: U.S. Customs and Border Protection Office of
Field Operations (OFO) Enforcement Actions Processed for

U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    31

Figure 12: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    32

Figure 13: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    34

Figure 14: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    35

Figure 15: U.S. Immigration and Customs Enforcement (ICE) Procedures for Investigating Potential U.S. Citizenship of Individuals Prior to or After Issuing a Detainer    38

Figure 16: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    40

Figure 17: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location of Detention from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    63

Figure 18: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location of Detention from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    65

Figure 19: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location of Removal from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    67

Figure 20: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    70

Figure 21: Citizenship of Individuals Identified in Immigration Status Checks by U.S. Immigration and Customs

Enforcement (ICE) from Fiscal Year 2015 through 2020
Quarter 2 (March 2020)                                                72

**Abbreviations**

| | |
|---|---|
| Border Patrol | U.S. Border Patrol |
| CBP | U.S. Customs and Border Protection |
| CRCL | Office for Civil Rights and Civil Liberties |
| DHS | Department of Homeland Security |
| ERO | Enforcement and Removal Operations |
| ICE | U.S. Immigration and Customs Enforcement |
| OFO | Office of Field Operations |
| OIG | Office of Inspector General |
| OPLA | Office of the Principal Legal Advisor |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**
*A Century of Non-Partisan Fact-Based Work*

**441 G St. N.W.**
**Washington, DC 20548**

July 20, 2021

Congressional Requesters

In recent years, some U.S. citizens have claimed that they were mistakenly subject to immigration detainers,[1] detained, or removed by the Department of Homeland Security's (DHS) U.S. Immigration and Customs Enforcement (ICE) on administrative immigration charges.[2] Additionally, some U.S. citizens have claimed they were held for long periods of time at or between U.S. ports of entry by DHS's U.S. Customs and Border Protection (CBP) and, in some instances, were incorrectly identified as removable foreign nationals, resulting in their transfer to ICE custody pending an immigration court hearing.[3]

ICE has the authority to take enforcement actions, such as issuing detainers for, arresting, detaining, litigating administrative immigration charges against, and removing certain removable foreign nationals.[4] CBP is responsible for enforcing travel requirements at or between official ports of entry where individuals, including U.S. citizens, must present

---

[1]A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agency, which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the individual for up to 48 hours to allow DHS to assume custody.

[2]We use the term "administrative immigration charges" to refer to allegations of removability typically included in a Notice to Appear in immigration court or an expedited removal order. Such allegations are based on civil violations of U.S. immigration law, which would render a charged foreign national statutorily inadmissible or deportable and therefore subject to removal from the United States. See 8 U.S.C. §§ 1182, 1227, 1229, 1229a.

[3]A "foreign national" in this report is synonymous with the term "alien" in the Immigration and Nationality Act, i.e., a person who is not a citizen or national of the United States. See 8 U.S.C. § 1101(a)(3), (a)(22). A foreign national in the United States may be removable on statutory grounds of inadmissibility, Immigration and Nationality Act § 212(a), 8 U.S.C. § 1182(a), if they have no prior lawful admission; or deportability, Immigration and Nationality Act § 237, 8 U.S.C. § 1227, if they were previously lawfully admitted. See 8 U.S.C. § 1229a(e)(2). The lawfulness of a prior admission may be at issue in removal proceedings. See 8 U.S.C. §§ 1182(a)(6)(C)(i) (inadmissibility for having fraudulently obtained admission into the United States), 1227(a)(1)(A) (deportability for having been inadmissible at the time of entry).

[4]6 U.S.C. §§ 251, 252, 452, 542. See also Name Change from the Bureau of Immigration and Customs Enforcement to U.S. Immigration and Customs Enforcement, and the Bureau of Customs and Border Protection to U.S. Customs and Border Protection, 72 Fed. Reg. 20131 (Apr. 23, 2007).

valid travel documents permitting their entry or admission into the country.[5] U.S. citizens, however, are not subject to administrative immigration enforcement and removal processes, which are only applicable to potentially removable foreign nationals.[6]

Ascertaining an individual's potential U.S. citizenship can be challenging given the intricacy of U.S. immigration law, as well as the often complex facts and circumstances related to immigration and citizenship status. An individual's citizenship status may depend on one or more of the following: (1) their place of birth either within or outside the United States; (2) citizenship of their parent(s) at birth or prior to the individual turning 18, depending on the specific scenario; (3) physical presence in the United States of U.S. citizen parent(s) prior to individual's birth; (4) whether the individual has served or is currently serving in the U.S. military; (5) whether the individual seeking naturalized citizenship is in lawful permanent resident status for the requisite period, and meets other criteria; (6) whether the individual's naturalization application is granted, they pass the exam, and are sworn in as a U.S. citizen; and (7) the outcome of any proceedings for revocation of naturalization in federal court, among the many other factors that may bear on an individual's citizenship status. These factors must be assessed against the statutory criteria applicable to the particular situation.[7]

In executing their immigration authorities, ICE and CBP officers and agents are required to investigate claims or indicia (signs or indications) of U.S. citizenship prior to conducting an immigration enforcement action, such as arresting an individual on administrative immigration charges. Sometimes DHS officials are not able to easily verify an individual's citizenship. This may be due to various factors, such as lack of readily available documentation (such as a birth certificate or passport), or the individual is a dual citizen traveling on a foreign passport. Additionally, not

---

[5]6 U.S.C. § 211.

[6]For the purposes of this report, we intend the term "U.S. citizen" to refer to anyone of U.S. nationality, whether U.S. citizen or noncitizen national. For example, those born to non-U.S. citizen parents in a U.S. outlaying possession—American Samoa and Swains Islands—on or after the date of formal acquisition of such possession. According to U.S. immigration law, such noncitizen nationals are not subject to administrative immigration enforcement and removal processes given their U.S. nationality. See 8 U.S.C. §§ 1101(a)(22) (defining "national of the United States"), (a)(29) (definition of "outlying possessions of the United States"), 1408 (situations in which an individual is a U.S. national but not a citizen at birth).

[7]See, generally, 8 U.S.C. ch. 12, subch. III (Nationality and Naturalization).

all individuals who may potentially be U.S. citizens are aware of their citizenship status, and there have been some instances of foreign nationals making false claims to U.S. citizenship in attempts to avoid detention or removal from the United States.

You asked us to review issues related to U.S. citizens detained by ICE or held by CBP on administrative immigration charges. This report discusses (1) the extent to which ICE and CBP have developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers and agents encounter; (2) what ICE and CBP data indicate about the number and characteristics of U.S. citizens detained by ICE or held by CBP on administrative immigration charges in the last 5 fiscal years; and (3) the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for detainers.

To address these objectives, we interviewed DHS officials, including those from DHS's Office of Strategy, Policy, and Plans; Office of Inspector General (OIG); and Office for Civil Rights and Civil Liberties (CRCL). We also interviewed officials from ICE's Enforcement and Removal Operations (ERO) directorate, Homeland Security Investigations directorate, Office of the Principal Legal Advisor (OPLA), Law Enforcement Support Center, and Pacific Enforcement Response Center. Additionally, we interviewed officials from CBP's Office of the Commissioner and Office of Chief Counsel; CBP's Office of Field Operations (OFO) Enforcement Programs Division and Planning, Program Analysis, and Evaluation Directorate; and U.S. Border Patrol's (Border Patrol) Law Enforcement Operations Directorate and Strategic Planning and Analysis Directorate.

Further, we interviewed selected field officials from ICE and CBP in June and July 2020. Specifically, we met with ERO officials from ICE's Buffalo, Los Angeles, and Philadelphia field offices; OFO officials from the Detroit, Laredo, and San Francisco field offices; and Border Patrol officials from the Miami, Rio Grande Valley, San Diego, and Spokane sectors. To select the ERO locations for interviews, we reviewed publicly available ERO data on the number of arrests by field office from fiscal year 2015 through fiscal year 2016 and the number of detainers issued from fiscal year 2015 through February 2017—the most recent data publicly available at the time of our review. To select the OFO locations for interviews, we reviewed publicly available OFO data on the number of inadmissible foreign nationals OFO inspected from fiscal year 2015 through the first quarter of fiscal year 2019—the most recent data publicly

available at the time. To select the Border Patrol locations for interviews, we reviewed available Border Patrol data on the arrests of removable foreign nationals from fiscal year 2015 through fiscal year 2019—the most recent data publicly available at the time.

For all of these selections, we included a range of low, medium, and high enforcement action field offices and sectors, as well as a variety of geographic locations. The information we obtained from our interviews with field officials are not generalizable to all ICE, OFO, or Border Patrol operations. However, they provided us the opportunity to learn more about how ICE and CBP officers and agents implement policies and procedures for investigating the citizenship of individuals they encounter and how they document these investigations.

To address the first objective, we reviewed ICE and CBP policy documents, training materials, processing guides, and other guidance documents in effect from October 2015 through March 2020. We compared ICE and CBP policies and procedures with processes described by officials we interviewed, as well as with DHS, ICE, and CBP data we collected. We compared ICE policies and procedures and training materials to *Standards for Internal Control in the Federal Government* and determined the control activities component of internal control—the actions management establishes to achieve objectives and respond to risks—and the information and communication activities component of internal control—that management should use quality information to achieve objectives—were significant to this objective.[8] We assessed ICE's policy documents and training materials related to investigating, elevating, and documenting claims or indicia of the potential U.S. citizenship of individuals ICE officers encounter. We also assessed the availability and reliability of ICE data for fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020). We took these steps to determine whether the policy documents and training materials were able to help ICE meet its immigration enforcement objectives, respond to risks related to taking enforcement actions against U.S. citizens, and meet DHS's information sharing needs.

To address the second objective, we analyzed record-level ICE data related to arrests, detentions, releases, and removals as well as record-level inspection and arrest data from OFO and Border Patrol. We

---

[8]GAO, *Standards for Internal Control in the Federal Government,* GAO-14-704G (Washington, D.C.: September 2014).

collected data for fiscal year 2015 through the second quarter of fiscal year 2020—the most recent data available at the time of our review. We analyzed the record-level data to describe the numbers and characteristics, including the age and gender, of U.S. citizens ICE, OFO, and Border Patrol arrested, detained, released, or removed. In addition, we analyzed the record-level data to determine the number of arrests, detentions, releases, and removals by ICE field office; admissibility referrals[9] and enforcement actions[10] by OFO field office; and arrests by Border Patrol sector.

To assess the reliability of the ICE, OFO, and Border Patrol data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the officers and agents who use them; and (3) discussed data entry issues and data limitations with the respective officials. We determined that the data were sufficiently reliable for the purposes of reporting a baseline number of arrests, detentions, releases, and removals of potential U.S. citizens by ICE, admissibility referrals and enforcement actions against U.S. citizens by OFO, and arrests of U.S. citizens by Border Patrol.

To address the third objective, we reviewed ICE policy documents, training materials, and other guidance documents in effect from October 2015 through March 2020. We compared ICE's documented policies and procedures with the processes described by ICE officials we interviewed. We also analyzed available record-level ICE data for detainers issued from fiscal year 2015 through the second quarter of fiscal year 2020—the most recent data available at the time of our review—to describe the numbers and characteristics, including the age and gender, of individuals for whom ICE data indicate potential U.S. citizenship and ICE issued a detainer. To assess the reliability of ICE's data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2)

---

[9]OFO officers conduct immigration and customs inspections of every individual presenting themselves for entry into the United States at U.S. ports of entry. If officers cannot admit, or permit entry of, an individual into the country based on the primary inspection, they are to refer the individual to secondary inspection—sometimes known as an admissibility referral—where OFO continues the immigration inspection and investigates any potential issues.

[10]When officers determine individuals are inadmissible to the United States, they may take custody of these individuals to pursue immigration enforcement and removal actions against them, including charging administrative immigration violations; or, if appropriate, they may arrest individuals, including U.S. citizens, in furtherance of criminal investigation and potential prosecution where there is probable cause that they committed a crime.

reviewed existing information about the data and the systems that produced them, such as relevant training materials for the ICE officers who use them; and (3) discussed data entry issues and data limitations with ICE officials. We determined that the ICE data were sufficiently reliable for the purposes of reporting a baseline number of detainers ICE issued for potential U.S. citizens.

For more information about our scope and methodology, see appendix I.

We conducted this performance audit from February 2020 to July 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Pathways to U.S. Citizenship

According to the Citizenship Clause of the Fourteenth Amendment to the United States Constitution, a U.S. citizen is any person who is born or naturalized in, and subject to the jurisdiction of, the United States.[11] The Immigration and Nationality Act describes the various ways in which an individual may obtain U.S. citizenship at birth; through naturalization, whereby U.S. nationality is conferred upon a person after birth, by any means (typically involving application and exam); or acquisition or derivation of citizenship from U.S. citizen parent(s).[12]

Individuals are U.S. citizens at birth either by being born in the United States or through other circumstances involving the citizenship status of one or both of their parents and other factors. For example, the following individuals acquire U.S. citizenship at birth:

- Individuals born in the United States;[13]

---

[11]U.S. CONST. amend. XIV, § 1, cl. 1.

[12]8 U.S.C. §§ 1101(a)(23), 1401-1409, 1421-1459.

[13]8 U.S.C. § 1401(a).

- Individuals born outside of the United States to U.S. citizen parents, one of whom having resided in the United States before the individual's birth;[14]

- Individuals born outside of the United States to one U.S. citizen parent, the other parent being either a noncitizen U.S. national or foreign national, subject to respective statutory criteria;[15] and

- Individuals born in American Samoa or Swains Island with one U.S. citizen parent who was continuously physically present in the United States, American Samoa or Swains Island for one year at any time prior to the individual's birth.[16]

Additionally, individuals who are noncitizens (i.e. foreign nationals) at birth may later obtain U.S. citizenship in various statutorily defined ways. Individuals of foreign nationality may become U.S. citizens through naturalization, which typically involves: (1) approval of a request for classification as an immigrant or qualifying nonimmigrant, (2) obtaining lawful permanent resident status, and (3) meeting continuous physical presence, good moral character, and other applicable eligibility requirements as part of the naturalization application and examination process.[17] Special provisions of the Immigration and Nationality Act also authorize the naturalization of current and recently discharged members of the U.S. Armed Forces.[18] In general, a lawful permanent resident child currently under 18 years old who was born outside of the United States

---

[14] See id. § 1401(c).

[15] Id. at § 1401(d), (g).

[16] Id. at § 1401(e).

[17] See, e.g., 8 U.S.C. §§ 1101(a)(15)(K), (T), (U), 1151-1160, 1181, 1184, 1186a, 1186b, 1251-1260, 1427.

[18] 8 U.S.C. §§ 1439-40, 1443a. Qualifying military service includes active or reserve service in the U.S. Army, Navy, Marine Corps, Air Force, Coast Guard, or service in a National Guard unit. A person who has served honorably in the U.S. Armed Forces for 1 year during peacetime may be eligible to apply for naturalization. Service is considered honorable when the quality of the member's service generally has met the standards of acceptable conduct and performance of duty for military personnel. The Department of Defense determines if a service member meets the qualifying service requirement. In addition, during designated periods of hostilities, such as World War I and World War II and the current global war on terrorism, members of the U.S. Armed Forces who serve honorably in an active duty status, or as members of the Selected Reserve of the Ready Reserve, are eligible to apply for naturalization without meeting any minimum required period of service. The spouse of a member of the U.S. Armed Forces may be eligible for expedited naturalization, and such member's child(ren) may be eligible to naturalize or automatically obtain citizenship. 8 U.S.C. §§ 1430-31.

automatically becomes a U.S. citizen when at least one parent is a U.S. citizen by birth or naturalization, and the child is residing in the United States in the legal and physical custody of the citizen parent.[19] Another scenario in which a child may obtain citizenship after birth is when a citizen parent applies for naturalization on behalf of a child born outside the United States who has not acquired citizenship automatically.[20]

## Federal Agencies' Roles and Responsibilities for Administrative Immigration Enforcement

Within DHS, ICE's ERO and CBP's OFO and Border Patrol, are responsible for identifying and arresting removable foreign nationals.[21] OFO and Border Patrol may transfer removable foreign nationals to ERO, which is also responsible for detaining and removing foreign nationals determined to be in the United States in violation of U.S. immigration law. ICE and CBP are to investigate and verify the citizenship of individuals their agents and officers encounter to ensure DHS appropriately applies U.S. laws related to immigration to foreign nationals—and does not take administrative immigration and removal actions against U.S. citizens.

Additionally, DHS's Office of Inspector General (OIG) and Office for Civil Rights and Civil Liberties (CRCL) receive and investigate complaints made by or on behalf of individuals claiming to be U.S. citizens who have been subject to administrative immigration and removal actions. We provide additional details on the complaints OIG and CRCL receive in appendix II.

---

[19]See 8 U.S.C. § 1431(a). Subsection (a) applies to a child adopted by a U.S. citizen parent if the child satisfies requirements of § 1101(b)(1) regarding adopted children. Id. at § 1431(b). Subsection (a)(3) is satisfied for a lawful permanent resident child in legal and physical custody of a citizen parent who is: (1) stationed and residing abroad as a U.S. government employee, or residing abroad and married to a U.S. government employee stationed abroad; or (2) stationed and residing abroad as a member of the U.S. military, or authorized to accompany and reside abroad with a member of the U.S. military pursuant to the member's official orders and is accompanying and residing abroad with such member in martial union. See id. § 1431(c).

[20]8 U.S.C. § 1433. If the citizen parent has died during the preceding five years, a citizen grandparent or citizen legal guardian may apply for naturalization on behalf of the child. A certificate of citizenship will be issued for the child once all criteria are satisfactorily demonstrated.

[21]ICE's Homeland Security Investigations also conducts worksite enforcement operations, including arresting workers who are not authorized to work in the United States and employers who knowingly hire them, among other law enforcement operations. While Homeland Security Investigations agents are to investigate the citizenship of individuals that they encounter during these operations, officials stated that they generally refer to ERO any individuals that make a claim or have indicia of U.S. citizenship that they cannot immediately ascertain.

Table 1 highlights DHS components' roles in immigration enforcement.

**Table 1: Selected Department of Homeland Security (DHS) Components' Roles in Immigration Enforcement**

| Agency | Role |
|---|---|
| U.S. Immigration and Customs Enforcement (ICE) | ICE's Enforcement and Removal Operations (ERO) conducts civil immigration enforcement actions, which includes administrative arrests, detentions, and removals. |
| | ICE has the authority to take enforcement actions, such as issuing detainers for, arresting, detaining, litigating administrative immigration charges against, and removing certain removable foreign nationals. U.S. citizens are not subject to administrative immigration enforcement and removal processes, which are only applicable to removable foreign nationals. When ERO officers encounter an individual claiming to be a U.S. citizen, or the officers identify indicia of potential citizenship, the officers are to notify and conduct joint citizenship investigations with ICE's Office of the Principal Legal Advisor's Field Locations. The Office of the Principal Legal Advisor is responsible for litigating charges of removability against, and claims of relief or protection from removal made by, foreign nationals whose removal cases are adjudicated by the immigration courts. |
| U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) and U.S. Border Patrol (Border Patrol) | CBP is responsible for conducting immigration and customs inspections at ports of entry and securing the U.S. border between ports of entry. |
| | • OFO officers inspect all individuals seeking entry at ports of entry, and as appropriate, they may arrest, initiate administrative removal proceedings against, order the expedited removal or otherwise permit return of, or enforce existing final removal orders for, removable foreign nationals who arrive at U.S. ports of entry. |
| | • Border Patrol agents interdict, and as appropriate, they may arrest, initiate administrative removal proceedings against, order expedited removal or otherwise permit return of, or enforce existing final removal orders for, removable foreign nationals between U.S. ports of entry and within a reasonable distance (defined as100 air miles inland) from the U.S. international border. |
| | CBP may hold individuals at short-term holding facilities for general processing and to determine the next appropriate course of action, such as continued detention, or release (typically on a conditional basis) pending proceedings, or removal from the United States. CBP's authority to enforce the Immigration and Nationality Act against U.S. citizens is typically limited to enforcing travel controls, such as inspection processes (to include passport checks) at official ports of entry, and stopping vehicles to confirm lawful immigration status or U.S. nationality/citizenship at designated immigration checkpoints close to the border. Otherwise, U.S. citizens are generally not subject to immigration enforcement at or between U.S. ports of entry. CBP officials said OFO and Border Patrol field officials may consult with CBP's Office of Chief Counsel when agents and officers are unable to verify an individual's citizenship. |
| DHS's Office of Inspector General (OIG) and Office for Civil Rights and Civil Liberties (CRCL) | The OIG and CRCL receive and investigate complaints made by or on behalf of U.S. citizens claiming to have been the target of a detainer or detained by ICE or held by CBP on administrative immigration charges, among other types of complaint investigations. |

Source: GAO analysis of DHS information. | GAO-21-487

Investigating claims or indicia of U.S. citizenship can be complex and challenging, according to ICE officials. In conducting such investigations, ICE and CBP officers, agents, and OPLA attorneys may, among other steps, check federal law enforcement databases for biometric and biographical information, interview the individuals and their family

members for relevant information, and collect any relevant documents. Additionally, officers and agents may search DHS's U.S. Citizenship and Immigration Services' and the Department of State's databases for information relevant to citizenship analysis. ICE and CBP officials also said they may contact state or local offices (such as foreign, state, or county vital records offices) to verify relevant information, such as birth, marriage, or death information. ICE and CBP officers and agents are to document encounters with individuals—both U.S. citizens and foreign nationals—in their respective agency data systems and in the individual's paper Alien file (A-file) as appropriate, including individuals' claims to citizenship and the results of subsequent investigations.[22]

By policy, ICE and CBP officers and agents are to consider the specific characteristics of each individual's case to ensure that ICE and CBP do not take administrative immigration and removal actions against U.S. citizens. However, ICE and CBP officials said that the various pathways to U.S. citizenship can sometimes make it difficult to verify whether an individual is a U.S. citizen. For example, ICE and CBP officials stated that they sometimes encounter individuals who are unaware that they have a potential claim to U.S. citizenship, and ICE and CBP officers and agents will initiate investigations into their potential citizenship based on the information they collect during the encounter. Further, ICE and CBP officials stated that some U.S. citizens engage in deception by claiming to be foreign nationals because they believe they can avoid criminal prosecution if they are removed from the United States.

---

[22]The A-file is a paper file that serves as the central record of all of a foreign national's immigration-related applications, petitions, and any other relevant documentation.

# ICE and CBP Have Policies and Procedures for Investigating Citizenship, but Some ICE Guidance Is Inconsistent

## ICE Has a Policy for Investigating Potential U.S. Citizenship, but Its Training Materials Are Inconsistent with Its Policy and It Does Not Systematically Track Encounters

In recognizing the challenges in ascertaining potential U.S. citizenship of individuals its officers encounter, ICE developed its 2015 policy titled *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE*. It states that it is ICE policy to carefully and expeditiously investigate and analyze the potential U.S. citizenship of individuals ICE encounters. The policy provides a list of potential indicia of U.S. citizenship for officers to consider, including:

- information suggesting the individual was born in the United States;

- information suggesting one or more of the individual's parents, grandparents, or foreign-born siblings are U.S. citizens;

- information suggesting the individual was adopted by a U.S. citizen;

- the individual has served in the U.S. Armed Forces; and

- an application for naturalization or a U.S. passport for the individual has been filed and is pending.

Further, the policy provides guidance for officers on the procedures to investigate, elevate, and document claims or indicia of U.S. citizenship, even if individuals do not make claims. Figure 1 describes these procedures.

**Figure 1: U.S. Immigration and Customs Enforcement (ICE) Procedures for Investigating Potential U.S. Citizenship of Individuals Officers Encounter**



Source: GAO analysis of ICE policy.  |  GAO-21-487

[a]Potential indicia of citizenship include but are not limited to: evidence that the individual was born in the United States; information suggesting that one or more of the individual's parents, grandparents, or foreign-born siblings are or were U.S. citizens; and the individual has served in the U.S. Armed Forces.

[b]All interviews with individuals claiming U.S. citizenship or for whom there are indicia of citizenship are to be conducted by an officer in the presence of, or in consultation with, a supervisor.

[c]According to ICE, probative evidence of U.S. citizenship means that the evidence tends to show that the individual may be a U.S. citizen. U.S. citizenship need not be shown by a preponderance of the evidence for ICE to find that there is some probative evidence of U.S. citizenship.

[d]It is not necessary for ICE to wait to release the individual if there is probative evidence of U.S. citizenship. ICE may also release the individual on non-detained removal proceedings to allow it more

time to conclusively resolve the individual's citizenship status. It may do so if it has reasons to believe that the individual is a foreign national in the United States in violation of immigration law.

**Conducting interviews and notifying supervisors.** ICE trains ERO officers on how to conduct interviews while investigating potential U.S. citizenship during academy training. For example, ICE's academy training materials specify that ERO officers are to ask: (1) the country the individual is a citizen or national of; (2) the country the individual's parents are citizens or nationals of; (3) where the individual was born; (4) where the individual's parents were born; (5) whether either of the individual's parents naturalized in the United States; and (6) whether there is any reason to believe that the individual may be a citizen or national of the United States.

However, as of May 2021, ICE's academy training materials contain guidance regarding when its officers are to notify supervisors of encounters with potential U.S. citizens that are inconsistent with its 2015 policy. As shown in Figure 1, ICE's policy requires ERO officers to interview the individual claiming U.S. citizenship or with potential indicia of citizenship in the presence of, or in consultation with, a supervisor. Conversely, ICE's 2020 academy training materials direct ERO officers to terminate the questioning of an individual who makes a claim to U.S. citizenship if the ERO officer believes the individual and the evidence suggests the individual is a U.S. citizen—without consulting a supervisor, as required by the 2015 policy.

Headquarters officials stated that ERO's Training Division is responsible for conducting annual reviews of academy training materials to ensure that they support ERO policy, but acknowledged the guidance in ICE's 2020 training materials is inconsistent with its 2015 policy. *Standards for Internal Control in the Federal Government* states that management should design control activities that provide the right training tools to achieve operational success.[23] By making its training materials regarding encounters with potential U.S. citizens consistent with ICE policy, ICE would have more assurance that all encounters with individuals who claim U.S. citizenship receive appropriate supervisory review.

**Documenting the course of action in agency data systems.** As shown in Figure 1, after ERO and ICE OPLA headquarters provide a decision on the field's recommended course of action following the investigation of an individual's claim or indicia of citizenship, ICE's policy requires ERO

---

[23]GAO-14-704G.

officers and local attorneys to notate the decision in their respective data systems and place a copy of the memorandum and headquarters' custody decision in the individual's A-file. However, ICE's policy does not ensure reliable electronic data on the individuals ICE arrested, detained, or removed but for whom ICE later identified probative evidence of U.S. citizenship. This is because the policy does not require ERO officers to update the citizenship field in the individual's electronic record specifically after identifying probative evidence that an individual may be a U.S. citizen.[24] Rather, ERO officers are instructed (but not required) to include all countries a person claims citizenship to in the narrative comments section, according to ICE officials. As a result, ICE does not know the extent to which its ERO officers are taking enforcement actions against individuals for whom it identifies probative evidence of U.S. citizenship. For example, ICE headquarters officials acknowledged that ERO has arrested, detained, and removed individuals for whom it later identified probative evidence of U.S. citizenship; however, they could not state how often this occurs because ICE does not systematically collect and maintain this data.

According to ICE headquarters officials, ICE does not systematically collect and maintain electronic data on encounters with individuals for whom ICE identifies probative evidence of U.S. citizenship because it is not required to do so by Congress. Additionally, officials stated ICE's process for revising its 2015 policy to specify how officers are to update the record of an individual for whom ICE identifies probative evidence of U.S. citizenship in agency data systems would be an administrative burden for headquarters. However, officials stated that if officers do not update the citizenship field, ICE or CBP officials attempting to investigate the same individual at a later date would not be able to easily recognize ICE's identification of probative evidence of U.S. citizenship in ICE's electronic records because the narrative comments section can be several pages long.[25] Additionally, officials agreed that updating the citizenship field would help headquarters to identify trends and additional

---

[24]According to ICE, probative evidence of U.S. citizenship means that the evidence tends to show that the individual may be a U.S. citizen. U.S. citizenship need not be shown by a preponderance of the evidence for ICE to find that there is some probative evidence of U.S. citizenship.

[25]According to CBP officials, CBP agents and officers may also search and review ICE records when investigating individuals' citizenship claims to support their own enforcement decisions for the individuals that they encounter. As such, CBP risks apprehending U.S. citizens on administrative immigration charges if ICE's citizenship information is inaccurate or incomplete.

training needs for officers related to U.S. citizens, which it currently does not do.

As stated previously, ICE has the authority to take enforcement actions, such as arresting, detaining, and removing certain removable foreign nationals. U.S. citizens, however, are not subject to administrative immigration enforcement and removal processes. Further, *Standards for Internal Control in the Federal Government* state that management should use quality information to make informed decisions and evaluate the entity's performance in achieving key objectives and addressing risks.[26] Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. In doing so, management should identify the information requirements needed to achieve objectives and address risks, and should consider the expectations of both internal and external users. Additionally, these standards state that management should internally and externally communicate the necessary quality information to enable personnel to perform key roles in achieving objectives and address related risks.

By systematically collecting and maintaining electronic data on encounters with individuals for whom ICE identifies probative evidence of U.S. citizenship, ICE would have better insight into its officers' enforcement of administrative immigration law and more assurance that its officers are following ICE policy. ICE would also be able to determine how often it has arrested, detained, and removed individuals for whom it identified probative evidence of U.S. citizenship and identify additional training needs for its officers to ensure they do not take immigration enforcement actions against U.S. citizens in the future. Such data could also help ensure that CBP has the quality information that it needs in order to make admissibility decisions regarding individuals who may be U.S. citizens, if CBP encounters them in the future.

## CBP Has Policies and Procedures for Investigating Citizenship

CBP has policies and procedures for investigating potential U.S. citizenship of the individuals its officers and agents encounter. CBP instructs OFO officers and Border Patrol agents on these procedures at their respective basic training academies. Among other things, CBP provides information on its procedures for how to ascertain citizenship, document claims to U.S. citizenship, and charge foreign nationals with administrative immigration violations, as applicable. For example, during OFO's *Nationality Law* and Border Patrol's *Administrative Law* training

---

[26]GAO-14-704G.

courses, CBP instructs officers and agents about the potential pathways to U.S. citizenship under the Immigration and Nationality Act and how to assess the potential U.S. citizenship of the individuals that they inspect. Figure 2 describes CBP's procedures for investigating the citizenship of individuals its officers and agents encounter.

**Figure 2: U.S. Customs and Border Protection (CBP) Procedures for Investigating the Citizenship of Individuals Officers and Agents Encounter**



**Determine admissibility**

CBP officers and agents interview the individual and review identification documents to ascertain an individual's citizenship and admissibility into the United States.[a]

**Process for arrest**

CBP officers and agents process the individual determined to be potentially removable for arrest and complete required checks in federal electronic databases to verify identity and country of citizenship.[b]

**Complete charging documents**

CBP officers and agents complete charging documents to process the individual for removal, including a sworn statement.[c]

**Unverifiable indicia or claim of U.S. citizenship**

Refer individual's case to an immigration judge for review.

**No indicia or claim of U.S. citizenship**

Charge individual as a foreign national for removal.

Source: GAO analysis of CBP policies and procedures.  |  GAO-21-487

[a]CBP officers and agents may also run database checks to verify an individual's citizenship and admissibility, depending on the circumstances of the encounter. CBP officers and agents are to admit individuals whom they ascertain to be U.S. citizens or otherwise admissible into the United States or release them at any point during processing.

[b]According to CBP officials, CBP officers and agents may also contact other agencies, such as state-level vital statistics, to verify an individual's identity and citizenship.

[c]The sworn statement details an individual's identity, noncitizenship, inadmissibility, and any claims to potential U.S. citizenship.

To begin an inspection, OFO's *Introduction to Passenger Processing* and Border Patrol's *Interview Techniques* training materials instruct officers and agents to directly question the individual about citizenship and examine available identification documents to assess the individual's citizenship and admissibility. OFO and Border Patrol officials stated that the specific questions officers and agents may ask vary depending on the circumstances of the encounter. For example, officers and agents may not ask a foreign national with valid documentation for permanent residence in the United States any additional questions regarding the individual's potential U.S. citizenship because the individual already has a documented legal status. Additionally, OFO and Border Patrol academy training guidance, *Introduction to Passenger Processing* and *Radio Operations* respectively, instruct officers and agents to conduct record checks for the individual in federal electronic databases to search for citizenship information or to verify the information the individual provided.

When officers and agents cannot verify an individual's citizenship and admissibility after an initial evaluation, OFO and Border Patrol field officials said they conduct a more extensive evaluation, which may include further questioning, additional electronic records checks, and coordination with other agencies, such as state vital records agencies to obtain birth records. OFO's *Secondary Passenger Processing* training outlines these procedures for officers. Similarly, Border Patrol academy's 2019 *e3 Processing Training Guide Book* directs agents to conduct biographic and biometric database searches as part of these evaluations.

For individuals they identify as likely removable foreign nationals, including individuals whose claims to U.S. citizenship that CBP cannot verify, OFO and Border Patrol academy training materials direct officers and agents to conduct sworn statements. The sworn statements are to detail an individual's biographic information and document the circumstances of the encounter and evidence of an individual's removability before processing the individual on administrative immigration charges. Officers and agents place these sworn statements in individuals' A-files, which are used as evidence during removal proceedings. The sworn statement is generally the last opportunity for an officer or agent to identify indicia of potential U.S. citizenship or for the individual to make a claim to U.S. citizenship prior to removal proceedings.

OFO's 2019 *Adverse Action Trainee Guide* and Border Patrol's 2019 *e3 Processing Training Guide Book* direct officers and agents to include various elements in the sworn statement, including an individual's identity, noncitizenship, and inadmissibility. Additionally, the guidance directs them to tailor the questions they ask to the circumstances of the individual case to establish these required elements. OFO's 2019 guide specifies that the sworn statements include the following:

- **Identity.** The individual's name, aliases, date and place of birth, and other biographical data associated with the individual.

- **Noncitizenship.** The citizenship, nationality, and residence of the individual, as well as any potential claims to possible U.S. citizenship;

- **Inadmissibility.** The specific facts of the case and suspected grounds of inadmissibility that apply to the case.

In addition, OFO's 2019 guide states that during the sworn statement, officers are to investigate indicia of potential U.S. citizenship derived from the individual's parents by asking questions about the parents' citizenship

and about the individual's and the individual's parents' previous residence in the United States, if applicable.[27] As shown above in figure 2, if officers and agents are unable to verify an individual's citizenship during sworn statement proceedings, they are to send the individual to an immigration judge for review of the removal order.

## Available Data Indicate ICE and CBP Took Enforcement Actions Against Some U.S. Citizens

Available data indicate ICE and CBP took enforcement actions against some U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020). However, the data that ICE and CBP collect and maintain on their encounters with individuals do not allow us or the agencies to determine how many U.S. citizens they detained or held on administrative immigration charges. As stated previously, ICE officers are not required to update the citizenship field when ICE identifies probative evidence that individuals may be U.S. citizens. As a result, there may be additional individuals who could be U.S. citizens that ICE arrested, detained, released, or removed that we were unable to identify in the available data. Additionally, CBP data do not specify whether the enforcement actions taken against U.S. citizens were for administrative immigration charges or other types of charges.

## Available Data Indicate ERO Took Enforcement Actions Against a Small Number of Potential U.S. Citizens

According to available ERO data, ERO arrested, detained, released, and removed a small number of individuals for whom ERO data indicate potential U.S. citizenship from fiscal year 2015 through the second quarter of fiscal year 2020. These enforcement actions represent less than 1 percent of all ERO enforcement actions during this timeframe (see figure 3). ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

---

[27]OFO's guidance also requires that officers document some of the same biographic information on the Form I-213 *Record of Deportable/Inadmissible Alien* that would assist officers to identity indicia of U.S. citizenship, including the individual's date and place of birth, citizenship, address, immigration record, and the names, citizenship, and addresses of the individual's parents.

**Figure 3: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests, Detentions, Releases, and Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Additionally, according to available ERO data, individuals for whom ERO data indicate potential U.S. citizenship and whom ERO arrested, detained, released, and removed were mostly males (see figure 4) and individuals ages 19 to 45 (see figure 5).

**Figure 4: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests, Detentions, Releases, and Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Figure 5: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests, Detentions, Releases, and Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Age Group from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)



Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

## Arrests

According to available ERO arrest data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO made at least 674 arrests of individuals for whom ERO data indicate potential U.S. citizenship (less than 1 percent of all ERO arrests during that period). Additionally, data

indicate ERO made at least 72 arrests of individuals with unknown citizenship during the same period (see table 2).[28]

**Table 2: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 169 | 4 | 119,599 |
| 2016 | 94 | 13 | 109,997 |
| 2017 | 70 | 26 | 143,374 |
| 2018 | 153 | 10 | 158,418 |
| 2019 | 138 | 17 | 142,944 |
| 2020 Q1-2 | 50 | 2 | 66,207 |
| **Total** | **674** | **72** | **740,539** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

**Detentions**

According to available ERO detention data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO booked at least 121 individuals for whom ERO data indicate potential U.S. citizenship into immigration detention facilities (less than 1 percent of all individuals booked into immigration detention facilities during that period). Additionally, data indicate ERO booked at least 148 individuals with unknown citizenship into immigration detention facilities during the same period (see table 3).

[28]Individuals with unknown citizenship include individuals in ERO's data system with a value of "unknown" or who were missing a citizenship value in the fields for citizenship and country of birth, when applicable. We provide the numbers for individuals with unknown citizenship because ICE did not verify whether they are potential U.S. citizens.

**Table 3: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 37 | 31 | 307,274 |
| 2016 | 17 | 19 | 352,846 |
| 2017 | 21 | 28 | 323,542 |
| 2018 | 19 | 29 | 396,400 |
| 2019 | 20 | 30 | 510,804 |
| 2020 Q1-2 | 7 | 11 | 135,818 |
| **Total** | **121** | **148** | **2,026,684** |

Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

According to available ERO detention data, CBP apprehended and transferred to ICE at least 24 of the 121 (approximately 20 percent) individuals for whom ICE data indicate potential U.S. citizenship and whom ERO booked into immigration detention facilities from fiscal year 2015 through the second quarter of fiscal year 2020.

**Releases**

According to available ERO release data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO released at least 46 individuals for whom ERO data indicate potential U.S. citizenship from immigration detention facilities (less than 1 percent of all releases during that period). Additionally, data indicate ERO released at least 59 individuals with unknown citizenship from immigration detention facilities. See table 4.

**Table 4: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from ICE Detention Facilities from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 11 | 9 | 95,246 |
| 2016 | 9 | 7 | 143,154 |
| 2017 | 10 | 10 | 122,625 |
| 2018 | 6 | 13 | 167,984 |
| 2019 | 7 | 15 | 263,241 |
| 2020 Q1-2 | 3 | 5 | 44,206 |
| **Total** | **46** | **59** | **836,456** |

Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Removals

According to available ERO removal data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO removed at least 70 individuals for whom ERO data indicate potential U.S. citizenship from the United States (less than 1 percent of all individuals ICE removed during that period). Additionally, data indicate ICE removed at least 42 individuals with unknown citizenship. See table 5.

**Table 5: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations Removals (ERO) of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 2 | 19 | 235,392 |
| 2016 | 2 | 6 | 240,247 |
| 2017 | 15 | 3 | 226,101 |
| 2018 | 21 | 3 | 256,061 |
| 2019 | 21 | 10 | 267,227 |
| 2020 Q1-2 | 9 | 1 | 133,484 |
| **Total** | **70** | **42** | **1,358,512** |

Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an

enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

According to available ERO removal data, CBP apprehended and transferred to ICE at least 48 of the 70 (approximately 69 percent) individuals for whom ERO data indicate potential U.S. citizenship and whom ERO removed from fiscal year 2015 through the second quarter of fiscal year 2020.

We provide additional details on ICE data in appendix III.

## Available Data Do Not Indicate Whether CBP Held U.S. Citizens on Administrative Immigration Charges

Available OFO and Border Patrol data provide the number of occurrences when CBP held and arrested U.S. citizens as well as the characteristics of those individuals; however, the data do not allow us or CBP to identify whether CBP processed those U.S. citizens on administrative immigration charges.

### Data Do Not Indicate Whether OFO Held U.S. Citizens on Administrative Immigration Charges

OFO's data systems do not maintain data in a manner that would allow us or OFO to identify whether officers held and processed U.S. citizens on administrative immigration charges. As previously discussed, OFO inspects all individuals entering the country through ports of entry and may hold U.S. citizens as part of inspection processes, as needed, to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband. However, OFO officials stated that only specific data system processing pathways are relevant to individuals officers identify as U.S. citizens. Further, OFO officials said if officers first process an individual as a foreign national but later identify the individual as a U.S. citizen, they are to update the processing pathway so that it reflects the individual is a U.S. citizen.[29] As such, the data do not allow us or OFO to identify if officers mistakenly held U.S. citizens as foreign nationals on administrative immigration charges, which OFO officials stated officers would document in electronic inspection or case file narratives.

Available OFO data indicate that officers referred U.S. citizens to secondary inspection for admissibility reasons on 6,255,077 occasions

[29]A processing pathway refers to the steps officers take to process an individual in OFO's data system after making an admissibility decision.

from fiscal year 2015 through the second quarter of fiscal year 2020.[30] See figure 6.

**Figure 6: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Number of referrals (in thousands)

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

OFO data indicate that the U.S. citizens whom OFO referred for secondary inspection for admissibility reasons were most often males (see figure 7) and individuals ages 31 or older (see figure 8).

---

[30]Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

**Figure 7: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Of referral records for U.S. citizens, 9,866 were missing the individuals' gender (4,472 referrals in fiscal year 2015; 3,884 referrals in fiscal year 2016; and 1,510 in fiscal year 2017).

**Figure 8: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Of referral records for U.S. citizens, five were missing the individuals' ages (one referral in fiscal year 2019 and four referrals in fiscal year 2020 through quarter 2).

Further, when officers determine individuals are inadmissible or have potential travel or trade violations, among other reasons, they are to arrest these individuals to pursue enforcement actions against them, including charging them with administrative immigration violations, or to facilitate other civil enforcement action or criminal investigation and

potential prosecution.[31] Available OFO data indicate that OFO held U.S. citizens and processed them for various types of enforcement actions on 16,560 occasions from fiscal year 2015 through the second quarter of fiscal year 2020 (see figure 9).[32]

**Figure 9: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Number of enforcement actions

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration violations and criminal offenses, among others.

Additionally, OFO data indicate that enforcement actions OFO processed against U.S. citizens most often involved males (see figure 10) and individuals ages 19 to 30 (see figure 11).

---

[31]CBP may temporarily hold juvenile U.S. citizens for the purpose of transferring them to the custody of a U.S. citizen relative or state or local agency if, for example, they are traveling with their foreign national parents who are being held for immigration violations. Additionally, CBP may arrest U.S. citizens for federal criminal violations, such as narcotics smuggling.

[32]OFO officials stated that officers enter the reason for holding and/or charges in narrative fields and on the appropriate processing forms. As such, the available data does not specify whether U.S. citizens were charged with administrative immigration violations.

**Figure 10: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Enforcement actions records include enforcement actions related to administrative immigration violations and criminal offenses, among others.

Of enforcement action records for U.S. citizens, 80 did not indicate either a male or female gender for the individuals (seven in fiscal year 2016; 14 in fiscal year 2017; 18 in fiscal year 2018; 16 in fiscal year 2019; and 25 in fiscal year 2020 through quarter 2).



**Figure 11: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

Source: GAO analysis of OFO data. | GAO-21-487

Notes: Enforcement actions records include enforcement actions related to administrative immigration violations and criminal offenses, among others.

Of enforcement action records for U.S. citizens, two were missing the individuals' age (one in fiscal year 2017 and one in fiscal year 2020 through quarter 2).

We provide additional details on OFO data in appendix III.

## Data Do Not Indicate Whether Border Patrol Held U.S. Citizens on Administrative Immigration Charges

Border Patrol's data system does not maintain data in a manner that would allow us or Border Patrol to identify whether agents held and processed U.S. citizens on administrative immigration charges. Border Patrol officials stated that data system controls prevent agents from processing individuals they enter as U.S. citizens on administrative immigration charges by restricting certain processing pathways. Further, if agents first process an individual as a foreign national but later identify

the individual as a U.S. citizen and update the citizenship field, the system no longer allows the agent to process the individual on administrative immigration charges. As such, the data do not allow us or Border Patrol to identify if agents mistakenly held U.S. citizens as foreign nationals, which Border Patrol officials stated agents would document in electronic case file narratives.

Similar to OFO, Border Patrol may hold U.S. citizens that its agents encounter between ports of entry, as needed to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband. Available data indicate Border Patrol made 85,423 arrests of U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020. See figure 12.

**Figure 12: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



**Number of arrests** (in thousands)

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Additionally, available data indicate Border Patrol made 44 arrests of individuals with unknown or missing citizenship information during that period (see table 6).

**Table 6: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Arrests of U.S. citizens | Arrests of individuals with unknown citizenship |
|---|---|---|
| 2015 | 16,588 | 14 |
| 2016 | 16,241 | 9 |
| 2017 | 14,210 | 9 |
| 2018 | 15,045 | 6 |
| 2019 | 15,514 | 5 |
| 2020 Q1-2 | 7,825 | 1 |
| **Total** | **85,423** | **44** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens and individuals with unknown citizenship, including arrests related to criminal violations, such as smuggling of contraband.

Available data also indicate Border Patrol's arrests of U.S. citizens were mostly of males (see figure 13) and individuals ages 19 to 45 (see figure 14).

**Figure 13: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Notes: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Of arrest records for U.S. citizens, 322 did not indicate either a male or a female gender (94 in fiscal year 2015; 67 in fiscal year 2016; 55 in fiscal year 2017; 52 in fiscal year 2018; 43 in fiscal year 2019; and 11 in fiscal year 2020 through quarter 2).

**Figure 14: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Notes: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Of arrest records for U.S. citizens, 109 were missing the individuals' age (28 in fiscal year 2015; 18 in fiscal year 2016; 18 in fiscal year 2017; 15 in fiscal year 2018; 28 in fiscal year 2019; and 2 in fiscal year 2020 through quarter 2).

We provide additional details on Border Patrol data in appendix III.

# ICE Has Policies and Procedures for Investigating Citizenship for Detainers and Issued Detainers for a Small Number of Potential U.S. Citizens

## ICE Has Policies and Procedures for Investigating Potential U.S. Citizenship

ICE has two policies that describe steps ERO officers are to take to investigate citizenship when contemplating lodging a detainer or after issuing a detainer.[33] First, the procedures for investigating, elevating, and documenting claims and indicia described in ICE's 2015 policy also apply to officers issuing detainers. According to the 2015 policy, ERO officers are, to the extent feasible, to interview the individual in custody of another law enforcement agency to aid in assessing any claims or indicia of potential U.S. citizenship.[34] Additionally, ICE's 2017 policy titled *Issuance of Immigration Detainers by ICE Immigration Officers* requires ERO officers to establish probable cause that the individual is a removable foreign national prior to issuing a detainer.[35] The 2017 policy also requires

---

[33]ERO becomes aware that an individual in a local, state, federal, or tribal law enforcement agency's custody may be a potentially removable foreign national by various means. For example, a law enforcement agency may request that ICE conduct an immigration status review for an individual in its custody, which prompts ICE officials to search federal immigration records for the individual. Additionally, ERO officers, through ICE's Criminal Alien Program, or co-located at a state or local law enforcement facility, may identify and arrest removable foreign nationals in another law enforcement agency's custody.

[34]Officials also stated that there are limited permissible circumstances in which officers might not interview individuals prior to issuing detainers, including if the individuals have prior removal orders with no prior claims to U.S. citizenship or if the individuals are too intoxicated to respond.

[35]ERO officers may not issue a detainer based on the initiation of an investigation to determine whether the individual is removable—and may not establish probable cause of removability—solely based on evidence of foreign birth or the absence of records in federal databases.

ERO officers to issue all detainers with a *Warrant for Arrest of Alien* or a *Warrant of Removal/Deportation*.[36]

Figure 15 describes ICE procedures for investigating any claims or indicia of potential U.S. citizenship prior to or after issuing a detainer, as described in ICE policy.

---

[36]Per section 236 and 287 of the Immigration and Nationality Act and part 287 of Title 8, Code of Federal Regulations, immigration officers may issue a *Warrant of Arrest of Alien* to another law enforcement agency if they have determined there is probable cause to believe the individual is removable from the United States. ERO officers may also issue a *Warrant of Removal/Deportation* if the individual has a final order of removal/deportation from an immigration judge in exclusion, removal, or deportation proceedings, a designated official, the Board of Immigration Appeals, or a U.S. District or Magistrate Court judge pursuant to certain provisions of the Immigration and Nationality Act.

**Figure 15: U.S. Immigration and Customs Enforcement (ICE) Procedures for Investigating Potential U.S. Citizenship of Individuals Prior to or After Issuing a Detainer**



**Claim or indicia**[a]

Individual in federal, state, local, or tribal law enforcement agency custody who is subject to or who may become subject to a detainer by ICE Enforcement and Removal Operations (ERO) claims U.S. citizenship or ERO officer discovers indicia of citizenship.

**Factual examination**

ERO conducts a factual examination by:
- checking all available Department of Homeland Security and other law enforcement data systems,
- reviewing the individual's Alien-file and other documents, and
- interviewing the individual, among other steps.[b]

**Memorandum**

ERO and local ICE attorneys jointly prepare a memorandum assessing the claim or indicia and recommend a course of action for headquarters to review.

**Headquarters review**

Headquarters reviews the memorandum and responds to the field with a decision on the recommendation.

**Course of action**

Is there probative evidence, or is there uncertainty about whether the evidence is probative of U.S. citizenship?[c]

**No**
ERO may issue the detainer to the law enforcement agency accompanied by a Warrant of Arrest or Warrant of Removal/Deportation.

**Yes**[d]
Has ERO already issued a detainer?

**Yes**
ERO immediately cancels the detainer.

ERO officers inform the individual how to attempt to obtain proof of U.S. citizenship.

**No**
ERO does not issue a detainer.

**Documenting investigations and results**

ERO officers and attorneys document the findings of the investigations in their respective databases and place a copy of the memorandum in the individual's Alien-file.

Source: GAO analysis of ICE policy.  |  GAO-21-487

Notes: A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agency which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the individual for up to 48 hours to allow DHS to assume custody.

According to ICE policy, probable cause may be supported by (1) a final order of removal against the individual; (2) the pendency of ongoing removal proceedings against the individual; (3) biometric confirmation of the individual's identity and a records match in federal databases that affirmatively indicate the individual is removable; or (4) statements made voluntarily by the individual to an ICE

officer or other reliable evidence that indicate the individual lacks lawful immigration status or is removable.

[a]Potential indicia of citizenship include but are not limited to: evidence that the individual was born in the United States; information suggesting that one or more of the individual's parents, grandparents, or foreign-born siblings are or were U.S. citizens; and the individual has served in the U.S. Armed Forces.

[b]All interviews with individuals claiming U.S. citizenship or for whom there are indicia of citizenship are to be conducted by an officer in the presence of or in consultation with a supervisor.

[c]According to ICE, probative evidence of U.S. citizenship means that the evidence tends to show that the individual may be a U.S. citizen. U.S. citizenship need not be shown by a preponderance of the evidence for ICE to find that there is some probative evidence of U.S. citizenship.

[d]It is not necessary for ICE to wait to cancel the detainer if there is probative evidence of U.S. citizenship.

## Available Data Indicate ERO Issued Detainers for At Least 895 Potential U.S. Citizens

According to ERO detainer data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO issued detainers for at least 895 individuals for whom ERO data indicate potential U.S. citizenship and for at least 1,841 individuals with unknown citizenship (less than 1 percent of all detainers issued).[37] See table 7.

**Table 7: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operation (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 146 | 363 | 96,383 |
| 2016 | 140 | 308 | 85,578 |
| 2017 | 196 | 388 | 141,772 |
| 2018 | 192 | 429 | 176,526 |
| 2019 | 145 | 242 | 165,100 |
| 2020 Q1-2 | 76 | 111 | 64,379 |
| **Total** | **895** | **1,841** | **729,738** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

[37]As stated previously, ERO officers entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO issued the detainer. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

According to ERO detainer data, individuals for whom ERO data indicate potential U.S. citizenship and whom ERO issued detainers were mostly males (figure 16) and individuals ages 19 to 45 (table 8).

**Figure 16: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Of detainer records for potential U.S. citizens, three records in fiscal year 2019 were missing individuals' gender.

**Table 8: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Age | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| 0 to7 | 0 | 0 | 0 | 1 | 0 | 0 | **1** |
| 8 to 13 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 14 to 18 | 7 | 2 | 5 | 10 | 3 | 2 | **29** |
| 19 to 30 | 67 | 62 | 98 | 83 | 55 | 31 | **396** |
| 31 to 45 | 53 | 62 | 66 | 65 | 55 | 30 | **331** |
| 46 and up | 18 | 14 | 27 | 33 | 32 | 13 | **137** |
| **Total:** | **146** | **140** | **196** | **192** | **145** | **76** | **895** |

Source: GAO analysis of ICE data. | GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Of detainer records for potential U.S. citizens, one record in fiscal year 2015 was missing the individual's date of birth.

Finally, available data indicate that ERO cancelled at least 665 of the 895 detainers for individuals for whom ERO data indicate potential U.S. citizenship (approximately 74 percent). Table 9 provides information on the reasons ICE indicated it cancelled these detainers and the number of detainers not cancelled from fiscal year 2015 to the second quarter of fiscal year 2020.[38]

---

[38]ICE guidance does not specify which cancellation reason to select if ICE identifies probative evidence that an individual may be a U.S. citizen. Further, the data does not indicate when specifically ICE cancelled the detainer, such as after investigating a claim to citizenship.

**Table 9: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Cancellation Reason from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Cancellation reason | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| **Detainers cancelled by ICE** | | | | | | | |
| Not subject to deportation | 6 | 14 | 53 | 84 | 59 | 29 | **245** |
| Booked into detention | 12 | 6 | 23 | 23 | 15 | 6 | **85** |
| Case closed | 1 | 1 | 5 | 2 | 3 | 0 | **12** |
| Detainer declined by law enforcement agency | 4 | 0 | 1 | 5 | 2 | 3 | **15** |
| Cancelled[a] | 14 | 31 | 47 | 43 | 29 | 17 | **181** |
| Prosecutorial discretion | 0 | 0 | 0 | 0 | 1 | 0 | **1** |
| Transferred | 0 | 1 | 1 | 2 | 0 | 0 | **4** |
| U.S. citizen interviewed[b] | 37 | 60 | 25 | 0 | 0 | 0 | **122** |
| **Total cancelled** | **74** | **113** | **155** | **159** | **109** | **55** | **665** |
| **Detainers not cancelled by ICE** | | | | | | | |
| **Total not cancelled** | **72** | **27** | **41** | **33** | **36** | **21** | **230** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

[a]ICE's guidance for cancelling detainers states that officers are to use "Cancelled" only when the individual's case falls outside of the other provided reasons.

[b]ICE stopped using the U.S. citizen interviewed detainer cancellation reason after fiscal year 2017.

We provide additional details on ICE data in appendix III.

# Conclusions

ICE and CBP have developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers and agents encounter. However, ICE's officer training materials contain guidance for notifying supervisors of encounters with potential U.S. citizens that are inconsistent with ICE policy. By making its training materials consistent with its policy, ICE would have more assurance that all encounters with individuals who claim U.S. citizenship receive appropriate supervisory review. Moreover, while ICE policy directs officers and attorneys to document the course of action that results from investigations into potential U.S. citizenship in individuals' electronic records, officers are not required to update the citizenship field if ICE identifies probative evidence that individuals may be U.S. citizens. As a

result, ICE does not know the extent to which its officers are encountering and taking enforcement actions against individuals who could be U.S. citizens.

## Recommendations for Executive Action

We are making the following two recommendations to ICE.

1.  The Director of ICE should update ICE's training materials to reflect ICE policies requiring officers to consult supervisors during encounters with potential U.S. citizens. (Recommendation 1)

2.  The Director of ICE should systematically collect and maintain electronic data on its encounters with individuals for whom there is probative evidence of U.S. citizenship. (Recommendation 2)

## Agency Comments and Our Evaluation

We provided a draft of this report to DHS for review and comment. DHS provided formal, written comments, which are reproduced in full in appendix IV. DHS also provided technical comments to our draft report, which we incorporated, as appropriate.

DHS concurred with our two recommendations and described actions planned or underway to address them. For example, in response to our recommendation that ICE update its training materials to reflect ICE policies requiring officers to consult supervisors during encounters with potential U.S. citizens, ICE described the changes it made in June 2021 to its training materials for ERO officer trainings and requested that we consider the recommendation resolved and closed. We reviewed the revised training materials and found that the revisions are positive steps. However, to fully address the intent of our recommendation, ICE should ensure that its training materials reflect ICE's policy that officers are to interview all individuals claiming U.S. citizenship or with potential indicia of citizenship in the presence of, or in consultation with, a supervisor. Regarding our recommendation that ICE systematically collect and maintain electronic data on its encounters with individuals for whom there is probative evidence of U.S. citizenship, ICE stated that it will analyze the processes and systems used to collect such information and update user guides and standard operating procedures to reflect new data collection requirements.

We are sending copies of this report to the appropriate congressional committees and the Secretary of Homeland Security. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8777 or gamblerr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff members who made key contributions to this report are listed in appendix V.

Rebecca Gambler
Director, Homeland Security and Justice

*List of Requesters*

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
House of Representatives

The Honorable Zoe Lofgren
Chairperson
Subcommittee on Immigration and Citizenship
Committee on the Judiciary
House of Representatives

The Honorable David N. Ciciline
House of Representatives

The Honorable Steve Cohen
House of Representatives

The Honorable Val Demings
House of Representatives

The Honorable Sylvia R. Garcia
House of Representatives

The Honorable Pramila Jayapal
House of Representatives

The Honorable Ted W. Lieu
House of Representatives

The Honorable Eric Swalwell
House of Representatives

# Appendix I: Objectives, Scope, and Methodology

This report examines (1) the extent to which U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have developed and implemented policies and procedures for investigating potential U.S. citizenship of individuals its officers and agents encounter, (2) what ICE and CBP data indicate about the number and characteristics of U.S. citizens detained by ICE or held by CBP on administrative immigration charges in the last 5 fiscal years,[1] and (3) the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for immigration detainers.[2]

To address these three objectives, we interviewed Department of Homeland Security (DHS) officials, including those from DHS's Office of Strategy, Policy, and Plans; Office of Inspector General (OIG); and Office for Civil Rights and Civil Liberties (CRCL). We also interviewed officials from ICE's Enforcement and Removal Operations (ERO) directorate (including Field Operations and Law Enforcement Systems and Analysis), Homeland Security Investigations directorate, Office of the Principal Legal Advisor (OPLA), Law Enforcement Support Center, and Pacific Enforcement Response Center. Further, we interviewed officials from CBP's Office of the Commissioner and Office of Chief Counsel; CBP's Office of Field Operations (OFO) Admissibility and Passenger Programs Directorate (including the Enforcement Programs Division) and OFO's Planning, Program Analysis, and Evaluation Directorate; and Border Patrol's Law Enforcement Operations Directorate and Strategic Planning and Analysis Directorate.

In addition, we interviewed selected field officials from ICE and CBP in June and July 2020. Specifically, we met with ERO officials from ICE's Buffalo, Los Angeles, and Philadelphia field offices; OFO officials from the Detroit, Laredo, and San Francisco field offices; and Border Patrol officials from the Miami, Rio Grande Valley, San Diego, and Spokane sectors. To select the ERO locations for interviews, we reviewed publicly

---

[1]We use the term "administrative immigration charges" to refer to allegations of removability typically included in a Notice to Appear in immigration court or an expedited removal order. Such allegations are based on civil violations of U.S. immigration law, which would render a charged foreign national statutorily inadmissible or deportable and therefore subject to removal from the United States.

[2]A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agency, which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the individual for up to 48 hours to allow DHS to assume custody.

available ERO data on the number of arrests by field office from fiscal year 2015 through fiscal year 2016 and the number of detainers issued from fiscal year 2015 through February 2017—the most recent data publicly available at the time. To select the OFO locations for interviews, we reviewed publicly available OFO data on the number of inadmissible foreign nationals OFO inspected from fiscal year 2015 through the first quarter of fiscal year 2019—the most recent data publicly available at the time. To select the Border Patrol locations for interviews, we reviewed publicly available Border Patrol data on the arrests of removable foreign nationals from fiscal year 2015 through fiscal year 2019—the most recent data publicly available at the time.

For all of these selections, we included a range of low, medium, and high enforcement action field offices and sectors, as well as a variety of geographic locations. The information we obtained from interviews with field officials are not generalizable to all ICE, OFO, or Border Patrol operations; however, they provided us the opportunity to learn more about how ICE and CBP officers and agents implement policies and procedures for investigating the citizenship of individuals they encounter and how they document these investigations.

Additionally, we interviewed individuals from Northwestern University's Deportation Clinic and Syracuse University's Transactional Resource Access Clearinghouse Immigration, which are research entities that conduct similar work analyzing immigration enforcement issues and data, to gather their perspectives based on their work.

To assess the extent to which ICE and CBP have developed and implemented policies and procedures to investigate the potential U.S. citizenship of the individuals their officers and agents encounter, we reviewed ICE and CBP policy documents, training materials, processing guides, and other guidance documents in effect from October 2015 through March 2020. For example, we reviewed ICE's 2015 policy titled *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE* and CBP officer and Border Patrol agent basic training academy materials on how officers and agents are to investigate citizenship and process individuals for removal, among other documents.[3] We compared ICE and CBP policies and procedures with processes described by

---

[3]U.S. Immigration and Customs Enforcement, *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE* (November 2015).

**Appendix I: Objectives, Scope, and
Methodology**

officials we interviewed, as well as with DHS, ICE, and CBP data we
collected.

Specifically, we analyzed data from DHS's OIG and CRCL related to
complaints these offices received by or on the behalf of individuals
claiming to be U.S. citizens who were held, detained, or subject to
detainers by DHS to aid in this comparison. To collect OIG and CRCL
complaint data, we provided OIG and CRCL with key words for searches
to identify potentially relevant records they received from fiscal year 2015
through the second quarter of fiscal year 2020.[4] We requested that OIG
and CRCL withhold records, which were unnecessary for our work,
related to individuals seeking immigration relief as victims of domestic
abuse, human trafficking, or other qualifying crimes, and whose
information is generally to be kept confidential.[5] OIG withheld three such
complaint records and CRCL withheld 11 that are not included in our
analysis and reporting.

To determine which of the complaints we received were relevant to our
review, we further analyzed each complaint record's narrative for
information related to individuals claiming to be U.S. citizens who were
detained, removed, subject to a detainer by ICE, or held for administrative
immigration reasons by OFO or Border Patrol. Because OIG and CRCL
sometimes receive the same complaints, receive the same complaint
more than once, and also share complaints with one another, we also
identified and removed duplicate records based on record-level details
(such as the individual's name, the date the complaint was received, and
narrative details) within and across the records we received from OIG and
CRCL. This allowed us to report on numbers of complaints we identified
as received by the respective offices and combined across offices.
Because our identification of relevant complaints was based on key word
searches, there may be additional relevant complaints that we were
unable to identify and include in the report; however, we worked with the
OIG and CRCL to develop a list of terms likely to identify complaints in
our scope. We determined these data were sufficiently reliable to identify
a baseline number of relevant complaints.

---

[4]For example, we used key words and terms such as "citizenship claim," "United States
citizen," "parent is a citizen," "naturalized citizen," "detained by ICE," "detained by CBP,"
and "detainer" to identify relevant complaints.

[5]8 U.S.C. § 1367.

We compared ICE policies and procedures and training materials to
*Standards for Internal Control in the Federal Government*.[6] We
determined the control activities component of internal control—the
actions management establishes to achieve objectives and respond to
risks—was significant to this objective. We assessed ICE's policy
documents, training materials, and processing guides related to
investigating, elevating, and documenting claims or indicia of the potential
U.S. citizenship of individuals ICE officers encounter to determine
whether they were capable of achieving ICE's immigration enforcement
objectives and responding to risks related to taking enforcement actions
against U.S. citizens. Further, we determined the information and
communication activities component of internal controls—that
management should use quality information to achieve objectives—was
significant to this objective.[7] We assessed ICE's policy documents and
training materials for investigating, elevating, and documenting claims or
indicia of the potential U.S. citizenship of individuals ICE officers
encounter and the availability and reliability of ICE's arrest, detention,
release, and removal data from fiscal year 2015 through the second
quarter of 2020. We took these steps to determine whether the policy
documents and training materials were able to help ICE meet its
immigration enforcement objectives, respond to risks related to taking
enforcement actions against U.S. citizens, and meet DHS's information
sharing needs.

To describe what ICE and CBP data indicate about the numbers and
characteristics of U.S. citizens detained by ICE or held by CBP on
administrative immigration charges, we reviewed and analyzed record-
level ICE data related to arrests, detentions, releases, and removals as
well as record-level inspection and arrest data from OFO and Border
Patrol. We collected data for fiscal year 2015 through the second quarter
of fiscal year 2020 (March 2020)—the most recent data available at the
time of our review. We also collected and analyzed record-level data
related to OPLA investigations of potential U.S. citizenship of individuals
that ICE encountered, arrested, detained, removed, issued a detainer, or
released. However, we did not include this data in the report because,
after reviewing our draft report, ICE informed us that the data it provided
for our analysis were incomplete. In addition, we assessed record-level
data related to electronic investigations ICE conducted into the citizenship

---

[6]GAO, *Standards for Internal Control in the Federal Government,* GAO-14-704G
(Washington, D.C.: September 2014).

[7]GAO-14-704G.

of individuals in another law enforcement agency's custody or that ICE officers encountered from fiscal year 2015 through the second quarter of fiscal year 2020. The record-level data we analyzed are current as of the date ICE, Border Patrol, and OFO provided it to us; the respective agency or component may have subsequently updated the data. Specifically, we received ICE arrest, detention, removal, and release data in September 2020; OPLA investigation data in August 2020; ICE electronic investigation data in August 2020; OFO data in July 2020 with supplemental inspections data received in November 2020; and Border Patrol data in July 2020.

We analyzed the record-level data to describe the numbers and characteristics, including the age and gender, of U.S. citizens involved in an arrest, detention, release, removal, or admissibility referral in the case of OFO. In addition, we analyzed the record-level data to determine the number of arrests, detentions, and removals by ICE field office; admissibility referrals[8] and enforcement actions[9] by OFO field office; and arrests by Border Patrol sector. We used number of arrests (or detentions, releases, removals, referrals, investigations) rather than the number of U.S. citizens (or individuals with unknown citizenship) as the unit of analysis because an individual may have been involved in an enforcement action or referred for a secondary admissibility inspection multiple times in the same year.

**ICE data.** To assess the reliability of all of ICE's data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the ICE officers

---

[8]OFO officers conduct immigration and customs inspections of every individual presenting themselves for entry into the United States at U.S. ports of entry. If officers cannot admit, or permit entry of, an individual into the country based on the primary inspection, they are to refer the individual to secondary inspection—sometimes known as an admissibility referral—where OFO continues the immigration inspection and investigates any potential issues.

[9]When officers determine individuals are inadmissible to the United States, they may take custody of these individuals to pursue immigration enforcement and removal actions against them, including charging administrative immigration violations; or, if appropriate, they may arrest individuals, including U.S. citizens, in furtherance of criminal investigation and potential prosecution where there is probable cause that they committed a crime. CBP may temporarily hold juvenile U.S. citizens for the purpose of transferring them to the custody of a U.S. citizen relative or state or local agency if, for example, they are traveling with their foreign national parents who are being held for immigration violations. Additionally, CBP may arrest U.S. citizens for federal criminal violations, such as narcotics smuggling.

who use them; and (3) discussed data entry issues and data limitations with ICE officials. According to ICE headquarters officials, ICE officers are not required to update the country of citizenship field in its data systems when ICE identifies probative evidence of U.S. citizenship for individuals originally processed as foreign nationals; therefore, we described relevant ICE data using modifiers such as "at least" and "approximately" because there may be additional individuals who could be U.S. citizens that we were unable to identify. Additionally, for the individuals for whom ICE data indicate potential U.S. citizenship that we report, officials said ICE entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ICE took an enforcement action. ICE's data do not indicate when ICE entered "United States" in these fields in its data system. We determined that the ICE data were sufficiently reliable for the purposes of reporting a baseline number of potential U.S. citizens arrested, detained, released, and removed by ICE.

**OFO data.** We limited our review of OFO admissibility inspection referral and enforcement action data to records OFO identified as involving U.S. citizens due to the large volume of admissibility referrals and enforcement actions taken against individuals with a citizenship other than the United States over the review period. We report admissibility referral data that includes referrals of U.S. citizens for all types of admissibility reasons in our analysis because OFO officials stated officers do not consistently enter specific admissibility referral reasons in the related data field. Similarly, we report enforcement action data that includes all enforcement actions for U.S. citizens because the enforcement action data does not provide the reason OFO held or charged an individual. To assess the reliability of OFO's data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the OFO officers who use them; and (3) discussed data entry issues and data limitations with OFO officials. We determined that the OFO data were sufficiently reliable for the purposes of reporting the numbers of referrals to secondary inspection for admissibility reasons and enforcement actions processed against U.S. citizens for all types of reasons.

**Border Patrol data.** We limited our review of Border Patrol arrest data to records Border Patrol identified as involving U.S. citizens or individuals with unknown citizenship due to the large volume of Border Patrol arrests

of individuals with a citizenship other than the United States over the review period. We report Border Patrol arrest data that includes all arrests of U.S. citizens because Border Patrol officials stated that the data system does not record if agents mistakenly processed U.S. citizens on administrative immigration violations.[10] We calculated time in custody for the U.S. citizens arrested by Border Patrol by subtracting the initial book-in date from the final book-out date. To assess the reliability of Border Patrol's data, we (1) performed electronic testing, for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the Border Patrol agents who use them; and (3) discussed data entry issues and data limitations with Border Patrol officials. We determined that the Border Patrol data were sufficiently reliable for the purposes of reporting the number of arrests of U.S. citizens.

To determine the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for detainers—we reviewed ICE policy documents, training materials, and other guidance documents in effect from October 2015 through March 2020. For example, we reviewed ICE's 2015 policy previously described and ICE's 2017 policy titled *Issuance of Immigration Detainers by ICE Immigration Officers*.[11] We compared ICE policies and procedures with the processes described by ICE officials we interviewed.

We also analyzed available record-level ICE data for detainers issued from fiscal year 2015 through the second quarter of fiscal year 2020—the most recent data available at the time of our review—to describe the numbers and characteristics, including the age and gender, of individuals for whom ICE data indicate potential U.S. citizenship and for whom ICE issued a detainer. In addition, we analyzed the record-level data to determine the number of detainers by the ICE field office and the number of detainers ICE cancelled. The record-level detainer data we analyzed are current as of September 2020, when ICE provided it to us; ICE may have subsequently updated the data.

---

[10]Border Patrol may hold U.S. citizens that its agents encounter between ports of entry, as needed to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband.

[11]U.S. Immigration and Customs Enforcement, *Issuance of Immigration Detainers by ICE Immigration Officers* (March 2017).

**Appendix I: Objectives, Scope, and
Methodology**

To assess the reliability of ICE's data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the ICE officers who use them; and (3) discussed data entry issues and data limitations with ICE officials. Because ICE officers are not required to update the country of citizenship field in its data systems when ICE identifies probative evidence of U.S. citizenship for individuals originally processed as foreign nationals, we described ICE detainer data using modifiers such as "at least" and "approximately" because of possible missing information. Additionally, ICE's data do not indicate when ICE entered "United States" in the fields for citizenship and country of birth in its data system, which may have occurred after ICE issued the detainers. We determined that the ICE data were sufficiently reliable for the purposes of reporting a baseline number of detainers that ICE issued and cancelled for potential U.S. citizens.

We conducted this performance audit from February 2020 to July 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Department of Homeland Security (DHS) Complaint Data

The following provides information about the complaints the DHS Office of Inspector General (OIG) and Office for Civil Rights and Civil Liberties (CRCL) received made by or on the behalf of individuals claiming to be U.S. citizens who were detained or the target of immigration detainers by U.S. Immigration and Customs Enforcement (ICE) from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020).[1] In addition, it includes information about the complaints the OIG and CRCL received made by or on behalf of individuals claiming to be U.S. citizens who were held for administrative immigration reasons by U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) and U.S. Border Patrol (Border Patrol) during the same period.[2] The OIG and CRCL receive and investigate these types of complaints against ICE and CBP, among others concerning DHS.[3]

## OIG Complaints

The following tables contain information about the complaints the OIG received made by or on the behalf of individuals claiming to be U.S. citizens who were detained or the target of detainers by ICE or held by Border Patrol or OFO for administrative immigration reasons from fiscal year 2015 through the second quarter of fiscal year 2020.

Available OIG complaint data indicate the OIG received 130 complaints made by or on the behalf of individuals claiming to be U.S. citizens who were detained or the target of detainers by ICE or held by CBP for

---

[1]A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agency, which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the individual for up to 48 hours to allow DHS to assume custody.

[2]We use the term "administrative immigration charges" to refer to allegations of removability typically included in a Notice to Appear in immigration court or an expedited removal order. Such allegations are based on civil violations of U.S. immigration law, which would render a charged foreign national statutorily inadmissible or deportable and therefore subject to removal from the United States. See 8 U.S.C. §§ 1182, 1227, 1229, 1229a.

[3]We did not independently investigate or verify the claims made in these complaints. Forty-six of the complaints we collected and identified as relevant appeared in both the OIG and CRCL data. To collect OIG and CRCL complaint data, we provided OIG and CRCL with key words for searches to identify potentially relevant records they received from fiscal year 2015 through the second quarter of fiscal year 2020. We analyzed each complaint record's narrative for information related to individuals claiming to be U.S. citizens who were detained, removed, subject to a detainer by ICE, or held for administrative immigration reasons by OFO or Border Patrol. For more information about how we collected these complaints, see appendix I.

administrative immigration reasons from fiscal year 2015 through the second quarter of fiscal year 2020. See table 10.

**Table 10: U.S. Department of Homeland Security (DHS) Office of the Inspector General (OIG) Number of Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Complaints received |
|---|---:|
| 2015 | 37[a] |
| 2016 | 31[b] |
| 2017 | 17 |
| 2018 | 19[c] |
| 2019 | 22 |
| 2020 Q1-2 | 9 |
| **Total** | **130[d]** |

Source: GAO analysis of OIG data.  |  GAO-21-487

Note: Enforcement actions by DHS include U.S. Immigration and Customs Enforcement (ICE) detention and targeting of individuals for detainers and U.S. Customs and Border Protection (CBP) holding of individuals for administrative immigration reasons.

[a]One individual's complaint was received in fiscal year 2015 and fiscal year 2019 and is included in both years in the table.

[b]Two individuals' complaints were received in fiscal year 2016 and fiscal year 2017 and are included in both years in the tables. One individual's complaint was received in fiscal year 2015 and fiscal year 2019 and is included in both years in the table.

[c]One individual's complaint was received in fiscal year 2018 and fiscal year 2019 and is included in both years in the table.

[d]Column totals do not equal total overall number of complaints due to duplicate complaints received in more than one fiscal year.

In addition, available OIG complaint data indicate the majority of complaints OIG received were made by or on the behalf of individuals claiming to be U.S. citizens who were detained by ICE (see table 11).

Appendix II: Department of Homeland Security
(DHS) Complaint Data

**Table 11: U.S. Department of Homeland Security (DHS) Office of the Inspector General (OIG) Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Type of enforcement action | Number of complaints received |
|---|---|
| Detained by U.S. Immigration and Customs Enforcement (ICE) | 105[a] |
| Target of detainer by ICE | 15 |
| In removal proceedings or processed for removal by ICE | 3 |
| Held by U.S. Customs and Border Protection (CBP) | 3 |
| Held by CBP's Office of Field Operations (OFO) | 15 |
| Held by CBP's U.S. Border Patrol (Border Patrol) | 7 |
| Subject of detainer by unspecified DHS agency | 1 |
| **Total** | **130[b]** |

Source: GAO analysis of OIG data.  |  GAO-21-487

Note: Enforcement actions by DHS include ICE detention and targeting of individuals for detainers and CBP holding of individuals for administrative immigration reasons.

[a]Eight complaints that allege ICE detained U.S. citizens also allege that CBP took administrative immigration enforcement actions, including: three that CBP held U.S. citizens; three that OFO held U.S. citizens; and two that Border Patrol held U.S. citizens. These complaints are included in both types of enforcement actions in the table. Additionally, 12 complaints that allege ICE detained US. citizens also allege that ICE took additional enforcement actions, including 11 that ICE targeted U.S. citizens for a detainer and one that ICE put the U.S. citizen in removal proceedings or processed the U.S. citizen for removal. These complaints are included in both types of enforcement actions in the table.

[b]Column totals do not equal total overall number of complaints due to complaints that alleged more than one type of enforcement action.

Further, available OIG complaint data also indicate that the OIG received five additional records that CRCL officials initiated based on their review of media reports, which are not included in the tables above. Four of these records were from individuals claiming to be U.S. citizens who were detained by ICE, three of whom also claim ICE targeted them for detainers. One record was from an individual claiming to be a U.S. citizen who was held by OFO for administrative immigration reasons.

**Appendix II: Department of Homeland Security (DHS) Complaint Data**

## CRCL Complaints

The following tables contain information about the complaints CRCL received made by or on the behalf of individuals claiming to be U.S. citizens who were detained or the target of detainers by ICE or held by Border Patrol or OFO for administrative immigration reasons from fiscal year 2015 through the second quarter of fiscal year 2020.

Available CRCL complaint data indicate that CRCL received 74 complaints made by or on the behalf of individuals claiming to be U.S. citizens who were detained or targets of detainers by ICE or held by CBP for administrative immigration reasons from fiscal year 2015 through the second quarter of fiscal year 2020. See table 12.

**Table 12: U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) Number of Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Complaints received |
|---|---|
| 2015 | 10 |
| 2016 | 12 |
| 2017 | 19[a] |
| 2018 | 20 |
| 2019 | 13 |
| 2020 Q1-2 | 3 |
| **Total** | **74[b]** |

Source: GAO analysis of CRCL data. | GAO-21-487

Note: Enforcement actions by DHS include U.S. Immigration and Customs Enforcement (ICE) detention and targeting of individuals for detainers and U.S. Customs and Border Protection (CBP) holding of individuals for administrative immigration reasons.

[a]Two individuals' complaints received in fiscal year 2017 were received again in fiscal year 2018 and are included in both years in the table.

[b]Column totals do not equal total overall number of complaints due to duplicate complaints received in more than one fiscal year.

In addition, available CRCL complaint data indicate complaints CRCL received were most often made by or on the behalf of individuals claiming to be U.S. citizens who were detained by ICE (see table 13).

**Table 13: U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Type of enforcement action | Number of complaints received |
|---|---|
| Detained by U.S. Immigration and Customs Enforcement (ICE) | 49[a] |
| Target of detainers by ICE | 7[b] |
| Held by U.S. Customs and Border Protection (CBP) | 3 |
| Held by CBP's Office of Field Operations (OFO) | 21 |
| Held by CBP's U.S. Border Patrol (Border Patrol) | 5 |
| **Total** | **74[c]** |

Source: GAO analysis of CRCL data. | GAO-21-487

Note: Enforcement actions by DHS include ICE detention and targeting of individuals for detainers and CBP holding of individuals for administrative immigration reasons.

[a]Five complaints that allege ICE detained U.S. citizens also allege that CBP took enforcement actions, including two that OFO held U.S. citizens, one that Border Patrol held a U.S. citizen, and two that did not specify the CBP component that held U.S. citizens. These complaints are included in both types of enforcement actions in the table.

[b]One complaint that alleges ICE targeted a U.S. citizen for a detainer also alleges that OFO held a U.S. citizen. This complaint is included in both types of enforcement actions in the table. Five complaints that allege ICE detained U.S. citizens also allege that ICE targeted U.S. citizens for detainers. These complaints are included in both types of enforcement actions in the table.

[c]Column totals do not equal total overall number of complaints due to complaints that alleged more than one type of enforcement action.

Further, available CRCL complaint data indicate that CRCL also initiated 14 additional records based on media reports that CRCL officials reviewed (see table 14).

Appendix II: Department of Homeland Security
(DHS) Complaint Data

**Table 14: U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) Records Initiated from Media Reports Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Type of enforcement action | Number of records initiated |
|---|---:|
| Detained by U.S. Immigration and Customs Enforcement (ICE) | 12[a] |
| Target of detainers by ICE | 8[b] |
| Held by U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) | 2 |
| Held by CBP's U.S. Border Patrol (Border Patrol) | 1 |
| **Total** | **14[c]** |

Source: GAO analysis of CRCL data. | GAO-21-487

Note: Enforcement actions by DHS include ICE detention and targeting of U.S. citizens for detainers and CBP holding of U.S. citizens for administrative immigration reasons.

[a]Two complaints that allege ICE detained U.S. citizens also allege that CBP took enforcement actions against U.S. citizens, including one that OFO held U.S. citizens and one that Border Patrol held U.S. citizens. These complaints are included in both types of enforcement actions in the table.

[b]Seven complaints that allege ICE detained individuals also allege that ICE targeted U.S. citizens in detainers. These complaints are included in both types of enforcement actions in the table.

[c]Column totals do not equal total overall number of complaints due to complaints that alleged more than one type of enforcement action.

# Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens

The following provides information about the detention and holding of U.S. citizens by U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO) and U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) and U.S. Border Patrol (Border Patrol) from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020). It also provides information about immigration status inquiries that ERO conducted during the same timeframe.

## ICE Enforcement Actions Against Potential U.S. Citizens

The following tables contain information on the individuals for whom ERO data indicate potential U.S. citizenship and whom ERO arrested, detained, released, and removed from fiscal year 2015 through the second quarter of fiscal year 2020. ERO officers are not required to update the citizenship field when ERO identifies probative evidence that individuals may be U.S. citizens.[1] As a result, there may be additional individuals who could be U.S. citizens whom ERO arrested, detained, released, or removed that we were unable to identify in the available data. Additionally, ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

### Arrests

According to available ERO arrest data, the majority of individuals for whom ERO data indicate potential U.S. citizenship and whom ERO arrested had a criminal or immigration history (see table 15).

---

[1]According to ICE, probative evidence of U.S. citizenship means that the evidence tends to show that the individual may be a U.S. citizen. U.S. citizenship need not be shown by a preponderance of the evidence for ICE to find that there is some probative evidence of U.S. citizenship.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Table 15: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 23 | 17 | 16 | 32 | 19 | 8 | **115** |
| Other immigration violator | 146 | 77 | 54 | 106 | 109 | 42 | **534** |
| Pending criminal charges | 0 | 0 | 0 | 15 | 10 | 0 | **25** |
| **Total** | **169** | **94** | **70** | **153** | **138** | **50** | **674** |

Source: GAO analysis of ICE data. | GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

Detentions

According to available ERO detention data, more than half of the individuals for whom ERO data indicate potential U.S. citizenship and whom ERO booked into immigration detention facilities had a criminal or immigration history (see table 16).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

**Table 16: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 23 | 4 | 10 | 14 | 13 | 4 | **68** |
| Other immigration violator | 14 | 13 | 11 | 1 | 5 | 2 | **46** |
| Pending criminal charges | 0 | 0 | 0 | 4 | 2 | 1 | **7** |
| **Total** | **37** | **17** | **21** | **19** | **20** | **7** | **121** |

Source: GAO analysis of ICE data. | GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

Individuals for whom ERO data indicate potential U.S. citizenship and whom ERO booked into immigration detention facilities were most often detained in the Los Angeles and Phoenix areas of responsibility (see figure 17).[2]

[2]ERO operates across 24 areas of responsibility nationwide.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Figure 17: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of
Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location of Detention from Fiscal Year 2015 through
2020 Quarter 2 (March 2020)



Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when
applicable, in its data system at some point during or after completing investigations of any claims or
indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an
enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in
its data system.

According to available ERO detention data, about half of all individuals for
whom ERO data indicate potential U.S. citizenship and whom ERO
booked into immigration detention facilities were released when their
immigration proceedings were terminated by ICE (see table 17).

**Table 17: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Release Reason from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Release reason | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Order of recognizance | 3 | 4 | 2 | 2 | 2 | 2 | 15 |
| Proceedings terminated | 20 | 5 | 10 | 9 | 9 | 5 | 58 |
| Prosecutorial discretion | 7 | 3 | 7 | 4 | 3 | 0 | 24 |
| Removed | 1 | 2 | 0 | 1 | 2 | 0 | 6 |
| All others[a] | 6 | 3 | 2 | 3 | 4 | 0 | 18 |
| **Total** | **37** | **17** | **21** | **19** | **20** | **7** | **121** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

[a]Other release reasons include "Bonded Out," "Order of Supervision," "Paroled," "Transferred," "U.S. Marshals or Other Agency," and "Withdrawal." Additionally, of release records for U.S. citizens, one record in 2015 was missing the individual's release reason.

Releases

According to available ERO release data, most individuals for whom ERO data indicate potential U.S. citizenship and whom ERO released from immigration detention facilities had a criminal or immigration history (see table 18).

**Table 18: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 3 | 0 | 4 | 3 | 3 | 2 | 15 |
| Other immigration violator | 8 | 9 | 6 | 0 | 4 | 1 | 28 |
| Pending criminal charges | 0 | 0 | 0 | 3 | 0 | 0 | 3 |
| **Total** | **11** | **9** | **10** | **6** | **7** | **3** | **46** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

According to available ERO release data, individuals for whom ERO data indicate potential U.S. citizenship and whom ERO released were most often released in the Los Angeles, Phoenix, and San Antonio areas of responsibility (see figure 18).

**Figure 18: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location of Detention from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Further, according to available ERO release data, more than half of all individuals for whom ERO data indicate potential U.S. citizenship and whom ERO released from immigration detention facilities were released on prosecutorial discretion (see table 19).

**Table 19: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Release Reason from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Release reason | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Bonded out | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Order of recognizance | 3 | 4 | 2 | 1 | 2 | 3 | 15 |
| Order of supervision | 0 | 1 | 1 | 0 | 0 | 0 | 2 |
| Paroled | 0 | 0 | 0 | 1 | 2 | 0 | 3 |
| Prosecutorial discretion | 7 | 3 | 7 | 4 | 3 | 0 | 24 |
| **Total** | **11** | **9** | **10** | **6** | **7** | **3** | **46** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

## Removals

According to available ERO removal data, most individuals for whom ERO data indicate potential U.S. citizenship and whom ERO removed from the United States had a criminal or immigration history (see table 20).

**Table 20: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 2 | 1 | 6 | 13 | 10 | 4 | 36 |
| Other immigration violator | 0 | 0 | 0 | 8 | 11 | 5 | 24 |
| Non-criminal | 0 | 1 | 9 | 0 | 0 | 0 | 10 |
| **Total** | **2** | **2** | **15** | **21** | **21** | **9** | **70** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

**Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens**

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

Individuals for whom ERO data indicate potential U.S. citizenship and whom ERO removed were most often removed from the San Diego area of responsibility (see figure 19).

**Figure 19: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location of Removal from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Additionally, according to available ERO removal data, most individuals
for whom ERO data indicate potential U.S. citizenship and whom ERO
removed from the United States had a case status that indicated they
were removed due to inadmissibility or deportability (see table 21).

**Table 21: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Case Status from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Case status | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Withdrawal permitted | 0 | 0 | 0 | 1 | 3 | 0 | **4** |
| Voluntary departure confirmed | 0 | 0 | 2 | 1 | 2 | 2 | **7** |
| Removed - deportability | 0 | 0 | 3 | 6 | 4 | 2 | **15** |
| Removed – inadmissibility | 2 | 2 | 10 | 13 | 9 | 5 | **41** |
| Voluntary return | 0 | 0 | 0 | 0 | 3 | 0 | **3** |
| **Total** | **2** | **2** | **15** | **21** | **21** | **9** | **70** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when
applicable, in its data system at some point during or after completing investigations of any claims or
indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an
enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in
its data system.

## ICE Immigration Detainers

The following tables contain information on individuals for whom ERO
data indicate potential U.S. citizenship and whom ERO officers issued
immigration detainers for from fiscal year 2015 through the second
quarter of fiscal year 2020.[3] According to available ERO detainer data,
most individuals for whom ERO data indicate potential U.S. citizenship
and whom ERO issued detainers for had a criminal history (see table 22).

---

[3]A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement
agencies which articulates probable cause for removability. It also requests for such
agency to inform DHS of a pending release date for a removable foreign national and to
maintain custody of the foreign national for up to 48 hours to allow DHS to assume
custody.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

**Table 22: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 78 | 119 | 173 | 173 | 71 | 36 | **650** |
| Other immigration violator | 68 | 21 | 23 | 19 | 14 | 11 | **156** |
| Pending criminal charges | 0 | 0 | 0 | 0 | 60 | 29 | **89** |
| **Total** | **146** | **140** | **196** | **192** | **145** | **76** | **895** |

Source: GAO analysis of ICE data. | GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

Further, according to available ERO detainer data, ERO issued detainers for individuals for whom ERO data indicate potential U.S. citizenship in the Dallas and Los Angeles areas of responsibility the most often (see figure 20).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Figure 20: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued
for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location from Fiscal Year 2015 through 2020
Quarter 2 (March 2020)



Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when
applicable, in its data system at some point during or after completing investigations of any claims or
indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an
enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in
its data system.

Of detainer records for potential U.S. citizens, 10 were missing the area of responsibility where ICE
issued the detainer (five in fiscal year 2015; four in fiscal year 2018; and one in fiscal year 2019)

Additionally, according to available ERO detainer data, most individuals
for whom ERO data indicate potential U.S. citizenship and whom ICE
issued detainers were located in county and state detention facilities (see
table 23).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

**Table 23: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Detention Facility Type from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Detention facility type | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| County facility | 86 | 71 | 128 | 127 | 92 | 44 | **548** |
| Federal facility | 9 | 11 | 18 | 16 | 30 | 9 | **93** |
| Local facility | 13 | 6 | 14 | 13 | 5 | 4 | **55** |
| State facility | 27 | 34 | 31 | 29 | 17 | 17 | **155** |
| All others | 11 | 18 | 5 | 7 | 1 | 2 | **44** |
| **Total** | **146** | **140** | **196** | **192** | **145** | **76** | **895** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Of detainer records for potential U.S. citizens, one record in 2015 was missing the individual's detention facility type.

## Immigration Status Inquires

ICE conducts immigration status inquiries on individuals in the custody of local, state, federal, and tribal law enforcement agencies upon their request or after otherwise identifying these individuals as potentially removable foreign nationals. ICE data indicate that it conducted 1,662,238 immigration status checks from fiscal year 2015 through the second quarter of fiscal year 2020. Of those 1,662,238 status checks, ICE identified that the individual was a U.S. citizen on 788,331 occasions (see figure 21).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens



Figure 21: Citizenship of Individuals Identified in Immigration Status Checks by U.S.
Immigration and Customs Enforcement (ICE) from Fiscal Year 2015 through 2020
Quarter 2 (March 2020)

Source: GAO analysis of OPLA data.  |  GAO-21-487

## U.S. Citizens Held and Arrested by CBP

The following tables contain additional information on U.S. citizens arrested and held by OFO and Border Patrol from fiscal year 2015 through the second quarter of fiscal year 2020.

### OFO Admissibility Referrals of U.S. Citizens

OFO inspects all individuals entering the country through ports of entry and may hold U.S. citizens as part of inspection processes, as needed, to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband. OFO officers conduct immigration and customs inspections of every individual presenting themselves for entry into the United States at U.S. ports of entry. If officers cannot admit, or permit entry of, an individual into the country based on primary inspection, they are to refer the individual to secondary inspection—sometimes known as an admissibility referral—where OFO continues the immigration inspection and investigates any potential issues. Available OFO data on admissibility referrals to secondary inspection indicate OFO officers made referrals of

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

U.S. citizens to secondary inspection for admissibility reasons on
6,255,077 occasions from fiscal year 2015 through the second quarter of
fiscal year 2020.[4] See table 24.

**Table 24: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Referrals for secondary inspection |
|---|---:|
| 2015 | 831,231 |
| 2016 | 934,460 |
| 2017 | 1,072,690 |
| 2018 | 1,380,308 |
| 2019 | 1,364,471 |
| 2020 Q1-2 | 671,917 |
| **Total** | **6,255,077** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Additionally, available OFO data on admissibility referrals to secondary
inspection indicate that OFO officers made more referrals of male U.S.
citizens than of female U.S. citizens for admissibility reasons during the
same time period (see table 25).

---

[4]Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

**Table 25: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Admissibility referrals for secondary inspection | | |
|---|---|---|---|
| | Male | Female | Other or not disclosed |
| 2015 | 520,867 | 305,672 | 220 |
| 2016 | 588,785 | 341,365 | 426 |
| 2017 | 658,838 | 395,977 | 16,365 |
| 2018 | 819,945 | 536,156 | 24,207 |
| 2019 | 813,951 | 528,102 | 22,418 |
| 2020 Q1-2 | 396,875 | 265,048 | 9,994 |
| **Total** | **3,799,261** | **2,372,320** | **73,630** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Of referral records for U.S. citizens, 9,866 were missing the individuals' gender (4,472 referrals in fiscal year 2015; 3,884 referrals in fiscal year 2016; and 1,510 in fiscal year 2017).

Further, available OFO data on admissibility referrals to secondary inspection indicate that OFO officers consistently made referrals of U.S. citizens aged 46 and older more than any other age group from fiscal year 2015 through the second quarter of fiscal year 2020 (see table 26).

**Table 26: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Age group | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| 0-7 | 48,174 | 51,211 | 58,826 | 81,178 | 78,790 | 37,272 | **355,451** |
| 8-13 | 42,672 | 45,662 | 53,801 | 75,127 | 72,902 | 32,556 | **322,720** |
| 14-18 | 58,134 | 65,006 | 72,595 | 93,854 | 92,369 | 45,313 | **427,271** |
| 19-30 | 213,061 | 248,904 | 276,932 | 338,518 | 330,444 | 167,853 | **1,575,712** |
| 31-45 | 211,923 | 241,918 | 275,798 | 348,608 | 345,045 | 165,016 | **1,588,308** |
| 46 and older | 257,267 | 281,759 | 334,738 | 443,023 | 444,920 | 223,903 | **1,985,610** |
| **Total** | **831,231** | **934,460** | **1,072,690** | **1,380,308** | **1,364,471** | **671,917** | **6,255,077** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S.

**Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens**

citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Of referral records for U.S. citizens, five were missing the individuals' ages (one referral in fiscal year 2019 and four referrals in fiscal year 2020 through quarter 2).

Available OFO data on admissibility referrals to secondary inspection also indicate that the San Diego Field Office area of responsibility made the most admissibility referrals to secondary admissibility inspection for U.S. citizens (see table 27).

**Table 27: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Field Office and Preclearance Operations Locations from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Field office and preclearance operations | Number of referrals of U.S. citizens | Percentage of referrals of U.S. citizens |
|---|---:|---:|
| Atlanta | 18,658 | 0.3 |
| Baltimore | 50,266 | 0.8 |
| Boston | 112,867 | 1.8 |
| Buffalo | 268,254 | 4.3 |
| Chicago | 82,341 | 1.3 |
| Detroit | 173,578 | 2.8 |
| El Paso | 606,191 | 9.7 |
| Houston | 128,215 | 2.1 |
| Laredo | 1,085,296 | 17.4 |
| Los Angeles | 53,582 | 0.9 |
| Miami | 225,740 | 3.6 |
| New Orleans | 1,515 | 0.0 |
| New York | 480,697 | 7.7 |
| Portland | 13,164 | 0.2 |
| Preclearance | 104,741 | 1.7 |
| San Diego | 2,012,420 | 32.2 |
| San Francisco | 90,725 | 1.5 |
| San Juan | 11,169 | 0.2 |
| Seattle | 206,239 | 3.3 |
| Tampa | 18,482 | 0.3 |
| Tucson | 510,937 | 8.2 |
| **Total** | **6,255,077** | **100** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Of admissibility referral records for U.S. citizens, one referral record from headquarters (Washington, D.C.) is included in the Baltimore Field Office.

## OFO Enforcement Actions for U.S. Citizens

When officers determine individuals are inadmissible or have potential travel or trade violations, among other reasons, they are to arrest these individuals to pursue enforcement actions against them, including charging them with administrative immigration violations or to facilitate other civil enforcement action or criminal investigation and potential prosecution.[5] Available OFO enforcement action data indicate that OFO held U.S. citizens and processed them for various types of enforcement actions on 16,560 occasions from fiscal year 2015 through the second quarter of fiscal year 2020.[6] See table 28.

**Table 28: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Enforcement actions processed for U.S. citizens |
|---|---:|
| 2015 | 1,679 |
| 2016 | 2,126 |
| 2017 | 2,554 |
| 2018 | 3,080 |
| 2019 | 3,784 |
| 2020 Q1-2 | 3,337 |
| **Total** | **16,560** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration violations and criminal offenses, among others.

---

[5]CBP may temporarily hold juvenile U.S. citizens for the purpose of transferring them to the custody of a U.S. citizen relative or state or local agency if, for example, they are traveling with their foreign national parents who are being held for immigration violations. Additionally, CBP may arrest U.S. citizens for federal criminal violations, such as narcotics smuggling.

[6]OFO officials stated that officers enter the reason for holding and/or charges in narrative fields and on the appropriate processing forms. As such, the available data does not specify whether U.S. citizens were charged with administrative immigration violations.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Additionally, available OFO enforcement action data indicate that the
enforcement actions OFO processed against U.S. citizens most often
involved males during the same time period (see table 29).

**Table 29: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | Enforcement actions processed for U.S. citizens | | |
|---|---|---|---|
| | Male | Female | Other or not disclosed |
| 2015 | 1,174 | 505 | 0 |
| 2016 | 1,458 | 661 | 7 |
| 2017 | 1,659 | 881 | 14 |
| 2018 | 1,964 | 1,098 | 18 |
| 2019 | 2,347 | 1,421 | 16 |
| 2020 Q1-2 | 2,035 | 1,277 | 25 |
| **Total** | **10,637** | **5,843** | **80** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration
violations and criminal offenses, among others.

Available OFO enforcement action data also indicate that the
enforcement actions processed against U.S. citizens most often involved
individuals ages 19 to 30 (see table 30).

**Table 30: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Age Group | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| 0-7 | 25 | 61 | 117 | 124 | 167 | 181 | **675** |
| 8-13 | 17 | 69 | 176 | 217 | 367 | 213 | **1,059** |
| 14-18 | 66 | 96 | 182 | 226 | 318 | 225 | **1,113** |
| 19-30 | 524 | 699 | 826 | 1,127 | 1,293 | 1,126 | **5,595** |
| 31-45 | 538 | 619 | 737 | 805 | 954 | 804 | **4,457** |
| 46 and older | 509 | 582 | 515 | 581 | 685 | 787 | **3,659** |
| **Total** | **1,679** | **2,126** | **2,554** | **3,080** | **3,784** | **3,337** | **16,560** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Enforcement actions records include enforcement actions related to administrative immigration
violations and criminal offenses, among others.

Of enforcement action records for U.S. citizens, two were missing the individuals' age (one in fiscal
year 2017 and one in fiscal year 2020 through quarter 2).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Further, available OFO enforcement action data indicate that the San
Diego Field Office area of responsibility processed the most enforcement
actions against U.S. citizens (see table 31).

**Table 31: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Field Office and Preclearance Operations Locations from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Field office and preclearance locations | Number of enforcement actions | Percentage of total enforcement actions |
|---|---|---|
| Atlanta | 42 | 0.3 |
| Baltimore | 61 | 0.4 |
| Boston | 219 | 1.3 |
| Buffalo | 1,141 | 6.9 |
| Chicago | 19 | 0.1 |
| Detroit | 667 | 4.0 |
| El Paso | 1,163 | 7.0 |
| Houston | 830 | 5.0 |
| Laredo | 2,822 | 17.0 |
| Los Angeles | 40 | 0.2 |
| Miami | 3,196 | 19.3 |
| New Orleans | 0 | 0.0 |
| New York | 145 | 0.9 |
| Portland | 21 | 0.1 |
| Preclearance | 314 | 1.9 |
| San Diego | 3,433 | 20.7 |
| San Francisco | 37 | 0.2 |
| San Juan | 2 | 0.0 |
| Seattle | 219 | 1.3 |
| Tampa | 289 | 1.8 |
| Tucson | 1,900 | 11.5 |
| **Total** | **16,560** | **100** |

Source: GAO analysis of OFO data. | GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration
violations and criminal offenses, among others.

Finally, for most enforcement actions, OFO held U.S. citizens for less
than 24 hours (see table 32).

**Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens**

**Table 32: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Time in Custody from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Time in custody | Number of enforcement actions | Percentage of total enforcement actions |
|---|---|---|
| Not specified | 340 | 2.1 |
| Less than 24 hours | 14,884 | 89.9 |
| 24 to less than 48 hours | 782 | 4.7 |
| 48 to less than 72 hours | 268 | 1.6 |
| 72 to less than 96 hours | 102 | 0.6 |
| 96 to less than 120 hours | 52 | 0.3 |
| 120 to less than 144 hours | 16 | 0.1 |
| 144 hours to less than 1 week | 21 | 0.1 |
| 1 week and greater | 95 | 0.6 |
| **Total** | **16,560** | **100** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration violations and criminal offenses, among others.

**Border Patrol Arrests of U.S. Citizens**

Similar to OFO, Border Patrol may hold U.S. citizens that its agents encounter between ports of entry, as needed to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband. Available Border Patrol data indicate Border Patrol made 85,423 arrests of U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020. See table 33.

**Table 33: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Arrests of U.S. citizens |
|---|---|
| 2015 | 16,588 |
| 2016 | 16,241 |
| 2017 | 14,210 |
| 2018 | 15,045 |
| 2019 | 15,514 |
| 2020 Q1-2 | 7,825 |
| **Total** | **85,423** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Additionally, Border Patrol data indicate Border Patrol made more than double of the amount of arrests of male U.S. citizens than of female U.S. citizens during the same period (see table 34).

**Table 34: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | | | Arrests of U.S. citizens |
|---|---|---|---|
| | Male | Female | Other or not disclosed |
| 2015 | 11,692 | 4,802 | 94 |
| 2016 | 11,311 | 4,863 | 67 |
| 2017 | 10,076 | 4,079 | 55 |
| 2018 | 10,369 | 4,624 | 52 |
| 2019 | 10,454 | 5,017 | 43 |
| 2020 Q1-2 | 5,415 | 2,399 | 11 |
| **Total** | **59,317** | **25,784** | **322** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Available Border Patrol data also indicate that arrests of U.S. citizens most often involved individuals ages 19 to 30 (see table 35).

**Table 35: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Age group | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Not specified | 28 | 18 | 18 | 15 | 28 | 2 | **109** |
| 0-7 | 232 | 245 | 189 | 142 | 386 | 124 | **1,318** |
| 8-13 | 174 | 255 | 226 | 142 | 607 | 203 | **1,607** |
| 14-18 | 1,334 | 1,343 | 1,237 | 1,542 | 1,646 | 904 | **8,006** |
| 19-30 | 7,751 | 7,888 | 6,893 | 7,175 | 7,242 | 3,739 | **40,688** |
| 31-45 | 4,543 | 4,364 | 3,807 | 4,075 | 3,931 | 2,042 | **22,762** |
| 46 and older | 2,526 | 2,128 | 1,840 | 1,954 | 1,674 | 811 | **10,933** |
| **Total** | **16,588** | **16,241** | **14,210** | **15,045** | **15,514** | **7,825** | **85,423** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Further, available Border Patrol data indicate that arrests of U.S. citizens occurred in Rio Grande Valley Sector in Texas most often (see table 36).

**Table 36: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Border Patrol Sector from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Sector | Number of arrests of U.S. citizens | Percentage of total arrests |
|---|---|---|
| Big Bend | 10,391 | 12.2 |
| Blaine | 146 | 0.2 |
| Buffalo | 74 | 0.1 |
| Del Rio | 4,687 | 5.5 |
| Detroit | 402 | 0.5 |
| El Centro | 4,739 | 5.6 |
| El Paso | 6,869 | 8.0 |
| Grand Forks | 97 | 0.1 |
| Houlton | 56 | 0.1 |
| Havre | 48 | 0.1 |
| Laredo | 10,697 | 12.5 |
| Miami | 107 | 0.1 |
| New Orleans | 323 | 0.4 |
| Rio Grande Valley | 19,556 | 22.9 |
| Ramey | 72 | 0.1 |
| San Diego | 11,041 | 12.9 |
| Spokane | 99 | 0.1 |
| Swanton | 603 | 0.7 |
| Tucson | 10,068 | 11.8 |
| Yuma | 5,348 | 6.3 |
| **Total** | **85,423** | **100** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Finally, available data indicate that Border Patrol held U.S. citizens for less than 24 hours in approximately 83 percent of arrests and less than 48 hours in about 92 percent of arrests (see table 37).

**Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens**

**Table 37: U.S. Border Patrol (Border Patrol) Arrests by Time in Custody from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Time in custody[a] | Total | Percent of total |
|---|---|---|
| Not specified | 1,128 | 1.3 |
| Less than 24 hours | 71,099 | 83.2 |
| 24 to less than 48 hours | 7,528 | 8.8 |
| 48 to less than 72 hours | 2,968 | 3.5 |
| 72 to less than 96 hours | 1,143 | 1.3 |
| 96 to less than 120 hours | 533 | 0.6 |
| 120 to less than 144 hours | 219 | 0.3 |
| 144 hours to less than 1 week | 121 | 0.1 |
| 1 week and greater | 684 | 0.8 |
| **Total** | **85,423** | **100** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

[a]We calculated time in custody by subtracting the initial book-in date from the final book-out date.

# Appendix IV: Comments from the Department of Homeland Security



U.S. Department of Homeland Security
Washington, DC 20528

June 30, 2021

Rebecca Gambler
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street, NW
Washington, DC  20548

Re:    Management Response to Draft Report GAO-21-487, "IMMIGRATION
       ENFORCEMENT:  Actions Needed to Better Track Cases Involving U.S.
       Citizenship Investigations"

Dear Ms. Gambler:

Thank you for the opportunity to comment on this draft report.  The U.S. Department of
Homeland Security (DHS or the Department) appreciates the U.S. Government
Accountability Office's (GAO) work in planning and conducting its review and issuing this
report.

The Department is pleased to note GAO's recognition that the U.S. Immigration and
Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have policies
and procedures for investigating the potential U.S. citizenship of individuals its offices and
agents encounter.  It is also important to note, however, that U.S. citizenship law is complex,
and an individuals' U.S. citizenship may not always be easily ascertained.  ICE and CBP
handle potential claims to U.S. citizenship with the utmost care and highest priority, pursuant
to the Immigration and Nationality Act of 1952, codified under Title 8 of the United States
Code, which governs immigration to, and citizenship, in the United States.  Specifically, the
Act sets forth the parameters for U.S. citizenship by virtue of birth in the United States,
naturalization, derivation of citizenship through a parent who has been naturalized, or
acquisition of citizenship from a U.S. citizen parent.

On November 10, 2015, for example, ICE issued Directive 16001.2 – "Investigating the
Potential U.S. Citizenship of Individuals Encountered by ICE," which updated previous
guidance, dated November 19, 2009, on reporting and investigating claims to U.S.
citizenship.  This updated directive established an agency-wide policy for ensuring ICE
officers, agents, and attorneys immediately investigate any potential claims to U.S.
citizenship and analyze any evidence presented by the individual or family member.

**Appendix IV: Comments from the Department of Homeland Security**

ICE does not have legal authority to arrest and/or detain a U.S. citizen for a civil administrative immigration violation. Nevertheless, while performing their duties, ICE officers and agents may encounter individuals who are not certain of their citizenship status, who may claim to be a U.S. citizen, or who may not know they are U.S. citizens. During these encounters, for instance, ICE officers and agents may observe or note some indicia warranting further examination to determine whether these individuals potentially have U.S. citizenship. Accordingly, ICE evaluates the articulable facts of every individual encountered to determine whether to detain, arrest, or lodge an immigration detainer against the individual based upon those facts. However, these encounters can be complicated by an individual's lack of knowledge of the necessary details regarding, among other things: their citizenship status; the citizenship and immigration status of their parents and grandparents; or their periods of physical presence in the United States.

Family members may also be unwilling to provide information when contacted, or conflicting records or falsified documentation may also be a factor, which contribute to U.S. citizenship inquiries often requiring extensive investigation and substantive legal research and analysis due to the complexity of citizenship and nationality law.

Additionally, changes in citizenship law or decisions by the Board of Immigration Appeals or the U.S Courts of Appeals can affect the analysis of whether an individual has a viable claim to U.S. citizenship, including changes in law that might occur after ICE has reviewed a citizenship claim and undertaken a certain course of action.

ICE and CBP remain committed to not only investigating and analyzing claims of U.S. citizenship when encountering individuals making a claim to U.S. citizenship, but also when certain indicia of potential U.S. citizenship are present in a case, even if the individual does not affirmatively make a claim to U.S. citizenship expeditiously.

The draft report contained two recommendations with which the Department concurs. Attached, find our detailed response to each recommendation. DHS previously submitted technical comments addressing accuracy, contextual, and other issues under a separate cover for GAO's consideration.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

Sincerely,

JIM H CRUMPACKER
Digitally signed by JIM H CRUMPACKER
Date: 2021.06.30 07:39:00 -04'00'

JIM H. CRUMPACKER, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

Attachment

2

**Attachment:  Management Response to Recommendations
Contained in GAO-21-487**

GAO recommended the Director of ICE:

**Recommendation 1:**  Update ICE's training materials to reflect ICE policies requiring officers to consult supervisors during encounters with potential U.S. citizens.

**Response:**  Concur.  The ICE Enforcement and Removal Operations (ERO) Academy made updates to the Basic Immigration Enforcement Training Program.  Specifically, ERO added a student note to the "Creating a Scratch I-213" course, which stated, "what to do if a subject claims to be a U.S. citizen, or indicia exists of potential U.S. citizenship, will be discussed further in upcoming Encounter Subjects in Law Enforcement Custody and Field Operations Overview courses."  The focus of this section is to make it clear that U.S. citizens shall not be arrested, detained, or subject to detainers.  ICE ERO also added additional references to ICE Directive 16001.2 within the "Encounter Subjects in Law Enforcement Custody" course. These courses were updated on June 9, 2021, and documentation attesting to the completion of the following updates was provided to GAO under a separate cover on June 21, 2021:

- Scratch I-213 lesson plan;
- Scratch I-213 student guide; and
- Encounter Subjects in Law Enforcement Custody lesson plan.

DHS requests that GAO consider this recommendation resolved and closed, as implemented.

**Recommendation 2:**  Systematically collect and maintain electronic data on its encounters with individuals for whom there is probative evidence of U.S. citizenship.

**Response:**  Concur.  ICE ERO, the Office of the Principal Legal Advisor, and others, as appropriate, will analyze the processes and the systems used when processing a noncitizen and capturing information about citizenship when there is evidence in a case that suggests a credible claim to U.S. citizenship.  Further, the ICE Office of the Principal Legal Advisor, ERO Field Operations, and the Law Enforcement Systems and Analysis Divisions are internally working together to appropriately define the requirements, and ICE ERO will update system user guides and standard operating procedures to reflect new guidance for ICE ERO officers to systematically collect and maintain this data electronically.  Estimated Completion Date:  June 30, 2022.

3

# Appendix V: GAO Contact and Staff Acknowledgments

| GAO Contact | Rebecca Gambler at (202) 512-8777, gamblerr@gao.gov |
|---|---|
| Staff Acknowledgements | In addition to the contact named above, Meg Ullengren (Assistant Director), Nasreen Badat, Michele Fejfar, Eric Hauswirth, Stephanie Heiken (Analyst-in-Charge), Kelsey Kestenbaum, Claire Liu, Jeffrey Love, Sasan J. "Jon" Najmi, and Minette Richardson made key contributions to this report. |

(104073)

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact FraudNet: <br><br> Website: https://www.gao.gov/about/what-gao-does/fraudnet <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| Congressional Relations | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.