**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

|  |  |
|---|---|
| **New England Synod, Evangelical Lutheran Church in America,** *et al.*,<br><br>Plaintiffs,<br><br>**v.**<br><br>**Department of Homeland Security,** *et al.*,<br><br>Defendants. | Case No. 4:25-cv-40102-FDS<br><br>**LEAVE TO FILE GRANTED ON JULY 29, 2025** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

I.    Defendants have removed longstanding protections for sensitive locations. .................... 2

    A.    For decades, the government limited immigration enforcement at
        houses of worship and other sites of religious practice. .......................................... 2

    B.    Defendants abruptly rescinded these protections for sensitive locations ............... 4

II.   DHS's new policy has sown fear among congregations across the country ..................... 5

    A.    Under its new policy, DHS is accelerating enforcement actions at
        houses of worship and other sensitive locations. ..................................... 5

    B.    As a result of DHS's new policy, people now fear participating in
        worship and other activities at houses of worship. .................................. 7

III.  DHS's new policy harms Plaintiffs and their members. ..................................... 8

    A.    Plaintiffs' beliefs and connection to immigrant communities. ............................. 8

    B.    The effect of DHS's new policy on Plaintiffs and their members. ....................... 11

LEGAL STANDARD ......................................................................................... 15

ARGUMENT ..................................................................................................... 16

I.    Plaintiffs are likely to succeed on the merits. ................................................. 16

    A.    DHS's new policy violates the Religious Freedom Restoration Act. ................... 16

        1.    The policy imposes a substantial burden on Plaintiffs' religious
            exercise. ...................................................................................... 16

        2.    The policy cannot survive strict scrutiny. .................................................. 19

    B.    DHS's new policy violates Plaintiffs' First Amendment rights of
        expressive association. ........................................................................ 20

        1.    The policy directly and substantially interferes with Plaintiffs'
            right to gather for religious exercise. ......................................................... 20

        2.    The policy cannot satisfy exacting scrutiny. ............................................... 22

C.      DHS's new policy is arbitrary and capricious in violation of the APA............... 23

       1.      Defendants' adoption of the new policy constitutes final
        agency action subject to review under the APA. ....................................... 23

       2.      The policy is arbitrary and capricious in multiple respects. .................... 25

D.      DHS's new policy is contrary to law, in excess of statutory limitations,
        and contrary to constitutional right in violation of the APA. ............................ 26

II.     Plaintiffs will suffer irreparable harm unless DHS's new policy is stayed. .................... 26

III.    The balance of equities and public interest favor Plaintiffs................................................. 27

IV.     Plaintiffs are entitled to a stay under the APA or a preliminary injunction...................... 27

CONCLUSION ............................................................................................................................ 30

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12 (D.D.C. 2010) ......................... 16

*Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-cv-628, 2025 WL 1191844
    (D. Md. Apr. 24, 2025) ................................................................................ 28

*Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) .................................... 20, 22, 23

*Ass'n of Am. Univs. v. Dep't of Def.*, No. 25-cv-11740, 2025 WL 2022628
    (D. Mass. July 18, 2025) ............................................................................. 29

*Ass'n of Am. Univs. v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135
    (D. Mass. May 15, 2025) ............................................................................. 24

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) ............................... 20

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................... 23

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ............................................................ 21

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)........................................... 16, 19, 20

*Cabrera v. DOL*, No. 25-cv-1909, 2025 WL 2092026 (D.D.C. July 25, 2025)......................... 29

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024).......................... 28

*Cohen v. United States*, 578 F.3d 1 (D.C. Cir. 2009) ...................................................... 24

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024)......................... 29

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)................................................... 25

*District of Columbia v. USDA*, 444 F. Supp. 3d 1 (D.D.C. 2020)................................. 29

*Doe v. Trump*, 766 F. Supp. 3d 266 (D. Mass. 2025) ...................................................... 27

*Dorce v. Wolf*, 506 F. Supp. 3d 142 (D. Mass. 2020)...................................................... 27

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................... 25

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021)...................................................... 19

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006) ................. 19

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) ................................................... 17

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ..................................... 27

*LeBaron v. Spencer*, 527 F. App'x 25 (1st Cir. 2013) ..................................................... 17

*Mass. Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600 (D. Mass. 2020) .................................. 15, 30

*Massachusetts v. NIH*, 770 F. Supp. 3d 277 (D. Mass. 2025) .......................................... 26, 27, 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................................ 25

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ............................................. 21

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................... 27

*Ohio v. EPA*, 603 U.S. 279 (2024) .............................................................................. 25

*Orr v. Trump*, No. 25-cv-10313-JEK, 2025 WL 1145271 (D. Mass. Apr. 18, 2025) ................. 28

*Parsons v. DOJ*, 878 F.3d 162 (6th Cir. 2017) ............................................................. 24

*Perrier-Bilbo v. United States*, 954 F.3d 413 (1st Cir. 2020) ................................................ 16, 18

*Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*,
    767 F. Supp. 3d 293 (D. Md. 2025) ........................................................ 12, 17, 19, 22, 26

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ....................................................................... 20, 21

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ..................................... 1, 18, 26

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8 (1st Cir. 2000) ............................. 26

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) ............................. 21

*Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33 (1st Cir. 2007) ................................................... 17, 20

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) .......................................................... 22

*Texas v. Becerra*, No. 24-cv-211, 2024 WL 4490621 (E.D. Tex. Aug. 30, 2024) ..................... 28

*Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022) ................................................. 28

*Texas v. DHS*, 123 F.4th 186 (5th Cir. 2024) .............................................................. 30

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ............................................................ 24

*Texas v. HHS*, 770 F. Supp. 3d 940 (E.D. Tex. 2025) .................................................. 28

*The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) ............... 12, 21

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981) ............................................ 21

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025)........................................................................ 27, 29

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) .......................................... 23, 24

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) ...................................... 26

*West Virginia v. EPA*, 577 U.S. 1126 (2016)................................................................................ 27

*Winter v. NRDC*, 555 U.S. 7 (2008) ............................................................................................. 16

## STATUTORY PROVISIONS

5 U.S.C. § 704................................................................................................................................ 23

5 U.S.C. § 705........................................................................................................................ 15, 30

5 U.S.C. § 706........................................................................................................................ 25, 26

8 U.S.C. § 1252.............................................................................................................................. 30

42 U.S.C. § 2000bb-1 ................................................................................................................... 16

42 U.S.C. § 2000cc–3 ................................................................................................................... 16

42 U.S.C. § 2000cc–5 ....................................................................................................................16

## OTHER AUTHORITIES

Alexandra Crosnoe, *After Reports of ICE at Catholic Churches, California Bishop Denounces Raids*, Mercury News (June 25, 2025) https://perma.cc/G3P2-APWR ................................................................................................................... 6

Billal Rahman, *ICE Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025), https://perma.cc/7EJP-Q33G ..................................................... 5

Celine Stevens, *Vineyard Business Owner Detained by ICE Outside Oregon Church Amid Heightened Immigration Enforcement*, KGW8 (June 15, 2025), https://perma.cc/F8Z6-PY2E ............................................................................. 6

Diocese of San Bernardino, *Decree Dispensing from the Obligation to Attend Sunday Mass* (July 8, 2025), https://perma.cc/7ZSC-WCTH.......................................... 7

Gustavo Sagrero Álvarez, *Washington Family Torn Apart After Father Arrested Outside of Church and Deported*, NPR (Mar. 6, 2025), https://perma.cc/L638-43VG.................................................................................................................... 5

Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025), https://perma.cc/SFH6-H42U ............................................................................ 6

Karla Rendon, *Immigration Raids Reported Near Downey Churches*, NBC News (June 11, 2025), https://perma.cc/LLU9-SH2T .................................................. 6

Press Release, Nat'l Ass'n of Evangelicals, National Association of Evangelicals Responds to New Executive Orders (Jan. 22, 2025), https://perma.cc/77UB-H7N3 ........................................................................................................................ 7

Press Release, U.S. Conf. of Cath. Bishops, Human Dignity is Not Dependent on a Person's Citizenship or Immigration Status (Jan. 23, 2025), https://perma.cc/QP2N-77S6 .......................................................................................... 7

Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The 2023/KFF LA Times Survey of Immigrants*, KFF (Sept. 17, 2023), https://perma.cc/UHB7-A7VN ....................................................................................... 8

## INTRODUCTION

For many people across the country, "attending religious services" is "at the very heart" of the "guarantee of religious liberty." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19–20 (2020). The government has long recognized this: For decades, it strictly limited immigration enforcement at houses of worship and other sensitive locations, concluding that it could enforce immigration laws without intruding on these areas in ways that might infringe on people's ability to exercise fundamental rights.

Defendants the Department of Homeland Security and DHS Secretary Kristi Noem have now jettisoned that longstanding policy and the respect for religious practice that it embodied. In place of the protections the government previously afforded to houses of worship, Defendants have freed their agents to surveil attendees, seize parishioners as they go to or from services, and even enter churches themselves, subject only to the agents' discretion and "a healthy dose of common sense." Since that change in policy, DHS agents have carried out an increasing number of operations at or near houses of worship, and the pace and aggression of those actions has only accelerated in recent weeks.

Congregants now fear attending services and events at their houses of worship, leaving them unable to take part in one of the most fundamental rituals of their faith. Even those who are able to attend now do so in a climate of fear, sometimes behind locked doors or signs marking the church as "private," and deprived of the ability to commune with their absent co-congregants in spiritual fellowship. Likewise, congregations are unable to minister to the wider public—as their faith demands of them—when people are too scared of the threat of immigration enforcement at houses of worship to seek sustenance at a food pantry, attend an English as a Second Language class, or receive other vital services. Across the country, people of faith have been put to an

impossible choice between two deeply held beliefs: on one hand, welcoming all to join them and, on the other, not putting those who would do so in harm's way through an encounter with an armed federal agent. Plaintiffs—religious organizations representing congregations across the country—have suffered all these harms and others as a result of DHS's new policy.

The First Amendment and Religious Freedom Restoration Act prohibit that burdening of Plaintiffs' rights of expressive association and religious exercise. And the Administrative Procedure Act bars DHS's unlawful and irrational change in policy. Plaintiffs therefore are likely to succeed in challenging that policy, which is causing grave harm to them and to people of faith around the country. Those factors, plus the public interest, strongly favor preliminarily setting aside the new policy under 5 U.S.C. § 705—or, in the alternative, preliminarily enjoining its enforcement—to ensure that Defendants cease to infringe upon fundamental rights.

## FACTUAL BACKGROUND

I.    **Defendants have removed longstanding protections for sensitive locations.**

A.    **For decades, the government limited immigration enforcement at houses of worship and other sites of religious practice.**

For more than 30 years, it has been the government's policy to restrict immigration-enforcement operations at "sensitive locations"—also referred to as "protected areas"—such as schools, hospitals, and, as relevant here, houses of worship.

In 1993, the Immigration and Naturalization Service ("INS") adopted a policy "to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." Ex. 1. That policy required written advance notice of operations that were likely to involve sensitive locations, set standards for when such operations were appropriate, and required agents to consider ways to "minimize the impact on operation of the . . . place of worship." *Id.* at 1–2.

In 2008, Immigration and Customs Enforcement ("ICE"), a successor of INS, reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances." Ex. 2, at 1. That memo outlined the rare situations required to justify enforcement at such locations, including "terrorism-related investigations" or "matters of public safety." *Id.* at 2.

Three years later, ICE further underscored the importance of avoiding enforcement actions near sensitive locations. Ex. 3. Such actions, that guidance made clear, should be avoided and could proceed only in exigent circumstances (e.g., terrorism or imminent risk of death) or with prior written approval. *Id.* at 2–3.

In 2021, DHS Secretary Alejandro Mayorkas rescinded and superseded the prior memos while reaffirming the government's longstanding policy of avoiding enforcement at sensitive locations. Ex. 4 ("Mayorkas Memo"). The Mayorkas Memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." *Id.* at 2. And it recognized that enforcement actions—"includ[ing] . . . arrests, civil apprehensions, searches, inspections, . . . and immigration enforcement surveillance"—at sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at 3.

The Mayorkas Memo announced that DHS had an "obligation to refrain, *to the fullest extent possible*, from conducting a law enforcement action in or near a protected area"—an obligation it emphasized repeatedly. *Id.* (emphasis added); *see also, e.g.*, *id.* at 2 ("The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area."). The memo recognized that certain exigent

circumstances might require enforcement at sensitive locations. *Id.* at 3–4. Outside of those circumstances, however, it dictated that "an Agent or Officer must seek prior approval" before proceeding. *Id.* at 4. And because the memo applied to all DHS personnel, not just line agents, any official asked to approve an enforcement action at a sensitive location would themselves be bound by the requirement that such actions be avoided "to the fullest extent possible."

### B.    Defendants abruptly rescinded these protections for sensitive locations.

In January 2025, DHS threw out these longstanding protections. In a short memo from Acting DHS Secretary Benjamine Huffman, DHS rescinded the Mayorkas Memo, effective immediately. Ex. 6 ("Huffman Memo"). While Defendants' new policy does away with the requirement that agents "refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area," it contains no replacement constraints on agents' authority. It does not require any internal process for enforcement at sensitive locations. And it does not require that exigent circumstances exist before agents may raid a sensitive location, let alone define what exigent circumstances might be enough.

Instead, the Huffman Memo leaves it to individual agents' "enforcement discretion"— guided only by "a healthy dose of common sense"—whether it is appropriate to undertake enforcement at a sensitive location, specifically disavowing the need for "bright line rules."

In a press release issued the next day, DHS stated that:

This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders [sic] and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

Ex. 7.

Following the Huffman Memo, ICE issued further instructions to agents. Ex. 8 ("Vitello Memo" and, together with the Huffman Memo, the "2025 Policy"). The Vitello Memo emphasized that DHS "will not be issuing bright line rules regarding where immigration laws are permitted to be exercised" and instead would leave those decisions to the discretion "of the Department's law enforcement personnel." It "charge[d] Assistant Field Office Directors . . . and Assistant Special Agents in Charge . . . with responsibility for making case-by-case determinations" when to enforce at sensitive locations, but did not clarify when or on what basis such determinations should be made. *Id.* at 2.

## II.    DHS's new policy has sown fear among congregations across the country.

### A.    Under its new policy, DHS is accelerating enforcement actions at houses of worship and other sensitive locations.

Defendants quickly availed themselves of the new opportunity to carry out enforcement at houses of worship. The first Sunday after Defendants announced the new policy, for example, ICE agents attempted to enter a Georgia church in the middle of a sermon, ultimately arresting one of the congregants as he exited.[1] The same day, agents in unmarked pickups and SUVs surrounded a family in their church parking lot as they were leaving Sunday service in Washington, pulling the father out of his car and arresting him in front of his family and pastor.[2]

As the administration has increased the pace and aggressiveness of immigration enforcement across the country in recent weeks, raids and arrests at or near houses of worship are becoming more frequent. In June alone, news outlets reported that federal agents: arrested a man

---

[1] Billal Rahman, *ICE Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025), https://perma.cc/7EJP-Q33G.

[2] Gustavo Sagrero Álvarez, *Washington Family Torn Apart After Father Arrested Outside of Church and Deported*, NPR (Mar. 6, 2025), https://perma.cc/L638-43VG.

outside a church in Downey, California, brandishing a rifle at the church pastor in the process[3]; detained a grandfather dropping off his granddaughter at school at a different church in Downey[4]; seized a man outside a church in Oregon[5]; and detained multiple people in operations at two churches in Montclair and Highland, California.[6]

Such incidents have touched Plaintiffs and their members directly. A congregation of the Sierra Pacific Synod experienced an incident where ICE used their parking lot as a staging ground, with unmarked SUVs in the lot and men standing around donning weapons and vests marking them as federal law enforcement. Ex. 10 ¶ 27 (reporting that the incident "sen[t] a clear signal to the whole neighborhood that this is no longer a safe space"). Immigration enforcement activities have been carried out near some of the Pacific Yearly Meeting's monthly meetings, including just a block away from one meeting earlier this month. Ex. 11 ¶ 34. At least two congregations of the Greater Milwaukee Synod that offer services in Spanish have seen ICE activity take place near their churches; in both cases, congregants were left in fear of attending worship services. Ex. 12 ¶¶ 11, 20. And earlier this summer, ICE agents attempted to enter the grounds of an American Baptist Churches USA member church in New York that has been heavily involved in resettling refugees. Ex. 26 ¶ 17. Four individuals—one wearing a t-shirt identifying him as an ICE agent— came through the privacy gate into the parsonage of the church property, indicating they were

---

[3] Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025), https://perma.cc/SFH6-H42U.

[4] Karla Rendon, *Immigration Raids Reported Near Downey Churches*, NBC News (June 11, 2025), https://perma.cc/LLU9-SH2T.

[5] Celine Stevens, *Vineyard Business Owner Detained by ICE Outside Oregon Church Amid Heightened Immigration Enforcement*, KGW8 (June 15, 2025), https://perma.cc/F8Z6-PY2E.

[6] Alexandra Crosnoe, *After Reports of ICE at Catholic Churches, California Bishop Denounces Raids*, Mercury News (June 25, 2025) https://perma.cc/G3P2-APWR.

looking for someone and leaving only after confronted by a pastor. Ex. 26 ¶ 17; *see also* Ex. 26 ¶ 14 (describing reports of visible ICE presence or activity near other churches).

> **B.    As a result of DHS's new policy, people now fear participating in worship and other activities at houses of worship.**

Predictably, news of the policy change and of immigration enforcement at churches and other sensitive locations pursuant to the new policy has left people too afraid to attend worship services and other religious activities they otherwise would.

Soon after the policy was announced, Catholic organizations reported that, "[w]ith the mere rescission of the protected areas guidance," they were "already witnessing reticence among immigrants to engage in daily life, including . . . attending religious services." Press Release, U.S. Conf. of Cath. Bishops, Human Dignity is Not Dependent on a Person's Citizenship or Immigration Status (Jan. 23, 2025), https://perma.cc/QP2N-77S6. A national Evangelical group similarly cautioned that "[e]ven the announcement of this policy has caused fear, deterring some from attending church." Press Release, Nat'l Ass'n of Evangelicals, National Association of Evangelicals Responds to New Executive Orders (Jan. 22, 2025), https://perma.cc/77UB-H7N3.

These impacts have increased as DHS has ramped up its enforcement activities this summer. Earlier this month, for example, the Catholic Bishop of the San Bernadino Diocese was even compelled to take the rare step of issuing a special dispensation to worshippers, indefinitely lifting the obligation to attend Sunday Mass for those "who, due to genuine fear of immigration enforcement actions, are unable to attend." Diocese of San Bernardino, *Decree Dispensing from the Obligation to Attend Sunday Mass*, at 2 (July 8, 2025), https://perma.cc/7ZSC-WCTH. The diocese reported that "attendance at Spanish-language Masses across its parishes had dropped by at least half." Claire Moses and Orlando Mayorquín, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (July 10, 2025), https://perma.cc/8P2D-8866.

The fear engendered by Defendants' new policy extends beyond people without lawful status. Ample data shows that, in general, "[f]ears of detention and deportation are a concern for immigrants across immigration statuses." Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The 2023/KFF LA Times Survey of Immigrants*, KFF (Sept. 17, 2023), https://perma.cc/UHB7-A7VN. For example, a comprehensive 2023 study found that 26% of immigrants, regardless of their own legal status, "worry they or a family member could be detained or deported." *Id.* Under this administration, that risk has only grown as Defendants rush to meet new immigration arrest quotas, sweeping up citizens and those otherwise protected from deportation in the process. *See, e.g.*, Compl. ¶¶ 61–64 and sources cited therein.

## III.     DHS's new policy harms Plaintiffs and their members.

### A.     Plaintiffs' beliefs and connection to immigrant communities.

Plaintiffs are a coalition of houses of worship and religious organizations representing congregations across the country. While their beliefs differ, Plaintiffs all place great religious importance on coming together in person for regular communal worship; on welcoming those who wish to worship with them; on protecting and uplifting the vulnerable, especially "the stranger" or the immigrant; and on practicing the tenets of their faith in their everyday lives and in their communities through programs such as food banks, schools, and English as a Second Language ("ESL") classes. Plaintiffs are also united in serving diverse immigrant communities as part of their religious missions, and all have a history of activism and support for immigrants.

Plaintiffs New England Synod, Greater Milwaukee Synod, Southwest California Synod, Southwestern Texas Synod, and Sierra Pacific Synod (together, the "Synods") are regional bodies of the Evangelical Lutheran Church in America (ELCA). They include many churches with significant memberships from immigrant communities. Ex. 17 ¶ 4; Ex. 13 ¶¶ 5, 7; Ex. 12 ¶¶ 7–8;

Ex. 14 ¶¶ 2, 5; Ex. 15 ¶ 14; Ex. 10 ¶ 16; Ex. 16 ¶¶ 14, 19; Ex. 18 ¶ 5–6; Ex. 19 ¶ 6. Synod members believe that Jesus's command to love God and one's neighbors must guide their actions. Ex. 17 ¶¶ 6–7; Ex. 15 ¶¶ 16–23; Ex. 10 ¶¶ 17–18; Ex. 18 ¶¶ 7, 11–12; Ex. 13 ¶¶ 11–17; Ex. 19 ¶ 10; Ex. 16 ¶ 21. The scriptural mandate in Matthew 25—"I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink, I was a stranger and you invited me in . . ."—is essential to their faith. Ex. 15 ¶ 19. Synod members welcome all people, especially for worship on Sunday morning. Ex. 17 ¶¶ 11, 15–16; Ex. 14 ¶ 6; Ex. 13 ¶ 22; Ex. 15 ¶¶ 20, 23; Ex. 10 ¶¶ 16–18; Ex. 16 ¶¶ 10, 16; Ex. 19 ¶ 7. As Lutherans, they also believe that loving one's neighbor is something they must do in practice. Ex. 14 ¶ 4; Ex. 13 ¶¶ 10, 17–18; Ex. 10 ¶¶ 16–18; Ex. 19 ¶ 10. They do so through public works such as housing migrants, distributing food to those in need, assisting in refugee resettlement, and providing ESL classes. Ex. 17 ¶¶ 8–10; Ex. 14 ¶¶ 3–4; Ex. 10 ¶ 16; Ex. 15 ¶ 28; Ex. 13 ¶¶ 17–21; Ex. 16 ¶¶ 13, 15, 21; Ex. 18 ¶ 17; Ex. 19 ¶ 9.

Plaintiffs San Francisco Friends Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting are part of the Quaker faith. Quakers are deeply committed to worshipping together in person at regular meetings. Ex. 20 ¶¶ 5–6, 28–29; Ex. 22 ¶ 16. They believe that anyone can hear the voice of God, and that when they do, they should share it. Ex. 21 ¶ 12; Ex. 20 ¶¶ 9, 13–14; Ex. 22 ¶¶ 8, 16; Ex. 11 ¶ 16. When someone speaks during meeting, it is similar to when a pastor speaks to a congregation, and it is to be taken the same way—as ministry given to the congregation. Quaker meetings are open to all comers; it is important to their faith that the doors be open, both physically and metaphorically. Ex. 20 ¶¶ 25, 35–36; Ex. 21 ¶ 12; Ex. 22 ¶¶ 5, 13; Ex. 11 ¶¶ 15–16. Quakers are also committed to pacifism and non-violence. Ex. 20 ¶ 39; Ex. 21 ¶¶ 25–26; Ex. 22 ¶ 19. The presence of weapons at a Meetinghouse would be wholly antithetical to their faith. Ex. 22 ¶ 19; Ex. 20 ¶¶ 38, 40–42; Ex. 21 ¶¶ 26–27. The San Francisco Friends

Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting all welcome individual immigrants to their meetings. Ex. 22 ¶ 20; Ex. 20 ¶¶ 27, 32; Ex. 21 ¶¶ 12–17; Ex. 11 ¶ 17.

Plaintiffs American Baptist Churches USA and Alliance of Baptists together represent nearly 5,000 Baptist congregations across the country, including many serving immigrant communities. Ex. 23 ¶ 19; Ex. 26 ¶¶ 4–6. Since educating freedmen after the Civil War, social outreach and justice have been a core aspect of the Baptist[7] tradition. Ex. 26 ¶ 8. Baptists are religiously committed to serving immigrants and refugees based on the biblical call to "welcome the stranger" in Matthew 25:35. Ex. 26 ¶¶ 9, 11–12. Scripture instructs Baptists to treat the whole world as neighbors that they must love as they love themselves, regardless of their legal status. Ex. 23 ¶¶ 13–14, 17–18; Ex. 26 ¶ 12. They live out this commitment by, among other things, providing resettlement assistance, helping refugees and immigrants meet basic needs, and offering ESL and citizenship classes. Ex. 26 ¶ 10; Ex. 23 ¶¶ 15–16. Baptists welcome all to regular worship services, which are a fundamental part of their religious practice. Ex. 23 ¶ 12; Ex. 26 ¶ 15.

Plaintiff Metropolitan Community Churches is an association of Christian churches. Since its inception, MCC has had a particular focus on welcoming LGBTQ+ individuals. Ex. 24 ¶ 6. One of MCC's core religious beliefs is that love is the greatest moral value, and resisting exclusion is a primary focus of MCC's ministry. MCC believes that everyone is included in the family of God, and communal worship is central to its members' faith. Ex. 24 ¶¶ 9–11. Indeed, while the structure of worship is generally not prescribed, member churches are required to use inclusive language in their services and to maintain an "open table"—that is, welcome all comers to communion. Ex. 24

---

[7] There are a variety of Baptist denominations; for ease of reference, "Baptist" as used in this motion refers to those affiliated with American Baptist Churches USA or Alliance of Baptists.

¶ 10; Ex. 25 ¶ 4. Many member churches count immigrants, both with legal status and without, among their congregations. Ex. 24 ¶¶ 10, 12; Ex. 25 ¶ 3.

**B.    The effect of DHS's new policy on Plaintiffs and their members.**

DHS's rescission of protections for sensitive locations and its adoption of a new policy in which enforcement at houses of worship is left to uncabined individual discretion has caused and continues to cause serious harm to Plaintiffs, their members, and countless others.

As a result of Defendants' change in policy, Plaintiffs and their members now reasonably fear immigration enforcement at and around their houses of worship. Indeed, as noted above, *supra* at 6–7, some of Plaintiffs' members have already experienced such incidents. For Plaintiffs and their members, the experience of armed federal agents on church property would be devastating and shatter their understanding of the church as a safe and sacred place. Ex. 23 ¶¶ 26–27; Ex. 20 ¶¶ 38, 40–41; Ex. 13 ¶ 36; Ex. 24 ¶ 13; Ex. 21 ¶¶ 26–27; Ex. 17 ¶ 26; Ex. 25 ¶ 12; Ex. 18 ¶ 19; Ex. 19 ¶ 27; Ex. 11 ¶¶ 32–33.

Congregants are well aware of Defendants' change in policy and of the increase in enforcement activity it has recently set loose at houses of worship. Ex. 13 ¶ 25; Ex. 20 ¶ 34; Ex. 21 ¶ 22; Ex. 10 ¶ 19; Ex. 14 ¶ 8; Ex. 12 ¶¶ 9, 11; Ex. 17 ¶¶ 12–13; Ex. 23 ¶ 20; Ex. 18 ¶¶ 14–15; Ex. 19 ¶ 21; Ex. 11 ¶ 37. As a direct consequence of that policy change, many congregants are now too afraid of immigration enforcement at church to attend regular worship services. Ex. 14 ¶ 10; Ex. 10 ¶¶ 22, 26, 29; Ex. 12 ¶¶ 9, 10, 17; Ex. 15 ¶ 24; Ex. 24 ¶ 16; Ex. 16 ¶¶ 11–12; Ex. 17 ¶ 14; Ex. 25 ¶ 8; Ex. 18 ¶ 13; Ex. 11 ¶ 35; Ex. 26 ¶ 13. The drop in attendance at some churches has been severe. *See, e.g.*, Ex. 12 ¶ 17 (reporting 50 percent drop in attendance at one church); Ex. 16 ¶ 19 (reporting that at another church, "attendance is down 80% and youth attendance is down 40%"); Ex. 13 ¶¶ 23–24 (reporting a "huge and immediate impact on our weekly

attendance"). The fear and anxiety Defendants' policy has created around attending communal religious activities is felt not only by congregants who lack legal status but by those who have legal status—and even by those who are not immigrants at all. Ex. 13 ¶¶ 28–29; Ex. 16 ¶ 19; Ex. 21 ¶¶ 22–23; Ex. 10 ¶ 26; Ex. 19 ¶ 11; Ex. 17 ¶ 25.

When congregants stay home for fear of ICE at their church, they are deprived of the opportunity to take part in a central ritual of their faith by gathering with others in communal worship, harming both them and their churches. *See, e.g.*, Ex. 17 ¶ 16; Ex. 18 ¶ 14 (describing how one congregant is now "unable to pray in community, to receive comfort from her fellow parishioners, or embrace those who once walked with her in faith"); *see also The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) (recognizing that "concrete, demonstrable decrease in attendance at . . . worship activities" injured churches); *Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, 767 F. Supp. 3d 293, 313 (D. Md. 2025) ("A reduction in attendance at religious services and activities constitutes a concrete injury in fact.").

The absence of those congregants in turn harms the broader congregation, including those who are able to attend, because they are then left unable to worship together with their full religious community. Ex. 17 ¶¶ 15–17; Ex. 24 ¶ 11; Ex. 20 ¶¶ 36–37; Ex. 13 ¶¶ 30–32; Ex. 10 ¶¶ 18, 26; Ex. 23 ¶¶ 21, 25; Ex. 16 ¶ 12; Ex. 21 ¶¶ 12, 24; Ex. 11 ¶ 13; Ex. 14 ¶ 10; Ex. 25 ¶¶ 10–11. For Quakers, that is a loss of spiritual unity that means being cut off from hearing the voice of God as expressed through their absent co-congregants. Ex. 21 ¶ 12; Ex. 20 ¶¶ 13–14; Ex. 11 ¶ 13. For Lutherans, who "consider it an experience of the fullness of the body of Christ when we are able to come together," the enforced absence of their fellow congregants "compromises the body . . . gathering for Eucharist." Ex. 10 ¶ 18. So too, Baptists view "[c]ommunal worship and fellowship" as "fundamental" to their faith, Ex. 26 ¶ 15, and believe they are unable to "live up to the duties

and obligations of [thei]r religious tradition" when Defendants' policy prevents them from "be[ing] able to minister to anyone at church regardless of their legal status." Ex. 23 ¶ 25.

Congregations further suffer the financial impact of decreased giving that comes with decreased attendance. Ex. 13 ¶ 33; Ex. 16 ¶ 12; Ex. 11 ¶ 13; Ex. 21 ¶ 10. For some congregations, particularly those serving marginalized communities, that decrease could force them to shut down entirely. Ex. 13 ¶¶ 3–4, 6, 33. The financial strain is felt not only by individual churches but by Plaintiff associations themselves. Ex. 17 ¶¶ 21–22; Ex. 11 ¶ 13; Ex. 21 ¶¶ 9–10; *see* Ex. 13 ¶ 3.

The effects of Defendants' policy go beyond regular worship services to impact other vital expressions of Plaintiffs' and their members' faith, such as their operation of food pantries for the needy, church camps, schools, and ESL classes. Ex. 23 ¶ 22; Ex. 16 ¶¶ 15, 17; Ex. 14 ¶¶ 3–4, 9; Ex. 10 ¶¶ 23, 28; Ex. 12 ¶¶ 15, 18; Ex. 17 ¶¶ 18–20; Ex. 18 ¶ 17; Ex. 19 ¶ 14; Ex. 11 ¶¶ 37–38. These programs are central to Plaintiffs' religious practice. Ex. 10 ¶¶ 16–18; Ex. 13 ¶ 18; Ex. 14 ¶ 4 ("[I]f we leave people hungry, we're leaving Jesus hungry. It's an essential part of who we are to have these food distributions."); Ex. 16 ¶ 10; Ex. 18 ¶ 17; Ex. 17 ¶ 19; Ex. 19 ¶ 10; Ex. 22 ¶ 21; Ex. 11 ¶ 43; Ex. 26 ¶ 15 (explaining the importance of Sunday schools "for the next generation's spiritual formation"). Yet, just as it has suppressed attendance at regular worship services, Defendants' policy has left people too scared to take part in these other programs—even to receive food when in need. Ex. 17 ¶ 18; Ex. 15 ¶¶ 24, 28; Ex. 26 ¶¶ 14, 18; Ex. 10 ¶¶ 23 (charitable flea market), 28 (ESL classes); Ex. 23 ¶ 22 (church day care and food pantries); Ex. 16 ¶¶ 15 (diaper pantry), 17 (Vacation Bible School); Ex. 14 ¶¶ 8–9 (food pantry); Ex. 19 ¶¶ 14–18 (food pantry); Ex. 12 ¶¶ 15 (summer camp), 18 (food pantry); Ex. 18 ¶ 16 (Vacation Bible School); Ex. 11 ¶ 37 (organizing events in support of immigrants). The result is significant harm to Plaintiffs' ability to carry out their religious mandate to minister to the wider world.

The climate of fear and anxiety created by Defendants' policy infringes Plaintiffs' exercise of religion and association in other ways too. It has led pastors to avoid preaching freely about their churches' stance on immigration or other issues, for fear that it might draw enforcement attention to the church—to the detriment of the entire congregation. Ex. 23 ¶¶ 20–21, 25 ("[I]f the pastors who are charged with shepherding [congregants] along the way cannot fully speak, none of us are experiencing religion to its fullest extent."); Ex. 17 ¶¶ 24–25; Ex. 18 ¶ 18. It has driven behind closed doors ceremonies such as baptisms that before would have been occasions for communal worship and celebration, open to both members and the wider community. Ex. 12 ¶¶ 10, 12, 16 18, 20; Ex. 15 ¶ 27; *see also* Ex. 18 ¶ 15. One congregation has even had to discuss changing the day and time they gather for Mass in order to avoid the threat of ICE targeting their congregants at regular worship services. Ex. 12 ¶ 21.

Those who continue to attend now must do so with the fear that armed agents may be waiting outside or may even seek to enter the sanctuary, directly burdening their religious worship. Ex. 12 ¶ 19; Ex. 23 ¶ 26; Ex. 24 ¶¶ 14–15; Ex. 21 ¶¶ 20, 26; Ex. 26 ¶ 16; Ex. 19 ¶ 13 ("When I am leading worship on Sundays . . . I can't help but note in the back of my mind whether each new person . . . could be an ICE officer in plainclothes entering our service."); Ex. 20 ¶ 42 ("Each time the door opens to admit new attendees, we are now left to wonder if ICE has arrived. This interferes with our ability to achieve stillness and receive messaging from the Spirit/God."); Ex. 17 ¶ 25 ("Churches are no longer spaces set apart. At any moment they could be filled with force and violence."). Congregations whose faith directs them to worship together with open doors and open arms now feel compelled to lock the doors to their churches, put up signage declaring previously open areas to be private, and otherwise take steps inconsistent with their religious commitment to openness and welcoming all. Ex. 24 ¶ 16; Ex. 10 ¶¶ 22, 24; Ex. 15 ¶ 27; Ex. 13 ¶¶ 22, 34–35;

Ex. 23 ¶¶ 20, 23–24; Ex. 12 ¶ 12; Ex. 16 ¶ 16; Ex. 25 ¶¶ 5, 7, 9; Ex. 17 ¶¶ 12, 23; Ex. 11 ¶ 40. Many have also had to spend time, effort, and financial resources on training and preparation in the event of an ICE raid—resources that would otherwise be devoted to other aspects of their religious mission, such as providing social services. Ex. 17 ¶¶ 12–13; Ex. 25 ¶ 6; Ex. 16 ¶¶ 14, 20; Ex. 19 ¶¶ 21–26, 28; Ex. 13 ¶ 35; Ex. 22 ¶ 21; Ex. 18 ¶¶ 13–14 ("Daycare providers in churches focus on what they will do if ICE shows up on church grounds, rather than on the joy of teaching Jesus's message to children."). They are driven to take these measures by their religious commitment to protecting their fellow worshippers, particularly the most vulnerable among them. Ex. 20 ¶ 40 ("Knowingly putting a person in harm's way or risking their involvement in a violent encounter violates our religious beliefs."); Ex. 19 ¶ 20 ("Failing to take steps to keep my congregation and those who use our facilities safe at church would be contrary to my faith and religious beliefs."); Ex. 18 ¶ 14; Ex. 11 ¶ 41; Ex. 21 ¶ 21; Ex. 16 ¶¶ 10, 18; Ex. 22 ¶ 21.

For many of these congregations, DHS's policy thus creates an implacable injury of conscience: either violate their belief in freely welcoming all to communal worship or violate their belief that they must avoid putting others in harm's way. Ex. 25 ¶ 9; Ex. 20 ¶¶ 35, 40; Ex. 11 ¶¶ 40–41; Ex. 21 ¶ 21; Ex. 10 ¶ 33; Ex. 16 ¶ 16.

## LEGAL STANDARD

Under the Administrative Procedure Act ("APA"), "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Whether to stay agency action under Section 705 turns on the same factors that courts consider before issuing a preliminary injunction. *E.g.*, *Mass. Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020); *Affinity Healthcare Servs., Inc. v.*

*Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010). Those factors require the moving party to show: "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.    Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on the merits of all of their claims that the 2025 Policy violates the Religious Freedom Restoration Act ("RFRA"), the First Amendment, and the APA.

#### A.    DHS's new policy violates the Religious Freedom Restoration Act.

Under RFRA, government actions that "substantially burden" religious exercise must satisfy strict scrutiny. 42 U.S.C. § 2000bb-1. Under the standard, the action is valid only if the government shows that it is in furtherance of a compelling governmental interest and is the least-restrictive means of furthering that interest. The 2025 Policy triggers, and flunks, strict scrutiny.

##### 1.    The policy imposes a substantial burden on Plaintiffs' religious exercise.

RFRA's substantial burden test applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" and must "be construed in favor of a broad protection of religious exercise." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (quoting 42 U.S.C. §§ 2000cc–5(7)(A), 2000cc–3(g)).

"While 'substantial burden' is not defined in RFRA, case law counsels that a substantial burden on one's exercise of religion exists" where the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," including by coercing believers "to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Perrier-Bilbo v. United States*, 954 F.3d 413, 431 (1st Cir. 2020); *see also Spratt v. R.I. Dep't of Corr.*, 482 F.3d

33, 38 (1st Cir. 2007) (accepting and applying a definition of "substantial burden" as "one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs" (quotation marks and brackets omitted)); *LeBaron v. Spencer*, 527 F. App'x 25, 29 (1st Cir. 2013) (same); *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) ("A substantial burden exists when government action puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." (quotation marks omitted)).

By any metric, DHS's new policy puts "substantial pressure" on Plaintiffs and their members to modify their behavior in ways inconsistent with their religious beliefs, *see Perrier-Bilbo*, 954 F.3d at 431, and therefore substantially burdens Plaintiffs' and their congregants' religious exercise, *see Phila. Yearly Meeting*, 767 F. Supp. 3d at 330–32 (finding that the 2025 Policy imposed a substantial burden on plaintiffs' religious exercise). A quintessential aspect of all Plaintiffs' religious exercise is regular, communal worship. *See supra* at 8–11. The 2025 Policy frees armed DHS agents to conduct enforcement operations—including raids, arrests, investigations, interviews, and surveillance—inside, on the grounds of, and near houses of worship. The deep fear created by that new policy and its ongoing implementation deters attendance at houses of worship, especially but not only for immigrants. As a result, Plaintiffs and their members have seen substantial decreases in attendance at worship services and other aspects of their ministry, such as at food distributions, camps, and schools. *See supra* at 11–13.

Congregants who are unable to attend worship services because of reasonable fears of immigration enforcement at their house of worship suffer a direct and obvious burden on their religious exercise because they are unable to take part in a central ritual of their faith. *Cf. LeBaron*, 527 F. App'x at 30 (reversing grant of summary judgment under Religious Land Use and Institutionalized Persons Act and emphasizing that "we . . . cannot say, as a matter of law, that

appellant's religious exercise has not been substantially burdened by the lack of any opportunities to engage in group prayer"); *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 294 (D.D.C. 2020) (finding that church's "belief about the theological importance of gathering in person as a full congregation" was substantially burdened by restrictions on in-person worship); *cf. also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19–20 (2020) (noting centrality of "attending religious services" to "religious liberty").

As documented above, Defendants' policy substantially burdens Plaintiffs' religious exercise in other ways as well. *See supra* at 14–15. Decreased attendance at worship services deprives the entire congregation of the ability to worship together as a faith community. Fear of coming to church-run food pantries, schools, and other programs carried out on church property prevents congregations from satisfying their religious obligations to minister to the wider world, provide religious education to their children, and serve the most vulnerable, among other things. Congregants who attend services must do so with the fear and anxiety that ICE could enter the sacred space of the church at any moment. That fear has led congregations to lock their doors during services and take similar steps that violate their genuinely held beliefs. Pastors now reasonably fear that preaching their faith's position on immigration and other issues could invite immigration enforcement at their church. And Plaintiffs' religious duty to protect congregants and maintain their houses of worship as places of safety has required them to devote time and resources preparing for ICE incursions that could be spent on other parts of their ministries.

Whether viewed together or in isolation, these and the myriad other burdens on Plaintiffs' religious exercise documented in the record, *see supra* at 11–15, plainly qualify as "substantial" within the meaning of RFRA, including because they place "substantial pressure" on adherents to "modify [their] behavior and to violate [their] beliefs." *Perrier-Bilbo*, 954 F.3d at 431.

### 2. The policy cannot survive strict scrutiny.

Because Plaintiffs can demonstrate a substantial burden on their religious exercise, DHS's policy must satisfy strict scrutiny. It cannot do so. DHS does not have a compelling interest in undertaking immigration-enforcement activity at houses of worship specifically. Even if it did, the policy does not further that interest through the least-restrictive means.

To establish a "compelling interest" that might justify its policy with respect to houses of worship, the government may not rest on "broadly formulated interests" or those stated "at a high level of generality." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021) (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430–32 (2006)); *accord Hobby Lobby*, 573 U.S. at 726–27. The relevant inquiry therefore is not whether the government has a compelling interest in immigration enforcement or law enforcement generally, but whether it has a compelling interest in employing the 2025 Policy with respect to houses of worship. The government bears the burden of persuasion on that point. *Gonzales*, 546 U.S. at 429.

Defendants cannot satisfy that burden. The only interest DHS has identified is in catching "criminal aliens—including murders [sic] and rapists"—who the government says are "hid[ing] in America's schools and churches." *See* Ex. 7. But DHS has provided nothing to substantiate that alleged interest or to document a plague of violent "criminal aliens" in churches. *Cf. Phila. Yearly Meeting*, 767 F. Supp. 3d at 332 (noting that "DHS has not even attempted to satisfy [its] burden" to articulate a specific compelling interest served by the 2025 Policy).

Even if the government had a compelling interest at stake, the 2025 Policy would not be the least-restrictive means of furthering it. *See id.* at 333. "The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. To satisfy it, the government must show that it lacks other means to achieve its interests without substantially burdening Plaintiffs' religious

exercise. *See id.*; *Spratt*, 482 F.3d at 41 (policy failed strict scrutiny where government "offer[ed] no explanation for why alternative policies would be unfeasible"). But when the government successfully employs other methods of achieving the same goals, and those methods would not substantially burden religious exercise, then the government cannot satisfy the least-restrictive-means standard. *See Hobby Lobby*, 573 U.S. at 730-31; *Spratt*, 482 F.3d at 42 (prison's ban on inmate preaching failed strict scrutiny where other prisons allowed it without incident).

**B.     DHS's new policy violates Plaintiffs' First Amendment rights of expressive association.**

**1.     The policy directly and substantially interferes with Plaintiffs' right to gather for religious exercise.**

The Supreme Court "has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'" *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). "The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties," including "the exercise of religion." *Roberts*, 468 U.S. at 618. "An individual's freedom . . . to worship . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id.* at 622; *see also, e.g.*, *Americans for Prosperity*, 594 U.S. at 606 (explaining that "[p]rotected association furthers 'a wide variety of political, social, economic, educational, *religious*, and cultural ends'" (emphasis added) (quoting *Roberts*, 468 U.S. at 622)); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987) ("[T]he Court has upheld the freedom of individuals to associate for the purpose of engaging in . . . religious activities.").

Infringement on the right of expressive association "can take a number of forms," *Roberts*, 468 U.S. at 622, including imposing penalties because of membership in a group, interfering in an organization's internal organization or operations, or otherwise making membership or participation in a group "less attractive," *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006). Importantly, courts give deference to an association's own articulated view of what would burden its expression: "As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000). "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* at 651 (quoting *Thomas v. Review Bd. of Ind*. *Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)).

The 2025 Policy infringes on Plaintiffs' and their members' expressive-association rights by deterring attendance at worship, ministry, and other events that occur at houses of worship. Specifically, and as documented above, it suppresses attendance, especially but not only of immigrants, by causing fear of surveillance, interrogation, or arrest at or near houses of worship.

Courts have long recognized the obvious chilling effect that government surveillance may have on a person's exercise of associational rights. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (describing the "vital relationship between freedom to associate and privacy in one's associations"); *Presbyterian Church*, 870 F.2d at 522 (holding that churches suffered injury "[w]hen congregants are chilled from participating in worship activities" and "refuse to attend church services because they fear the government is spying on them and taping their every utterance").

DHS goes further and adds the threat of investigation and arrest. That deters immigrant worshippers. *See Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (finding that "the prospect of being singled out" for detention and interrogation after attending Islamic religious conference "could reasonably deter others from associating at similar conferences"); *Phila. Yearly Meeting*, 767 F. Supp. 3d at 324–25 (finding that "even the threat of enforcement actions . . . has already caused reductions in attendance at Plaintiffs' places of worship"). But, as explained above, the chilling effect is not limited to immigrants. And even those who are not themselves deterred from gathering for religious worship suffer injury to their expressive-association rights, because they are deprived of the ability to associate with others for the purpose of communal worship if they have fewer congregants with whom to worship.

### 2.  The policy cannot satisfy exacting scrutiny.

The government's infringement of Plaintiffs' expressive-association rights is subject to exacting scrutiny. Under that standard, the government's infringement of protected rights of association may be justified only by the government showing "a substantial relation between the [challenged action] and a sufficiently important governmental interest," *Americans for Prosperity*, 594 U.S. at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)), and that the government action is "narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end," *id.* at 609–10. Defendants cannot satisfy their burden on either prong.

First, there is no relation, substantial or otherwise, between conducting immigration enforcement at houses of worship and a sufficiently important government interest. *Phila. Yearly Meeting*, 767 F. Supp. 3d at 327 (finding that the 2025 Policy lacked any relation to sufficiently important government interest). That is because, as discussed above, DHS has provided no

evidence that its asserted interest in apprehending violent "criminal aliens" hiding in churches has any basis in reality. *See supra* at 19.

Second, the 2025 Policy is not narrowly tailored to any relevant government interest. Although exacting scrutiny does not require showing the least-restrictive means, the breadth of government action "must be viewed in the light of less drastic means for achieving the same basic purpose." *Americans for Prosperity*, 594 U.S. at 610. As DHS has acknowledged, it "can accomplish [its] enforcement mission without denying or limiting individuals' access to" sensitive locations, including "places of worship," Ex. 4, at 2—in other words, without abandoning protections for sensitive locations. The existence of these less drastic means for advancing the government's interests demonstrate that the policy it has chosen instead—leaving it to individual discretion and "common sense" whether to carry out raids, arrests, surveillance, and similar operations at houses of worship—is not narrowly tailored, particularly in light of the substantial threats to core First Amendment rights it entails.

### C.    DHS's new policy is arbitrary and capricious in violation of the APA.

#### 1.    Defendants' adoption of the new policy constitutes final agency action subject to review under the APA.

The APA authorizes judicial review of "final agency action." 5 U.S.C. § 704. Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156, 177–78 (1997) (quotation marks omitted). Courts take a "pragmatic approach . . . to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quotation marks omitted). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the

parties." *Ass'n of Am. Univs. v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135, at *9 (D. Mass. May 15, 2025).

The 2025 Policy marks the consummation of DHS's decisionmaking process because it rescinded, effectively immediately, the previous sensitive locations policy and put in its place a new policy in which the decision to carry out immigration enforcement at sensitive locations is left to the uncabined discretion of agency staff.

The 2025 Policy is also one by which rights or obligations have been determined or from which legal consequences flow, for two reasons. First, it removes previously binding restrictions on DHS personnel with respect to sensitive locations, including eliminating the requirement that they avoid enforcement at sensitive locations "to the fullest extent possible." *See, e.g.*, *Parsons v. DOJ*, 878 F.3d 162, 167 (6th Cir. 2017) ("[A]gency actions that legally bind an agency or prevent other government actors from pursuing a particular course of action cause legal consequences." (citing *Hawkes Co.*, 578 U.S. at 598–99)); *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations.").

Second, and relatedly, the new policy has legal consequences for Plaintiffs because the policy revoked the safe harbor that previously existed for sensitive locations. *See Hawkes Co.*, 578 U.S. at 599 (recognizing that "the denial of [a] safe harbor" can constitute final agency action). When "parties can rely on [a policy] as a norm or safe harbor by which to shape their actions," that agency action "can be binding as a practical matter." *Cohen v. United States*, 578 F.3d 1, 9 (D.C. Cir. 2009) (internal citations omitted). "It follows that . . . the denial of [a] safe harbor" has legal consequences, too. *Hawkes Co.*, 578 U.S. at 599.

### 2.   The policy is arbitrary and capricious in multiple respects.

Under the APA, courts must set aside agency action that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation marks omitted). For multiple reasons, Plaintiffs are likely to show that the 2025 Policy is neither reasonable nor reasonably explained and therefore should be vacated as arbitrary and capricious.

First, the government failed to adequately explain its departure from its longstanding policy of avoiding immigration enforcement in sensitive locations. While the Huffman Memo acknowledged that it was rescinding the prior policy, it offered no explanation why that policy needed to be replaced or what DHS believed to be the advantages of the new policy. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[O]f course the agency must show that there are good reasons for the new policy."). Indeed, the memo provides no rationale at all. Second, in issuing the 2025 Policy, Defendants "simply ignore[d] 'an important aspect of the problem,'" *Ohio v. EPA*, 603 U.S. at 293 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983))—namely, the predictable and substantial harms that the new policy would inflict on the free exercise of religion and association. Third, the 2025 Policy entirely fails to account for the substantial reliance interests created by the prior protections for sensitive locations. An agency, when departing from a prior policy, must "assess whether there were reliance interests [engendered by the prior policy], determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). Defendants did none of these things. For these reasons and others, Plaintiffs are likely to show that the 2025 Policy is arbitrary and capricious.

D.    **DHS's new policy is contrary to law, in excess of statutory limitations, and contrary to constitutional right in violation of the APA.**

Because the 2025 Policy is a final agency action that violates Plaintiffs' and their members' rights under RFRA, Plaintiffs are likely to show that it must be set aside and vacated under the APA as "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). And because the policy also violates Plaintiffs' and their members' First Amendment rights of expressive association, Plaintiffs are likely to show that the policy is "contrary to constitutional right" and must be set aside under 5 U.S.C. § 706(2)(B) as well.

## II.    **Plaintiffs will suffer irreparable harm unless DHS's new policy is stayed.**

"In determining if . . . harm is irreparable, '[i]t is settled beyond peradventure that irreparable harm can consist of a substantial injury that is not accurately measurable or adequately compensable by money damages.'" *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 319 (D. Mass. 2025) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000)), *appeal pending*, No. 25-1344 (1st Cir.). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Cuomo*, 592 U.S. at 19; *accord Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009) (explaining that "infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief" cause irreparable harm); *see also Phila. Yearly Meeting*, 767 F. Supp. 3d at 333 (concluding that "a violation of Plaintiffs' rights under RFRA constitutes an irreparable harm for the purposes of issuing preliminary relief"). Defendants' infringement of Plaintiffs' rights of free exercise and association unquestionably causes irreparable harm to Plaintiffs.

**III.    The balance of equities and public interest favor Plaintiffs.**

The final two *Winter* factors—the balance of equities and the public interest—"merge

when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These

factors, too, weigh in favor of the requested relief.

While Plaintiffs are suffering and will continue to suffer substantial harm to their religious-

exercise and expressive-association rights, the government stands to suffer little—if any—injury

if its policy is temporarily stayed: "[T]he government has no legitimate interest in pursuing

unconstitutional agency action." *Doe v. Trump*, 766 F. Supp. 3d 266, 286 (D. Mass. 2025).

Additionally, "there is 'substantial public interest in having governmental agencies abide by the

federal laws,'" *Massachusetts*, 770 F. Supp. 3d at 326 (quoting *League of Women Voters of U.S.

v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)), and "no public interest in upholding unlawful agency

action," because "the government cannot suffer harm from an injunction that merely ends an

unlawful practice," *id.* at 326–27 (quotation marks and citation omitted). Finally, the merged

factors heavily favor Plaintiffs here as "it is always in the public interest to prevent the violation

of a party's constitutional rights." *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020)

(quotation marks omitted); *accord Newby*, 838 F.3d at 12.

**IV.    Plaintiffs are entitled to a stay under the APA or a preliminary injunction.**

Because Plaintiffs are likely to succeed on their claims, including under the APA, and will

continue to suffer injury without the Court's intervention, the Court should enter a stay under

5 U.S.C. § 705 to preliminarily set aside the 2025 Policy. *See, e.g.*, *Trump v. CASA, Inc.*, 145 S.

Ct. 2540, 2567 (2025) (Kavanaugh, J., concurring) (explaining that "in cases under the

Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency

rule" and citing *West Virginia v. EPA*, 577 U.S. 1126 (2016), as an example); *Career Colls. &*

Sc*hs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."); *Texas v. Biden*, 646 F. Supp. 3d 753, 769 (N.D. Tex. 2022) ("Just as a preliminary injunction is often a precursor to a permanent injunction, a stay under Section 705 can be viewed as a precursor to vacatur under Section 706.").

A stay of the 2025 Policy will restore the status quo prior to Defendants' rescission of the sensitive locations policy—reinstating the former requirement that enforcement at such locations be avoided to the fullest possible extent—until the Court can rule on the merits. "Just as vacating an agency action does nothing but re-establish the status quo absent the unlawful agency action, staying an agency action under Section 705 (even after the effective date) restores the same status quo *ex ante*." *Texas v. HHS*, 770 F. Supp. 3d 940, 957 (E.D. Tex. 2025) (quotation marks omitted); *see also Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-cv-628, 2025 WL 1191844, at *23 (D. Md. Apr. 24, 2025) (explaining that stay "will preserve the status quo" and "necessarily preclude enforcement based on the [agency action's] changes to existing law").

Like vacatur under Section 706, a stay under Section 705 operates directly on the agency action itself. *See Orr v. Trump*, No. 25-cv-10313-JEK, 2025 WL 1145271, at *23 (D. Mass. Apr. 18, 2025) ("While an injunction is a means by which a court tells someone what to do or not to do, a stay operates upon the [agency action] itself . . . by temporarily divesting [a rule or policy] of enforceability." (quotation marks omitted)). The effect of a stay thus would not be limited to Plaintiffs. *See Career Colls.*, 98 F.4th at 255 ("[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted."); *Texas v. Becerra*, No. 24-cv-211, 2024 WL 4490621, at *1 (E.D. Tex. Aug. 30, 2024) ("[R]elief under

§ 705 should not be party restricted."); *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020) ("[Section] 705 must be read to authorize relief from agency action for any person otherwise subject to the action, not just as to plaintiffs.").

That remains the case even after the Supreme Court's decision in *CASA*, which specifically did not address the scope of relief under the APA. *See CASA*, 145 S. Ct. at 2554 n.10; *see also Ass'n of Am. Univs. v. Dep't of Def.*, No. 25-cv-11740, 2025 WL 2022628, at *27, *28 n.84 (D. Mass. July 18, 2025) (expressing skepticism that *CASA* restricts the scope of Section 705 stays). The Court's holding in *CASA* turned on its interpretation of the Judiciary Act of 1789; the Court found that the Act did not provide district courts "equitable authority to issue universal injunctions." *CASA*, 145 S. Ct. at 2550. Yet, as Justice Kavanaugh has explained, even if "equitable relief is ordinarily limited to the parties in a specific case[,] . . . in the APA, Congress did in fact depart from that baseline and authorize vacatur." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring).

Indeed, the U.S. District Court for the District of Columbia recently reached the same conclusion in ordering a Section 705 stay. *Cabrera v. Dep't of Labor*, No. 25-cv-1909, 2025 WL 2092026, at *8–9 (D.D.C. July 25, 2025). As Judge Friedrich explained in that decision, a Section 705 stay, by its nature, "is not a party-specific remedy," and courts thus routinely "appl[y] § 705 to permit wholesale, rather than party-specific, stays of agency action." *Id.* at *8 (collecting cases). "Because the plaintiffs have shown that each of the four preliminary injunction factors weigh in their favor," the court concluded, "they are entitled to a stay." *Id.*

So too here, where a Section 705 stay is particularly appropriate given the nature of Defendants' action. Defendants have announced—and proceeded to implement—a fundamental change in the rules governing immigration enforcement at houses of worship across the country,

in the process creating deep fear for countless congregations about their free exercise of religion and association. A preliminary setting aside of that action under Section 705, until the Court is able to render a ruling on the merits, is "necessary to prevent irreparable injury" and "to preserve status or rights pending conclusion of the review proceedings," 5 U.S.C. § 705, including for the many worshippers beyond Plaintiffs and their members who are harmed in just the same way by Defendants' policy. Preliminarily setting aside the new policy will also ensure clarity with respect to the rules around houses of worship—both for Defendants and for congregants—and be easier to administer than a remedy that requires Defendants to employ different rules for different churches. And because the "normal remedy for a successful APA challenge is vacatur of the [agency action] and its applicability to all who would have been subject to it," "[i]t would be anathema to reasonable jurisprudence that only the named Plaintiffs should be protected from the irreparable harms" pending judicial review. *Massachusetts*, 770 F. Supp. 3d at 329.

In the alternative, if the Court is not inclined to issue a Section 705 stay, it should enter a preliminary injunction barring Defendants from implementing or otherwise giving effect to the 2025 Policy. *See, e.g.*, *Mass. Fair Hous. Ctr.*, 496 F. Supp. 3d at 609 (same factors govern issuance of Section 705 stay and preliminary injunction).[8]

## CONCLUSION

For these reasons, the Court should grant the motion and stay—or, in the alternative, preliminarily enjoin enforcement of—the 2025 Policy.

---

[8] Contrary to arguments the government has made in similar cases, the restriction on courts' power to "enjoin or restrain the operation of" 8 U.S.C. §§ 1221–31 does not apply here. *See* 8 U.S.C. § 1252(f)(1). Plaintiffs do not challenge DHS's enforcement or implementation of Sections 1221-31, which contain certain specific authorities permitting the inspection, apprehension, exclusion, and removal of aliens. Any effect, if any, of Plaintiffs' requested relief on the operation of these provisions would be at most "collateral" and therefore would not implicate Section 1252(f)(1). *See Texas v. DHS*, 123 F.4th 186, 209–10 (5th Cir. 2024).

Dated:  July 29, 2025

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl*
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Mark B. Samburg
Audrey Wiggins*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
kfriedl@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
msamburg@democracyforward.org
awiggins@democracyforward.org

Ryan Downer*
Madeleine Gates*
Melissa Colon*
WASHINGTON LAWYERS' COMMITTEE FOR
    CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org
melissa_colon@washlaw.org

Richard J. Leveridge*
Sonia W. Murphy*
Sarah Sraders*
Brandon A. Levey*
Samone Ijoma*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Sraderss@gilbertlegal.com
Leveyb@gilbertlegal.com
Ijomas@gilbertlegal.com

*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

On July 29, 2025, I caused the foregoing to be served by certified mail on Defendants, the Attorney General, and the U.S. Attorney's Office for the District of Massachusetts at the below addresses. I further caused the foregoing to be served via email on Alex Haas, Diane Kelleher, and John Griffiths, co-directors of the Federal Programs Branch, Department of Justice, and Rayford Farquhar, Chief of Defensive Litigation, Civil Division, U.S. Attorney's Office for the District of Massachusetts.

Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525

Attorney General Pam Bondi
Department of Justice
950 Pennsylvania Avenue NW,
Washington, DC 20530

Secretary Kristi Noem
Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525

Leah B. Foley
U.S. Attorney
District of Massachusetts
1 Courthouse Way, Suite 9200
Boston, MA 02210

/s/ Kevin E. Friedl
Kevin E. Friedl