# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND SYNOD, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>    Defendants | Civil Action No. 4:25-cv-40102-FDS<br>Leave to file granted on August 8, 2025 |

## DEFENDANTS' MEMORANDUM IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR A STAY UNDER 5 U.S.C. § 705 OR, IN THE
## <u>ALTERNATIVE, A PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 1

    I.    STATUTORY BACKGROUND ................................................................................ 1

    II.   DHS'S INTERNAL GUIDANCE FOR IMMIGRATION ENFORCEMENT ACTIONS ................ 2

    III.  PLAINTIFF'S LAWSUIT ...................................................................................... 3

    IV.  RELATED LAWSUITS ......................................................................................... 4

STANDARD OF REVIEW .............................................................................................. 5

ARGUMENT .................................................................................................................. 5

    I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. ............... 5

        A.   *Plaintiffs Lack Standing.* ......................................................................... 5

        B.   *This Court Lacks Jurisdiction to Issue the Requested Injunction.* .............. 20

        C.   *Plaintiffs are not Likely to Succeed on their RFRA Claim.* ...................... 21

        D.   *Plaintiffs are not Likely to Succeed on their First Amendment Claim.* ...... 28

        E.   *Plaintiffs Are Not Likely to Succeed on their APA claim.* ......................... 31

    II.   PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM. ........................................... 36

    III.  PLAINTIFFS HAVE NOT SHOWN THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIP IN THEIR FAVOR. ........................................................................... 37

    IV.  PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD. ............................................... 38

CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) .................................................................................................................... 29

*Arizona v. United States,*
  567 U.S. 387 (2012) .............................................................................................................. passim

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta,*
  785 F.3d 710 (D.C. Cir. 2015).................................................................................33, 34, 35, 36

*Ass'n of Irritated Residents v. EPA,*
  494 F.3d 1027 (D.C. Cir. 2007)..................................................................................................36

*Babbit v. United Farm Workers Nat. Union,*
  442 U.S. 289 (1979) ....................................................................................................................11

*Bechade v. Baker,*
  No. CV 20-11122-RGS, 2020 WL 5665554 (D. Mass. Sept. 23, 2020) ...................................11

*Bennett v. Spear,*
  520 U.S. 154 (1997) ...................................................................................................... 33, 35, 36

*Biden v. Texas,*
  597 U.S. 785 (2022) ...................................................................................................... 21, 26, 36

*Blackie's House of Beef, Inc. v. Castillo,*
  659 F.2d 1211 (D.C. Cir. 1981)...................................................................................... 25, 28, 38

*Blum v. Holder,*
  744 F.3d 790 (1st Cir. 2014) ................................................................................................11, 12

*Bowen v. Roy,*

    476 U.S. 693 (1986) ........................................................................................................... 23

*Boy Scouts of Am. v. Dale,*

    530 U.S. 640 (2000) ......................................................................................................29, 30

*Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.,*

    622 F.3d 36 (1st Cir. 2010) ............................................................................................... 39

*Burwell v. Hobby Lobby Stores, Inc.,*

    573 U.S. 682 (2014) ........................................................................................................... 23

*California v. Texas,*

    593 U.S. 659 (2021) ........................................................................................................... 13

*Cassidy v. City of Brewer,*

    No. 1:12-CV-00137-DBH, 2012 WL 5844874 (D. Me. Sept. 12, 2012).............................. 23

*City of Los Angeles v. Lyons,*

    461 U.S. 95 (1983) ................................................................................................. 10, 11, 36

*Clapper v. Amnesty Int'l USA,*

    568 U.S. 398 (2013) .........................................................................................................7, 12

*Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.,*

    770 F. Supp. 3d 400 (D.N.H. 2025) ...............................................................................13, 17

*Cowels v. FBI,*

    327 F. Supp. 3d 242 (D. Mass. 2018), *aff'd*, 936 F.3d 62 (1st Cir. 2019)............................. 33

*DaimlerChrysler Corp. v. Cuno,*

    547 U.S. 332 (2006) ........................................................................................................... 19

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.,*

    958 F.3d 38 (1st Cir. 2020) ........................................................................13, 16, 17, 18

*Dep't of Com. v. New York,*

    588 U.S. 752 (2019) ........................................................................................... 13

*DSE, Inc. v. United States,*

    169 F.3d 21 (D.C. Cir. 1999) ............................................................................ 40

*Employment Division, Department of Human Resources of Oregon v. Smith,*

    494 U.S. 872 (1990) ........................................................................................... 21

*Food & Drug Admin. v. All. for Hippocratic Med.,*

    602 U.S. 367 (2024) ........................................................................................6, 18

*Freeman v. City of Keene,*

    561 F. Supp. 3d 22 (D.N.H. 2021) ................................................................... 11

*Garland v. Aleman Gonzalez,*

    596 U.S. 543 (2022) ................................................................................... 2, 20, 21

*Go Leasing, Inc. v. Nat'l Transp. Safety Bd.,*

    800 F.2d 1514 (9th Cir. 1986) .......................................................................... 32

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*

    546 U.S. 418 (2006) ........................................................................................... 27

*Haaland v. Brackeen,*

    599 U.S. 255 (2023) ........................................................................................... 13

*Heckler v. Chaney,*

    470 U.S. 821 (1985) ......................................................................................31, 32

*Henderson v. Kennedy*,

    253 F.3d 12 (D.C. Cir. 2001) ................................................................................22, 29

*Hernandez v. Mesa*,

    589 U.S. 93 (2020) ............................................................................................... 26

*Hunt v. Wash. State Apple Advert. Comm'n*,

    432 U.S. 333 (1977) ............................................................................................ 6

*I.C.C. v. Bhd. of Locomotive Eng'rs*,

    482 U.S. 270 (1987) ............................................................................................ 32

*Iowaska Church of Healing v. Werfel*,

    105 F.4th 402 (D.C. Cir. 2024) ........................................................................... 27

*JGE ex rel. Tasso v. United States*

    772 F. App'x 608 (10th Cir. 2019) ...................................................................... 32

*Johnson v. District of Columbia*,

    71 F. Supp. 3d 155 (D.D.C. 2014) ...................................................................... 11

*Kaemmerling v. Lappin*,

    553 F.3d 669 (D.C. Cir. 2008) ............................................................................23, 25

*Kersey v. Trump*,

    No. CV 17-11635, 2017 WL 6452420 (D. Mass. Dec. 18, 2017) ........................... 8

*Laird v. Tatum*,

    408 U.S. 1 (1972) ..........................................................................................7, 11, 35

*Lujan v. Def. of Wildlife*,

    504 U.S. 555 (1992) ......................................................................................6, 11, 19

v

*Lujan v. Nat'l Wildlife Fed'n,*

    497 U.S. 871 (1990) ................................................................................................................ 33

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*

    485 U.S. 439 (1988) ................................................................................................................ 23

*M.M.V. v. Garland,*

    1 F.4th 1100 (D.C. Cir. 2021) ................................................................................................ 39

*Massachusetts v. Trump,*

    No. 25-cv-11221-WGY, 2025 WL 1836592 (D. Mass July 3, 2025) ....................................... 34

*Mennonite Church USA v. Department of Homeland Security,*

    778 F. Supp. 3d 1 (D.D.C. 2025) ....................................................................................... 19, 20

*Molina v. I.N.S.,*

    981 F.2d 14 (1st Cir. 1992) ................................................................................................... 27

*Murthy v. Missouri,*

    603 U.S. 43 (2024) ......................................................................................................... passim

*Nat'l Educ. Ass'n v. United States Dep't of Educ.,*

    No. 25-CV-091, ---Fed. Supp. 3d ---. 2025 WL 1188160 (D.N.H. Apr. 24, 2025)...................34

*Nat'l Mining Ass'n v. McCarthy,*

    758 F.3d 243 (D.C. Cir. 2014)................................................................................................ 34

*Nat'l Treasury Emps. Union v. Von Raab,*

    489 U.S. 656 (1989) ................................................................................................................ 25

*Nken v. Holder,*

    556 U.S. 418 (2009) .......................................................................................................... 25, 37

*Ozonoff v. Berzak,*

    744 F.2d 224 (1st Cir. 1984) ................................................................................................ 7

*Pagan v. Calderon,*

    448 F.3d 16 (1st Cir. 2006) ........................................................................................... 12, 21

*Perrier-Bilbo v. United States,*

    954 F.3d 413 (1st Cir. 2020) ............................................................................................. 22

*Philadelphia Yearly Meeting of Religious Society of Friends v. U.S. Department of Homeland Security,*

    767 F. Supp. 3d 293 (D. Md. 2025) ................................................................................. 4, 40

*Presbyterian Church v. Unites States,*

    870 F.2d 518 (9th Cir. 1989) ............................................................................................. 16

*Pérez-Kudzma v. United States,*

    940 F.3d 142 (1st Cir. 2019) ............................................................................................. 17

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.,*

    867 F.3d 338 (3d Cir. 2017) .............................................................................................. 22

*Roberts v. U.S. Jaycees,*

    468 U.S. 609 (1984) .................................................................................................... 28, 29

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*

    102 F.3d 12 (1st Cir. 1996) ............................................................................................... 36

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.,*

    547 U.S. 47 (2006) ............................................................................................................ 28

*Sackett v. EPA,*

    566 U.S. 120 (2012) .......................................................................................................... 36

*Sampson v. Murray*,

　415 U.S. 61 (1974) ....................................................................................................... 38

*Sherbert v. Verner*,

　374 U.S. 398 (1963) .................................................................................................22, 23

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,

　699 F.3d 1 (1st Cir. 2012) .............................................................................................. 5

*Singh v. Berger*,

　56 F.4th 88 (D.C. Cir. 2022).......................................................................................... 27

*Starbucks Corp. v. McKinney*,

　602 U.S. 339 (2024) ....................................................................................................... 38

*Susan B. Anthony List v. Driehaus*,

　573 U.S. 149 (2014) ....................................................................................................... 11

*Thomas v. Review Bd.*,

　450 U.S. 707 (1981) ....................................................................................................... 22

*Trump v. CASA, Inc.*,

　No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025)................................................... 38

*U.S. Army Corp. of Eng'rs v. Hawkes Co.*,

　578 U.S. 590 (2016) ......................................................................................... 33, 35, 36

*United Presbyterian Church in the U.S.A. v. Reagan*,

　738 F.2d 1375 (D.C. Cir. 1984)........................................................................... 7, 8, 10

*United States v. Grady*,

　18 F.4th 1275 (11th Cir. 2021)...................................................................................... 27

*United States v. Graham,*

    553 F.3d 7 (1st Cir. 2009) ............................................................................................ 9

*United States v. Iowa,*

    126 F.4th 1334 (8th Cir. 2025).............................................................................27, 28

*United States v. Lee,*

    455 U.S. 252 (1982) .................................................................................................. 27

*United States v. Place,*

    462 U.S. 696 (1983) .................................................................................................. 28

*United States v. Texas,*

    599 U.S. 670 (2023) ...............................................................................12, 24, 28, 32

*Webster v. Doe,*

    486 U.S. 592 (1988) .............................................................................................32, 33

*Whole Woman's Health v. Jackson,*

    595 U.S. 30 (2021) .................................................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.,*

    555 U.S. 7 (2008).........................................................................................5, 7, 36, 37

*Wisconsin v. Yoder,*

    406 U.S. 205 (1972) .................................................................................................. 22

**Statutes**

5 U.S.C. § 701(a)(2) ........................................................................................................ 31

5 U.S.C. § 704 ................................................................................................................. 33

5 U.S.C. § 705 ................................................................................................................. 38

6 U.S.C. § 101 ...............................................................................................................2, 3

8 U.S.C. § 1103(a)(1) ........................................................................................................ 1

8 U.S.C. § 1252(f)(1) .................................................................................................. passim

8 U.S.C. §§ 1221–31 ........................................................................................... 2, 21, 40

8 U.S.C. §§ 1226 ............................................................................................................ 25

8 U.S.C. §§ 1226(a) ..................................................................................................33, 35

42 U.S.C. § 2000bb-1(a) ............................................................................................... 21

42 U.S.C. § 2000bb-1(b) ............................................................................................... 25

42 U.S.C. § 2000bb(b)(1) .............................................................................................. 21

42 U.S.C. §§ 2000cc ...................................................................................................... 23

Immigration Reform and Control Act of 1986,

    Pub. L. No. 99–603, § 115(1), 100 Stat. 3359 ............................................................ 27

### Rules

Fed. R. Civ. P. 65.......................................................................................................... 40

### Other Authorities

Exec. Order No. 14,159

    *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025) ...........................26, 27

Exec. Order No. 14165

    *Securing Our Borders*, 90 Fed. Reg. 8467 (Jan. 20, 2025) ......................................26, 27

Proclamation 10886

    *Declaring a National Emergency at the S. Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025) ... 26

## INTRODUCTION

On January 20, 2025, the Department of Homeland Security (DHS) issued new internal guidance advising immigration officers to exercise their "common sense" and "discretion" when conducting enforcement activities near sensitive locations such as places of worship. Plaintiffs seek to stay, or, in the alternative, preliminarily enjoin this guidance. Plaintiffs speculate the guidance may result in their locations being targeted for enforcement actions and assert their members no longer feel safe attending worship or other services. The complaint asserts claims under the Religious Freedom Restoration Act ("RFRA"), the First Amendment, and the Administrative Procedure Act ("APA").

The Court should deny Plaintiffs' motion. Plaintiffs lack standing to challenge internal DHS guidance and Plaintiffs fail to carry their evidentiary burden of establishing their purported harms are caused by the new guidance. The RFRA and First Amendment claims fail because internal guidance advising immigration officers to exercise discretion does not impose a substantial burden on Plaintiffs' exercise of religion or right to associate. The APA claim fails because such guidance is committed to DHS's discretion by law and does not constitute final agency action.

## BACKGROUND

### I.    Statutory Background

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Congress has assigned DHS the responsibility to enforce the Nation's immigration laws, 8 U.S.C. § 1103(a)(1), authorizing DHS officers to, among other things, arrest, detain, and remove unlawfully present aliens. *See id.* §§ 1226, 1357.

Congress has restricted the authority of lower courts to enjoin immigration officers' operations to arrest and detain aliens. Under 8 U.S.C. § 1252(f)(1), except in a case brought by "an individual alien"

1

in removal proceedings, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221–31]," which includes the "implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–50 (2022).

## II.     DHS's Internal Guidance for Immigration Enforcement Actions

Since at least 1993, DHS or its predecessor[1] has permitted immigration enforcement actions in or near sensitive locations, including places of worship, under exigent circumstances or with prior supervisor approval. *See, e.g.*, Ex.[2] 1 ("Puleo Memorandum"); Ex. 3 ("Morton Memorandum"). As the Morton Memorandum explained, the agency's guidance was "not intended to categorically prohibit lawful enforcement operations" but instead was "meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations." Ex. 3 at 2.

In 2021, DHS updated its guidance regarding enforcement activities near sensitive locations. Ex. 4 ("Mayorkas Memorandum"). Consistent with the Puleo and Morton Memoranda, the Mayorkas Memorandum recognized that there were circumstances "under which an enforcement action" in or near a sensitive location "needs to be taken," including "exigent circumstances." *Id.* at 3–4. Absent exigent circumstances, immigration officers could "seek prior approval from their Agency's headquarters, or as" otherwise delegated. *Id.* at 4. The guidance included a list of circumstances that would justify enforcement actions in or near a sensitive location, but the list included "only examples," was "not complete," and stressed that "the exercise of judgment is required." *Id.* The exercise of judgment is also required when determining what constitutes "near" for purposes of an enforcement action. *Id.* at 3. The memorandum expressly stated that it "does not limit an agency's or employee's

---

[1] Pursuant to the Homeland Security Act of 2002, DHS superseded the Immigration and Naturalization Service. *See* 6 U.S.C. § 101 *et seq.*
[2] Unless otherwise specified, "Ex." refers to exhibits attached to Plaintiffs' Complaint. *See* ECF No. 1-1 to ECF No. 26-1.

2

statutory authority" and "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any . . . matter." *Id.* at 4–5.

On January 20, 2025, DHS issued superseding guidance for enforcement actions in or near sensitive locations. Ex. 6 ("Huffman Memorandum"). The new guidance recognizes that immigration officers "frequently apply enforcement discretion to balance a variety of interests." *Id.* at 1. "Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense" when considering enforcement actions in or near sensitive locations. *Id.* While the new guidance does not create "bright line rules regarding where … immigrations laws are permitted to be enforced," it recognized that component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

On January 31, 2025, United States Immigration and Customs Enforcement (ICE) issued follow-on guidance charging "Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." Ex. 7 ("Vitello Memorandum") at 2. The Vitello Memorandum specifies that AFODs and ASACs "may provide authorization for such actions either verbally or in writing." *Id.* Both the Huffman Memorandum and the Vitello Memorandum (together, the "2025 Guidance") specify that they do not create any legally enforceable rights or benefits. Ex. 6 at 1; Ex. 7 at 2.

### III.    Plaintiffs' Lawsuit

On July 28, 2025, Plaintiffs – a coalition of Lutheran, Quaker, Baptist, and Metropolitan Community churches – filed this lawsuit seeking declaratory and injunctive relief. Compl. at 42–43, Prayer for Relief. Plaintiffs allege the 2025 Guidance's rescission of the Mayorkas Memorandum has caused widespread fear of potential enforcement actions at their locations, resulting in various injuries.

3

*See, e.g., id.* ¶ 7.  Plaintiffs claim the change from the Mayorkas Memorandum to the 2025 Guidance violates RFRA and their First Amendment right of expressive association.  They also claim the 2025 Guidance is arbitrary, capricious, and contrary to law in violation of the APA.  *Id.* ¶¶ 162–92.

### IV.    Related Lawsuits

The 2025 Guidance has been challenged in four other lawsuits.  In the first, *Philadelphia Yearly Meeting of Religious Society of Friends v. U.S. Department of Homeland Security*, several religious groups similarly alleged violations of RFRA, the First Amendment, and the APA based on the 2025 Guidance.  767 F. Supp. 3d 293, 304 (D. Md. 2025).  On February 24, 2025, the court granted plaintiffs' motion for a preliminary injunction after finding they likely had standing and had made a sufficient showing on their RFRA and First Amendment claims.  *See id.* at 319, 328, 333.  The Court limited the injunction to the parties and, consistent with 8 U.S.C. § 1252(f)(1), refused to enjoin "DHS's ability to engage in arrests pursuant to an administrative warrant."  *Id.* at 320.  Defendants' appeal of the preliminary injunction is currently pending before the Fourth Circuit (case no. 25-1512).  Defendants' motion to dismiss the APA claims is currently before the district court.

In the second similar case, *Denver Public Schools v. Noem*, No. 1:25-cv-00474 (D. Colo.), a public school system alleged that the 2025 Guidance violated the APA and moved for preliminary relief.  On March 7, 2025, the court denied the motion for lack of standing.  *See* (Mar. 7, 2025 Hearing Tr.) at 55–56, attached as Exhibit A.  On June 9, 2025, the court dismissed the case based on the parties' stipulation.  D. Colo., Case No. 1:25-cv-00474-DDD-KAS, ECF 59.

In the third case, *Mennonite Church USA v. Department of Homeland Security*, several faith communities alleged violations of RFRA, the First Amendment, and the APA based on the 2025 Guidance. 778 F. Supp. 3d 1 (D.D.C. 2025). The court denied plaintiffs' motion for preliminary relief for lack of standing.  *Id.* at *8.  Plaintiffs' appeal is pending in the D.C. Circuit (case no. 25-5209).

In the fourth case, *Pineros Y Campesinos Unidos Del Noroeste, et al., v. Noem*, a coalition of churches, a Latinx organization, and an interfaith organization similarly alleged the 2025 Guidance violated RFRA, the First Amendment, and the APA.  No 6:25-cv-699-AA (D. Or. Apr. 28, 2025).  The United States moved to dismiss the complaint on July 21, 2025, *id.* ECF No. 17.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs "must establish" that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Id.* at 20.

"To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quotation omitted). The Supreme Court has also instructed that a preliminary injunction cannot issue on the basis of speculative or possible injury.  Rather, the moving party must establish that irreparable harm is "*likely* in the absence of an injunction." *Winter*, 555 U.S at 22.

## ARGUMENT

I.     **Plaintiffs are Unlikely to Succeed on the Merits of Their Claims.**

A. **Plaintiffs Lack Standing.**

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing,"—namely that they have (1) suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical" that is (2) "fairly

traceable" to the challenged conduct of the defendant, and will (3) "likely" be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs bring this lawsuit on behalf of themselves and their members. *See* Pls.' Mem. at 9, 15. Organizations have standing to sue on their own behalf if they satisfy the three elements of standing that apply to individuals. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024). Organizations have standing to sue on their members' behalf when their members "would otherwise have standing to sue in their own right," the interests they "seek[] to protect are germane" to their purpose, and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "At the preliminary injunction stage," Plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted). Plaintiffs have not made that clear showing as to any element of standing.

### i.  Plaintiffs fail to show a cognizable injury.

Plaintiffs assert they are injured by the 2025 Guidance in a number of ways: (1) congregants fear attending services and events[3] at their houses of worship due to the threat of ICE enforcement; (2) some churches are now choosing to lock doors or mark their premises as private in contravention of their beliefs to be welcoming to all; (3) church services have suffered from decreased attendance; (4) church services have degraded due to leaders avoiding preaching their conscience for fear of drawing ICE's retribution; and (5) churches are being forced to make an "impossible choice" between welcoming all to join them in worship, and "putting those who would do so in harm's way through an encounter with an armed federal agent." Pls.' Mem. 8–9, ECF No. 33. The chill on Plaintiffs' religious

---

[3] Plaintiffs allege the 2025 Guidance has also led to a decrease in attendance at church-sponsored community outreach programs such as food pantries, English as a Second Language (ESL) classes, and daycares. *See* Pls.' Mem. at 16. Defendants do not distinguish between attendance at worship services and attendance at such programs during this motion.

exercise and expressive association rights is compounded, Plaintiffs contend, by the immigration enforcement activity that has been occurring across the country and in their communities since the 2025 Guidance was issued. *Id.* at 12–15. And Plaintiffs point to five instances where immigration enforcement activity has occurred in or near Plaintiffs' places of worship. *Id.* at 13. The harms Plaintiffs describe, however, do not constitute a cognizable injury sufficient to support Plaintiffs' standing.

It is well-settled that a cognizable injury cannot arise merely from the knowledge that the Government is engaged in certain activities. *Laird v. Tatum*, 408 U.S. 1, 11 (1972). There must be "some concrete harm (past or immediately threatened) apart from the 'chill' itself" that arises from an "'exercise of governmental power'" that is "'regulatory, proscriptive, or compulsory in nature[.]'" *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (quoting *Laird*, 408 U.S. at 11); *see also Ozonoff v. Berzak*, 744 F.2d 224, 229 (1st Cir. 1984). And the "complainant" must be either "presently or prospectively subject to the regulations, proscriptions, or compulsions" at issue. *Laird*, 408 U.S. at 11. In other words, the challenged Government action must directly regulate or constrain the party challenging the exercise of governmental power by issuing a "command[] or prohibition[] to the[] [P]laintiffs" or setting forth "standards governing their conduct." *United Presbyterian Church*, 738 F.2d at 1378; *see also Ozonoff*, 744 F.2d at 229 (explaining that the cases finding standing based upon a chilling effect involved instances where the government action was specifically directed towards an individual, effectively forcing an individual to choose between bringing his associational activity into conformity with a policy or risk losing employment); *Clapper*, 568 U.S. at 419 (recognizing that past cases do not "suggest[] that plaintiffs can establish standing" based on the alleged chilling effect of a policy that "does not regulate, constrain, or compel any action on [the plaintiffs'] part").

The 2025 Guidance issues no such command or prohibition. Nor does it set forth standards governing Plaintiffs' conduct. Instead, the guidance instructs *immigration enforcement officers* to exercise

their discretion and use common sense when contemplating enforcement actions in or near sensitive locations. Because the 2025 Guidance does not directly "regulate, constrain, or compel" Plaintiffs or their members, any harms stemming from their fear that immigration enforcement activity might occur in or near their places of worship at some indeterminate point in the future are not cognizable. *Clapper*, 568 U.S. at 419. Moreover, the 2025 Guidance, similar to the Mayorkas Memorandum, "does not *direct*" immigration enforcement officers to take actions in or near sensitive locations, it "merely *authorizes* them" to do so. *United Presbyterian Church*, 738 F.2d at 1380. Because the 2025 Guidance "*authorizes— but does not mandate or direct—*" the immigration enforcement actions Plaintiffs and their members fear, Plaintiffs' "allegations are necessarily conjectural." *Clapper*, 568 U.S. at 412. "Simply put, [Plaintiffs] can only speculate as to how" immigration enforcement officers "will exercise their discretion" and common sense in determining whether to carry out enforcement operations in or near their places of worship. *Id.*

Plaintiffs point to several recent instances of immigration enforcement activity that have occurred in or near their communities. *See* Pls.' Mem. at 12-13. But none of these instances establishes standing because Plaintiffs do not assert that they were subject to those actions. *See Kersey v. Trump,* No. CV 17-11635, 2017 WL 6452420, at *1–2 (D. Mass. Dec. 18, 2017), *aff'd*, No. 18-1056, 2018 WL 11303565 (1st Cir. Sept. 4, 2018) (no standing where plaintiff not subject to the challenged action).

As for the five instances of immigration enforcement activity Plaintiffs identify as having "directly" touched their members, *see* Pls.' Mem. at 13, Plaintiffs' own declarations demonstrate the speculative nature of their claims. Three of the five instances did not occur on the grounds of a place of worship but rather blocks away, and Plaintiffs do not allege that their members or congregants were the subject(s) of the activity. *See id.* (citing Ex. 11, ¶ 34; Ex. 12, ¶¶ 11, 20). Of the remaining two instances, Plaintiffs admit the staging activity in the Sierra Pacific Synod's parking lot was not directed

8

at the synod or its congregants.  *See id.* (citing Ex. 10, ¶ 27).  These four instances do not, therefore, establish a cognizable injury.  *See Kersey*, 2017 WL 6452420, at *1–2.

Plaintiffs aver the final instance of enforcement activity occurred on the grounds of a member church in New York where ICE agents came through the privacy gate "into the parsonage of the [member] church property" to "look for somebody" and left only after the pastor told them to leave. Ex. 26 ¶ 17.  In a local media story, however, the pastor said agents came to "her home"—not a church—looking for a man "who had stayed" with her for several months and told the agents that "the individual no longer lived at her home."  These direct statements from the homeowner severely undercut the reliability of Plaintiffs' hearsay declaration about the location where this event allegedly occurred.  Further, ICE has confirmed that an ICE officer and two other officers attempted to execute an I-200, Warrant for Arrest of Alien, at the last known address for the target of the warrant on May 24, 2025.  *See* Decl. of Joshua Kincaid ¶ 3, attached as Exhibit B.  "It is routine" for ICE officers "to visit a target's last known address and speak with the occupant(s) of the address."  *Id.* ¶ 6.  When approaching the target's last known address, the ICE officer "did not observe any signage or other indications . . . signifying that" the address "is used for the purpose of religious worship[;]" it appeared to be a "private residence within a residential neighborhood."  *Id.* ¶¶ 3, 5.  After the female who answered the door informed the officers that the target no longer lived at the address, the officers left. *Id.* ¶ 4.  The Kincaid Declaration thus demonstrates that Plaintiffs have not established a cognizable injury because law enforcement officers are permitted to approach and knock on the door a private residence to execute an arrest warrant where there is reason to believe that the subject of the warrant is within the residence.  *See cf. United States v. Graham*, 553 F.3d 7, 14 (1st Cir. 2009).

In any event, Plaintiffs' averments "still fall short of the 'genuine threat' required to support" Plaintiffs' theory of standing for the prospective relief they seek because, as discussed above, the 2025

9

Guidance did not direct or require the immigration enforcement activity; it merely authorized it. *See United Presbyterian Church*, 738 F.2d at 1380. Further, there is nothing in the record that suggests these two churches—much less any of Plaintiffs' other churches—will be the subject of *future* immigration enforcement activity given that the 2025 Guidance does not direct that immigration enforcement operations take place at those or any other place of worship. *See Murthy*, 603 U.S. at 58; *Clapper*, 568 U.S. at 412; *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also United Presbyterian Church*, 738 F.2d at 1380. To conclude Plaintiffs have standing to challenge an internal guidance memorandum instructing immigration enforcement officers to exercise discretion and use common sense when contemplating an enforcement action in or near a sensitive location would be tantamount to "acknowledg[ing] . . . that all churches would have standing to challenge a statute which provides that search warrants may be sought for church property if there is reason to believe that felons have taken refuge there." *United Presbyterian Church*, 738 F.2d at 1380. But "[t]hat is not the law." *Id.*

Plaintiffs' allegations that their members have implemented, or are contemplating implementing, protective measures that are inconsistent with the tenets of their faith also do not give rise to a cognizable injury-in-fact. Plaintiffs cannot demonstrate a cognizable injury by pointing to "costly and burdensome measures" they have already taken or are contemplating taking in response to a speculative risk of harm. *See Clapper*, 568 U.S. at 415-16; *Mennonite Church USA*, 778 F. Supp. 3d at 13.

In the absence of any certainly impending injury, Plaintiffs effectively seek pre-enforcement review of DHS's hypothetical application of the 2025 Guidance. But pre-enforcement review is severely limited and warranted only "under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158-59 (2014); *see also Lyons*, 461 U.S. at 111. Plaintiffs have not carried their burden to meet that standard here.

10

As the First Circuit has emphasized, "'[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'" *Blum v. Holder*, 744 F.3d 790, 796 (1st Cir. 2014) (quoting *Babbit v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). The likelihood of sustaining a direct injury depends on the "full panoply of circumstances" present in each case, such as "the history of enforcement of the challenged statute to like facts" and "any threats of enforcement." *Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 160 (D.D.C. 2014) (citation omitted) (citing *Blum*, 744 F.3d at 798). "'Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Blum*, 744 F.3d at 796 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14, (1972)).

Courts often find the absence of a specific threat of enforcement fatal to pre-enforcement standing. *See Freeman v. City of Keene*, 561 F. Supp. 3d 22, 32 (D.N.H. 2021). Indeed, in the First Circuit, a pre-enforcement plaintiff must plead individualized conditions that might distinguish him or her from an undifferentiated and ambiguous threat of prosecution to establish a credible threat. *Bechade v. Baker*, No. CV 20-11122-RGS, 2020 WL 5665554, at *2 (D. Mass. Sept. 23, 2020). In other words, the plaintiff must usually show that the potential prosecution will target him or her personally in such a way as to distinguish the plaintiff from the general public. *City of Keene*, 561 F. Supp. 3d at 32; *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 316 (2021); *Lujan*, 504 U.S. at 573.

Plaintiffs here have not presented any evidence that they have received any threat of immigration enforcement distinguishable from that of the general public. *City of Keene*, 561 F. Supp. 3d at 32; *see also* Pls.' Mem. at 12–15. Indeed, the 2025 Guidance does not "direct law enforcement to target churches or synagogues or to treat places of worship as high priority locations for immigration enforcement." *Mennonite Church USA*, 778 F. Supp. 3d at 9. Nor have Plaintiffs presented evidence that they "are being singled out as special targets." *Id.* (citing *Clapper*, 568 U.S. at 412). Because Plaintiffs

fail to present sufficient facts suggesting it is likely, much less imminent, that Defendants will attempt to enforce the 2025 Guidance against them in the future, their purported fears of potential enforcement amount to no more than a subjective chill, which is insufficient to confer pre-enforcement standing to assert a challenge to a future enforcement action. *See Blum*, 744 F.3d at 796; *Mennonite Church USA*, 778 F. Supp. 3d at 9.

Finally, the Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023), confirms the lack of a cognizable injury. At bottom, Plaintiffs asks this Court to second guess the Executive's discretionary decision regarding where and how vigorously to direct its immigration enforcement resources. *Id.* at 679. The Supreme Court has made clear, however, that parties challenging immigration enforcement priorities lack an Article III injury because such lawsuits "run up against the Executive's Article II authority to enforce federal law," *id.* at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive to weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy, *id.* at 679-80. Consequently, "federal courts lack Article III jurisdiction over suits that challenge the Executive's enforcement decisions." *Id.* at 685.[4]

> ### ii. Even if Plaintiffs have demonstrated a cognizable injury, they have not shown the injury was caused by and is traceable to the 2025 Guidance.

Plaintiffs submit numerous declarations stating that since the President took office and the 2025 Guidance was issued, they have experienced a reduction in worship attendance and had to implement or consider implementing protective measures since congregants "fear that armed agents may be waiting outside or may even seek to enter the sanctuary." Pls.' Mem. at 21. To establish standing, Plaintiffs

---

[4] If the Court were to disagree, it should limit its finding of a cognizable injury-in-fact to Plaintiffs Sierra Pacific Synod and American Baptist Churches USA—the only Plaintiffs whose members assert they have been the subject of an immigration enforcement action since the 2025 Guidance was issued. *See Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006) ("The standing inquiry is both plaintiff-specific and claim-specific. Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts.").

must clearly show they have suffered a cognizable injury "that is fairly traceable to the [D]efendant[s'] allegedly unlawful conduct . . . ." *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (citation omitted). This requires Plaintiffs to demonstrate that their claimed injury is actually caused by the specific wrongful conduct that they allege. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

Plaintiffs' claimed injuries arise from the fear experienced by their congregants who are confronted with the potential of immigration enforcement. *See* Pls.' Mem. at 18–22. "[W]here a causal relation between injury and challenged action depends upon the decision[s] of [] independent third part[ies] . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (citation omitted); *see also Clapper*, 568 U.S. at 414. "'[C]ausation is absent if the injury stems from the independent action of a third party,' [] so long as the injury is not the product of that third party's 'coercive effect,'" *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020).

To satisfy the causation and traceability element of standing, Plaintiffs must adduce facts that clearly show the third parties "will likely react in predictable ways" to the challenged Government action. *Dep't of Com.*, 588 U.S. at 768; *see also Murthy*, 603 U.S. at 68 n.8. "That connection cannot be overly attenuated." *Dantzler*, 958 F.3d at 47 (internal citations omitted). Thus, plaintiffs are required to present "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 770 F. Supp. 3d 400, 405 (D.N.H. 2025).

Plaintiffs have not met their burden. The evidence Plaintiffs have adduced is, at best, "murky[.]" *Murthy*, 603 U.S. at 68 n.8. As noted above, Plaintiffs allege several classes of harms stemming from the fear of immigration enforcement. Each Plaintiff alleges the 2025 Guidance violates their religious belief to minister unto the immigrant and that the 2025 Guidance has decreased attendance at their

places of worship.  *See* Pls.' Mem. at 16–18.  Many Plaintiffs allege they have spent time and effort preparing for an ICE "raid" with some alleging they have engaged in self-censorship.  *See* Pls.' Mem. at 21–22.  The Quaker Plaintiffs allege the mere possibility of armed ICE agents showing up to a worship service "would be wholly antithetical to their faith."  *See* Pls. Mem. at 16.  Plaintiffs are careful to allege that the 2025 Guidance is the direct cause of their congregants' fear.  Pls.' Mem. at 18.  But Plaintiffs' factual allegations do not establish such a causal relationship.

For example, Reverand Jeff Johnson of the Sierra Pacific Synod acknowledges that congregants are aware they are "exposed to jeopardy from ICE" from "walking down the street[.]"  Ex. 10 ¶ 19. And his pastors report that people are not attending "because of visible and increased ICE activity *in the area* of the church."  *Id.* ¶ 26 (emphasis added).  To be sure, Reverand Johnson attempts to tie his congregants' fear specifically to the 2025 Guidance, *see id.* ¶¶ 19, 22.  But he offers few substantial allegations to support this claim, relying instead on conclusory statements.  *See id.* ¶ 19 ("people know [the sensitive locations policy] has changed now, and as a result they are staying away from . . . churches"); *id.* ¶ 22 ("I am aware that the government's decision to rescind a longstanding policy on ICE enforcement at sensitive locations . . . has had a damaging effect upon many congregations…").

Robin DuRant of the Pacific Yearly Meeting is even more explicitly equivocal.  "*I believe that threatened* or actual immigration-enforcement action near or inside a Quaker meeting. . . *may* lead *some* to refrain from attending worship services."  Ex 11 ¶ 39 (emphasis added).  Her ambiguity is well taken since she identified only a single immigration enforcement activity that occurred near a monthly meeting.  *See* Ex. 11 ¶ 34.  Pastor Edwin Aparicio and Reverand Paul Erickson of the Greater Milwaukee Synod similarly highlight their congregants' generalized fear of immigration enforcement.  Pastor Aparicio cites three instances of immigration enforcement which lead to his congregants fears: the arrest of one of his congregants by ICE in May 2025 *ten minutes away from the church*, an ICE "sighting" on June

14

21 *three blocks away from the church*, and a similar ICE "sighting" *two blocks away from another church*. Ex. 12 ¶ 9, 11, 20 (emphasis added). None of these episodes happened on church property. This enforcement *around* non-Plaintiff churches has led many of Pastor Aparicio's congregants to "express[] concern about the potential for ICE raids at the church or in the surrounding area[]" with a "noticeable decrease in attendance" after a member was detained "10 minutes away from the church[.]" *Id.* ¶ 9.

Other declarants similarly highlight the speculative connection between the 2025 Guidance and Plaintiffs' alleged injuries. Pastor Nelson Rabell-Gonzalez of the Sierra Pacific Synod notes the fear of immigration enforcement stems from "raids in the area" and the "uncertainty around whether there will be raids or not[.]" Ex. ¶ 27. Reverand Brenda Bos of the Southwest California Synod mentions one community has started to be "very cautious about unlocking exterior gates and doors" because it is located "very close" to an ICE field office. Ex. 16 ¶ 16. Gail Cornwall-Feeley of the San Francisco Friends Meeting clarifies the *mere prospect* of armed ICE agents at a meeting is "distressing enough to make it very difficult to engage in" worship and will discourage attendance. Ex. 20 ¶ 42. Jeanne-Marie Duval Pierrelouis of the North Pacific Yearly Meeting reports *"[s]ome* members and attenders also join groups that escort folks to their immigration appointments" and so "worry that ICE *might* choose to retaliate against us by targeting our congregation." Ex. 22 ¶ 18 (emphasis added). Paul Christiansen of the same Yearly Meeting says he knows of immigrant attenders who are worried about the 2025 Guidance and that "*some may* simply not show up in person for worship services if there is a *chance* that immigration enforcement actions could happen[.]" Ex. 21 ¶ 22 (emphasis added). Reverand Cecilia Eggleston of the Metropolitan Community Church notes attendance has decreased but fails to even try to tie the decline to the 2025 Guidance. *See* Ex. 24 ¶ 16. And Reverand Gina Jacobs-Strain of the American Baptist Church USA shares that "visible [ICE] presence or activity *near* places of worship. . . has [] discouraged engagement and fostered mistrust and fear." Ex. 26 ¶ 14 (emphasis added).

15

To be sure, Plaintiffs attempt to artfully tie their inchoate fears of general immigration enforcement directly to the 2025 Guidance by alleging their fear is a direct consequence of the new guidance. Pls.' Mem. at 18. But the evidence in the record does not support this. First, as discussed above, Plaintiffs only point to two incidents of enforcement activity taking place at or near their places of worship and neither of those incidents, according to Plaintiffs' accounts, consisted of detaining congregants (i.e. an enforcement action) during worship services. *Compare* Ex. 10 ¶ 27; Ex. 26 ¶ 17 *with Presbyterian Church v. United States*, 870 F.2d 518, 521-22 (9th Cir. 1989) (concluding plaintiffs suffered an actual injury where enforcement officers infiltrated four churches and surreptitiously recorded worship services over a nine-month period). Second, Plaintiffs state in their memorandum that their fears have increased in light of the recent increase in enforcement activity generally. *See* Pls.' Mem. at 12–15 (citing articles reporting specific instances of immigration enforcement at non-plaintiff places of worship and various non-plaintiff religious organizations' statements on the 2025 Guidance). These statements amount to an admission that the cause of the congregants' fears is the recent uptick in enforcement activity, not the 2025 Guidance. The incidental effects of increased immigration enforcement generally on church attendance is far too attenuated to establish standing.

Third, Plaintiffs' conclusory statements fail to establish a "sufficiently direct causal connection" between the 2025 Guidance and their alleged harms. *See Dantzler*, 958 F.3d at 47. Compare Plaintiffs' allegations to those found in *Dantzler*. There, the plaintiffs alleged that third parties were "forced" to collect fees from the plaintiffs, resulting in higher prices. But the First Circuit determined that the plaintiffs' allegation "[was] nothing more than a bare hypothesis that [third parties] possibly might push" the added fee cost "onto [plaintiffs]." *Id.* at 48 (quotation omitted). The plaintiffs' allegation did not "describe [the plaintiffs'] injury 'in terms specific enough to indicate that it will result from'" the

imposition of fees "rather than from a 'multitude of other factors.'" *Id.* at 49 (quoting *Pérez-Kudzma v. United States*, 940 F.3d 142, 145 (1st Cir. 2019)).

Here too, Plaintiffs have failed to show the 2025 Guidance causes their alleged injuries rather than "a 'multitude of other factors.'" *Id.* at 49. Plaintiffs' theory of injury rests entirely on the actions of third parties and the conclusory and second-hand statements of declarants. *See, e.g.*, Ex. 15 ¶ 24 ("*Some* of the pastors who participate in the Latino Strategy have reported decreases in attendance at church service and church-sponsored events.") (emphasis added); Ex. 21 ¶ 23 ("DHS's policy *could* discourage them from attending worship services in person as well.") (emphasis added); Ex. 24 ¶ 15 ("Leadership, clergy, and congregants have expressed a sense of anxiety and fear *about the possibility* of immigration enforcement in a member church.") (emphasis added). These assertions are not enough for the Court to conclude with "little doubt" that the 2025 Guidance has caused reduced worship attendance, *Concord Hosp.,* 770 F. Supp. 3d at 405; *see also Mennonite Church USA*, 778 F. Supp. 3d at 11-12, as opposed to more general concerns from third parties about enhanced immigration enforcement, to say nothing of the myriad other economic, social, or personal reasons that might cause someone not to attend worship. At most, Plaintiffs point to a temporal correlation between reduced attendance and the 2025 Guidance, but Article III standing demands more. *See Dantzler*, 958 F.3d at 49. Plaintiffs have not clearly shown that their alleged harms are traceable to the 2025 Guidance rather than a predictable response by third parties to the recent and highly publicized prioritization of immigration enforcement more generally. *See Murthy*, 603 U.S. at 68 n.8; *see also Mennonite Church USA*, 778 F. Supp. 3d at 12; *Denver Public Schools*, Hr'g Tr., at 44-54.

Even when a plaintiff can show that the injury is based on the predictable actions of third parties, the plaintiff cannot rely on risks that are too attenuated. *Dantzler*, 958 F.3d at 47. Organizations and their members can be affected by all manner of federal decisions and policies. But they generally

do not have standing to challenge decisions and policies of general applicability unless they can show that those federal decisions and policies directly affect them. "The causation requirement also rules out attenuated links," including "distant (even if predictable) ripple effects." *Hippocratic Medicine*, 602 U.S. at 383. For example, in *Hippocratic Medicine*, the Court declined to recognize standing for the plaintiff-doctors to challenge drug approvals merely because "use of the drugs by others may cause more visits to doctors." *Id.* at 392. The Court reasoned that such an approach to standing would be "limitless" with "no principled way to cabin such a sweeping doctrin[al] change to doctors or other healthcare providers." *Id.* By way of example, the Court observed that if it found standing in such a situation, teachers in border states would have standing to "sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms." *Id.* That same logic applies here. To conclude that Plaintiffs' purported injuries are fairly traceable to the 2025 Guidance would confer standing on "virtually every citizen" to challenge the law enforcement priorities of every government entity on the speculative theory that they might be subject to such enforcement in the future. *Id.* This Court, like the Supreme Court, should decline to go down that path. *See id.*

### iii. Plaintiffs have not shown a favorable decision will redress their injury.

Even if Plaintiffs could demonstrate that their claimed injury is cognizable and traceable to the 2025 Guidance, Plaintiffs have not clearly shown that their "injury likely would be redressed by the requested judicial relief." *Id.* at 380. For much the same reason Plaintiffs cannot show causation, they also fail to successfully allege redressability. *See Dantzler*, 958 F.3d at 49. Although Plaintiffs need not demonstrate their entire injury will be redressed by a favorable judgment, it must show that the court can fashion a remedy that will at least lessen its injury. *Id.*

Plaintiffs claim that their requested stay—"reinstating the former requirement that enforcement at [sensitive locations] be avoided to the fullest possible extent"—would remedy Plaintiffs' "deep fear

for countless congregations about their free exercise of religion and association." Pls.' Mem. at 35, 37. Because the likelihood of Plaintiffs' claimed injuries being redressed is grounded in the "unfettered choices" made by independent third parties not before the Court and "whose exercise of broad and legitimate discretion the [C]ourt[] cannot presume either to control or to predict," Plaintiffs must show that those choices by third parties "will be made in such a manner as to . . . permit redressability of injury." *Lujan*, 504 U.S. at 562. But Plaintiffs offer no evidence showing that their requested stay would provide such redress for their claimed injuries. *See* Pls.' Mem. at 8–11, 33.

In the absence of such evidence, it is speculative to assume that the subjective concerns of congregants about future immigration enforcement activity at Plaintiffs' places of worship would be assuaged by the requested stay and a return to the Mayorkas Memorandum, which would still permit immigration enforcement actions when officers, exercising their discretion, determine exigent circumstances exist or obtain approval from their component's headquarters or delegee, or with a judicial warrant. *See* Ex. 4 at 4. "[R]edressability [that] requires speculat[ion]" is insufficient to support standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006).

Further, given these "limited protections against immigration officers' exercise of discretion," reverting to the Mayorkas Memorandum "would not mitigate the risk[]" of immigration enforcement in or near Plaintiffs' places of worship. *Mennonite Church*, 778 F. Supp. at 12. The memorandum "provides no bright-line definition of what constitutes near a place of worship and directs officers to use the exercise of judgment, thus allowing officers to take enforcement actions within blocks" of places of worship. *Id.* (quotations omitted); *see also* Pls.' Mem. at 35; Ex. 12 ¶¶ 9, 11. Moreover, as discussed above, the memorandum provides that immigration enforcement officers "*may* enter places of worship with 'prior approval from their Agency's headquarters' or from a supervisor the agency may 'otherwise delegate.'" *Id.* (quotation omitted). Such a minimal change from the 2025 Guidance, which directs ICE

officers to seek prior approval from AFODs and ASACs, would continue to permit immigration enforcement activity in or near places of worship so long as officers received prior supervisory approval. *See id.* Thus, even if a stay or, in the alternative, a preliminary injunction was issued, the potential for immigration enforcement in or near Plaintiffs' places of worship would remain.

### B.  This Court Lacks Jurisdiction to Issue the Requested Injunction.

Section 1252(f)(1) of Title 8 of the U.S. Code provides that, except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim of the identity of the party or parties bringing this action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." 8 U.S.C. § 1252(f)(1).  Part IV of the subchapter includes Sections 1221-1231, which the Supreme Court has described as provisions that "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Aleman Gonzalez*, 596 U.S. at 549-50.

In *Aleman Gonzales*, the Supreme Court interpreted Section 1252(f)(1) as applying broadly to immigration enforcement operations.  The Court explained that the provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550.  Accordingly, if an order enjoins or restrains action that "in the Government's view" serves to "enforce, implement, or otherwise carry out" Sections 1221-1231, it is impermissible—regardless of whether the court considers the Government to be carrying out those sections as "properly interpreted." *Id.* at 550-52. Because Plaintiffs' requested stay would restrict the manner in which the Government engages in immigration enforcement activity in or near places of worship, it restrains the Government "from actions that[,]" in the Government's view, "are allowed" by Sections 1221-1231, and it "interfere[s] with

the Government's efforts to operate" those provisions. *Id.* at 551. Section 1252(f)(1) thus bars this Court from enjoining or restraining Defendants from engaging in the apprehension of aliens as authorized by Sections 1226 and 1231. *See Biden v. Texas*, 597 U.S. 785, 797 (2022).

### C. Plaintiffs are not Likely to Succeed on their RFRA Claim.

#### i. Plaintiffs have not shown that the 2025 Guidance significantly burdens their religious exercise.

The Court should also find that Plaintiffs have no likelihood of success on their RFRA claim. Plaintiffs allege the 2025 Guidance substantially burdens their religious exercise by "deterring attendance at worship, ministry, and other events that occur at houses of worship." Pls.' Mem. at 28. This deterrence, Plaintiffs assert, is manifested in a decline in worship service attendance "by causing fear of surveillance, interrogation, or arrest at or near houses of worship." *Id.* Plaintiffs also contend it has forced them to make an impossible choice between either "violat[ing] their belief in freely welcoming all to communal worship or violat[ing] their belief that they must avoid putting others in harm's way." *Id.* at 22. Defendants do not doubt the sincerity of Plaintiffs' beliefs. Plaintiffs, however, are not likely to succeed on their RFRA claim for reasons similar to why they lack standing.

RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). RFRA does not define "substantial burden," so courts look to First Amendment cases decided before *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), to construe the term. *See* 42 U.S.C. § 2000bb(b)(1). Under those cases, a substantial burden exists "'[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by

religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Perrier-Bilbo v. United States*, 954 F.3d 413, 431 (1st Cir. 2020) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)).

The quintessential example of such coercive pressure is *Wisconsin v. Yoder*, cited favorably by Congress when passing RFRA, where members of the Amish religion were convicted of violating a Wisconsin law that required their children to attend school until the children reached the age of sixteen, under the threat of criminal sanctions for the parents.  406 U.S. 205, 207-08 (1972); *see* 42 U.S. § 2000bb(b).  Indeed, "[c]ases finding a substantial burden under RFRA have consistently done so" where the burden that interfered with claimants' religious exercise is, similar to *Yoder*, "directly implicated by federal action."  *Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 360-61 (3d Cir. 2017) (collecting cases); *see also Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001).

Contrary to Plaintiffs' assertion, *see* Pls.' Mem. at 24, such direct coercive pressure is not present in the 2025 Guidance.  By its plain terms, the 2025 Guidance does not directly coerce Plaintiffs and their members to modify their behavior or violate the tenets of their faith because it does not expressly issue any commands or prohibitions to them—it simply instructs immigration enforcement officers to exercise their "discretion" and "common sense" when deciding where to conduct enforcement operations.  *See* Ex. 6.  Further, the 2025 Guidance does not direct immigration enforcement officers to enforce federal immigration law at sensitive locations—it merely authorizes such activity.  *See id.*

Nor does the 2025 Guidance indirectly coerce Plaintiffs or their members by imposing "substantial pressure" to modify their behavior or violate their religious beliefs.  *Perrier-Bilbo*, 954 F.3d at 431.  A hallmark example of indirect coercion is *Sherbert v. Verner*, 374 U.S. 398 (1963).  There, the Supreme Court held that a claimant's "ineligibility for [unemployment] benefits derive[d] solely from the practice of her religion" and thus indirectly coerced her to modify her behavior by forcing her to

22

choose between the tenets of her faith or forfeiting unemployment benefits. *Id.* at 403-04. More recently, the Supreme Court concluded in *Burwell v. Hobby Lobby Stores, Inc.* that a regulation mandating certain employers provide health-insurance coverage for methods of contraception substantially burdened the plaintiffs' religious exercise by coercing them to either provide the health-insurance coverage in violation of their religious beliefs or pay monetary fines. 573 U.S. 682, 690-91, 726 (2014). Unlike in *Sherbert* and *Hobby Lobby*, the 2025 Guidance does not coerce Plaintiffs or their members to choose between the tenets of their faith and a government benefit or penalize Plaintiffs for following the tenets of their faith. Moreover, the religious burdens Plaintiffs assert as injuries flow from the independent decisions of third parties—aliens who are present in the United States unlawfully or otherwise removable—or are self-imposed. That kind of alleged harm fails to identify a RFRA substantial burden or support a finding of Article III traceability and redressability. *See Cassidy v. City of Brewer*, No. 1:12-CV-00137-DBH, 2012 WL 5844874, at *11 (D. Me. Sept. 12, 2012) (holding a landlord failed to establish injury under Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et seq., due to church-tenant's termination of lease in response to city's zoning enforcement).

Further, RFRA, like the Free Exercise Clause, "simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particularized citizens." *Bowen v. Roy*, 476 U.S. 693, 699 (1986) (plurality op.); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988). As discussed *infra* at 33–6, the 2025 Guidance by its own terms does not create any right or benefit and thus does not constitute final agency action. Ex. 6. Rather, it is an internal guidance document that governs how Defendants exercise their discretion in enforcing the Nation's immigration laws and does not require any particular action against any particular individual, group of individuals, or religious entity. *See id.* It is well-settled that the Executive "retains discretion over whether to remove a noncitizen from the United States." *Texas*, 599 U.S. at 679 (citing

*Arizona*, 567 U.S. at 396). How the Executive exercises that discretion is an internal matter not suitable for judicial review. *Id.* at 679-80. That is because, as noted above, courts "generally lack meaningful standards for assessing the propriety of enforcement choices in this area" due in part to the fact that the Executive "must constantly react and adjust to the ever-shifting public-safety and public-welfare needs of the American people." *Id.* It is, therefore, not surprising that Plaintiffs cite no authority holding that a general law enforcement policy that authorizes—but does not mandate—specific enforcement actions constitutes a substantial burden on religious exercise.

In sum, the link between the 2025 Guidance and the burdens on Plaintiffs' religious exercise is too attenuated to rise to the level of "substantial." It is speculative that immigration enforcement officers will decide to exercise their discretion and common sense to carry out an enforcement action in or near Plaintiffs' places of worship. It is also speculative that the decisions Plaintiffs, their congregants, and other community members have and will make relating to worship service attendance is a response to the 2025 Guidance as opposed to a response to the general increase in immigration enforcement activity in Plaintiffs' communities. Indeed, as previously noted, many of Plaintiffs' declarations specifically reference general immigration enforcement action in their communities as the basis for their concerns. *See, e.g.,* Ex. 10 ¶ 26; Ex. 29 ¶ 14. The fact that some individuals voluntarily chose to stay away from places of worship because of enhanced immigration enforcement in the community at large is not a substantial burden on Plaintiffs' exercise of religion. Indeed, such a theory has no limiting principle as it would invite RFRA claims over all manner of lawful government policies—*e.g.*, road construction, snow removal, transportation fees—that have incidental impacts on church attendance, but are plainly not substantial burdens on religion.

> ii.    **The 2025 Guidance furthers compelling governmental interests in uniform enforcement of the Nation's immigration laws that cannot be achieved through means significantly less restrictive.**

Even if the Court were to conclude that the 2025 Guidance imposes a substantial burden on Plaintiffs, there is no RFRA violation if the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Here, Defendants have a compelling interest in the uniform enforcement of the Nation's immigration laws in light of the overwhelming surge of illegal immigration over the past several years, and the 2025 Guidance is the least restrictive means of advancing those interests. *See generally*, *Kaemmerling v. Lappin*, 553 F.3d 669, 685 (D.C. Cir. 2008) (noting RFRA does not require the government to adopt an alternative that is "less effective" at accomplishing its compelling interest than the government action challenged).

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. "The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (citing cases); *see Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989). Congress, through the Immigration and Nationality Act (INA), delegated to the Secretary of Homeland Security significant authority to administer and enforce the immigration and nationality laws, without placing any limitations on the Executive's arrest authority on property owned or operated by religious organizations. *See, e.g.*, 8 U.S.C. §§ 1226, 1231, 1357; *see also Arizona*, 567 U.S. at 396. "The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and permits and prolongs a continuing violation of United States law." *Nken v. Holder*, 556 U.S. 418, 435 (2009) (cleaned up).

The Government's compelling interest is even stronger in the current context because of the "unprecedented flood of illegal immigration" that has occurred over the past four years. Exec. Order

25

No. 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025).  As the President has recognized, "[m]illions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws." *Id.*  The numbers are staggering.  As documented by the House Committee on Homeland Security, "U.S. Customs and Border Protection has reported more than 8.2 million encounters of inadmissible aliens at the Southwest border, a number that grows to more than 10.1 million when factoring in America's borders and ports of entry nationwide." *See* House Committee on Homeland Security, *Crisis by Design: A Comprehensive Look at the Biden-Harris Administration's Unprecedented Border Crisis* at 3 (Sept. 18, 2024) (citation omitted); *Biden*, 597 U.S. at 816-17 (2022) (Alito, J., dissenting) ("In fiscal year 2021, the Border Patrol reported more than 1.7 million encounters with aliens along the Mexican border.").

This massive increase in illegal immigration has imposed significant harms on Americans.  The recent influx has "cost taxpayers billions of dollars at the Federal, State, and local levels."  Exec. Order No. 14159, 90 Fed. Reg. at 8443.  "Deadly narcotics and other illicit materials have flowed across the border[.]"  Exec. Order No. 14165, *Securing Our Borders*, 90 Fed. Reg. 8467 (Jan. 20, 2025); *see also Hernandez v. Mesa*, 589 U.S. 93, 107 (2020) ("During the last fiscal year, approximately 850,000 persons were apprehended attempting to enter the United States illegally from Mexico, and large quantities of drugs were smuggled across the border").  "Foreign criminal gangs and cartels" have extended their influence beyond the southern border into American cities.  Proclamation 10886, *Declaring a National Emergency at the S. Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025).  "Many of these aliens unlawfully within the United States present significant threats to national security and public safety," thus the Government must take appropriate action to "protect[] the American people by faithfully

executing the immigration laws of the United States." Exec. Order No. 14,159, 90 Fed. Reg. at 8443; *see also* Exec. Order No. 14,165, 90 Fed. Reg. at 8467; Proclamation No. 10,866, 90 Fed. Reg. at 8327.

A policy that imposes heightened procedural requirements for such enforcement beyond what Congress provided in the INA would create a nationwide hodgepodge of immigration enforcement sanctuaries with different rules for the enforcement of generally applicable laws. Such a scheme would undermine Congress's instruction that "the immigration laws of the United States should be enforced vigorously and uniformly." Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384; *see also Arizona*, 567 U.S. at 401-02. The Supreme Court has expressly recognized that "that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006). This case is one of those instances because both Congress and the Supreme Court have emphasized the need for uniform application and enforcement of the Nation's immigration laws. *See United States v. Lee*, 455 U.S. 252, 260 (1982); *see also Gonzales*, 546 U.S. at 435; *Molina v. I.N.S.*, 981 F.2d 14, 19 (1st Cir. 1992); *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 416 (D.C. Cir. 2024). Defendants accordingly have a compelling interest in "denying an exemption to these specific plaintiffs" from the uniform and evenhanded enforcement of the Nation's immigration laws. *Singh v. Berger*, 56 F.4th 88, 99 (D.C. Cir. 2022) (citation omitted); *see also United States v. Grady*, 18 F.4th 1275, 1287 (11th Cir. 2021) (stating that "RFRA is not a 'get out of jail free card,' shielding [individuals] from criminal liability").

The 2025 Guidance is also the least restrictive means of furthering Defendants' compelling interests. "Discretion in the enforcement of federal immigration law is vital for accomplishing the purposes of federal immigration law." *United States v. Iowa*, 126 F.4th 1334, 1347 (8th Cir. 2025). The 2025 Guidance is narrowly tailored to further that important interest because it eschews "bright line

27

rules regarding where our immigration laws are permitted to be enforced" in favor of immigration officers' discretion. Ex. 6. It acknowledges that "officers frequently apply enforcement discretion to balance a variety of interests" when conducting immigration enforcement activities, "including the degree to which any law enforcement action occurs in a sensitive location." *Id.*; *see also Texas*, 599 U.S. at 680. The 2025 Guidance, therefore, directs officers to rely on their "discretion along with a healthy dose of common sense" when contemplating enforcement actions in a sensitive location. Ex. 6. Allowing immigration officers to exercise their discretion in this manner is narrowly tailored to further the "vigorous enforcement program" that Congress contemplated "in passing the Immigration and Nationality Act." *Castillo*, 659 F.2d at 1219, 1221. A contrary holding would conflict with the Supreme Court's warning that courts should not create "rigid" limitations on law enforcement officers by imposing "a clear rule to guide their conduct." *United States v. Place*, 462 U.S. 696, 709 n.10 (1983). Instead, the 2025 Guidance is the least restrictive means to further the well-established principle that law enforcement officers should be given broad discretion, within the bounds of reasonableness, "to graduate their responses to the demands of any particular situation." *Id.*

### D. Plaintiffs are not Likely to Succeed on their First Amendment Claim.

It is well settled that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit" of religious ends. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The Supreme Court has recognized that the Government may unconstitutionally infringe this right by imposing penalties or withholding a benefit because of membership in a disfavored group, *id.* at 622-23, or requiring disclosure of the fact of membership for groups seeking anonymity, both of which makes "group membership less attractive," *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006). They can also take the form of interference

28

with a group's internal organization or affairs by forcing the group to accept members it does not desire. *See Roberts*, 468 U.S. at 622-23; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

The right of expressive association, however, "is not absolute." *Boy Scouts*, 530 U.S. at 648. And the Supreme Court has never recognized the novel expressive association claim that Plaintiffs advance here, which would require the Government to relax a neutral law enforcement policy that allegedly disincentivizes certain individuals from attending communal gatherings. Traditionally, interference with a plaintiff's expressive association rights, either through direct or indirect restrictions on the ability to freely associate, will only result in a violation of the First Amendment if the infringement would significantly burden those rights. *See id.* at 653; *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2021). Even if a governmental action significantly burdens expressive-association rights, the action does not violate the First Amendment if it serves a compelling interest that "cannot be achieved through means significantly less restrictive of associational freedoms." *Boy Scouts*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623); *cf. Ams. for Prosperity*, 594 U.S. at 607 (explaining that the standard of review for "First Amendment challenges to compelled disclosure" is "exacting scrutiny[,]" which requires the Government to demonstrate a "substantial relation between the disclosure requirement and a sufficiently important governmental interest" (citation omitted)).

### i. Plaintiffs have not shown the 2025 Guidance is likely to significantly burden their expressive rights.

Plaintiffs argue that the 2025 Guidance "infringes on Plaintiffs' and their members' expressive-association rights by deterring attendance at worship. . . [through] causing fear of surveillance, interrogation, or arrest[.]" Pls.' Mem. at 28. But in support of their argument, Plaintiffs point to widely reported prior immigration enforcement actions—not the 2025 Guidance—to evince their alleged burdens are not hypothetical or subjective. *See id.* at 12–15. And Plaintiffs only point to two incidents of enforcement activity arguably taking place in or near their churches, neither of which resulted in the

detention of congregants or any actual interference with a religious practice in a house of worship. Ex. 10 ¶ 27; Ex. 27 ¶ 17. These arguments reenforce the speculative nature of Plaintiffs' claim, by demonstrating that any burdens on their expressive association stem not from the 2025 Guidance, but rather from the President's prioritization of immigration enforcement.

The speculative nature of the burdens Plaintiffs describe is further evidenced by the fact that the 2025 Guidance does not directly force or prohibit Plaintiffs' expressive association because, as discussed above, the memorandum does not regulate, constrain, or compel Plaintiffs to modify their behavior. *See supra* at 21–4. Nor does the memorandum require immigration officers to carry out enforcement actions in or near Plaintiffs' places of worship. The burdens Plaintiffs describe are thus based on conjecture—the possibility that immigration enforcement officers will decide to exercise their discretion and common sense to conduct enforcement activities in or near Plaintiffs' places of worship. *See, e.g.*, Ex. 10 ¶ 33 ("I fear that our rostered leaders and congregations *could* be exposing themselves to potential prosecutions by following Jesus Christ and responding to the needs of our immigrant members and neighbors.") (emphasis added); Ex. 11 ¶ 42 ("The *threat* of immigration enforcement near or inside a Quaker meeting house or any place where a meeting for worship is occurring causes significant harm") (emphasis added); Ex. 13 ¶ 27 ("The *uncertainty* around *whether there will be raids or not* is devastating to the congregants.") (emphasis added). Such speculation simply does not support a finding that the burdens Plaintiffs describe are significant.

      **ii.**    **The 2025 Guidance furthers compelling governmental interests in uniform enforcement of the Nation's immigration laws that cannot be achieved through means significantly less restrictive of associational rights.**

Because Plaintiffs have failed to carry their burden of establishing that the 2025 Guidance imposed a direct and significant burden on their right to expressive association, the First Amendment does not require Defendants to respond further. *See Boy Scouts*, 530 U.S. at 656. Even if the Court were

to disagree, the 2025 Guidance serves the compelling governmental interest in enforcement of the Nation's immigration laws and is the least restrictive means to further that interest. *See supra* at 25.

### E.  Plaintiffs Are Not Likely to Succeed on their APA claims.

Plaintiffs' APA claims fails because (1) DHS's internal guidance to its enforcement officers regarding its enforcement approach is committed to agency discretion by law and (2) the decision is not a "final agency action" that is subject to judicial review.

### i.    Immigration enforcement is committed to agency discretion by law.

Plaintiffs' APA claim fails because discretionary policy choices about how best to enforce immigration law are committed to agency discretion by law.  The APA bars judicial review of agency action to the extent that it "is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"— where, effectively, "there is no law to apply"—the APA does not permit judicial review. *Id.*

When considering whether a matter is committed to agency discretion, courts review the statutory scheme to determine if it provides an adequate standard of review. *Id.* at 831.  "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, is there 'law to apply' under § 701(a)(2)." *Id.* at 833-34.  Courts may also consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832.  Decisions are "general[ly] unsuitabl[e]" for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within its expertise" including "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* at 831.

Enforcement decisions traditionally involve considerable agency discretion. *See Texas*, 599 U.S. at 678; *see also JGE ex rel. Tasso v. United States*, 772 F. App'x 608, 612 (10th Cir. 2019); *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800 F.2d 1514, 1523 (9th Cir. 1986).  Law enforcement guidance is generally committed to agency discretion because enforcement inherently requires a complicated balancing of factors to assess how the agency can best carry out its responsibility to enforce the law. *Cf. Heckler*, 470 U.S. at 831; *Texas*, 599 U.S. at 680.  Further, where "the type of agency decision in question has traditionally been committed to agency discretion," the action does not "become[] reviewable" just because "the agency gives a reviewable reasons" for it (or fails to do so). *I.C.C. v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282-3 (1987) (citation omitted).

Under these standards, DHS's adoption of the 2025 Guidance, which provides internal guidance to immigration enforcement officers, is committed to agency discretion.  The analysis begins with the statute. *See Webster v. Doe*, 486 U.S. 592, 600 (1988).  Congress through the INA and other statutes has granted immigration enforcement officers broad discretion in carrying out immigration laws. *See Arizona*, 567 U.S. at 396.  Nothing in the relevant statutes indicates that Congress intended to "limit [the] agency's exercise of enforcement power . . ., either by setting substantive priorities, or by otherwise circumscribing [the] agency's power to discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 832-33.  Thus, the INA's enforcement provisions, far from seeking to impose constraints on the agency's "exercise of enforcement power," affords the Executive ample discretionary authority to prioritize when and where it will enforce law. *Id.* at 833.

Plaintiffs do not address Defendants' enforcement discretion in their memorandum and thus do not evaluate the discretionary nature of the INA. *See* Pls.' Mem. at 30-33.  That decision is unsurprising given that the INA does not provide any meaningful standard by which to judge the agency's discretion as to enforcement actions in or near places of worship.  The INA imposes few

location-based restrictions on DHS's broad authority to investigate and make arrests, and it evinces only limited intent to dictate agency discretion with respect to the mechanics of enforcement operations. *See, e.g.*, 8 U.S.C. §§ 1226(a), 1231(a)(1)(A), (2), 1357(a).  But aside from the requirement to obtain warrants in certain circumstances, *see, e.g., id.* § 1226(a), Congress has not placed other restrictions on Defendants' enforcement discretion, such as whether, when, or under what circumstances immigration enforcement officers may enter or approach sensitive locations, such as places of worship.  Because the INA does not address enforcement in or near places of worship and other sensitive locations, there is "no basis on which a reviewing court could properly assess" the 2025 Guidance.  *Cowels v. FBI*, 327 F. Supp. 3d 242, 250 (D. Mass. 2018), *aff'd*, 936 F.3d 62 (1st Cir. 2019) (quoting *Webster*, 486 U.S. at 600).

### ii. The 2025 Guidance is not a reviewable final agency action.

The APA claims fail for another reason: Plaintiffs have not shown that the 2025 Guidance was a reviewable final action that has led to legal consequences.  Judicial review is available only to challenge a "final agency action for which there is no other adequate remedy in a court . . . ."  5 U.S.C. § 704; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990).

Agency action may be deemed final if two conditions are satisfied.  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature."  *U.S. Army Corp. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* (quoting *Bennett*, 520 U.S. at 178).  The 2025 Guidance does not meet this standard because it is "nothing more than an internal guidance document that does not carry the "force and effect of law."  *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015) (quotation omitted).

33

"In litigation over guidance documents, the finality inquiry is often framed as the question of whether the challenged agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule." *Id.* at 716. "A policy statement 'explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion . . . under some extant statute or rule." *Id.* (citation omitted). By contrast, a legislative rule "modifies or adds to a legal norm based on the agency's own authority flowing from a congressional delegation to engage in supplementary lawmaking." *Id.* at 716 (citation omitted). "The most important factor in differentiating between binding and nonbinding actions is 'the actual legal effect (or lack thereof) of the agency action in question,'" *id.* at 717 (citation omitted)—that is, whether the guidance carries "the force and effect of law," *id.* at 713 (citation omitted). *See also Massachusetts v. Trump*, No. 25-cv-11221-WGY, 2025 WL 1836592, at *11 (D. Mass July 3, 2025) (quoting *Nat'l Educ. Assn'n v. U.S. Dep't of Educ.*, No. 25-cv-091, ---Fed. Supp. 3d ---. 2025 WL 1199160, at *16 (D.N.H. Apr. 24, 2025) and *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) ("[A]n agency's action will be considered final if, looking to the practical effects, it 'appears on its face to be binding' or if it 'is applied by the agency in a way that indicates it is binding.' The 'most important factor' is 'the actual legal effect (or lack thereof) of the agency action . . . on regulated entities.'")).

Plaintiffs conclusory assert that the Mayorkas Memorandum constituted a final agency rule, but do not explain why beyond saying it "reaffirm[ed] the government's longstanding policy of avoiding enforcement at sensitive locations." Pls.' Mem. at 10. The 2025 Guidance, they contend, is a final action because it "removes previously binding restrictions on DHS personnel[.]" Pls.' Mem. at 31. But the 2025 Guidance does not carry binding, legal consequences for Plaintiffs. It merely serves as internal advisements to immigration enforcement officers about the use of discretion for enforcement actions in or near sensitive locations and thus does not carry the force and effect of law. *See* Ex. 6; Ex. 8.

34

To begin, the Mayorkas Memorandum did not constitute a binding agency rule subject to review under the APA. DHS's enforcement authority is derived from statute. *See, e.g.*, 8 U.S.C. § 1226(a). The Mayorkas Memorandum does not modify the applicable legal regime by interpreting the scope of Plaintiffs' statutory rights or duties. It offers no interpretations of the statutes and regulations governing immigration enforcement, and it states that the guidance contained within the memorandum "does not limit an agency's or employee's statutory authority[.]" Ex. 4 at 4. Although the Mayorkas Memorandum expressly provides that the agency's officers should, "[t]o the fullest extent possible" refrain from taking enforcement actions in or near a sensitive location, it does not prohibit such actions. *See id.* at 3-4. Rather, the memorandum acknowledges that enforcement actions in or near sensitive locations may be taken and that ultimately, the decision to take or refrain from taking such an action requires the "exercise of judgment[.]" *See id.* Because the Mayorkas Memorandum does not "definitive[ly]" provide a safe harbor for places of worship and other sensitive locations, it does not "give[] rise to 'direct and appreciable legal consequences,'" and thus does not satisfy the second prong of the test for final agency action. *Hawkes Co.*, 578 U.S. at 598; *see also Ass'n of Flight-Attendants-CWA*, 785 F.3d at 717.

Given that the Mayorkas Memorandum was not a final agency action, it follows that neither is the 2025 Guidance. As an initial matter, the 2025 Guidance cannot "alter[] the legal regime' to which Plaintiffs are 'subject[,]'" *Bennett*, 520 U.S. at 178, because the Mayorkas Memorandum did not modify the applicable legal regime. The 2025 Guidance offers no interpretations of the statutes or regulations governing immigration enforcement and does not require or prohibit enforcement actions in or near sensitive locations. *See* Ex.6.

The 2025 Guidance thus does not share the characteristics of agency actions that the Supreme Court has found to be final agency actions subject to APA review. The Supreme Court has found the "final agency action" requirement satisfied where an agency order exposed a party to double penalties

in a future enforcement proceeding and limited its ability to obtain a government permit, *see Sackett v. EPA*, 566 U.S. 120, 126 (2012); where an agency terminated a program providing for certain non-Mexican nationals to be returned to Mexico to await the results of their removal proceedings and preventing government staff from returning aliens to Mexico pending removal proceedings, *see Biden*, 597 U.S. at 791, 793, 807-09; where an agency made a definitive determination whether property contained "waters of the United States," which affected the property owner's liability for the disposal of pollutants and was binding for five years, *Hawkes Co.*, 578 U.S. at 593, 598-600; and where an agency adopted regulatory requirements for actions that will affect endangered species, thus altering the "legal regime," *Bennett*, 520 U.S. at 158, 177-78.  The 2025 Guidance has no similar legal consequences for any external parties.  *See Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1037 (D.C. Cir. 2007); *cf. Ass'n of Flight Attendants-CWA*, 785 F.3d at 712-13.

## II.    Plaintiffs Have Not Shown Irreparable Harm.

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.  Conclusory or speculative allegations do not establish a likelihood of irreparable harm. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).

For the same reasons Plaintiffs lack standing to bring this lawsuit, *see supra* at 5–12, Plaintiffs fail to carry their burden of establishing irreparable harm.  Plaintiffs' claims that the 2025 Guidance burdens their exercise of religion and infringes on their right to associate is based on the subjective concerns of their members and other community members not before this Court.  As such, Plaintiffs' alleged harm is speculative and does not demonstrate a harm that is "certainly impending." *Clapper*, 568 U.S. at 409; *see also City of Los Angeles*, 461 U.S. at 111.

36

Plaintiffs also cannot establish irreparable injury by alleging RFRA and First Amendment violations. *See* Pls.' Mem. at 33. That argument improperly conflates the merits with the harm analysis. As already explained, Plaintiffs have not shown that they are likely to succeed on the merits of those claims because Plaintiffs' allegations supporting those claims are based on the subjective fears of their members and other congregants not before this Court and thus are too speculative to demonstrate that the 2025 Guidance substantially burdens the exercise of their religion.

Finally, Plaintiffs cannot establish irreparable injury with respect to their APA claims because the 2025 Guidance is committed to agency discretion by law and does not constitute reviewable final agency action. Even if the Court were to disagree, Plaintiffs have not demonstrated that the relief they seek would prevent Plaintiffs' claimed harms because the Mayorkas Memorandum did not prohibit immigration enforcement actions at places of worship. Nor have Plaintiffs shown that the Mayorkas Memorandum would have prohibited the enforcement actions that were taken at two member churches. Plaintiffs' argument that they will be harmed by immigration enforcement if the 2025 Guidance is not stayed or preliminarily enjoined, is, therefore, too speculative to demonstrate irreparable harm.

III.    **Plaintiffs Have Not Shown That the Balance of Equities and Public Interest Tip in Their Favor.**

The final two preliminary injunction factors, the public interest and the balance of the equities, also weigh against granting Plaintiffs' motion. These factors merge when the Executive is a party. *Nken*, 556 U.S. at 435. As discussed above, Plaintiffs cannot establish a cognizable injury sufficient to confer Article III standing, let alone the much higher standard of an irreparable injury required for a stay or preliminary injunction. *See Winter*, 555 U.S. at 21-22. Nor have they demonstrated that they are likely to succeed on the RFRA and First Amendment claims. In contrast, Defendants have explained that the public interest in enforcement of the Nation's immigration laws is significant, particularly in light of the substantial increase in illegal immigration over the past several years. *See supra* at 25–8. And Section

37

1252(f)(1) reflects Congress's determination that the public interest supports avoiding judicial interference with enforcement by immigration officers carrying out their arrest and removal functions. The relief Plaintiffs seek would interfere with those enforcement functions, hindering "vigorous enforcement of [Congress's] prohibition against illegal immigration." *Castillo*, 659 F.2d at 1221.

## IV.    Plaintiffs' Requested Relief is Overbroad.

If the Court is inclined to grant Plaintiffs relief, it should reject the terms of Plaintiffs' overbroad requested relief. A Section 705 stay is subject to the same equitable limits as a preliminary injunction. Section 705 was designed "to reflect existing law . . . and not to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). The House Report that accompanied the APA explained that relief under Section 705 should "normally, if not always, be limited the parties' complainant." Administrative Procedure Act, S. Doc. No. 79-248, at 277 (1946). The Supreme Court recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do not lightly assume that Congress has intended to depart from established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted). The plain language of Section 705 requires the Court to consider relief that merely "preserve[s] status or rights pending conclusion of the review proceedings" tailored "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. In limiting such relief "to the extent necessary to prevent irreparable injury," *id.*, the statue directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Thus, Section 705's text, precedent, and the applicability of the injunction standard confirm that Section 705 is constrained by the same traditional equitable principles as the Judiciary Act of 1789. *See Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *8 (U.S. June 27, 2025). And just as those principles foreclose universal preliminary injunctions, they also foreclose universal relief under Section 705. *See id.* at *11. As does 8 U.S.C. §

1252(f), which bars lower courts from restraining the government from apprehending aliens as authorized by Section 1226 and 1231 of Title 8 of the U.S. Code.

A universal stay is even more inappropriate in this case because such a decision would effectively overrule the decisions of the other courts that are addressing the same issues and stunt the ordinary process of percolation among lower courts. *See supra* at 38. In these circumstances, there is no basis for this Court to exercise universal veto power over all other federal judges across the country on these issues.

The Court should similarly reject Plaintiffs' alternative relief—a preliminary injunction. Plaintiff's requested injunction would prohibit Defendants from "carrying out immigration enforcement operations at or near houses of worship absent a judicial warrant or genuinely exigent circumstances." Compl., Prayer for Relief (e). This language far exceeds the guidance contained in the Mayorkas Memorandum and would drastically alter the status quo that existed for years before the 2025 Guidance was issued. *See supra* 2–3. The Court should decline to issue a mandatory injunction that "would change the status quo," limiting agents' ability to use their judgment to determine what constitutes an exigent circumstance or whether an enforcement action will take place "near" a sensitive location, particularly where Plaintiffs have failed to explain why altering the status quo is necessary. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 40 (1st Cir. 2010).

Moreover, because "standing is not dispensed in gross," any injunction must be tailored only to those specific plaintiffs who establish standing "for each form of relief that they seek." *Murthy*, 603 U.S. at 61(citation omitted). Only two Plaintiffs have even alleged an immigration enforcement activity at a member's place of worship after the 2025 Guidance was issued. *See supra* at 9; *M.M.V. v. Garland*, 1 F.4th 1100, 1110-11 (D.C. Cir. 2021) (recognizing that courts are not prohibited from "paring down a case by eliminating plaintiffs who lack standing"). Any injunction should also, consistent with

§1252(f)(1), not restrict Defendants' ability to execute administrative warrants or enforcement activity under 8 U.S.C. §§ 1221-1231. *See supra* at 20–1; *Philadelphia Yearly*, 2025 WL 585768, at * 14, 25, 27. The Court should also strike Plaintiffs' vague request to enjoin any enforcement activity "near" a protected location. That vague term violates Rule 65(d)'s specificity requirement and would bar lawful enforcement activity on government and private property and public areas. Any relief should be limited to specifically-identified locations and Plaintiff should file a list of the names and addresses of their members' places of worship, so Defendants have fair notice of the locations where enforcement is restrained by any injunction. *See* Fed. R. Civ. P. 65(d)(1).

Finally, the Court should order security with any preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction should be denied.

Dated: August 18, 2025                    Respectfully submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General
                                          Civil Division

                                          ANDREW WARDEN
                                          Assistant Branch Director
                                          Federal Programs Branch

KRISTINA A. WOLFE
(VA Bar No. 71570)
Senior Trial Counsel
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW, Room 7506
Washington, D.C. 20530
(202) 353-4519
Kristina.Wolfe@usdoj.gov

*/s/ Richard C. Giles*
RICHARD C. GILES
Trial Attorney (WY Bar No. 8-7222)
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St., NW, Room 11404
Washington, D.C. 20530
(202) 616-8482
Richard.C.Giles@usdoj.gov

*Counsel for Federal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2025, the foregoing pleading was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

<u>/s/ Richard C. Giles</u>
Richard C. Giles
Trial Attorney
United States Department of Justice
