**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| **New England Synod, Evangelical Lutheran Church in America,** *et al.*,<br><br>Plaintiffs,<br><br>**v.**<br><br>**Department of Homeland Security,** *et al.*,<br><br>Defendants. | Case No. 4:25-cv-40102-FDS<br><br>**LEAVE TO FILE GRANTED ON AUGUST 8, 2025** |

**REPLY IN SUPPORT OF MOTION FOR STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page


INTRODUCTION ..... 1

ARGUMENT ..... 1

I. The 2025 Policy eliminates longstanding legal protections for houses of worship. ..... 1

II. Plaintiffs have standing to challenge the 2025 Policy. ..... 3

A. Plaintiffs can proceed on behalf of their member congregations. ..... 4

B. Plaintiffs are also themselves directly injured by the 2025 Policy. ..... 14

III. Plaintiffs are likely to succeed on the merits of their challenges to the new policy. ..... 15

A. The 2025 Policy violates the Religious Freedom Restoration Act. ..... 15

B. The 2025 Policy infringes protected rights of expressive association. ..... 17

C. The 2025 Policy violates the Administrative Procedure Act. ..... 18

IV. The other preliminary relief factors weigh in Plaintiffs' favor. ..... 22

A. Plaintiffs, their members, and others will suffer irreparable harm without the Court's intervention. ..... 22

B. The balance of equities and public interest strongly favor preliminary relief. ..... 22

V. The Court should stay the challenged policy under 5 U.S.C. § 705. ..... 22

A. The Immigration and Nationality Act does not bar the relief requested. ..... 22

B. A Section 705 stay is warranted here. ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Fed'n of Tchrs. v. Dep't of Educ.*,
No. 25-cv-628, 2025 WL 2374697 (D. Md. Aug. 14, 2025) ....25

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ....17

*Antilles Cement Corp. v. Fortuño*,
670 F.3d 310 (1st Cir. 2012) ....13, 14

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ....20, 21

*Ass'n of Am. Univs. v. Dep't of Energy*,
No. 25-cv-10912-ADB, 2025 WL 1414135 (D. Mass. May 15, 2025) ....21

*Bennett v. Spear*,
520 U.S. 154 (1997) ....20

*Brito v. Garland*,
22 F.4th 240 (1st Cir. 2021) ....24

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ....9, 16

*California v. Dep't of Educ.*,
132 F.4th 92 (1st Cir.) ....18

*Cent. Maine Power Co. v. Maine Comm'n on Gov't Ethics & Election Pracs.*,
144 F.4th 9 (1st Cir. 2025) ....17

*City of Columbus v. Kennedy*,
No. 25-cv-2114, 2025 WL 2426382 (D. Md. Aug. 22, 2025) ....24, 25

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) ....8, 9

*Conservation Law Found., Inc. v. Acad. Express, LLC*,
129 F.4th 78 (1st Cir. 2025) ....4, 10, 11, 12, 13

*Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*,
958 F.3d 38 (1st Cir. 2020) ....12

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....7, 11, 18, 19, 20

*DHS v. Regents of the Univ. of Cal,*,
591 U.S. 1 (2020)....20

*Diamond Alternative Energy, LLC v. EPA*,
145 S. Ct. 2121 (2025)....7, 11, 13, 14

*Doe v. Trump*,
766 F. Supp. 3d 266 (D. Mass. 2025)....22

*Employment Division v. Smith*,
494 U.S. 872 (1990)....16

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024)....4, 5, 14

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022)....23, 24

*Gen. Elec. Co. v. EPA*,
290 F.3d 377, 383 (D.C. Cir. 2002)....20, 21

*Healy v. James*,
408 U.S. 169 (1972)....17

*Heckler v. Chaney*,
470 U.S. 821 (1985)....19

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
110 F.4th 295 (1st Cir. 2024)....5

*Laird v. Tatum*,
408 U.S. 1 (1972)....6, 7

*Mennonite Church USA v. DHS*,
778 F. Supp. 3d 1 (D.D.C. 2025)....8, 13, 14

*Munroe v. Bos. Med. Ctr.*,
No. 22-cv-11935-FDS, 2024 WL 4203238 (D. Mass. Sept. 16, 2024)....9

*Murthy v. Missouri*,
603 U.S. 43 (2024)....11, 14

*Nat'l Fed'n of Fed. Emps. v. Weinberger*,
818 F.2d 935 (D.C. Cir. 1987)....19

*OSG Bulk Ships, Inc. v. United States*,
132 F.3d 808 (D.C. Cir. 1998)....19

*Ozonoff v. Berzak*,
744 F.2d 224 (1st Cir. 1984) ........................................................................................6, 7

*Perrier-Bilbo v. United States*,
954 F.3d 413 (1st Cir. 2020) ........................................................................................15

*Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*,
767 F. Supp. 3d 293 (D. Md. 2025) ........................................................................ *passim*

*Pol'y & Rsch., LLC v. HHS*,
313 F. Supp. 3d 62 (D.D.C. 2018) .......................................................................18, 19

*Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989) ....................................................................................4, 5, 13

*R.I. Coal. Against Domestic Violence v. Bondi*,
No. 25-cv-279-WES, 2025 WL 2271867 (D.R.I. Aug. 8, 2025)..........................................24

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)........................................................................................................22

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006)........................................................................................................17

*Seafreeze Shoreside, Inc. v. Dep't of Interior*,
No. 22-cv-11091-IT, 2023 WL 3660689 (D. Mass. May 25, 2023).....................................25

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
699 F.3d 1 (1st Cir. 2012)..............................................................................................22

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..................................................................................................4, 10

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)........................................................................................................8

*Texas v. Biden*,
646 F. Supp. 3d 753 (N.D. Tex. 2022) ..........................................................................24

*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) .......................................................................................23

*Trump v. CASA, Inc.*,
145 S. Ct. 2540 (2025)...................................................................................................25

*United Presbyterian Church in the U.S.A. v. Reagan*,
738 F.2d 1375 (D.C. Cir. 1984) .....................................................................................6, 7

*United States v. Texas*,
599 U.S. 670 (2023) ........ 9, 10, 20

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ........ 22

*Webster v. Doe*,
486 U.S. 592, 603 (1988) ........ 20

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) ........ 18

**Statutes, Regulations, and Rules**

5 U.S.C. § 701 ........ 18

5 U.S.C. § 705 ........ 22, 24, 25

5 U.S.C. § 706 ........ 24

8 U.S.C. §§ 1221–1232 ........ 22, 23

8 U.S.C. § 1226 ........ 24

8 U.S.C. § 1252 ........ 22, 23, 24

8 U.S.C. § 1357 ........ 19, 23

42 U.S.C. § 2000bb-1 ........ 16

42 U.S.C. § 2000bb-3 ........ 19

8 C.F.R. § 287.8 ........ 19

Fed. R. Civ. P. 65(c) ........ 25

**Other Authorities**

Parsonage, Merriam-Webster.com, http://merriam-webster.com/dictionary/parsonage ........ 7

## INTRODUCTION

In two memos issued this year ("2025 Policy"), DHS repealed decades of protections for houses of worship and other sensitive locations. Its agents have used their new authority to carry out arrests and other immigration enforcement actions at houses of worship across the country. The predictable—perhaps intentional—consequence of declaring open season on churches and other places that were once relatively safe is that worshippers and others now avoid those areas. Plaintiffs, their members, and countless others are suffering significant ongoing harms as a result, including from reduced attendance and the inability to practice their faith together as a community.

In their response, Defendants DHS and Secretary Noem (together, "DHS") largely fail to address the realities of the 2025 Policy and the injuries it inflicts. Rather than defend the policy it adopted and is carrying out, DHS describes a different, nonexistent policy—in which it merely reiterated that agents should use "common sense"—and defends that instead. Rather than address the injuries that Plaintiffs and their members are presently suffering, DHS incorrectly imagines that they complain about speculative future harms. Rather than identify any "compelling interest" in conducting enforcement operations at houses of worship, DHS points to its interest in enforcing immigration laws generally. The Court should reject these and DHS's other efforts at misdirection and enter preliminary relief to stop ongoing irreparable harm until the Court can reach the merits.

## ARGUMENT

### I. The 2025 Policy eliminates longstanding legal protections for houses of worship.

The 2025 Policy departs radically from the government's prior policy toward sensitive locations. The core tenet of the prior policy was that DHS had an "*obligation* to refrain, *to the fullest extent possible*, from conducting a law enforcement action in or near a protected area." Ex. 4 at 3 (emphasis added). DHS itself called this the "foundational principle" of its policy. *Id.* at 2, 3.

And it recognized that such a rule was needed because to carry out arrests, surveillance, and other enforcement actions in or near a house of worship could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at 3. While the policy did not ban *all* enforcement actions at sensitive locations, it sharply limited the situations in which they could happen. DHS agents could conduct such actions only in emergencies (*e.g.*, "imminent risk of death, violence, or physical harm") or with prior approval from officials who were themselves bound to avoid such actions "to the fullest extent possible." *Id.* at 3–4. In the "limited circumstances" in which enforcement was required at a sensitive location, agents were obligated "to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." *Id.*

The 2025 Policy abandons every one of those restraints and puts no meaningful protections in their place, expressly disclaiming the need for "bright line rules" to cabin individual discretion. Ex. 6; Ex. 8 at 1. Under the 2025 Policy, DHS agents are no longer "obligat[ed] to refrain" from seizing people in church parking lots or staking out food pantries. They no longer need to identify any exigent circumstances to justify such actions. And while the Vitello Memo "charge[d] Assistant Field Office Directors . . . and Assistant Special Agents in Charge . . . with responsibility for making case-by-case determinations" for actions carried out by ICE (not CBP), it imposed no restrictions on their decisionmaking, specifying only that they did not have to provide authorization in writing. Ex. 8 at 2. The Vitello Memo thus imposes no substantive limitations on the decision to carry out enforcement at sensitive locations. *See Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, 767 F. Supp. 3d 293, 321 (D. Md. 2025) ("Though the Vitello Memorandum adds a requirement of authorization from a local supervisor, . . . it does not reinstate

any of the three main safeguards contained in the Mayorkas Memorandum[.]"), *appeal pending*, No. 25-1512 (4th Cir.).

DHS's opposition brief fails to acknowledge—let alone substantively engage with—the stark changes wrought by the 2025 Policy. In DHS's telling (at 22, for example), its new policy "simply instructs immigration enforcement officers to exercise their 'discretion' and 'common sense.'" That is not a fair or accurate account. As noted, the 2025 Policy does away with the "foundational principle" that DHS should avoid enforcement at sensitive locations "to the fullest extent possible," and puts in place no alternative protections. That is the difference between "avoid at nearly all costs" and "have at it"—and it is transformative. (Indeed, when it issued the new policy, DHS described the prior rules as having "thwart[ed] law enforcement in or near so-called 'sensitive' areas" and said its new policy "empowers . . . CBP and ICE to enforce our immigration laws and catch criminal aliens." Ex. 7.) Yet DHS does not even mention the foundational principle underpinning its prior policy until almost the end of its opposition (at 35), and even then fails to meaningfully address it. The Court should not credit DHS's belated efforts to reframe its policy for purposes of this litigation—efforts that only underscore the indefensibility of that policy.[1]

## II. Plaintiffs have standing to challenge the 2025 Policy.

The 2025 Policy causes concrete and ongoing harm to Plaintiffs' member congregations and to Plaintiffs themselves, and Plaintiffs have standing to challenge it. A plaintiff may proceed on behalf of its members under a theory of associational standing where "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane

[1] For this reason, among others, the Court should not follow the oral ruling in *Denver Public Schools v. Noem*, No. 25-cv-474 (D. Colo.). Defs.' Ex. A (transcript of TRO hearing). The court in that case incorrectly understood there to be only "narrow differences" between the 2025 Policy and the prior policy and, largely based on that misunderstanding, concluded that the plaintiff had not shown it was likely to have standing. *See id.* at 54–55.

to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Conservation Law Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 86 (1st Cir. 2025) (quotation marks omitted). A plaintiff may proceed on its own behalf under a theory of organizational standing where it can "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Plaintiffs can do both.

**A. Plaintiffs can proceed on behalf of their member congregations.**

Plaintiffs can proceed on behalf of their member congregations because those members would have standing to sue in their own right. *See Conservation Law*, 129 F.4th at 86.[2] To have standing, the members "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

*Injury in fact.* The 2025 Policy inflicts multiple harms on Plaintiffs' members. For example, it has caused significant declines in attendance at worship services—as much as 80% at one church. Ex. 16 ¶ 19; *see also* Pls.' Mem. in Supp. of Mot. for Stay or PI ("Mem.") at 18–19. That "reduction in attendance at religious services . . . constitutes a concrete injury in fact" to Plaintiffs' members. *See Phila. Yearly Meeting*, 767 F. Supp. 3d at 313; *accord Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 523 (9th Cir. 1989) ("Churches, as organizations, suffer a cognizable injury when assertedly illegal government conduct deters their adherents from freely participating in religious activities protected by the First Amendment."). "When congregants are chilled from . . . attend[ing] church services," "a church suffers organizational injury because its ability to carry out

[2] So too, the interests Plaintiffs seek to protect—*e.g.*, freedom of worship and expressive association—are germane to their purposes, and this case does not require the participation of individual members. *See Conservation Law*, 129 F.4th at 86. Defendants do not argue otherwise.

its ministries has been impaired." *Presbyterian Church*, 870 F.2d at 522; *cf. Alliance for Hippocratic Med.*, 602 U.S. at 395 (reaffirming that entities suffer cognizable harm when government "actions directly affect[] and interfere[] with [their] core . . . activities"). The 2025 Policy directly affects and interferes with the religious activities of member congregations when it prevents them from worshipping together as a body and deters many congregants from participating at all. Mem. at 19–20.

With that decline in attendance comes a decline in financial giving. *Id.* at 20; *see also Phila. Yearly Meeting*, 767 F. Supp. 3d at 313–14 (noting that "[r]educed attendance" caused by DHS's 2025 Policy "would also have an adverse financial impact" on congregations). "Such an out-of-pocket loss is a quintessential injury in fact." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 308 (1st Cir. 2024) (quotation marks omitted).

DHS's new policy has depressed turnout not just at worship services but at many other parts of Plaintiffs' ministries that people now fear attending, including food distributions, church camps, and English as a Second Language classes. Mem. at 20. The policy harms members by impairing their ability to carry out these important aspects of their religious practice, as when, for example, even the hungry are too afraid to come receive sustenance at a church food pantry. *Id.*

The new policy harms Plaintiffs' members in others way too, as when it forces them to take actions that are contrary to their faith. Numerous congregations have been compelled by the change in policy and the new threat of enforcement to take steps such as locking the doors during services and adding signage to mark formerly open areas as "private." *Id.* at 21–22. For many of Plaintiffs' members, those actions violate their deeply held beliefs that worship services must be open and welcoming to all. *Id.* The new policy has also forced congregations to spend time, money, and other resources on preparations in case of an enforcement operation on their premises, such as

training staff, educating parishioners, posting congregants who are U.S. citizens to stand guard, and even fortifying part of their church. *Id.* at 22; *see also* Ex. 12 ¶ 12; Ex. 16 ¶ 14. These actions—which would not be necessary but for DHS's change in policy—take resources away from other aspects of the members' ministries, further interfering with their core religious activities.

After acknowledging (at 6) many of these well-documented injuries, DHS proceeds to ignore them. DHS instead marches through a series of assertions that are either irrelevant or simply incorrect. First, DHS insists (at 7) that "mere[] . . . knowledge that the Government is engaged in certain activities" is not a cognizable injury, relying primarily on *Laird v. Tatum*, 408 U.S. 1, 13 (1972) and *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984). Plaintiffs, however, do not base their showing of injury on mere knowledge of government illegality or on "[a]llegations of a subjective 'chill.'" *Laird*, 408 U.S. at 13. They instead have documented several specific, concrete injuries presently being suffered by their members, such as reduced attendance. *See Phila. Yearly Meeting*, 767 F. Supp. 3d at 314 (distinguishing *Laird* on similar grounds). As DHS's own authorities hold, such "specific present objective harm[s]" are sufficient to show standing. *Laird*, 408 U.S. at 13–14; *see also United Presbyterian*, 738 F.2d at 1378 (plaintiff can show standing where it has "suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself"). Indeed, that is the primary lesson of *Ozonoff v. Berzak*, 744 F.2d 224, 228–30 (1st Cir. 1984), which DHS also cites (at 7), but without mentioning that the court there found the plaintiff had standing because the challenged government action did not just cause a "chilling effect" but threatened the concrete "loss of an employment opportunity."

Next, DHS asserts (at 7–8) that, for injury in fact to exist, "the challenged Government action must directly regulate or constrain the party challenging [it]." No such requirement exists or is stated in any of DHS's offered authorities. These cases merely note that standing may be

established where a plaintiff is "presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging." *Laird*, 408 U.S. at 11; *see also United Presbyterian*, 738 F.2d at 1378 (quoting the same language); *Ozonoff*, 744 F.2d at 229 (same). None of these cases, however, holds that a plaintiff may challenge government action *only* where such action "directly regulate[s] or constrain[s]" it. In fact, binding precedent holds just the opposite. *See, e.g.*, *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2142 (2025) (holding that plaintiffs had standing to challenge EPA approval of state regulations and emphasizing that government may not "evade . . . lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders"); *Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019) (plaintiffs had standing to challenge conduct of census). While DHS frets (at 10) that this precedent could allow churches to challenge a statute authorizing search warrants on church property in certain circumstances, it is at best unclear that such a statute would give rise to the concrete harms at issue here.

DHS proceeds to argue (at 10–12) that no injury in fact exists because it is speculative whether any of Plaintiffs' members will be the subject of enforcement actions in the future.[3] Even granting that premise *arguendo*, DHS's argument falls short because it again misapprehends the nature of the injuries Plaintiffs are suffering, which are not only "imminent" but actually ongoing. Mem. at 18–19; *cf. Phila. Yearly Meeting*, 767 F. Supp. 3d at 313 (finding injury based in part on "actual or imminent reductions in attendance" at houses of worship). Contrary to DHS's apparent belief, Plaintiffs are not relying for standing purposes on the (severe) injuries that would be caused by an enforcement action being carried out at one of their houses of worship. That alone

[3] DHS challenges (at 9) the "reliability" of Plaintiffs' account of an incursion by ICE officers "into the parsonage of the church property," Ex. 26 ¶ 17. But DHS seemingly misunderstands what a "parsonage" is. It is housing for the church pastor, typically owned by the church. *See* Parsonage, Merriam-Webster.com, http://merriam-webster.com/dictionary/parsonage. Nothing in DHS's opposition or its attached declaration calls Plaintiffs' account into doubt.

distinguishes this case from *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013), in which the plaintiffs alleged they would be harmed if and when "their communications with their foreign contacts w[ere] . . . intercepted" by the government, a possibility the Court found too speculative to support standing. *See Phila. Yearly Meeting*, 767 F. Supp. 3d at 314 (distinguishing *Clapper* on similar grounds). The same goes for *Mennonite Church USA v. DHS*, in which the plaintiffs claimed injury "based on the imminent risk that immigration enforcement actions will be taken at member congregations," which the court likewise found (on a different factual record from the one here) too speculative for standing. 778 F. Supp. 3d 1, 8–9 (D.D.C. 2025), *appeal pending*, No. 25-5209 (D.C. Cir.). The government's invocation of these cases therefore gets it nowhere. For similar reason, DHS's argument (at 12 n.4) that at most two Plaintiffs have standing again misses that all Plaintiffs have documented presently ongoing injuries to their members.

Similarly, because Plaintiffs' standing is established by current and ongoing injuries to their members, this is not a "pre-enforcement review" case in which the only injuries alleged are those that would come from the government carrying out an enforcement action in the future. *E.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (considering when "the threatened enforcement of a law" itself constitutes Article III injury). DHS therefore is wrong to claim (at 10) that Plaintiffs "effectively seek pre-enforcement review," and its extended discussion (at 10–12) of pre-enforcement challenge cases is beside the point.

DHS further disputes (at 10) whether Plaintiffs suffer injury in fact from having to take burdensome and sometimes costly steps to prepare for the possibility of immigration enforcement in or near their houses of worship and from having to take actions that are contrary to their faith, such as locking church doors during services. DHS seemingly means to paint these injuries as "self-inflicted" because they are "based on [Plaintiffs'] fears of hypothetical future harm that is

not certainly impending." *Clapper*, 568 U.S. at 416, 418. But that argument fails in this context because it constitutes an impermissible effort by the government to second-guess the reasonableness of Plaintiffs' religious beliefs. Those beliefs are what compel Plaintiffs' members to take steps to protect their congregants and others who come to them to worship or receive vital services and to try to maintain their houses of worship as places of sanctuary. Mem. at 22. While DHS seemingly suggests that it is unreasonable for Plaintiffs' members to believe that their faith compels these actions, that is not a question for the government to decide. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014) ("federal courts have no business addressing . . . whether the religious belief asserted in a RFRA case is reasonable"); *Munroe v. Bos. Med. Ctr.*, No. 22-cv-11935-FDS, 2024 WL 4203238, at *6 (D. Mass. Sept. 16, 2024) ("It is clear, of course, that courts cannot delve into the merits of a particular religious belief.").

Finally on injury in fact, DHS relies (at 12) on *United States v. Texas*, 599 U.S. 670 (2023), but it reads that case far too broadly. *United States v. Texas* rejected a "novel standing argument" in "an extraordinarily unusual lawsuit" in which states sought an order requiring the government "to alter its arrest policies so as to make more arrests." *Id.* at 681, 686. Key to the Court's decision was that the suit challenged "alleged Executive Branch *under*-enforcement," *id.* at 681 (emphasis added), which the Court explained implicated a very different set of concerns than when the government is affirmatively exercising its coercive power, *id.* at 678. That difference alone makes *Texas* inapplicable here. Nor does that case stand for the broad proposition that "federal courts lack Article III jurisdiction over suits that challenge the Executive's enforcement decisions"—a proposition that DHS purports to quote (at 12) from the Supreme Court's decision but that appears nowhere in that (or, so far as Plaintiffs can determine, in any) decision. The Court in fact said almost the opposite, clarifying that there are numerous situations in which "federal courts may

. . . entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Id.* at 681–83 (listing examples).

*Causation.* The second element of standing requires that the injury in fact be "fairly traceable to the challenged conduct of the defendant." *Conservation Law*, 129 F.4th at 90 (quoting *Spokeo*, 578 U.S. at 338). That standard "does not require a tort-like showing of proximate causation," and a plaintiff can satisfy it simply "by showing that the defendant's conduct is one among multiple causes of the alleged injury." *Id.* (quotation marks omitted).

The record establishes that the harms to Plaintiffs' members are "fairly traceable" to DHS's abandonment of protections for houses of worship. Copious evidence documents that Plaintiffs' member congregations are aware of that change in policy and understand that houses of worship no longer enjoy the same status they previously did. Mem. at 18. Predictably, the elimination of protections that once made houses of worship a (relatively) safe space has left people more afraid to go to and spend time at these locations, resulting in the harms just described. It is also the cause of congregations having to take steps such as locking doors during services and training staff to prepare for ICE incursions. The 2025 Policy is therefore, at minimum, "one among multiple causes of the alleged injur[ies]." *See Conservation Law*, 129 F.4th at 90 (quotation marks omitted).

DHS disputes causation, primarily by alleging (at 13–15) that Plaintiffs' evidence is "murky" and "speculative" as to whether the injuries to Plaintiffs' members are fairly traceable to the 2025 Policy. Not at all. Numerous declarations establish that Plaintiffs and their member congregations are aware of the 2025 Policy and its changes to the protections available for houses of worship. *See* Mem. at 18. DHS does not dispute these facts. Numerous declarations also establish that the reasonable fears created by that change in policy are causing people to avoid houses of worship and other areas that were once protected and no longer are. *Id.* at 18–19;

*see also*, *e.g.*, Ex. 10 ¶ 19 ("people know [protection for churches] has changed now, and as a result they are staying away"); Ex. 12 ¶ 17 ("many immigrant families are not attending church due to fear of ICE raids *at the church*"); Ex. 13 ¶ 24 (pastor's report that he regularly "get[s] calls from congregants asking if it is safe to go to church yet"); Ex. 14 ¶ 10 (pastor's report that "[f]ears of ICE activity *at the church* have . . . decreased attendance at our bilingual worship services"). And the declarations directly connect the 2025 Policy to additional harms to Plaintiffs' members, such as requiring they take burdensome extra steps to safeguard their congregants. Mem. at 21–22. Rather than engage with this evidence, DHS selectively quotes (at 14–15) from other parts of the record, taking these passages out of context and italicizing any words susceptible of any degree of ambiguity ("*some*," "*near*," "*might*"). Suffice to say that this does not demonstrate any shortcoming in the relevant evidence on which Plaintiffs rely.

Nor is significant evidence even required in order to establish the obvious connection between the 2025 Policy and decreased attendance at the locations affected by that policy (as well as the other harms to Plaintiffs' members)—especially at the preliminary injunction stage, where Plaintiffs need only make "a clear showing that [they are] *likely* to establish each element of standing," *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation marks omitted; emphasis added). "When third party behavior is predictable, commonsense inferences may be drawn" to support causation. *Diamond Alternative*, 145 S. Ct. at 2136; *see also id.* at 2139 (rejecting claim that plaintiffs were required to "introduce evidence from expert economists or from directly regulated third parties to show how third parties would likely respond" to government action); *Dep't of Com.*, 588 U.S. at 768 (affirming standing where causation "relie[d] . . . on the predictable effect of Government action on the decisions of third parties"); *Conservation Law*, 129 F.4th at 91 (taking account of "[c]ommon sense" in assessing causation). DHS could hardly dispute that it is a

"commonsense inference" that making a location less safe will cause more people to avoid that location. Indeed, DHS appears to concede (at 17), correctly, that changes to immigration enforcement will produce "a predictable response by third parties." And the fact that the conduct of "third parties"—*i.e.*, Plaintiffs' congregants and others who come to their houses of worship to receive social services—can be so readily inferred in this case (and, indeed, is already documented in the record) distinguishes it from *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38 (1st Cir. 2020). In that case, unlike here, the court found the allegations insufficient to determine whether the collection of fees from entities not before the court would result in those entities passing on the cost of the fees to the plaintiff. *Id.* at 48–49.

Relatedly, DHS argues that causation is lacking here because Plaintiffs cannot disentangle the harms caused by the 2025 Policy from the harms inflicted by the government's other actions against immigrant communities. That argument is wrong on the law and on the facts. As a legal matter, it ignores this Circuit's precedent, which holds that the challenged conduct need not be the sole cause but only "one among multiple causes of the alleged injury." *Conservation Law*, 129 F.4th at 90 (quotation marks omitted).[4] As a factual matter, the evidence again amply demonstrates that injuries to Plaintiffs' members are "fairly traceable" to the 2025 Policy itself and not just to a general increase in immigration enforcement. Contrary to DHS's claim (at 16), Plaintiffs made no "admission" that their members' fears are based on immigration enforcement generally—rather than on the enforcement at houses of worship let loose by the 2025 Policy—when they cited

[4] The First Circuit has explained that, "[i]n applying this standard to a case with multiple alleged contributors to a cumulative harm, a court may find it helpful to engage in a counterfactual inquiry, asking whether the defendant's alleged conduct would have been a factual cause of a concrete and particularized portion of the injury if the other competing causes had not been operating." *Conservation Law*, 129 F.4th at 90 (quotation marks and brackets omitted). Here, that counterfactual inquiry further confirms the causal role of the 2025 Policy in Plaintiffs' injuries.

incidents of enforcement actions *at houses of worship*. DHS's claim makes little sense.

For these reasons, the Court should part ways with the causation analysis in *Mennonite Church*. In that case, the court concluded that the plaintiffs' declarations "d[id] not delineate between the effects of broader immigration enforcement priorities and the [sensitive locations] policy rescission specifically." 778 F. Supp. 3d at 11. Here, they do. *See supra* at 10–11. That alone suffices to distinguish *Mennonite Church*. In addition, the court appears to have imposed too demanding a legal standard, at least under this Circuit's law. Its analysis seemingly required a showing that the 2025 Policy was the sole or at least main cause of the plaintiffs' injuries. *See Mennonite Church*, 778 F. Supp. 3d at 11; *but see Conservation Law*, 129 F.4th at 90. And it demanded "objective statistical evidence" to support the commonsense inference that when people are aware that a formerly protected location no longer is, they will be more likely to avoid that location. *Mennonite Church*, 778 F. Supp. 3d at 11; *but see Diamond Alternative*, 145 S. Ct. at 2136, 2139 (rejecting such a requirement where "commonsense inferences may be drawn").

*Redressability.* To establish redressability, Plaintiffs "need only show that a favorable ruling could potentially lessen [their] injury; [they] need not definitively demonstrate that a victory would completely remedy the harm." *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 318 (1st Cir. 2012); *see also Diamond Alternative*, 145 S. Ct. at 2135 (redressability required plaintiffs to show only that judicial relief "would *likely* redress *at least some of*" their injuries (emphasis added)). A favorable ruling from this Court would likely lessen the injuries to Plaintiffs' members by returning to the status quo ante in which DHS sought to avoid immigration enforcement actions at houses of worship to the fullest extent possible. *Cf. Presbyterian Church*, 870 F.2d at 523 (finding redressability because "[a] judicial determination that the INS surveillance of the churches' religious services violated the First Amendment would reassure members that they could

freely participate in the services without having their religious expression being recorded by the government"). Just as "[e]ven one dollar of additional revenue . . . would satisfy the redressability component," *Diamond Alternative*, 145 S. Ct. at 2135 (quotation marks omitted), the likelihood that the Court's ruling allows even one additional person to take part in religious worship or receive social services at one of Plaintiffs' house of worship is enough to establish redressability.

In response, DHS repeats its claims (at 19) about third-party conduct, but those arguments no more undermine redressability than they did causation. DHS's other response is to depict the 2025 Policy as only "a minimal change" from the prior sensitive locations policy, but as before, that argument fails to account for the new policy's actual effect. The Court should also again reject the government's reliance on *Mennonite Church*. The court's requirement in that case that redressability be established "with 'little doubt,'" *Mennonite Church*, 778 F. Supp. 3d at 12, is contrary to precedent holding that a plaintiff need only show it is "likely" that at least some of their injury would be remedied, *see, e.g.*, *Diamond Alternative*, 145 S. Ct. at 2135; *Murthy*, 603 U.S. at 58; *Antilles Cement*, 670 F.3d at 318. And to the extent the court was relying on what it understood to be concessions by the plaintiffs in that case, *see, e.g.*, *Mennonite Church*, 778 F. Supp. 3d at 12 ("the plaintiffs recognize that their requested injunction would not rectify the alleged attendance declines"), Plaintiffs here have not adopted—and affirmatively dispute—those concessions.

**B. Plaintiffs are also themselves directly injured by the 2025 Policy.**

Plaintiffs have standing to proceed not only on behalf of their member congregations but on their own behalf for injuries they themselves have suffered. *See Alliance for Hippocratic Med.*, 602 U.S. at 393 (explaining that "organizations may have standing to sue on their own behalf for

injuries they have sustained" (quotation marks omitted)).[5] Plaintiffs have directly suffered injuries in the form of suppressed attendance at their religious meetings, Mem. at 18–19, lost income from diminished giving at the congregation level, *id.* at 20, and having to spend time and resources preparing for possible immigration enforcement actions on their premises, *id.* at 22. For the same reasons that injuries to Plaintiffs' members are fairly traceable to the 2025 Policy and would likely be redressed by a favorable ruling from the Court, *see supra* Sec. II.A., the injuries to Plaintiffs themselves are caused by that policy and are redressable by the Court.

## III. Plaintiffs are likely to succeed on the merits of their challenges to the new policy.

### A. The 2025 Policy violates the Religious Freedom Restoration Act.

Plaintiffs are likely to succeed on the merits of their claim under RFRA. Plaintiffs have shown that DHS's new policy substantially burdens their religious exercise because it "put[s] substantial pressure" on them and their member congregations "to modify [their] behavior and to violate [their] beliefs" in a number of ways. *See Perrier-Bilbo v. United States*, 954 F.3d 413, 431 (1st Cir. 2020); *see also* Mem. at 23–27; *Phila. Yearly Meeting*, 767 F. Supp. 3d at 329–32. Indeed, until recently, DHS itself recognized the burden that unrestrained enforcement could impose on religious exercise, as when it emphasized in the Mayorkas Memo that such action could "deny[] or limit[] . . . people of faith access to their places of worship." Ex. 4 at 2.

DHS appropriately concedes (at 21) the sincerity of Plaintiffs' religious beliefs and does not contest (at 22–23) that government action may indirectly coerce adherents by imposing "substantial pressure" on them to act out of accord with their beliefs. DHS nonetheless now claims (at 23) that no substantial burden exists because the 2025 Policy "does not coerce Plaintiffs or their

[5] In contrast to the other Plaintiffs, San Francisco Friends Meeting is an individual congregation proceeding solely on behalf of itself and its congregants.

members to choose between the tenets of their faith and a government benefit or penalize Plaintiffs for following the tenets of their faith." But that argument incorrectly assumes that those are the only two ways the government can exert substantial pressure on adherents, and it is inconsistent with RFRA's text, which imposes no such limitation. *See* 42 U.S.C. § 2000bb-1. DHS' related suggestion (at 21) that "substantial burden" is limited to the particular circumstances addressed in cases that pre-date *Employment Division v. Smith*, 494 U.S. 872 (1990), is flatly contrary to the Supreme Court's decision in *Hobby Lobby*, 573 U.S. at 715–16, which dismissed as "absurd" the government's claim that "RFRA merely restored this Court's pre-*Smith* decisions in ossified form." And even accepting DHS's crabbed reading of "substantial burden," its argument is doubtful on its face; congregations that follow the tenets of their faith and continue to worship in the same spirit of openness they once did may indeed be "penalized" by future enforcement actions on their premises.

Plaintiffs further showed that the 2025 Policy cannot survive strict scrutiny because DHS cannot demonstrate a compelling interest in carrying out immigration enforcement in or near houses of worship and, even if it could, the 2025 Policy would not be the least-restrictive means of advancing that interest. Mem. at 26-27; *see also Phila. Yearly Meeting*, 767 F. Supp. 3d at 332–33. In response, DHS expounds at length (at 25-27) on its general interest in carrying out immigration enforcement, particularly at the U.S.-Mexico border and at ports of entry. This case, however, is not about immigration enforcement generally. And in any event, "RFRA . . . contemplates a more focused inquiry." *Hobby Lobby*, 573 U.S. at 726 (quotation marks omitted). It requires DHS to identify a compelling interest in carrying out immigration enforcement actions, freed from the restrictions of its prior sensitive locations policy, *at Plaintiffs' houses of worship*. *Id.* at 726–27. DHS makes no effort to do so, nor could it. DHS also comes up short in claiming

(at 27–28) that the 2025 Policy is "narrowly tailored." That policy, again, jettisons *any* substantive restrictions on conducting enforcement actions at sensitive locations; it is not "tailored" at all. And the government's decades-long experience under its prior sensitive locations policy undermines any claim that DHS could not serve whatever limited interest it may have in enforcing at houses of worship through less-restrictive means.

**B. The 2025 Policy infringes protected rights of expressive association.**

Plaintiffs' motion showed that DHS's new policy infringes the expressive association rights of Plaintiffs and their members and cannot satisfy exacting scrutiny, Mem. at 27–30; *see also Phila. Yearly Meeting*, 767 F. Supp. 3d at 322–28, under which standard the policy can be upheld only if it is "narrowly tailored to serve a sufficiently important governmental interest," *Cent. Maine Power Co. v. Maine Comm'n on Gov't Ethics & Election Pracs.*, 144 F.4th 9, 24 (1st Cir. 2025).

DHS responds (at 30) by suggesting that the 2025 Policy cannot infringe on association rights because it "does not directly force or prohibit Plaintiffs' expressive association." This argument overlooks that "[g]overnment infringement of this freedom can take a number of forms," *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quotation marks omitted), including actions that fall short of direct requirements but that nonetheless "ma[k]e group membership less attractive," *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006); *see also Healy v. James*, 408 U.S. 169, 181 (1972) (finding infringement of expressive association based on "practical effect" of refusal to recognize group). In further response to this claim, DHS relies (at 30–31) on its arguments that the policy satisfies strict scrutiny. For the reasons already given, it does not. DHS's failure to offer any argument that the policy, even if it fails strict scrutiny, nonetheless satisfies exacting scrutiny means that DHS has forfeited any such claim. Regardless, the 2025 Policy fails exacting scrutiny too. Mem. at 29–30.

### C. The 2025 Policy violates the Administrative Procedure Act.

Plaintiffs are also likely to succeed on the merits of their claims that the 2025 Policy violates the APA because it is arbitrary and capricious, contrary to law and in excess of statutory authority, and contrary to constitutional right. Mem. at 30–33. DHS can muster no defense on the merits of Plaintiffs' arbitrary and capricious claim and thus has waived any claim that its policy satisfies that standard. DHS instead offers two threshold arguments. But both miss the mark.

*Committed to agency discretion by law.* DHS first argues (at 31–33) that its 2025 Policy escapes judicial review under the APA because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has repeatedly instructed courts to construe this exception "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). Meaningful standards sufficient to enable judicial review can come not only from statutes but from the agency itself. As then-Judge Ketanji Brown Jackson has explained in a different context, "agencies themselves frequently cabin their own discretionary . . . determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions under the APA." *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 76–78 (D.D.C. 2018); *see also California v. Dep't of Educ.*, 132 F.4th 92, 97 (1st Cir.) ("applicable regulations cabin the Department's discretion"), *stay granted on other grounds*, 145 S. Ct. 966 (2025).

Here, meaningful standards are found in RFRA and the First Amendment, as well as in DHS's own prior sensitive locations policy. RFRA, as noted, broadly prohibits the government from burdening religious exercise, and by its terms "applies to all Federal law, and the

implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a). It and the First Amendment provide meaningful standards against which to judge the 2025 Policy's infringement of religious exercise and expressive association.[6] *See, e.g.*, *Nat'l Fed'n of Fed. Emps. v. Weinberger*, 818 F.2d 935, 941 n.11 (D.C. Cir. 1987) ("Here, there is clearly 'law to apply'—the Constitution."). So too, DHS's prior sensitive locations policy, which recognized the burdens on religious practice from unrestrained enforcement at houses of worship, constitutes a "binding polic[y] that provide[s] meaningful standards for a court to employ when reviewing agency decisions." *See Pol'y & Rsch.*, 313 F. Supp. 3d at 76–78.

DHS's reliance (at 31–32) on *Heckler v. Chaney*, 470 U.S. 821 (1985) for the proposition that "[l]aw enforcement guidance is generally committed to agency discretion" is misplaced several times over. First, *Heckler* concerned the reviewability of "single-shot" enforcement determinations, not general policies like the one here. *See* 470 U.S. at 832, 833 n.4; *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (distinguishing *Heckler* on this basis and emphasizing that "an agency's adoption of a general enforcement policy is subject to review"). Second, *Heckler* was a case about "a decision *not* to institute enforcement proceedings," *Dep't of Com.*, 588 U.S. at 772, a choice that is not implicated here. Finally, *Heckler* specifically did not decide whether its holding would apply to a claim that the agency had acted contrary to constitutional right, 470 U.S. at 838, a claim Plaintiffs bring here and on which they are likely to

---

[6] Similarly, the Immigration and Nationality Act constrains DHS's use of its enforcement authority in ways that confirm this subject is not one committed wholly to agency discretion. *See, e.g.*, 8 U.S.C. § 1357(a)(3) (permitting warrantless arrest in specified locations, such as a "railway car, aircraft, conveyance, or vehicle, . . . but not dwellings"); *id.* § 1357(e) (restricting entry to a farm or outdoor agricultural operation absent a "properly executed warrant" or owner's consent); *see also* 8 C.F.R. § 287.8(f) (DHS regulation governing DHS site inspections).

succeed. *See also Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.").

Moreover, as noted, the Supreme Court recently underscored that courts *can* review an agency's exercise of enforcement powers in a variety of circumstances, *see United States v. Texas*, 599 U.S. at 681–83; *see also DHS v. Regents of the Univ. of Cal,*, 591 U.S. 1, 19 (2020) (considering "a program for conferring affirmative immigration relief" and holding that "[t]he creation of that program—and its rescission—is an action that provides a focus for judicial review" (quotation marks and brackets omitted)); *cf. Dep't of Com.*, 588 U.S. at 771–73 (reviewing conduct of census while recognizing that "the Act confers broad authority on the Secretary").

*Final agency action.* The 2025 Policy is reviewable final agency action because it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted); *see also* Mem. at 30–31. DHS does not contest the first prong of this inquiry.

On the second prong, DHS primarily insists (at 34–35) that its prior sensitive locations policy, as expressed in the Mayorkas Memo, did not carry binding consequences. As DHS acknowledges, "an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). The Mayorkas Memo meets both tests. On its face, it provides direct instructions from the head of the agency to all agency personnel that they have an "obligation" to refrain "to the fullest extent possible" from enforcing at sensitive locations. Ex. 4 at 3. And it commands that, "[a]bsent exigent circumstances, an Agent or Officer *must* seek prior approval" before doing so. Ex. 4 at 4 (emphasis added); *cf. Appalachian*

*Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (finding agency pronouncement binding, and thus reviewable, where "[i]t commands, it requires, it orders, it dictates").

DHS also "applied [the policy] in a way that indicates it is binding." *Gen. Elec.*, 290 F.3d at 383. As of January, before the page was modified, DHS's website emphasized the policy's requirements and described it as "*instructing* officers to refrain from taking enforcement actions at or near . . . protected areas." Ex. 5 at 3 (emphasis added). More than that, it provided a channel for the public to submit complaints "[i]f DHS officers and agents take enforcement actions that are believed to be in violation of the protected areas policy." *Id.* at 3–5. This shows that DHS considered the policy binding: One cannot "violate" mere nonbinding advice, nor would it make sense to solicit public complaints about whether nonbinding advice was being followed. The boilerplate disclaimer at the end of the Mayorkas Memo, stating that it does not create rights or benefits, cannot overcome that conclusion about how the policy was actually applied. *See Appalachian Power*, 208 F.3d at 1022–23 (rejecting agency's appeal to similar language).

DHS supplies no case law to support its view (at 35) that any allowance for individual discretion in the Mayorkas Memo renders that action nonbinding and its recission nonfinal. DHS's scattershot citations (at 35-36) to Supreme Court decisions holding that various agency actions were final and reviewable are likewise unavailing. To state the obvious, those cases do not represent an exhaustive list of the types of reviewable final agency actions.

As explained, the 2025 Policy marked a dramatic break from the prior policy and significantly expands agents' ability to conduct enforcement activities at houses of worship. The 2025 Policy thus did change officers' practical ability to carry out immigration-enforcement activities in or near protected areas and so "will directly affect the parties." *See Ass'n of Am. Univs. v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135, at *9 (D. Mass. May 15, 2025),

*appeal pending*, No. 25-1727 (1st Cir.); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599–600 (2016) (holding that denial of safe harbor was reviewable final agency action).

## IV. The other preliminary relief factors weigh in Plaintiffs' favor.

### A. Plaintiffs, their members, and others will suffer irreparable harm without the Court's intervention.

Because Plaintiffs have made a strong showing they are likely to succeed on their claims, "it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012); *see also* Mem. at 33. That is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). In response, DHS repeats its arguments offered elsewhere, but those arguments fail for all the same reasons.

### B. The balance of equities and public interest strongly favor preliminary relief.

The final two factors favor Plaintiffs, Mem. at 34, including because "the government has no legitimate interest in pursuing unconstitutional agency action," *Doe v. Trump*, 766 F. Supp. 3d 266, 286 (D. Mass. 2025), *appeal pending*, No. 25-1169 (1st Cir.). DHS disagrees (at 37–38), citing the public interest in enforcing immigration laws. But not even DHS claims a public interest in its agents surveilling, detaining, and arresting people at houses of worship specifically, and the government's long policy of avoiding such actions would severely undercut any such claim.

## V. The Court should stay the challenged policy under 5 U.S.C. § 705.

### A. The Immigration and Nationality Act does not bar the relief requested.

DHS contests (at 20–21) the Court's ability to order preliminary relief, relying on 8 U.S.C. § 1252(f)(1). That provision generally bars district courts from "enjoin[ing] or restrain[ing] the operation of the provisions of part IV of this subchapter"—*i.e.*, 8 U.S.C. §§ 1221–1232. For several

reasons, Section 1252(f)(1) is inapplicable here.

First, Plaintiffs' requested relief does not implicate any of Sections 1221–1232. Mem. at 37 n.8. Those provisions contain certain specific authorities permitting the inspection, apprehension, exclusion, and removal of aliens. But DHS does not identify any specific part of those sections that it thinks would be "enjoin[ed]" or "restrain[ed]" by the requested relief. Instead, DHS relies on a misreading of *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), which DHS says (at 20) held that Section 1252(f)(1) "appl[ies] broadly to immigration enforcement operations." In reality, and as the language quoted in DHS's opposition shows, the Court held only that Section 1252(f)(1) applies with respect to "the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550. Those "specified statutory provisions" do not include the one most clearly relevant here: 8 U.S.C. § 1357, which concerns the power of immigration officers to carry out arrests, conduct interrogations, and execute warrants. *See Phila. Yearly Meeting*, 767 F. Supp. 3d at 320 (noting government's agreement that "the core of these activities [implicated by the 2025 Policy] is governed by 8 U.S.C. § 1357"); *cf. Texas v. DHS*, 123 F.4th 186, 209–10 (5th Cir. 2024) ("[B]ecause § 1357(a)(3) is not one of the statutes referenced in § 1252(f)(1), the injunction Texas seeks is not barred."). DHS's opposition here simply ignores Section 1357 as well as the government's prior concession in *Philadelphia Yearly Meeting*.

Second, to the extent that any of the provisions specified in Section 1252(f)(1) would be affected by the requested relief, that effect would be at most "collateral" and thus insufficient to constitute a cognizable restraint under Section 1252(f)(1). *See Texas v. DHS*, 123 F.4th at 209–10 ("[A] court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." (quoting *Aleman Gonzalez*, 596 U.S. at 553 n.4)). For this reason, it was unnecessary for the court in

*Philadelphia Yearly Meeting* to have carved out from its preliminary injunction DHS arrests made pursuant to administrative warrants. 767 F. Supp. 3d at 320. Section 1226(a) generally authorizes DHS arrests pursuant to administrative warrants, but it does not address *where* DHS may make such arrests—the sole subject of Plaintiffs' requested preliminary relief.

Third, a Section 705 stay would not "enjoin or restrain" the operation of the specified provisions in the first place because it is not an injunction. *See Texas v. Biden*, 646 F. Supp. 3d 753, 767–68 (N.D. Tex. 2022) ("Just as Section 1252(f)(1) does not prohibit 'vacatur' under Section 706, Section 1252(f)(1) does not prohibit issuance of a 'stay' under Section 705."). For similar reason, the First Circuit has held that Section 1252(f)(1) does not bar class-wide declaratory relief because, "while declaratory relief can sometimes have much the same practical effect as injunctive relief, it differs legally and materially." *Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021); *see also Aleman Gonzalez*, 596 U.S. at 551 n.2 (declining government's invitation to decide whether Section 1252(f)(1) "also prohibits any other form of relief that is 'practically similar to an injunction'"). That result simply recognizes that, in enacting Section 1252(f)(1), "Congress meant only what it said—and not what it did not say." *Brito*, 22 F.4th at 252.

**B. A Section 705 stay is warranted here.**

Plaintiffs' opening motion collected numerous decisions from courts across the country confirming the availability of (and universal effect of) Section 705 stays in these circumstances. Mem. at 34–37. More have issued since. *E.g.*, *City of Columbus v. Kennedy*, No. 25-cv-2114, 2025 WL 2426382, at *33–34 (D. Md. Aug. 22, 2025); *R.I. Coal. Against Domestic Violence v. Bondi*, No. 25-cv-279-WES, 2025 WL 2271867, at *10 (D.R.I. Aug. 8, 2025).

Tellingly, DHS's opposition ignores every one of these decisions. But DHS cannot simply wish away the weight of authority against it. Nor are DHS's cited authorities any help to it. DHS

contends (at 38) that the APA is limited to "traditional equitable principles" of the kind discussed in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). But as Plaintiffs previously pointed out, Mem. at 36, and DHS fails to acknowledge, the Court there did not address the scope of relief under the APA, *CASA*, 145 S. Ct. at 2554 n.10; *see also id.* at 2567 (Kavanaugh, J., concurring); *American Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-cv-628, 2025 WL 2374697, at *32 & n.19 (D. Md. Aug. 14, 2025) (explaining that, "[l]ike every other court to consider this issue since *CASA*, this Court believes the APA has always expressly authorized vacatur, and *CASA* did not change that" and collecting other cases). DHS's recourse to legislative history—and to a footnote in a 1974 decision citing that legislative history—is likewise unpersuasive. And its claim (at 39) that a stay in this case would "effectively overrule" the decisions of other judges is incorrect and merely reflects a disagreement with the way Section 705 stays work.

Finally, the Court should not require a bond under Federal Rule of Civil Procedure 65(c) because, "[u]nlike a preliminary injunction, a stay under 5 U.S.C. § 705 does not expressly require the movant post a bond." *Seafreeze Shoreside, Inc. v. Dep't of Interior*, No. 22-cv-11091-IT, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023); *accord, e.g.*, *Columbus*, 2025 WL 2426382, at *34 ("The APA has no bond requirement."). And even were the Court to apply the Rule 65(c) standard, the "proper" amount of any security would be $0—or, at most, a nominal bond of $1—because DHS has not even alleged, let alone documented, any cognizable "costs and damages." Fed. R. Civ. P. 65(c).[7]

## CONCLUSION

The Court should stay the 2025 Policy under 5 U.S.C. § 705 or enjoin its enforcement.

[7] Were the Court to order a preliminary injunction, rather than a stay, Plaintiffs have not requested that the injunction restrain DHS's conduct at sensitive locations beyond what was required by the Mayorkas Memo. *Contra* Defs.' Opp'n at 39 (discussing judicial warrants).

Dated: August 25, 2025

Respectfully submitted,

/s/ *Kevin E. Friedl*
Kevin E. Friedl*
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Mark B. Samburg
Audrey Wiggins*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
kfriedl@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
msamburg@democracyforward.org
awiggins@democracyforward.org

Ryan Downer*
Madeleine Gates*
Melissa Colon*
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org
melissa_colon@washlaw.org

Richard J. Leveridge*
Sonia W. Murphy*
Brandon A. Levey*
Samone Ijoma*
Brittney M. Welch*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Leveyb@gilbertlegal.com
Ijomas@gilbertlegal.com
Welchb@gilbertlegal.com

*Admitted *pro hac vice*