# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PHILADELPHIA YEARLY MEETING OF
THE RELIGIOUS SOCIETY OF FRIENDS,
NEW ENGLAND YEARLY MEETING OF
THE RELIGIOUS SOCIETY OF FRIENDS,
BALTIMORE YEARLY MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS, INC.,
ADELPHI FRIENDS MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS,
RICHMOND FRIENDS MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS,
NEW YORK YEARLY MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS, INC.,
COOPERATIVE BAPTIST FELLOWSHIP
and
SIKH TEMPLE SACRAMENTO,

        Plaintiffs,

        v.

U.S. DEPARTMENT OF
HOMELAND SECURITY and
KRISTI NOEM,
*in her official capacity as*
*Secretary of Homeland Security*,

        Defendants.

Civil Action No. 25-0243-TDC

## MEMORANDUM OPINION

Plaintiffs Philadelphia Yearly Meeting of the Religious Society of Friends, New England

Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious

Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends, Richmond

Friends Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious

Society of Friends, Inc., Cooperative Baptist Fellowship, and Sikh Temple Sacramento have filed

this civil action against Defendants the United States Department of Homeland Security and Secretary of Homeland Security Kristi Noem (collectively, "DHS") in which they challenge DHS's January 2025 decision to rescind a longstanding policy which significantly limited the execution of immigration enforcement actions in or near places of worship and other protected areas (collectively, "protected areas") and replace it with a new policy which leaves the decision on whether to conduct such enforcement actions to the discretion of individual immigration officers.

Specifically, Plaintiffs have asserted claims under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb-4 (Count 1), the First Amendment to the United States Constitution, U.S. Const. amend. I (Count 2), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706 (Counts 3–6). DHS has filed a Partial Motion to Dismiss in which it seeks dismissal of Counts 3–6. After the Motion was fully briefed, the Court held a hearing on the Motion on December 12, 2025. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On January 20, 2025, Acting Secretary of Homeland Security Benjamine Huffman issued a memorandum entitled "Enforcement Actions in or Near Protected Areas" (the "Huffman Memorandum" or the "2025 Policy"), which rescinded an October 27, 2021 memorandum issued by then-Secretary of Homeland Security Alejandro Mayorkas entitled "Guidelines for Enforcement Actions in or Near Protected Areas" (the "Mayorkas Memorandum" or the "2021 Policy"). In line with longstanding DHS policy, the 2021 Policy had instituted internal restrictions and safeguards that significantly limited immigration enforcement activity in or near protected areas. The 2025 Policy replaced the 2021 Policy with a general policy of permitting immigration

officers to exercise their discretion and common sense in determining whether to engage in enforcement actions in or near a protected area.

On February 24, 2025, after Plaintiffs filed the present action and a Motion for a Temporary Restraining Order and Preliminary Injunction as to Counts 1 and 2, the Court issued a Memorandum Opinion in which it granted a preliminary injunction relating to Counts 1 and 2 so as to "bar application of the 2025 Policy, and to return to the 2021 Policy, as to Plaintiffs only." *See Philadelphia Yearly Meeting of the Religious Soc'y of Friends v. U.S. Dep't of Homeland Security* ("*Philadelphia Yearly I*"), 767 F. Supp. 3d 293, 336 (D. Md. 2025). The legal background, relevant facts, and early procedural history of this case are set forth in the Court's Memorandum Opinion, which is incorporated by reference. *See id.* at 303–311.

In that motion, Plaintiffs sought no relief as to the APA claims in counts 3, 4, 5, and 6 (collectively, "the APA claims"). In Count 3, Plaintiffs assert that DHS's adoption of the 2025 Policy through the issuance of the Huffman Memorandum was arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A), on the grounds that DHS rescinded the 2021 Policy without providing reasoning, considering alternative actions, or addressing Plaintiffs' reliance interests. In Count 4, Plaintiffs assert that the 2025 Policy is contrary to a constitutional right in violation of the APA, 5 U.S.C. § 706(2)(B), on the grounds that where the 2025 Policy lacks the restrictions and safeguards set forth in the 2021 Policy, the 2025 Policy violates their right to freedom of expressive association under the First Amendment to the Constitution. In Count 5, Plaintiffs assert that the 2025 Policy is unlawful as "in excess of statutory jurisdiction, authority, or limitations" in violation of the APA, 5 U.S.C. § 706(2)(C), on the grounds that the 2025 Policy violates RFRA by placing a substantial burden on their exercise of religion. In Count 6, Plaintiffs assert that DHS's rescission of the 2021 Policy without having first engaged in notice-and-

3

comment rulemaking violated the APA by failing to observe procedures required by law. *See* § 706(2)(D).

DHS has now filed a Partial Motion to Dismiss in which it seeks dismissal of the APA claims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6).

## DISCUSSION

In the Motion, DHS argues that the APA claims should be dismissed for lack of subject matter jurisdiction because the issuance of the 2025 Policy through the Huffman Memorandum was not a final agency action and was committed to agency discretion by law, such that it is not subject to judicial review under the APA. Further, DHS argues that Count 6 should be dismissed for failure to state a claim because the 2025 Policy is a general statement of policy that is exempt from the APA's notice-and-comment rulemaking requirement.

## I.    Legal Standards

It is the plaintiff's burden to show that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co., Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal when it believes that the plaintiff has failed to make that showing. When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When a defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d

4

392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d at 192. The court should grant a Rule 12(b)(1) motion based on a factual challenge to subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## II.    Final Agency Action

DHS first argues that the APA claims should be dismissed because the issuance of the 2025 Policy did not constitute a final agency action for purposes of the APA. Under the APA, a "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. Because the APA waives sovereign immunity for challenges to such actions, a district court lacks subject matter jurisdiction to review steps taken by a federal agency that do not qualify as a "final agency action." *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024).

The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

5

Two conditions must be satisfied for an agency action to be deemed "final": (1) "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Notably, under the APA, there is a "'strong presumption' in favor of judicial review of agency action." *CASA de Md. v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 697 (4th Cir. 2019) (quoting *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008)). Accordingly, the United States Supreme Court has instructed that courts take a "'pragmatic' approach" to the finality inquiry. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

DHS does not dispute that the 2025 Policy meets the first prong of *Bennett* because it marked the consummation of the agency's decisionmaking process. Rather, DHS argues that the 2025 Policy is not an action that has "direct and appreciable legal consequences" and thus does not meet *Bennett*'s second prong. Mot. Dismiss at 12, ECF No. 78-1. Specifically, DHS argues that neither the 2021 Policy nor the 2025 Policy imposed any "obligations, prohibitions, restrictions" on Plaintiffs or had any "direct regulatory effect" on them. *Id.* at 12–13.

Even if the 2025 Policy had no direct impact on the rights or obligations of Plaintiffs or other members of the public, the second prong can be satisfied if the agency action determines an agency's own "rights or obligations" or those of its personnel. *See Bennett*, 520 U.S. at 178. This was the case in *Bennett*, in which the Supreme Court found that a Biological Opinion issued by the United States Fish and Wildlife Service, a component agency of the United States Department of the Interior ("Interior"), was a final agency action because it placed obligations on the Bureau

6

of Reclamation, another Interior component agency, in relation to its operation of an irrigation project. *See id.* at 157, 159, 177–78. Specifically, the Biological Opinion required the Bureau of Reclamation to comply with certain "reasonable and prudent alternatives," consisting of maintaining certain minimum water levels at certain reservoirs, in order to be permitted to "take" fish designated as an endangered species. *Id.* at 158–59, 169–70. Although the United States Court of Appeals for the Fourth Circuit has not directly addressed whether an agency action meets the second prong of *Bennett* if it modifies an agency's rights or obligations rather than those of members of the public, other circuits, as well as district courts, have so found. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("[A]n agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of *Bennett.*"); *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Air Force*, 128 F.4th 1089, 1111–12 (9th Cir. 2025) (finding that the Air Force's submission of a renewal permit imposed obligations on itself and thus was a final agency action); *Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 461 (D. Md. 2012) ("The second prong does not require that the agency action confer rights or obligations on the plaintiff. . . . [A]n equally apposite question is whether the [agency's] decision . . . determined its own rights or obligations.").

Further, "where agency action withdraws an entity's previously-held discretion" in an area subject to its coverage, it effectively binds the entity and thus constitutes a final agency action. *Texas*, 933 F.3d at 442 (internal citations omitted). In *Texas*, the court reviewed a United States Equal Opportunity Employment Commission ("EEOC") guidance document entitled "Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII [of the Civil Rights Act of 1964]" that stated, in part, the agency's views that Title VII disparate impact liability could follow from an employer's policy of screening out applicants with criminal records

7

if it is not consistent with business necessity, warned that an employer would need to show how such a policy is specifically linked to the duties of the position, and presented circumstances that would "*consistently*" meet this requirement. *Id.* at 437–38. The court held that even though the EEOC lacked the authority to promulgate substantive rules and could not bring civil actions against state employers, the issuance of this guidance was a final agency action in part because it bound EEOC staff to following a particular "analytical method" in conducting investigations relating to this issue and "limit[ed] discretion respecting the use of certain evidence" by "leav[ing] no room for EEOC staff" to decline to issue referrals under certain factual scenarios. *Id.* at 439, 443.

Similarly, both the 2021 Policy and the 2025 Policy were final agency actions in that they redetermined the rights and obligations of DHS personnel, specifically immigration officers considering whether to conduct immigration enforcement actions at or near protected areas. In *Philadelphia Yearly I*, the Court detailed the restrictions placed on immigration officers under the 2021 Policy, including the requirement that immigration enforcement actions were not to be taken at places of worship and other protected areas "to the fullest extent possible," subject only to exceptions in "limited circumstances" consisting of six specific scenarios and other comparable circumstances. *Philadelphia Yearly I*, 767 F. Supp. 3d at 318. The 2021 Policy specifically referred to this restriction as an "obligation" that applied "at all times." Mayorkas Mem. at 3, Am. Compl. Ex. 20, ECF No. 28-21. In addition, the 2021 Policy imposed a requirement that if an exception to the general rule appeared warranted, immigration officers "must seek prior approval from their Agency's headquarters . . . before taking an enforcement action in or near a protected area," unless there were exigent circumstances, in which case the agency headquarters "should be consulted post-action." *Id.* at 4. The 2021 Policy further stated that "[t]o the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of

8

public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." *Id.*

These provisions illustrate that the 2021 Policy determined the rights and obligations of DHS personnel by placing specific restrictions on their ability to conduct immigration enforcement actions at or near protected areas. *See Texas*, 933 F.3d at 441–44. Although DHS argues that the restrictions were not obligations because the 2021 Policy noted that immigration officers needed to engage in the "exercise of judgment" and that it did "not limit an agency's or employee's statutory authority," Mot. Dismiss at 14, this argument fails for two reasons. First, the 2021 Policy referenced the application of judgment in relation to specific decisions, including assessing whether a particular location was a protected area, whether an enforcement action was to occur "near" such a location, and whether in a particular situation there were circumstances other than one of the six identified exceptions that warranted action contrary to the general restriction on such actions. Mayorkas Mem. at 3. The fact that the 2021 Policy required agency personnel to engage in some interpretation of its terms does not change the mandatory nature of its provisions. Indeed, DHS personnel who violated the 2021 Policy were likely subject to discipline: as noted in the Amended Complaint, while the 2021 Policy was in effect, DHS advised the public through its website that "[i]f DHS officers and agents take enforcement actions that are believed to be in violation of the protected areas policy, a complaint may be filed" and provided information how to do so. *See* Immigr. & Customs Enf't, Protected Areas Enforcement Actions at 5, Am. Compl. Ex. 22, ECF No. 28-23. Second, to the extent that the 2021 Policy could be construed as not mandatory because it did not absolutely bar all enforcement actions at protected areas, it still determined obligations of DHS personnel because, at a minimum, it placed significant limits on immigration officers' exercise of discretion. *See Texas*, 933 F. 3d at 443.

The Court therefore finds that the 2021 Policy was a final agency action. Upon such a finding, as DHS acknowledged at the hearing on the Motion, the adoption of the 2025 Policy through the issuance of the Huffman Memorandum was necessarily also a final agency action because it materially redetermined the rights and obligations of immigration officers by removing the restrictions and limitations of the 2021 Policy. DHS acknowledged this change when its spokesman, upon the issuance of Huffman Memorandum, characterized the 2021 Policy as "thwart[ing] law enforcement" and "[tying] the hands of our brave law enforcement." 1/21/2025 DHS Statement at 1, Am. Compl. Ex. 30, ECF No. 28-31. Such contemporaneous statements show that DHS understood that the 2021 Policy imposed obligations on immigration officers, and that the purpose of the 2025 Policy was to redetermine those obligations.

The Court also finds that the adoption of the 2025 Policy was a final agency action because it withdrew the effective safe harbor provided in the 2021 Policy. An agency action that withdraws a regulatory "safe harbor" meets the second prong of *Bennett*. *See Hawkes*, 578 U.S. at 599 (finding that a "denial of [a] safe harbor" meets the second prong of *Bennett* and concluding that the issuance of a negative "jurisdictional determination" in which the U.S. Army Corps of Engineers determined that a property did not contain waters subject to the Clean Water Act ("CWA") was a final agency action in part because it bound two federal agencies for purposes of litigation and thus prevented them from bringing a CWA civil enforcement action against the property owner). Courts have applied this theory to satisfy the second prong of *Bennett* even where an agency action did not provide an absolute safe harbor to the plaintiffs. *See Frozen Food Express v. United States*, 351 U.S. 40, 44–45 (1956); *Texas*, 933 F.3d at 445; *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 500–01 (D. Md. 2019) (rejecting the argument that the Foreign Affairs Manual's rule barring consular officers from considering a visa applicant's receipt

of non-cash benefits in determining whether a noncitizen could be excluded from the United States as a "public charge" was not effectively a safe harbor because it did not provide applicants with an assurance they would not be found to be a public charge on some other basis, where the rule narrowed the grounds on which such a determination could be made). In *Frozen Food Express*, the Supreme Court held that an "order" issued by the Interstate Commerce Commission ("ICC") listing agricultural commodities the transporting of which was deemed to provide an exemption to motor carriers from a requirement to obtain a certificate or permit to operate was a final agency action, even though it was only "declaratory" and itself had no authority other than to give notice of the ICC's interpretation. *Id.* at 44–45; *see Hawkes*, 578 U.S. at 599 (discussing *Frozen Food Express*). In *Texas*, the court, assessing finality "flexibly and pragmatically," found that EEOC guidance that it "believes that certain practices will consistently meet statutory requirements" effectively provided a safe harbor for purposes of the second prong even though it did not actually guarantee that no civil enforcement action would be brought against an employer which followed those practices. *Texas*, 933 F.3d at 445–46 (internal citations omitted).

Here, under a pragmatic view of the issue of finality, the 2021 Policy created, in practice, a comparable safe harbor by barring immigration enforcement actions at or near places of worship except in limited circumstances consisting of six identified exceptions and other presumably comparable circumstances. It therefore effectively provided to places of worship an assurance that they would not be subjected to an intrusion related to an immigration enforcement action outside of those limited exceptions. In turn, when the 2025 Policy rescinded the "meaningfully narrower" 2021 Policy, it eliminated that effective safe harbor because, as a result of the replacement of the 2021 Policy's restrictions with a broad policy that the decision to conduct immigration enforcement actions at protected areas was limited only by the individual immigration officer's

discretion, "the range of scenarios under which an immigration enforcement action could occur at a place of worship" was effectively expanded. *See Philadelphia Yearly I*, 767 F. Supp. 3d at 318. Thus, the 2025 Policy determined rights and obligations for purposes of the second prong in this way as well.

     *Flue-Cured Tobacco Cooperative Stabilization Corp. v. Environmental Protection Agency* ("*Flue-Cured*"), 313 F.3d 852 (4th Cir. 2002), does not alter the Court's conclusion that the 2025 Policy constitutes a reviewable final agency action. *Flue-Cured* involved a challenge to a report issued by the United States Environmental Protection Agency that classified secondhand tobacco smoke as a known human carcinogen. *Id.* at 854. In finding that the report was not a final agency action subject to review under the APA, the court relied significantly on the fact that the report was prepared pursuant to a research program established by the Radon Gas and Indoor Air Quality Act ("Radon Act"), Pub. L. No. 99-499, §§ 401–405, 100 Stat. 1758, which explicitly prohibited any such reports from having any regulatory effect. *Id.* at 858. Further, the court noted that to the extent that other agencies had "relied on the Report in imposing tobacco related restrictions," such restrictions were "the product of independent agency decisionmaking," as "other federal agencies [were] free to embrace or disregard the Report which is advisory and does not trigger the mandatory creation of legal rules, rights, or responsibilities." *Id.* at 860. Thus, the court held that the report was akin to advisory reports provided to final decisionmakers that have been deemed not to constitute final agency actions. *Id.* (citing *Franklin v. Massachusetts*, 505 U.S. 788, 797–98 (1992), and *Dalton v. Specter*, 511 U.S. 462, 469 (1994)). As discussed above, the 2021 Policy imposed actual obligations on immigration officers relating to how they could or could not conduct immigration enforcement actions at protected areas, and unlike for the report in *Flue-Cured*, immigration officers were not "free to embrace or disregard" the terms of the 2021 Policy. *Id.*

12

Finally, DHS's reliance on the language in both the 2021 Policy and the 2025 Policy stating that the policy is "not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party," *e.g.*, Mayorkas Mem. at 5, is misplaced because such boilerplate language is not dispositive if the action, in fact, determines rights or obligations. *See Appalachian Power Co. v. Env't Prot. Agency*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000) (finding a final agency action despite language in an EPA guidance document stating that the policies in the document were "intended solely as guidance, do not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party," because the guidance in practice had legal consequences).

Because the 2025 Policy was the consummation of agency action, redetermined the rights and obligations of immigration officers, and withdrew a safe harbor set forth in the 2021 Policy, the Court finds that it was a final agency action.

## III.     Committed to Agency Discretion by Law

DHS further argues that Plaintiffs' APA claims are unreviewable because the 2025 Policy is committed to agency discretion by law. The APA provides that judicial review of an agency action is not available where the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court, however, has read this exception to judicial review "quite narrowly." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). It applies only "in those rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). In such a circumstance, a court would have "no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)).

13

The Supreme Court found one such circumstance in *Heckler*, in which it held that the United States Food and Drug Administration's decision to exercise its discretion not to institute an enforcement action against certain states for allegedly violating the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, based on the potential use of drugs in executions of the plaintiffs by lethal injection was presumptively unreviewable under the APA. *Heckler*, 470 U.S. at 823, 831–32. Such decisions are generally committed to the agency's "absolute discretion" and are "unsuitabl[e]" for judicial review because they often involve a complicated balancing of factors within the agency's expertise, they do not infringe on liberty or property interests, and the nonreviewability of such decisions resembles the strong discretion given to prosecutors on whether to secure an indictment. *Id.* at 831–32.

Citing *Heckler*, DHS argues that the 2025 Policy is not reviewable because it involves discretionary policy choices about how best to enforce immigration law which are committed to agency discretion. However, the Fourth Circuit rejected a similar argument in *CASA de Maryland v. U.S. Department of Homeland Security*, 924 F.3d 684 (4th Cir. 2019), in which the Government argued that a memorandum rescinding the Deferred Action for Childhood Arrivals ("DACA") policy ("the DACA Rescission Memorandum") was not reviewable under *Heckler* because the action was based on the broad discretion exercised by immigration officials and was therefore committed to agency discretion by law. *See id.* at 697. The court disagreed and found that the DACA Rescission Memorandum was "not a '[*Heckler*]-type enforcement action'" because it did not involve the exercise of enforcement discretion in an individual case and instead was the rescission of a "general enforcement policy" in that it did not involve questions of whether there was a specific violation of the law, whether government resources would be best spent enforcing a particular violation over another, or whether an enforcement action against a specific violation

14

would succeed. *Id.* at 698–99 (internal citations omitted). The court noted that "[m]ajor agency policy decisions" such as the DACA Rescission Memorandum are "quite different from day-to-day agency enforcement decisions," *id.* at 699 (quoting *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1998)), in that "different considerations than those driving [*Heckler*'s] presumption are at play" in that they are "more likely" to be based on an interpretation of legal requirements than the "mingled assessments of fact, policy, and law that drive an individual enforcement decision" such as in *Heckler*. *Id.* (quoting *Crowley Caribbean Transp., Inc.*, 37 F.3d 671, 677 (D.C. Cir. 1994)). The court also distinguished *Heckler* based on the fact that it involved a discretionary exercise in non-enforcement, which generally does not "involve the exercise of '*coercive* power'" over liberty or property rights and thus does not "infringe upon areas that courts often are called upon to protect." *Id.* at 698 (quoting *Heckler*, 470 U.S. at 832). Noting that courts have previously recognized that "an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review," the court found that the DACA Rescission Memorandum was not committed to agency discretion pursuant to *Heckler* and was instead subject to judicial review. *Id.* at 699.

Like the DACA Rescission Memorandum, the 2025 Policy is a broad or general enforcement policy for which the considerations at issue in *Heckler* are inapplicable. The 2025 Policy does not involve the exercise of enforcement discretion in an individual case, including in relation to whether there was a specific violation of law against which action should be taken and whether resources should be allocated to enforce that violation over another, or an assessment on whether such a specific enforcement action would succeed. Rather, as with the DACA Rescission Memorandum, it is necessarily based on broader considerations than those at issue in individual enforcement decisions as in *Heckler*. Moreover, unlike in *Heckler*, which involved a decision not

15

to use enforcement power, the 2025 Policy, by removing restrictions on enforcement actions generally, involves an increased likelihood of the use of coercive power in violation of individual rights. *See CASA de Md.*, 924 F.3d at 698.

DHS nevertheless argues that *CASA de Maryland* applies only to general enforcement policies "based on the agency's legal interpretation," Reply at 12, ECF No. 83 (emphasis omitted) (quoting *CASA de Md.*, 924 F.3d at 699), and notes that unlike the DACA Rescission Memorandum, which was explicitly based on the conclusion that DACA was or was likely to be found unlawful, neither the Mayorkas Memorandum nor the Huffman Memorandum directly addressed whether and when law enforcement actions at or near places of worship are lawful. The Court does not read *CASA de Maryland* so narrowly. Although the *CASA* court emphasized the fact that the DACA Rescission Memorandum relied on a legal interpretation, it did not conclude that it would have been unreviewable had its reasoning been based on other considerations. *See CASA de Md.*, 924 F.3d at 699. Rather, in addressing *Interstate Commerce Commission v. Brotherhood of Locomotive Engineers* ("*BLE*"), 482 U.S. 270 (1987), cited by the Government, the *CASA* court acknowledged that the Supreme Court in *BLE* rejected the principle that "if an agency gives a reviewable reason," such as a legal interpretation, for an "otherwise unreviewable action, the action becomes reviewable," a determination that is difficult to square with the Government's present claim that the DACA Rescission Memorandum was subject to judicial review only because it involved a legal interpretation. *CASA de Md.*, 924 F.3d at 700–01 (quoting *BLE*, 482 U.S. at 283)) Moreover, by distinguishing *BLE* based on the fact that it "addressed the scope of judicial review in the context of agency non-enforcement action in an individual case," while the DACA Rescission Memorandum effected a "broad enforcement policy," the *CASA* court further emphasized that its holding that *Heckler* did not apply to the DACA Rescission

16

Memorandum was grounded in the distinction between a general enforcement policy and an individual non-enforcement decision rather than the degree to which it was based on a legal interpretation. *Id.* at 701. Indeed, the primary cases cited on this issue by DHS involved individual enforcement decisions rather than general enforcement policies and thus are inapplicable. *See Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 317 (4th Cir. 2008) (holding that the Secretary of Labor's decision to issue a citation to an individual mining company under the Mine Act was committed to agency discretion); *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 951–52, 964–65 (4th Cir. 2025) (finding that an advisory opinion issued by Inspector General of the U.S. Department of Health and Human Services that concluded that a program proposed by a coalition of drug manufacturers could violate the Anti-Kickback Statute under certain circumstances and declined to disavow possible enforcement of the Anti-Kickback Statute against the coalition was committed to agency discretion).

Finally, the Court notes that to the extent that the principle that agency actions are committed to agency discretion by law is premised on the concept that in some instances there would be "no meaningful standard" or "no law to apply" when reviewing an agency action, *Heckler*, 470 U.S. at 830, here, Plaintiffs' challenge is subject to such standards because it is primarily based on the claim that the 2025 Policy violates the First Amendment and RFRA. *See Elecs. of N.C., Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1267 (4th Cir. 1985) (in discussing the APA, noting that "an agency decision that violates a statutory or constitutional command . . . is not immune from judicial review" and that "'even where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations'" (quoting *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981))); *see also Garcia v. Neagle*, 660 F.2d 983,

17

988 (4th Cir. 1981) (stating that even if "the controlling statute indicates that particular agency action is committed to agency discretion, a court may review the action if there is a claim that the agency has violated constitutional, statutory, regulatory or other restrictions"). The Court therefore finds that the 2025 Policy, as a general enforcement policy akin to the DACA Rescission Memorandum, is not committed to agency discretion by law. *See CASA de Md.,* 924 F.3d at 701.

DHS's reliance on *Lincoln v. Vigil*, 508 U.S. 182 (1993), does not alter this conclusion. In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue the Indian Children's Program, which was established by a discretionary allocation of funds from a lump-sum appropriation to the agency, was committed to agency discretion by law based on a principle not relevant here: that the "allocation of funds from a lump-sum appropriation is . . . traditionally regarded as committed to agency discretion." *See id.* at 192. Although DHS argues that the fact that this ruling was issued even though the claims in *Lincoln* included both APA and constitutional claims can be interpreted as support for its position that even review of the constitutional claims is barred by 5 U.S.C. § 702(a)(2), the Court in no way discussed the interplay between the APA and the constitutional claims, whether asserted through the APA or otherwise. In fact, the *Lincoln* Court expressly stated that "the APA contemplates, in the absence of a clear expression of contrary congressional intent, that judicial review will be available for colorable constitutional claims," and it expressly declined to address the constitutional claims because they had not been reviewed in the lower courts and thus remanded those claims to the Court of Appeals. *Id.* at 195.

For all of these reasons, the Court finds that the 2025 Policy is not committed to agency discretion by law pursuant to § 701(a)(2) and therefore will not dismiss the APA claims on this basis.

## IV.    No Adequate Remedy in a Court

DHS argues for the first time in its reply brief that Counts 4 and 5 should be dismissed because Plaintiffs already have an adequate alternative judicial remedy for these claims through their RFRA claim in Counts 1 and their First Amendment claim in Count 2. "Generally, 'new arguments cannot be raised in a reply brief' before the district court." *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) (quoting *United States v. Smalls*, 720 F.3d 193, 197 (4th Cir. 2013)). Because DHS raised this argument for the first time in their reply brief, the Court could fairly deem it to be waived.

Regardless, the Court will not dismiss Counts 4 and 5 on this basis. The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The Supreme Court has read this provision narrowly and cautioned that while § 704 was not intended to duplicate specific statutory procedures for review of agency action, it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). In *Bowen*, the Court drew a distinction between judicial review based on statutes providing "special and adequate review procedures" that must be "followed in reviewing a particular agency's action," such as those providing that orders issued by the Federal Trade Commission or the National Labor Relations Board are directly reviewable in a United States Court of Appeals, and the APA's general grant of jurisdiction for judicial review of other agency actions not subject to such special procedures. *Id.* at 882–83, 887, 903–04 (holding that the general availability of monetary relief in the United States Court of Claims pursuant to the Tucker Act did not preclude an APA action in federal district court seeking declaratory and injunctive relief relating to the federal government's failure to properly reimburse a state

19

government for Medicaid payments). The Fourth Circuit has specifically rejected the argument that "the APA's provisions for judicial review apply only to agency actions which have not been made reviewable by any other statute" and instead held that "[c]ourts will decline to review agency actions" under the APA "only upon a showing that Congress clearly intended to restrict access to judicial review." *Ohio River Valley Env't Coal., Inc. v. Kempthorne*, 473 F.3d 94, 100–01 (4th Cir. 2006) (quoting *Hanauer v. Reich*, 82 F.3d 1304, 1307 (4th Cir. 1996) (permitting APA review of an amendment to a state regulatory program pursuant to the Surface Mining Control and Reclamation Act of 1977 even though that statute had its own procedures and standard of review that govern the approval or denial of such amendments). Here, although RFRA provides a private right of action to challenge an agency action as imposing a substantial burden on the exercise of religion, it does not state, directly or indirectly, that it was intended to restrict or bar APA review of a claim such as the one asserted in Count 4. Likewise, there is no basis to conclude that Congress intended to restrict APA review of a First Amendment claim such as the one asserted in Count 5. The Motion will therefore be denied as to this argument.

**V.     Notice and Comment**

Finally, DHS argues that Plaintiffs' claim in Count 6 should be dismissed because the 2025 Policy set forth in the Huffman Memorandum is a general policy statement exempt from any requirement for notice-and-comment rulemaking. Generally, the APA requires notice of, and an opportunity for interested persons to comment on, "proposals to create, amend, or repeal a[n] [agency] rule." *See CASA de Md.*, 924 F.3d at 701. Such rules, sometimes referred to as substantive or legislative rules, are those that have "the force of law," create "new law," or impose "new rights or duties." *See id.* at 702 (quoting *Children's Hosp. of the King's Daughters, Inc. v. Azar* ("*CHKD*"), 896 F.3d 615, 620 (4th Cir. 2018)). Such a rule is one that "supplements a statute,

20

adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *See id.* at 702 (quoting *CHKD*, 896 F.3d at 620). In contrast, notice-and-comment rulemaking is not required for "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *See id.* at 701 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)). These distinctions are based on the premise that general policy statements "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," but do not establish a "binding norm" and otherwise leave agency officials free to exercise their discretion. *See id.* at 702 (citations omitted).

Notably, the question of whether an agency action is subject to notice-and-comment rulemaking is distinct from the question of whether it is a final agency action. *See Cal. Communities Against Toxics v. Env't Protection Agency*, 934 F.3d 627, 635 (D.C. Cir. 2019). A substantive or legislative rule, which has "the force and effect of law," is necessarily a final agency action, but not all final agency actions are necessarily substantive or legislative rules. *Id.*

In *CASA de Maryland*, the Fourth Circuit held that the DACA Rescission Memorandum, although subject to judicial review under the APA, was not a legislative rule and therefore was exempt from notice-and-comment rulemaking. *See CASA de Maryland*, 924 F.3d at 702–03. In so ruling, the court found that the DACA Rescission Memorandum, while removing "a mechanism under which individuals could receive deferred action" from removal, did not place limits on "other lawful enforcement prerogatives" or impose a "new binding rule of substantive law" and still allowed agency officials to exercise their discretion to make deferred action available on an individualized basis. *Id.* at 702 (quoting *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1015 (9th Cir. 1987)). In addition, the DACA Rescission Memorandum did not bind future Secretaries of Homeland Security from implementing future deferred action policies. *See id.* at 702. Thus, the

21

DACA Rescission Memorandum fell "on the policy 'end of the spectrum'" such that it was not subject to notice-and-comment rulemaking. *See id.* at 702–03 (quoting *CHKD*, 896 at 620–21).

Here, as in *CASA de Maryland*, the 2025 Policy's rescission of the 2021 Policy removed certain agency-imposed restrictions, specifically those related to conducting immigration enforcement actions at or near protected areas, but it did not curtail an immigration officer's discretion to, when appropriate, refrain from conducting an enforcement operation at or near protected areas. Nor does it create a binding rule of substantive law that would prevent a future Secretary from reverting back to a more restrictive policy similar to the 2021 Policy. Thus, the Court finds that the 2025 Policy was not a legislative rule and was therefore exempt from the APA's notice-and-comment requirement. *See id.* at 702–03. The Motion will therefore be granted as to Count 6.

## CONCLUSION

For the foregoing reasons, DHS's Partial Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to Count 6 but will be denied as to Counts 3, 4, and 5. A separate Order shall issue.

Date:  February 3, 2026

THEODORE D. CHUANG
United States District Judge