**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

**New England Synod, Evangelical Lutheran Church in America; Greater Milwaukee Synod, Evangelical Lutheran Church in America; Southwest California Synod, Evangelical Lutheran Church in America; Southwestern Texas Synod, Evangelical Lutheran Church in America; Sierra Pacific Synod, Evangelical Lutheran Church in America; Metropolitan New York Synod, Evangelical Lutheran Church in America; Northwest Washington Synod, Evangelical Lutheran Church in America; Minneapolis Area Synod, Evangelical Lutheran Church in America; Delaware-Maryland Synod, Evangelical Lutheran Church in America; Metro D.C. Synod, Evangelical Lutheran Church in America; Southeastern Synod, Evangelical Lutheran Church in America; Metropolitan Chicago Synod, Evangelical Lutheran Church in America; Pacifica Synod, Evangelical Lutheran Church in America; Upstate New York Synod, Evangelical Lutheran Church in America; San Francisco Friends Meeting of the Religious Society of Friends; Pacific Yearly Meeting of the Religious Society of Friends; North Pacific Yearly Meeting of the Religious Society of Friends; American Baptist Churches USA; Alliance of Baptists; District of Columbia Baptist Convention; Metropolitan Community Churches;** and **Southern New England Conference, United Church of Christ,**

Plaintiffs,

**v.**

**Department of Homeland Security** and **Markwayne Mullin**, in his official capacity as

**Civil Case No. 4:25-cv-40102-FDS**

**FIRST AMENDED COMPLAINT**

Secretary of the Department of Homeland Security,

Defendants.

1. For over 30 years, the federal government restricted immigration enforcement at houses of worship and other "sensitive locations," recognizing that it could enforce immigration laws without, in its words, "denying . . . people of faith access to their places of worship."

2. Under that policy, the government barred immigration enforcement in or near sensitive locations "to the fullest extent possible." Agents were allowed to carry out such actions only in exigent circumstances or with prior approval from supervisors who were themselves bound by the government's policy to avoid such actions whenever possible. Where enforcement actions had to occur at sensitive locations, they were to be done in nonpublic areas and with the aim of minimizing the impact on people's access to the sensitive location.

3. Soon after taking office, the new administration abruptly reversed course and abandoned these longstanding protections.

4. In a memorandum issued on January 20, 2025, then-Acting Secretary of the Department of Homeland Security, Benjamine Huffman, rescinded the prior sensitive locations policy. In place of the guardrails that policy provided, Acting Secretary Huffman determined that the decision whether to carry out enforcement actions at or near houses of worship should be left to agents' individual discretion, guided only by "common sense."

5. Unsurprisingly, the revocation of decades-old protections for churches and other sensitive locations by Defendants Department of Homeland Security ("DHS") and now-DHS Secretary Markwayne Mullin has led to a growing number of immigration enforcement actions at or near these formerly protected areas. As the administration has accelerated its immigration

enforcement efforts across the country, federal agents have become an increasingly common presence at houses of worship.

6. For example, last summer, agents seized a man in front of a church near Los Angeles and brandished a rifle at a pastor in the process; detained a grandfather in the same city who was dropping his granddaughter off at a church school; arrested a man outside a church in Oregon; and carried out arrests on two Catholic parish properties in Montclair and Highland, California.

7. As a result, people across the country, regardless of immigration status, reasonably fear attending houses of worship. Churches have seen both attendance and financial giving plummet. Congregations have gone underground to protect their parishioners, eschewing in-person meetings central to their faith. Baptisms that previously would have been occasions for communal worship and celebration are now being held in private. Families are making hard choices about which parent gets to practice their religion communally and which stays home, so that their children have at least one caregiver should the other be detained at Sunday service. Churches have quietly stopped advertising immigrant-focused ministries and have canceled programming that served immigrant populations who are now too fearful to attend. Congregations whose faith compels them to worship with open doors and open arms have suddenly had to lock those doors and train their staff on how to respond to immigration raids. In many places of faith across the United States, the open joy and spiritual restoration of communal worship has been replaced by isolation, concealment, and fear.

8. For Plaintiffs and their members, the present threat of surveillance, interrogation, or arrest at their houses of worship means, among other things, fewer congregants participating in communal worship; a diminished ability to provide or participate in religious ministries; and

interference with their ability to fulfill their religious mandates, including their obligations to welcome all comers to worship and not to put any person in harm's way.

9. Defendants' rescission of longstanding protections for houses of worship and other sensitive religious locations is not just harmful and un-American; it violates federal law.

10. By unjustifiably and substantially burdening Plaintiffs' religious exercise and chilling their First Amendment right of expressive association, Defendants' new policy violates the First Amendment and the Religious Freedom Restoration Act ("RFRA"). And, as an unexplained and irrational change in agency policy, it violates the Administrative Procedure Act ("APA"). It is arbitrary and capricious, contrary to constitutional right, and in excess of statutory authority.

11. The Court should hold the new policy unlawful and order appropriate preliminary and permanent relief.

## JURISDICTION AND VENUE

12. This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiffs allege violations of the First Amendment; RFRA, 42 U.S.C. § 2000bb, *et seq.*; and the APA, 5 U.S.C. § 701, *et seq.*

13. Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this district and no real property is involved in the action.

## PARTIES

14. Plaintiff **New England Synod** is a regional body of the Evangelical Lutheran Church in America ("ELCA") with territory across New England. It represents 155 congregations and 10 synodically authorized worship communities and has its main offices in Worcester, Massachusetts.

15. Plaintiff **Greater Milwaukee Synod** is a regional body of the ELCA that includes 115 congregations and other authorized worshipping communities with over 59,000 baptized members across southeast Wisconsin. Its main offices are in Milwaukee, Wisconsin.

16. Plaintiff **Southwest California Synod** is a regional body of the ELCA that includes 104 congregations across five counties in California: Kern, Los Angeles, San Luis Obispo, Santa Barbara, and Ventura. Its main offices are in Glendale, California.

17. Plaintiff **Southwestern Texas Synod** is a regional body of the ELCA that includes 113 congregations with over 26,000 worshipping members across southwest Texas. Its headquarters are in Seguin, Texas.

18. Plaintiff **Sierra Pacific Synod** is a regional body of the ELCA with territory covering Northern California and Northern Nevada. It comprises more than 170 congregations, ministries, and authorized worshipping communities; along with a camp, seminary, and a social service agency. Its main offices are in Berkeley, California.

19. Plaintiff **Metropolitan New York Synod** is a regional body of the ELCA that covers all of New York City, all of Long Island, and several counties immediately north of New York City. The Synod consists of over 170 congregations and ministry sites, 350 rostered ministers, and over 100 Synod deacons. There are nearly 64,000 baptized members, and 16,000 individuals attend weekly worship. Its main office is in New York, New York.

20. Plaintiff **Northwest Washington Synod** is a regional body of the ELCA with over 100 congregations, synod-authorized worshiping communities, and ministry sites in Washington state's Greater Puget Sound territory—reaching from the Canadian border south to Kent—and from the Cascade foothills into the Islands of the Salish Sea. Its offices are in Seattle, Washington.

21. Plaintiff **Minneapolis Area Synod** is a regional body of the ELCA consisting of 134 congregations and three synodically authorized worshipping communities located in and around Minneapolis, Minnesota. Its main office is in Minneapolis, Minnesota.

22. Plaintiff **Delaware-Maryland Synod** is a regional body of the ELCA with over 160 congregations and agencies throughout Delaware and 14 counties in Maryland, with one congregation in Pennsylvania. The Delaware-Maryland Synod has approximately 30,000 active members. Its offices are located in Catonsville, Maryland.

23. Plaintiff **Metro D.C. Synod** is a regional body of the ELCA that consists of about 25,000 baptized members within 71 faith communities located in the District of Columbia, upper Montgomery County and south to the Quantico Marine barracks, the western shore of the Chesapeake Bay to the foothills of the Blue Ridge Mountains, and Bermuda. Its main office is in Washington, D.C.

24. Plaintiff **Southeastern Synod** is a regional body of the ELCA made up of 140 congregations and new starts across Alabama, Georgia, Mississippi, and Tennessee. Its main office is in Atlanta, Georgia.

25. Plaintiff **Metropolitan Chicago Synod** is a regional body of the ELCA with 152 active congregations and nine authorized worshipping communities serving four counties in northeast Illinois. Its main offices are in Chicago, Illinois.

26. Plaintiff **Pacifica Synod** is a regional body of the ELCA with territory that includes the state of Hawaii and portions of Southern California, including the counties of Orange, San Bernadino, Riverside, San Diego, Imperial, and part of Los Angeles County. Its main office is in Santa Ana, California.

27. Plaintiff **Upstate New York Synod** is a regional body of the ELCA that extends across upstate New York north and west of Poughkeepsie and includes the territory as far west as Buffalo and as far north as Watertown. It comprises 152 member congregations, missional communities, and campus ministries, as well as 103 active rostered ministers and about 155 retired rostered ministers. Its main office is in Syracuse, New York.

28. Plaintiff **San Francisco Friends Meeting of the Religious Society of Friends** is a Quaker religious corporation located in San Francisco, California.

29. Plaintiff **Pacific Yearly Meeting of the Religious Society of Friends** is the association of the members of 34 local Quaker congregations—Monthly Meetings—in California, Nevada, Hawaii, and Mexico. It was formed in 1947 and legally incorporated as a 501(c)(3) nonprofit organization in 2004.

30. Plaintiff **North Pacific Yearly Meeting of the Religious Society of Friends** is the formal and legal association of more than 20 local Quaker congregations throughout parts of Washington, Oregon, Idaho, and Montana. It has met continuously since 1972, and is headquartered in Portland, Oregon.

31. Plaintiff **American Baptist Churches USA** is the formal and legal association of approximately 4,700 congregations across the United States. It was named American Baptist Churches USA in 1972. It is the successor of the American Baptist Convention, which was originally known as Northern Baptist Convention and traces its roots to the first Baptist association formed in 1707. Its main offices are in King of Prussia, Pennsylvania.

32. Plaintiff **Alliance of Baptists** is a partnership of approximately 5,000 individuals and roughly 155 member congregations mutually supporting one another to pursue God's justice in the world. It was founded in 1987 and has its main offices in Raleigh, North Carolina.

33. Plaintiff **District of Columbia Baptist Convention** is the formal and legal association of more than 160 churches in the District of Columbia, Maryland, Virginia, Georgia, and Florida. It was established in 1877, and its main office is in Washington, D.C.

34. Plaintiff **Metropolitan Community Churches** is the formal and legal association of approximately 90 churches throughout the United States and 27 additional churches globally. It was founded in 1968 and has its principal address in Venice, Florida.

35. Plaintiff **Southern New England Conference, United Church of Christ**, is a regional body of the United Church of Christ comprising 556 churches, 1,370 authorized ministers, and 100,000 members across Massachusetts, Connecticut, and Rhode Island. It has its main offices in Framingham, Massachusetts.

36. Defendant **Department of Homeland Security** is the federal agency responsible for enforcing United States immigration laws and policies. DHS contains component agencies, including U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP").

37. Defendant **Markwayne Mullin** is sued in his official capacity as the Secretary of the Department of Homeland Security.

## FACTUAL BACKGROUND

### *The Government's Longstanding Policy Toward "Sensitive Locations"*

38. For more than 30 years, it has been the government's policy not to conduct immigration enforcement operations in certain "sensitive locations"—also referred to as "protected areas"—such as houses of worship and other places where religious activities are taking place.

39. In 1993, the Immigration and Naturalization Service ("INS") adopted a policy "to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." Ex. 1, Memorandum from James A. Puleo, INS Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P (May 17, 1993). Under that policy, the INS required written advance notice of operations that were likely to involve such sensitive locations. *Id.* at 1. It set standards for when such operations were appropriate and required agents to consider ways to "minimize the impact on operation of the … place of worship." *Id.* at 2. And it provided that when exigent circumstances arose that did not permit prior written approval before carrying out operations at a sensitive location, "the matter must be reported immediately" up the chain of command. *Id.*

40. INS ceased to exist in 2003, when most of its functions were transferred to ICE, USCIS, and CBP. In 2008, ICE reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies," directing ICE personnel to "refrain from conducting enforcement actions or investigative activities" at such locations "except in limited circumstances." Ex. 2, Memorandum from Julie L. Myers, Assistant Secretary, ICE, "Field Guidance on Enforcement Actions or Investigative Activities at or Near Sensitive Community Locations" 10029.1 (Jul. 3, 2008). "Precedent for this approach is clear," the agency noted, citing the 1993 INS policy. *Id.* The memo outlined the extreme situations that might merit enforcement at or near sensitive locations, including "terrorism-related investigations" or "matters of public safety." *Id.*

41. In 2011, ICE adopted further guidance designed to ensure that enforcement actions neither occurred at nor were focused on sensitive locations absent either exigent circumstances

(such as terrorism, imminent risk of death, or pursuit of a dangerous felon) or prior written approval. Ex. 3, Memorandum from John Morton, Director, ICE, "Enforcement Actions at or Focused on Sensitive Locations" 10029.2 (Oct. 24, 2011). Where "extraordinary circumstances" compelled enforcement action at or near a sensitive location, agents were required to "conduct themselves as discre[et]ly as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location." *Id.* at 3.

42. In 2021, DHS Secretary Alejandro Mayorkas rescinded and superseded the prior memos while reaffirming the government's historic policy of avoiding enforcement at sensitive locations. *See* Ex. 4, Memorandum from Alejandro N. Mayorkas, Secretary, DHS, to Tae D. Johnson, et al., "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021) ("Mayorkas Memo").

43. The Mayorkas Memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." *Id*. at 2. The memo recognized that enforcement actions in or around sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id*. at 3.

44. The Mayorkas Memo thus announced that DHS had an "obligation to refrain, *to the fullest extent possible*, from conducting a law enforcement action in or near a protected area." *Id*. (emphasis added). And it explained that the "enforcement actions" covered by the policy "include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at 4.

45. The Mayorkas Memo recognized that certain exigent circumstances might require enforcement in or near a sensitive location. Outside of those circumstances, however, it dictated that "an Agent or Officer must seek prior approval" before proceeding. *Id.* And because the Mayorkas Memo applied to all DHS personnel, not just line-level agents, any official asked to provide prior approval of an enforcement action at a sensitive location would themselves be bound by the rule that such actions were to be avoided "to the fullest extent possible." *Id.* at 3.

46. Consistent with that direction, ICE's website formerly emphasized that "[a]bsent exigent circumstances, DHS officers and agents must seek prior approval" before taking enforcement actions at protected areas. Ex. 5, ICE, Protected Areas Enforcement Actions (accessed Jan. 27, 2025) (emphasis added). And it explained that individuals who believe DHS officers violated the sensitive locations policy should file complaints with ICE, CBP, the Office of the Inspector General, or the DHS Office for Civil Rights and Civil Liberties. *Id.* at 3.

***The Current Administration Abandons Protections for Sensitive Locations***

47. In January 2025, DHS broke with decades of prior practice and removed the guardrails that had long protected houses of worship and other sensitive locations.

48. In a short memo from then-Acting Secretary Benjamine Huffman, DHS rescinded the Mayorkas Memo and its protections for sensitive locations, effective immediately. Ex. 6, Memorandum from Benjamine C. Huffman, Acting Secretary, DHS, to Caleb Vitello, et al., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Huffman Memo").

49. The Huffman Memo jettisons the former rule that enforcement at sensitive locations should be avoided "to the fullest extent possible." It contains no replacement constraints on agents' authority. It does not require any internal process before agents may carry out enforcement at these locations. And it does not require that exigent circumstances exist before agents enter sensitive

locations, let alone define what exigent circumstances could justify such operations. Instead, the Huffman Memo leaves these decisions to individual agents' "enforcement discretion" and "common sense," specifically disavowing the need for "bright line rules" to cabin that discretion. *Id.*

50. Although DHS undid more than 30 years of policy, it did not explain why the previous policy had failed. It did not address how people may have come to rely on the policy. It did not address any of the harms it was likely to cause. And it did not outline any alternatives that the agency considered.

51. In a press release issued the next day, DHS stated of its new policy:

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders [*sic*] and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

Ex. 7, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025).

52. Following the Huffman Memo, then-Acting ICE Director Caleb Vitello issued further instructions to staff. Ex. 8, Memorandum from Caleb Vitello, Acting Director, ICE, to Russell Hott, et al., "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025) ("Vitello Memo" and, together with the Huffman Memo, the "2025 Policy"). The Vitello Memo applies to ICE personnel but not to CBP personnel. It states in relevant part:

> I have great faith in the judgment of our law enforcement personnel and, accordingly, charge Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area. AFODs and ASACs may provide authorization for such actions either verbally or in writing. Before authorizing an immigration enforcement action at a site where a public demonstration is underway,

> AFODs and ASACs must consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations.

*Id.* at 2.

53. ICE agents told Fox News when the new policy was announced that they expected it would "free them up to go after more illegal immigrants, because illegal immigrants have until now been able to hide near schools and churches and avoid arrest." Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://perma.cc/KSC2-MAUR.

***Implementation of the Administration's New Policy***

54. From the start, the new DHS policy and its abrupt abandonment of decades of protections for sensitive locations "sow[ed] fear within . . . migrant-friendly congregations," and faith leaders reported almost immediately that it has caused many immigrants to fear attending houses of worship. Giovanna Dell'Orto, Luis Andres Henao & Deepa Bharath, *Trump won't ban immigration arrests at churches. Now clergy are weighing how to resist*, Associated Press (Jan. 23, 2025), https://perma.cc/C8GW-R586.

55. Shortly after it issued, three of the largest Catholic organizations in the United States—the U.S. Conference of Catholic Bishops, the Catholic Health Association of the United States, and Catholic Charities USA—stated that, "[w]ith the mere rescission of the protected areas guidance," they were "already witnessing reticence among immigrants to engage in daily life, including . . . attending religious services." *Human Dignity is Not Dependent on a Person's Citizenship or Immigration Status*, U.S. Conf. of Cath. Bishops (Jan. 23, 2025), https://perma.cc/QP2N-77S6.

56. The National Association of Evangelicals stated similarly that "[e]ven the announcement of this policy has caused fear, deterring some from attending church." Press

Release, Nat'l Ass'n of Evangelicals, *National Association of Evangelicals Responds to New Executive Orders* (Jan. 22, 2025), https://perma.cc/77UB-H7N3.

57. These fears were quickly borne out. On January 26, 2025, for example, the first Sunday following announcement of the 2025 Policy, ICE agents came to Fuente de Vida Church in Tucker, Georgia, while a worship service was ongoing, and arrested the congregant they sought—a father of three whose GPS ankle monitor began alarming mid-service—after he exited the church. Billal Rahman, *ICE Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025), https://perma.cc/7EJP-Q33G.

58. The same day, in Washington State, federal agents in unmarked pickups and SUVs surrounded a family in their church parking lot as they were leaving Sunday services. Gustavo Sagrero Álvarez, *Washington family torn apart after father arrested outside of church and deported*, NPR (Mar. 6, 2025), https://perma.cc/L638-43VG. Men in bulletproof vests pulled the father out of his car and arrested him in front of his family and the church pastor. *Id.*; Gustavo Sagrero, *A high schooler stays back as his family, separated by deportation, returns to Guatemala*, NPR (Apr. 26, 2025), https://perma.cc/9T5J-B52T.

59. These incidents continued over subsequent months, further stoking fear. *See, e.g.*, Myles Harris, *'Wrong on every level' Faith leaders lambast recent ICE operation at Charlotte church during preschool pickup*, WCNC (May 28, 2025), https://perma.cc/NS4W-YBNJ (reporting on an operation by armed ICE agents carried out during preschool pick-up time at a church in Charlotte, North Carolina).

60. By summer 2025, the pace and aggression of immigration enforcement activities at houses of worship appeared to have increased substantially.

61. In June 2025, a group of armed, masked federal agents arrested a man outside a church in Downey, California, a predominately Latino suburb of Los Angeles. Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (Jun. 11, 2025), https://perma.cc/M3MQ-KZRF. After a pastor told the masked agents they were on church property, one of them reportedly responded, "The whole country is our property." *Id*. After another pastor shouted instructions to the man being arrested, an agent pointed his rifle at her. *Id.*

62. That same day in Downey, federal agents stopped a man on the sidewalk in front of Our Lady of Perpetual Help as he was dropping his granddaughter off at the church's school. Karla Rendon, *Immigration raids reported near Downey churches*, NBC News (Jun. 11, 2025), https://perma.cc/W4DV-QPWW. Parishioners at churches in the area told reporters they were concerned that the same could happen elsewhere, and some churches began offering online streaming options for those who were worried about attending in-person service. Mónica De Anda, *Fear looms among immigrant community over church gatherings after ICE raid*, ABC News (Jun. 15, 2025), https://abc7.com/videoClip/16757306/.

63. Fears have grown to the point that church leadership have given the faithful permission not to attend services if they face a risk of immigration enforcement. During an immigration enforcement sweep in Nashville, Tennessee, the Diocese of Nashville issued a message telling worshippers they are not required to attend Sunday Mass if they fear for their well-being; the diocese reported that Sunday Mass attendance at its two major Spanish-speaking parishes was down about 50%. Gina Christian, *Amid immigration raids, Nashville diocese tells Catholics they don't have to attend Sunday Mass if safety is at risk*, America (May 15, 2025), https://perma.cc/Z8RS-NPEY.

64. In July 2025, the Catholic Bishop of the San Bernadino Diocese was compelled to issue a similar statement, indefinitely lifting the obligation to attend Sunday mass for those "who, due to genuine fear of immigration enforcement actions, are unable to attend." Diocese of San Bernardino, *Decree Dispensing from the Obligation to Attend Sunday Mass* (Jul. 8, 2025), https://perma.cc/7ZSC-WCTH. The diocese reported that "attendance at Spanish-language Masses across its parishes had dropped by at least half." Claire Moses and Orlando Mayorquín, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (Jul. 10, 2025), https://perma.cc/8P2D-8866.

65. In Chelsea, Massachusetts, some congregants are splitting their families up when attending church, because they are fearful that an ICE raid would leave their children parentless. Kristina Rex, *Some Massachusetts schools see spike in absences amid immigration fears*, CBS News (Feb. 13, 2025), https://perma.cc/Z88D-7T2A (reporting that some families are no longer attending church together so that only one parent would be deported in the event of an ICE raid at church).

66. These fears are well-supported. In response to criticism of DHS's tactics in Los Angeles, then-Border Patrol Chief Gregory Bovino told reporters, "Better get used to us now, [']cause this is going to be normal very soon." He added: "We will go anywhere, anytime we want in Los Angeles." Kelli Johnson, *ICE in LA: Mayor Bass confronts federal agents in MacArthur Park, demands withdrawal*, Fox 11 Los Angeles (Jul. 7, 2025), https://perma.cc/9GYV-UY85.

67. DHS has applied that "go anywhere" policy well beyond Los Angeles. It seized a man last summer outside St. Michael's Episcopal Church in Oregon, taking him into ICE custody. Celine Stevens, *Vineyard business owner detained by ICE outside Oregon church amid heightened immigration enforcement*, KGW9 (Jun. 15, 2025), https://perma.cc/F8Z6-PY2E. Immediately

following that arrest, attendance at the church's Spanish-language service dropped from the typical 40-50 people to just 12 adults and no children. *Id.*

68. In June 2025, ICE agents entered two Catholic parish properties in Montclair and Highland, California, detaining multiple people in the parking lot of St. Adelaide Church and arresting a man at Our Lady of Lourdes Church. Alexandra Crosnoe, *After Reports of ICE at Catholic Churches, California Bishop Denounces Raids*, Mercury News (June 25, 2025) https://perma.cc/G3P2-APWR.

69. The fears created by Defendants' new policy and the resulting wave of immigration enforcement at houses of worship extend far beyond people without lawful immigration status.

70. Ample data shows that "[f]ears of detention and deportation are a concern for immigrants across immigration statuses." Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The 2023/KFF LA Times Survey of Immigrants*, KFF (Sep. 17, 2023), https://perma.cc/UHB7-A7VN. A 2023 study described as "the largest and most representative survey of immigrants living in the U.S. to date" found that 26% of all immigrants, regardless of their own legal status, "worry they or a family member could be detained or deported." *Id.*

71. That finding echoed previous research showing that even those with legal status fear immigration enforcement because they are "fearful for their family members or because their own 'status' might be questioned." Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73(4) Soc. Sci. & Med. 586 (2011), https://perma.cc/DRW9-SB2A.

72. Such fears are reasonable, particularly given how often ICE operations sweep up citizens or others with legal status. In 2021, the Government Accountability Office reported that ICE "arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015

through the second quarter of fiscal year 2020." Ex. 9, U.S. Gov't Accountability Office, GAO-21-487, *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations* (2021).

73. Similar mistakes are becoming increasingly common as Defendants rush to meet arrest quotas.

74. In January 2025, ICE agents conducting a warrantless raid in New Jersey detained a U.S. military veteran. *Mayor Ras. J. Baraka's Statement on ICE Raid on Newark Business Establishment*, City of Newark (Jan. 23, 2025), https://perma.cc/H7QX-82G6. ICE arrested and detained a Florida-born U.S. citizen, claiming his REAL ID was fake, while he was working at his construction job in Alabama. Naomi LaChance, *Trump's ICE Detains U.S. Citizen, Claiming His REAL ID Was Fake*, Rolling Stone (May 24, 2025), https://perma.cc/NA6B-6F9M. A U.S.-born citizen was detained at the request of immigration authorities, and, despite demonstrating that he was a citizen, was released only after his case gained widespread media attention. Gisela Salamon, *A US citizen was held for pickup by ICE even after proving he was born in the country*, AP (Apr. 19, 2025), https://perma.cc/T7H9-5Y89. And, infamously, the administration rendered a man living in Maryland to a hellish Salvadoran super-prison by mistake—then fought efforts to secure his return. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).

75. Indeed, a judge of the U.S. District Court for the Central District of California determined, on review of a "mountain of evidence presented," that defendants in that case—federal immigration enforcement authorities, including former Secretary of DHS Kristi Noem—were responsible for carrying out detentive stops in Los Angeles without reasonable suspicion and based solely on race, accents, presence at a particular location, and profession. Order Granting Plaintiffs' *Ex Parte* Applications for Temporary Restraining Order and Order to Show Cause Regarding

Preliminary Injunction, *Vasquez-Perdomo v. Noem*, No. 2:25-cv-05605, ECF No. 87 (C.D. Cal. July 11, 2025).

76. The administration has indicated that it will only continue to escalate its efforts. President Trump directed ICE agents "to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History" and stated that "we must expand efforts to detain and deport Illegal Aliens in America's largest Cities, such as Los Angeles, Chicago, and New York." Donald J. Trump, "*Our Nation's ICE Officers have shown incredible strength, determination, and courage as they facilitate a very important mission, the largest Mass Deportation Operation of Illegal Aliens in History …*" Truth Social (Jun. 15, 2025, 8:43 PM), https://perma.cc/LP22-CR95. This escalation extends to this District. During a Massachusetts immigration sweep dubbed "Operation Patriot," immigration authorities arrested more than 1,500 people across the state; a Milford resident described ICE "pounding on the back door" of Catholic Charities Worcester County during a food distribution drive. Isabela Dias, *How ICE's Arrest of a High School Student Activated a Massachusetts Town*, Mother Jones (Jul. 15, 2025), https://perma.cc/GUR9-FE29.

77. Defendants now have more resources than ever with which to conduct immigration enforcement: Last year, Congress appropriated more than $6 billion dollars for hiring additional CBP personnel and almost $30 billion that can be used for hiring ICE agents. H.R. 1, 119th Cong. §§ 90002, 100052 (2025). The nearly $30 billion in additional funding for ICE is comparable to the annual military budgets of Italy, Israel, and the Netherlands. Brendan Cole & John Feng, *ICE Budget Now Bigger Than Most of the World's Militaries*, Newsweek (Jul. 2, 2025), https://perma.cc/7VKM-979H.

***Plaintiffs' Religious Beliefs and Their Connections to Immigrant Communities***

**New England Synod, ELCA; Greater Milwaukee Synod, ELCA; Southwest California Synod, ELCA; Southwestern Texas Synod, ELCA; Sierra Pacific Synod, ELCA; Metropolitan New York Synod, ELCA; Northwest Washington Synod, ELCA; Minneapolis Area Synod, ELCA; Delaware-Maryland Synod, ELCA; Metro D.C. Synod, ELCA; Southeastern Synod, ELCA; Metropolitan Chicago Synod, ELCA; Pacifica Synod, ELCA; and Upstate New York Synod, ELCA**

78. The New England Synod, Greater Milwaukee Synod, Southwest California Synod, Southwestern Texas Synod, Sierra Pacific Synod, Metropolitan New York Synod, Northwest Washington Synod, Minneapolis Area Synod, Delaware-Maryland Synod, Metro D.C. Synod, Southeastern Synod, Metropolitan Chicago Synod, Pacifica Synod, and Upstate New York Synod (collectively, "the Synods") are regional bodies of the ELCA with shared religious commitments to welcoming all who wish to worship and seeking to protect the most vulnerable.

79. The New England Synod includes 165 congregations and authorized worship communities across Massachusetts, Maine, Rhode Island, Connecticut, New Hampshire, Vermont, and a small part of eastern New York. It contains congregations that serve sizable immigrant populations from across the world, including the Dominican Republic, Liberia, China, and Central and South America. These congregations include people both with and without documented legal status.

80. The Greater Milwaukee Synod includes 115 congregations and other authorized worshipping communities in the greater Milwaukee area. It contains churches with significant Latino memberships, including congregants from El Salvador, Colombia, Venezuela, Guatemala, and Honduras. Some of these congregants have documented status; some do not.

81. The Southwest California Synod includes 104 congregations in the Southwest region of California. Its territory spans Los Angeles, Kern, Ventura, Santa Barbara and San Luis

Obispo counties. It contains churches with significant immigrant membership, including congregants with legal status and without.

82. The Southwestern Texas Synod consists of 113 congregations in Southwestern Texas. Its territory stretches east from the U.S.-Mexico border and includes Austin, San Antonio, and Corpus Christi. It shares the longest border with Mexico of any synod in the ELCA.

83. The Sierra Pacific Synod includes more than 170 congregations, ministries, and authorized worshipping communities across Northern California and Northern Nevada. It includes churches with significant memberships from a variety of different immigrant communities, including from the Americas, Asia, and Africa.

84. The Metropolitan New York Synod includes over 170 congregations and ministry sites, 350 rostered ministers, and over 100 Synod deacons. The Synod has nearly 64,000 baptized members and 16,000 individuals attend weekly worship. The Synod includes a diverse membership, including a large number of immigrants who are active in the Synod. These immigrants come from all over the world, and particularly Latin and Central America, Mexico, Guatemala, and certain other countries in Asia, Africa, and the Middle East. This diversity is especially evident in the strong presence of Hispanic/Latino congregations across the denomination (indeed, the Latino community is the fastest growing ethnic community within the ELCA). The Metropolitan New York Synod's commitment to helping immigrants is so central to their religious beliefs that they have pastors who focus on immigrant-specific work and ministry.

85. The Northwest Washington Synod is comprised of over 100 faith communities, including 90 congregations, 9 synod authorized worshipping communities (SAWCs), and three synod authorized outreach communities (SAOMs). There is also one camp and two campus ministry sites. Nine of these faith communities are primarily immigrant congregations who

worship in a language other than English. Four of the congregations, while not primarily immigrant, have a significant number of immigrants attending. In total, the Northwest Washington Synod has approximately 10,000 members in their faith communities. Many of these congregations are immigrant churches or have significant immigrant membership/participation, with diverse populations of children and families from all over the world.

86. The Minneapolis Area Synod is made up of 142,000 baptized members within 134 congregations and three synodically authorized worshipping communities located in and around Minneapolis, Minnesota. The Synod has nearly 700 pastors and deacons, with more than 300 actively serving in congregations and specialized settings such as hospitals. Congregations in this Synod worship in eleven languages, including English, Spanish, Hmong, Oromo, Swahili, Norwegian, and ASL.

87. The Delaware-Maryland Synod includes over 160 congregations and agencies throughout Delaware and 14 counties in Maryland, with one congregation in Pennsylvania. Rooted in Jesus's ministry of liberation, unconditional love, and hospitality, the Delaware-Maryland Synod strives to welcome all into fully inclusive community, including those who have traditionally been marginalized due to their citizenship/documentation status.

88. The Metro D.C. Synod is made up of about 25,000 baptized members within 71 faith communities located in the District of Columbia, upper Montgomery County and south to the Quantico Marine barracks, the western shore of the Chesapeake Bay to the foothills of the Blue Ridge Mountains, and Bermuda. Its members worship every week in English, Spanish, Norwegian, Slovak, Amharic, German, and Swahili.

89. The Southeastern Synod is made up of 140 congregations and new starts across Alabama, Georgia, Mississippi, and Tennessee.

90. The Metropolitan Chicago Synod consists of 152 active congregations and nine synod authorized worshipping communities in four counties across northeast Illinois. The Metropolitan Chicago Synod has eight conferences with nearly 60,000 baptized members. It has thriving African Descent, Asian, and Latino ministries, who the Metropolitan Chicago Synod seeks to support and enable to connect and gather, and to carry out God's work in their communities.

91. The Pacifica Synod covers territory that includes the state of Hawaii and portions of Southern California, including the counties of Orange, San Bernadino, Riverside, San Diego, Imperial, and part of Los Angeles County. It is made up of 99 congregations and over 20,000 baptized members.

92. The Upstate New York Synod comprises 152 member congregations, missional communities, and campus ministries. These missional communities often serve specific ethnic populations and are often predominated by immigrants, asylum seekers, and new Americans. For example, the Synod is currently planting a community aimed at serving a Middle Eastern community, led by clergy who are Middle Eastern themselves.

93. Synod members believe that Jesus's command to love God and one's neighbors must guide their actions as they build and nurture just and welcoming communities. The scriptural mandate in Matthew 25—"I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink, I was a stranger and you invited me in . . ."—is essential to who they are as followers of Christ.

94. Reflecting that belief, in 2019 the ELCA Churchwide Assembly adopted a resolution declaring the ELCA a sanctuary church body. That resolution affirmed the Synods' and the broader ELCA's religiously-rooted commitment to support and protect immigrants, refugees, and asylum-seekers through actions such as offering physical sanctuary to individuals seeking

refuge, advocating for changes in the country's immigration laws and policies, and welcoming all to join in religious worship.

95. Synod members welcome all people at all times, especially for worship on Sunday morning. They believe that every person is created in the image and likeness of God. They value people from all walks of life and the diversity of people and consider it an experience of the fullness of the body of Christ when they are able to come together. They commune with the Holy Trinity through their sacraments, which they participate in collectively.

96. Congregations also practice their faith through public works such as, for example, providing housing to migrants and asylum seekers, providing food and support services to people in need, assisting in refugee resettlement, and providing English-as-second-language classes. That these activities may take place outside of Sunday worship services makes them no less an expression of the members' religious faith. Restricting the idea of "religious exercise" to formal sacraments like the Eucharist is inconsistent with their faith as Lutherans who believe that loving one's neighbor has to be something they do in practice.

**San Francisco Friends Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting**

97. Plaintiffs San Francisco Friends Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting and are regional associations of Quakers—members of the Religious Society of Friends, a religious movement dating to the seventeenth century.

98. While Quakers have no formal hierarchy, they are generally organized into Yearly Meetings, Quarterly Meetings, and Monthly Meetings. A "meeting" is an association, a gathering held to do business at a certain interval (*i.e.*, yearly, quarterly, or monthly), and a way of describing Quakers within a certain region.

99. Monthly Meetings are the basic organizational unit in the Quaker religion. They are local congregations that hold weekly worship services and, once a month, hold a meeting for worship with attention to business.

100. Quaker religious practice is rooted in the belief that anyone can hear the voice of God, and there is part of God in every person.

101. Different life experiences, backgrounds, and cultures lead people to hear and experience God differently. Having a diversity and richness of human experience yields a fuller understanding of how God speaks to the Quakers, individually and as a community.

102. Quaker worship generally consists of Spirit-led waiting—gathering in silence and waiting to hear the voice of God. There is no clergy leading worship; rather, anyone who feels called upon by the Spirit/God to speak may do so. Everyone who attends worship meetings is participating in worship, whether they speak or not.

103. This communal aspect of worship—of gathering as a body to experience spiritual connectedness with the Spirit/God through one another—is central to the exercise of the Quaker faith.

104. Likewise, welcoming and worshipping with all comers, including by opening meetings to anyone who desires to attend, is an important aspect of the Quaker faith because every individual who attends presents an opportunity for God to speak to worshippers through them.

105. Pacifism is deeply ingrained in the Quaker faith. The Friends have a religious commitment to oppose violence in all forms. The presence of arms in or around their meeting houses would violate this founding principle of their faith. Knowingly putting a person in harm's way or risking their involvement in a violent encounter likewise violates Quaker religious beliefs.

106. Quakers practice their faith and live their core testimonies—including community, equality, and stewardship—by carrying out Spirit-led ministries and services in their communities.

107. Given the Quaker values of welcoming strangers, worshipping with all-comers from diverse backgrounds, community, and service, many Quaker meetings, including Plaintiffs, have built deep and meaningful connections to immigrant communities.

108. Plaintiffs Pacific Yearly Meeting and North Pacific Yearly Meeting and their constituent Monthly Meetings, including Plaintiff San Francisco Friends Meeting, have members and attenders who are immigrants from around the world. Both Pacific Yearly Meeting and North Pacific Yearly Meeting have special ties to Friends in Latin America who join their in-person annual sessions.

109. Many of their Monthly Meetings carry out ministries that serve immigrants in their communities. These ministries include: welcoming immigrants into their meeting house for food, shelter, and other services; hosting other organizations that serve immigrant communities; and providing financial and other support for immigrants going through legal proceedings.

**American Baptist Churches USA**

110. Plaintiff American Baptist Churches USA, so named in 1972, is the successor of the American Baptist Convention and traces its roots to the first Baptist association formed in 1707. Transforming communities, engaging in hands-on ministry, speaking the prophetic Word of Christ in love, and nurturing authentic relations are primary tenets of their ministry.

111. American Baptist Churches USA represents approximately 4,700 congregations and 1.3 million members across the country, participating in shared mission and ministry. At the core of who American Baptists are, there is a commitment to the Baptist freedoms—soul, church, religious and biblical freedom. As reflected in their mission statement, American Baptist churches

are missional congregations that nurture devoted disciples of Jesus Christ who live their lives in mission and ministry for the healing of the world through the love of God.

112. Since educating freedmen after the Civil War, social outreach and justice have been a core aspect of the tradition of American Baptists and their commitment to promote holistic and healing change.

113. The American Baptists are one of the most ethnically diverse bodies of Protestants. American Baptist Churches USA includes a vibrant number of congregations representing diverse backgrounds, including Hispanic congregations (e.g., Puerto Rican, Mexican, Dominican, Central and South American), Haitian congregations, African congregations (e.g., Somalian, Congolese), as well as congregations made up of refugees from Burma (e.g., Chin, Kachin, Karen). Many of these churches are bilingual or Spanish-speaking, or speak languages other than English, and are actively engaged in ministries of evangelism, community development, worship, and social justice.

114. Support and ministry to immigrants and refugees is among the pillars of the American Baptist Churches USA faith. Through its regions and local congregations, American Baptist Churches USA offers immigration- and refugee-related resources to its member churches, including providing training opportunities and information about changes in immigration law and policy.

115. American Baptist Churches USA believes that serving and ministering to immigrants, refugees, and asylum seekers is a biblical and moral responsibility. Rooted in Scripture's call to love one's neighbors, show hospitality, and seek justice, the denomination affirms the dignity and rights of all people regardless of immigration status. American Baptists have a long history of advocacy, direct service, and resettlement work in support of immigrant communities.

116. Serving and ministering to immigrant communities is a core tenet of American Baptists' faith because it reflects the biblical call to love one's neighbors, practice hospitality, seek justice, and care for the vulnerable. Rooted in the teachings of Christ, American Baptists believe that all people are made in the image of God and deserve dignity, compassion, and support. American Baptist Churches USA's longstanding commitment to immigrants and refugees is an expression of their faith in action—offering holistic ministry, advocating for just policies, and partnering in resettlement efforts as they welcome the stranger and serve those in need.

**Alliance of Baptists**

117. Plaintiff Alliance of Baptists is a group of progressive Baptists and Christians committed to enacting God's love and justice in the world.

118. As affirmed in its organizational Covenant, the Alliance of Baptists is dedicated to welcoming "all persons with full respect to gender, sexual, racial, and ethnic identities" and "hold[ing] space for all persons with varying abilities, social standing, or economic status."

119. Guided by the teachings of the Bible, the Alliance of Baptists believe they are called to welcome, clothe, and feed foreigners and immigrants as their neighbors, regardless of their legal status. As Baptists, they have a fundamental obligation to lead with love, show mercy, and walk humbly with God. To the Alliance of Baptists, this means that they must show kindness and compassion to their immigrant neighbors, regardless of their immigration status.

120. The Alliance of Baptists considers immigrants to be members of their community that they must love as they love themselves. Its members believe that the Bible makes their call to welcome and support immigrants very clear, from the Parable of the Good Samaritan in Luke 10:25-37 to Leviticus 19:34, which teaches Baptists to treat the whole world as their neighbors.

121. The Alliance of Baptists' member churches have publicly proclaimed their support for immigrants and their belief that immigrants should be safe from governmental action in houses of worship. The Alliance of Baptists has also funded ministry and congregational partners who work closely with immigrant populations to assist them in providing food, legal aid, and other social services.

122. The Alliance of Baptists has a demonstrated commitment—rooted in its faith and religious practice—to social justice and healing, including with respect to race, immigration, and refugees. In 1990, for example, the Alliance of Baptists offered the first public apology from any Baptist organization in the South for the sins of slavery.

**District of Columbia Baptist Convention**

123. Plaintiff District of Columbia Baptist Convention ("DCBC") is a diverse network of more than 160 Baptist churches and ministry organizations across the Washington D.C. metropolitan region, Georgia, and Florida. It was established in 1877 and has a long history of addressing spiritual and social concerns in their communities, our nation, and around the world. Together, DCBC churches represent 41,394 individuals from a wide range of ethnic, cultural, and national backgrounds. DCBC's motto is: "One Faith. Many Cultures. Endless Possibilities." For DCBC, this is more than a slogan. It defines who they are. They are united by their faith in Jesus Christ, enriched by the many cultures within their fellowship, and committed to creating opportunities for ministry, service, and transformation wherever God calls them.

124. DCBC's commitment to immigrant and refugee communities is not a recent development. It is woven into their history, their ministry, and their understanding of the Gospel. Since its founding, DCBC has sought to strengthen churches, serve communities, and respond to human needs wherever they exist. Caring for immigrants, refugees, and displaced persons is a

natural expression of DCBC's mission to equip leaders, empower congregations, and engage communities.

125. DCBC's involvement with immigrant communities dates back decades. Following the Vietnam War, DCBC helped organize efforts to assist refugees from Southeast Asia as they resettled in the United States. Working alongside Baptist partners and community organizations, they helped establish the Indo-Chinese Community Center in Washington, D.C., which provided immigration assistance, English-language instruction, and settlement support for newly arriving refugees. The center was housed in the Baptist Building and served immigrant families for many years as they sought to establish new lives in the United States.

126. DCBC also helped foster relationships and initiatives that eventually grew into organizations serving immigrant communities throughout the Washington metropolitan region. What began as ministry to Southeast Asian refugees expanded over time to include support for Haitian, Ethiopian, Afghan, African, Latino, and other immigrant communities.

127. For more than thirty-five years, DCBC has demonstrated its commitment by providing affordable office space within their building for organizations serving immigrant populations; consistently seeking to use its facilities, resources, relationships, and influence to help individuals and families who are seeking safety, opportunity, and stability.

128. One of the clearest examples of this commitment is DCBC's ethnic and cultural workgroups. These groups are composed of leaders and members from their churches who represent a variety of immigrant and diasporic communities. They serve as listening posts that help DCBC understand the unique challenges these communities face in their countries of origin and here in the United States.

129. Through these workgroups, DCBC remains informed about humanitarian crises, political instability, religious persecution, displacement, and other issues affecting the communities its members serve. These relationships allow them to respond in meaningful and practical ways. By partnering with member churches, community organizations, medical providers, and national ministry partners, DCBC has helped provide medicine, humanitarian assistance, educational resources, volunteers, and financial support for vulnerable populations. When crises arise overseas or immigrant families face hardships locally, DCBC's churches regularly respond with generosity, prayer, volunteer support, and financial assistance.

**Metropolitan Community Churches**

130. Plaintiff Metropolitan Community Churches ("MCC") was founded by Rev. Troy Perry in 1968 in Los Angeles. It is a Christian denomination with approximately 90 member churches in the United States.

131. Since the start, MCC has had a particular focus on welcoming LGBTQ+ individuals, and many of its members and clergy identify as LGBTQ+. It was the first religious organization to bless same-sex marriages beginning in 1969.

132. One of MCC's core religious beliefs is that love is the greatest moral value, and resisting exclusion is a primary focus of MCC's ministry. MCC believes that everyone is included in the family of God and that all parts of people's being are welcomed at God's table. Indeed, while the structure of worship is generally not prescribed, all member churches are required to use inclusive language in their services and to maintain an "open table," that is, to welcome all comers to communion, regardless of their religious tradition. MCC has always been and will continue to be welcoming towards immigrants, without regard to immigration status.

133. MCC's members believe that they are required to make a "house of prayer for all the peoples," as God commands in Isaiah 56:7. Communal worship in a welcoming and inclusive space is central to their faith.

134. MCC's members further believe, in accordance with Matthew 25:36-40, that when they care for those at the margins—the poor, the sick, the stranger, the prisoner—they serve God. Accordingly, they practice their faith through social justice ministries, including those that serve immigrant communities. MCC believes in the "priesthood of all believers," meaning that every single person is gifted and called by God to serve. Members become involved in the church's ministry as part of their own spiritual growth.

**Southern New England Conference, UCC**

135. The Southern New England Conference is made up of 556 churches, 1,370 authorized ministers, and 100,000 members across Massachusetts, Connecticut, and Rhode Island.

136. The Conference was founded under a united covenant to live the love and justice of Jesus. Under that covenant, members are committed to making God's love and justice real by loving their neighbors through collective work and by welcoming all people unconditionally. Members could not express their faith without including those who are marginalized or pushed away in society, including immigrants.

137. As part of that commitment, many member churches take steps such as hosting asylum seekers, operating food pantries that serve significant numbers of immigrant community members, and sharing their worship spaces with other congregations made up primarily of immigrant members.

138. The Conference has undertaken significant efforts to equip and support its member churches in these and related efforts. For example, the Conference established an Immigration,

Refugee and Asylum Task Team that helps churches in taking faithful actions to support immigrants, refugees, and asylum seekers such as by hosting or sponsoring refugees. The Conference provides information and updates to help churches understand the most recent actions by the government on immigration as well as related news events. Increasingly, since January 2025, the Conference has been called on to provide advice and assistance to help churches prepare for the possibility of ICE agents carrying out raids at and near the church.

***Defendants' Policy Burdens Plaintiffs' Religious Exercise and Expressive Association***

139. Defendants' rescission of the sensitive locations policy and adoption of the 2025 Policy has substantially harmed and continues to harm the religious exercise and freedom of association of Plaintiffs and their members. Plaintiffs, whose religious beliefs mandate that they welcome immigrants without regard to immigration status, now face the risk of immigration enforcement actions at or near their places of worship—and some members have already had this happen.

**New England Synod, ELCA**

140. Congregants across the New England Synod are aware that the administration has changed the rules that once limited immigration enforcement at churches. Congregations are educating themselves and spending time, energy, and money that would otherwise be spent on religious activities to designate "public" and "private" spaces and prepare themselves and others on how to interact with ICE officers if they show up during worship.

141. Following the administration's change in policy, the Synod has seen a decrease in attendance at some of its churches, including in East Boston. The minister there also had to tell some congregants not to participate in weekly public prayer vigils out of concern that ICE could use the events to detain members.

142. Decreases in attendance have a ripple effect across the Synod's congregations, impacting those that cannot attend but also those that do attend. Those prevented from attending due to the new policy are robbed of the opportunity to fully experience fellowship with God and the other members of the congregation. The drop in attendance also has a financial impact on the congregations and on the Synod itself.

143. The Synod's social ministries have seen decreased attendance as well. One member church in Connecticut operates a food pantry as part of their religious mission. It has seen a steady and sustained reduction in the number of families who come to their Sunday meal program, as people in need are now too afraid to come to the church even for food and sustenance.

144. Operating food pantries is an expression of Synod members' Lutheran Christian faith, as much as praying or gathering on Sundays. The act of feeding the hungry is a direct response to Jesus's teachings, and caring for and feeding neighbors is part of the process of directly serving Jesus.

145. For those who stay home as well as those who come to church to attend worship or to provide or receive vital services, Defendants' change in policy has created deep fear and anxiety. It has caused congregations to wonder if outreach ministries to their community, and loving and serving their neighbors in need, puts them on the radar for ICE enforcement.

**Greater Milwaukee Synod, ELCA**

146. The Greater Milwaukee Synod has long been active on immigration issues and works with immigration attorneys to make sure people understand their rights by holding workshops and providing informational "know your rights" cards and other materials. Congregations within the Synod are aware of the change in policy and the removal of former limits on immigration enforcement at churches and other religious spaces.

147. The fear engendered by the new policy has caused significant drops in church attendance, with one of the Synod's churches noting a staggering 50 percent drop in attendance.

148. At Ascension Lutheran Church, for example, following the arrest of a congregation member by ICE in late May, some families were too frightened to attend church service the next Sunday. When the church held a prayer vigil in support of its arrested member, it had to advise Latino members of the congregation not to attend because of fear that ICE might show up. As a result, many members were unable to come together in communal prayer and worship both at regular Sunday service and at the vigil. And even those who were able to attend were denied the chance to participate in worship and prayer with all of their co-congregants—and, in particular, with the most vulnerable of their co-congregants—as their religious beliefs compel them to do.

149. Defendants' new policy has affected other aspects of the Synod's religious mission. Many Synod churches run food pantries to fulfill their spiritual obligation to feed the hungry and care for those in need. Yet fear of ICE raids at these pantries has driven down the number of people who come to receive food, directly impairing the ability of Synod members to carry out this important group expression of their faith.

150. The policy change has even affected how Synod members can gather for baptisms, one of the most central rites of the Christian faith. Before the change, baptisms would happen at a publicly announced service with the community present. Synod members believe in the power and religious significance of having the community in attendance in order to witness and support a child's entrance into the religion. Now, following Defendants' change in policy and the concomitant increase in enforcement at churches, some families have concluded that the risk is too great and have requested private baptisms instead. Others have had baptisms in churches but have

had to do so secretly, without the opportunity to celebrate and worship with their full faith community.

151. Even where congregants and clergy can come to worship services, the fear of immigration enforcement at church has and will continue to have a chilling effect on their expressive association and religious worship. And it puts Synod members to an impossible choice, where to honor their deeply held beliefs in welcoming the stranger and opening their doors to all who would come to worship means violating their equally deeply held beliefs in caring for and ensuring the protection of the vulnerable.

**Southwest California Synod, ELCA**

152. As a result of the change in policy, the Southwest California Synod's congregations have seen declines in attendance at Sunday worship services, as well as declines in participation at social service ministries. Congregations have dedicated time and resources to protect members from immigration enforcement, including by organizing volunteers to patrol the church perimeter and screen visitors, locking gates and entrances, moving previously outdoor ministries inside, and training congregations on what to do in case of an immigration raid. Fear of and preparation for an immigration enforcement action has substantially chilled congregations' religious expression and disrupted their religious practice.

153. One congregation with significant immigrant membership from the Middle East, including from Iran, Lebanon, and Palestine, took on non-budgeted construction to seal and fortify a private space in the event that parishioners need protection from immigration enforcement.

154. Another congregation offers, as part of its ministry, a monthly diaper pantry that provides free diapers to families and primarily serves immigrants. Prior to the rescission of the sensitive locations policy, the program was run in the parking lot, but the change in policy has

forced the church to change its distribution protocols. Now, the pantry has moved indoors, and volunteers wear identifying vests that read "safe" to signal that they are a part of the program. Despite these measures, attendance has dropped precipitously, from about 300 families to around 100. Not only has the church's ability to conduct its ministry in the community been seriously impacted, babies and children in the community are losing access to a valuable resource.

155. Another church is situated close to an ICE headquarters, causing members to fear immigration enforcement at the church. The congregation has had to keep the exterior doors and gates locked to limit access to the building and programs. Locking doors and limiting access to the church goes against their religious obligation to welcome the stranger and serve their neighbors, but they have to take these measures to protect their congregants.

156. Another congregation situated in a neighborhood that experienced several ICE sweeps had to cancel its Vacation Bible School program because of the threat of an ICE raid. This program often serves 100 children aged five to twelve with religious education, social skills, and lunch programs. Both immigrant and U.S. citizen parents were not able to provide their children with religious education and formation because of the rescission of the sensitive locations policy.

157. Another migrant-serving congregation has seen an 80% decline in church attendance and a 40% decline in youth group attendance. Youth groups provide spiritual and social development for the congregation's young people; the rescission of the sensitive locations policy has deprived them of this community and opportunity for faith formation.

158. In Synod congregations, volunteers have been taken out of education programs or feeding programs to serve as observers and guards on church property. Hours that could be spent on Christian education are now being spent training congregants on what to do if ICE interrupts a

worship service or Sunday school. Churches that do not perceive themselves to be at risk of an immigration raid are sending resources to support impacted congregations.

**Southwestern Texas Synod, ELCA**

159. The unique geography of the Southwestern Texas Synod joins it with individuals and families fleeing horrible circumstances in their home countries to seek asylum and a new life in the United States. Part of its ministry is to offer welcome, safety, and belonging to their migrant neighbors on their journey, through direct service, education, and advocacy.

160. The Southwestern Texas Synod has been deeply impacted by the adoption of the 2025 Policy. Pastors have seen diminished attendance at worship services, ministries, and church-sponsored events. Daycare providers in churches focus on what they will do if ICE shows up on church grounds rather than on the joy of teaching Jesus's message to children. Members of the congregations are distracted from their worship by anxieties and fears that they or their neighbors are at risk of being arrested or deported. Food pantries operated by members of the Synod are serving fewer people as compared to 2024 because people feel vulnerable waiting in line outside for food.

161. Many congregations within the Synod host Vacation Bible Schools. Of those, three that serve predominantly Hispanic communities used to each have, on average, 20 to 25 children in attendance. This year was different. One of those congregations welcomed only four children. Another had ten, and the third, just nine. All three of these congregations have reported that this is not due to lack of interest or poor outreach—the diminished attendance is because families are now afraid. They are unwilling to step foot in a church, worried that ICE might show up. And as a result, activities that were once joyful, hopeful, and sacred opportunities for these churches to nurture the next generation are now marked by hesitation and anxiety.

162. As part of their efforts to help and welcome the immigrant community, churches within the Synod hold "Know Your Rights" presentations. One church, Iglesia Luterana San Pablo, planned such a presentation for its Spanish-speaking church community in February of 2025. The church had hosted similar events before, and always held them at the church following a worship service. This time, however, the lay leader held the presentation at her house, knowing that the church was no longer a safe space. The pastor spent the evening constantly checking the windows, making sure the curtains were closed, and felt afraid every time the doorbell rang.

163. In 2019, the Synod announced a new ministry, where the Synod would focus on ministering to migrants along the U.S.-Mexico border. From the inception of that ministry up until the adoption of the 2025 Policy, the Synod preached, advertised, and fundraised extensively for this ministry. Since the 2025 Policy was implemented, however, the Synod has stopped these activities. It no longer preaches about it, reference to the ministry was removed from the front page of its website, and there is no longer any active fundraising, for fear of making the Synod a target of immigration enforcement efforts.

**Sierra Pacific Synod, ELCA**

164. As a result of the new policy, the number of people attending church services at congregations within the Sierra Pacific Synod has declined. Congregants are now afraid to come because of visible and increased ICE activity near churches. ICE used the parking lot at one church as a base for carrying out enforcement activity, parking several large unmarked SUVs in the lot while agents donned weapons and law enforcement gear.

165. The experience of Iglesia Luterana Santa Maria Peregrina, a member congregation located in Stockton, California, exemplifies the harms suffered by Sierra Pacific churches. Santa Maria Peregrina serves a predominantly Spanish-speaking community and

includes undocumented members in its congregation. Attendance at the church dropped after the sensitive locations policy was changed and has remained depressed and unsteady ever since.

166. Congregants at other Sierra Pacific churches have expressed their fear of coming to worship given the possibility of being detained by ICE while at church. Attendance has further suffered because of the fear many mixed-status families have if one of their breadwinners is deported. That in turn has a direct impact on the ability of the churches and other worshipping communities across the Synod to carry out their outreach work and grow their congregations.

167. Attendance at church-run activities has also declined due to fears of the new policy. One church has had to stop holding its English-language classes entirely after attendance fell from 14 students to just two. Since the rescission of the sensitive locations policy, another ministry has seen a consistent drop in the number of customers and vendors coming each week to a flea market they sponsor as a way to provide low-income vendors a means to support their families. Since that change, participation is down roughly one third, meaning 40-50 fewer vendors showing up.

168. Defendants' changed policy has put significant pressure on congregations to abandon their religiously rooted commitment to welcoming all to worship services. One congregation asked their pastor to lock the church doors on Sunday for fear of governmental authorities entering the church. Santa Maria Peregrina, which used to leave its doors open during worship as a message of welcome, has had to begin closing them to reduce the risk of immigration enforcement. Others have had to prepare for a potential encounter with immigration enforcement, including adding signage to designate certain areas as "non-public."

**Metropolitan New York Synod, ELCA**

169. The government's decision to rescind its longstanding policy on immigration enforcement at churches has had a damaging effect on many congregations and Synod-authorized ministries within the Metropolitan New York Synod. Pastors have reported diminished attendance at worship services, ministries, and church-sponsored events.

170. Members of the congregations are distracted from their worship by anxieties and fears that they, or their neighbors, are at risk of being subject to enforcement actions. Many pastors report lower attendance at regular worship services because people—immigrant and non-immigrant alike—no longer feel safe to come to congregations to pray. Individuals who previously would find shelter and refuge at church no longer can do so given the chaotic policies being enacted by the government.

171. One pastor within the Synod, who ministers primarily to immigrants, has reported that while the demand and need for help has increased, this is sharply countered by the fact that many who need help are no longer comfortable receiving it, as, given the adoption of the new policy with respect to sensitive locations, going to church or church-related events, is seen as a risky move that could have permanent consequences.

172. Food pantries, food banks, shelters, and schools run by or associated with the Synod have also been affected. Some churches within the Synod are seeing a chilling effect on participation in ministries that once served as vital touchpoints for community support, such as food pantries, English as a Second Language ("ESL") classes, or counseling services. Pastors have shared reports of visible ICE presence or activity near places of worship or faith-based events, which has further discouraged engagement and fostered mistrust and fear.

173. For many of the Synod's members, immigrants and non-immigrants alike, church is no longer a safe place of refuge. Certain congregants report feeling stress and anxiety, worrying that their activities may be disrupted with arrests. At one church within the Synod in Long Island, ICE was patrolling directly around the church during a Lenten procession, making it difficult to enter, and then, once inside, making worshippers afraid to leave. At another church in New York City, ICE agents followed around individuals following a church procession. ICE previously tried to enter the church but were blocked from entering because they did not have a warrant.

174. When individuals who are new to the faith, or visiting the area, enter church, there is fear among the regular congregants that they may be working for DHS. The welcoming atmosphere has been stifled by this, creating a real conflict with their religious beliefs to welcome outsiders into the church.

**Northwest Washington Synod, ELCA**

175. Pastors within the Northwest Washington Synod have noted a significant decline in attendance at worship services and church-sponsored events including Sunday morning service, Vacation Bible School, food pantries, shelters, and other social services. Members are increasingly distracted at worship services, because they are highly concerned about themselves or others, and wonder whether ICE may enter their houses of worship to detain them or their neighbors.

176. One congregation in Bellingham, Washington has installed a controlled electronic lock-and-access system to protect its sanctuary. This congregation has also placed signage outside of the church noting that the church is private property and "off limits" to ICE/CBP without a warrant. Congregations throughout the Synod are undertaking similar additional security measures, such as discontinuing live streams and recording of worship services to prevent ICE/CBP from racially profiling attendees. The Synod offers these services to congregants that are

homebound for a variety of reasons and discontinuing these services prevents them from participating in and receiving the benefits of worship.

177. One congregation in Everett, Washington has seen a notable decrease in church participation and even cancelled a church event because of this policy change. This church was supposed to host an event for children in the community. It was ultimately cancelled because many of the parents were too afraid to come to the church.

178. The rescission of this longstanding policy threatens the very mandate to help and serve others, because those that might be served are too afraid to come. Children are afraid their parents will disappear at worship service, and the parents who are still attending services do not know if they will return from worship each Sunday.

**Minneapolis Area Synod, ELCA**

179. The rescission of the sensitive locations policy has had a damaging effect on many congregations and ministries in the Minneapolis Area Synod. Minneapolis has been the focus of intense immigration enforcement activity by federal agents, leading many to fear that churches in the area will be targeted. Many Synod churches have significant immigrant membership and are located in areas where many immigrants live; several churches have had congregants detained or deported during Operation Metro Surge.

180. Minneapolis Area Synod congregations have seen federal agents conducting enforcement at or near their places of worship. Immigration enforcement used one Synod church's parking lot as a base for patrol and surveillance for several hours before the pastor told them to leave. Immigration enforcement parked directly in front of another Synod church.

181. Churches have had to take drastic measures to protect their congregants. One congregation, Tapestry, which has significant immigrant membership and holds services in

Spanish and English went "underground" after sensitive locations protections were removed; it largely stopped advertising its services and activities, began locking the church doors on a regular basis during the week, and stopped sharing pictures and stories on social media, directly limiting the congregation's ability to conduct outreach and communicate with current and potential members. They developed a protocol in case of a raid at the church.

182. Another Synod church hired security, at significant cost, so that church members would not have to interact with federal agents when they arrive to conduct immigration enforcement. Despite these measures, some families at the church have made the choice to stop attending worship for fear of immigration enforcement.

183. Minneapolis Area Synod churches, as part of the practice of their faith, conduct ministries that welcome community members into their spaces. As people fear immigration enforcement at houses of worship, the ministries—particularly immigrant-focused ministries—have suffered.

184. At the Central Lutheran Church, prior to the rescission of the sensitive locations policy, many immigrants were consistent visitors at the church's Free Store, a ministry that provides clothing and other items for community members experiencing poverty. When it became clear that churches were no longer places that ICE would not raid, immigrants who came to the Free Store stopped coming.

185. At Tapestry, attendance at a weekly community meal has dropped by about half despite food insecurity in the community. At the height of the surge in immigration enforcement, the congregation saw attendance at a free legal clinic for immigration services that it hosts dwindle away. One couple who was supposed to get married at the church made the choice to move the wedding for fear of immigration enforcement. Tapestry has canceled its ESL classes in 2026.

**Delaware-Maryland Synod, ELCA**

186. The changes to the sensitive locations policy have had a major negative effect on the Delaware-Maryland Synod, its ministry, and the surrounding communities they serve. The neighborhoods around many of their churches have seen immigration raids, causing increased fear that has affected participation and attendance at churches within the Synod. One of their churches in Baltimore has seen regular raids in the neighborhood where the church is located, with other raids near the Synod's churches in other parts of Baltimore as well as in Westminster and Frederick, Maryland.

187. After the rescission of the DHS policy, some of the Synod churches noticed a decline in attendance at worship services and other church activities. Attendance, participation, and volunteerism are markedly down. Church leaders report that congregants (both documented and undocumented) are afraid to come to church, fearing that ICE or other enforcement agencies might appear—even in what should be a sacred and protected space.

188. In recent months, the Synod received a notice of deportation of a pastor within the Synod. The deportation details were very vague and he had to quickly self-deport. A lay staff member was arrested in a raid and then seemingly disappeared into the system. Certain congregants received requests for evidence of already-issued visas. Synod leadership is aware of individuals who have received services from its congregations who have been directly targeted or affected by ICE raids, particularly within Baltimore.

189. The decrease in participation caused by fear of ICE/CBP raids deeply undermines the Synod's ability to live out its religious mission. In the Synod's tradition, worship is not optional —it is central to how congregants understand themselves as the Body of Christ. Gathering in Word

and Sacrament is how they receive grace, build community, and enact their public witness. If fear keeps people from participating fully, the Synod's ministry is disrupted at its core.

**Metro D.C. Synod, ELCA**

190. For Metro D.C. Synod, the threat of immigration enforcement action at its churches has interfered with their ability to carry out the mission compelled by their faith to welcome and advocate for immigrants, and has had a damaging effect upon many congregations and ministries in the Synod's territory, including upon faith formation and discipleship activities.

191. The Synod has briefed its Council on the policy change, and the congregations have educated themselves on their rights and spent hours and energy that would otherwise be spent serving God and helping those in need to instead prepare themselves and others for the possibility of an ICE raid.

192. One church immediately went "underground" following the policy rescission. This involved taking down the website dedicated to its Latino ministries where it had information about its congregants, programming, and ways for the wider community to contribute financial support for the ministries, out of concern that this information could be used by ICE to target the church and/or its congregants.

193. Following the administration's change in policy, the Synod saw decreases in attendance, particularly at its churches with Latino ministries and/or Spanish-language worship services.

194. At St. Mark's Lutheran Church, for example, there was a decline in average attendance at its Spanish worship service. At one point, average attendance at the Spanish worship service was down 40 percent compared to the same period the previous year. There has been no

parallel decline in attendance at the English service. Attendance numbers for the Spanish service have not returned to normal, and giving from the Latino congregation has also declined.

195. One church that typically had 25 attendees at its Spanish-language service saw it drop to as few as 6 attendees in weeks when ICE was present in the community or near the church.

196. Another church has seen up to a 60 percent drop in attendance at its Spanish-language service since the rescission of the sensitive locations policy. To protect its congregants, this church also stopped its online livestream of the Spanish-language service which typically reached hundreds of local and international worshippers.

197. One church, which used to keep its doors open during worship as a message of welcome, has begun keeping its doors locked to reduce the risk of ICE interference.

198. The Synod's social ministries have also suffered. To protect its congregants and volunteers, one church cancelled its English as a Second Language program and its offsite community food distribution program, which primarily served immigrant day laborers. The same church also moved its onsite food ministry indoors to avoid creating a visible line of people vulnerable to ICE interaction. And at Saint Mark's, attendance at its English for Speakers of Other Languages classes has dropped by half, with Spanish speakers driving that decline.

199. For those who stay home as well as those who come to church to attend worship or to provide or receive vital services, Defendants' change in policy has created deep fear and anxiety among Synod congregants, regardless of immigration status.

**Southeastern Synod, ELCA**

200. The prospect of immigration enforcement action threatens Plaintiff Southeastern Synod's deeply held commitment to welcoming and serving immigrants. This commitment is

fulfilled through the offering of inclusive worship services and programming designed to support members in their pursuit of social and economic stability and well-being.

201. The Southeastern Synod is comprised of 140 congregations and new starts. A number of these congregations were specifically formed to serve immigrant and refugee members of the faith.

202. The Synod's congregations have witnessed significant anxiety from their members about the possibility of immigration enforcement action on church property.

203. One such congregation in Georgia provides immigrant-focused ministries and services. Since the rescission of the sensitive locations policy, church leadership has had to train its staff and the congregation on how to respond to law enforcement who attempt to enter the church. The church's leadership has also posted signage in multiple languages informing congregants of their rights in case of an immigration raid.

204. Another congregation in Georgia that largely serves Spanish-speaking immigrants and their families has witnessed a 50 percent drop in attendance at worship services. These congregants have expressed fear of an immigration raid at church during in-person services. This drop in attendance has impacted giving to the church. In 2024, offerings at the Spanish-language service totaled $17,143. In 2025, after rescission of the sensitive locations policy, total giving from these services dropped to $7,965.

205. A third congregation in Georgia operates a clothing closet out of its church building. Since rescission of the sensitive locations policy, the church has seen a significant decline in participation in this ministry by its Spanish-speaking members out of fear of a raid at the church.

206. A congregation in Tennessee that serves African immigrants and refugees has also witnessed a drastic drop in participation in worship services and other church-sponsored activities.

The congregation has seen over a 50 percent drop in attendance at weekly worship services since rescission of the sensitive locations policy.

207. The rescission of the sensitive locations policy has created extreme anxiety amongst the Synod's members in their participation in church activities. As such, both attendance and giving within Southeastern Synod has declined.

**Metropolitan Chicago Synod, ELCA**

208. The fear of immigration raids has affected participation and attendance at churches within the Metropolitan Chicago Synod. The Metropolitan Chicago Synod's congregations do much more than simply conduct services, they also serve as community centers and resources for their members. For example, the Metropolitan Chicago Synod's churches are active in food distribution to families in need and also provide a diverse array of informational events.

209. After the rescission of the DHS policy, Metropolitan Chicago Synod's churches quickly noticed a decline in attendance at worship services and other church activities. Church leaders reported that congregants (both documented and undocumented) were afraid to come to church, fearing that ICE or other enforcement agencies might appear—even in what should be a sacred and protected space.

210. Several families in the Metropolitan Chicago Synod's congregations have reported witnessing or experiencing enforcement activity in their neighborhoods, leading to a sharp decline in worship attendance and participation in church ministries. In one instance, a family stopped attending services after agents were seen near their home, fearing they could be detained on their way to church. Additionally, parents have expressed fear of leaving their homes, even to take their children to school or church programs, and some have requested assistance with food and essential deliveries because they no longer feel safe accessing public spaces. These situations have deeply

impacted the Metropolitan Chicago Synod's ability to gather, worship, and care for one another as a community.

211. The decrease in participation caused by fear of ICE/CBP raids deeply undermines the Metropolitan Chicago Synod's ability to live out their religious mission. In their tradition, worship is not optional —it is central to how they understand themselves as the Body of Christ. Gathering in Word and Sacrament is how they receive grace, build community, and enact their public witness. If fear keeps people from participating fully, then the Metropolitan Chicago Synod's ministry is disrupted at its core.

**Pacifica Synod, ELCA**

212. Across Pacifica Synod's congregations, the fear of immigration enforcement on church property has increased since the rescission of the sensitive locations policy and has had an impact on the Synod's ability to carry out its faith-compelled mission to welcome and advocate for immigrants.

213. The Synod's commitment to welcoming and supporting immigrants is demonstrated by its congregations' ministries, such as offering ESL classes, immigrant legal services, job training, school supplies, and food and clothing assistance.

214. The rescission of the sensitive locations policy has had a damaging effect on many of the Synod's congregations and ministries, as well as upon basic faith formation and discipleship activities.

215. When the policy change was announced, the Synod had to take immediate action to protect its congregants, encouraging local congregations to conduct "Know Your Rights" seminars and consider ways to support congregants who might be negatively impacted by the policy change.

Synod clergy also began accompanying people, including congregants, attending immigration hearings in San Diego.

216. At one church, which has a primarily immigrant and Spanish-speaking congregation, attendance at weekly worship services has dropped from 30 per week to just 10. Most of the congregants give cash in person, not online. Therefore, when they do not attend worship services, the church receives less in congregational offerings, impacting the church's funding to carry out its ministries. At this church, the pastor began offering to go to parishioners' homes to give them communion so they would not be exposed to a potential immigration enforcement action at the church. The pastor has felt unable to continue with the community outreach he had previously engaged in for fear of subjecting community members to potential immigration enforcement actions on church property. In this way, the policy change has impeded the church's ability to welcome new members to participate in worship services or other church programming.

217. Some of the Synod churches that offer Spanish-language services have had members patrol the church property or stay posted at the sanctuary door during services to keep an eye out for immigration enforcement.

218. One church in California has had to develop a safety preparedness policy in case of immigration enforcement raids on church property. This safety policy involves designating previously public areas of the property (such as offices) as "Private," having sanctuary doors closed and locked, having members stand outside the sanctuary doors and patrol the property, educating members in recognizing a judicial warrant, and identifying members who will engage with ICE, if needed. The church employs this policy whenever immigrant community members

are present on the property. The church did not need to have such a safety policy before the rescission of the sensitive locations policy.

**Upstate New York Synod, ELCA**

219. As a result of DHS's change in policy, pastors throughout the Upstate New York Synod have reported decreases in attendance at worship services. One member congregation that comprises predominantly immigrants, asylees, and new Americans was hit particularly hard by the rescission of the policy. There, the rescission has cut regular attendance at worship services to half of the church's pre-rescission numbers.

220. Also because of the change in policy, attendance levels at some member churches' food banks and community meals have decreased. Pastors at these churches have reported that formerly regular attenders who they knew to be undocumented immigrants have stopped attending. Turnout at one regular community meal became so low that the congregation recently had to stop hosting it altogether.

221. The rescission is also an obstacle to the Synod's ability to create new missional communities, which often serve immigrants, asylees, and new Americans. Planting a religious missional community in the United States is already a difficult and fragile process. The rescission has made that challenging process all the more difficult by increasing the risks of failure and the added costs associated with security concerns and finding suitable property.

**San Francisco Friends Meeting**

222. For Plaintiff San Francisco Friends Meeting, the threat of immigration enforcement action at its meeting house has interfered with members' and attenders' ability to welcome all comers to communal worship and to encourage a diversity of worshippers, core aspects of their faith.

223. Members and attenders have, for example, discussed whether to lock the doors during worship, or to ask those arriving their purpose in doing so, measures that San Francisco Friends Meeting has never taken because closing off the meeting or interrogating attendees would interfere with the Quaker religious commitment to communal worship.

224. At the same time, knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter with an armed law-enforcement officer would violate Quaker beliefs in peace and nonviolence.

225. The present threat of immigration enforcement activity also makes it more difficult for members and attenders to engage in waiting worship and Spirit-led listening, which are at the core of Quaker worship. It likewise impedes their ability to carry out their religious and spiritual practice of community ministry in the meeting house.

226. Quakers have held a religious commitment against violence for hundreds of years. For many Quakers, the presence of a weapon in a Quaker meeting would be absolutely unacceptable.

227. The presence of armed immigration officers at meeting houses—which the new policy allows—would thus significantly hamper Plaintiffs' ability to exercise their faith. Importantly, even the *threat* of armed government agents at meeting houses—which has existed since the moment DHS announced its new policy—does the same.

**Pacific Yearly Meeting**

228. Immigration enforcement activities have been carried out in proximity to some of Pacific Yearly Meeting's monthly meetings, including just a block away from one monthly meeting in July 2025.

229. Not surprisingly, people are afraid to come to weekly worship. At least one family felt unsafe attending the Meeting's annual session this year, which took place in July 2025, and declined to attend.

230. People are likewise afraid to attend events sponsored by monthly meetings about topics like social action, learning to be bystanders, or any other event in support of immigrants, documented or undocumented. These activities are part of Pacific Yearly Meeting members' religious practice and exercise.

231. The threat of immigration enforcement near or inside a Quaker meeting house or any place where a meeting for worship is occurring causes significant harm, including immediate and lasting disruption to Pacific Yearly Meeting members' ability to worship.

**North Pacific Yearly Meeting**

232. DHS's decision to revoke its sensitive locations policy has put North Pacific Yearly Meeting and its Monthly Meetings under threat of immigration enforcement. As a result, members are reluctant to encourage immigrants to attend worship. Both immigrant and non-immigrant attenders who are worried about DHS's new policy may simply not show up in person for worship services if there is a chance that immigration enforcement actions could happen there.

233. Some of North Pacific Yearly Meeting's members have virtual attendance options, but some do not. And even when such an option is available, it does not facilitate complete participation in Quaker worship. Some Friends find it is essentially impossible to facilitate a spiritual connection online, as opposed to through in-person worship.

234. Armed law enforcement showing up in worship rooms or at meeting houses would be massively disruptive to the ability of members to worship. Because Quakers avoid and abhor physical violence, bringing weapons into their places of worship would be an assault on their faith.

**American Baptist Churches USA**

235. American Baptists openly welcome immigrants and refugees to their services and ministries. American Baptists boast of being one of the most ethnically diverse congregations, including Hispanic congregations (e.g., Puerto Rican, Mexican, Dominican, Central and South American), Haitian congregations, and African congregations (e.g., Somalian, Congolese), as well as congregations made up of refugees from Burma (e.g., Chin, Kachin, Karen).

236. While American Baptist Churches USA congregations vary in their experiences based on geography and demographics, churches with significant immigrant populations, particularly those serving undocumented or mixed-status families, have reported increased fear and anxiety among members. Even congregants who have legal status in the United States worry that ICE may enter their church and arrest indiscriminately. Churches in the western United States have reported diminished attendance at worship services, Bible studies, and community programs out of concern for potential encounters with immigration enforcement while taking part in those activities.

237. Communal worship and fellowship are fundamental to the American Baptists' faith. Many member churches host Bible studies, which are an essential part of spiritual growth for American Baptists, as well as a fellowship hour after the worship service, where congregants can gather as a community. Churches also offer Sunday School to children during the worship services, which forms the basis for the next generation's spiritual formation. The ability of American Baptists to come together for worship and fellowship is significantly burdened when members of the congregations stay home, depriving them and their fellow congregants of their religious community.

238. Earlier this summer, a member church in New York experienced an incursion by ICE onto their property. This church is heavily involved in resettling refugees who arrive in the United States. Four individuals—one wearing a t-shirt identifying him as an agent of ICE, one wearing a t-shirt labeled "FBI," and two others in plain clothes—came through the privacy gate into the parsonage of the church property. They indicated that they were looking for someone. The pastor told these individuals that they needed a warrant.

**Alliance of Baptists**

239. The rescission of the 2025 Policy is substantially burdening the Alliance of Baptists' religious exercise and their ability to come together to worship.

240. Member congregations and pastors have had to change the way that they act on their religious mandate. Pastors have reported not feeling comfortable preaching freely about their stance on immigration and have removed signage from church windows indicating that they are a place of refuge for undocumented immigrants for fear of becoming a target for immigration enforcement. Churches that declared themselves sanctuary churches under the previous policy are no longer publicizing themselves as such.

241. Multiple congregations have revisited their security protocols and begun locking church doors during services. Locking the church doors and monitoring who is coming and going are antithetical to the Alliance of Baptists' religious teachings.

**District of Columbia Baptist Convention**

242. DCBC serves over 160 churches across the District of Columbia, Maryland, Virginia, and one church each in Georgia and Florida. Many of DCBC churches' membership includes immigrants from a variety of places including El Salvador, Haiti, Myanmar/Burma, and DRC. Indeed, DCBC congregations worship in a variety of languages, with a variety of cultural

understandings. This is key to their communal life as their motto states: One Faith. Many Cultures. Endless Possibilities.

243. The change in policy has brought about a noticeable decline in worship and Bible study attendance at DCBC churches, as people are afraid to enter a space which was once safe.

244. Many DCBC churches engage with their community members through food distribution and clothing closets, English classes and support.

245. DCBC churches have experienced a significant dip in guests who come for food and clothing assistance for fear ICE will be present on the church campus. This undermines their mission, as they see missional engagement as central to their existence. The Bible is clear regarding serving those in need, those who are strangers, and those who are new to the community.

**Metropolitan Community Churches**

246. Many MCC member churches count immigrants, both with legal status and without, among their congregations. The threat of immigration enforcement at worship services inhibits churches' ability to create a safe and inclusive house of prayer. Leadership, clergy, and congregants have expressed anxiety and fear about the possibility of enforcement at a member church.

247. For example, an MCC member church in California, which has a substantial number of immigrant attendees and offers worship services in Spanish, has seen declines in attendance by immigrant members who have expressed fear of the church being the target of an immigration raid.

248. The church has been forced to take steps to protect congregants in case of such a raid, including closing off entrances that were left open prior to the rescission, marking previously public areas as private, and dedicating staff and congregation time and resources to developing and training on a plan in the event that immigration authorities enter the church. During Spanish-

language services, the church has taken to locking the doors and having volunteers from the congregation screen anyone coming in, only permitting entry to those present for the worship service. The church has been forced to choose between its religious mandate to welcome all comers and its obligation to protect its congregation. Congregants' communal worship experience is diminished by the loss of their co-congregants' presence.

249. An immigration enforcement action at an MCC member church would seriously harm MCC, its congregants, and community members to whom the church ministers. It would desecrate the sacred, welcoming space and further prevent congregants from coming together in communal worship.

**Southern New England Conference**

250. Rescission of the sensitive locations policy has harmed the Southern New England Conference as well as its member churches.

251. Because of the change in policy, a substantial amount of the Conference's staff time and programmatic infrastructure is now dedicated to safety and security concerns relating to immigration enforcement, including by organizing standing meetings, creating designated websites, putting out immediate response bulletins to churches, and creating practical and legal guidance for churches in the event ICE shows up. The time and effort the Conference has had to put into this work because of the government's change in policy could instead have been used to help solve other problems facing its churches and advance its broader religious mission.

252. Since the change in policy, member congregations have seen incidents of DHS immigration enforcement at and around their churches. They have experienced decreases in attendance at worship services and at social ministries such as food pantries, diaper drives, and community dinners. Congregants have felt it is too unsafe even to baptize their child at church, for

fear of unrestrained immigration enforcement. And churches that share space with predominately immigrant congregations have seen those congregations dwindle away as well, causing not only spiritual but financial harm to the host churches.

## CLAIMS FOR RELIEF

### COUNT I

***Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, et seq.***

253. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

254. RFRA provides that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

255. Anyone "whose religious exercise has been burdened in violation" of RFRA may raise a RFRA claim and "obtain appropriate relief" against the government. 42 U.S.C. § 2000bb-1(c).

256. The 2025 Policy frees Defendants and their agents to conduct enforcement operations—including arrests, investigations, interviews, and surveillance—at and near houses of worship and religious ceremonies.

257. Permitting immigration enforcement operations at and near houses of worship, including those in which Plaintiffs practice, deters people from attending religious services, even if they are lawful permanent residents or citizens.

258. The 2025 Policy substantially burdens Plaintiffs' free exercise of religion by reducing the number and diversity of worshippers and interfering with their ability to practice communally, as their religious beliefs call them to do.

259. The 2025 Policy also substantially burdens Plaintiffs' free exercise of religion by rendering Plaintiffs unable to encourage all to join without contradicting their faith.

260. The 2025 Policy puts Plaintiffs to an impossible choice: either violate their core religious beliefs by failing to welcome all to worship or violate their core religious beliefs by placing others in harm's way.

261. The 2025 Policy is not the least restrictive means of furthering the government's legitimate interests, including because the government operated for decades, and across multiple administrations, under its previous policy of providing appropriate protections for sensitive locations.

## COUNT II

### *First Amendment—Freedom of Expressive Association*

262. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

263. The First Amendment to the U.S. Constitution safeguards the freedom of expressive association: the right to associate with others for the purpose of engaging in activities protected by the First Amendment, including the exercise of religion.

264. Government actions that directly abridge freedom of expressive association, as well as those that chill the exercise of that right, are subject to heightened scrutiny. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010).

265. Plaintiffs and their congregants engage in protected expressive association when they gather for communal religious worship and when they conduct social service ministries, activities that are core aspects of their religious exercise.

266. The 2025 Policy toward sensitive locations adopted by Defendants burdens and chills the expressive association rights of Plaintiffs and their congregants and is therefore subject to heightened scrutiny.

267. Defendants cannot prevail under that standard, including because for more than three decades they have deployed less restrictive means with respect to enforcement in or near houses of worship and cannot articulate a reason why they are now insufficient.

## COUNT III

### *Violation of the Administrative Procedure Act—§ 706(2)(A)*
### *Arbitrary and Capricious*

268. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

269. Under the APA, a court shall "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

270. The 2025 Policy is a final agency action subject to review under the APA because it is "the consummation of the agency's decisionmaking process" and it determines "rights [and] obligations" and creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc*., 578 U.S. 590, 599-600 (2016) (finding final agency action can include the denial or revocation of a safe harbor).

271. Since at least 1993, federal immigration authorities have adopted a consistent rule restricting their agents' authority to carry out enforcement operations in and around sensitive locations.

272. Under the APA, agencies cannot depart from prior policies without explaining their reasons for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies must, for example, "examine the relevant data and articulate a satisfactory explanation" for their choice. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). And they must

specifically consider the reliance interests of those who may be impacted by a change in their policies. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30-31 (2020).

273. The 2025 Policy is arbitrary and capricious in numerous respects, including because it undoes decades of prior agency policy without adequate reasoning, it fails to consider alternative approaches, and it leaves unaddressed decades of substantial reliance interests held by Plaintiffs and others.

**COUNT IV**

***Violation of the Administrative Procedure Act—§ 706(2)(A), (C)***
***Contrary to Law and In Excess of Statutory Limitation***

274. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

275. Under the APA, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

276. As set forth above, the 2025 Policy constitutes final agency action subject to review under the APA.

277. As set forth above, the 2025 Policy substantially burdens Plaintiffs' religious exercise and fails to satisfy strict scrutiny, in violation of RFRA.

278. Because the 2025 Policy is barred by RFRA, it is both "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations" under the APA, 5 U.S.C. § 706(2)(A), (C).

**COUNT V**

***Violation of the Administrative Procedure Act—§ 706(2)(B)***
***Contrary to Constitutional Right***

279. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

280. Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

281. As set forth above, the 2025 Policy burdens and chills the First Amendment expressive-association rights of Plaintiffs and their congregants and is subject to strict scrutiny.

282. As set forth above, the 2025 Policy fails strict scrutiny, including because Defendants cannot show it is the least restrictive means of advancing their asserted interest.

283. Because the 2025 Policy is contrary to the First Amendment, it is unlawful under § 706(2)(B) and must be set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a. Declare the 2025 Policy unconstitutional and otherwise unlawful;

b. Vacate and set aside the 2025 Policy;

c. Preliminarily set aside and stay the 2025 Policy under 5 U.S.C. § 705;

d. Preliminarily and permanently enjoin Defendants, including DHS's constituent subagencies, from implementing, enforcing, acting according to, or reissuing under another name the 2025 Policy;

e. Preliminarily and permanently enjoin Defendants, including DHS's constituent subagencies, from carrying out immigration enforcement operations at or near houses of worship absent a judicial warrant or genuinely exigent circumstances;

f. Award Plaintiffs costs of suit, attorneys' fees, and expenses to the greatest extent authorized by all applicable laws; and

g. Issue such other relief as the Court deems proper.

June 4, 2026

Respectfully submitted,

_/s/_____
Ryan Downer*
Madeleine Gates*
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org

Mark B. Samburg (MA Bar No. 680099)
Kevin E. Friedl*
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Ayesha Khan*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
msamburg@democracyforward.org
kfriedl@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
akhan@democracyforward.org

Richard J. Leveridge*
Sonia W. Murphy*
Brandon A. Levey*
Samone Ijoma*
Brittney M. Welch*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Leveyb@gilbertlegal.com
IjomaS@gilbertlegal.com
Welchb@gilbertlegal.com

*Counsel for Plaintiffs*

* *Admitted* pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on 4th of June 2026, I electronically filed the foregoing pleading through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

*/s/ Madeleine Gates*
Madeleine Gates