**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

**New England Synod, Evangelical Lutheran Church in America**, *et al.*,

Plaintiffs,

v.

**Department of Homeland Security**, *et al.*,

Defendants.

**Case No. 4:25-cv-40102-FDS**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

BACKGROUND ........ 2

A. Defendants have removed longstanding protections for sensitive locations. ........ 2

B. Defendants' 2025 Policy harms Plaintiffs' and their members' religious exercise. ........ 7

C. The preliminary injunction has ameliorated the harms of the 2025 Policy. ........ 17

PROCEDURAL HISTORY ........ 18

LEGAL STANDARD ........ 19

ARGUMENT ........ 20

I. Plaintiffs have standing to challenge the 2025 Policy. ........ 20

A. Plaintiffs and their members have suffered and are suffering injury-in-fact. ........ 20

B. Those injuries are traceable to the 2025 Policy and would be redressed by a favorable judicial decision. ........ 23

II. The 2025 Policy violates the Religious Freedom Restoration Act. ........ 24

A. The policy substantially burdens Plaintiffs' exercise of religion. ........ 25

B. The policy cannot survive strict scrutiny. ........ 27

III. The 2025 Policy violates Plaintiffs' First Amendment rights. ........ 29

A. The policy infringes on Plaintiffs' freedom of expressive association. ........ 29

B. The policy cannot satisfy exacting scrutiny. ........ 31

IV. The 2025 Policy violates the APA. ........ 32

A. The policy constitutes final agency action. ........ 32

B. The policy is contrary to law, contrary to constitutional right, and arbitrary and capricious. ........ 37

V. The Court should enter a permanent injunction and declare unlawful and vacate the 2025 Policy. ........ 39

CONCLUSION ........ 40

## INTRODUCTION

For decades, the federal government imposed limits on immigration enforcement at houses of worship and other sensitive locations, recognizing that unrestrained enforcement at such locations was unnecessary and would burden fundamental rights. Last year, Defendants the Department of Homeland Security (DHS) and its Secretary abruptly rescinded those longstanding protections in favor of a different policy ("2025 Policy") that places no substantive limitations on DHS agents' ability to conduct raids, arrests, and similar actions at houses of worship. The 2025 Policy instead leaves those decisions up to uncabined individual discretion.

The effect has been predictable. DHS agents have deployed into church parking lots, surveilled congregants, arrested people at and around their places of worship, and in one instance pointed a rifle at a pastor on church property. As a result, people across the country, regardless of immigration status, now reasonably fear attending houses of worship. Churches have seen both attendance and financial giving plummet. Congregations religiously compelled to worship with open doors and open arms have suddenly had to lock those doors and train their staff on how to respond to immigration raids. In many places of faith across the United States, the open joy and spiritual restoration of communal worship has been replaced by isolation, concealment, and fear.

Plaintiffs—religious organizations representing churches in Massachusetts and across the country—have suffered all these harms and more because of the 2025 Policy. They challenge that policy as violating the Religious Freedom Restoration Act, the First Amendment, and the Administrative Procedure Act. Because the 2025 Policy is unlawful, and because there are no genuine disputes of material fact, the Court should enter summary judgment for Plaintiffs and issue appropriate relief as set forth below and in Plaintiffs' proposed order.

## BACKGROUND

### A. Defendants have removed longstanding protections for sensitive locations.

#### 1. For decades, the government limited immigration enforcement at houses of worship and other sites of religious practice.

For more than 30 years, it was the government's policy to restrict immigration-enforcement activities at "sensitive locations"—also referred to as "protected areas"—such as schools, hospitals, and, as relevant here, houses of worship.

In 1993, the Immigration and Naturalization Service (INS) adopted a policy "to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." Ex. 1 at 1. That policy required written advance notice of operations that were likely to involve sensitive locations, set standards for when such operations were appropriate, and instructed agents to consider ways to "minimize the impact on operation of the … place of worship." *Id.* at 1-2.

In 2008, Immigration and Customs Enforcement (ICE), a successor of INS, reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances" such as "terrorism-related investigations." Ex. 2 at 1-2. Three years later, ICE further underscored the importance of avoiding enforcement actions near sensitive locations. Ex. 3. Such actions, the agency stated, should be avoided and could proceed only in exigent circumstances (e.g., terrorism or imminent risk of death) or with prior written approval. *Id.* at 2-3.

Arrests at sensitive locations were, predictably, rare. ICE Enforcement and Removal Operations records show nine "planned" arrests near places of worship from October 2018 to October 2020. Ex. 4 at 48-49. Similar records from ICE Homeland Security Investigations show eleven arrests (one exigent, and ten "planned") at religious spaces from October 2017 through

October 2020, with at least seven of the "planned" arrests involving search warrants. *Id.* at 49-51.

In 2021, DHS Secretary Alejandro Mayorkas superseded the prior memos while reaffirming the government's longstanding policy of avoiding enforcement at sensitive locations. Ex. 5 ("Mayorkas Memo"). The Mayorkas Memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." *Id.* at 2. It recognized that enforcement actions—"includ[ing] … arrests, civil apprehensions, searches, inspections, … and immigration enforcement surveillance"—at sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at 3-4.

The Mayorkas Memo announced that DHS had an "obligation to refrain, *to the fullest extent possible*, from conducting a law enforcement action in or near a protected area"—an obligation the memo made clear "applies at all times and is not limited by hours or days of operation." *Id.* at 3 (emphasis added); *see also id.* ("The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area."). The memo recognized that certain exigent circumstances might require enforcement at sensitive locations. *Id.* at 3-4. Outside of those circumstances, however, it dictated that "an Agent or Officer *must* seek prior approval" before proceeding. *Id.* at 4 (emphasis added). And because the memo applied to all DHS personnel, not just line agents, any official asked to approve an enforcement action at a sensitive location would themselves be bound by the requirement that such actions be avoided "to the fullest extent possible." *See* Ex. 6 ¶¶ 6-7.

The Mayorkas Memo thus set forth both substantive and procedural restrictions that limited DHS agents' ability to conduct enforcement at sensitive locations. Ex. 7 ¶¶ 12-16; Ex. 6 ¶¶ 6, 8.

Unsurprisingly, enforcement actions at such locations were "extremely rare" under this policy. Ex. 7 ¶ 17. Yet even with those protections in place, ICE and Customs and Border Protection (CBP) "did not struggle to conduct robust immigration enforcement." *Id.* ¶ 19; *see also* Ex. 6 ¶ 9.

**2. Defendants abruptly rescinded these protections and immediately began conducting enforcement operations at houses of worship.**

In January 2025, DHS threw out these longstanding protections. In a short memo from Acting DHS Secretary Benjamine Huffman, DHS rescinded the Mayorkas Memo, effective immediately. Ex. 8 ("Huffman Memo"). The Huffman Memo does away with the requirement that agents "refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area," and it imposes no replacement constraints on agents' authority. It does not require any internal process for enforcement at sensitive locations. Nor does it require that exigent circumstances exist before agents may raid a sensitive location, let alone define what exigent circumstances might be enough. Instead, the Huffman Memo leaves it to individual agents' "enforcement discretion" whether it is appropriate to undertake enforcement at a sensitive location, specifically disavowing the need for "bright line rules."

In a press release issued the next day, DHS stated that:

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders [sic] and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

Ex. 9.

Following the Huffman Memo, ICE issued further instructions to its agents. Ex. 10 ("Vitello Memo" and, together with the Huffman Memo, the "2025 Policy"). The Vitello Memo emphasized that DHS "will not be issuing bright line rules regarding where immigration laws are permitted to be exercised" and instead would leave those decisions to the discretion "of the

Department's law enforcement personnel." It "charge[d] Assistant Field Office Directors … and Assistant Special Agents in Charge … with responsibility for making case-by-case determinations" when to enforce at sensitive locations, but imposed no substantive restrictions on those employees' decisionmaking, specifying only that they did not have to provide authorization in writing. *Id.* at 2; *see Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, 767 F. Supp. 3d 293, 321 (D. Md. 2025) ("Though the Vitello Memorandum adds a requirement of authorization from a local supervisor, … it does not reinstate any of the three main safeguards contained in the Mayorkas Memorandum[.]") ("*Phil. Yearly Meeting I*"), *appeal pending*, No. 25-1512 (4th Cir.).

Under the new policy, Defendants quickly began carrying out enforcement at and near houses of worship. The first Sunday after Defendants announced the new policy, for example, it was reported that ICE arrested a man outside a Georgia church. Ex. 11. The same day, agents in unmarked pickups and SUVs reportedly surrounded a family in their church parking lot as they were leaving Sunday service in Washington, pulling the father out of his car and arresting him in front of his family and pastor. Ex. 12. Since then, enforcement actions have continued apace; ICE reports that, from January 20, 2025 to April 1, 2026, it conducted 1,454 arrests in or near sensitive locations. Ex. 13 at 1. This enforcement has not been discreet or calculated to minimize impacts on adherents. In June 2025, for example, federal agents reportedly arrested a man outside a church in Downey, California, and brandished a rifle at the church's pastor in the process. Ex. 14.

Plaintiffs here—a coalition of religious organizations representing congregations in Massachusetts and across the country—have themselves experienced repeated instances of DHS enforcement operations at and around their houses of worship, including on their property. Immigration agents used one Minneapolis Area Synod church's parking lot for surveillance, arresting drivers passing the church. Ex. 15 ¶ 18. ICE agents attempted to enter a Metropolitan

New York Synod church without a warrant and were denied entry. Ex. 16 ¶ 27. They used a Sierra Pacific Synod congregation's parking lot as a staging ground, with unmarked SUVs in the lot and men standing around donning weapons and vests marking them as federal law enforcement. Ex. 17 ¶ 27 (reporting that the incident "sen[t] a clear signal to the whole neighborhood that this is no longer a safe space"). Around twenty masked agents used a Southwest California Synod church's parking lot, without permission, for an apparent immigration-enforcement action; videos of the incident showed agents escorting individuals with their hands zip-tied. Ex. 18 ¶¶ 6-14. At another Southwest California Synod church, a masked agent sat parked in the church's clearly marked parking lot; when asked to leave by the pastor, he did not do so immediately, then lingered in front of the church before eventually driving off. Ex. 19 ¶¶ 7-9; *see also* Ex. 20 ¶¶ 11-12 (suspected ICE agent parked in church's lot, watching people enter and exit the church building). In one particularly horrifying incident, ICE agents arrested a man in the parking lot of an American Baptist Churches USA church in Minneapolis while families were dropping off children at preschool in the church building. Ex. 89 ¶ 7. In front of a crowd of clergy, staff, congregants, and family members, the ICE agents pinned the man face down on the snow-covered parking lot while he pleaded for his life, before loading him into the back of an SUV and driving off. *Id.* ¶¶ 8-9.

Still more of Plaintiffs' congregations have experienced immigration enforcement in the direct vicinity of their houses of worship. Ex. 21 ¶¶ 20-21 (ICE seized people right in front of church); Ex. 22 ¶ 6 (same); Ex. 23 ¶ 16 (ICE agents arrested individual walking by the church); Ex. 24 ¶ 5 ("[T]here have been raids and checkpoints near the church, including across the street"); Ex. 16 ¶¶ 26-27 (ICE agents patrolled near one Lenten procession and followed individuals participating in another procession); Ex. 25 ¶¶ 8-9; Ex. 26 ¶¶ 21-22; Ex. 27 ¶ 4; Ex. 28 ¶¶ 5-6. At a Pacifica Synod church, the pastor and staff have seen ICE agents standing on the sidewalk off the

corner of the church parking lot, surveilling, stopping, and questioning community members coming onto church property, including parents who parked there when taking their children to school. Ex. 29 ¶¶ 10-11.

Predictably, and as explained in more detail below, DHS's implementation of its 2025 Policy immediately deterred congregants from attending worship services. Just days after DHS rescinded the Mayorkas Memo, Catholic organizations reported that they were "already witnessing reticence among immigrants to … attend[] religious services." Ex. 30. A national Evangelical group cautioned that "[e]ven the announcement of this policy has caused fear, deterring some from attending church." Ex. 31. And those effects have only increased as DHS has ramped up its activities at sensitive locations. At least three Catholic dioceses, for example, have had to issue special dispensations to worshippers, lifting the obligation to attend Sunday Mass for those fearing immigration enforcement. Ex. 32, 33, 34. One of these dioceses reported that "attendance at Spanish-language Masses across its parishes had dropped by at least half." Ex. 35.

### B. Defendants' 2025 Policy harms Plaintiffs' and their members' religious exercise.

#### 1. Plaintiffs' beliefs and connection to immigrant communities.

While their beliefs differ, Plaintiffs all place great religious importance on coming together in person for regular communal worship; welcoming those who wish to worship with them; protecting and uplifting the vulnerable, especially "the stranger" or the immigrant; and practicing the tenets of their faith in their communities through programs such as food banks, schools, and English as a Second Language ("ESL") classes. Plaintiffs are also united in serving diverse immigrant communities as part of their religious missions.

Plaintiffs New England Synod, Greater Milwaukee Synod, Southwest California Synod, Southwestern Texas Synod, Sierra Pacific Synod, Metropolitan New York Synod, Northwest

Washington Synod, Minneapolis Area Synod, Delaware-Maryland Synod, Metro D.C. Synod, Southeastern Synod, Metropolitan Chicago Synod, Upstate New York Synod, and Pacifica Synod (together, the "Synods") are regional bodies of the Evangelical Lutheran Church in America ("ELCA"). They include many churches with significant memberships from immigrant communities. *See, e.g.*, Ex. 15 ¶¶ 12, 18; Ex. 36 ¶ 19; Ex. 37 ¶ 9; Ex. 16 ¶¶ 6-7; Ex. 38 ¶ 9; Ex. 39 ¶¶ 9, 21; Ex. 40 ¶ 8; Ex. 41 ¶ 6; Ex. 42 ¶¶ 24-25; Ex. 43 ¶ 5. Synod members believe that Jesus's command to love God and one's neighbors must guide their actions. *See, e.g.*, Ex. 15 ¶¶ 11-12; Ex. 44 ¶ 10; Ex. 36 ¶¶ 13-14; Ex. 37 ¶ 13; Ex. 16 ¶¶ 17-18; Ex. 38 ¶¶ 13, 20; Ex. 45 ¶¶ 11-12; Ex. 46 ¶ 10; Ex. 39 ¶¶ 11, 19. The scriptural mandate in Matthew 25—"I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink, I was a stranger and you invited me in …"—is essential to their faith. *See, e.g.*, Ex. 39 ¶ 14; Ex. 15 ¶ 11; Ex. 44 ¶ 10; Ex. 47 ¶ 19; Ex. 48 ¶ 5. Synod members welcome all people, especially for worship on Sunday morning. *See, e.g.*, Ex. 15 ¶ 12; Ex. 36 ¶ 14; Ex. 37 ¶ 12; Ex. 38 ¶ 18; Ex. 45 ¶ 12; Ex. 16 ¶ 17. As Lutherans, they also believe that loving one's neighbor is something they must do in practice. *See, e.g.*, Ex. 39 ¶ 14; Ex. 36 ¶ 13; Ex. 44 ¶ 10; Ex. 45 ¶ 11; Ex. 49 ¶ 6; Ex. 50 ¶¶ 10-11; Ex. 41 ¶¶ 11-12. They do so through public works such as housing migrants, distributing food and clothes to those in need, assisting in refugee resettlement, and providing ESL classes. *See, e.g.*, Ex. 44 ¶¶ 13, 19; Ex. 36 ¶ 14; Ex. 15 ¶ 12; Ex. 37 ¶ 14; Ex. 16 ¶ 10; Ex. 45 ¶ 12; Ex. 49 ¶ 11; Ex. 39 ¶ 26.

Plaintiffs San Francisco Friends Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting are part of the Quaker faith. Quakers are deeply committed to worshipping together in person at regular meetings. Ex. 51 ¶¶ 29, 38; Ex. 52 ¶¶ 8, 10-11, 22; Ex. 26 ¶¶ 2-3, 25. They believe that anyone can hear the voice of God, and that when they do, they should share it. Ex. 52 ¶ 12; Ex. 26 ¶¶ 12, 25, 34; Ex. 51 ¶¶ 9, 13. When someone speaks during meeting, it is similar to when a

pastor speaks to a congregation, and it is to be taken the same way—as ministry given to the congregation. Quaker meetings are open to all comers; it is important to their faith that the doors be open, both physically and metaphorically. Ex. 51 ¶ 25; Ex. 52 ¶ 12; Ex. 26 ¶ 12. Quakers are also committed to pacifism and non-violence. Ex. 26 ¶¶ 26, 34; Ex. 52 ¶ 26; Ex. 51 ¶¶ 41-42. The presence of weapons at a Meetinghouse would be wholly antithetical to their faith. Ex. 51 ¶¶ 42-44; Ex. 52 ¶¶ 25-26. The three Quaker Plaintiffs all welcome individual immigrants to their meetings. Ex. 26 ¶¶ 12, 25; Ex. 52 ¶ 7; Ex. 51 ¶ 27.

Plaintiffs American Baptist Churches USA, Alliance of Baptists, and the District of Columbia Baptist Convention together represent roughly 5,000 Baptist congregations across the country, including many serving immigrant communities.[1] Ex. 53 ¶¶ 4-6; Ex. 54 ¶¶ 6, 19; Ex. 55 ¶¶ 7, 12-13. Since educating freedmen after the Civil War, social outreach and justice have been core parts of the Baptist tradition. Ex. 53 ¶ 8; Ex. 54 ¶¶ 9-11; Ex. 55 ¶¶ 11, 18. Baptists are religiously committed to serving immigrants and refugees based on the biblical call to "welcome the stranger" in Matthew 25. Ex. 53 ¶ 11; Ex. 55 ¶ 15; *see also* Ex. 54 ¶ 13. Scripture instructs Baptists to treat the whole world as neighbors that they must love as they love themselves, regardless of their legal status. Ex. 53 ¶ 9; Ex. 54 ¶¶ 13-14; Ex. 56 ¶¶ 6-7. They live out this commitment by, among other things, providing resettlement assistance, helping refugees and immigrants meet basic needs, and offering ESL and citizenship classes. Ex. 53 ¶¶ 9-12; Ex. 54 ¶¶ 16-17; Ex. 55 ¶ 14. Baptists welcome all to regular worship services, which are a fundamental part of their religious practice. Ex. 53 ¶ 15; Ex. 54 ¶ 25; Ex. 55 ¶¶ 13, 16; Ex. 58 ¶ 4.

Plaintiff Metropolitan Community Churches (MCC) is an association of Christian churches.

---

[1] There are a variety of Baptist denominations; for ease of reference, "Baptist" as used in this motion refers to those affiliated with American Baptist Churches USA, Alliance of Baptists, and the District of Columbia Baptist Convention.

Since its inception, MCC has had a particular focus on welcoming LGBTQ+ individuals. Ex. 57 ¶ 6. One of MCC's core religious beliefs is that love is the greatest moral value, and resisting exclusion is a primary focus of MCC's ministry. MCC believes that everyone is included in the family of God, and communal worship is central to its members' faith. Ex. 57 ¶¶ 9-11. Indeed, while the structure of worship is generally not prescribed, member churches are required to use inclusive language in their services and to maintain an "open table"—that is, welcome all comers to communion. Ex. 57 ¶ 10. Many member churches count immigrants, both with legal status and without, among their congregations. *Id.*

Plaintiff Southern New England Conference, United Church of Christ is a regional body of the UCC. Ex. 59 ¶ 2. The Conference, which traces its heritage to the Pilgrims who left their native England to come to America 400 years ago, is instructed by scripture to care for the marginalized, including immigrants. *Id.* ¶¶ 4-6. Its member congregations carry out that commitment by, among other things, operating food pantries and community meals, housing and supporting asylum seekers, and sharing their worship spaces with immigrant congregations. *Id.* ¶¶ 9-10; Ex. 60 ¶¶ 4-5; Ex. 61 ¶¶ 7-8; Ex. 22 ¶¶ 2-3.

**2. DHS's new policy infringes on Plaintiffs' religious exercise.**

DHS's rescission of protections for sensitive locations has caused and continues to cause serious harm to Plaintiffs and their members in multiple ways.

*Declines in attendance at worship services*. As a result of Defendants' 2025 Policy, Plaintiffs and their members now reasonably fear immigration enforcement at and around their houses of worship. Indeed, as documented above, some of Plaintiffs' members have already experienced such incidents. For Plaintiffs and their members, the experience of armed federal agents on church property is and would be devastating, shattering their understanding of the church

as a safe and sacred place. *See, e.g.*, Ex. 39 ¶ 30; Ex. 53 ¶ 16; Ex. 57 ¶ 13; Ex. 59 ¶¶ 14-15; Ex. 54 ¶¶ 26-27; Ex. 51 ¶ 44; Ex. 52 ¶ 26. The reasonable fear of such incidents at Plaintiffs' houses of worship has caused many congregations to experience declines in attendance at worship services. *E.g.*, Ex. 38 ¶ 27; Ex. 37 ¶¶ 16, 18; Ex. 39 ¶ 27; Ex. 26 ¶ 25; Ex. 61 ¶¶ 10-12; Ex. 36 ¶¶ 18-20; Ex. 62 ¶ 14; Ex. 47 ¶ 13; Ex. 63 ¶ 10; Ex. 64 ¶¶ 4, 6-7; Ex. 77 ¶¶ 23-25, 27-28; Ex. 49 ¶ 15; Ex. 79 ¶ 8; Ex. 78 ¶ 9; Ex. 65 ¶ 8; Ex. 42 ¶¶ 37-38; Ex. 66 ¶¶ 6-8; Ex. 16 ¶¶ 20-21; Ex. 84 ¶ 11; Ex. 52 ¶ 17, 24; Ex. 67 ¶¶ 14, 20-21; Ex. 57 ¶ 17; Ex. 55 ¶ 28; Ex. 44 ¶¶ 12, 16-18, 22; Ex. 15 ¶¶ 18, 20; Ex. 20 ¶ 23; Ex. 68 ¶¶ 7-10; Ex. 69 ¶¶ 12-13; Ex. 25 ¶¶ 5-6, 10-11; Ex. 45 ¶¶ 16-18; Ex. 55 ¶ 28; Ex. 70 ¶ 5; Ex. 51 ¶ 35; Ex. 71 ¶¶ 32-37; Ex. 53 ¶¶ 13, 18, 19; Ex. 72 ¶¶ 13-14; Ex. 17 ¶¶ 22, 26; Ex. 73 ¶ 6; Ex. 74 ¶ 4; Ex. 75 ¶ 24; Ex. 58 ¶ 6; Ex. 23 ¶ 6; Ex. 76 ¶ 13; Ex. 88 ¶ 11. Some churches have seen attendance fall by as much as 80 percent. Ex. 44 ¶ 22; *see also* Ex. 41 ¶¶ 13-14 (drop from as many as 250 in-person worshippers to as few as 60); Ex. 50 ¶¶ 15-17 (60 percent drop in attendance at Spanish-language liturgy); Ex. 43 ¶¶ 9-10 (50 percent drop in attendance at services); Ex. 40 ¶ 17 (same). The fear and anxiety Defendants' policy has created around attending communal religious activities is felt not only by congregants who lack legal status but by those who have legal status—and even by those who are not immigrants. *See* Ex. 38 ¶ 27; Ex. 50 ¶¶ 18, 26; Ex. 36 ¶¶ 18-20; Ex. 62 ¶¶ 18-19; Ex. 47 ¶¶ 12-13, 16; Ex. 64 ¶ 9; Ex. 77 ¶¶ 28-29; Ex. 39 ¶ 29; Ex. 79 ¶ 8; Ex. 16 ¶¶ 21, 25; Ex. 52 ¶¶ 20-22; Ex. 44 ¶ 22; Ex. 45 ¶ 21; Ex. 71 ¶¶ 35-37; Ex. 80 ¶¶ 10, 12; Ex. 53 ¶¶ 13, 16; Ex. 66 ¶ 13; Ex. 48 ¶ 18.

When congregants stay home for fear of ICE at their church, they are deprived of the opportunity to take part in a central ritual of their faith by gathering with others in communal worship, harming both them and their churches. *See, e.g.*, Ex. 39 ¶¶ 31-33; Ex. 57 ¶¶ 11, 13; Ex. 38 ¶¶ 40, 43; Ex. 45 ¶ 18; Ex. 54 ¶ 25; Ex. 53 ¶ 15; Ex. 52 ¶ 22; Ex. 26 ¶¶ 33-34; Ex. 51 ¶ 39; Ex. 40

¶ 10; Ex. 66 ¶¶ 11-12; Ex. 43 ¶ 16.

The absence of those congregants in turn harms the broader congregation, including those who are able to attend, because they are then left unable to worship together with their full religious community. *See, e.g.*, Ex. 39 ¶¶ 41, 44; Ex. 57 ¶ 13; Ex. 44 ¶ 12; Ex. 72 ¶ 13; Ex. 52 ¶ 23; Ex. 26 ¶ 34; Ex. 51 ¶ 39; Ex. 54 ¶ 25; Ex. 53 ¶ 15; Ex. 63 ¶ 10; Ex. 58 ¶ 7; Ex. 42 ¶¶ 41-42, 50-52; Ex. 55 ¶ 30; Ex. 25 ¶ 11. For Quakers, that is a loss of spiritual unity that means being cut off from hearing the voice of God as expressed through their absent co-congregants. Ex. 26 ¶¶ 25, 34; Ex. 51 ¶ 39; Ex. 52 ¶ 22. For Lutherans, communal worship gatherings are "how [they] are saved by God, how [they] are forgiven by God, and how [they] experience the divine," Ex. 77 ¶ 9, and are expressions of their "theology, [thei]r community bonds, and [thei]r public witness as churches within [thei]r sanctuary Synod." Ex. 38 ¶ 40; *see also* Ex. 17 ¶ 18. So too, Baptists view "[c]ommunal worship and fellowship" as "fundamental" to their faith, Ex. 53 ¶ 15, and believe they are unable to "live up to the duties and obligations of [thei]r religious tradition" when "the most vulnerable people in [thei]r communities are afraid to come to church," Ex. 54 ¶ 25. Worshipping in community is "central" to MCC churches' religious practice; the inclusion of "Community" in the denomination's name "denotes the importance [they] place on building a spiritual and physical home for congregants," and "[e]very single congregant's presence adds to the communal worship experience." Ex. 57 ¶ 11. Similarly, "[w]orshipping together is central" to the faith of the Southern New England Conference. Ex. 59 ¶ 7; *see also* Ex. 61 ¶¶ 13-14.

*Declines in attendance at other aspects of Plaintiffs' ministries.* Defendants' policy impacts other core expressions of Plaintiffs' and their members' faith, such as their operation of ministries like Sunday School, food pantries for the needy, church camps, schools, and ESL classes, where many have seen declines in participation due to fears of immigration enforcement. *See* Ex. 38

¶ 27; Ex. 37 ¶ 18; Ex. 39 ¶ 32; Ex. 21 ¶¶ 25-32; Ex. 76 ¶¶ 17-20; Ex. 26 ¶¶ 19-20, 30-31; Ex. 61 ¶ 15; Ex. 81 ¶¶ 5-8; Ex. 50 ¶¶ 20-21; Ex. 36 ¶¶ 18-19; Ex. 47 ¶¶ 13, 15; Ex. 63 ¶ 9; Ex. 64 ¶ 8; Ex. 49 ¶ 14; Ex. 78 ¶¶ 11, 13; Ex. 42 ¶¶ 37-38; Ex. 48 ¶¶ 6-15; Ex. 24 ¶ 9; Ex. 16 ¶¶ 22-23; Ex. 19 ¶ 6; Ex. 67 ¶ 18; Ex. 44 ¶¶ 13, 17-19, 21-22; Ex. 55 ¶¶ 27, 29; Ex. 15 ¶ 21; Ex. 82 ¶¶ 4, 6; Ex. 29 ¶ 13; Ex. 20 ¶¶ 19, 23, 25; Ex. 69 ¶ 19; Ex. 45 ¶ 17; Ex. 70 ¶ 7; Ex. 51 ¶ 34; Ex. 83 ¶ 3; Ex. 71 ¶¶ 38-40; Ex. 46 ¶¶ 14-15; Ex. 17 ¶¶ 23, 28; Ex. 41 Decl. ¶¶ 20-21; Ex. 73 ¶ 11; Ex. 75 ¶¶ 25-28; Ex. 40 ¶ 18; Ex. 89 ¶¶ 25-27; Ex. 88 ¶ 12. These programs are central to Plaintiffs' religious practice. *See, e.g.*, Ex. 63 ¶ 4 ("It's an essential part of who we are to have these food distributions. … This is one of our mandates from God to feed God's people."); Ex. 48 ¶¶ 5-6; Ex. 21 ¶¶ 8-10; Ex. 53 ¶¶ 16-18; Ex. 55 ¶¶ 14-15, 31; Ex. 53 ¶¶ 14-15; Ex. 51 ¶ 21; Ex. 26 ¶ 32; Ex. 16 ¶ 10; Ex. 49 ¶ 11; Ex. 72 ¶ 17; Ex. 75 ¶ 23; Ex. 67 ¶ 19.

Some of Plaintiffs' members have had to restructure how they conduct ministries, such as by moving food distributions indoors and delivering resources to people's home rather than distributing from one location, in order to minimize the risks of immigration enforcement to the participants. Ex. 36 ¶ 19; Ex. 62 ¶ 13; Ex. 78 ¶ 13; Ex. 57 ¶ 18; Ex. 82 ¶ 9; Ex. 20 ¶ 20; Ex. 68 ¶ 11; Ex. 45 ¶¶ 16-17; Ex. 70 ¶ 8; Ex. 48 ¶ 14; Ex. 41 ¶ 20; Ex. 46 ¶¶ 16-18. In many cases, these changes require more resources and make the ministries less accessible to the populations the congregants are seeking to reach. *E.g.*, Ex. 48 ¶ 14 ("[D]oing individual deliveries is much more labor-intensive than having clients come pick up the food at one centralized location."); Ex. 45 ¶ 16 (congregation "had to move their meal program indoors …, making it more difficult for community members to know about and access the meal program"); Ex. 46 ¶ 17.

Plaintiffs' members have even had to cancel ministries and religious ceremonies—including public weddings and baptisms—altogether due to fears of immigration enforcement or

low attendance caused by those fears. Ex. 76 ¶ 10 (congregants ceased outside worship services), ¶ 16 (couple cancelled wedding at church); ¶ 19 (ESL classes cancelled); Ex. 43 ¶¶ 12-13 (confirmation classes and Hispanic Heritage Month fair and workshop cancelled); Ex. 61 ¶ 12 (baptism not held); Ex. 36 ¶ 19 (cancelled ESL classes and neighborhood food distribution); Ex. 62 ¶ 12 (cancelled ESL classes and neighborhood food distribution); Ex. 78 ¶ 10 (cancelled in-person Bible Studies and leadership trainings, reduced number of baptisms, quinceañeras, and other religious celebrations); Ex. 44 ¶ 21 (cancelled Vacation Bible School); Ex. 51 ¶ 34 (cancelled community events at Meetinghouse); Ex. 40 ¶ 20 (three families opted for private baptisms and weddings); Ex. 89 ¶ 22 (cancelled concerts and community gatherings). The result is significant harm to Plaintiffs' ability to carry out their religious mandate to minister to the wider world and serve their communities in accordance with their beliefs.

*Financial harms*. Congregations have also suffered the financial impact of decreased giving that accompanies decreased attendance. Ex. 41 ¶ 18 ("Donations are down by at least 50 percent."); Ex. 43 ¶ 15; Ex. 23 ¶ 8; Ex. 50 ¶ 19; Ex. 36 ¶ 18; Ex. 77 ¶ 33; Ex. 78 ¶ 14; Ex. 15 ¶ 18; Ex. 68 ¶ 13; Ex. 69 ¶ 16; Ex. 25 ¶ 12; Ex. 45 ¶¶ 17-18; Ex. 73 ¶ 7; Ex. 89 ¶ 17.

Congregations have suffered other kinds of financial harms as the result of the Policy as well. *See* Ex. 21 ¶¶ 10, 30-32 (community members stopped renting church's social hall for gatherings); Ex. 60 ¶¶ 6-10 (Brazilian congregation rents church space less frequently); Ex. 89 ¶¶ 22-23 (church lost $10,000 in revenue from cancelled events); Ex. 67 ¶¶ 20-21 (Synod paid $4,000 for translators at Synod event for individuals who ultimately did not attend because of fears of ICE coming during the event); Ex. 74 ¶¶ 5-6 (congregation relies on building renters that have seen the immigrant communities they serve staying away). And some congregations have had to take on added expense in order to protect their congregants in case of an immigration enforcement action at the

church. Ex. 25 ¶ 15 (hired security for $8,500 per month); Ex. 18 ¶ 16 (upgraded security cameras for $5,000 and added signage following unauthorized ICE incursion onto church property); Ex. 46 ¶ 26 (spent "thousands of dollars" installing signage throughout the church). This lessens these churches' ability to conduct their ministries and serve their congregations and communities, and, for some congregations, that decrease could force them to shut down entirely. *See* Ex. 78 ¶¶ 14-16 (lost 30% of church budget and had to reduce pastor's salary so drastically that the pastor left); Ex. 45 ¶ 18 (church staff and pastor had to cut hours); Ex. 77 ¶ 33. Plaintiff associations themselves have experienced financial strain as a result. *See* Ex. 78 ¶ 15 (Synod covered 50% of church's mortgage payments); Ex. 67 ¶ 22.

*Additional harms.* Defendants' policy chills Plaintiffs' exercise of religion and association in other ways too. In response to the 2025 Policy, pastors have avoided preaching freely about their churches' stance on immigration-related issues, for fear it might draw enforcement attention to the church. Ex. 54 ¶¶ 20-21; Ex. 58 ¶ 9; Ex. 72 ¶ 18. In at least one instance, a pastor made the painful choice to not visit a congregant in immigration detention for fear of immigration-enforcement retaliation against the church. Ex. 84 ¶¶ 9-10. The 2025 Policy has driven behind closed doors ceremonies such as baptisms and weddings that before would have been occasions for communal worship and celebration. *See* Ex. 66 ¶¶ 11-12; Ex. 69 ¶ 19; Ex. 40 ¶ 20. One Minneapolis church was forced to relocate its Sunday services entirely after CBP agents killed Alex Pretti just one block from the church, resulting in even greater fear of enforcement activities at the church. Ex. 89 ¶¶ 16-17. Some have had to reduce their presence online or in the community, including by taking down livestreams of worship services, to avoid publicly identifying members or attracting the attention of immigration enforcement. Ex. 37 ¶ 17; Ex. 36 ¶ 19; Ex. 62 ¶¶ 9-11, 15; Ex. 42 ¶ 47; Ex. 72 ¶ 18; Ex. 54 ¶ 20; Ex. 76 ¶¶ 9, 20; Ex. 89 ¶ 24.

Those who continue to attend now must do so with the fear that armed agents may be waiting to waylay them outside the church, or may even seek to enter the sanctuary, a constant threat that directly burdens their religious worship. Ex. 37 ¶ 19; Ex. 16 ¶ 28; Ex. 45 ¶ 18; Ex. 79 ¶ 11; Ex. 54 ¶¶ 26-27; Ex. 53 ¶ 13; Ex. 52 ¶ 23; Ex. 51 ¶ 44; Ex. 26 ¶ 34; Ex. 23 ¶ 5; Ex. 76 ¶ 21; Ex. 89 ¶¶ 10, 14. Congregations whose faith directs them to welcome all comers to communal worship now are compelled to lock their church doors, post guards to look out for immigration enforcement, put up signage declaring previously open areas private, and take other steps inconsistent with their religious commitment to openness and welcoming all. Ex. 37 ¶ 17; Ex. 43 ¶ 14; Ex. 89 ¶ 15; Ex. 88 ¶ 16; Ex. 28 ¶¶ 7, 9; Ex. 36 ¶ 19; Ex. 62 ¶ 16; Ex. 22 ¶ 9; Ex. 77 ¶ 34; Ex. 49 ¶ 15; Ex. 39 ¶ 37; Ex. 79 ¶¶ 7, 9; Ex. 65 ¶ 10; Ex. 44 ¶ 20; Ex. 15 ¶ 20; Ex. 29 ¶¶ 16-17; Ex. 20 ¶ 21; Ex. 45 ¶¶ 16-19; Ex. 69 ¶ 20; Ex. 71 ¶ 48; Ex. 80 ¶ 13; Ex. 17 ¶ 22; Ex. 73 ¶ 9-10; Ex. 74 ¶ 6; Ex. 41 ¶ 16; Ex. 58 ¶ 8; Ex. 76 ¶ 11; Ex. 46 ¶ 26. Many have also had to spend time, effort, and financial resources on training and preparation in the event of an ICE raid—resources that would otherwise be devoted to other aspects of their religious mission. Ex. 89 ¶¶ 11-13, 18-21; Ex. 21 ¶ 24; Ex. 76 ¶ 8; Ex. 26 ¶¶ 26, 29; Ex. 43 ¶ 14; Ex. 28 ¶ 8; Ex. 50 ¶ 24; Ex. 36 ¶ 18; Ex. 22 ¶ 10; Ex. 77 ¶ 35; Ex. 59 ¶¶ 9-13; Ex. 49 ¶¶ 13, 15; Ex. 79 ¶ 6; Ex. 24 ¶¶ 6-8; Ex. 66 ¶¶ 9-10; Ex. 84 ¶ 13; Ex. 18 ¶¶ 5, 16-18; Ex. 57 ¶¶ 17, 19; Ex. 44 ¶ 14; Ex. 82 ¶¶ 7-8; Ex. 29 ¶ 16; Ex. 20 ¶ 22; Ex. 68 ¶¶ 16-17; Ex. 69 ¶ 20; Ex. 45 ¶¶ 16, 18-20; Ex. 25 ¶ 15; Ex. 70 ¶ 8; Ex. 71 ¶ 47; Ex. 80 ¶¶ 10, 13-14, 17; Ex. 56 ¶ 8; Ex. 55 ¶ 26; Ex. 46 ¶¶ 19-25; Ex. 88 ¶ 17.

DHS's policy thus creates an implacable injury of conscience: Plaintiffs must either violate their belief in freely welcoming all to communal worship and loudly proclaiming their faith to the world, or violate their belief that they must do everything possible to keep their congregants and community safe as they worship, serve, and pray. Ex. 39 ¶ 44; Ex. 79 ¶ 9; Ex. 51 ¶¶ 37,42; Ex. 26

¶ 26; Ex. 52 ¶ 19; Ex. 44 ¶ 20; Ex. 54 ¶ 23; Ex. 15 ¶ 22; Ex. 49 ¶ 16; Ex. 22 ¶¶ 8-9; Ex. 42 ¶¶ 47-48; Ex. 29 ¶ 17; Ex. 71 ¶ 48; Ex. 28 ¶ 9; Ex. 89 ¶ 29.

### C. The preliminary injunction has ameliorated the harms of the 2025 Policy.

The Court's preliminary injunction, ECF No. 75, has mitigated the harms of the 2025 Policy for the Plaintiffs whose members it protects. For many of these congregations, having even temporary protections in place has given them a sense of security that has allowed them to practice their faith more freely and openly. *See* Ex. 64 ¶ 14 ("Because of the court order, now we feel freedom … that we can worship and be safe to practice our religion here in the sanctuary."); Ex. 77 ¶¶ 42-43 ("People say they feel safer now. … They can worship without fear of being detained or the service being interrupted."); Ex. 56 ¶¶ 10-11 ("[T]he larger congregation feels both great relief as well as ongoing preparedness should ICE try to circumvent the Court's order. … We are … able to breathe easier[.]"); Ex. 40 ¶ 22 ("We intended to cancel our Holy Week celebration … but upon learning of the Court's order, we decided to move forward with the event").

With the preliminary injunction in place, Plaintiffs' members have seen worshippers return to services. Ex. 64 ¶¶ 10-12; Ex. 77 ¶¶ 39, 41-42; Ex. 67 ¶¶ 28-29; Ex. 57 ¶ 20; Ex. 21 ¶¶ 35, 38; Ex. 44 ¶¶ 16-18, 22, 24; Ex. 17 ¶ 32; Ex. 53 ¶¶ 19, 21; Ex. 40 ¶¶ 22-23. In some cases, they have even seen their congregations grow as they are viewed as a safe space in the community. Ex. 44 ¶ 17. Attendance at Plaintiffs' ministries has similarly rebounded under the protections of the injunction. Ex. 21 ¶¶ 35-37 (attendance at community meal improved; community members began renting the church's social hall again); Ex. 64 ¶ 13 (increased participation at food pantries); Ex. 77 ¶ 40 (families who had previously avoided coming to church together attended a children's day celebration together); Ex. 48 ¶ 17 (attendance at food distribution has stabilized and returned to normal); Ex. 44 ¶¶ 17-18, 21-22, 24 (attendance at food distributions and youth group rebounded; congregation that cancelled Vacation Bible School in 2025 plans to hold it in 2026); Ex. 46 ¶ 30

(following the injunction, attendance at the food pantry has increased since they moved it inside the church).

**PROCEDURAL HISTORY**

Plaintiffs filed suit in July 2025, bringing claims under the Religious Freedom Restoration Act (RFRA), the First Amendment, and the Administrative Procedure Act (APA). ECF No. 1. Plaintiffs promptly moved for a preliminary injunction or stay under 5 U.S.C. § 705. ECF No. 33.

In February, the Court granted Plaintiffs' motion in part, holding that Plaintiffs had showed a likelihood of success on the RFRA claim, a likelihood of irreparable harm, and that an injunction would serve the public interest. ECF No. 74 ("PI Op."). The Court found that three plaintiffs—San Francisco Friends Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting—had not shown they likely had standing. *Id.* at 30-34. It did not reach Plaintiffs' First Amendment claims, *id.* at 46-48, and did not order a stay under section 705 because it preliminarily concluded that neither the 2025 Policy nor the Mayorkas Memo constituted final agency action reviewable under the APA, *id.* at 49-53.

The preliminary injunction that the Court entered carefully restricts immigration enforcement at and near covered Plaintiffs' houses of worship except in specified circumstances. ECF No. 75 at 4. It does not restrict immigration enforcement where Defendants' agents act pursuant to an administrative warrant, as the Court preliminarily concluded that 8 U.S.C. § 1252(f)(1) barred such relief. PI Op. at 56-58.

In April, Defendants produced the administrative records for the Huffman and Vitello Memos, certifying that each record reflected "all non-privileged documents and materials considered by [each agency] in issuing" the memos. ECF Nos. 90-2 ¶ 3, 90-4 ¶ 3. Both records are notably brief and consist solely of executive orders, memos, and other agency documents, most if

not all of which are publicly available. *See* ECF No. 90-1 (index of record for Huffman Memo, totaling 21 pages of material); ECF No. 90-3 (index of record for Vitello Memo, totaling 67 pages of material). The administrative records contain no evidence that DHS had experienced difficulties conducting immigration enforcement while the Mayorkas Memo was in place, and no reports of immigrants evading enforcement by hiding in churches or other sensitive locations. Also absent from the records is any indication that Defendants considered the 2025 Policy's impact on constitutional or statutory rights, the reliance interests created by the prior sensitive locations policy, or any less restrictive alternatives to their new approach.

In June, Plaintiffs amended their complaint to include eleven additional religious organizations that, along with their members, have been injured by the 2025 Policy. ECF No. 97.

**LEGAL STANDARD**

At summary judgment, "the movant must demonstrate that 'there is no genuine dispute as to any material fact' and that it 'is entitled to judgment as a matter of law.'" *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). Genuine disputes do not exist where "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Ithier v. Aponte-Cruz*, 105 F.4th 1, 6 (1st Cir. 2024) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which it has the burden of proof, to demonstrate that a trier of fact reasonably could find in its favor." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (brackets omitted). The non-movant must "produc[e] specific facts, in suitable evidentiary form to counter the evidence" presented, *Lopez-Carrasquillo v. Rubianes*, 230 F.3d 409, 413 (1st Cir. 2000) (quotation marks omitted);

"conjectural allegations, conclusory assertions, and [] inconsequential evidence" will not suffice, *see Nicolo v. Phillip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000).

## ARGUMENT

### I. Plaintiffs have standing to challenge the 2025 Policy.

A plaintiff has organizational standing and may sue on its own behalf where it can "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). A plaintiff has associational standing and may sue on behalf of its members where "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Conservation Law Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 86 (1st Cir. 2025) (quotation marks omitted).

Plaintiffs here satisfy both standards. They have organizational standing because they themselves suffered injury caused by the 2025 Policy that the Court could redress. And they have associational standing because (1) their members have been similarly harmed and therefore would have standing to sue in their own right, (2) the interests Plaintiffs seek to protect—e.g., freedom of worship and expressive association—are germane to their purposes, and (3) this case does not require the participation of individual members.

#### A. Plaintiffs and their members have suffered and are suffering injury-in-fact.

The 2025 Policy has inflicted several types of cognizable injuries in fact. First, and as the Court previously acknowledged, the policy has resulted in decreased attendance and participation at regular worship services, at ceremonies such as baptisms and weddings, at church events, and at other aspects of Plaintiffs' and their members' religious ministries, such as food pantries and

Sunday school classes. *See supra* 10-14; PI Op. at 14-18. That "reduction in attendance at religious services … constitutes a concrete injury in fact." *See Phila. Yearly Meeting I*, 767 F. Supp. 3d at 313; *accord Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 523 (9th Cir. 1989) ("Churches, as organizations, suffer a cognizable injury when assertedly illegal government conduct deters their adherents from freely participating in religious activities protected by the First Amendment."). Second, and as the Court also previously recognized, the 2025 Policy has decreased financial giving to Plaintiffs and their members as congregants stay home for fear of raids at or near the church. *See supra* 14-15; PI Op. at 18. "Such an out-of-pocket loss is a quintessential injury in fact." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024) (quotation marks omitted).

Third, the policy has chilled and burdened Plaintiffs' religious exercise in other ways, such as by forcing congregations to worship behind closed and locked doors, leading clergy to censor themselves when preaching, and causing Plaintiffs to remove references to immigration from their public-facing materials. *See supra* 15-16. The Court previously (and preliminarily) concluded that this claim of injury was likely foreclosed by *Laird v. Tatum*, 408 U.S. 1, 11 (1972). *See* PI Op. at 19-20. It should reach a different conclusion this time. As the First Circuit has held, a plaintiff is harmed where it is "chilled from exercising [its] right to free expression or forgoes expression in order to avoid enforcement consequences," at least where the plaintiff can show "specific present objective harm or a threat of specific future harm." *Blum v. Holder*, 744 F.3d 790, 796 (1st Cir. 2014); *see also Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 175-78 (D. Mass. 2025) (collecting cases), *appeal pending*, No. 26-1141 (1st Cir.). There can be little doubt here that Plaintiffs face a genuine threat of enforcement at their churches; indeed, numerous such incidents have already occurred. *See supra* 5-7. And that threat has harmed Plaintiffs in specific and concrete

ways, such as by forcing them to close worship spaces they believe should be open to the world. Plaintiffs here are thus entirely unlike those in *Laird*, who objected generally to the existence of a government program they did not allege affected them in any specific way. *See* 408 U.S. at 9-10.

Fourth, the 2025 Policy has forced Plaintiffs' members to devote time, effort, and financial resources to trainings, physical security upgrades, and other preparations to keep congregants safe in the event of immigration enforcement—resources that would otherwise be devoted to other aspects of their religious mission, such as providing social services. *See supra* 16. Such "direct[] … interfere[nce] with [Plaintiffs'] core … activities" constitutes injury in fact. *All. For Hippocratic Med.*, 602 U.S. at 395; *see also, e.g.*, *Am. Acad. of Pediatrics v. Kennedy*, 814 F. Supp. 3d 150, 159-61 (D. Mass. 2026) (medical association was harmed where agency action required it to expend additional resources counseling and assisting members). While the Court previously judged such harms to be self-inflicted because they were "based on … fears of hypothetical future [immigration enforcement actions]," PI Op. at 19 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)), new evidence in the record showing that such actions have already occurred demonstrates that Plaintiffs' fears are anything but hypothetical, and nothing like the attenuated chain of speculative causation in *Clapper*. *See supra* 5-7; *cf. Clapper*, 568 U.S. at 410-11.

While the Court also previously concluded, based on the preliminary injunction record, that the three Quaker Plaintiffs had not provided sufficient information to establish that they likely had standing, PI Op. at 30-34, the record now assembled at summary judgment confirms that they do. That record shows that the Pacific Yearly Meeting has experienced, among other harms, a "sharp decrease" in participation at a food pantry and sheltering operation run by one of its member meetings, as well as decreases in attendance at that meeting's worship services and events. Ex. 26 ¶¶ 19-25. The San Francisco Friends Meeting has had to cancel multiple community events due to

fears of ICE enforcement at the meeting house, and even legal documented immigrant attendees now reasonably fear participating in worship as a result of Defendants' policy. Ex. 51 ¶¶ 33-35. And the North Pacific Yearly Meeting has seen injuries that include international visitors staying away from its annual session and potential new immigrant worshippers ceasing to show up at one of its member meetings. Ex. 52 ¶¶ 14-17, 22.

### B. Those injuries are traceable to the 2025 Policy and would be redressed by a favorable judicial decision.

Traceability and redressability "are often 'flip sides of the same coin,'" because "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 380-81 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)); *see also Town of Milton, Mass. v. FAA*, 87 F.4th 91, 95 (1st Cir. 2023) (discussing traceability and redressability together). Plaintiffs have shown that their injuries are fairly traceable to the 2025 Policy and that the relief they seek would likely redress those injuries, just as the preliminary injunction has already done for some Plaintiffs. *See supra* 17-18.

As the Court has explained, "[a] plaintiff can satisfy traceability by showing that the defendant's conduct is one among multiple causes of the alleged injury." PI Op. at 21 (quoting *Conservation L. Found.*, 129 F.4th at 90). Thus, "to establish traceability" with respect to the decreases in attendance and financial giving they have experienced, Plaintiffs "must show that third parties (their church members) will likely react in predictable ways to the challenged conduct (the adoption of the 2025 Policy) that will lead to an injury (declining church attendance)." *Id.* at

22.[2] "When third party behavior is predictable, commonsense inferences may be drawn," and Plaintiffs need not "introduce evidence … to show how third parties would likely respond." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116, 120-21 (2025). Here, the Court has already found that it is "obvious" that third parties will predictably react to a location becoming less safe by avoiding that location. PI Op. at 23. If that were not enough—and, under *Diamond Alternative Energy*, it is—Plaintiffs have also documented significant evidence of causation, such as attendance declines that coincided with the 2025 Policy and statements by congregants who ceased attending that they feared immigration raids at and around their church. *See, e.g.*, Ex. 64 ¶¶ 6-9; Ex. 77 ¶¶ 23-25; Ex. 48 ¶¶ 10-11; Ex. 45 ¶ 16; Ex. 58 ¶ 6; Ex. 29 ¶ 7; Ex. 43 ¶¶ 9-10; Ex. 25 ¶ 5. The rebounds in attendance following entry of the Court's preliminary injunction likewise confirm that these harms were traceable to the 2025 Policy. *See supra* 17-18.

Those increases in attendance also provide incontrovertible evidence of redressability. The threshold for redressability is low; in cases involving monetary damages, for example, a likelihood of recovering "[e]ven 'one dollar' … would satisfy the redressability component." *Diamond Alt. Energy*, 606 U.S. at 114 (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021)). Here, the increases in attendance that have already occurred in just a few months as a result of the Court's preliminary injunction confirm the commonsense conclusion that relief at final judgment will likely redress at least some of Plaintiffs' injuries.

## II. The 2025 Policy violates the Religious Freedom Restoration Act.

Defendants' 2025 Policy violates RFRA because it substantially burdens the practice of Plaintiffs' faith and cannot satisfy strict scrutiny. RFRA prohibits the government from

[2] Because Plaintiffs' third and fourth types of injuries—chill to religious exercise and having to devote resources to protecting their churches and congregants—do not stem from the actions of third-party churchgoers, causation for those injuries is, if anything, even clearer.

"substantially burden[ing] a person's exercise of religion," unless it demonstrates that the challenged action "is in furtherance of a compelling government interest" and "is the least restrictive means of furthering that … interest." 42 U.S.C. § 2000bb-1(a)-(b). This prohibition applies "even if the burden results from a rule of general applicability." *Id.* § 2000bb-1(a).

**A. The policy substantially burdens Plaintiffs' exercise of religion.**

**1. Exercise of religion**

All aspects of Plaintiffs' religious practice are protected by RFRA. Exercise of religion under RFRA includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4) (cross-referencing *id.* § 2000cc-5); *contra* PI Op. at 6 (considering whether "certain identified activities are central to [Plaintiffs'] religious practice"). This concept must "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of [the statute] and the Constitution." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014); *see also Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990) (noting that exercise of religion "often involves not only belief and profession but the performance of (or abstention from) physical acts"). Under this definition, Plaintiffs' exercise of religion includes not only weekly worship services but religious ministries such as Sunday school, Vacation Bible School, religious education, food pantries, community meals, and other faith-based activities that they attest are part of their religious practice. *See supra* 7-10, 13.

**2. Substantial burden**

As the Court has already preliminary concluded, the 2025 Policy "clearly imposes" a substantial burden on Plaintiffs' exercise of religion because it coerces them to behave contrary to their sincerely held religious beliefs. PI Op. at 43; *see also Phila. Yearly Meeting I*, 767 F. Supp. 3d at 329-32 (same). RFRA does not define "substantial burden," and the First Circuit has not

adopted a test. *See* PI Op. at 40. However, many circuits agree that a substantial burden under RFRA exists where the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."[3] *Perrier-Bilbo v. United States*, 954 F.3d 413, 431 (1st Cir. 2020) (quoting *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981)); *see also Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 38 (1st Cir. 2007) (applying, *arguendo*, same definition to RLUIPA claim). Where plaintiffs "sincerely believe" that they must act in a particular way in accordance with their religious beliefs, "it is not for [courts] to say that their religious beliefs are mistaken or insubstantial"; rather, the only question is "whether the line drawn reflects an honest conviction." *Hobby Lobby*, 573 U.S. at 725 (quotation marks omitted).

The uncontroverted record evidence demonstrates that the 2025 Policy substantially burdens Plaintiffs' religious exercise in several ways. The Policy "would permit immigration-enforcement officers to set up a checkpoint just outside a church, or to question parishioners in the middle of a Catholic Mass," which would unquestionably "substantially hinder, constrain, and inhibit individuals from attending church or religious schools or programs, regardless of citizenship status, thereby imposing a 'substantial burden.'" PI Op. at 43. Indeed, under the 2025 Policy, Defendants have already carried out numerous operations at and around Plaintiffs' member houses of worship. The predictable effect has been to discourage congregants and participants, both with status and without, from attending communal worship and in-person ministries that are central to the practice of Plaintiffs' faith, in many cases resulting in a concomitant decline in financial offerings that support Plaintiffs' and their members' activities and ministries. Moreover,

---

[3] *See, e.g.*, *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008); *Davis v. Wigen*, 82 F.4th 204, 212 (3d Cir. 2023); *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 100 (4th Cir. 2013); *Doe v. Cong. of the U.S.*, 891 F.3d 578, 589-90 (6th Cir. 2018); *Korte v. Sebelius*, 735 F.3d 654, 682-83 (7th Cir. 2013).

the Policy has forced Plaintiffs to compromise on central tenets of their religious convictions, including boldly sharing their faith and enthusiastically welcoming all comers, by locking doors, discontinuing publicity for worship and ministries, posting guards during services, and even in some cases changing the messages they share from the pulpit. *Cf. Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (policy that forced prisoner to choose between religious requirement to wear a beard and "serious disciplinary action" substantially burdened his religious exercise). All of these impacts are substantial burdens on Plaintiffs' exercise of religion. *See* 42 U.S.C. §§ 2000bb-2(4), 2000cc-5.

**B. The policy cannot survive strict scrutiny.**

**1. DHS cannot demonstrate a compelling government interest.**

Defendants' prior invocation of a general interest in uniform application of immigration law, *see* ECF 56 at 25, falls well short of articulating a compelling government interest. RFRA forecloses this kind of "categorical approach," and instead requires considering the interest in "application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espiria Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006) (quoting 42 U.S.C. § 2000bb-1(b)). Courts must "look beyond broadly formulated interests" and instead scrutinize "the marginal interest in enforcing" the challenged action in the particular case. *Hobby Lobby*, 573 U.S. at 726-27 (brackets omitted). It is Defendants' burden to demonstrate a compelling interest. *See O Centro*, 546 at 429-30.

Thus, Defendants must show a compelling interest in maintaining their policy of enforcement at Plaintiffs' houses of worship specifically, rather than in conducting immigration enforcement generally. Defendants cannot come close to satisfying this standard. The record is devoid of any evidence demonstrating the necessity of conducting immigration enforcement

without a judicial warrant or exigent circumstances at Plaintiffs' houses of worship. Moreover, in the months that the preliminary injunction has been in place, the government has been able to enforce the immigration laws without being hampered by the injunction's reasonable limitations on doing so at and around Plaintiffs' churches.

**2. The 2025 Policy is not the least restrictive means of furthering DHS's stated interest.**

Nor can the government meet the "exceptionally demanding" least-restrictive means test with respect to the 2025 Policy. *See Hobby Lobby*, 573 U.S. at 728. To do so, Defendants would have to show that they "lack[] other means of achieving [their] desired goal without imposing a substantial burden on the exercise by the objecting parties in" the case. *Id.* Where a less restrictive means is available, "the Government must use it." *Holt v. Hobbs*, 574 U.S. 352, 365 (2015).

Even if Defendants had a compelling interest in conducting immigration enforcement at Plaintiffs' houses of worship, they cannot show that the 2025 Policy is the least restrictive means of accomplishing their goals. PI Op. at 43-44 (finding it "clear" that the 2025 Policy is not the least restrictive means); *Phila. Yearly Meeting I*, 767 F. Supp. 3d at 333 (likewise finding that government cannot satisfy this standard). Indeed, for decades, the government was able to conduct immigration enforcement while respecting the rights of worshippers. *Cf. Hobby Lobby*, 573 U.S. at 730 ( "HHS itself has demonstrated that it has at its disposal an approach that is less restrictive" because it already offered an accommodation to nonprofit organizations). DHS's prior policy is "an example of a less restrictive means that has not been shown to be inadequate to meet the governmental interest." *Phila. Yearly Meeting I*, 767 F. Supp. 3d at 333. And there is nothing in the paltry administrative record Defendants have produced that suggests that a policy limiting operations at houses of worship hampered effective immigration enforcement in any way.

**III. The 2025 Policy violates Plaintiffs' First Amendment rights.**

Defendants' 2025 Policy has had the predictable effect of preventing Plaintiffs' members from participating in the communal practice of their faith, a violation of Plaintiffs' rights of expressive association. The policy cannot survive heightened scrutiny, as it is not substantially related to a sufficiently important government interest, and therefore violates the First Amendment.

**A. The policy infringes on Plaintiffs' freedom of expressive association.**

The effect of the 2025 Policy on Plaintiffs' associational activities is squarely within the types of harms the Supreme Court has recognized as infringing expressive associational rights. *See Phila. Yearly Meeting I*, 767 F. Supp. 3d at 325 (concluding that "it is likely that Plaintiffs will be able to establish that the 2025 Policy is significantly affecting or burdening their expressive association rights"). When Plaintiffs gather to practice their faith, through worship or ministry, they are engaged in expressive association under the auspices of the First Amendment. Freedom of expressive association "emerges from the insight that expressive rights explicitly guaranteed by the First Amendment 'could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.'" *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 50 (1st Cir. 2005) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). "Religious groups are the archetype of associations formed for expressive purposes," and "the First Amendment gives special solicitude to the[ir] rights." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., concurring) (quotation marks omitted). Gathering for worship and religious activity is an archetypical exercise of these rights. See *Bd. Of Dirs. Of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987) ("[T]he Court has upheld the freedom of individuals to associate for the purpose of engaging in … religious activities.").

Government action that discourages and impedes Plaintiffs' members' participation in communal worship and practice of faith infringes their associational rights. The Supreme Court has recognized a wide array of government actions that burden such rights, including "requir[ing] disclosure of membership lists," "impos[ing] penalties or withhold[ing] benefits based on membership in a disfavored group," or otherwise making "group membership less attractive, raising … First Amendment concerns about affecting the group's ability to express its message." *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 69 (2006). As the Court has recognized, a neutral law of general application may violate an organization's expressive association rights. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000) (New Jersey public accommodations law violated the Boy Scouts' right of expressive association); *Ams. for Prosperity v. Bonta*, 594 U.S. 595, 618 (2021) (California requirement that charities disclose donors facially unconstitutional). Government actions that "discourage people from associating with groups engaged in protected First Amendment advocacy" and "encourage groups and individuals to cease or modify protected First Amendment advocacy the government disfavors" infringe on those groups' expressive association. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026) (brackets and quotation marks omitted); *see also Ams. for Prosperity*, 594 U.S. at 616 ("Exacting scrutiny is triggered by state action which *may* have the effect of curtailing the freedom to associate") (quotation marks omitted). Courts "give deference to an association's view of what would impair its expression." *Boy Scouts*, 530 U.S. at 653.

As documented above, Defendants' 2025 Policy inhibits Plaintiffs' and their members' ability to engage in communal worship, to minister to their communities, and to engage in faith education and formation activities with their congregations. The fear created by that policy deters people—including not only immigrants lacking legal status but also immigrants with legal status

and even people who are not immigrants at all—from coming together at Plaintiffs' houses of worship to take part in religious worship or to receive vital services. And even those who are not themselves deterred from gathering suffer injury to their expressive-association rights, because they are deprived of the ability to associate with others for the purpose of communal worship and other expressions of their religious faith.

**B. The policy cannot satisfy exacting scrutiny.**

Government action that infringes on associational rights must satisfy exacting scrutiny, which requires that the action be "substantially related to a sufficiently important interest" and "be narrowly tailored to the government's asserted interest." *Ams. for Prosperity*, 594 U.S. at 607-08. Defendants cannot meet this standard. *See Phila. Yearly Meeting I*, 767 F. Supp. 3d at 326-28.

There is no substantial relation between conducting unrestricted enforcement at houses of worship and a sufficiently important government interest. *See id.* Defendants have previously argued that the federal government has an interest in uniform enforcement of immigration laws. *See* ECF 56 at 25. However, this contention ignores that the federal government was demonstrably able to conduct immigration enforcement in the decades proceeding the 2025 Policy, and there is no countervailing evidence in the administrative records that contradicts that conclusion. Defendants therefore cannot show that the 2025 Policy is related, let alone substantially related, to their interest in enforcing immigration laws.

Moreover, even if Defendants could show the 2025 Policy is substantially related to their interest in immigration enforcement, they cannot show that the policy is narrowly tailored. *See Shelton v. Tucker*, 364 U.S. 479, 488 (1960) (even where "the governmental purpose [is] legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved"). "Narrow tailoring is crucial

where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. for Prosperity*, 594 U.S. at 609 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Where, as here, there is a "dramatic mismatch" between the government's interest in immigration enforcement and the policy that Defendants have "implemented in service of that end," the policy "falls far short of satisfying the means-ends fit that exacting scrutiny requires." *Ams. for Prosperity*, 594 U.S. at 613.

Defendants' Policy has had profound negative impacts on communal worship and ministry across the United States, without yielding any improvements in immigration enforcement that could not be achieved while respecting the rights of worshippers. There is nothing in the record to show that unrestrained immigration enforcement at houses of worship "form[s] an integral part" of Defendants' enforcement of immigration law, as would be expected in light of the substantial burden on association the Policy inflicts. *Ams. for Prosperity*, 594 U.S. at 613 (disclosure requirement not narrowly tailored where there was no instance where the information collected "did anything to advance the Attorney General's investigative, regulatory, or enforcement efforts"). Further, it is clear from the scant administrative record that Defendants did "not even consider[] alternatives" to the 2025 Policy to determine whether a less restrictive means was available. *Id.* Accordingly, Defendants fail exacting scrutiny.

## IV. The 2025 Policy violates the APA.

### A. The policy constitutes final agency action.

The APA provides for judicial review of "final agency action." 5 U.S.C. § 704. Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156, 177-78 (1997) (quotation marks omitted). Courts take

a "pragmatic approach … to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quotation marks omitted). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Ass'n of Am. Univs. v. Dep't of Energy*, No. 25-cv-10912, 2025 WL 1414135, at *9 (D. Mass. May 15, 2025).

The 2025 Policy marks the consummation of DHS's decisionmaking process because it rescinded, effective immediately, the prior sensitive locations policy. The first prong of the *Bennett* test is therefore satisfied—and Defendants have not argued otherwise. *See* PI Op. at 49.

The 2025 Policy is also one "by which rights or obligations have been determined" and "from which legal consequences will flow," *Bennett*, 520 U.S. at 156 (quotation marks omitted), because it rescinded a directive—the Mayorkas Memo—that imposed binding substantive and procedural limitations on DHS personnel's ability to undertake immigration enforcement operations at and around sensitive locations. *See* PI Op. at 51 (assessing whether the 2025 Policy was likely "final" by looking to the effect of the Mayorkas Memo); *see also Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, No. 25-cv-0243, 2026 WL 280089, at *3-6 (D. Md. Feb. 3, 2026) ("*Phila. Yearly Meeting II*") (holding that 2025 Policy is final agency action).

That the Mayorkas Memo imposed such binding limitations is demonstrated both by its text and by the way DHS applied it. *See Sw. Airlines Co. v. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) ("In assessing whether a particular agency action qualifies as final … , this court and the Supreme Court have looked to the way in which the agency subsequently treats the challenged action."); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding … or is applied by the agency in a way that indicates it is binding.").

By its terms, the Mayorkas Memo was binding. It provided direct instructions from the head of the agency to all agency personnel about their unflagging "obligation" to refrain from enforcing at sensitive locations. Ex. 5 at 3. It set forth in detail the limited circumstances in which such enforcement could occur, commanding, for example, that, "[a]bsent exigent circumstances, an Agent or Officer *must* seek prior approval" before proceedings. *Id.* at 4 (emphasis added). The memo required employees to receive training on its instructions. *Id.* at 4. And it further directed that any enforcement action at a sensitive location "*must* be fully documented in [an agency system of record] in a manner that can be searched and validated," including the reason the action was taken at that location. *Id.* at 4-5 (emphasis added).

Not surprisingly, then, the Mayorkas Memo was understood and implemented by DHS and its subagencies as a binding directive. As confirmed by one former high-ranking ICE official directly involved in its drafting, "[t]he Mayorkas Memo contained both substantive and procedural enforcement limitations" and "was a restrictive policy" that agents understood as such. Ex. 7 ¶¶ 10, 12-15. "DHS did not treat the memo as simply discouraging immigration enforcement near protected locations; it treated the memo as requiring agents to avoid enforcement actions near protected locations unless one of the limited exceptions described in the policy existed." *Id.* ¶ 15. That is because, as explained by another high-ranking DHS official, "[t]he Secretary is the highest authority at DHS and all leadership, officers and agents of ICE and CBP were clearly bound by the [Mayorkas Memo] and did not have discretion to disregard its limitations on immigration enforcement." Ex. 6 ¶ 7.

That understanding is confirmed by other evidence. A message from the ICE Acting Director transmitting the memo to all ICE employees underscored at the time that, "[e]ffective immediately, enforcement actions should not be taken in or near a location that would restrain

people's access to essential services or engagement in essential activities." Ex. 85. DHS's website specifically invited the public to submit complaints "[i]f DHS officers and agents take enforcement actions that are believed to be *in violation of* the protected areas policy"—an invitation that would make little sense if the memo was purely precatory. Ex. 86 at 3-4 (emphasis added); *see Phila. Yearly Meeting II*, 2026 WL 280089, at *4 (noting that "DHS personnel who violated the 2021 Policy were likely subject to discipline"). As of the date of this filing, CBP's website still stated of the Mayorkas Memo that, "[a]bsent exigent circumstances, an Agent or Officer *must* seek prior approval from their Agency's headquarters" and provided avenues for lodging complaints about "violation[s]" of the policy. Ex. 87 (emphasis added). When DHS rescinded the sensitive locations policy last year, it emphasized that the policy had "thwarted law enforcement" and "tied the hands of our brave law enforcement," further confirming the policy's binding nature. Ex. 9. And following rescission of the policy, the number of enforcement actions at sensitive locations exploded, by Defendants' admission. *Compare* Ex. 4 (reporting that between 2017 and 2020, ICE planned or conducted 68 arrests at sensitive locations, including 20 at houses of worship), *with* Ex. 13 at 1 (reporting that, in the last year alone, ICE has made 1,454 arrests at sensitive locations).

By entirely eliminating the binding limitations in the Mayorkas Memo, the 2025 Policy is an action "by which … obligations have been determined"—specifically, the obligations on DHS personnel when carrying out their duties and interacting with the public. *See Phila. Yearly Meeting II*, 2026 WL 280089, at *4 (concluding that the memo "determined the rights and obligations of DHS personnel by placing specific restrictions on their ability to conduct immigration enforcement actions at or near protected areas"). Likewise, the 2025 Policy is one "from which legal consequences will flow" because it determines where and under what circumstances people may be surveilled, questioned, and seized.

The Court therefore should revise its preliminary determination that the 2025 Policy likely did not constitute final agency action, including in light of the new evidence, described above, about how the Mayorkas Memo was implemented in practice. PI Op. at 49-53. The preliminary injunction opinion noted that the memo "did not entirely prevent immigration-enforcement actions at sensitive places." *Id.* at 52. But the fact that a rule contains exceptions ("no exit except in emergencies") does not make it less of a rule. *See McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988) ("Though such a provision for exceptions obviously qualifies a rule—it's not 'ironclad'—, it does not push it much in the direction of a policy statement."); s*ee also Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (holding that policy that left agency staff with discretionary decision-making authority was final agency action).

The opinion also noted that the memo "did not indicate that [it] was based on an interpretation of the [Immigration and Nationality Act]." PI Op. at 52. But the memo does appear to have been motivated by an understanding of RFRA and the First Amendment. *See* Ex. 5 at 2 (noting the "fundamental" principle that government should not deny or limit "people of faith['s] access to their places of worship"). And in any event, an agency action need not be based on an interpretation of a statute in order to be final. *See, e.g.*, *Bennett*, 520 U.S. at 158-59, 177-78 (holding that Fish and Wildlife Service's determination that a water-management project "was likely to jeopardize the continued existence of [two species of endangered fish]" was final agency action). Similarly, although agency action need not "purport to limit an agency's or employee's statutory authority" in order to be final, PI Op. at 52 (quotation marks omitted); *see, e.g.*, *New York v. Trump*, 171 F.4th 1, 18 (1st Cir. 2026) (freezing of federal grant money constituted final agency action); *Venetian Casino*, 530 F.3d at 931 ("permitting employees to disclose confidential

information without notice" constituted final agency action), the Mayorkas Memo did in fact limit DHS employees' exercises of authority, in the ways just discussed.

Lastly, to the extent the opinion's preliminary determination was based on a view that the legal consequences of the 2025 Policy were not sufficiently "immediate and concrete" to constitute final agency action, *see* PI Op. at 52, that conclusion appears to overlook that an action's "legal consequences" need not fall directly on the plaintiffs. *Bennett* is illustrative. That case involved an action by one agency component (a FWS determination on endangered fish) that effectively bound a second component of the same agency (the Bureau of Reclamation) in its administration of a water-management project, with downstream practical (but not legal) consequences for the plaintiffs, who complained that "the amount of available water would be reduced." 520 U.S. at 168-69; *see also Phila. Yearly Meeting II*, 2026 WL 280089, at *3 (citing *Bennett* for the same point and collecting similar cases). And even if it were otherwise, the 2025 Policy does create very real legal consequences for Plaintiffs and their members by dramatically expanding "the range of scenarios under which an immigration enforcement action could occur at a place of worship." *Phila. Yearly Meeting I*, 767 F. Supp. 3d at 318; *cf. Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956-58 (D.C. Cir. 2019) ("increased risk of prosecution and penalties constitutes a 'legal consequence' under *Bennett*" even where such consequences are "not … certain").

### B. The policy is contrary to law, contrary to constitutional right, and arbitrary and capricious.

The 2025 Policy violates the APA's substantive requirements in three ways.

First, the 2025 Policy is "not in accordance with law" and "in excess of statutory … limitations, or short of statutory right"—in violation of 5 U.S.C. § 706(2)(A) and (C)—because, as explained above, it violates Plaintiffs' rights under RFRA. *See generally FCC v. NextWave*

*Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasizing that the APA's reference to "law" in the phrase "not in accordance with law," "means, of course, *any* law" (emphasis in original)).

Second, the policy is "contrary to constitutional right"—in violation of 5 U.S.C. § 706(2)(B)—because, as also explained above, it violates Plaintiffs' and their members' First Amendment rights of expressive association.

Third, the 2025 Policy is "arbitrary [and] capricious," in violation of 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation marks omitted). For multiple reasons, the policy is neither reasonable nor reasonably explained. For example, in issuing the policy, the government failed to adequately explain why it was departing from its decades-long policy of avoiding immigration enforcement in sensitive locations. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that agencies may change course from prior policies but, when doing so, "the agency must show that there are good reasons for the new policy"). Indeed, the Huffman Memo provides no rationale at all, and therefore flunks the requirement that agency actions be "reasonably explained." *Ohio*, 603 U.S. at 292.

Relatedly, in issuing the 2025 Policy, Defendants "simply ignore[d] 'an important aspect of the problem,'" *Ohio*, 603 U.S. at 293 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))—namely, the predictable and substantial harms that their new policy would inflict on the free exercise of religion and association. Neither the Huffman Memo nor anything in the limited administrative record reflects that Defendants considered any of the likely consequences of their decisions. Lastly, the policy entirely fails to account for the substantial reliance interests created by the prior protections for sensitive locations. An agency, when departing from a prior policy, must "assess whether there were reliance interests

[engendered by the prior policy], determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). Defendants did none of these things, as the administrative record confirms. These multiple critical failings render the 2025 Policy arbitrary and capricious.

## V. The Court should enter a permanent injunction and declare unlawful and vacate the 2025 Policy.

Because the 2025 Policy violates RFRA, the Constitution, and the APA, the Court should enter permanent injunctive relief, declare the policy unlawful, and vacate it.

The party seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). As this Court previously recognized, the harm to Plaintiffs' religious worship "unquestionably constitutes irreparable injury" and "is not susceptible to compensation by money damages." PI Op. at 54-55 (first quotation from *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025)). Likewise, the Court correctly found that the balance of equities and public interest favored the targeted preliminary injunction that it entered, including because "there is a strong public policy favoring protection of the freedom of religion" and because the injunction leaves the government flexibility to enforce immigration law. *Id.* at 55-56.

These factors therefore warrant making permanent the bulk of the provisions the Court ordered in its preliminary injunction, which already has helped ameliorate the harms of Defendants' policy. *See supra* 17-18. The Court should depart from the preliminary injunction in one key respect, however. Whereas the Court preliminarily concluded that, under 8 U.S.C.

§ 1252(f)(1), its injunction could not extend to the execution of administrative warrants, PI Op. at 57-58, it should reach a different conclusion in entering a permanent injunction. As the Court correctly observed, Section 1252(f)(1) bars relief that would "enjoin or restrain the operation of" 8 U.S.C. §§ 1221-32, but it does not affect the Court's ability to order relief with respect to the operation of other provisions, including 8 U.S.C. § 1357. PI Op. at 57. And while Section 1226(a) authorizes the *issuance* of administrative arrest warrants, it is Section 1357 that authorizes agents to "*execute and serve* any … [such] warrant." 8 U.S.C. § 1357(a) (emphasis added); *see also, e.g.*, 8 C.F.R. § 287.5(e)(3) (DHS regulation referring to agents who are "authorized … to exercise the power pursuant to [Section 1357] to *execute* warrants of arrest … *issued* under [Section 1226]"). "There is a clear distinction between the authority to issue warrants under § 1226(a) and the one to execute arrests under § 1357." *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 986 (C.D. Cal. 2024). "An injunction requiring that Defendants execute warrants in a manner consistent with the Constitution"—such as, here, by ensuring reasonable protections for houses of worship—"would have no direct impact on the issuance of a warrant for arrest." *Id.* Any effect of such an injunction on the operations of Section 1226 would be at most "collateral" and therefore would not implicate Section 1252(f)(1). *See Texas v. DHS*, 123 F.4th 186, 209-10 (5th Cir. 2024).

The Court should also declare that the 2025 Policy is unlawful. *See generally* 28 U.S.C. § 2201(a). And because the 2025 Policy violates the APA, the Court should issue "the normal remedy under APA section 706": "vacatur of the agency action." *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 103 (D.D.C. 2025); *see also* 5 U.S.C. 706(2) ("The reviewing court shall … hold unlawful and set aside agency action" that violates the APA.).

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion for summary judgment.

Dated: June 18, 2026

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl*
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Mark B. Samburg
Ayesha Khan*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
kfriedl@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
msamburg@democracyforward.org
akhan@democracyforward.org

Ryan Downer*
Madeleine Gates*
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org

Richard J. Leveridge*
Sonia W. Murphy*
Brandon A. Levey*
Samone Ijoma*
Brittney M. Welch*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Leveyb@gilbertlegal.com
Ijomas@gilbertlegal.com
Welchb@gilbertlegal.com

*Admitted *pro hac vice*