**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

NEW ENGLAND SYNOD, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants

Civil Action No. 4:25-cv-40102-FDS

Hearing Scheduled October 14, 2026

**DEFENDANTS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND MOTION TO SEVER ON THE GROUNDS OF IMPROPER JOINDER**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Statutory Background ..... 2

II. Factual Background ..... 2

III. Procedural Background ..... 4

ARGUMENT ..... 5

I. Joinder Is Not Appropriate Here ..... 5

II. Plaintiffs Lack Standing ..... 9

A. Plaintiffs have not suffered injury-in-fact ..... 9

B. Plaintiffs' alleged injuries are not traceable to the 2025 Guidance ..... 13

C. Plaintiffs' requested relief will not redress their alleged injury ..... 19

III. APA Review is Unavailable ..... 20

A. The 2025 Guidance is not final agency actions because they do not create or alter either Plaintiffs' or Defendants' rights or obligations ..... 20

B. Allowing officers to exercise discretion in choosing where to enforce immigration law is committed to agency discretion ..... 24

IV. The 2025 Guidance Does Not Violate the APA ..... 26

A. The 2025 Guidance is not arbitrary or capricious ..... 26

B. The 2025 Guidance is not contrary to law ..... 28

V. The 2025 Guidance Does Not Violate RFRA ..... 28

A. The 2025 Guidance does not impose a substantial burden on Plaintiffs' exercise of religion ..... 28

B. The 2025 Guidance is the least restrictive means to further a compelling government interest ..... 31

VI. The 2025 Guidance Does Not Violate Plaintiffs' Expressive Association Rights ..... 34

VII. Any Relief Should be Narrowly Tailored ..... 36

A. Section 1252(f)(1) Prohibits Vacatur Under the APA ....36

B. Any Injunction Should be Narrowed to Align with the Mayorkas Memorandum....38

C. Section 1252(f) Bars the Court From Enjoining Where Officers May Execute Administrative Warrants....38

CONCLUSION....40

# TABLE OF AUTHORITIES

## CASES

*Abel v. United States*,
362 U.S. 217 (1960) ........ 39, 40

*Acevedo v. Allsup's Convenience Stores, Inc.*,
600 F.3d 516 (5th Cir. 2010) ........ 5

*Alcantarillados de Puerto Rico*,
279 F.3d 49 (1st Cir. 2002) ........ 7

*Am. Tort Reform Ass'n v. OSHA*,
738 F.3d 387 (D.C. Cir. 2013) ........ 23

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) ........ 35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 19

*Arizona v. United States*,
567 U.S. 387 (2012) ........ *passim*

*Atieh v. Riordan*,
727 F.3d 73 (1st Cir. 2013) ........ 22

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 20, 21

*Blackie's House of Beef, Inc. v. Castillo*,
659 F.2d 1211 (D.C. Cir. 1981) ........ 32

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) ........ 22

*Bowen v. Roy*,
476 U.S. 693 (1986) ........ 29, 30

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ........ 35

*Brito v. Garland*,
22 F.4th 240 (1st Cir. 2021) ........ 40

*Brock v. Cathedral Bluffs Shale Oil Co.*,
796 F.2d 533 (D.C. Cir. 1986) ........ 26

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ....................................................................................................33

*Cal. Cmtys. Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019) .......................................................................................21

*California v. Yamasaki*,
442 U.S. 682 (1979) ....................................................................................................38

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ....................................................................................................31

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ..........................................................................................12, 13, 17

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................12, 13, 17

*Comm. on Judiciary of U.S. H.R. v. Miers*,
542 F.3d 909 (D.C. Cir. 2008) .......................................................................................36

*Conservation L. Found., Inc. v. Acad. Express*, LLC,
129 F.4th 78 (1st Cir. 2025) ..........................................................................................13

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
483 U.S. 327, (1987) .......................................................................................................7

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ....................................................................................................20

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
958 F.3d 38 (1st Cir. 2020) ....................................................................................13, 19

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ................................................................................................16, 25

*DHS v. Regents of the University of California*,
591 U.S. 1 (2020) .........................................................................................27, 28, 29

*Diamond Alternative Energy, LLC v. Environmental Protection Agency*,
606 U.S. 100 (2025) ................................................................................................15, 16

*Division, Department of Human Resources of Oregon v. Smith*,
494 U.S. 872 (1990) ....................................................................................................30

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................................26, 27

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ....26

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .... 17, 18

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ....39

*Fighting Finest, Inc. v. Bratton*,
95 F.3d 224 (2d Cir. 1996) ....34

*First Choice Women's Resource Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026) ....35

*Fridley Public Sch. Dist. v. Mullin*,
No. 26-cv-1023, 2026 WL 1244043 (D. Minn. May 6, 2026) .... 11, 14, 16, 23

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ....13

*Garland v. Aleman Gonzales*,
596 U.S. 543 (2022) ....*passim*

*Gill v. Whitford*,
585 U.S. 48 (2018) ....38

*Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*,
800 F.2d 1514 (9th Cir. 1986) ....26

*Gonzales v. O Centro Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ....32

*Grace Brethren Church*,
457 U.S. 393 (1982) ....36

*Heckler v. Chaney*,
470 U.S. 821 (1985) .... 24, 26

*Holt v. Hobbs*,
574 U.S. 352 (2015) ....29

*Housatonic River Initiative v. EPA, New Eng. Region*,
75 F.4th 248 (1st Cir. 2023) ....22

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006) ....8

*Immigrant Defs'. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025)....................37

*Int'l Salt Co. v. United States*,
332 U.S. 392 (1947)....................8

*Iowa Migrant Movement for Justice v. Bird*,
157 F.4th 904, 921 (8th Cir. 2025)....................32

*JGE ex rel. Tasso v. United States*,
772 F. App'x 608 (10th Cir. 2019)....................26

*Kidd v. Mayorkas*,
734 F. Supp. 3d 967 (C.D. Cal. 2024)....................38, 39

*Laird v. Tatum*,
408 U.S. 1 (1972)....................12, 17

*Libby Welding Co. v. United States*,
444 F. Supp. 987 (D.D.C. 1977)....................28

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020), *cert. denied*, 145 S. Ct. 1480 (2025)....................30

*Lujan v. Def. of Wildlife*,
504 U.S. 555 (1992)....................9, 11, 15, 20

*Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*,
485 U.S. 360 (1988)....................34, 35, 36

*Lyng v. Northwest Indian Cemetery Protective Association*,
485 U.S. 439 (1988)....................29, 30, 31, 36

*Magee v. United States*,
121 F.3d 1 (1st Cir. 1997)....................19

*Mennonite Church USA v. Dep't of Homeland Sec.*,
778 F. Supp. 3d 1 (D.D.C. 2025)....................14, 23

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)....................37

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................26

*Mullin v. Al Otro Lado*,
2026 WL 1825741 (U.S. June 25, 2026)....................37

*Munroe v. Boston Med. Ctr.*,
No. 22-11935-FDS, 2024 WL 4203238 (D. Mass. Sep. 16, 2024) ....................7

*Murthy v. Missouri*,
603 U.S. 43 (2024) ....................13, 15, 16

*N.H. Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021) ....................39, 40

*N.S. v. Dixon*,
141 F.4th 279 (D.C. Cir. 2025) ....................40

*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ....................21

*Nat'l Treasury Emps. Union v. Von Raab*,
489 U.S. 656 (1989) ....................32

*New Eng. Synod v. DHS*,
824 F. Supp. 3d 118 (D. Mass. 2026) ....................*passim*

*Nieves-Villanueva v. Soto-Rivera*,
133 F.3d 92 (1st Cir. 1997) ....................22

*Nken v. Holder*,
556 U.S. 418 (2009) ....................32

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (Mem.) (2025) ....................32

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. 2019) ....................37

*OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Canada*,
804 F. Supp. 2d 77 (D. Mass. 2011), *aff'd*, 684 F.3d 237 (1st Cir. 2012) ....................22

*Pan Am. World Airways, Inc. v. U.S. Dist. Court for Cent. Dist. of Cal.*,
523 F.2d 1073 (9th Cir. 1975) ....................5

*Patrick Collins, Inc. v. Does 1-38*,
941 F. Supp. 2d 153 (D. Mass. 2013) ....................5, 6

*Perez v. Volvo Car Corp.*,
247 F.3d 303 (1st Cir. 2001) ....................10, 15

*Phila. Yearly Meeting of the Religious Soc'y of Friends v. DHS*,
767 F. Supp. 3d 293 (D. Md. 2025) ....................37

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ....................25

*Reyes-Gaona v. N. Carolina Growers Ass'n*,
250 F.3d 861 (4th Cir. 2001) ....................39

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ....................34

*Roman Cath. Bishop of Springfield v. City of Springfield*,
724 F.3d 78 (1st Cir. 2013) ....................29

*Rowley v. City of New Bedford*,
Civ. A. No. 21-11649-FDS, 2023 WL 2918921 (D. Mass. Apr. 12, 2023) ....................38

*Ryan v. Newark Grp., Inc.*,
No. 4:22-CV-40089-MRG, 2024 WL 4815478 (D. Mass. Nov. 18, 2024) ....................8

*Santos-Pagan v. Bayamon Med. Ctr*,
178 F.4th 66 (1st Cir. 2026) ....................13

*Sierra Club v. EPA*,
955 F.3d 56 (D.C. Cir. 2020) ....................21

*Spratt v. R.I. Dept. of Corr.*,
482 F.3d 33 (1st Cir. 2007) ....................29, 36

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ....................17

*Tabbaa v. Chertoff*,
509 F.3d 89 (2d Cir. 2007) ....................34

*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) ....................38

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) ....................37

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
450 U.S. 707 (1981) ....................29

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ....................38

*Trump v. Hawaii*,
585 U.S. 667 (2018) ....................33

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 20, 21

*Union of Concerned Scientists v. Wheeler*,
954 F.3d 11 (1st Cir. 2020) .......... 24, 25

*United Presbyterian Church v. Reagan,*
738 F.2d 1375 (D.C. Cir. 1984) .......... 13, 17

*United States v. Aguilar*,
883 F.2d 662 (9th Cir. 1989) .......... 7

*United States v. Merkt*,
794 F.2d 950 (5th Cir. 1986) .......... 7

*United States v. Seeger*,
380 U.S. 163 (1965) .......... 7

*United States v. Texas*,
599 U.S.670 (2023) .......... 18, 25, 26

*United States v. Thompson*,
229 F. Supp. 3d 91 (D. Mass. 2017) .......... 22

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) .......... 20

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .......... 32

**STATUTES**

5 U.S.C. § 701(a)(2) .......... 20, 24

5 U.S.C. § 704 .......... 20

5 U.S.C. § 705 .......... 4

5 U.S.C. § 706(2)(A)-(C) .......... 26

8 U.S.C. § 1103(a)(1) .......... 2

8 U.S.C. § 1221 .......... 2

8 U.S.C. § 1226 .......... *passim*

8 U.S.C. § 1252(f)(1) .......... *passim*

8 U.S.C. § 1231 .......... 25

8 U.S.C. § 1357 ..... 2, 25, 38, 39

28 U.S.C. § 1391 ..... 8

42 U.S.C. § 2000bb-1(b) ..... 28, 31

42 U.S.C. § 2000cc ..... 28

**RULES**

Fed. R. Civ. P. 20 ..... 5

Fed. R. Civ. P. 21 ..... 6

Fed. R. Civ. P. 56(c)(4) ..... 10

Fed. R. Evid. 801(c) ..... 15

Federal Rule of Evidence 702 ..... 22

**REGULATIONS**

8 C.F.R. § 287.5(e)(3) ..... 39, 40

**ADMINISTRATIVE MATERIALS**

Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ..... 32

Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 20, 2025) ..... 32

## INTRODUCTION

On January 20, 2025, the Department of Homeland Security (DHS) issued new internal guidance (the Huffman Memorandum) advising immigration officers to exercise their "common sense" and "discretion" when conducting enforcement activities near sensitive locations, such as places of worship. Days later, U.S. Immigration and Customs Enforcement (ICE) issued follow-on guidance charging supervisors with the responsibility of determining whether enforcement actions should occur at sensitive locations (the Vitello Memorandum). Plaintiffs, a coalition of various religious communities, sued arguing that the memoranda (together, the 2025 Guidance) violates the Religious Freedom Restoration Act (RFRA), the First Amendment, and the Administrative Procedure Act (APA). This Court, on February 13, 2026, preliminary enjoined DHS from acting in accordance with the 2025 Guidance. Although the Court held the 2025 Guidance did not constitute final agency action, the Court found Plaintiffs were likely to succeed on their RFRA claim, reasoning that the 2025 Guidance substantially burdened Plaintiffs' religious practice by increasing the likelihood that immigration enforcement actions would occur at their places of worship.

Defendants respectfully disagree. The 2025 Guidance does not burden Plaintiffs' religious exercise because it does not direct officers to take enforcement actions at places of worship. It simply superseded prior guidance directing officers to obtain approval from headquarters and instead entrusted the determination to undertake an enforcement action to field supervisors at ICE, and to officers' discretion and common sense at Customs and Border Protection (CBP).

Plaintiffs ask this Court to vacate the 2025 Guidance, as well as permanently enjoin any immigration enforcement action at their places of worship absent exigent circumstances. The implications of such an injunction are astounding; religious communities would have standing to direct the inner workings of the government whenever it takes any action they contend conflicts with their religious beliefs. That result is plainly untenable.

## BACKGROUND

### I. Statutory Background

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Congress has directed DHS to enforce the Nation's immigration laws, 8 U.S.C. § 1103(a)(1), and has granted immigration officers broad authority to issue warrants, arrest, and detain removable aliens, *see, e.g.*, *id.* §§ 1226, 1357. Congress has not placed location-based restrictions on that authority, with one exception: § 1357(e) requires immigration officers to obtain a warrant or the owner's consent before entering a farm or other outdoor agricultural operation for the purpose of questioning a person believed to be an alien about his right to be in or remain in the United States. *Id.* § 1357(e).

Congress has, however, limited the power of lower courts to enjoin DHS from acting pursuant to certain statutory provisions that authorize immigration officers to detain and remove aliens. Except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221-1231]." *Id.* § 1252(f)(1). Those provisions "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzales*, 596 U.S. 543, 549-50 (2022).

### II. Factual Background

For decades, federal agencies charged with enforcing immigration laws have issued internal guidance governing the factors they should consider, and the approvals they should obtain, before conducting actions in or near sensitive locations, including places of worship. That guidance has consistently instructed officers they may conduct such actions under exigent circumstances or with

prior supervisor approval. *See, e.g.*, Ex.[1] 1, Mem. from Acting Assoc. Comm'r James A. Puelo (May 17, 1993); Ex. 2, Mem. from Assistant Sec'y Julie L. Myers (July 3, 2008); Ex. 3, Mem. from Dir. John Morton (Oct. 24, 2011). As the Morton Memorandum explained, the guidance was "meant to ensure that ICE officers . . . exercise sound judgment when enforcing federal law at or focused on sensitive locations" but was "not intended to categorically prohibit lawful enforcement operations when there is an immediate need for enforcement action." Ex. 3 at 2 (emphasis omitted).

In 2021, DHS updated its guidance. Ex. 5, Mem. from Sec'y Alejandro Mayorkas (Oct. 27, 2021) (Mayorkas Memorandum). Consistent with prior guidance, the Mayorkas Memorandum urged officers to avoid taking enforcement actions in or near sensitive locations but recognized that there were circumstances "under which an enforcement action" in or near a sensitive location "needs to be taken." *Id.* at 3. It identified several circumstances that would justify action in or near a sensitive location but stressed that the list was "not complete" and that "the exercise of judgment is required." *Id.* at 4. It instructed officers, "[a]bsent exigent circumstances," to "seek prior approval from their agency's headquarters, or as" otherwise delegated, before conducting an enforcement action. *Id.* Finally, the guidance stated that it "does not limit an agency's or employee's statutory authority" and "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* at 5.

On January 20, 2025, DHS issued superseding guidance. Ex. 8, Huffman Memorandum. The memorandum explained that officers routinely use their "enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location, and directed officers to "continue to use that discretion along with a healthy dose of common sense."

[1] Unless otherwise specified, "Ex." refers to exhibits attached to Plaintiffs' Motion for Summary Judgment. *See* ECF No. 111-1 to ECF No. 111-91.

*Id.* It acknowledged, however, that component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

On January 31, 2025, ICE issued follow-on guidance charging "Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." Ex. 10, Vitello Memorandum.

## III. Procedural Background

Plaintiffs, a coalition of religious communities filed suit on July 28, 2025, alleging that the 2025 Guidance violates RFRA, the First Amendment, and the APA. Compl. ¶ 10, ECF No. 1. The next day, Plaintiffs moved for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction barring DHS from acting in accordance with the 2025 Guidance. Proposed Or. 1, ECF No. 32-1.

The Court granted Plaintiffs' motion in part. First, the Court determined that some of the Plaintiffs likely had standing. *New Eng. Synod v. DHS*, 824 F. Supp. 3d 118, 143–155 (D. Mass. 2026). The Court then concluded that Plaintiffs had established a likelihood of success on the merits of their RFRA claim. *Id.* at 157-58. The Court declined to reach Plaintiffs' First Amendment claim, *id.* at 159–60, and rejected Plaintiffs' APA claims and request for a section 705 stay. *Id.* at 161–63.

As to the scope of relief, the Court limited its injunction to warrantless activities recognizing that 8 U.S.C. § 1252(f)(1) barred it from enjoining enforcement activities taken pursuant to an administrative warrant. *Id.* at 165–66. The Court declined to reinstate the Mayorkas Memorandum, reasoning such an injunction would most likely fail Rule 65(d)'s requirement that an order "state its terms specifically[.]" *Id.* at 166–67 (citation omitted). Instead, the Court issued an injunction that largely "tracks" the memorandum while providing more specific limitations. *Id.* at 167–68.

Plaintiffs amended their complaint on June 4, 2026, adding eleven coalitions of Plaintiffs but leaving their legal claims untouched. Am. Compl. ¶¶ 19-27, 33, 35, ECF No. 97. Plaintiffs moved for

summary judgment on June 18, 2026, ECF No. 110, requesting a declaration that the 2025 Guidance is unlawful and the guidance be vacated under the APA, as well as injunctive relief. Plaintiffs also seek an order directing Defendants to file a status report setting forth the steps they took to notify agency employees of the injunction and to append copies of all written communications. ECF No. 110-1.

## ARGUMENT

### I. Joinder Is Not Appropriate Here

As an initial matter, pursuant to Rule 21, Defendants move to drop newly added Plaintiffs Metropolitan New York Synod, Evangelical Lutheran Church in America (ECLA); Northwest Washington Synod, ECLA; Minneapolis Area Synod, ECLA; Delaware-Maryland Synod, ECLA; Metro D.C. Synod, ECLA; Southeastern Synod, ECLA; Metropolitan Chicago Synod, ECLA; Pacifica Synod, ECLA; Upstate New York Synod, ECLA; and District of Columbia Baptist Convention from this case. Rule 21 provides: "On motion or on its own, the court may at any time, on just terms, add or drop a party." Because Rule 21 does not provide any standards by which district courts can determine if parties are misjoined, courts look to Rule 20 for guidance. *See, e.g., Acevedo v. Allsup's Convenience Stores, Inc.,* 600 F.3d 516, 521 (5th Cir. 2010); *Pan Am. World Airways, Inc. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 523 F.2d 1073, 1079 (9th Cir. 1975).

Parties "may join in one action as plaintiffs if: . . . any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). But "the court may issue orders—including an order for separate trials—to protect a party against . . . prejudice . . ." Fed. R. Civ. P. 20(b). "Accordingly, although joinder may be technically appropriate . . . a district court must 'examine whether permissive joinder would comport with the principles of fundamental fairness or would result in prejudice to either side.'" *Patrick Collins, Inc. v. Does 1-38*, 941 F. Supp. 2d 153, 164 (D. Mass. 2013) (citation omitted). "Courts may also consider factors such as the motives of the party seeking joinder and whether joinder would confuse and complicate the issues for the parties involved." *Id.* (citation

omitted). Courts have discretion to "drop a party" upon finding the party was improperly joined. Fed. R. Civ. P. 21.

Here, the number and diversity of Plaintiffs—not to mention the number of each Plaintiff's member churches and congregants—is prejudicial. Plaintiffs represent diverse denominations spanning thousands of places of worship across the nation. *See* ECF No. 111 at 7–10. The "Synods," ECF No. 111 at 8, represent thousands of active congregations comprised of tens of thousands of members. *See, e.g.*, Ex. 38 ¶ 7; Ex. 44 ¶ 7; Ex. 17 ¶ 5; Ex. 67 ¶ 3. The "Baptists," ECF No. 111 at 9 n. 1, "represent roughly 5,000 [] congregations across the country[.]" ECF No. 111 at 9. The United Church of Christ ("UCC") "comprises 556 churches. . . and more than 100,000 congregants[.]" Ex. 59 ¶ 3. Metropolitan Community Churches "has approximately 90 member churches in the United States[.]" Ex. 57 ¶ 7. And the San Francisco, Pacific, and North Pacific Yearly Meetings (the "Quakers") comprise dozens of local congregations. *See, e.g.*, Ex. 52 ¶ 5. The newly added Plaintiffs, only one of whom resides within this district, Ex. 59 ¶ 3, alone add hundreds of places of worship and tens of thousands of congregants. *See, e.g.*, Ex. 16 ¶ 5; Ex. 37 ¶ 9; Ex. 39 ¶ 6.

"The purpose of permissive joinder of parties is 'to promote trial convenience and expedite the final determination of disputes.'" *Patrick Collins*, 941 F. Supp. 2d at 164 (quotation omitted). But Plaintiffs' diverse religious practices will force the Court to address unique circumstances particular to each place of worship, creating thousands of potential fact-bound compliance disputes, should the Court issue Plaintiffs' requested injunction. Many Plaintiffs participate in community outreach programs[2] such as "housing migrants, distributing food and clothes to those in need, assisting in refugee resettlement, and providing ESL classes." ECF No. 111 at 8. Plaintiffs alleged these programs "are central to [their] religious practice." *Id.* at 13. But community outreach programs are not

[2] The Synods, Baptists, and UCC state they participate in these programs. ECF No. 111 at 8. It is unclear whether the Quakers and MCC participate in similar programs.

necessarily religious just because they are performed by a church. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 332, (1987) (leaving untouched a district court's determination that church administration of a gymnasium was nonreligious activity, though opining the line between secular and religious belief "is hardly a bright one"). Religiosity revolves around "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but (not including) essentially political, sociological, or philosophical views or a merely personal moral code." *United States v. Seeger*, 380 U.S. 163, 165 (1965). Thus, drawing the line between religious and non-religious conduct is necessary. As this Court has explained, "religious belief must have some meaning[]" otherwise defendants may be forced "to accommodate what amounts to a 'purely personal preference.'" *Munroe v. Boston Med. Ctr.*, No. No. 22-11935-FDS, 2024 WL 4203238, at *6 (D. Mass. Sep. 16, 2024) (quoting *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002)).

Engaging in such fact-based inquiries will be burdensome. It is unclear whether all the congregations even have community outreach programs; whether those programs are structurally mandated; or how long the congregations have performed these services. And the risk of frustrating legitimate law enforcement concerns under the cover of religious practice is high. *See United States v. Aguilar*, 883 F.2d 662, 696 (9th Cir. 1989) (citation omitted) ("If the Government attempted to accommodate into its immigration policy [Plaintiffs'] religious beliefs, the Government's efforts would result in no immigration policy at all."); s*ee also United States v. Merkt*, 794 F.2d 950, 956 (5th Cir. 1986) (examining religious beliefs and ministries in evaluating First Amendment claim); Defs.' Ex. A, Oral Hr'g Tr. 28:20–23 ("Does the church have a legitimate interest in being a sanctuary from law enforcement? In other words, not during the service itself by 24-7 serving as a sanctuary where people can be protected from law enforcement?").

The odds of at least some congregations asserting religious protections over non-religious immigration advocacy are high. For example, Plaintiffs previously argued a pastor's home—one "heavily involved in resettling refugees who arrive in the United States," ECF No. 33-17 ¶ 17,—was due the same First Amendment protections as their places of worship. *See* ECF No. 33 at 13;[3] ECF No. 57 at 7 n. 3. Plaintiffs also contend that community events like "Cribbage, Mahjong, various book clubs, self-defense classes, and other neighborhood groups[,]" Ex. 73 ¶ 11, constitute religious activity. Should the Court issue Plaintiffs' requested injunction, it will have to examine the religiosity of similar practices—sanctuary or otherwise—on an individual basis in future compliance disputes. *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) (urging the district court "to fashion [an injunction] that will avoid repetitious applications which would be as vexatious to the Court as to the litigants."), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). The disparity of Plaintiffs' practices, along with the sheer numerosity of churches, means this will be a taxing and inefficient enterprise. And, as noted above, DHS's efforts to comply with an injunction will become significantly more burdensome given that the original Plaintiffs' places of worship currently total more than 5,000.

Equally troubling is Plaintiffs' motivation for gathering in this district. This Court previously questioned Plaintiffs why so many came from outside the forum, Defs.' Ex. A, Oral Hr'g Tr. 41:1–9, noting Massachusetts became a destination for plaintiffs challenging "Trump policies." *Id.* 42:17–25; 43:1–7. Plaintiffs did not dispute they had selectively chosen the district, but justified their decision based on "the widespread harm that [the 2025 Guidance] caused." *Id.* at 42:16–21. True, "there[ is] no rule that everyone has to file suit in their home district," *id.*; *see also* 28 U.S.C. § 1391, but "[t]here must be guardrails on this action to prevent it from spiraling into a black hole where any entity that had even isolated or minimal contact" with immigration enforcement can determine DHS's internal guidance to enforcement officers. *Ryan v. Newark Grp., Inc.,* No. 4:22-CV-40089-MRG, 2024 WL

[3] ECF No. 33 does not have page numbers. Defendants cite the blue PACER pagination in the top right corner.

4815478, at *19 (D. Mass. Nov. 18, 2024), *reconsideration denied*, 349 F.R.D. 254 (D. Mass. 2025). Limiting this action to only the original Plaintiffs and the newly added Plaintiff that resides in this district is a fair guardrail—one which will save this Court numerous headaches down the road. At bottom, Plaintiffs selected a forum they believed to be advantageous, brought multi-state co-plaintiffs into their suit forming a class action in all but name, and seek essentially a nation-wide injunction. *See* ECF No. 110-1. This is unfair. The Court should exercise its discretion to drop the Plaintiffs identified above and allow them to refile in their home districts.[4]

## II. Plaintiffs Lack Standing

To establish standing, a plaintiff must demonstrate (1) that it has suffered or will imminently suffer an injury-in-fact, (2) that its alleged injury is "fairly traceable" to the challenged conduct of the defendant, and (3) that it is "likely" that its injury will be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992).

### A. Plaintiffs have not suffered injury-in-fact

Plaintiffs have not raised specific facts sufficient to establish injury-in-fact traceable to the 2025 Guidance. Plaintiffs assert four categories of harms: (1) decreased attendance at worship services and community service programs; (2) financial harm via decreased donations and tithes; (3) "chill" on Plaintiffs' religious exercise; and (4) expenditure of time and resources to prevent immigration enforcement at their places of worship. ECF No. 111 at 20–22. The Court previously held the first two categories constituted a cognizable injury; but the final two did not. *New Eng. Synod*, 824 F. Supp. 3d at 142–43. The Court, respectfully, erred by concluding Plaintiffs' vague assertions made a sufficiently "clear showing" of decreased attendance and financial harm. *See* ECF No. 56 at 6–12.

[4] Defendants conferred with Plaintiffs' counsel and were informed that Plaintiffs oppose this request.

Previously, this Court described Plaintiffs assertions as "conclusory," though noting "the evidence . . . taken as a whole, is sufficient[5] to show injury-in-fact[.]" *New Eng. Synod*, 824 F. Supp. 3d at 145–54. Almost a year later, Plaintiffs continue to rely on the same vague assertions. *See, e.g.*, Ex. 39 ¶ 27 ("After the rescission of the DHS policy, some of our churches noticed a decline in attendance at worship services and other church activities . . . Our church leaders report that congregants (both documented and undocumented) are afraid to come to church, fearing ICE . . ."); Ex. 38 ¶ 27 (same); Ex. 37 ¶ 16 ("Pastors have noted a significant decline in attendance at worship services and church-sponsored events. . . Members are increasingly distracted at worship services, because they are highly concerned. . . and wonder whether ICE may enter their places of worship"); Ex. 16 ¶¶ 20–21 ("Pastors have reported to me diminished attendance at worship services, ministries, and church-sponsored events. Members of our congregations are distracted from their worship by anxieties and fears that they. . . are at risk of. . . enforcement actions"); Ex. 84 ¶ 11 ("We have also seen multiple individuals afraid to attend church because of the heightened risk of immigration enforcement at or around church."); Ex. 49 ¶ 15 ("Parishioners have been afraid to attend services and other church activities as a result of the recission of the sensitive locations policy.").

These statements are insufficient to support standing at this stage in the litigation. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[T]he requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise." *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) (citation omitted). "Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule

[5] The Court held all Plaintiffs but the San Francisco Friends Meeting, the Pacific Yearly Meeting, and the North Pacific Yearly Meeting produced evidence sufficient to show standing. ECF No. 75 at 12–20.

56(c)[.]" *Id.* The statements referenced in the above paragraph are impermissibly vague. Further, other declarations contain unsupported conclusions[6] and hearsay.[7] Plaintiffs cannot rest on these statements to support their theory of standing. *Lujan*, 504 U.S. at 561.

The Court's conclusion that the 2025 Guidance marked a stark departure from prior guidance because it "removes restrictions on immigration raids at churches," *New Eng. Synod*, 824 F. Supp. 3d at 145, and permits officers to "conduct a raid, with weapons drawn, at any type of church proceeding . . . subject only to the exercise of their 'discretion' and 'common sense,'" *id.* at 133, is incorrect. The 2025 Guidance did not remove any restrictions on enforcement activity at places of worship because the prior guidance simply "provid[ed] management guidance to . . . officers exercising discretionary law enforcement functions" but did not limit officers' statutory authority. Ex. 3 at 4. Indeed, the Mayorkas Memorandum "did not categorically preclude such activity," *Fridley Public Sch. Dist. v. Mullin*, No. 26-cv-1023, 2026 WL 1244043, at *8 (D. Minn. May 6, 2026) ("*Fridley*"). Like prior guidance, the Mayorkas Memorandum recognized that there are some circumstances in which "enforcement action needs to be taken" in or near a sensitive location. Ex. 5 at 4; *see also* Ex. 1 at 3; Ex. 2 at 2; Ex. 3 at 3. "The 2025 Guidance, in short, did not change DHS's ability to engage in enforcement activity at or near protected areas," which has "always been subject to DHS's judgment and discretion." *Fridley*, 2026 WL 1244043, at *8. Nor does the 2025 Guidance relieve DHS of its obligation to abide by other applicable constraints on government action, including RFRA and the First Amendment when taking enforcement actions.

---

[6] *See, e.g.*, Ex. 77 ¶ 25; Ex. 52 ¶ 17; 67 ¶ 14; Ex. 25 ¶¶ 5-6; Ex. 70 ¶ 6; Ex. 51 ¶ 35; Ex. 73 ¶ 6; Ex. 58 ¶ 6; Ex. 88 ¶ 11; Ex. 41 ¶ 13; Ex. 39 ¶ 32; Ex. 83 ¶ 3; Ex. 88 ¶ 12.

[7] *See, e.g.*, Ex. 61 ¶¶ 10-12; Ex. 26 ¶ 25; Ex. 36 ¶¶ 18-20; Ex. 77 ¶¶ 23-24; Ex. 67 ¶ 20; Ex. 57 ¶ 17; Ex. 55 ¶¶ 27–29; Ex. 45 ¶¶ 16–18; Ex. 44 ¶¶ 12–13, 16-19, 21–22; Ex. 68 ¶¶ 7-10; Ex. 70 ¶ 5; Ex. 51 ¶ 35; Ex. 71 ¶¶ 32-40; Ex. 53 ¶¶ 13, 18, 19; Ex. 72 ¶¶ 13-14; Ex. 17 ¶¶ 22–23, 26, 28; Ex. 74 ¶ 4; Ex. 75 ¶ 24, 27; Ex. 44 ¶ 22; Ex. 40 ¶¶ 17–18; Ex. 36 ¶¶ 18–19; Ex. 49 ¶ 14; Ex. 16 ¶¶ 22–23; Ex. 67 ¶ 18; Ex. 15 ¶ 21.

The 2025 Guidance does differ from prior guidance in two minor respects, neither of which support the Court's conclusion. First, although the Mayorkas Memorandum directed officers, absent exigent circumstances, to obtain approval from agency headquarters (or a delegee) before taking enforcement action in or near a sensitive location, the 2025 Guidance charges AFODs and ASACs with responsibility for approving such actions on a case-by-case basis. *See* Ex. 5 at 5; Ex. 10 at 3. In this respect, the 2025 Guidance is in line with pre-2021 guidance, which vested local leadership with authority to approve enforcement actions. *See, e.g.*, Ex. 1 at 2.

Second, while the Mayorkas Memorandum identified circumstances in which enforcement action in or near a sensitive location would be appropriate, *see* Ex. 5 at 4-5, the 2025 Guidance does not articulate any such circumstances but instead directs officers to use their discretion "along with a healthy dose of common sense[.]" Ex. 8 at 2. Nevertheless, the 2025 Guidance does not depart radically from prior guidance, including the Mayorkas Memorandum, which expressly states that its list of circumstances is not exhaustive and that the "exercise of judgment is required." Ex. 5 at 5. This is consistent with prior guidance, which called on officers to "analy[ze]" facts and "exercise [their] judgment" before taking action in or near a sensitive location. *Id.* at 4; Ex. 1 at 3. As to the final two categories of harms—subjective chill and lost time/resources—the Court need not change its position. *New Eng. Synod*, 824 F. Supp. 3d at 143. The Supreme Court has foreclosed both types of harm. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972); *also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 (2013). Plaintiffs argue they "face a genuine threat of enforcement" since "numerous such incidents have already occurred." ECF No. 111 at 21. But Plaintiffs' argument misses the mark. Past enforcement actions—which Plaintiffs do not convincingly[8] allege anyway—are insufficient to

[8] Plaintiffs' allegations of past harm are also insufficient. Many are hearsay, *see* Ex. 15 ¶ 18; Ex. 16 ¶ 27; Ex. 17 ¶ 27; Ex. 18 ¶¶ 6-14; Ex. 82 ¶ 5. Some are conclusory, *see* Ex. 19 ¶¶ 7-9; Ex. 20 ¶¶ 11-12. And one lacks foundation, s*ee* Ex. 89 ¶¶ 7-9. The remainder allege enforcement actions in public places—not Near a Protected Area, *see* ECF No. 75. *See* Ex. 21 ¶¶ 20-21; Ex. 22 ¶ 6; Ex. 23 ¶ 16; Ex. 24 ¶ 5; Ex. 25 ¶¶ 8-9; Ex. 26 ¶¶ 21-22; Ex. 27 ¶ 4; Ex. 28 ¶¶ 5-6; Ex. 29 ¶¶ 10-11.

support standing unless they can show a certainly impending "threat that [they] will be wronged again[.]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also Clapper*, 568 U.S. at 409. And Plaintiffs posit no evidence of certainly impending immigration enforcement actions at their places of worship. *See* ECF No. 111 at 21–22. Nor could they, given that the 2025 Guidance does not direct immigration enforcement operations take place at those or any other place of worship. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *Clapper*, 568 U.S. at 412; *Lyons*, 461 U.S. at 111; *see also United Presbyterian Church v. Reagan,* 738 F.2d 1375, 1380 (D.C. Cir. 1984).

**B. Plaintiffs' alleged injuries are not traceable to the 2025 Guidance**

Plaintiffs have not shown that they have suffered any cognizable injury traceable to the 2025 Guidance. This Court previously accepted the theory that the 2025 Guidance inflicts injury on plaintiffs by reducing attendance[9] at their worship services/ministry programs and finances. *New Eng. Synod*, 824 F. Supp. 3d at 140–42. But plaintiffs cannot trace any such declines to the 2025 Guidance in particular, as opposed to general concerns about increased immigration enforcement. Plaintiffs need to show the 2025 Guidance causes a "'concrete and particularized[]' portion of" their injuries. *Conservation L. Found., Inc. v. Acad. Express*, LLC, 129 F.4th 78, 91 (1st Cir. 2025) ("*Conservation L.*") (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Traceability "does not demand proximate causation," *Santos-Pagan v. Bayamon Med. Ctr*, 178 F.4th 66, 71 (1st Cir. 2026) (citing *Conservation L.*, 129 F.4th at 90), but requires a sufficiently direct causal connection between the challenged action and the identified harm" that is not "overly attenuated[,]" *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020).

Plaintiffs have not made that showing. At best, Plaintiffs' declarations show their congregants fear immigration enforcement generally—not specifically at their places of worship. *See, e.g.*, Ex. 47

[9] Plaintiffs' financial injuries are predicate upon their congregants' attendance at church. ECF No. 111 at 14 ("Congregations have also suffered the financial impact of decreased giving that accompanies decreased attendance."). Thus, the financial injuries are not traceable to the 2025 Guidance for the same reason the declines in attendance are not.

¶ 13 ("Our usual attendance has been 25-30 members in each of the services (Spanish and English) for a total of 50-60 members worshipping on Sundays, *but when there was ICE activity in our community*, attendance would dwindle down to as low as 6-8 persons" (emphasis added)); Ex. 78 ¶ 9 ("attendance in the Spanish Service went down 30% to 40% during the second half of the year, *due to the presence of ICE in the community* which created a culture of fear, division, and anxiety." (emphasis added)); Ex. 42 ¶ 38 ("ICE recently conducted a raid at . . . a major cultural organization in the community that was once considered a safe space by our congregants . . . This action, and others like it, continue to have a ripple effect throughout the neighborhood and deeply impacted the sense of safety among our congregants"); Ex. 44 ¶¶ 17-18 ("When immigration enforcement began conducting raids *in the area*, attendance declined significantly." (emphasis added)); Ex. 69 ¶ 12 ("When there is news of increased ICE activity *in our area*, congregants stop attending worship services." (emphasis added)); Ex. 23 ¶ 6 (attendance dropped "after the first enforcement operations and the increased presence of federal agents in our communities"); Ex. 50 ¶ 17 ("On more than one occasion, members have messaged to warn the group about ICE activity in our community and near the church, and in response we have often seen corresponding drops in attendance at our Spanish-language liturgy."); Ex. 48 ¶¶ 13–14 ("an ICE vehicle parked. . . three blocks from the church. . . The next day. . ." fewer households showed up for food distribution); Ex. 19 ¶ 6 ("Whenever immigration enforcement is sighted *in the area*, attendance at the food bank declines drastically." (emphasis added)); Ex. 20 ¶ 19 ("Whenever there have been reports of ICE activity or presence *in the surrounding area*, there is a palpable shift." (emphasis added)); Ex. 70 ¶ 7 ("ICE was spotted about two blocks from the church; only 100 households were served at the diaper pantry following the incident."); Ex. 43 ¶¶ 9-10. It's doubtful Plaintiffs even could show traceability, given that the 2025 Guidance treats places of worship no differently than any other location. *See* Ex. 2*; see also Mennonite Church USA v. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 11 (D.D.C. 2025), *appeal filed*, No. 25-5209 (D.C. Cir. June 5, 2025); *Fridley*, 2026 WL 1244043, at *12.

The Court previously held Plaintiffs demonstrated traceability because declining attendance was a "predictable effect" of the 2025 Guidance while controlling for heightened immigration enforcement elsewhere. *New Eng. Synod*, 824 F. Supp. 3d at 144-45 (citing *Murthy*, 603 U.S. at 72; *Conservation L.*¸ 129 F.4th at 91). That reasoning relied on two assumptions: the 2025 Guidance caused a marked decrease in church attendance; and that it clearly deterred at least some individuals even absent heightened enforcement elsewhere. *Id.* at 145. Respectfully, those assumptions were improper.

*Lujan* is instructive. There, the lower court resolved an affidavit's factual ambiguity in plaintiffs' favor, 497 U.S. at 888, but the Supreme Court rejected this approach because it would dilute Rule 56's evidentiary requirements. *Id.* at 889. The Court explained that while there was "room for debate as to how 'specific'" facts must be under Rule 56, it would "not do to 'presume' [] missing facts because without them the affidavits would not establish" traceable injury. *Id.* To do so would "convert[] the operation of Rule 56 to a circular promenade:" plaintiffs make a "general allegation of injury; defendant[s] constest[] . . .; plaintiff[s] respond[] with affidavit[s] containing general allegation[s] of injury, which must be deemed . . . specific facts since otherwise the allegation . . . would be unsupported (which is precisely what defendant[s] claim it is)." *Id.* Here too, Plaintiffs ask the Court to presume the missing fact upon which standing hinges—that the 2025 Guidance is traceable to decreased attendance distinct from general immigration enforcement. ECF No. 111 at 23*; see e.g.*, Ex. 63 ¶ 10; Ex. 64 ¶¶ 4, 6-7; Ex. 77 ¶¶ 23-25; Ex. 49 ¶ 15; Ex. 65 ¶ 8; Ex. 66 ¶¶ 6-8; Ex. 16 ¶¶ 20–21; Ex. 84 ¶ 11; Ex. 57 ¶ 17; Ex. 73 ¶ 6. Even where Plaintiffs quote their congregants as fearing enforcement at places of worship *specifically*, *see, e.g.*, Ex. 26 ¶ 25; Ex. 61 ¶¶ 10–12; Ex. 77 ¶¶ 23–25; Ex. 79 ¶ 8; Ex. 68 ¶¶ 7–10; Ex. 45 ¶¶ 16–18; Ex. 51 ¶ 35; Ex. 53 ¶¶ 18–19; Ex. 17 ¶ 26; Ex. 74 ¶ 4, the statements do not pass muster because they are hearsay. *See* Fed. R. Evid. 801(c); *Perez*, 247 F.3d at 316.

*Diamond Alternative Energy, LLC v. Environmental Protection Agency*, 606 U.S. 100 (2025), is not to the contrary. There, regulations forced automakers to manufacture more electric vehicles and fewer

gas vehicles which, in turn, decreased demand for gasoline: the regulation's stated purpose. *Id.* at 116–19. The Court reasoned that, in the "familiar" circumstance where government regulation of a business "may be likely" to cause injuries to other linked businesses, "commonsense economic principles" were useful when evaluating causation and redressability. *Id.* at 116. "After all, the fact that a regulation was designed to produce a particular effect on the market ordinarily means that the likely result of vacating that regulation would be to reduce that effect on the market." *Id.* at 117. *Diamond's* regulations were compulsory in nature, *see id.* at 106–07, and designed to cause the plaintiffs' harm. *Id.* at 117. The causal chain was so clear that the Court even opined the plaintiffs "might be considered an object of the [] regulations. . ." *Id.* at 115. In contrast, the causal chain here is "murky[.]" *Murthy*, 603 U.S. at 69 n.8. The 2025 Guidance does not direct officers to target places of worship. Ex. 8. And it coincides with a widely publicized general increase in immigration enforcement. *See Murthy*, 603 U.S. at 69 n.8 (noting independent actions make it difficult to say whether certain conduct caused injury).

Further, because Plaintiffs' theory of injury depends on the independent actions of third parties, standing is "substantially more difficult to establish." *New Eng. Synod*, 824 F. Supp. 3d at 144 (citation omitted). Plaintiffs must show that their injury arises from the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Plaintiffs have not satisfied that burden. Reduced attendance is not a predictable effect of the 2025 Guidance. As discussed, the guidance does not target any location for enforcement but simply treats places of worship like other locations. The 2025 Guidance also does not grant DHS any new authority. DHS guidance has consistently permitted immigration enforcement actions at places of worship. *See New Eng. Synod*, 824 F. Supp. 3d at 162–63; *see also Fridley*, 2026 WL 1244043, at *8–9. Reduced attendance at Plaintiffs' services is not a predictable consequence of guidance that merely alters internal agency procedures regarding the necessary approvals officers must obtain.

Even if Plaintiffs could demonstrate the 2025 Guidance—rather than immigration enforcement generally—caused congregants to cease attending their places of worship and ministry services, their theory of standing runs headlong into Supreme Court precedent explaining that plaintiffs cannot establish standing based on the alleged chilling effect of a policy that "does not regulate, constrain, or compel any action on [the plaintiffs'] part." *Clapper*, 568 U.S. at 419; *see also Laird,* 408 U.S. at 11 (finding no injury where a challenged policy was not "regulatory, proscriptive, or compulsory in nature"). As previously explained, the 2025 Guidance, like the Mayorkas Memorandum, "does not *direct*" immigration enforcement officers to take actions in or near places of worship. *See Presbyterian Church,* 738 F.2d at 1380. Nor have Plaintiffs demonstrated that any enforcement action at their locations has occurred or is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Consequently, Plaintiffs "can only speculate as to how" immigration enforcement officers "will exercise their discretion" and common sense. *Clapper*, 568 U.S. at 412. That is insufficient. *Id.* (rejecting plaintiffs' theory of standing "based on third parties' subject fear of surveillance"). It "is the *reality* of the threat . . . that is relevant to the standing inquiry, not . . . subjective apprehensions." *Lyons*, 461 U.S. at 107 n.8.

Additionally, Plaintiffs cannot establish standing because their theory of causation is too attenuated. "The causation requirement . . . rules out attenuated links," including "distant (even if predictable) ripple effects." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). For example, in *Alliance for Hippocratic Medicine*, the Court declined to recognize standing for plaintiff-doctors to challenge drug approvals merely because "use of the drugs by others may cause more visits to doctors." *Id.* at 392. The Court explained that finding causation in such circumstances would be both "unprecedented and limitless" and would "allow doctors to sue in federal court to challenge almost any policy affecting public health." *Id.* at 391-92. The Court further explained that there would be no "principled way to cabin" such a doctrinal change to doctors: firefighters, police officers, and teachers

would also have standing to challenge policies that affected their work, and the "path would seemingly not end until virtually every citizen had standing to challenge virtually every government action that they do not like." *Id.* at 392.

That same logic applies here. The 2025 Guidance provides internal guidance to DHS officers; it does not regulate or constrain Plaintiffs' conduct. To find that reductions in attendance at Plaintiffs' worship services are fairly traceable to such guidance would grant religious communities standing to challenge virtually *any* governmental action that predictably reduces attendance at their services—from a military deployment of congregants to a highway project that increases traffic on Sunday mornings. This Court should not endorse such an "unprecedented and limitless approach[.]" *Id.* at 391.

Finally, the Supreme Court has indicated that parties challenging the downstream effects of the government's immigration enforcement policies—as Plaintiffs do here—lack a cognizable Article III injury. *United States v. Texas*, 599 U.S. 670, 676-77 (2023). In *Texas*, the Court held that the plaintiff States lacked standing to challenge DHS guidelines that they argued resulted in too few immigration arrests. *Id.* The Court reasoned that federal courts lack jurisdiction over such suits, which "run up against the Executive's Article II authority to enforce federal law." *Id.* at 678. Aside from interfering with the Executive's Article II authority, such suits are also improper because courts "lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive to weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy. *Id.* at 679-80.

This Court previously implied that *Texas* only applies to challenges asserting that the government is under-enforcing federal immigration law, *New Eng. Synod*, 824 F. Supp. 3d at 155, but the Supreme Court's reasoning applies equally where, as here, Plaintiffs attempt to superintend the Executive's enforcement authority by dictating where and under what circumstances immigration enforcement actions may occur. And, just as courts are ill-equipped to "assess[] the propriety" of the

government's discretionary decisions about who to target for arrest, they are equally ill-equipped to decide how immigration officers should exercise their enforcement discretion. *Texas*, 599 U.S. at 679.

**C. Plaintiffs' requested relief will not redress their alleged injury**

For much the same reason that Plaintiffs have not shown causation, they also fail to demonstrate redressability. *Dantzler*, 958 F.3d at 49. Although a plaintiff need not demonstrate that its entire injury will be redressed by a favorable judgment, it must show that the Court could fashion a remedy that would at least lessen its injury. *Id.*

Plaintiffs argue that purported "rebounds in attendance following entry of the Court's preliminary injunction . . . [provide incontrovertible evidence of redressability." ECF No. 111 at 24. But Plaintiffs have not shown the preliminary injunction caused an increase in attendance at their places of worship beyond conclusory declarations. A close examination of Plaintiffs' supporting declarations reveals these claims are no more than vague and conclusory assertions. Ex. 21 ¶ 35 ("As word of the preliminary injunction spread, we have seen our attendance at worship and ministries recover."); Ex. 57 ¶ 20; Ex. 77 ¶¶ 39–40; Ex. 17 ¶ 32; Ex. 48 ¶ 17; Ex. 46 ¶ 17; Ex. 64 ¶ 7. Some are hearsay. Ex. 17 ¶ 32 ("Ater the district court's preliminary injunction, pastors have reported increases for worship and ministry activities."); Ex. 67 ¶¶ 28–29; Ex. 44 ¶¶ 16–18; Ex. 53 ¶¶ 19–21. Some do not even allege *any* rise in attendance. Ex. 64 ¶ 14; Ex. 56 ¶¶ 10–11. At this stage in the litigation, Plaintiffs must put forth more than mere conclusory statements to support their allegations. *See Magee v. United States*, 121 F.3d 1, 3 (1st Cir. 1997); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (evidence that "is not significantly probative" cannot deter summary judgment).

The Court also specifically recognized that, under 8 U.S.C. § 1252(f)(1), any injunction entered by the district court cannot "restrict or enjoin DHS's ability to engage in arrests pursuant to an administrative warrant." *New Eng. Synod*, 824 F. Supp. 3d at 30. The possibility of immigration enforcement at Plaintiffs' places of worship remains under any relief the Court can provide, and so

Plaintiffs' claims the preliminary injunction allows them to safely "practice our religion here in the sanctuary[,]" Ex. 64 ¶ 14, is built upon a faulty premise.

At bottom, redressability depends upon the "unfettered choices" of Plaintiffs' congregants. *Lujan*, 504 U.S. at 562. Because the 2025 Guidance does not target places of worship and because any judicial relief could not categorically preclude enforcement actions in or near Plaintiffs' places of worship, it is entirely speculative that Plaintiffs' congregants would return to services if the 2025 Guidance were vacated or permanently enjoined. "[R]edressability [that] requires speculat[ion]," however, is insufficient to support standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006).

## III. APA Review is Unavailable

Although the APA creates a "strong presumption favoring judicial review of administrative action[,]" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (citation omitted), it imposes several limitations. Two of those limitations bar Plaintiffs' APA claims. First, the 2025 Guidance does not constitute "final agency action" because it does not have any direct and appreciable legal consequences and thus does not determine rights or obligations. 5 U.S.C. § 704. Second, the guidance is a matter committed to agency discretion by law. *Id.* § 701(a)(2).

### A. The 2025 Guidance is not final agency actions because they do not create or alter either Plaintiffs' or Defendants' rights or obligations

Agency action may be deemed final if two conditions are satisfied. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citation omitted). Defendants do not dispute that the 2025 Guidance meets the first prong set forth in *Hawkes*. However, Defendants maintain the guidance does not have "direct and appreciable legal consequences" and, therefore, does not satisfy the second prong. *Id.* at 598 (quoting *Bennett*, 520 U.S. at 178).

The second prong is satisfied if the action has "direct and appreciable legal consequences." *Id.* (quoting *Bennett*, 520 U.S. at 178). "Whether an agency action has 'direct and appreciable legal consequences' . . . is a 'pragmatic' inquiry." *Sierra Club v. EPA*, 955 F.3d 56, 62 (D.C. Cir. 2020) (quoting *Hawkes*, 578 U.S. at 598-99). The Court of Appeals for the District of Columbia Circuit has explained that such an injury requires an examination of the "concrete consequences" the challenged action "has or does not have as a result of the specific statutes and regulations that govern it." *Id.* at 63 (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019)). When evaluating the "concrete consequences" of an agency guidance document, the District of Columbia Circuit considers several factors including (1) "the actual legal effect (or lack thereof)" of the action "on regulated entities"; (2) "the agency's characterization of the guidance"; and (3) "whether the agency has applied the guidance as if it were binding on regulated parties." *Id.* at 62-63 (quotation omitted).

The Court previously held the 2025 Guidance did not satisfy the second prong because neither it, nor the Mayorkas Memorandum before it, had "sufficiently 'concrete consequences'" to constitute final agency action. *New Eng. Synod*, 824 F. Supp. 3d at 162 (quoting *Cal. Cmtys. Against Toxics*, 934 F.3d at 637). The Court explained the memoranda were "general statement[s] of policy" because they "explain[] how the agency . . . will exercise its broad enforcement discretion . . . under some extant statute or rule"—here, the Immigration and Nationality Act. *Id.* at 161–63 (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014)). Plaintiffs urge this Court to reconsider, arguing the rescission of Mayorkas Memorandum redefined the "rights or obligations" of immigration officers. ECF No. 111 at 33 (quoting *Bennett*, 520 U.S. at 156). But Plaintiffs' argument misses the mark.

As this Court explained, the Mayorkas Memorandum lacks crucial indicia of finality: it "did not entirely prevent immigration-enforcement actions at sensitive places[;]" "it did not indicate that its policy of restraint was based on an interpretation of the INA[;]" and it "did not purport to 'limit an agency's or employee's statutory authority.'" *New Eng. Synod*, 824 F. Supp. 3d at 162–63 (quoting

Ex. 5 at 4). Plaintiffs cite extra-record declarations from former "high-ranking" DHS officials[10] who opine that "DHS . . . treated the [Mayorkas Memorandum] as requiring agents to avoid enforcement actions near protected locations unless one of the limited exceptions described in the policy existed." ECF No. 111 at 34. As an initial matter, these extra-record declarations are not properly before the Court. "The focal point of APA review is the existing administrative record[,]" *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013) (citation omitted), "not some new record made initially in the reviewing court." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 48 (1st Cir. 2016) (quotation omitted). Plaintiffs have made no attempt to demonstrate that an exception to this general rule applies. *See* ECF No. 111 at 34; *see also Housatonic River Initiative v. EPA, New Eng. Region*, 75 F.4th 248, 278–79 (1st Cir. 2023) (enumerating exceptions). As a result, the Court should disregard the extra-record declarations. *See also supra* 22 n.10 (urging the Court to strike the declarations as inadmissible expert legal testimony). If the Court is inclined to consider them, Defendants request an opportunity to depose the declarants and submit supplemental briefing before a hearing on the parties' cross-motions is held.

In any event, Plaintiffs cite no authority where a Court has considered self-serving, post-hoc statements from former agency employees opining on the finality of an agency action, a question of law. *See* ECF No. 111 at 34. And regardless of the subjective intent of several former administration officials, the Mayorkas Memorandum explicitly *did not* redefine rights or obligations. Ex. 5 at 4–5. Moreover, even if the Court were to consider the extra-record declarations, the declarations do not

[10] These statements are inadmissible expert legal testimony. "Lay witnesses may only opine on matters within their personal knowledge that are 'not based on scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702.'" *United States v. Thompson*, 229 F. Supp. 3d 91, 93 (D. Mass. 2017) (quoting Fed. R. Evid. 701(c)). "A lay witness may testify based on particularized knowledge that the witness has by virtue of his or her position in a business but not if the testimony crosses over into specialized knowledge within the realm of an expert." *Id.* (citation modified). "[E]xpert testimony on . . . purely legal issues is rarely admissible." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997). Declarants here rely on specialized legal knowledge, *see* Ex. 6 ¶ 4; Ex. 7 ¶ 9, to testify the Mayorkas Memorandum did not give officers discretion, Ex. 6 ¶ 7; Ex. 7 ¶ 13, and that the 2025 Guidance is a "radical change[.]" Ex. 6 ¶ 11; Ex. 7 ¶ 20. This is quintessential expert legal opinion, *see, e.g.*, *OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Canada*, 804 F. Supp. 2d 77, 85 (D. Mass. 2011) (striking testimony labeling insurance policies and opining to the intent of the parties as inadmissible expert testimony), *aff'd,* 684 F.3d 237 (1st Cir. 2012), and the Court should exclude it.

controvert the Court's previous determination; it merely reflects the unremarkable position that a previous administration intended DHS officers to follow internal guidance.

Plaintiffs' other evidence to the contrary is similarly unconvincing. Plaintiffs invoke the message transmitting the Mayorkas Memorandum and various DHS websites. ECF No. 111 at 35. "But [P]laintiffs cite no authority for the proposition that an agency's informal public statements about a policy can transform an otherwise nonbinding policy into a reviewable final agency action." *New Eng. Synod*, 824 F. Supp. 3d at 163. In any event, ICE's website explicitly states the Mayorkas Memorandum "does not limit ICE's or employee's statutory authority[.]" Ex. 86 at 4. Plaintiffs also cite the Huffman Memorandum's language that the Mayorkas Memorandum "tied the hands of our brave law enforcement," ECF No. 111 at 35 (quoting Ex. 9), but, again, Plaintiffs seem to conflate metaphorical "binding" with binding legal consequences. *See New Eng. Synod*, F. Supp. 3d at 163. And that number of enforcement actions at sensitive locations has increased over the past year, *see* ECF No. 111 at 35, shows, at most, a change in enforcement priorities between administrations.

Plaintiffs' argument that "agency action need not be based on an interpretation of a statute in order to be final[,]" *Id.* at 36, also misses the mark; the 2025 Guidance and the Mayorkas Memorandum are general statements of policy because they explain how the agency will exercise its enforcement discretion. *New Eng. Synod*, 824 F. Supp. 3d at 162–63 (citation omitted). Such statements do not qualify as final agency action unless they finally determine rights or obligations, *id.* (citing *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013)), which, as explained above, they do not. Lastly, Plaintiffs argue an action's legal consequences need not fall directly on plaintiffs. ECF No. 111 at 37. Even if true, this argument fundamentally rests on the presumption that the Mayorkas Memorandum was final agency action, *see id.*, which, as explained above, it was not. *See New Eng. Synod*, 824 F. Supp. 3d at 162; *Fridley*, 2026 WL 1244043, at *8–9; *Mennonite Church*, 778 F. Supp. 3d at 12.

### B. Allowing officers to exercise discretion in choosing where to enforce immigration law is committed to agency discretion

Even if the 2025 Guidance is final agency action, Plaintiffs' APA claims are not cognizable because discretionary policy choices about how best to enforce the Nation's immigration laws are committed to agency discretion by law. 5 U.S.C. § 701(a)(2). Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review[.]" *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—where, effectively, "there is no law to apply"—the APA does not permit judicial review. *Id.* (citation omitted).

"Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2)[.]" *Id.* at 833-34. Courts may also consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832; *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17–18 (1st Cir. 2020).

The analysis begins with the statute. Congress, through the INA and other statutes, has granted DHS broad discretion in enforcing the Nation's immigration laws. *See Arizona*, 567 U.S. at 396. Nothing in the INA indicates that Congress intended to "limit [the] agency's exercise of enforcement power . . . , either by setting substantive priorities, or by otherwise circumscribing [the] agency's power to discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 832-33. Thus, the INA's enforcement provisions, far from seeking to impose constraints on the agency's "exercise of enforcement power," affords the Executive Branch ample discretionary authority to prioritize when and, as relevant here, where it will enforce the law and who will make that decision. *Id.* at 833.

As previously discussed, the INA imposes few location-based restrictions on DHS's broad authority to investigate and make arrests, and it evinces only limited intent to dictate agency discretion

with respect to the mechanics of enforcement. *See, e.g.*, 8 U.S.C. §§ 1226(a), 1231(a)(1)(A), (2), 1357(a). But aside from the requirement to obtain warrants in certain circumstances, *see, e.g.*, *id.* § 1226(a), Congress has not placed other restrictions on defendants' enforcement discretion, to include DHS's discretion to proscribe internal procedures for exercising its discretion, such as the selection of individuals to make case-by-case determinations regarding whether to undertake an enforcement action at a sensitive location, and the factors the selected individual should consider when making those determinations. The INA's silence with respect to sensitive locations leaves the Court with no manageable standard to apply. *But see Dep't of Commerce*, 588 U.S. at 772–73 (explaining ways the Census Act constrained the Secretary's authority to determine the form and content of the census); *Union of Concerned Scientists*, 954 F. 3d at 19 (identifying an internal statutory provision limiting agency's discretion over the makeup of advisory committees).

Indeed, the Supreme Court recently emphasized in *Texas* that lawsuits like this one challenging agency immigration enforcement policies "run up against the Executive's Article II authority to enforce federal law[,]" 599 U.S. at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive Branch to weigh "resource constraints and regularly changing public-safety and public-welfare needs . . . when devising arrest and prosecution policies." *Id.* at 679-80. This "complicated balancing process in turn leaves courts without meaningful standards for assessing those policies." *Id.* at 680; *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake . . ." "These concerns are greatly magnified in the deportation context." (citation omitted)).

Further, enforcement choices are "an area in which the courts have traditionally been most reluctant to interfere." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538 (D.C. Cir. 1986). The rationale for this principle is twofold. First, enforcement decisions traditionally involve considerable agency discretion. *See Texas*, 599 U.S. at 678; *Arizona*, 567 U.S. at 396; *JGE ex rel. Tasso v. United States*, 772 F. App'x 608, 612 (10th Cir. 2019); *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800 F.2d 1514, 1523 (9th Cir. 1986). Second, as discussed above, enforcement decisions inherently require a complicated balancing of factors to assess how the agency can best carry out its responsibility to enforce the law. *Heckler*, 470 U.S. at 831; *Texas*, 599 U.S. at 680. An agency is "far better equipped than the courts" to balance these factors and determine its enforcement priorities. *Heckler*, 470 U.S. at 831.

## IV. The 2025 Guidance Does Not Violate the APA

Courts may "hold unlawful and set aside agency action" if it determines the action was "arbitrary [or] capricious," "contrary to constitutional right," or "in excess of statutory . . . limitations[.]" 5 U.S.C. § 706(2)(A)–(C). None of these criteria apply to the 2025 Guidance.

### A. The 2025 Guidance is not arbitrary or capricious

If the Court reaches the merits of DHS's decision, the guidance is not arbitrary or capricious. Judicial review under the APA's arbitrary-and-capricious standard "is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That review is "narrow." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this standard, a court "simply ensures that the agency has acted within a zone of reasonableness," and "may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423. When an agency changes a policy, it need not demonstrate "that the reasons for the new policy are better than the reasons for the old one," but only that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Here, DHS adequately explained its reasons for making modest changes in internal guidance for determining when officers can take enforcement action in or near protected areas. DHS recognized that "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." *See* Ex. 8. DHS reiterated that "law enforcement officers should continue to use that discretion along with a healthy dose of common sense." *Id.* DHS determined, however, that it was not necessary "for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced" and authorized ICE and CBP to issue "further guidance to assist officers in exercising appropriate enforcement discretion." *Id.* ICE issued such guidance, charging field supervisors with responsibility to determine whether enforcement actions should occur at sensitive locations. *See* Ex. 10. These memoranda are more than sufficient to explain the modest changes from the Mayorkas Memorandum.

Nor does Plaintiffs' assertion that DHS "ignore[d] an important aspect of the problem" "namely," the impact the 2025 Guidance would have on Plaintiffs' exercise of religion and association. ECF No. 111 at 38 (citation omitted). As discussed above, federal agencies charged with enforcing immigration laws have for decades directed their officers to exercise enforcement discretion when contemplating an action in or near a sensitive location. *See supra* 2-3; *see also New Eng. Synod*, 824 F. Supp. 3d at 162 (finding Mayorkas Memorandum "did not entirely prevent immigration-enforcement actions at sensitive locations"). The 2025 Guidance reflects a modest change with respect to the individuals who have responsibility for approving enforcement actions on a case-by-case basis. *Id.*

Plaintiffs also miss the mark claiming that DHS should have accounted for "substantial reliance interests" based on the Mayorkas Memorandum. ECF No. 111 at 38–39. Plaintiffs do not identify any decisions they made in reliance on the prior guidance. Accordingly, this case bears no resemblance to the reliance interests at issue in *DHS v. Regents of the University of California*, 591 U.S. 1, 30-31 (2020). For one, the Court reviewed that policy change only because "DACA is not simply a

non-enforcement policy" but much more; the policies here, on the other hand, are exclusively enforcement guidance for law enforcement officers. *Id.* at 18. Moreover, that case challenged the termination of a program that provided access to certain immigration benefits to a specific group of individuals brought to the United States as children, and the Court recognized the longstanding reliance interests of those beneficiaries. *See id.* at 31. Here, Plaintiffs do not have any comparable reliance interests in the way DHS chooses to instruct its officers to conduct enforcement actions under the Mayorkas Memorandum as opposed to the 2025 Guidance. To the extent Plaintiffs were under the misimpression that the memorandum shielded them altogether from immigration enforcement at protected locations, any such reliance would be unreasonable and mistaken under a plain reading of the guidance. *See Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977).

### B. The 2025 Guidance is not contrary to law

As explained below, *see infra* 28-36, the 2025 Guidance does not violate either RFRA or Plaintiffs' expressive association rights under the First Amendment.

## V. The 2025 Guidance Does Not Violate RFRA

RFRA provides that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that. . . (1) [it] is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). As explained below, Plaintiffs have failed to show that the 2025 Guidance imposes a substantial burden on their exercise of religion. And in any event, the guidance is the least restrictive means to further compelling government interests in enforcing the immigration laws.

### A. The 2025 Guidance does not impose a substantial burden on Plaintiffs' exercise of religion

The First Circuit has not adopted a comprehensive definition of what constitutes a substantial burden on the exercise of religion under RFRA. In deciding cases involving the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, which is a "sister statute" to RFRA,

*Holt v. Hobbs*, 574 U.S. 352, 356 (2015), the First Circuit has held that a substantial burden involves substantial or significant government pressure to modify or violate one's religious beliefs. *See Spratt v. R.I. Dept. of Corr.*, 482 F.3d 33, 38 (1st Cir. 2007) (citing *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)); *accord Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 95-96 (1st Cir. 2013). However, not every "restriction on a religious organization imposes a substantial burden" on the exercise of religion, *Roman Cath. Bishop*, 724 F.3d at 96.

This Court previously held Plaintiffs likely experienced a substantial burden because the 2025 Guidance would permit immigration enforcement actions such as "set[ting] up a checkpoint just outside a church, or . . . question[ing] parishioners in the middle of a Catholic Mass[,]" which would "substantially hinder, constrain, and inhibit individuals from attending church. . ." *New Eng. Synod*, 824 F. Supp. 3d at 157. For their part, Plaintiffs have never alleged such a hypothetical, *see* ECF No. 111 at 5–7, but argue declining attendance and various conscience injuries—locking doors, discontinuing publicity, posting guards during services, and changing the messages they share from the pulpit—all qualify as a substantial burden. *Id.* at 26–27. That argument conflicts with Supreme Court precedent.

The free exercise of religion "affords an individual protection from certain forms of governmental compulsion" but "does not afford an individual a right to dictate the conduct of the [g]overnment's internal procedures." *Bowen v. Roy*, 476 U.S. 693, 700 (1986). Applying that rule, *Bowen* held that the federal government's use of a child's social security number in determining the child's parents' eligibility for federal benefits did not impose a substantial burden on the child's exercise of religion. *See id.* at 701-02. The Court held that the First Amendment does not "require the [g]overnment *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family," *id.* at 699.

The Court reaffirmed those principles in *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), where three Indian tribes argued that the Free Exercise Clause barred the U.S.

Forest Service from constructing a road through a portion of a National Forest the tribes used for religious purposes. The Court rejected that claim on the ground that the "incidental effects of government programs, which may make it more difficult to practice certain religions, but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not impose a substantial burden on religion. *Id.* at 450-51.

Under *Bowen* and *Lyng*, Plaintiffs' fear of an immigration enforcement action at Plaintiffs' worship and ministry activities, and the purported downstream effects on attendance and purported conscious conduct, does not constitute a RFRA substantial burden.[11] Like the government action challenged in *Bowen* and *Lyng*, the 2025 Guidance neither prohibits Plaintiffs from conducting worship or ministry services nor imposes any financial or other penalty on plaintiffs for engaging in such activity. And while the 2025 Guidance provides that law enforcement actions in or near places of worship may occur without approval from agency headquarters (or a designee), determining approval levels for government action is a classic type of internal affair that does not substantially burden the exercise of religion. *See Bowen*, 476 U.S. at 693. The Free Exercise Clause "affords an individual protection from certain forms of governmental compulsion but does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.*

In addition, RFRA affords Plaintiffs no more right to restrict how the government chooses to enforce the Nation's immigration laws near their property than the plaintiff Indian tribes had in *Lyng*. *See* 485 U.S. at 452-53. Any other conclusion would provide Plaintiffs with a free-exercise veto over otherwise permissible law enforcement activity, similar to the "religious servitude" on the government's use of its own land the Supreme Court ruled out in *Lyng*. *Id.* at 452. Holding otherwise

[11] While *Lyng* and *Bowen* involved Free Exercise Clause challenges, the substantial burden analysis in those cases properly inform the interpretation of RFRA because those cases were decided under the pre-*Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) substantial burden/compelling interest test RFRA restored as a matter of federal statutory right. *See*, *e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 687, 692 (2020) (Alito & Gorsuch, JJ. Concurring) (citing *Bowen* in analyzing a RFRA claim), *cert. denied*, 145 S. Ct. 1480 (2025).

leads to absurd results and inappropriately restricts the government's ability to enforce the law. *See id.* at 452. For example, the government's decision to close a key highway exit near a church for public safety reasons would impose a RFRA substantial burden if the closure would prevent people from attending church and would require the government to prove that its action was the least restrictive means to further a compelling government interest, the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The Court's theory would also require strict scrutiny of religiously neutral criminal laws that result in the imprisonment of congregants, *any* increase in immigration enforcement that may result in removal of would-be attendees, and economic policies that may cause parishioners to need to work and forgo gathering for worship. Under such a theory, for example, a religious entity that distributes illegal substances to its congregants for use during religious ceremonies could challenge stepped-up government enforcement of the drug laws by reciting that fear of enforcement has caused some participants to forgo attending. No court has ever suggested RFRA reaches that far. *See Lyng*, 485 U.S. at 452.

**B. The 2025 Guidance is the least restrictive means to further a compelling government interest**

Even if the Court were to conclude that the 2025 Guidance imposes a substantial burden on plaintiffs, there is no RFRA violation if the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Here, Defendants have a compelling interest in the uniform enforcement of the Nation's immigration laws in light of the overwhelming surge of illegal immigration over the past several years, and the 2025 Guidance is the least restrictive means of advancing those interests.

**a.** The Court previously recognized that enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. *New Eng. Synod*, 824 F. Supp. 3d at 157. "The Supreme Court has [similarly] recognized that the public interest in enforcement of

the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (citing cases); *see Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989). "The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and permits and prolongs a continuing violation of United States law." *Nken v. Holder*, 556 U.S. 418, 436 (2009) (citation modified).

"[A]t least 15 million people are in the United States illegally, many of whom entered (or illegally overstayed) just in the last few years." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (Mem.) (2025) (Kavanaugh, J., concurring). The recent influx has "cost taxpayers billions of dollars at the Federal, State, and local levels," Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025), resulting in "[d]eadly narcotics and other illicit materials [flowing] across the border," Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 20, 2025). This situation presents "significant threats to national security and public safety," Exec. Order No. 14,159. The 2025 Guidance furthers the government's compelling interest in addressing "myriad significant economic and social problems caused by illegal immigration," *Vasquez Perdomo*, 2025 WL 2585637, at *4 (citation omitted).

Plaintiffs argue the government may not rest on its compelling interest in immigration enforcement generally, but it must show that it has a compelling interest in conducting enforcement in or near places of worship specifically. ECF No. 111 at 27. To conduct that analysis, a court asks whether the government's interests would be undermined by denying the religious exemption requested. *See Gonzales v. O Centro Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 213, 221 (1972)). The 2025 Guidance meets that standard because requiring law enforcement officials to obtain prior high-level approval before conducting immigration enforcement in or near sensitive locations is far less timely and effective than allowing those officials to rely on their common sense and discretion. *See Iowa Migrant Movement for Justice v. Bird*, 157 F.4th 904, 921 (8th Cir. 2025) (noting "[d]iscretion in the enforcement of federal immigration law is vital").

**b.** The 2025 Guidance is the least restrictive means of furthering that compelling interest. An alternative qualifies as a less-restrictive alternative only where it furthers the government's compelling interests "equally well" as the government's chosen approach, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 731 (2014). This Court held that the Mayorkas Memorandum is a less-restrictive alternative here. *New Eng. Synod*, 824 F. Supp. 3d at 157. But requiring officers to obtain prior high-level approval before conducting immigration enforcement in or near sensitive locations is unduly restrictive and far less timely and effective than allowing those officials to rely on their common sense and discretion. *See Bird*, 157 F.4th at 921. The Court held that nothing in the record shows that adherence to the Mayorkas Memorandum would "in any material respect impair the effective enforcement of the immigrations law," *New Eng. Synod*, 824 F. Supp. 3d at 158, but in "sensitive and weighty" contexts such as immigration, the government is not required to wait until a threat has actually materialized before acting to address that threat. *Trump v. Hawaii*, 585 U.S. 667, 708 (2018) (noting the President's right to make "predictive judgments" regarding immigration, national security, and foreign affairs (citation omitted)).

As explained, recent events, including the recent influx of aliens into the United States, necessitated DHS's change in guidance. Given those events, and in light of the fact that officers "frequently apply enforcement discretion to balance of a variety of interests," including the extent to which any enforcement action occurs in a sensitive location, DHS reasonably determined that it would be more effective to entrust decisions regarding whether to an enforcement action in or near a sensitive location to officers' law enforcement discretion and common sense, subject to any further guidance provided by the leaders of ICE or CBP, rather than have the "head of the agency . . . create bright line rules" ex ante. Ex. 8 at 2. That determination is reasonable, and the government is entitled

to deference on how best to enforce the Nation's immigration laws[12] and address those harms, including in a RFRA suit. *See Tabbaa v. Chertoff*, 509 F.3d 89, 106 (2d Cir. 2007).

**VI. The 2025 Guidance Does Not Violate Plaintiffs' Expressive Association Rights**

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "To be cognizable," however, "the interference with associational rights must be 'direct and substantial' or 'significant.'" *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (quoting *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 485 U.S. 360, 367 & n.5 (1988)).

The Supreme Court's jurisprudence regarding the right of expressive association confirms that Plaintiffs have failed to demonstrate a violation of that right. The Court has held that interferences with the right of expressive association that qualify as "direct and substantial" include "impos[ing] penalties or withhold[ing] benefits from individuals because of membership in a disfavored group," "attempt[ing] to require disclosure of the fact of membership in a group seeking anonymity," and "interfer[ing] with the internal organization or affairs of the group." *Jaycees*, 468 U.S. at 622-23.

Plaintiffs allege none of those kinds of interferences here, ECF No. 111 at 30–31 (listing communal worship, ministering to their communities and engaging in faith education as inhibited activities), and allowing officers to use their discretion in determining whether it is appropriate to forgo otherwise lawful enforcement activities near sensitive locations does not impose any kind of significant burden on expressive association. Moreover, the Supreme Court has never held that neutral and generally applicable government action occurring near expressive association significantly burdens

[12] For similar reasons, Defendants maintain the 2025 Guidance also satisfies exacting scrutiny under the First Amendment expressive association analysis. *See* ECF No. 111 at 31.

that activity by discouraging participation. That includes *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000), on which Plaintiffs rely. *See* ECF No. 111 at 30. *Boy Scouts* held a court order forcing Dale's inclusion in the Boy Scouts under New Jersey's public accommodations laws violated the Boy Scouts' First Amendment expressive association rights. 530 U.S. at 656. Unlike this case, the action in *Boy Scouts* was directed at and penalized the Boy Scouts for engaging in expressive association.

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 618 (2021) and *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026), which Plaintiffs cite, *see* ECF No. 111 at 30, are similarly inapposite. In *Bonta*, two tax-exempt charities declined to file unredacted names and addresses of their major donors as required by California law. 594 U.S. at 603. In *First Choice*, the New Jersey Attorney General demanded a religious nonprofit disclose its donors. 146 S. Ct. at 1120. Unlike the actions at issue in *Bonta* and *First Choice*, the 2025 Guidance does not compel Plaintiffs to disclose their members or take any other action. Instead, the guidance merely supersedes the prior guidance that an officer obtain prior approval from agency headquarters (or a delegee) before taking enforcement action in or near places of worship. No decision of which Defendants are aware holds that treating expressive association the same as other activity imposes a significant burden on that First Amendment right.

*International Union*, 485 U.S. 360, further confirms that the Plaintiffs' understanding of a significant burden is overbroad. *International Union* held that a federal statute that disqualified any household from the federal food stamp program during the time any member of the household was on strike did not implicate the right of expressive association. The Supreme Court acknowledged that "[d]enying such benefits makes it harder for strikers to maintain themselves and their families during the strike and exerts pressure on them to abandon their union." *Id.* at 368. The Court nevertheless held that the statute did not directly and substantially burden union members' expressive association rights because it did not "'order' [union members] not to associate together for the purpose of

conducting a strike, or for any other purpose," and did not "'prevent' them from associating together or burden their ability to do so in any significant manner." *Id.* at 366.

Likewise, the 2025 Guidance neither orders Plaintiffs to alter or forgo worship services or ministries nor prevents them from conducting those activities. Neither *International Union* nor any other case of which Defendants are aware concludes that law enforcement activity prevents expressive association merely by discouraging attendance, and as explained, the government "simply could not operate" if that idea were accepted. *Int'l Union*, 485 U.S. at 452.

Finally, even if the Court were to conclude that the 2025 Guidance imposes a significant burden on their expressive association rights, the 2025 Guidance is the least restrictive means to further a compelling government interest. *See supra* at 31-34.

## VII. Any Relief Should be Narrowly Tailored

Plaintiffs urge this Court to vacate the 2025 Guidance nationwide and permanently enjoin defendants from executing immigration enforcement actions at their places of worship absent exigent circumstances. ECF No. 110-1. Neither relief is appropriate.

### A. Section 1252(f)(1) Prohibits Vacatur Under the APA

Section 1252(f)(1)'s prohibition applies to both injunctions and to orders that "restrain" the Secretary. *Cal. v. Grace Brethren Church*, 457 U.S. 393, 408 (1982); *Aleman Gonzalez*, 596 U.S. at 549; *Comm. on Judiciary of U.S. H.R. v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008).

By invoking the APA and asking this Court to vacate the 2025 Guidance, *see* ECF No. 111 at 39, Plaintiffs seek the type of coercive order prohibited by 8 U.S.C. § 1252(f)(1). The Supreme Court has explained that "restrain" is broad, reaching all judicial orders that "check, hold back, or prevent" governmental action. *Aleman Gonzalez*, 596 U.S. at 549 (citation omitted). Vacatur plainly can have such "inhibit[ing]" effect. *Id.* (citation omitted). If a rule provides the legal authority for officials to act, vacating the rule obviously "prevents" officials from acting. Regardless of how Plaintiffs style their

motion or frame their claims, the requested relief would "enjoin or restrain" DHS from implementing the guidance to its officers relating to the arrest and detentions of aliens and is thus jurisdictionally barred under § 1252(f)(1). *See* 8 U.S.C. § 1226; *see also Mullin v. Al Otro Lado*, 2026 WL 1825741, at *12 (U.S. June 25, 2026) (Thomas, J., concurring) (urging the Supreme Court to "address . . . apparent end-run[s] around" § 1252(f) because it likely bars orders which "have the practical effect of 'restraining' the Government in the same way that an injunction would.").[13]

Even if the Court disagrees that § 1252(f) bars relief under the APA, it should continue to recognize § 1252(f) prohibits restricting DHS's ability to engage in arrests in or near places of worship pursuant to an administrative warrant. *See New Eng. Synod*, 824 F. Supp. 3d at 165–66; *see also Phila. Yearly Meeting of the Religious Soc'y of Friends v. DHS*, 767 F. Supp. 3d 293, 320, 335 (D. Md. 2025). Thus, any relief, whether in the form of vacatur under the APA or a permanent injunction should be limited so as not to restrict DHS's ability to execute administrative warrants in or near places of worship.

If the Court determines the 2025 Guidance does not comply with the APA and that § 1252(f) does not prohibit relief under the APA, relief should be limited to vacatur because it would provide Plaintiffs with complete relief. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 153-54 (D.D.C. 2019) ("The Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would 'have [a] meaningful practical effect independent of its vacatur.'" (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)); *see also Monsanto Co.*, 561 U.S. at 165-66 (as long as "a less drastic remedy" is available—including "partial or complete vacatur" . . . "recourse to the additional and extraordinary relief of an injunction" is not warranted).

[13] Defendants recognize the Fifth Circuit has held that § 1252(f) does not apply to vacatur under the APA, *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022), and that the Ninth Circuit has similarly held that it does not apply to stays under the APA, *Immigrant Defs'. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025), but respectfully disagree with those holdings.

### B. Any Injunction Should be Narrowed to Align with the Mayorkas Memorandum

If the Court is inclined to issue a permanent injunction,[14] the Court should narrow the injunction to match any injury established by Plaintiffs. Consistent with Article III, a court must tailor its remedy "to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Principles of equity reinforce those limitations. Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *California v. Yamasaki*, 442 U.S. 682, 702 (1979). Here, Plaintiffs argued that their injuries were caused by the recission of the Mayorkas Memorandum. *See* ECF No. 111 at 7. Yet the relief they seek in this motion—entry of the Court's preliminary injunction—awards Plaintiffs greater relief than necessary to redress their injury. Plaintiffs have not alleged that the circumstances outlined in the Mayorkas Memorandum under which enforcement action may be taken or that obtaining approval from Headquarters prior to conducting and enforcement action are insufficient to redress their alleged harms.

### C. Section 1252(f) Bars the Court From Enjoining Where Officers May Execute Administrative Warrants

Plaintiffs argue their proposed injunction would not run afoul of § 1252(f) because it "would have no direct impact on the issuance of a warrant for arrest" or the general authority to arrest someone. ECF No. 111 at 40 (citation omitted). Instead, it would directly affect the execution of warrants, which plaintiffs contend is controlled by § 1357, *id.* (citing *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 985 (C.D. Cal. 2024)), a permissible collateral effect. *Id.* (citing *Texas v. DHS*, 123 F.4th 186, 209-10 (5th Cir. 2024)). This argument fails as a matter of statutory interpretation—and common sense.

[14] "The standard for a permanent injunction is 'essentially the same' as for a preliminary injunction with the exception that the plaintiff must show *actual* success[.]" *Rowley v. City of New Bedford*, Civ. A. No. 21-11649-FDS, 2023 WL 2918921, at *10 (D. Mass. Apr. 12, 2023). For the above reasons, Plaintiffs have not shown success on the merits or that their purported injuries are irreparable in the absence of a permanent injunction. And the public interest and balance of the equities tip in Defendants' favor because the government is irreparably injured when it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (citation omitted).

The plain meaning of a statute's text must be given effect reading the words in "their context and with a view to their place in the overall statutory scheme." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 55 (1st Cir. 2021) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). The Supreme Court does "not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and [its] reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest. "[W]here a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded." *Reyes-Gaona v. N. Carolina Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001). Section 1357 does not apply to arrests made pursuant to an administrative warrant because it, in relevant part, lists powers of immigration officers and employees *without* a warrant. 8 U.S.C. § 1357(a). Section 1226(a), in contrast, specifies the authority to arrest and detain aliens *pursuant* to an administrative warrant. *Id.* § 1226(a). As a matter of common sense, an injunction prohibiting officers from executing a warrant at certain locations directly implicates the statute authorizing arrests pursuant to that warrant—not the statute listing powers *without*[15] a warrant.

Precedent confirms this reading. The Supreme Court described § 1226(a)'s predecessor as the legislation "giving authority to the Attorney General or his delegated to arrest aliens pending deportation proceedings under an administrative warrant." *Abel v. United States*, 362 U.S. 217, 232 (1960). In *Arizona v. United States* the Court situated the entire arrest-warrant framework within § 1226(a), explaining the Attorney General "can exercise discretion to issue a warrant for an alien's arrest and detention" under that provision, that such warrants are "executed by federal officers who have received training in the enforcement of immigration law" under 8 C.F.R. § 287.5(e)(3), and that actions without an administrative warrant have only the "more limited authority" of § 1357(a). 567 U.S. at

[15] Plaintiffs' reliance on *Kidd v. Mayorkas* is misplaced. There, the district court baselessly stated, "the *execution* of warrants is governed by 8 U.S.C. § 1357," *Kidd*, 734 F. Supp. 3d at 985, without reference to § 1357's unambiguous text.

407–08. Execution of an arrest pursuant to a § 1226 warrant therefore exercises the authority that the provision confers, and its execution is part of § 1226 rather than § 1357. *Id.*; *Abel*, 362 U.S. at 232.

The First Circuit has also ruled § 1252(f) precludes an order restraining how officers exercise authority under § 1226. In *Brito v. Garland*, the plaintiffs argued that an injunction regulating bond hearings could not restrain § 1226(a) because the statute was silent about the procedural requirements. 22 F.4th 240, 249 (1st Cir. 2021). The court rejected that premise, explaining that § 1226 gave the government discretion to detain or release an alien and "[t]he fact that the statute may be 'silent' as to procedural issues" did "not change the fact that the district court's injunction restrains the operation of [§] 1226(a)[.]" *Id.* Like the vacated injunction in *Brito*, an injunction prohibiting where officers may execute administrative warrants would impermissibly impose judicial requirements on the exercise of § 1226, *see Aleman Gonzalez*, 596 U.S. at 551, even if the statue was silent as to the execution of warrants—which, to be clear, it is not, *see supra* at 39.

The D.C. Circuit reached the same conclusion *N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025). There, the district court enjoined the U.S. Marshals from executing arrests "made with a warrant issued pursuant to § 1226(a)" and detention under § 1226(c). *Id.* at 281, 290. But the D.C. Circuit reversed, rejecting the contention that the order implicated only the uncovered warrantless-arrest authority in § 1357 and affected § 1226 merely collaterally. *Id.* at 289–90. It further explained that 8 C.F.R. § 287.5(e)(3), the regulation governing who may execute administrative arrest warrants, "claims its authority in part from 8 U.S.C. §§ 1226 and 1231," both covered provisions. *Id.* at 288–89. *Dixon* thus rejects both premises: that restricting civil immigration arrests has only a collateral effect on § 1226, and that execution of a § 1226 warrant is a freestanding exercise of authority under § 1357. *See id.*

## CONCLUSION

For these reasons, the Court should grant Defendants' motion to sever the newly added Plaintiffs that do not reside in the district and Defendants' motion for summary judgment.

Dated: July 23, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

*/s/ Kristina A. Wolfe*
KRISTINA A. WOLFE (VA Bar No. 71570)
Assistant Branch Director
RICHARD C. GILES (WY Bar No. 8-7222)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St., NW
Washington, D.C. 20530
(202) 353-4519
Kristina.Wolfe@usdoj.gov

*Counsel for Defendants*

## LOCAL RULE 7.1(a)(2) CERTIFICATION OF COMPLIANCE

I hereby certify that prior to filing Defendants' Cross-Motion for Summary Judgment and Motion to Sever on Grounds of Improper Joinder, counsel for Defendants conferred with counsel for Plaintiffs and attempted in good faith to narrow the issues raised. The parties were unable to reach agreement, and Plaintiffs oppose the relief requested.

/s/ *Kristina A. Wolfe*
Kristina A. Wolfe
Assistant Branch Director
United States Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2026, the foregoing pleading was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

/s/ *Kristina A. Wolfe*
Kristina A. Wolfe
Assistant Branch Director
United States Department of Justice