# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEW ENGLAND SYNOD, EVANGELICAL LUTHERAN CHURCH IN AMERICA, et al., Plaintiffs, | ) | Civil Action No. 25-40102-FDS |
| vs. | ) | |
| DEPARTMENT OF HOMELAND SECURITY, ET AL., Defendants. | ) | |

BEFORE: HONORABLE F. DENNIS SAYLOR

MOTION HEARING

John Joseph Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, MA 02210

September 9, 2025
2:00 p.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way
Boston, MA 02210
E-mail: vaohara@gmail.com

APPEARANCES:

For the Plaintiffs:

Democracy Forward Foundation, by KEVIN E. FRIEDL, ESQ., ANDREW LIANG BOOKBINDER, ESQ., JOHN STERLING MOORE, ESQ., and AUDREY JORDAN WIGGINS, ATTORNEY, P.O. Box 34553, Washington, D.C. 20043;

Gilbert LLP, by SAMONE IJOMA, ATTORNEY, and SONIA J. MURPHY, ATTORNEY, 700 Pennsylvania Ave. SE, Suite 400, Washington, D.C. 20003;

Washington Lawyers' Committee for Civil Rights and Urba, MADELEINE GATES, ATTORNEY, 700 14th St. NW, Suite 400, Washington, D.C. 20005;

For the Defendants:

Federal Programs Branch, by RICHARD CODY GILES, ESQ., 1100 L Street, Suite 11404, Washington, D.C. 20005.

PROCEEDINGS

THE CLERK: All rise. Court is now in session in the matter of New England Synod, Evangelical Lutheran Church in America, et al. vs. Department of Homeland Security, et al., Civil Action Number 25-40102.

Would counsel please identify themselves for the record, starting with the plaintiff.

MR. FRIEDL: Good afternoon, your Honor, Kevin Friedl for all the plaintiffs. I'm joined here at counsel table by 01:01PM Sterling Moore, Andrew Bookbinder, Sonia Murphy, Samone Ijoma, and Audrey Wiggins.

THE COURT: Good afternoon, all.

MR. GILES: For the defendant, Richard Giles.

THE COURT: All right. Good afternoon. This is a hearing on plaintiff's motion for a preliminary injunction. I've read the papers. Mr. Friedl, are you taking the lead?

MR. FRIEDL: Yes, your Honor.

THE COURT: I'll hear you first. I'll ask you to stand when addressing the Court.

01:02PM MR. FRIEDL: To stand?

THE COURT: Yes.

MR. FRIEDL: Yes. For decades, your Honor, federal immigration authorities sought to limit their enforcement actions at houses of worship because they recognized that to carry out arrests and raids and surveillance of these sensitive

locations was going to burden fundamental rights in ways that weren't necessary to enforcing the law.

Earlier this year, defendants banned that longstanding policy rescinding all of the protections of the previous policy and putting none in their place.

The result has been genuine human suffering and fear so severe that has stopped even the devote from coming to worship or the hungry from coming to receive food. We think these harms are only going to increase as the administration 01:03PM continues to accelerate the pace and aggression of its enforcement, including here in the Boston area, as your Honor may have seen from recent headlines.

That policy is not only harmful but unlawful. We've shown a likelihood of success on the merits of all of our claims, and because we've also satisfied all the other relevant factors, the Court should order preliminary relief to halt ongoing injury.

There's a number of issues at play here. I'm happy to begin wherever your Honor would prefer, but I thought it might 01:03PM make sense just to start with exactly what the change in policy does because I think there's some dispute about that, and a proper understanding of the 2025 policy is necessary and very helpful for analyzing all the other issues.

So the 2025 policy, by which we mean the two memos that defendants issued earlier this year, the Huffman memo and

the Teller memo really work a sea change in what came before. The prior policy, as stated most recently and most relevantly for this case in the Mayorkas memo of 2021, established a foundational principle that DHS was to avoid enforcement actions at houses of worship to the fullest extent possible and repeated that phrase to the fullest extent possible six times in just about three and a half pages.

Now, it's true the Mayorkas memo was not a total ban on enforcement at sensitive locations, and we don't claim otherwise. I think what matters, however, is that it represented a significant cabining of DHS's discretion in critical ways that are now gone.

So the Huffman memo, really it's almost a pure negative. The memo just wipes out, rescinds what came before and puts no substantive limits in their place.

The Teller memo does largely the same thing. It includes this requirement that agents seek approval, which can be verbal or in writing from certain officials who I understand to be basically first line supervisors, but that's a purely procedural requirement.

The memo does not say anything to cabin those officials's exercise of their discretion, so for them, too, the policy just leaves it to their common sense and their uncabined discretion.

And that's, again, a very significant change from what

came before. You know, the government sort of contests that, but we think their briefing doesn't fairly grapple with what this new policy does, and, you know, the extent of the change I think is confirmed by the facts on the ground, which show an increasing especially over the summer, an increasing rate of these incidents at and around houses of worship.

And I think it's also confirmed by defendant's own statements when they issued the Huffman memo. This is Exhibit 7, the press release they put out at the time. They said that the prior policy had, quote, "afforded law enforcement a new policy," was going to, quote, "empower ICE and other DHS agents to go after people in sensitive locations.

I mean, there's the basic fact that this was a day one priority for the administration, something they did on January 20th. All of that is to be taken with the idea that there has been no change here, this is just a continuation of what came before.

So I would turn then to the significant, severe and ongoing harms to our plaintiffs and their members that resulted from that change, and I think the factual record here demonstrates a number of such injuries.

The first is the decrease in attendance at worship services, which is both widespread and for certain churches quite severe. I would highlight in particular the declaration of the Pastor Aparicio. This is Exhibit 12, paragraph 17. He

talks about a 50 percent reduction in attendance at a church. Bos of the Southwest California Synod describes an 80 percent reduction in attendance at one church. That's Exhibit 16, paragraph 19. And Bishop Pipho of the New England Synod in his declaration, Exhibit 17, paragraph 14 talks about, you know, decreases of attendance here in Boston, in East Boston.

And these sort of diminution in attendance we think is indisputably an injury in facts to the plaintiffs and their members that was recognized by the Ninth Circuit in the *United* 01:08PM *Presbyterian* case, also Judge Chaung in *Philadelphia Yearly Meeting*.

And it's easy to see why this is really a fundamental interference with the congregant's ability to come together in communal worship as their faith requires and of the church's sort of ability to carry out their core religious missions to minister to the faithful.

None of this is possible when people are forced to stay home out of fear, and, of course, the harm to those people who are unable to attend and unable to take part in this 01:09PM central aspect of their faith is clear, but I hope, I think what also comes through clearly in the declaration, this is an injury to these congregations more generally, even to the people who are able to show up but then are deprived of their ability to worship with their full community and their fellow congregants. That's one form of injury.

There's also --

THE COURT: And is that both an associational and an organizational injury or associational only?

MR. FRIEDL: I think it's both, your Honor, so clearly the individual congregants I think are being injured, and I think what *Presbyterian Church* recognizes that it's also an injury to the church itself because it is this direct impairment of their ability to carry out their core mission, their core function.

01:09PM You know, just to touch briefly on some of the other ones, of course, there's a similar decrease in attendance at other aspects of the members's ministry, their Sunday schools, food pantries, English as a second language classes, church camps.

The list goes on, and I think across the board, we documented in the declarations decreases in attendance at those other critical activities, which are not just sort of things that these churches do because they're nice to do but really are compelled to do by their faith as Pastor Knezovich 01:10PM explained in his declaration, Exhibit 14. You know, they are called on by the bible to feed the hungry, and as he said, when we leave people hungry, we're leaving Jesus hungry, this is essential who we are.

THE COURT: But is that a religious injury, I mean, the Catholic Church, for example, I think they still do, owns

and operates hospitals. Would a change in medical policy, would that effect on a catholic hospital be a religious injury? I'm not talking about abortion, but I don't know, reduction in Medicare payment for a particular form of surgery, would that be a religious injury? In other words, that the devote Catholic might say this is central to our faith, but it doesn't really, I guess I'll say, it doesn't feel like a religious injury, let's put it that way. English as a second language, harm to an ESL program doesn't instinctively to me feel like a religious injury as opposed to attendance of the services.

01:11PM MR. FRIEDL: Well, there are two responses to that, your Honor, so taking the last point first, and I think what the declarations spell out is just that for these members, ESL classes, these other activities are directly tied to their religious compulsion to welcome the stranger, to feed the hungry, to help the least vulnerable in their communities, and I think it really is a core part of their religious mission in a way that say a detail about medical billing probably wouldn't be.

01:12PM So my second point, I think the hypothetical that you're describing depending on the details there sounds like, you know, to put it generously, a much closer case than we have here when, you know, a congregation feels that they are carrying out the work of, you know, their faith and that the bible compels them to do by, for example, operating a food

pantry and feeding the hungry.

And then defendant's policy is creating so much fear that people are afraid to even show up to receive food, and I think this is, you know, well documented in the record that these decreases are happening, but that does directly impair their ability to exercise their faith.

But, of course, I guess I would step back and just say even if your Honor disagrees with us about these other parts of their ministry, we still have decreased attendance at worship 01:13PM services, with that a separate form of injury, which is decreased financial contributions, decreased financial giving.

This is really, you know, the most classic form of injury, in fact, perhaps, and even one dollar in lost giving is sufficient to constitute injury. In fact, in the first standing, we also have the injury that has come from the members being forced to take steps essentially to close off their churches.

Their faith compels them to operate their houses of worship especially during Sunday worship as places of openness 01:14PM and welcoming. Many of them talk in the declarations about keeping the doors open, or at the very least unlocked. And as a result of this policy, numerous plaintiffs members had to take steps such as closing their doors, locking their doors, putting up, you know, signage to mark areas as private and essentially keep people away, the very opposite of what their

faith compels them.

And the last thing I would mention now is just also the numerous steps that the member churches had to take in order to prepare for the possibility of immigration enforcement action at their church. There are a certain number of examples of this, training for staff, what to do if there's an ICE raid. One congregation in California talks about actually spending money to fortify a portion of their church.

Pastor Paul Doe of a church in Connecticut in 01:15PM Exhibit 19 talks about doing trainings. They retained an attorney. They prepared scripts for their staff to use. They put boxes around the church with sample warrants so people know what to look for, what to ask agents to produce if they show up at a church, and it says in that declaration that they spent thousands of dollars on this, and as his declaration and others establish, this is all money, time, and resources that the congregations could and would prefer to be spending on their religious mission.

THE COURT: I don't know if you're moving on but sort 01:16PM of going back to the question of the burden on religious services themselves, isn't that a constitutional harm itself an injury, in fact? Isn't that enough? I don't think you address the point in your papers, but I wonder if you could speak to that, whether the mere fact of a harm or constitutional right could itself be an injury, in fact, without more?

MR. FRIEDL: I do think that it could, your Honor, and I think it is here, and I think we, you know, have a number of statements in the declarations where people describe, for example, pastors having to sensor themselves during sermons. So, for example, Ms. Collins's declaration from the Alliance of Baptist, this is Exhibit 23, paragraph 8, she relays that pastors from multiple churches have reported not feeling comfortable preaching freely about their stance on immigration, Bishop Briner of the Synod in Texas, paragraph 18 talks about 01:17PM how the churches in her Synod, too, have steered clear of preaching and addressing issues related to immigration.

There's also statements by I think some of the Quaker declarants in particular because of sort of their long, deeply rooted transition of passivism, they talk about sort of the importance of having armed agents intrude into their services and how disruptive that it would be, and not just that it would be disruptive if that happened but knowing that this threat is sort of out there, disturbs their ability to sit in silence, as they often do at their meetings, and to worship as they would 01:18PM otherwise, and so I think that is also a form of injury, in fact, that is certainly ongoing here in addition to the other ones I've addressed.

And unless your Honor had further questions on that point, what I was going to emphasize next is I don't actually take the government to be disputing that what we've been

talking about are injuries, in fact, or at least can in some circumstances constitute injuries in fact. I think they instead make two moves: 1, they address injuries that we're not seeking to rely on here; and 2, they raise arguments about traceability and redressability.

With respect to --

THE COURT: Before we get to that, they talk about imminence. I think they say that this is hypothetical or there haven't been armed agents disrupting the services and hauling people away, I'm paraphrasing their argument, but they make the point that the injury is not imminence. Go ahead.

MR. FRIEDL: You're absolutely right about that, your Honor, and this is one place where they rely on Supreme Court's decision in *Clapper*, and I think we would dispute as a factual matter, you know, that this actual enforcement actions at our member churches is so speculative given the policy and what else is going on, but I think more fundamentally we don't think it matters for the injuries that I've been describing here and that we focus in our briefs, all of which are actually ongoing now and therefore are actual concrete injuries, in fact, sufficient to confer standing.

Another argument that they make is they contest the idea that subjective chill on free speech alone is necessarily enough, and, again, I think that that's sort of arguing against different injuries than the ones that we presented here and

documented in the declarations because what we have are, you know, actual current ongoing decreases in attendance, other steps that the churches are forced to take right now, loss in financial giving right now, things that don't turn on contingent future events, they're happening at this moment.

So I would then turn to causality and redressability where I think the government really focuses their arguments here on standing, so in terms of traceability, one thing they say is our injuries rely on the actions of third parties.

These are independent third parties, these are unpredictable actions, and that breaks the chain of causation. We can't connect these ongoing injuries to our member churches to the challenged government policy, and I think that that's contrary both to the facts here and to the law.

The declarations do connect the ongoing harms to the 2025 policy, so numerous declarations describe how congregations are very aware of this change in policy. Now you don't have pastors or individual congregants saying I'm aware that there used to be a memo called the Mayorkas memo in 2021, and it was replaced by a subsequent memo in 2025. They don't talk about it in that way, but what they do say is we're aware that there needs to be more protections for these houses of worship and that that policy has changed, those protections are no longer there. I think that's more than enough, that's all we need.

We've also connected that awareness to the injuries that we're describing here, including, you know, statements that people are staying home because of this change in policy, because they fear enforcement at the church specifically, and I think that that makes clear that it's really this change in policy.

You know, these churches, they experienced the first Trump administration at a time of greatly increased immigration enforcement generally, but what didn't happen back then was

02:24PM this change in policy. There still were -- even though there was greater immigration enforcement generally, there were still these protections for houses of worship and other sensitive locations, and as a result, they didn't see these sort of decreases in attendance. I think what's changed is this stripping away of protections for people when they're there at worship, and so we've established I think as a factual matter that connection, but I also think --

THE COURT: Before we get to the factual matter, what is the standard? The government says it's but-for causation.

02:24PM If it's not that, what is the standard? In other words, there has to be some level of causation for traceability, right? And, of course, this is put in a context. I would imagine that people here illegally are afraid to do all kind of things, and, you know, not just going to church, and I would imagine as well that because either people are self-deporting, whatever, there

are lots of causes for decline in attendance.

What is the legal standard that I should evaluate at this stage? Likelihood of success on the merits is not the same as bringing the case at the end of the day, but there still there has to be a legal standard that I follow as to the level of causation. What is the standard for showing causation that I can measure it against, and if it isn't but-for causation, what is it?

MR. FRIEDL: I don't think it's but-for causation, I 02:26PM think the standard that the Court should apply is to ask whether the injuries are fairly traceable to the challenged action. That is what the First Circuit said in --

THE COURT: That's kind of circular. What does it mean to be fairly traceable? In other words, there are surely multiple causes in the sense of why are immigrant populations -- illegal immigrant populations staying home, lots of different reasons why that might be true, right, so what quantum is necessary to establish the traceability here?

If this policy didn't exist, I have to believe in an 02:26PM attendance, right, so substantial contributing cause, there's lots of concepts in tort law that I don't know if they get barred in here, this is a genuine question. I don't know what the causing standard ought to be.

MR. FRIEDL: I think it's exactly the right question. I think the answer is provided in the First Circuit's

*Conservation Law Foundation* where it dealt with a scenario of multiple, at least alleged contributing causes, and this scenario arises frequently in the case of, you know, claims about pollution where there might be multiple factories, you know, polluting a river, what do you have to show in order to sue one of those factories, and what the First Circuit said in that case is that all that the plaintiff has to establish is that the particular action they're challenging contributed to their harm, and I think there's a very helpful passage in that decision where the Court says essentially we should ask a counterfactual question.

02:27PM

If those other causes or alleged causes did not exist, would the challenged action cause the harm here, and I think if you conduct that exercise here, it's quite clear it's both again documented in the factual record but just a common sense inference that if all we had was a decrease in the protections that people received at houses of worship, an entirely predictable outcome of that would be decreased attendance.

I think applying that case here really makes clear that we've established the traceability element, and just the other nuance that I would put on this, your Honor, as you mentioned, we're not at final judgment.

02:28PM

This is a motion for preliminary injunction, so I think under the Supreme Court's decision in *Murphy*, which is cited in the papers, we have to make a clear showing that we

are likely to establish this element of standing.

And so I really think that that decision is sort of outcome determinative here. If you apply the analysis that the First Circuit prescribed there, it compels the conclusion that we've shown traceability.

And then that's aside from, you know, these direct statements in the declaration that is in the declarations that I was alluding to before.

So redressability is sort of the other side of the same coin. It's not a high bar. To clear, we just have to show, you know, that there's a fair possibility that a favorable judicial decision would remedy some of our injury.

As the Supreme Court explained in *Diamond Alternative Energy* just last term, you know, if you can show you're likely to recover even a dollar in revenue, that's enough for redressability, even if you might still have to incur other costs.

I think the equivalent here is the Court only has to conclude that it's likely, you know, that a single additional congregant would resume attending church if the Court were to issue a favorable decision or, you know, a single extra dollar of financial gain, that would be enough to establish redressability. I think we've certainly met that burden here.

And I guess the other point I would make about *Diamond Alternative Energy* is I think it's also a very good case for us

on the actions of third parties because what the Court holds there really emphasizes there because it had already held this in the census case, Department of Commerce, is that the Court can make common sense inferences about how third parties are going to react.

The Supreme Court in *Diamond Alternative Energy* specifically rejected the argument that the challengers there had to come forward with detailed significant evidence to establish that point where it was clear that what the effects 02:31PM of the challenged policy were going to be, and, again, when here, what we're talking about is making a certain place, houses of worship, less safe, it is certainly common sense inference that people are going to be more likely and have, in fact, already, you know, begun to avoid those places.

People who attend worship, they may be at the church for an hour or two, and if they feel that while they're there, they're essentially sitting ducks because this change in policy has declared open season on houses of worship, I think it's certainly a reasonable inference to assume that people aren't 02:32PM going to attend.

THE COURT: But I continue to struggle, backing up with traceability. Again, if people are afraid to go to church, are they not afraid to go to the doctor or to go to the grocery store, or to even put it within the confines of the First Amendment, they're afraid to speak out, to assemble, to

petition the government to really to do anything.

And traceability must have some requirement, some quantum of proof that is required to show that the injury is traceable to the policy, and the affidavits talk about the atmosphere of fear, which I don't have any reason to question, but it would suggest that it isn't just fear of going to church, it's a fear of doing a lot of different things, and this segues into a somewhat different point, but we aren't just talking about the actual service itself but being near the church.

02:33PM

You know, to use that phrase that is often used in the affidavits, are you afraid to walk on the sidewalk two blocks away from the church? Are you afraid to cut through the church parking lot on the way to the convenience store or whatever? And I'm struggling with that, I guess, to show that there is sufficient evidence to indicate that this is traceable to the change in policy.

And maybe to throw out, these are genuine questions, and I'm throwing a lot at you just in a single question, but one issue I had was, well, what did the world look like before 2021, right, before the Mayorkas memo?

02:34PM

If the Mayorkas memo introduced a more enlightened regime, did that mean that attendance increased during the pendency of that? In other words, had it depressed before, and with I forget the names of the two memos, going back to 1993,

whatever it was, had church attendance been suppressed in that era and blossomed during the Mayorkas memo and has shrunk again.

I'll stop there before I make my question even more complicated and let you respond.

MR. FRIEDL: So I don't think there's anything in the factual record to tell us sort of how attendance has gone up and down. You know, the Mayorkas memo is different in some respects than what came before, but we do have, you know, 30 02:35PM plus years of a consistent -- there's a fruit line in these policies, which has consistently restricted enforcement agents at churches.

The details of how that was implemented, that changed slightly over time, but I think what the Mayorkas memo calls the foundational principle, that was really in place going back to the 1993 memo, so it's possible there had been variations over time. I don't know -- I don't think we know that, I don't think it's in the factual record now. What is in the factual record is that there have been significant decreases in 02:35PM attendance since this change in policy, again, you know, up to 80 percent at one church are not just small figures, it's really disseminated some churches, and I think one lesson we can draw from the recent past is this point I was making before that, again, these churches lived through Trump I, the first Trump administration, and they did not see these decreases in

attendance, and that, of course, was also a time of a sustained uptick in immigration enforcement activities, but the difference was if you could get your kids to school, another sensitive location, if could you get to the hospital, another sensitive location, you could get into church, at least during those two hours or so you were in the pews, you could enjoy some amount of sanctuary and some relative protection and security, and that is what has changed.

And I think, you know, in terms of specific evidence, 02:36PM again, I think the declarations do speak to this, your Honor, and don't just talk about general background enforcement. I think they're talking about this in particular, Pastor John Doe of the Metropolitan Community Churches, this is Exhibit 25 at paragraph 8, this is an individual pastor, talks about how his congregants have confided in me, they're afraid to come worship because they worry the church will be targeted by immigration enforcement.

You could have whatever background level of immigration enforcement you want to imagine, but if the 02:37PM Mayorkas memo or something similar were still in place, then at least you would be safe, relatively safe, at church, at least, you know, if the DHS agents could do what they will in the grocery store, I think was the example your Honor gave, but in church, they would have to void enforcement actions there to the fullest extent possible.

Another one, Pastor Aparicio, Exhibit 12, paragraph 17, many immigrant families are not attending church due to fear of ICE raids at the church. I mean they're worried about immigration enforcement that is specifically directed at the church, and that is entirely about this policy change. That is not about just background enforcement levels everywhere else.

Pastor Rabell-González, Exhibit 13, paragraph 24, he's a pastor at a church in California with many immigrants in their congregation, says, I get calls from congregants if it is 02:38PM safe to go to church yet. He says he gets them several times a month, and I can't promise them that our church won't be raided because it could be.

Again, this is all about fear of enforcement at churches, and that's what this policy change is about that we're challenging. It's not about, you know, being picked up on the street or somewhere else.

And the other declaration I would point to, just to give one more, your Honor, is Bishop Johnson. This is Exhibit 10, I believe it's paragraph 19. He makes the point 02:39PM that I was making a moment ago that in the past, at least, you know, yes, you might run risks in moving around in society, but at least when you got to a sensitive location, there was some degree of additional protection there, and so I think that the facts are in the record.

And the other point though I would emphasize is that

I'm not even sure we need those facts under *Diamond Alternative Energy*, under *Department of Commerce* because I do think we're talking about a common sense inference that a change in protection at a specific location is going to affect people's willingness to go to that location specifically.

So I don't know, there may have been other parts of your Honor's question that I did not get to, and I would be happy to address that. That, and the discussion that we were having a few minutes ago about *Conservation Law Foundation* and 02:40PM situations of multiple potential causes I think are all highly relevant and cut strongly in our favor here.

I would turn then from standing to the merits, if I could.

THE COURT: Before you get to the actual merits, the government had a very short section on subject matter jurisdiction. It was not their lead argument, and you didn't respond to it. What is your response to their claim that there is no subject matter jurisdiction?

MR. FRIEDL: Is your Honor referring to 8 U.S.C. 1252?

02:40PM THE COURT: It's what the government -- you're forcing me to look at their memo. Hold on. Page 20 and 21 under 1252, they say that I have no subject matter jurisdiction. It's about a page to that topic. At this point I was wondering what your response to that was.

MR. FRIEDL: Absolutely, your Honor. One thing I

would say at the outset, I think the argument here is about jurisdiction to order a particular type of relief but not jurisdiction to hear this case, so just to be clear on that point, I don't think by the government's lights this is like an argument for dismissal or something, they're arguing for the type of relief.

We did, your Honor, respond to this. We put it in a different order in our brief. It's at the end, sort of when discussing remedies. I would direct the Court beginning on 02:42PM page 22 of our reply and going on.

THE COURT: Okay.

MR. FRIEDL: And so the argument there is that one that we think the sort of remedial bar in 1252(f)(1) doesn't apply here for several reasons. That provision speaks to the operation of certain specified statutory provisions.

8 U.S.C. 1221 to 8 U.S.C. 1232, those provisions address specific immigration authorities, what happens to arrivals at airports and ports of entry conducting mental and physical examinations, what countries can people be removed to, 02:42PM and we really think that those authorities are all sort of outside the scope of what we're asking for here.

The more relevant provision I think for the authority of DHS agents to actually carry out enforcement actions within the country is a different provision, 8 U.S.C. 1357, which I think the government has conceded in other cases, that by its

02:44PM terms, it's not covered by 1252, so we think we're not asking for a remedy that affects any of the specified statutory provisions, and I guess our fallback argument to that is that if your Honor thought that there was any sort of effect on the operation of those provisions, any such effect would be purely collateral.

The courts have recognized, such as Texas, the DHS, The Fifth Circuit decision we cite and is part of our brief have recognized that where you're really focused on a different statutory provision, as we are here, 1357 the mere fact that there may be some sort of collateral effect on any of the relevant statutory provisions is not enough to trigger the bar in 1252.

And we offer another opinion and more fundamental argument, which is that because what we're asking for is a stay under the APA under Section 705, that for that reason, too, this provision we're talking about doesn't even apply here as a Texas District Court has so held, and we point to a First Circuit decision called *Brito*, which didn't deal with 705 but was looking at class-wide declaratory relief, and what the First Circuit said was, well, this relief does in some ways operate similarly to an injunction but it's not an injunction, and this provision 1252 is about injunctions.

Specifically we are going to respect what Congress actually said, what it actually wrote, we're not going to apply

that to this different form of remedy, and we think the same reasoning applies here to the 705 stay.

So I'm happy to discuss that more. That would be our response.

THE COURT: Turn to the merits of this dispute.

MR. FRIEDL: Absolutely, your Honor. I'll start with the Religious Freedom Restoration Act claim, where we bear the initial burden to show that the challenged policy is substantially burdening religious exercise, and what the First Circuit and other courts have held that the First Circuit in the *Pereira Brito* case is that a substantial burden exists or can exist where the government action is putting substantial pressure on adherence to modify their behavior and violate their beliefs. I don't think that's necessarily the only way that you can establish a substantial burden, but that is certainly a way, and we've done that here.

The challenged policy really for very similar reasons to what we've already been discussing this afternoon does put substantial pressure on congregations not to come together in communal worship, which obviously, again, harms both those people who stay home.

And I do want to be clear on one point, your Honor, just to emphasize, you know, the government I think at one point in their brief says it's just about, you know, removable aliens staying home, but I don't think that's consistent with

the evidentiary record, which talks about how people with legal status, even people who are not immigrants themselves, are reasonably staying home as a result of this policy change, but, again, even for people who do attend their religious practice is also burdened by having, you know, again, in some cases very significant diminution in attendance at a communal worship, but it also burdens religious exercise in some of the other ways we've been discussing.

It puts substantial pressure on congregations to take 02:47PM these steps to close off their churches from the public, to close doors and lock them and post signage to keep people away, really in direct violation of what their religion would call for them to do, which is welcome the community, welcome anyone who wants to come in to worship with them, to attend their services and to participate.

And another point we discussed previously, it impairs their ability to carry out these social service ministries and these other expressions of their religious belief beyond just gathering for worship every Sunday.

02:48PM THE COURT: Does the church have a legitimate interest in being a sanctuary from law enforcement? In other words, not during the service itself but 24-7 serving as a sanctuary where people can be protected from law enforcement? Is that a legitimate interest of the church?

MR. FRIEDL: I think we don't -- so I don't know if

this is a premise of your Honor's question or not, but a return to the Mayorkas memo would not mean that it would be impossible for DHS to ever carry out an enforcement action at a church, they would just have to do so in the circumstances specified in that memo and avoid it to the fullest extent possible.

There might be some scenario where that memo would allow them to, again, to carry out enforcement actions at churches. We don't dispute that.

I think we're talking -- I think we're talking less 02:49PM about sort of operating as a 24-hour sanctuary and just really something a bit more modest, your Honor, which is just to retain these decades-old protections, which, again, did not absolutely prohibit immigration enforcement at houses of worship but did significantly restrict it based on a recognition of the effect that was going to be produced on fundamental rights by having totally unrestrained enforcement, which is the regime that we're in now.

So I don't think we're asking for as much as that the question maybe suggests but a return to a policy that 02:50PM recognized that important interests on the other side of the scale because we've shown substantial burden on religious practice, then the burden shifts to the government to show that they're able to satisfy strict scrutiny, and they already flunked that test.

First, they identify no compelling interest in being

able to carry out unrestrained immigration enforcement at houses of worship. They don't even assert that they do. That's really the inquiry required by *Hobby Lobby* and the Supreme Court's other decision in *Fulton v. City of Philadelphia*, both at which emphasize this point that this is a narrow inquiry, and we're looking at, we're looking for a compelling interest in doing specifically the challenged action or the challenged policy.

And, again, they don't offer any argument that they 02:51PM have a compelling interest properly defined. They point to the government's interest in immigration enforcement generally, especially along the border and ports of entry, but that, again, is not the right inquiry.

That's directly contrary to finding precedent in *Fulton*, in *Hobby Lobby*, so perhaps recognizing this problem, they argue, oh, well, really our interest is in uniformed enforcement of immigration laws, and I think there are at least two problems with that argument, your Honor.

One is it's, again, flatly foreclosed by *Fulton* and 02:51PM *Hobby Lobby* if you could always establish a specific compelling interest just by arguing for an interest in not creating an exception, an interest in we have to have the same rule for everyone. That would really wipe that requirement out, and it's something that the government could then always meet, but I also think that asserted interest is contrary both to DHS's

past practice and their current practice.

Past practice, of course, again, we have a decade's-long policy of giving different treatment to houses of worship based on the recognition that there are different considerations at play when you're talking about fundamental freedoms, like religious exercising and expressive association.

But in terms of present practice, it's not the case that the government applies the same rule for immigration enforcement in every situation or in every location. The Immigration and Nationality Act, for example, sets different rules for farms and certain outdoor agricultural operations, that those provisions are cited in the briefing. It's not at issue in this case, but DHS has also put out guidance about how it should conduct enforcement operations at courthouses. It does that differently than in other places.

And even the Teller memo itself, this is Exhibit 8, it creates a special rule for public demonstrations requiring consultation with a legal advisor on the constitutional considerations that could be at issue there, so the fact that DHS can operate with those different rules for different situations is, 1, hardly surprisingly, just I think common sense that that would be not only possible but required, and, 2, it's just completely inconsistent with their representation now that they have this compelling interest in sort of no exceptions, a no exception policy.

Even if they had a compelling interest, of course, they would have to show this was the least restrictive means of advancing that interest, and I don't think they could possibly do that. This policy they've adopted is the opposite of narrowly tailored. It's not tailored in any way. It is almost entirely the removal of substantive restrictions, and, again, it puts no substantive restrictions in place of those that the agency has rescinded.

It's almost as though DHS is looking at least 02:54PM restrictive, at the least restrictive test as what would be the least restrictive for them, but that's the opposite of the inquiry here. It's supposed to be the least restrictive for religious exercise, and I don't think they can show that this policy satisfies that.

I think the analysis for the expressive association claim is similar in a lot of ways. We have to show that there is a significant burdening of our members's rights of expressive association, and I think for a lot of reasons we've been discussing already this afternoon, your Honor, we've done 02:55PM that here.

The test that the government has to meet is somewhat different, but even under the sort of the most forgiving of that test, which requires them -- this is the exacting scrutiny test. It requires them to show sufficiently important government interest, if that is narrowly tailored to that

interest, then there has to be a fit, an appropriate fit, between sort of the path chosen and the interest that they're seeking to advance, and really for the same reasons they can't satisfy even exacting scrutiny, including, again, because they've operated for decades, and under the past at least five presidential administrations, including previously President Trump under a radically different regime that requested or did more to respect the fundamental rights being exercised at houses of worship.

02:56PM So I'm happy to move onto the APA claims at this point. I think a point to emphasize at the beginning is just that the government does not contest our capricious claim on the merits at all, and so I think for purposes of this motion, at least, they've waived any argument that this policy change satisfies even the minimal standards of rationality that that statute requires.

Instead, they offer two threshold arguments. They first argue that this is a question committed to agency discretion by law, and, therefore, de facto not subject to judicial review, but what the Supreme Court has made clear time 02:56PM and time again, including in the census case, *Department of Commerce,* is that this is an exceedingly narrow exception to the strong general background principle of judicial review is available.

As the Supreme Court put it in *Overton Park*, it

applies where there's no law to apply, and we're just very far from that situation here, your Honor. We have RFRA itself, the First Amendment, here to provide law that the Court can apply and by which it can judge what defendants have done.

There is also DHS's previous binding policy, which I think is relevant because it highlights both, well, for several reasons. It highlights the effect that immigration enforcement at houses of worship can have on the exercise of fundamental rights.

02:58PM DHS frankly acknowledged that in the Mayorkas memo, and it shows that numerous alternatives are available that DHS could have pursued rather than just telling its agents essentially have at it, use your best judgment, we're not going to give you any rules to follow.

So I think I would turn then to their other threshold argument about final agency action, and for agency action to be reviewable under the APA, it has to be final, which requires that it be the consummation of the agency's decision-making process and that it produces legal consequences, in effect, and 02:58PM they don't contest the first of those elements, they contest only the second.

I think it's common ground between the parties that agency action can be reviewable if it is either written in such a way that indicates that it's binding or if it's carried out by the agency in a way that shows that they, in fact, treated

it as binding. This is something the D.C. Circuit explained in *General Electric v. EPA*. The government in their brief cites some other cases I think for the same basic proposition.

We only need one of those two, and we have both here, your Honor. The Mayorkas memo by its terms is clearly meant to operate in a binding way and restrain agents. It says, uses the word "must" in several places. It says agents when they are going to carry out immigration enforcement at a sensitive location, they must do so in ways that minimize the impact on worshipers, other people who would be there to receive essential services.

02:59PM

It commands the agencies, it says, "They must create essentially records any time they do carry out enforcement action at a sensitive location," and, again, I think it repeats just over and over again this fundamental obligation to avoid enforcement at houses of worship to the fullest extent possible.

I don't think it's really possible to read that document as just general advice or things people should consider. It clearly was setting out a binding policy for the agency, and the fact that it sort of allowed for some, you know, that it didn't seek to address sort of definitively every single situation that might arise I don't think undermines that in any way, so we have a policy that on its face appears to bind agency personnel, and separately we also know that it did

03:00PM

and that it was treated by the agency as binding.

And I think one place that really makes that clear is the page of DHS's website that we attach to the complaint. This is Exhibit 5, which, you know, for one thing details this whole policy we've been discussing, the requirements of the Mayorkas memo for the public, which by itself I think is somewhat inconsistent with the idea DHS now advances that this was just purely internal guidance, they call it, but, more importantly, it invites the public to submit complaints if they

03:01PM believe that the policy has been, quote, "violated," and it provides them subject channels for doing that.

I think the fact that the agency was even talking about violations in this context shows that the policy was something that they expected the agents to follow, that it was binding. It doesn't make sense to talk about a violation of just general guidance or advice, and the fact that they were actually inviting sort of information from the public where agents have strayed beyond the policy just underscores that point. I think it's fair to assume that the agency was

03:02PM collecting this information because it took those violations seriously and it was going to treat them as violations.

So there is language in the policy, and the government focuses on this saying this doesn't confer substantive rights or benefits. That's a paraphrase, but I think that language is relevant to the Court's analysis, but it's certainly not

dispositive, and, you know, the D.C. Circuit held as much in the *Appalachian Power* case that we cite, but also if your Honor looks at the DOCA decision from the Supreme Court, that's *DHS vs. Regents of California*, the Supreme Court notes at pages 30 to 31 of its opinion that the memo it was reviewing included similar language saying this doesn't confer substantive rights.

So I don't think that that is enough to overcome both the terms of the rest of the document and this evidence we have of how the agency actually carried it out. So I think that 03:03PM really disposes of the government's threshold arguments here, because they've offered no argument on the merits of any of the APA claims shows that we've demonstrated a likelihood of success on these APA claims.

THE COURT: All right. I don't think I need argument on immediate irreparable harm or the other few factors, but I do have some questions about the relief you ask me to order. I think you're asking me to vacate and set aside this 2025 policy and to reinstate the policy of the prior administration.

It feels different to me, I guess I'll put it that 03:04PM way, to restrain the government from doing something as opposed to ordering the government to reinstate an old policy. It's not a Court Order. They would violate that by modifying the existing policy, for example. That feels not right, I guess.

You know, suppose I agree with you every step of the way and I say you cannot enforce a 2025 policy, the 2021 policy

has been vacated, even repealed. Can I really reinstate it as opposed to, I don't know, sending the government back to the drawing board? What is your reaction to that?

MR. FRIEDL: So I think I understand your Honor's intuitive reaction, and my answer would be I think it is a product of the fact that the challenged action was in part or, in fact, largely a recision of the prior policy, and because what the 705 stay does is operate on the agency action itself and essentially, you know, deprives it of power. We're not 03:05PM asking for -- I wouldn't say vacature at this point but sort of the preliminary form.

THE COURT: Stay, isn't that what they call it?

MR. FRIEDL: Yes, yes, so a preliminary setting aside -- essentially that form of relief on a temporary basis until the Court can reach the merits, and I think that because it's a -- again, because what is being set aside on a preliminary basis is a recision. Just the natural and logical consequence of that is that we return back to the status quo before that agency action was taken, which necessarily means 03:06PM that the thing that was rescinded comes back, comes back into effect.

I think if just turning to our proposed order, I think -- yeah, I guess I would leave it at that, your Honor. I think it's just sort of a consequence of how a 705 stay operates combined with the nature of the action challenged

here.

If your Honor had, you know, significant misgivings here, I think another approach would be to essentially grant us what we request in the proposed order, which is, you know, a stay, a setting aside of this but not add the next line, which would order the government to continue to implement the Mayorkas memo in good faith.

I think that requirement is implicit in setting aside on a preliminary basis the 2025 policy, but perhaps it would make clearer exactly what the order was doing.

03:07PM

THE COURT: So another set of issues, even the Mayorkas policy itself permits enforcement actions in houses of worship in emergency situations or with prior approval of the supervisor. It is undesirable, if not illegal, for me to issue an order that I can't as a practical matter enforce, right?

How would I enforce that? How would I know whether my order was being violated if I did offer the relief or order the relief, I should say, that you're seeking? Would every single enforcement action result in, I don't know, some kind of contempt proceeding in front of me?

03:08PM

Maybe the right way to frame this is I'm not being asked to put a bright line in place, and how I do issue an injunction in this context without a bright line where the person or entity being enjoined knows whether they are on the right side of that line or the wrong side of that line? How do

I do that?

MR. FRIEDL: And so we include a few provisions in the proposed order that I think try to get at this, your Honor. So one is the requirement that they provide notice to all of the agents of this order and of the fact that the Mayorkas memo has been in effect unrescinded, and that that continues to govern agents's actions.

There's also we proposed in their reporting requirement to essentially ask, you know, what was the basis for any enforcement actions that took place at sensitive locations, and, again, the Mayorkas memo itself required the agency to keep very similar records.

There's also -- it's not in the briefing, but at various points, Congress has required DHS to provide very similar reports to get in the past, so I think this is not a truly burdensome requirement and would be something that would be kept in the ordinary course for the agency, and I think it would provide a means not to litigate any particular enforcement action but just to ensure, okay, these, you know, when these actions have been carried out, there were check, exigent circumstances, or there was a judicial warrant or what have you but to really confirm that there have been limits and that has not just been wholly unrestrained enforcement at houses of worship.

THE COURT: All right. Then finally we have

plaintiffs here from Florida, Texas, California, Nevada, what have you. What is my authority to issue injunctive relief outside of Massachusetts, that is, for plaintiffs other than the New England Synod?

I don't know if this qualifies as a nationwide injunction or not, but the fundamental issue remains why are those parties properly joined? Why are they before this court? Why is this case brought here and not in say Florida for the Metropolitan Church? What do I do about that?

03:11PM MR. FRIEDL: Absolutely. So it is a very broad coalition of plaintiffs with houses of worship across the country.

THE COURT: That's not a legal term, "coalition" is not a --

MR. FRIEDL: No, no, your Honor, but, as a practical matter, yes, there are a wide enough of plaintiffs here, and almost all of them are here representing their members who are distributed across many states. I think that reflects the scope of defense policy and the harms that it is causing. We 03:12PM are properly here because of the New England Synod and its members in this district who are being harmed by this policy.

You know, we could have filed suit in any number of places because of the, again, the scope of the injuries caused by the defense policy, but we're properly here because of them, and I don't think the Court's authority to issue relief, well,

first of all, if your Honor granted sort of our main request for a stay under 705, I think that just by the nature of the remedy would operate on the challenged policy and sort of incidentally provide benefits to everyone being affected by it, but the scope of the remedy, that's really a product of that particular type of remedy, I think.

In terms of an injunction, I don't think there's any dispute about your Honor's ability to provide relief to any of the parties here who have, you know, shown their standing and 03:13PM entitlement for relief, whether they be in Massachusetts or outside of it.

I think in cases like *Trump v. Casa* where the Court was talking about nationwide or universal injunctions, it was referring not to sort of where the parties were located but just parties to the case vs. nonparties, and I think that was the relevant issue.

THE COURT: And I understand that distinction. That piece of it would be clear to me if that were the issue. Surely, these are all parties, but, you know, there has been an 03:14PM issue bubbling around for some time in multiple administrations, you know, when people wanted relief from Biden Administration files, they filed in Waco, Texas, and now we have in Massachusetts a grossly disproportionate number of these types of claims, meaning claims challenging Trump policies. It's an issue, I guess, I'll put it that way. I

don't think the nationwide injunction case law to this point addresses that issue, but it's an issue.

Normally in any kind of lawsuit if someone brought suit here, I don't know, automobile accident in Massachusetts and an automobile accident in Idaho, I'll say why is this Idaho case in front of me, why don't you go file your lawsuit in Boise. Sometimes I sever on that basis.

I don't know the answer, which is why I'm asking the question otherwise it feels odd to me, and the parties haven't briefed it. I know the Maryland case and the D.C. case certainly involved, you know, the Temple of Sacramento I think was one of the plaintiffs in those cases raising the question why is a judge in Maryland deciding the Sacramento case.

MR. FRIEDL: May I respond to that, your Honor?

THE COURT: Yes.

MR. FRIEDL: I think that it, again, I think it's a product of the widespread harm that this policy has caused. There are a lot of affected houses of worship, there are a lot of affected Synods and other situations, and, you know, there's no rule that everyone has to file suit in their home district, you know, the venue.

THE COURT: Yes.

MR. FRIEDL: And we think there is venue here, and the government hasn't disputed that, and this is in our view certainly an appropriate place to be bringing this suit. You

know, we have significant harms to the New England Synod, we have a declaration from a pastor, Paul Doe, a member of that Synod, and as I alluded to certainly in my opening remarks, we have a pretty sustained focus by DHS and immigration enforcement authority on this district and more recently this city in particular, you know, the harms here are real, and it's, again, more than enough to establish venue, which the government has not disputed and to make this an appropriate place to hear this case.

03:17PM THE COURT: All right. Why don't we take a moment and stretch our legs.

Counsel.

MR. GILES: Yes, your Honor. This is Richard Giles for the defendants. And I guess we'll just pick up where counsel left off, and I'd like to start with the difference between the Mayorkas memorandum and the 2025 guidance, the Teller memorandum, if that's all right.

True, the Mayorkas memorandum does lay out the foundational principles section about the purpose for assuring

02:17PM this memorandum, however, if your Honor would look through the document, for example, to what protected areas are, it's very explicit that this is a determination that requires the exercise of judgment, of the officer's judgment.

If we go on throughout, I'm looking at --

THE COURT: That's hardly guidance. I think history

has taught us that not all law enforcement officers exercise good judgment all of the time. I'm going to go out on a limb and say that. That's one of the reasons we have rules. If they always exercised good judgment, our jurisprudence would be a lot simpler.

MR. GILES: But it's very important to recognize that the Mayorkas memorandum had these different caveats that relied on officer's discretion, not just with protected areas, what qualify as one, but also what qualifies as near a protected area, what qualified as an exigent circumstance.

02:18PM

Also there's language here that says that nothing in this memorandum is meant to limit this agent's authority, and it also states there's no private right conferred given by this memorandum, so this memorandum is very explicitly leaving a lot not only to officer's discretion but it's not creating these legal consequences that opposing counsel was talking about, and I'd like to get into that a little bit when we talk about the APA.

Do you have any questions on that right now your Honor?

02:19PM

THE COURT: No, go ahead.

MR. GILES: All right. So now that we've gone through the Mayorkas memorandum a bit, I'd like to talk about standing. The very first thing I would like to talk about, your Honor, we hold that there is no injury, in fact, here in this case.

As plaintiff's memorandums have made abundantly clear, they fear an enforcement action at one of their churches. This is a crystal clear case of a pre-enforcement challenge, one that the Supreme Court in *Clapper* was insufficient to provide Article III standing. Not only *Clapper* but just yesterday, your Honor, in *Noem v. Vasquez Perdomo*, the Supreme Court issued an opinion about the ICE enforcement actions in California where they were enforcing immigration laws pursuant to four factors: The ethnicity of the target; the language that they spoke; what kind of job they had; and where they were located.

Now, while there is not a controlling opinion on this case, your Honor, Justice Kavanaugh does have a good concurring opinion that shows that what plaintiffs were bringing in that action was, again, another pre-enforcement challenge.

First, under this Court's decision in *Los Angeles v. Lyons*, plaintiffs likely lack appropriate standing from a broad injunction restricting probation officers from making these investigative stops.

In *Lyons*, "The Court held that standing to obtain future injunctive relief does not exist merely because plaintiffs incurred past harm and fear its recurrence, what matters, the reality of the threat of repeated injury not subjective apprehension," so, too, here.

And going a little bit further on the page, "Absent a

sufficient likelihood that the plaintiffs will again be wronged in a similar way, they are no more entitled to an injunction than any other citizen of Los Angeles, and a federal court may not entertain a claim by any or all citizens who know more assert that a certain practice of law enforcement officers are unconstitutional."

That's exactly been our position here in this case, your Honor. Plaintiffs have alleged a harm. They allege several harms, excuse me.

02:21PM Right now I would like to talk about the declining attendance rates. Now, plaintiffs point to --

THE COURT: Before we get there, are you saying that an alleged impairment of the right to free exercise under the First Amendment is no different than other type of harms? I thought the Supreme Court had said that constitutional injuries can qualify as concrete injuries in fact by themselves, and I think they cited a free exercise claim to make that point, that they're different because of the existence of the First Amendment, right?

02:22PM I mean, the free speech jurisprudence, the free press jurisprudence is different, so is the free exercise jurisprudence, so the requirement of an injury, I think while it exists is somewhat different in the context of free exercise because the right to free exercise is protected by the Constitution.

MR. GILES: I would have to go back to *Clapper* on that issue, your Honor. My understanding of *Clapper* is that there were two distinct harms that were alleged. One was a constitutional free expression associational harm of the lawyers who associate with their clients abroad, and then the other harm in *Clapper* was this what the Court called a self-inflicted harm, right, which was all the money they spent to try and avoid the certifying statute, right?

I don't see a huge difference between the 02:23PM constitutional nature and this sort of like pre-enforcement challenge that we're discussing, your Honor.

I would also go on and say that in *Noem v. Vasquez Perdomo*, my understanding is that they brought a constitutional claim under the Fourth Amendment, and yet we're still talking about whether or not there is a concrete harm here.

So going down the pre-enforcement challenge down a little bit more, I think it's very important in the declarations that the plaintiffs have offered here today, there hasn't been an instance of an enforcement action directed at 03:24PM one of their members.

And, in fact, in the declarations where members have been detained, that goes to strengthen our points on traceability as well. If we look at Exhibit 12, we can see that, and I believe it's the Greater Milwaukee Synod, one of their members was detained 10 minutes away from the church, and

directly after that happened, the church saw a decrease in attendance, right?

That sort of immigration enforcement action 10 minutes away from the church would not have been covered under the Mayorkas memorandum, and it goes to show this greater fear of immigration enforcement that we have, this sort of heightened view of it is really what's causing plaintiff's fear.

And just the fear, the subjective fear by itself is not sufficient to cause Article III -- or, excuse me, is not sufficient to cause an injury in fact.

03:25PM In fact, the First Circuit has been very good, the First Circuit has pointed out in the COVID cases with masks that to allege a pre-enforcement challenge, there needs to be certain impending injury such that the person bringing the challenge is differentiated from the wider scope of the general public, right, and that's not simply an allegation we have in this case, your Honor. That's why we are very -- that's why we are adamantly saying there is no injury here. This is a classic pre-enforcement challenge.

03:26PM Now, assuming your Honor disagrees with us and does find an injury, in fact, we'd first like to bring up that plaintiffs allege injury, the first one, which is the declining attendance, which they bring from the *Presbyterian Church* in the Ninth Circuit and also from *Philadelphia Yearly* from the Fourth Circuit or from Maryland, those had very different --

well, at least the *Presbyterian Church* had very different facts from the case here.

There what happened was that government agents went into four separate churches, your Honor, and recorded the religious services for up to nine months. When the church members found out about those surveillance agents, the church attendance declined, and so there was -- and the Ninth Circuit decided that that was an injury, in fact.

You can see how that's very different from the

03:27PM situation where we have here, where there is a pre-enforcement challenge. There has not been an immigration enforcement action directed at plaintiff's members, and so without that sort of -- and so without that bedrock injury, we don't think that the declining attendance really qualifies as an injury.

But going onto one of your major concerns with the plaintiff's case, and that was with traceability. Now, unfortunately, your Honor, I do not have a bright line for what the test should be for traceability in this First Circuit. I do like the test that plaintiffs gave in *Conservation Law*.

03:27PM Now, in *Conservation Law*, the Court said we need to ask whether the defendant's alleged conduct would have been a factual cause of a concrete and particularized portion of the injury if the other competing causes had not been operating.

And so I think that's a very good test, your Honor. If we go back to the previous administration and we just change

the Mayorkas memorandum into the new 2025 guidance, would that have caused plaintiff's fear, and would that have caused the decline in attendance?

The honest answer, we don't really know, right? We can't say for sure, and where the evidence of causation is murky but *Murphy v. Missouri* teaches us is that we have to be very hesitant to find this sort of traceability.

This is also why Department of Commerce is not exactly on point with this case. In that same footnote in *Murphy v. Missouri,* what was at issue was the question asking about citizenship, that one discrete point right there, and because that question was sort of the only impetus for the action, this common sense inference was a lot clearer in *Department of Commerce*.

Here, as your Honor has pointed out previously, it's a much different situation. Not only do we have the 2025 guidance in play, we have the entire panoply of immigration enforcement happening in the nation right now. It's just unclear whether or not this 2025 guidance itself is traceable to plaintiff's alleged injury.

Another point on sort of these common sense inferences, your Honor, I also think our case in *Dantzler* is very clear that there are limits to the sort of common sense inferences the Court can make. In *Dantzler*, for example, we had the Puerto Rico Port of Authority who passed a tax on the

shippers, then clients of the shippers sued saying that the shippers would pass costs on to them, right?

That is a common sense inference, at least the armchair economist in me says that's a common sense inference, however, the Court failed to find traceability in that case saying that plaintiffs had alleged no more than a hypothesis.

I believe that *Dantzler* is very applicable here where we have sort of these decisions by third parties. It's unclear, it's murky whether or not the actions of defendants are actually going to cause plaintiff's injury, whether or not it's traceable to the defendants.

03:30PM

If your Honor does not have any questions, then I'd like to go onto redressability.

THE COURT: Go ahead.

MR. GILES: Again, our arguments under redressability are more or less the same as our arguments under causation/traceability. As opposing counsel pointed out, these are sort of flip sides of the same coin, and so since the 2025 guidance is not traceable to defendant's injury, it's also not redressable as well.

03:30PM

Now, I would quickly like to offer a point in recitation to the jurisdictional argument under Title 8 U.S.C. Section 1252(f). There, plaintiffs are correct in saying that the limit on injunctive relief that's provided by 1252(f) applies to Sections 1221 to 1232, I believe, of the INA.

03:31PM Plaintiffs omit Section 1226(a). That's a very key provision in there because it is the power of immigration officials to detain an illegal immigrant pursuant to an administrative warrant.

In *Philadelphia Yearly*, your Honor, the Court specifically exempted those detentions pursuant to an administrative warrant and the eventual preliminary injunction that the Court issued, so we would argue that if the Court were to order any sort of injunctive relief that the Court would carve out 1226(a) like the Court did in *Philadelphia Yearly*.

Now, going onto the merits of the case, your Honor, first we have the RFRA claim. Now, RFRA says that if there is a substantial burden on plaintiff's religious exercise, then the government needs to have a compelling interest in that and that interest -- a compelling interest, and it needs to be narrowly tailored to meet that interest. We maintain that there is no substantial burden here for the same reasons we maintain that there is no injury, in fact.

03:32PM This is a pre-enforcement challenge, and even if the Court were to disagree there is no traceability or redressability here, but as an additional point, plaintiffs have brought up this wide-sweeping challenge, your Honor, that doesn't have a clear limiting principle.

Under plaintiff's theory under RFRA, plaintiffs could bring a challenge against any government action that would

impair people's ability to come up to church. Take, for example, road construction that blocks off the entrance to the church, snow removal, things of that nature.

This sort of lack of a limiting principle was exactly what the Supreme Court was worried about in *Hippocratic Medicine*. There, the Court failed to find standing on behalf of doctors who brought claims against the United States for providing -- basically for allowing abortion pills to be made into the market.

03:33PM Now, the doctors alleged both a conscious injury there saying that they were afraid that they would be forced to provide abortion pills but they also sort of alleged sort of doctors saying that down the stream they would have to treat the effects of these abortion pills on their patients.

The Court denied finding standing in that situation because of the lack of a limiting principle. It specifically brought up the example of teachers who could sue under the immigration laws of the United States for there being too many students in their classrooms, and so for those exact same 03:34PM reasons, your Honor, I think it's very important that there is -- and for those reasons, your Honor, I think it's important that there is not a substantial burden here.

THE COURT: The problem, as so often in the law, like a phrase with "substantial burden," it does require some exercise of line drawing. This isn't quite like a failure to

repair a pot hole on the road on the way to the church. I mean this is basically ICE claiming the right to enforce immigration laws in places of public worship subject only to the discretion of individual law officers. It's a little more direct than that, isn't it? Go ahead.

MR. GILES: So there's that aspect of it, right, but then there's also the flip side, which opposing counsel brought up, there's also a desire for the members at the church to worship with the people who are not coming out to church, right? And, again, there's a little bit of a limiting principle there as well. What about churches who would like to work with people who are imprisoned, for example?

I understand the Court's hesitancy or the points about line drawing, but I do think that it's very important that -- I do think it's important that the Court remember sort of our argument about standing in this case and how that this is a classic pre-enforcement challenge and that there is no injury, in fact, really to begin with.

THE COURT: How would one do the post-enforcement challenge? Suppose ICE just began raiding religious services left and right, elementary schools, hospital emergency rooms, federal courtrooms, how exactly would the post-enforcement challenge work in that context, particularly when the government is taking the view that, you know, people can be deported immediately with minimal or no due process? How would

that work exactly?

MR. GILES: Well, I would like to direct the Court's attention again to that Kavanaugh concurrence in the *Perdomo* case, right? Not only does it have to be -- excuse me, what matters is the reality of the threat of the repeated injury and not subjective apprehensions, and so to have standing, there needs, of course, to be some sort of enforcement action at one of plaintiff's members, and then after that, based on the Kavanaugh concurrence, it sounds like there has to be the threat of repeated violations.

03:37PM

THE COURT: ICE would get one free bite and raid one church and then that creates an objective basis for fear in the other churches?

MR. GILES: Well, no, your Honor, it would have to be plaintiff member specific, I think, here as well. That was part of our opposition brief that if the Court were to find standing on any one of the plaintiff's members that it should limit an injunction or a stay for reasons we'll get to in a second to those members who have been able to show concrete injury, in fact.

03:38PM

THE COURT: Go ahead.

MR. GILES: So we were talking about substantial burden under RFRA. We were talking about substantial burden under RFRA, and if this Court were to find substantial burden, then we would move to the second part of the analysis, which is

compelling interest narrowly tailored.

On these points, your Honor, on these points, the government has a compelling interest in enforcing the immigration laws of the United States. I don't think anyone could argue otherwise. The real question is whether it's narrowly tailored, and we maintain that it's narrowly tailored, your Honor, because we are vigorously enforcing the laws that Congress has set.

Plaintiffs have brought up --

03:39PM THE COURT: That's not narrowly tailoring. Again, if the government is claiming the right to raid any religious service anywhere, round everybody up, have them prove their citizenship, that's not narrowly tailoring. What makes it narrow? I agree that the government has a substantial interest in enforcing the law, but how is it narrowly tailored? That doesn't answer the second part of the question. What makes this narrowly tailored?

MR. GILES: Our position, your Honor, is that we are fulfilling the mandates of Congress here, and that these 03:39PM limiting -- oh, excuse me, that us allowing immigration officers to exercise their discretion in the manner prescribed by the 2025 guidance is narrowly tailored to enforce the vigorous enforcement program that Congress contemplated and passed in the Immigration and Nationality Act, and a contrary holding would conflict with the Supreme Court's warning that

courts should not create rigid limitations on law enforcement officers by imposing a clear rule to guide their conduct.

THE COURT: I get that piece of it. Focus on the word "narrow." What about that is narrow? How does it guide the discretion of any law enforcement agent to minimize the impact on the free exercise of religion? What makes this narrowly tailored? Stick with the metaphor of tailoring. What makes this different from a big, shapeless Mumu as opposed to -- that's M-u-m-u. As opposed to a tightly fitted suit? What

03:41PM makes this narrowly tailored?

MR. GILES: Well, your Honor, we would just again point back to the government's compelling interest in fulfilling the immigration laws. We would also say that an injunction would go beyond the jurisdiction of this Court, and I would have to get back to you on some further briefing on "narrowly tailored" should you require it.

I also, implicit in your Honor's question there, I would also like to point out one thing I forgot to bring up about the Mayorkas and the Teller memorandum -- excuse me, the

03:41PM Huffman and the Teller memorandum, the Huffman memorandum does say that they should use their discretion.

There is, of course, the Teller memorandum, which applies to ICE, which is that it gives -- excuse me, it charges Assistant Field Office Directors and Assistant Special Agent-In-Charge with the responsibility for making case-by-case

information regarding whether, where, and when to conduct immigration enforcement action in their protected area.

Opposing counsel had said that this was a first line supervisor. It's not, it's one level above that. It's a second line supervisor, but just a small thing that I remembered from your Honor's question.

So we've talked about the substantial burden, and we've talked about the compelling and narrowly under RFRA.

The last merits point I would like to talk about is the APA. Again, we maintain that this guidance, the 2025 guidance, is not reviewable under the APA for two reasons. 1, it's committed to agency discretion by law, and, 2, because it's not a final agency action.

Now, first, this is committed to agency discretion by law. As *Heckler v. Chaney* pointed out, this is an exception that applies for there are no judicially managed standards from which to apply.

We start this analysis by looking at the governing statute, which is the Immigration and Nationality Act, and as opposing counsel brought up in their oral arguments, there are no carve-outs within the statute for these kind of protected areas for churches, for these protected areas.

There are carve-outs for farms, for example, but what Congress made a carve-out for farms, it's equally likely that they intended not to create a carve-out for churches. Not only

is there a lack of judicially manageable standards in this case, but also, your Honor, we'd like to say that immigration enforcement is something that's traditionally left to the discretion of the executive branch.

*United States vs. Texas* is very good on this point. Now, in *United States V. Texas*, the Court said that judicial review of the executive branch's arrest and prosecution policies in that, courts generally lack meaningful standards for assessing the propriety of enforcement choices in this

03:44PM area. After all, the executive branch must prioritize its enforcement efforts.

In their reply brief, plaintiffs brought up that the quote specifically laid out five expectations to this general deference to the enforcement priorities, however, none of which are at issue here.

So, as we can see from the Immigration and Nationality Act and from the *United States V. Texas*, this sort of immigration enforcement is a matter that's been traditionally left to the discretion of the executive branch.

03:45PM Okay. Going onto the second wrung, your Honor, which is that this is not a final agency action, we agree with plaintiffs that we are not contesting the first prong about the consummation of this decision, right, but we do argue that this is not a -- the 2025 guidance is not a policy. It does not create legal consequences for the plaintiffs. Instead, this is

more akin to an internal agency memorandum that directs ICE agents to use their discretion here.

As plaintiff's counsel made very clear in their previous oral arguments, this is a case mostly about the recision of the Mayorkas memorandum, thus we have to ask ourselves a question, did they, the Mayorkas memorandum, carry a legal consequence, binding legal consequences, and the answer is no.

As I pointed out earlier, your Honor, the Mayorkas memorandum was riddled with caveats. It did not create any enforceable rights, it left different things to the officers's individual discretion. It did not create these sort of binding legal consequences upon the plaintiffs, right?

Now, in comparison, your Honor, I'd like to point to *Hawkes v. Army Corps of Engineering*. There, the Supreme Court did find that an agency action was legally binding because it created a safe harbor for the plaintiffs.

There, I believe it was there the EPA, excuse me, would create these jurisdictional decisions deciding whether or not a certain set of water would fall under The Clean Waters Act, right? That jurisdictional bound the corps for five years.

And under a longstanding memorandum of agreement between the corps and the EPA, it would also be binding on the government and represent the government's position at any

subsequent federal action or litigation concerning that final determination.

Thus, something like this that creates these binding legal consequences, a safe harbor for five years, can be found to be a final agency action that creates legal consequences. Compare the Mayorkas memorandum with its caveats, the Mayorkas memorandum which did not create a legal benefit for plaintiffs, it's clearly not the sort of legally binding memorandum that plaintiffs make it out to be.

03:47PM For the same reason, your Honor, it's also why DOCA does not apply. There, the Supreme Court did determine that a certain agency decision was not left to agency discretion because it created an enforceable legal benefit on behalf of the plaintiffs.

Here, we don't have that sort of enforceable legal right. The Mayorkas memorandum was very explicit that it did not want to create such an enforceable legal right, therefore, it's not a final agency action under the APA, and it's not reviewable, your Honor. I'm sorry, your Honor.

03:48PM THE COURT: Go ahead.

MR. GILES: If your Honor doesn't have any questions on that, I'd like to talk a little bit about the scope of relief here.

THE COURT: All right.

MR. GILES: So first we'd like to point out that at

least one, excuse me, so at least one other court in this district where plaintiffs asked for a preliminary injunction or a stay or a preliminary injunction, the Court denied the stay and actually issued a preliminary injunction instead.

This is *Orr v. Trump*, which is 778 F. Supp 3d 394. We think that is -- we think that if the Court were to find against us and issue relief that it would be most appropriate to not issue a stay and issue a preliminary injunction that is tailored to the individual plaintiffs who can show standing 03:49PM here.

At least one other court has taken that position in this district, and the Ninth Circuit, which to my knowledge is the highest court so far to directly ask the question of the limits of a 705 stay, what they did is that they explicitly limited the scope of the 705 stay to the plaintiffs before the Court. There, the Ninth Circuit found that the complete relief principles for crafting injunctions under *Casa* would also apply to the 705 stay in a post-*Casa* world, your Honor.

And so we would ask that any relief that the Court 03:49PM decides to issue, if it does issue relief, would be narrowly tailored to the plaintiff's directive before it.

THE COURT: Anything else?

MR. GILES: That's it, your Honor.

THE COURT: Okay. Five minutes of quick response.

MR. FRIEDL: Thank you, your Honor. And I will try to

be quick. You've been very generous with your time this afternoon.

Returning to the Mayorkas memo because so much seems to turn on how to understand that policy, Mr. Giles emphasized, you know, that it involves certain exercises of judgment, but I think when you actually look at the particular instances, he talked about, they really crumble at the touch. For example, it says we're not listing all sensitive locations. There might be other locations that are also sensitive. Well, that's fine, 03:50PM but it's irrelevant for this case because the memo did not give the DHS agents the discretion to not treat house of worship as a sensitive location, and that's what matters here or the fact that it did not try to define the word "near."

That's fine because what matters for this case is that there was an area of protection around houses of worship. The church itself, the parking lot, the sidewalk right in front of the church, I think these are all near or any definition of that term. The exact outer limits of this protection aren't relevant in this case. What matters is that the new policy 03:51PM strips those protections away entirely.

He quoted, Mr. Giles said that the memo said nothing and it is meant to limit agents's authorities. That's a slightly misstatement. It said it doesn't limit agents's statutory authority, and of course it doesn't. No agency memo could change what the statute said, but it cabined their

authority under the statute.

Turning to the Supreme Court's recent interim order in the *Noem v. Vasquez* case, as Mr. Giles mentioned, there's no reasoning in that decision and no obvious reason that it applies here.

Even the one justice concurrence that Mr. Giles focused on was about the Supreme Court's prior decision in *Lyons*, but that has no application here because Lyons is about sort of pure future injury, and we're talking about injuries that we are incurring right now, not the ones, the very real and severe ones that befall one of our member churches were an immigration and enforcement action to take place there, so that has no application here.

I do think one way that *Lyons* is potentially relevant is it speaks to your Honor's question about what would a post-enforcement remedy look like. I have to imagine that if a church were raided and sued the government, one of the government's first arguments would be, well, you can't do that under *Lyons*.

Now, if we were in that situation, we would dispute that, but I'm sure that they would argue that that forecloses relief after the fact.

I think this is an example of how the government continues to litigate a different case, one that they wish we had brought, not the one we brought. This is not a

re-enforcement challenge, we're talking about actual injuries. Our Article III injury is not based on what would happen to us if and when an enforcement action happened at a church.

And so, similarly, we're not focusing on subjective chill, that's not our injury, and it's not the fear itself, although that is a very real fear. Our standing is based on more concrete specific instances.

In terms of 1226(a), which is the provision dealing with administrative warrants, we respectfully disagree with Judge Chuang's in *Philadelphia Yearly Meeting* on this point because we think any effect of the relief requested on that provision would be purely collateral. It would not bar the DHS from carrying out an administrative warrant anywhere outside of a church or even at a church itself if they did so sort of following the Mayorkas memo, if it fit into one of the limited exceptions in that memo.

The government also mentioned sort of a limiting principle argument, could a church get into court with a similar claim because of, you know, pot holes in front of the street, and I think the Court does not have to decide any of the sort of harder edge hypotheticals that we could come up with today.

Any plaintiff seeking to bring such a claim is going to have to clear all of the usual hurdles, real injury, in fact, traceability, redressability and also that that is

imposing a substantial burden. It's very hard for me to imagine that pot holes will be producing an 80 percent reduction in attendance at church.

THE COURT: So --

MR. FRIEDL: I'm sorry, your Honor.

THE COURT: -- if pot holes were the standard, no one in Boston or probably New York or Washington would ever go to church.

MR. FRIEDL: And I also think, your Honor, to the

03:55PM extent they're trying to conjure a parade of horribles, you know, it's been more than seven months since Judge Chaung's decision in *Philadelphia Yearly Meeting*, and we have not seen some sort of rush into the courthouse with the kind of claims that they're speculating about here.

And here, again, this is just again a very different case. There's a tight connection between the challenged policy, which is about what DHS agents can do at houses of worship, and the challenge brought by houses of worship that are being directly affected by that policy.

03:55PM I did not hear really any response from the government on your Honor's questions about narrow tailoring or really strict scrutiny in general.

And on *United States vs. Texas*, I think they continue to dramatically overread that decision. It does not stand for the proposition that decisions involving immigration

enforcement are presumably unreviewable or presumptively unreviewable. In fact, in a passage that we cite in our brief, the Court notes numerous situations in which those sorts of actions are reviewable.

I did want to address *Orr v. Trump*, which was the District Court decision Mr. Giles alluded to involving a request for a stay and a preliminary injunction. As I understand the case, what the Court said was that the plaintiffs had asked for a stay, and some parts of their relief were appropriate for a stay, and some parts went beyond what a stay would offer, and for that reason, the Court said, well, I'm not going to grant a stay, I'm going to grant an injunction instead.

03:56PM

And what we would respectfully suggest the path your Honor should follow in this case would be if you think some part of the proposed order goes beyond what would be appropriate for a stay, just to grant the stay rather than sort of basically to trim any portion that goes beyond what's appropriate under a 705 stay rather than rejecting that form of relief entirely.

03:57PM

And then the last point, if I could squeeze it in, is just addressing this Ninth Circuit decision called *Immigrant Defenders*, which did narrow the scope of a 705 stay. That's the only decision that I'm aware of to have done that, and the Ninth Circuit in a more recent decision called *National TPS*

*Alliance v. Noem* did just the opposite and came out the same way every other court to consider the issue has and said, well, this 705 stay that we are issuing here or affirming, in that case, does have universal relief, and its reasoning was directly applicable to this case.

The Court said to try to narrow the 705 stay just to the plaintiffs in this case is going to produce sort of a patchwork regulatory scheme when that's not going to be easy to administer and is not consistent with the statutory framework, and I think here the 705 stay that we've asked for is both going to be much easier for the Court to oversee and the government to implement.

Their position is that uniformly is extremely important here. The 705 stay would offer that. It would also provide relief to the very, very many similarly situated nonparties who are suffering grievously because of this policy.

THE COURT: All right. I'm going to stop it there and take this matter under advisement. I'm not the first judge to make this observation that all of these types of cases, that is challenges to these executive orders and similar types of documents are complicated and being decided at relatively high speed, which is not optimal, but I will do the best I can under the circumstances to get out an opinion as quickly as I think I can given the complexity of the subject matter. Thank you, and with that, we'll stand in recess. Thank you.

THE CLERK: All rise.

(Whereupon, the hearing was adjourned at 3:59 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I do hereby certify that the foregoing transcript, Pages 1 through 70 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 25-40102-FDS, NEW ENGLAND SYNOD, EVANGELICAL LUTHERAN CHURCH IN AMERICA, ET Al. vs. DEPARTMENT OF HOMELAND SECURITY, ET AL., and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

s/s Valerie A. O'Hara
__________________________
VALERIE A. O'HARA
OFFICIAL COURT REPORTER