**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

**New England Synod, Evangelical Lutheran Church in America,** *et al.*,

Plaintiffs,

v.

**Department of Homeland Security,** *et al.*,

Defendants.

**Case No. 4:25-cv-40102-FDS**

# NOTICE OF DEFENDANTS' NON-COMPLIANCE AND MOTION FOR ORDER TO SHOW CAUSE AND FOR EXPEDITED CONSIDERATION

Plaintiffs write to alert the Court to recently disclosed evidence of Defendants' multiple egregious violations of the preliminary injunction in this case, including deploying an undercover ICE agent into one of Plaintiffs' protected churches to surveil and record people inside. Plaintiffs respectfully request that the Court issue an order to show cause why Defendants should not be held in contempt for violating the preliminary injunction. Given the blatant and repeated nature of Defendants' violations, the harm to fundamental rights of religion and expressive association, and the threat of future similar violations, Plaintiffs also respectfully request the Court's expedited consideration of this motion. Defendants oppose the requests for an order to show cause and for expedited consideration.

## BACKGROUND

1. *The Court's order.* Plaintiffs, a group of religious organizations, sued Defendants the Department of Homeland Security and its Secretary last year to challenge their rescission of longstanding protections for sensitive locations such as houses of worship. In February, the Court

determined that Defendants' actions likely violated the Religious Freedom Restoration Act and were causing irreparable harm to Plaintiffs' religious rights. ECF No. 74 ("PI Op."). It found, among other things, that Defendants' new policy "clearly imposes" a substantial burden on Plaintiffs' religious exercise: It would permit, for example, "immigration-enforcement officers to set up a checkpoint just outside a church, or to question parishioners in the middle of a Catholic Mass," and those activities would, "[w]ithout question," "hinder, constrain, and inhibit individuals from attending church or religious schools or programs." *Id.* at 43. The Court entered a preliminary injunction to protect covered Plaintiffs while the case proceeds to final judgment.

The preliminary injunction order strictly proscribes enforcement actions in "Protected Area[s]," a term that includes both Plaintiffs' houses of worship and the surrounding property, such as "any parking lot [or] walkway," ECF No. 75 ¶ 1(e)-(g) ("PI Order"). The order states that, "[a]bsent Exigent Circumstances, Defendants shall not take Immigration Enforcement Action *In* a Protected Area." *Id.* ¶ 2 (emphasis added). It further states that, "[a]bsent either Exigent Circumstances or Prior Approval, Defendants shall not take Immigration Enforcement Action *Near* a Protected Area." *Id.* ¶ 3 (emphasis added); *see also id.* ¶ 1(h) ("'Near a Protected Area' shall mean any location within 100 feet of any doorway, gate, or other clearly demarcated entrance to any Protected Area."). The order defines "Immigration Enforcement Action" broadly to include "any action by Defendants that is planned, conducted, undertaken, or executed, *in whole or in part*, to enforce the immigration laws of the United States, including any … search, interrogation, questioning, interview, or investigation." *Id.* ¶ 1(i) (emphasis added).

The order directed Plaintiffs to file and provide to Defendants in writing a list of their Protected Areas, including names and addresses of houses of worship and descriptions of adjacent protected areas. *Id.* ¶¶ 7-9. Plaintiff did so. ECF Nos. 78, 80, 96.

The Court explained when issuing the preliminary injunction that the order "does not simply preserve the *status quo*, or return matters precisely to the *status quo ante*," but is in key respects "broader than the 2021 Policy" announced in the Mayorkas Memo. PI Op. at 60-61. The Court explained that the additional requirements in the order were needed to ensure compliance with Rule 65(d) and to provide bright-line rules that Defendants could implement and the Court could police. *See id.* at 58-61. The Court emphasized that "[it] can conceive of no circumstance, outside of a true emergency, in which a law-enforcement operation to enforce the immigration laws inside a church would be justifiable under the First Amendment and RFRA." *Id.* at 61.

2. *Defendants' violations of the order.* DHS documents filed last week in an ongoing criminal proceeding, *United States v. Sant*, No. 26-cr-115 (D. Minn.), reveal that Defendants have repeatedly violated the preliminary injunction at University Baptist Church in Minneapolis, including by sending an undercover ICE agent into the church itself in order to spy on those inside. University Baptist Church is a member of both Alliance of Baptists and American Baptist Churches USA. Lubke Decl. ¶ 2. The church was designated by Plaintiffs as a Protected Location on every list of locations they provided DHS, the first of which was filed on February 27, 2026 (at which point the preliminary injunction took effect). *See* ECF No. 78-1 at 119; ECF No. 80-1 at 168; ECF No. 96-1 at 160. Further, though not required to do so to receive the protections of the Court's order, the church posted signage in March at all main exterior entrances stating, "These Premises are a Protected Area Pursuant to Federal Court Order in New England Synod v. Department of Homeland Security, Case No. 4:25-cv-40102-FDS." Lubke Decl. ¶ 4.

An official report of investigation produced by Homeland Security Investigations (HSI), a part of ICE, documents that on May 28, 2026, an undercover ICE agent infiltrated a class being held inside University Baptist Church, surveilling and recording attendees in the church

gymnasium for approximately two hours. Ex. 1 at 3. The report states that "[a]t approximately 7:05 p.m., [the agent] arrived in the downstairs gymnasium area of the University Baptist Church." *Id.* The gymnasium is located within the church building, immediately below the sanctuary. Lubke Decl. ¶ 9. "Over the course of approximately two hours," the agent participated in the class, observing and speaking with several participants. Ex. 1 at 3. The agent wore a concealed microphone and appears to have recorded for the entire time she was inside the church. *Id.*

Other agency reports of investigation reveal that ICE agents also surveilled the church on Sunday, April 12; Sunday, April 19; and Thursday, June 11. Ex. 2 at 3, 10, 20. Like the report of the May 28 operation, these reports give no indication that Defendants took any steps at all to ensure compliance with the preliminary injunction, even while demonstrating that the agents were aware of the (obvious) fact that they were targeting a church. *See, e.g.*, Ex. 2 at 3 ("At approximately 12:10 PM, with no sign of KENNEDY at his residence, agents departed the residence and headed over to the University Baptist Church."). During these operations, ICE agents spent hours positioned outside the church, noting when individuals entered and exited the building and parking lot. *See, e.g.*, *id.* ("SA Briseno observed all five individuals enter what appeared to be a basement door of the church."). They ran registration checks on the individuals' license plates, including of cars parked in a library parking lot located immediately adjacent to the church and within 100 feet of the church's main entrance on 13th Avenue SE. *See, e.g.*, *id.*; *see also* Ex. 3. Agents also took video and photos of the church building and surrounding areas, some of which are included in the report. *See, e.g.*, Ex. 2 at 10 ("At approximately 2:35 PM-2:42 PM, SA Briseno and SA Green observed 9 individuals depart from the church. SA Briseno took a video of the individuals leaving the church.").

Members of the church learned of the violations last week and have been shocked and upset that ICE not only was monitoring the church, and doing so on Sundays, a holy day of worship, but even entered the church itself. Lubke Decl. ¶ 15. As stated by a current member and recent president of the church: "This is a complete violation of our sacred space. The Church is meant to be a place of sanctuary and safety—not infiltration by government agents." *Id.*

## ARGUMENT

DHS's multiple undercover operations at University Baptist Church—including an ICE agent's intrusion into the church itself—constitute clear and egregious violations of the Court's preliminary injunction order. A party may be held in civil contempt if the moving party shows that "(1) the alleged contemnor had notice of the order, (2) the order was clear and unambiguous, (3) the alleged contemnor had the ability to comply with the order, and (4) the alleged contemnor violated the order." *Alongi v. BR Steel, LLC*, No. 18-cv-12648, 2020 WL 3086071, at *2 (D. Mass. June 10, 2020) (quoting *Hawkins v. HHS*, 665 F.3d 25, 31 (1st Cir. 2012)). Plaintiffs have—at minimum—shown a sufficient likelihood of satisfying these elements that an order to show cause is warranted.

DHS's incursion into the church building itself on May 28 violates Section 2 of the order, which states that, "[a]bsent Exigent Circumstances, Defendants shall not take Immigration Enforcement Action In a Protected Area." The church was a Protected Area, appropriately designated by Plaintiffs. And there were no "Exigent Circumstances"—defined in the order as "an immediate threat to human life or safety," PI Order ¶ 1(j)—at the time the agent entered and conducted surveillance inside the church. Nor did the government claim otherwise during the meet-and-confer process that preceded Plaintiffs' filing of this motion. Ex. 4. As the ICE agent entered the premises, spoke to participants, and recorded these interactions, there is no question

that the agent, at minimum, conducted "question[ing], "interview[ing]," and "investigation," as covered by the order. *See* PI Order ¶ 1(i).

DHS's surveillance outside the church on April 11, April 19, and June 11 violates Section 3 of the order, which states that "[a]bsent either Exigent Circumstances or Prior Approval, Defendants shall not take Immigration Enforcement Action Near a Protected Area." The order defines "Near a Protected Area" as "within 100 feet of any doorway, gate, or other clearly demarcated entrance to any Protected Area." *Id.* ¶ 1(h). The reports of investigation indicate that ICE agents operated within 100 feet of the church's main entryway on 13th Avenue SE, as evidenced by, for example, the photos agents took in the adjacent library parking lot, many of which clearly document just how close agents were to the church building, the north wall of which dominates the images. *See* Ex. 2 at 12-15; *see also id.* at 10 (describing multiple instances of agents driving through the library parking lot); Ex. 3. The street immediately in front of the church's main entrance also qualifies as "Near a Protected Area" under the preliminary injunction. *See* Ex. 3. Agents' surveillance, documentation, and data collection constitute "investigation" and "search[es]," covered by the order. *See* PI Order ¶ 1(i). No Exigent Circumstances existed at the time of this surveillance, and DHS did not argue to the contrary during the meet-and-confer process. Ex. 4. Nor did DHS suggest that ICE or CBP headquarters in Washington, D.C., had granted "Prior Approval" for these operations. *Id.*

Prior to filing this motion, counsel for Plaintiffs conferred with counsel for DHS. Defendants failed to provide a satisfactory explanation as to why their actions did not violate the Court's order. Government counsel stated that "Defendants acknowledge the DHS HSI reports of investigation you have provided … are accurate." Ex. 4 at 3. DHS refused to confirm whether it had conducted additional enforcement operations at the church, and likewise refused to provide

any substantive information about the specific steps it has taken to ensure compliance with the Court's order. *Id.* at 3-4. DHS's refusal to confirm that it took no other enforcement activities at the church, or to provide additional information, raises serious questions about whether there are additional violations of the Court's order—at this Protected Area or others covered by the injunction—that have not yet come to light.

DHS's sole argument that its operations at University Baptist Church did not violate the preliminary injunction is that those operations do not qualify as "Immigration Enforcement Action[s]" under the order. DHS contends that the investigations "were not planned nor undertaken to enforce the immigration laws of the United States," but rather "were related to alleged Title 18 criminal offenses." *Id.* at 3. Citing language in the reports of investigation, DHS says that it was investigating "instances where individuals and organized networks have exploited events [i.e., protests against immigration-enforcement operations in the Minneapolis area] to engage in acts of violence, destruction of property, intimidation of federal officers and employees, and attempt to impede federal operations." *Id.*

As an initial matter, DHS has wholly failed to explain under what authority ICE agents even *could* undertake investigations into crimes having no connection to the immigration laws. The Immigration and Nationality Act details the powers of immigration officers and employees, specifically authorizing them "to make arrests" for felonies, but only where, among other things, "the officer or employee *is performing duties relating to the enforcement of the immigration laws at the time of the arrest*." 8 U.S.C. § 1357(a)(5) (emphasis added); *accord* 8 C.F.R. § 287.5(c)(4)(B). With respect to HSI specifically, President Trump on the first day of his second administration ordered Defendant the Secretary of Homeland Security to "ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations

division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order." Exec. Order 14159, *Protecting the American People Against Invasion*, § 4, 90 Fed. Reg. 8443, 8444 (Jan. 20, 2025). And HSI itself describes its enforcement mission as "launch[ing] and pursu[ing] investigations into transnational crime and violations of the customs and immigration laws of the United States." Homeland Security Investigations, *What We Investigate*, https://perma.cc/AD2M-J5LW.

DHS also reads the Court's order far too narrowly. The Court could simply have defined Immigration Enforcement Actions as those taken "to enforce the immigration laws." Instead, it specifically employed broader language, defining the term to mean actions taken "in whole *or in part*, to enforce the immigration laws." PI Order ¶ 1(i) (emphasis added). Even under the government's own (limited and unsworn) description of the investigation, it is clear the investigation was undertaken at least "in part" to enforce the immigration laws. After all, the "federal officers and employees" allegedly being "intimidate[ed]" in the conduct of their duties were federal *immigration* officers. And the "federal operations" allegedly being "impede[d]" were federal *immigration* operations. Actions taken to investigate people allegedly impeding enforcement of immigration laws—and thereby to facilitate the enforcement of those laws—are actions "planned, conducted, undertaken, or executed, in whole or in part, to enforce the immigration laws." PI Order ¶ 1(i). The government also has not claimed, let alone documented, that none of the information gathered in its operations at University Baptist Church was used for other purposes as well.

In support of DHS's position, government counsel cited an indictment said to stem from these investigations. Ex. 4 at 3; *see also* Ex. 5 (the indictment). But that indictment only

underscores Plaintiffs' point. The very first paragraph charges the defendants with conspiring to prevent DHS and ICE agents "from discharging the duties of their officers [sic]." Ex. 5 ¶ 1. So too, the first-listed purpose of the alleged conspiracy is "[p]reventing the enforcement of federal immigration law by force, intimidation, and threats." *Id.* ¶ 7(a). And the overt acts alleged to have been taken in service of the conspiracy include multiple actions involving immigration enforcement, such as following immigration agents or criticizing ICE on social media. *See, e.g.*, *id.* ¶¶ 79 (Instagram video described as "applaud[ing] the success of the efforts to impede federal immigration enforcement"), 91 ("follow[ing] vehicles that were driven by federal immigration officers" in an alleged effort to "interfere[]" with the performance of their "official duties"), 212 (sharing descriptions of "government-issued vehicles" and "suspected immigration … officers"), 245 ("follow[ing a] federal immigration officer from the Whipple Building"). The indictment makes plain that DHS is investigating alleged resistance to its ability to enforce the immigration laws—an investigation undertaken at least "in part" to enforce the immigration laws.

Government counsel highlighted that the indictment charges crimes under Title 18, rather than immigration violations. Ex. 4 at 3. As explained, however, that is not dispositive of whether the investigatory actions were taken, "in whole or in part, to enforce the immigration laws." PI Order ¶ 1(i). Nor are the charges that the government eventually brings necessarily indicative of the original purposes of the agency conducting the investigation, as the agency does not know at the outset of an investigation exactly what it will uncover. Those charges also do not reveal to what other purposes the agency may have used the information it gathered.

DHS's attempt to excuse its actions are further undermined by the fact that the prior sensitive location policy would have covered the actions at issue here. The Mayorkas Memo described that policy as governing "the execution of our enforcement responsibilities" writ large—

not just some subset of DHS's enforcement work. Pls.' SJ Ex. 5 at 2 (ECF No. 111-5). When the Court issued the preliminary injunction in this case, it gave no indication that it intended its order to apply more narrowly in this respect than the Mayorkas Memo. The Court specifically discussed the ways in which its order is broader and narrower than the Mayorkas Memo, but made no mention of the distinction that DHS now tries to read into the order. *See* PI Op. at 61. Indeed, nothing in the Court's opinion distinguished between the different types of investigations that DHS might undertake.

Moreover, it does not appear that DHS took any steps to consider the preliminary injunction before it took action at University Baptist Church and to ensure that its actions at the church were compliant with the order. It certainly has not suggested that it did. The lack of such evidence suggests that the argument DHS offers now may reflect merely a post-hoc effort by DHS to escape the consequences of its conduct rather than its considered interpretation of the order—an interpretation that would be unreasonable in any event, for the reasons already explained.

The Court therefore should issue an order to show cause and require the government's prompt response why it should not be held in contempt for violations of the preliminary injunction. Plaintiffs respectfully submit that it may aid the Court in its resolution of this issue if the Court were to require the government to submit competent evidence: (1) attesting to any other enforcement operations Defendants or their agents have undertaken at or near University Baptist Church, as well as any other Protected Areas designated by Plaintiffs, since issuance of the preliminary injunction; (2) documenting, with specificity, the steps Defendants have taken to disseminate to their agents information about the preliminary injunction, the list of protected locations provided by Plaintiffs, and the restrictions on carrying our immigration enforcement actions at those locations; and (3) documenting the steps Defendants took—if any—to ensure their

specific enforcement actions at and near University Baptist Church complied with the Court's preliminary injunction order.

## CONCLUSION

For all these reasons, including the severity of the violations and the threat of additional future violations, the Court should give this matter expedited consideration and issue an order directing Defendants to show cause why they should not be held in contempt for violations of the preliminary injunction.

Dated: August 20, 2026

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl*
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Mark B. Samburg
Ayesha Khan*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
kfriedl@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
msamburg@democracyforward.org
akhan@democracyforward.org

Ryan Downer*
Madeleine Gates*
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org

Richard J. Leveridge*
Sonia W. Murphy*
Brandon A. Levey*
Samone Ijoma*
Brittney M. Welch*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Leveyb@gilbertlegal.com
Ijomas@gilbertlegal.com
Welchb@gilbertlegal.com

*Admitted *pro hac vice*

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.1

Prior to filing this motion, I conferred with counsel for Defendants and attempted in good faith to resolve or narrow the issues raised. The parties were unable to resolve or narrow the issues, and Defendants oppose the relief requested.

*/s/ Kevin E. Friedl*
Kevin E. Friedl

## CERTIFICATE OF SERVICE

On August 20, 2026, I served the foregoing on all parties by electronically filing it through the CM/ECF system.

*/s/ Kevin E. Friedl*
Kevin E. Friedl