**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

**New England Synod, Evangelical Lutheran Church in America**, *et al.*,

Plaintiffs,

v.

**Department of Homeland Security**, *et al.*,

Defendants.

**Case No. 4:25-cv-40102-FDS**

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO MOTION TO SEVER FOR IMPROPER JOINDER**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

ARGUMENT ........ 1

I. The Court should grant summary judgment to Plaintiffs on all claims. ........ 1

A. The 2025 Policy eliminates longstanding protections for houses of worship. ........ 1

B. Plaintiffs have standing to challenge the 2025 Policy. ........ 4

1. Plaintiffs have proven injury-in-fact. ........ 4

2. Plaintiffs' injuries are fairly traceable to the 2025 Policy. ........ 10

3. The relief sought would likely redress Plaintiffs' injuries. ........ 15

C. The policy violates the Religious Freedom Restoration Act. ........ 16

1. The policy substantially burdens Plaintiffs' religious exercise. ........ 16

2. The policy cannot satisfy strict scrutiny. ........ 17

D. The policy violates the First Amendment. ........ 20

E. The policy violates the Administrative Procedure Act. ........ 22

1. The policy is final agency action. ........ 22

2. The policy is not committed to agency discretion by law. ........ 26

3. The policy is unlawful under the APA. ........ 29

F. The Court should enter a permanent injunction as well as declaring unlawful and vacating the 2025 Policy. ........ 32

1. Permanent injunctive relief is needed to provide complete relief. ........ 32

2. The Court should clarify the meaning of "exigent circumstances." ........ 33

3. The Court should declare unlawful and vacate the 2025 Policy. ........ 34

4. Injunctive relief should not carve out administrative warrants. ........ 35

II. The Court should deny DHS's motion to sever. ........ 38

CONCLUSION ........ 40

## INTRODUCTION

Plaintiffs' motion for summary judgment, and extensive supporting evidence, demonstrate that there are no genuine disputes of material fact and that Plaintiffs are entitled to judgment as a matter of law on all claims. DHS opposes that motion and has cross-moved for summary judgment. Notably, the agency has not tendered a single piece of evidence to defeat Plaintiffs' well-supported motion—let alone to show that *it* is entitled to summary judgment. Instead, DHS rehashes a series of unpersuasive and often contradictory legal arguments, many of which the Court already rejected: that DHS's 2025 Policy changed nothing, but that maintaining it is vital to compelling government interests; that the Mayorkas Memo "tied the hands" of immigration agents, but did not "bind" them; that congregants will not respond predictably to increased immigration enforcement at churches, but will respond predictably to increased immigration enforcement generally; that DHS's enforcement policies must comply with the Religious Freedom Restoration Act and the First Amendment, but that courts lack any legal standards by which to judge those policies. Throughout, DHS selectively criticizes small portions of Plaintiffs' evidence, while resting its own factual assertions on no evidence at all. None of this creates any genuine dispute of fact or otherwise defeats Plaintiffs' well-supported motion. DHS's tacked-on misjoinder argument likewise finds no support in the law or factual record. The Court should deny Defendants' motion to sever, grant summary judgment to Plaintiffs on all claims, and enter appropriate relief.

## ARGUMENT

### I. The Court should grant summary judgment to Plaintiffs on all claims.

#### A. The 2025 Policy eliminates longstanding protections for houses of worship.

As Plaintiffs' motion showed, and the Court previously determined, DHS's 2025 Policy radically altered the rules governing immigration enforcement at houses of worship. Under DHS's

prior policy, set forth in the Mayorkas Memo, DHS employees were "obligat[ed] to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area." Ex. 5 at 3; *see also* ECF No. 74 ("PI Op.") at 7-8. While that prior policy included narrow exceptions in cases of exigent circumstances or prior approval (by officials who were themselves subject to the requirement to avoid enforcement at sensitive locations), its rule was clear, that rule was intended to and did bind agency personnel, and it made enforcement actions at sensitive locations a rare occurrence. *See, e.g.*, ECF No. 111 ("Mot.") at 2-7, 34-35.

DHS changed all of that when, on January 20, 2025, and based on a wafer-thin administrative record, it threw out every single one of the substantive and procedural protections in the Mayorkas Memo, expressly disclaiming in the Huffman Memo the need for "bright line rules" to cabin individual discretion. *Id.* at 4; *see also* ECF Nos. 90-1, 90-3 (indexes of records). While the Vitello Memo subsequently added a requirement for ICE—but not other DHS components, including CBP—that approval for operations at houses of worship must come from specified personnel, it imposed no substantive limitations on those employees' decisionmaking. Mot. at 4-5; Ex. 10. Thus, as the Court found, the 2025 Policy—in stark contrast to the Mayorkas Memo—"permits DHS law-enforcement agents … to conduct arrests, searches, or interrogations in or near a church at their own discretion," raising the prospect "that a street-level law-enforcement agent … could conduct a raid during a church service, or lie in wait to interrogate or seize congregants as they seek to enter a church." PI Op. at 2. Since adoption of the 2025 Policy, immigration enforcement at houses of worship—once rare—has become common. Mot. at 5.

DHS nonetheless continues to deny the reality of its own actions. Rather than defend its actual 2025 Policy head-on, the government seeks to minimize it as merely "advising immigration officers to exercise their 'common sense' and 'discretion,'" ECF No. 113 ("Cross-Mot.") at 1,

"making modest changes in internal guidance," *id.* at 27, or "determining approval levels for government action," *id.* at 30. Those mischaracterizations in turn underlie many of DHS's substantive arguments. But they are simply wrong, as the Court already concluded. DHS provides no persuasive reason the Court should revisit that conclusion. And indeed, the Fourth Circuit, in upholding a preliminary injunction similar to the one here, recently and unanimously rejected this attempt to recast the 2025 Policy, holding that the policy "is not merely a matter of government record keeping" but instead "is intended to deprive churches … of substantial protection from immigration enforcement operations." *Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, --- F.4th ----, 2026 WL 2409055, at *11 (4th Cir. Aug. 18, 2026) ("*Phila. Yearly Meeting III*").

DHS points out (at 11), once again, that the Mayorkas Memo did not function as a total bar on enforcement at sensitive locations. Plaintiffs have never claimed otherwise. Nor does that alter the fact that the memo imposed important limitations that strictly curtailed such actions, while the 2025 Policy imposes no substantive limitations at all. As Plaintiffs have explained, the fact that a rule contains exceptions does not make it less of a rule or mean that nothing has changed if it is rescinded. *See* Mot. at 36; *see also Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, No. 25-cv-0243, 2026 WL 280089, at *4 (D. Md. Feb. 3, 2026) ("*Phila. Yearly Meeting II*") (while Mayorkas Memo "did not absolutely bar all enforcement actions at protected areas, … it placed significant limits on immigration officers' exercise of discretion").

The fact that some of those exceptions required the "exercise of judgment," *see* Cross-Mot. at 12, did not make the Mayorkas Memo any less binding. *See Phila. Yearly Meeting II*, 2026 WL 280089, at *4 ("The fact that the 2021 Policy required agency personnel to engage in some interpretation of its terms does not change the mandatory nature of its provisions."). Even the simplest rule—e.g., "no exit except in emergencies"—may call for some degree of judgment to

apply in practice, without being any less of a rule because of it.

DHS also notes (at 11) that the memo "did not limit officers' statutory authority." But it is fundamental that an agency cannot amend statutory law; only Congress can. *See, e.g.*, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("An agency … may change its own conduct, but it cannot change the law."). What DHS could and did do, however, is impose binding restrictions on how its agents would exercise the authority granted under statute, *see Phila. Yearly Meeting II*, 2026 WL 280089, at *4—then precipitously throw out those restrictions. The court in *Fridley Public School District v. Mullin*, No. 26-cv-1023, 2026 WL 1244043, at *8-9 (D. Minn. May 6, 2026), on which DHS relies, erred in failing to appreciate this point, as well as the significance of the change from "avoid enforcement to the fullest extent possible" to "have at it."

### B. Plaintiffs have standing to challenge the 2025 Policy.

#### 1. Plaintiffs have proven injury-in-fact.

Plaintiffs' evidence at summary judgment demonstrates at least four types of cognizable injury: (1) decreased attendance at worship services and other ministry activities; (2) decreased revenue from financial giving; (3) other burdens on Plaintiffs' religious exercise, such as being compelled to close off worship spaces they believe must be open and welcoming; and (4) lost time and money Plaintiffs have had to devote to physical security upgrades and other preparations to keep congregants and others safe. Mot. at 20-22. The table attached to this brief organizes this evidence by Plaintiff for ease of reference. Tbl. 1. In response, DHS offers no evidence of its own, but merely criticizes Plaintiffs' submissions in various respects. Those arguments fail to defeat Plaintiffs' well-supported motion for summary judgment.

*Declines in attendance and revenue.* DHS correctly does not dispute that the first two forms of injury—decreased attendance and financial giving—are cognizable harms. *See, e.g.*, *Phila.*

*Yearly Meeting III*, 2026 WL 2409055, at *6; *id.* at *14 (Agee, J., concurring). It argues only (at 9-11) that Plaintiffs have failed to prove these harms are occurring because, DHS says, the evidence on which Plaintiffs rely is conclusory, vague, and in some cases hearsay. DHS is wrong.

The summary judgment record includes more than 60 declarations from Plaintiffs and their members, including bishops, ministers, pastors, Quaker clerks, and lay leadership. As Plaintiffs have shown, Mot. at 10-15; Tbl. 1, dozens of these declarations speak in specific detail to the declines in attendance and financial giving that Plaintiffs have experienced. Other evidence in the record further demonstrates the predictable effects of the 2025 Policy on religious participation. *See* Ex. 30-35. Indeed, DHS itself previously recognized that a lack of restraint around sensitive locations would "deny[] or limit[] … people of faith['s] access to their places of worship." Ex. 5 at 2; *see also id.* ("[I]f we take an action at an emergency shelter, it is possible that noncitizens … will be hesitant to visit the shelter" to receive needed services.); Ex. 6 ¶ 9 (Mayorkas Memo was meant to ensure communities had access to essential services); Ex. 7 ¶ 18 (same).

Rather than seriously engage with this extensive body of evidence, DHS singles out (at 10-11 & n.6) particular statements in certain declarations it says are "conclusory" or "vague." But there is nothing unclear or conclusory about straightforward factual statements such as, for example, a pastor stating that "[w]e have … seen multiple individuals afraid to attend church," Ex. 84 ¶ 11; a different pastor reporting that his church previously "had approximately 200 individuals attending services" but now "attendance has dropped to approximately 120 individuals," Ex. 88 ¶ 11; or yet another pastor stating that "there has been a 30% drop in attendance at church services among my congregants," Ex. 73 ¶ 6. *Cf. Phila. Yearly Meeting III,* 2026 WL 2409055, at *5 ("find[ing] no merit" in government's similar argument that "concrete instances of decreased attendance and specific statements from congregants" were "vague and

conclusory”). DHS highlights these statements (and more), but does not explain why they are “conclusory” or specify what other information should have been included.

DHS also overlooks other, more specific statements in the record—sometimes in the very same declarations it calls conclusory. For example, DHS highlights (at 11 n.6) Rev. Martin Doe’s statement that “[t]he removal of protections from houses of worship has significantly impacted our ability to practice our faith and worship in community.” Ex. 25 ¶ 6. But DHS entirely ignores the rest of the declaration, which describes multiple specific incidents of ICE enforcement near the church, *id.* ¶¶ 8-9, explains that “[t]here are families in our church who have made the choice to stop attending worship,” *id.* ¶ 11, and describes how that affects the congregation’s ability to “worship[] in community” and decreases financial giving, *id.* ¶¶ 11-12, among other relevant facts. Similarly, if there is anything conclusory about Bishop Wayne Miller’s statement, standing alone, that “[a]fter the rescission … , our churches quickly noticed a decline in attendance,” Ex. 38 ¶ 27, it is more than made up for by the specific accounts of attendance declines offered by multiple pastors in the same Synod, *see* Ex. 23 ¶ 6; Ex. 24 ¶ 9; Ex. 27 ¶ 5; Ex. 42 ¶¶ 37-39; Ex. 78 ¶¶ 7-10; Ex. 82 ¶ 6. In just the same way, Christopher Vergara’s account of attendance at the Metropolitan New York Synod, Ex. 16 ¶¶ 20-21, which DHS quotes (at 10), is buttressed by the declaration of a minister quantifying specific attendance declines at his church, Ex. 41 ¶¶ 13-14, the substance of which DHS ignores.[1] DHS cannot prevail at summary judgment by cherry-picking statements it says are conclusory, offering no argument about what the statements omit, and ignoring the other evidence that adds elaborate detail. *See Facey v. Dickhaut*, 91 F. Supp. 3d 12, 24 (D. Mass. 2014) (“The record should not be scrutinized piecemeal, but rather must be ‘taken as a whole.’” (quoting

[1] Oddly, DHS cites (at 11 n.6) paragraph 13 of this declaration—“Before the rescission of the ‘Sensitive Locations’ policy, we had regular attendance every Sunday of 200 to 250 members”—as an example of a conclusory statement. It is not; and DHS offers no argument to the contrary.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))).

DHS's related claim (at 11 & n.7) that Plaintiffs rely on inadmissible hearsay evidence fares no better. First, many of the statements DHS cites are from pastors reporting the fears their congregants have expressed to them; such evidence is admissible as "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)." Fed. R. Evid. 803(3). A congregant's statement to their pastor "that they fear immigration enforcement even at church," Ex. 61 ¶ 12; a Quaker attender's statement to the Meeting clerk that "they do not think they can risk gathering for Meetings," Ex. 26 ¶ 25; worshippers' confiding in their pastor that "they were afraid that they or their family members would be taken at church by 'La Migra,'" Ex. 77 ¶ 24; or a family from Myanmar telling their pastor "they are afraid of immigration enforcement at the building," Ex. 74 ¶ 4, all reflect the declarants' then-existing mental and emotional state and are thus admissible under Rule 803(3). *See United States v. Estes*, 985 F.3d 99, 102-03, 106 nn.8-9 (1st Cir. 2021) (statements that declarant feared defendant were admissible under Rule 803(3)); *United States v. Lentz*, 282 F. Supp. 2d 399, 412 (E.D. Va. 2002) (same). DHS complains (at 10) that these congregants are "unnamed." But that in itself is irrelevant to application of Rule 803(3). *See Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 91 (1st Cir. 2017) (allowing statements where declarants "were not specifically named"); *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 332 F. Supp. 3d 446, 477 (D. Mass. 2018) (same). And to the extent these pastors are simply reporting their own firsthand observations of attendance declines, that is plainly not hearsay.

Second, DHS cites (at 11 n.6) some statements from bishops or similar officials describing declines in attendance across their organizations. Some of the statements DHS highlights reflect direct, firsthand knowledge and so are not hearsay in the first place. Ex. 55 ¶ 27 ("[The church]

where I am employed has suffered a marked decline in attendance at food distributions"); Ex. 67 ¶ 20 (bishop describing decreases in attendance at annual synod assembly); Ex. 71 ¶ 40 ("Prior to the rescission of the sensitive-locations policy, I had never heard of any Synod congregant declining to attend worship … for fear of immigration enforcement."). Other statements describe specific attendance declines that are also attested to by pastor declarations, *compare* Ex. 67 ¶ 18, *with* Ex. 46 ¶ 15; *see also* Ex. 94 ¶¶ 12-15, 19, and thus likewise do not raise hearsay issues. Still other cited statements can be considered because, even if not currently in admissible form, they could be offered in admissible form at trial. *See, e.g.*, *Yourga v. City of Northampton*, 474 F. Supp. 3d 408, 416 (D. Mass. 2020) ("Rule 56(c)(2) does not require that citations at summary judgment be in admissible form, only that the evidence can be presented in an admissible form at trial. The evidence Plaintiff has challenged … can be made admissible by Defendants calling their own available witnesses to testify at trial." (citation omitted)). The Court ultimately need not resolve those issues, however, because the record is replete with statements from pastors or others with firsthand knowledge describing declines in attendance or participation they have personally observed, in addition to other harms—statements that clearly are not hearsay. *See* Tbl. 1.

*Other burdens on Plaintiffs' religious practice*. The summary judgment record shows that Plaintiffs are harmed by having their religious practice burdened in other ways as well, such as when pastors are chilled from preaching freely or congregations are compelled to worship behind closed and locked doors. Mot. at 15-17. In response, DHS once again cites (at 12) *Laird v. Tatum*, 408 U.S. 1 (1972)—but without mustering any response to Plaintiffs' showing why that case does not control, Mot. at 21-22. Incredibly, DHS also disputes (at 12 & n.8) that it has carried out

enforcement actions near Plaintiffs' houses of worship.[2] But the agency makes no attempt to contest Plaintiffs' submissions with any evidence of its own, and its attacks on Plaintiffs' evidence make little sense. For example, DHS appears to discount documented enforcement actions that occurred "in public places"—such as directly in front of churches, *e.g.*, Ex. 21 ¶¶ 20-21; Ex. 22 ¶ 6—as irrelevant, while failing to recognize that the Mayorkas Memo restrained enforcement both in and *near* sensitive locations, Ex. 5 at 3. It incorrectly disparages testimony from clergy and staff describing confrontations with federal agents on church property as "conclusory." *See* Ex. 19 ¶¶ 7-9; Ex. 20 ¶¶ 11-12. And it claims (at 12 n.8) that evidence of an arrest at one of Plaintiffs' churches in Minneapolis "lacks foundation." In response, and to remove any potential doubt, Plaintiffs have filed with this brief additional declarations as well as a video of the arrest. Ex. 90 (video); Ex. 91; Ex. 92; Ex. 93. The ongoing pattern of immigration enforcement at their churches that Plaintiffs have documented suffices to show a "specific present objective harm or a threat of specific future harm." *Blum v. Holder*, 744 F.3d 790, 796 (1st Cir. 2014).

*Necessary expenditures to protect congregants.* Plaintiffs also demonstrated harm from having to spend money and resources undertaking preparations to keep congregants safe in the event of DHS raids or similar actions. Mot. at 16. DHS does not challenge this evidence or mount any defense beyond citing (at 12) to *Clapper v. Amnesty International USA*, 568 U.S. 398, 415 (2013). But, as Plaintiffs have explained and the government does not address, let alone rebut, this case does not involve anything like the attenuated chain of causation in *Clapper*. *See* Mot. at 22.

---

[2] DHS's denial is even less credible given new evidence that it conducted surveillance at and even inside Plaintiffs' and other churches. *See* ECF No. 117 at 5-6 (motion for order to show cause); Ex. 96 (describing surveillance at other churches).

### 2. Plaintiffs' injuries are fairly traceable to the 2025 Policy.

DHS does not directly dispute traceability for Plaintiffs' third and fourth types of harm (various burdens on Plaintiffs' religious practice and expenditures to protect congregants). It does dispute that Plaintiffs' first and second forms of injury (reduced attendance and financial giving) are traceable to the 2025 Policy, but its arguments are contrary to the facts and the law.

The Court correctly deemed it "obvious" that "a policy that largely removes restrictions on immigration raids at churches, coupled with a public statement that '[c]riminals will no longer be able to hide in America's ... churches to avoid arrest,' would likely cause a marked decrease in church attendance," including for citizens and legal residents who reasonably fear being "swept up in a raid, a mass arrest, or a mass interrogation." PI Op. at 23 (quoting Ex. 9 at 1); *see also Phila. Yearly Meeting III*, 2026 WL 2409055, at *7-8 (affirming traceability on similar facts). The record on summary judgment confirms as much. Mot. at 24. DHS offers nothing to create any genuine disputes of material fact or otherwise defeat Plaintiffs' showing on this issue.

The Supreme Court recently emphasized that where "third party behavior is predictable, commonsense inferences may be drawn," and plaintiffs need not "introduce evidence … to show how third parties would likely respond." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116, 120-21 (2025); *accord Conservation Law Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 91-92 (1st Cir. 2025) (applying "[c]ommon sense" to assess causation). A predictable—even "obvious"—response to the government making certain areas less safe is that third parties will seek to avoid those areas. *See* PI Op. at 23. Indeed, DHS itself predicted exactly that result in the Mayorkas Memo. Ex. 5 at 2 (warning that, "if we take an action at an emergency shelter, it is possible that noncitizens … will be hesitant to visit the shelter"). And even now, DHS's main argument on traceability—that Plaintiffs' attendance declines are caused by "general concerns

around increased immigration enforcement," Cross-Mot. at 13—reflects the same correct premise that third parties will react in predictable ways to increased risk of enforcement.

DHS nonetheless denies (at 16) that reduced attendance is a predictable consequence of removing protections for churches. But that claim—which defies logic and DHS's own prior admissions, and is tendered without any evidence—is based on the same old mischaracterization of the 2025 Policy as "guidance that merely alters internal agency procedures regarding … necessary approvals" addressed above and that the Court previously rejected. *See supra* Sec. I.A; PI Op. at 2; *Phila. Yearly Meeting III*, 2026 WL 2409055, at *11 (rejecting claim that 2025 Policy was "merely a matter of government record keeping"). DHS tries (at 15-16) to limit *Diamond Alternative Energy* to its facts, but that does not work either: The Supreme Court just last term emphasized that the case set forth a "general principle" that applies "[a]cross contexts." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026) (applying same principle to freedom-of-association claim); *see also Conservation Law*, 129 F.4th at 91-92.

Because the relevant consequences of the 2025 Policy were predictable, Plaintiffs were not required to "introduce evidence … to show [those consequences]," *Diamond*, 606 U.S. at 120-21, and the Court could simply end its analysis here. But if it chooses to go further and look to the evidence in the record on this point, that evidence only confirms that Plaintiffs' harms are traceable to DHS's policy. As Plaintiffs have shown, Mot. at 24, the summary judgment record includes evidence that attendance declines coincided with the 2025 Policy, *e.g.*, Ex. 26 ¶ 19; Ex. 29 ¶ 13; Ex. 41 ¶¶ 13-14; Ex. 42 ¶ 37; Ex. 50 ¶ 15; that congregants specifically feared immigration enforcement *in and around church* (something the Mayorkas Memo—but not the 2025 Policy—tightly restricted), *e.g.*, Ex. 22 ¶ 11; Ex. 26 ¶ 19; Ex. 29 ¶ 16; Ex. 43 ¶¶ 10, 14; Ex. 46 ¶ 16; and that, until the 2025 Policy, pastors were not hearing concerns from congregants about immigration

agents in church, *e.g.*, Ex. 25 ¶ 5; Ex. 26 ¶ 30; Ex. 29 ¶¶ 7, 14; Ex. 65 ¶ 9; Ex. 79 ¶ 8. The record also shows that congregations are aware of DHS's change in policy and the reduced protections DHS now gives to houses of worship—including because of DHS operations at Plaintiffs' churches. *E.g.*, Ex. 22 ¶ 5; Ex. 48 ¶ 11; Ex. 59 ¶¶ 9-10; Ex. 63 ¶ 8; Ex. 77 ¶ 25 (also describing how Spanish-language media has covered the changed policy "extensively"). Traceability is confirmed by the fact that many covered Plaintiffs saw rebounds in attendance after the preliminary injunction, even while background levels of immigration enforcement remained the same. Ex. 64 ¶¶ 10-12; Ex. 77 ¶¶ 39, 41-42; Ex. 67 ¶¶ 28-29; Ex. 57 ¶ 20; Ex. 21 ¶¶ 35, 38; Ex. 44 ¶¶ 16-18, 22, 24; Ex. 17 ¶ 32; Ex. 53 ¶¶ 19, 21; Ex. 40 ¶¶ 22-23; Ex. 48 ¶ 17.[3]

DHS does not seriously engage with any of this evidence. It offers (at 13-14) a page-long string-cite of statements in which declarants mention nearby ICE activity (e.g., "in our area," "two blocks from the church"), and argues that this defeats traceability. But that argument completely ignores the evidence of causation just discussed, including the increases in attendance that followed the preliminary injunction, and thus does not create any genuine disputes of material fact. It also fails on its own terms. The fact that congregants feel fear when ICE shows up near their church is an entirely rational response to DHS's policy change, and does not undermine Plaintiffs' showing that third parties are reacting predictably to the increased risk of immigration enforcement *at* churches. (After all, absent teleportation, there is no way for ICE to arrive "at" a church without

[3] The Court previously emphasized that standing "must be considered separately as to each plaintiff." PI Op. at 23. In undertaking that inquiry as to each Plaintiff, the Court can take account of all the above-cited evidence on traceability, because it all demonstrates that decreased attendance and financial giving are traceable to the 2025 Policy, and nothing in the record (or in reason) suggests that congregants from different Plaintiff denominations will react differently to the risk of arrest or interrogation at church. *Cf. Saunders v. Town of Hull*, 874 F.3d 324, 331 (1st Cir. 2017) (nonmovant cannot rest on "improbable inferences[] or unsupported speculation to defeat a motion for summary judgment" (brackets and quotation marks omitted)).

first being "near" the church.) What matters is that, under the prior sensitive locations policy, worshippers and others could feel some measure of security while receiving services at a place of worship—even if ICE might be active elsewhere in the community—and the 2025 Policy withdraws those protections. *Cf.* Ex. 48 ¶ 17 (pastor's statement that, with the preliminary injunction in place, "we do not see the big swings in attendance *even when immigration enforcement is happening in the county*" (emphasis added)).

DHS cites (at 15) *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), but that decision actually cuts the other way. It held that a nonmovant could not defeat a well-supported motion for summary judgment with fundamentally "ambiguous" affidavits that lacked the requisite specificity to create any genuine dispute of material fact. *Id.* at 888-89. Here, DHS has not submitted *ambiguous* evidence—it has offered no evidence at all. And its attacks on Plaintiffs' evidence as hearsay likewise fails because, as explained, *see supra* 7, congregants' statements that they fear immigration agents at church are admissible under Rule 803(3).

None of DHS's remaining arguments (at 17-19) supports reversing the Court's prior conclusion on traceability. DHS's suggestion (at 17) that Plaintiffs cannot challenge a policy that does not directly "regulate, constrain, or compel [them]" is not an accurate statement of the law, *see, e.g.*, *Diamond*, 606 U.S. at 125-26 (plaintiffs had standing to challenge action that did not directly regulate them); *Dep't of Com. v. New York*, 588 U.S. 752, 767-68 (2019) (same); *Bennett v. Spear*, 520 U.S. 154, 156, 177-78 (1997) (same); *see also Phila. Yearly Meeting III*, 2026 WL 2409055, at *7 (rejecting same argument). Its focus (at 17) on whether further enforcement at Plaintiffs' churches is sufficiently "imminent" ignores that Plaintiffs have identified actually ongoing—not just imminent—harms, including reduced attendance, caused by the 2025 Policy. Its claim (also at 17) that the connection between its policy on enforcement at churches and the

churches themselves is too "attenuated" makes little sense. Unlike the "distant … ripple effects" in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 383 (2024), the effects here were clear, direct, and fully understood by DHS both when it adopted the Mayorkas Memo, *e.g.*, Ex. 5 at 2 (noting that "if we take an action at an emergency shelter, it is possible that noncitizens … will be hesitant to visit the shelter" and receive needed services), and when it rescinded those protections, Ex. 9 at 1 (announcing that the rescission "empowers … CBP and ICE to enforce our immigration laws and catch criminal aliens … in America's schools and churches"); *see also Phila. Yearly Meeting III*, 2026 WL 2409055, at *7-8 (rejecting same argument and emphasizing that "the plaintiffs' theory of causation here is direct and straightforward"). DHS's imagined parade of horribles (at 18) thus is not implicated by recognizing standing in the circumstances of this case. *Cf. Phila. Yearly Meeting III*, 2026 WL 2409055, at *11 n.8.

Finally, DHS continues (at 18-19) to badly overread *United States v. Texas*, 599 U.S. 670 (2023), which it claims "indicate[s]" that even parties actually injured by "the downstream effects of … immigration enforcement policies" are barred from challenging those policies. *But cf. Biden v. Texas*, 597 U.S. at 813 (considering challenge brought by states allegedly injured by downstream effects of DHS's rescission of "Remain in Mexico" immigration policy). The case holds nothing of the sort. As the Supreme Court took pains to emphasize, that case "raise[d] only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law"—a "discrete standing question" that made the case "categorically different" from cases (such as this one) "involving statutory requirements or prohibitions on the Executive." *Texas*, 599 U.S. at 684-85. As the Fourth Circuit recently held, *Texas* plays no role in the standing analysis here. *See Phila. Yearly Meeting III*, 2026 WL 2409055, at *5 n.5.

### 3. The relief sought would likely redress Plaintiffs' injuries.

Here, as in most cases, traceability and redressability are "flip sides of the same coin," *Diamond*, 606 U.S. at 111; *see also* Mot. at 23-24; *Phila. Yearly Meeting III*, 2026 WL 2409055, at *8. The attendance increases that some Plaintiffs experienced from the preliminary injunction, *see supra* 12, only serve to confirm that the Court could fashion relief that would "likely" redress at least some of Plaintiffs' injuries, *Diamond*, 606 U.S. at 114.

DHS's evidentiary complaints (at 19) are unpersuasive for the reasons already discussed. As mentioned earlier, DHS identifies nothing actually vague or conclusory about pastors' reports that their churches have seen attendance increase since the Court's order. And in several instances, DHS highlights particular statements in a declaration while simply ignoring the rest of the pastor's testimony. *Compare* Ex. 21 ¶ 35 (stating that attendance has recovered, and cited by Cross-Mot. at 19 as an example of a "vague and conclusory assertion"), *with id.* ¶¶ 36-38 (providing specific attendance figures); *compare also* Ex. 64 ¶ 14 (cited by Cross-Mot. at 19 as an instance where Plaintiffs "do not even allege *any* rise in attendance"), *with id.* ¶¶ 10-13 (providing specific figures documenting rises in attendance at worship and food pantry). DHS's need to resort to unfair and inaccurate presentations of the record demonstrates the weakness of its position.

DHS's only other argument (at 19-20) is to repeat that neither the Mayorkas Memo nor the preliminary injunction barred *all* enforcement at houses of worship. Common sense and the evidentiary record confirm, however, that a return to sensible protections for houses of worship will likely redress at least some of Plaintiffs' injuries, whether or not those protections include limited exceptions, such as for exigent circumstances. *See Phila. Yearly Meeting III*, 2026 WL 2409055, at *8 (so holding).

### C. The policy violates the Religious Freedom Restoration Act.

DHS neither rebuts Plaintiffs' evidence showing that the 2025 Policy violates RFRA nor adduces evidence of its own. Plaintiffs' extensive and unanswered evidence of the substantial burdens the policy places on their religious exercise entitles them to summary judgment. In contrast, DHS's total lack of evidence in support of its argument that the policy satisfies strict scrutiny, which it carries the burden to demonstrate, *see* 42 U.S.C. § 2000bb-1(b), is fatal to its cross-motion for summary judgment on this claim.

#### 1. The policy substantially burdens Plaintiffs' religious exercise.

DHS fails to rebut Plaintiffs' showing, and the Court's prior preliminary finding, PI Op. at 43, that the 2025 Policy imposes a substantial burden on Plaintiffs' religious practice. DHS first attempts to argue (at 30) that the 2025 Policy does not substantially burden Plaintiffs' religious exercise because the policy is a "classic type of internal affair that does not substantially burden the exercise of religion." But DHS's policies dictating the terms of immigration enforcement's engagement at public places like churches and mosques cannot plausibly be characterized as an "internal" government choice akin to the "size or color of the Government's filing cabinets." *Bowen v. Roy*, 476 U.S. 693, 700 (1986); *see also supra* Sec. I.A; *Phila. Yearly Meeting III*, 2026 WL 2409055, at *11 (rejecting same argument). Indeed, DHS explicitly maintained the prior policy in recognition of the "profound impact" of its actions, explaining that "if we take an [immigration enforcement] action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter." Ex. 5 at 2.

The cases on which DHS relies only make plain the degree to which it attempts to stretch the definition of "internal" procedures past reason. In *Bowen*, the Supreme Court explained that the free exercise clause does not permit individuals to "demand that the Government join in their

chosen religious practices," and so petitioners could not insist that government agencies "refrain[] from using a number to identify their daughter" internally in administering benefits. 476 U.S. at 699-700. In *Lyng v. Northwest Indian Cemetery Protective Ass'n*, the Court similarly held that the government's use of its own land to build a road or harvest timber could not form the basis of a free exercise claim. 485 U.S. 439, 449, 453 (1988). Plaintiffs, however, are not seeking to control the government's use of federal land or asking government agents to conform their recordkeeping practices to Plaintiffs' religious beliefs. *See Phila. Yearly Meeting III*, 2026 WL 2409055, at *11 & n.7 (distinguishing *Bowen* and *Lyng*).

DHS's doomsaying (at 30) about "a free-exercise veto over otherwise permissible law enforcement activity" similarly falls flat. RFRA applies to law enforcement activity no less than it does to other government actions. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 425-26 (2006) (applying RFRA in criminal context); *see also* Ex. 95 at 9 (recent DOJ memo to agencies stating that "RFRA applies to agency enforcement just as it applies to every other governmental action."). Nor does it matter that the government activity may be "otherwise permissible," as RFRA explicitly prohibits burdening of religious exercise "even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). Moreover, RFRA requires that the challenged action impose a substantial burden, ensuring that mere inconveniences do not fall in the statute's ambit. *See Perrier-Bilbo v. United States*, 954 F.3d 413, 432 (1st Cir. 2020) ("[N]ot every imposition or inconvenience rises to the level of a 'substantial burden'"); *see also Phila. Yearly Meeting III*, 2026 WL 2409055, at *11 n.8.

**2. The policy cannot satisfy strict scrutiny.**

*Compelling interest.* DHS misstates (at 31-32) the compelling interest analysis that RFRA requires. Even demonstrating a generic interest in conducting immigration enforcement in or near

houses of worship does not suffice; the government must demonstrate a need to conduct unrestricted enforcement actions at *Plaintiffs'* houses of worship. *See O Centro*, 546 U.S. at 430-31 ("RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened" (quoting 42 U.S.C. § 2000bb–1(b))); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726-27 (2014) (RFRA requires examination of the "marginal interest in enforcing the" challenged policy in a particular case); *Phila. Yearly Meeting III*, 2026 WL 2409055, at *15 (Agee, J., concurring) (explaining that DHS's "conclusory and 'categorical' arguments" about its alleged compelling interests "would be insufficient to meet its burden even if they were properly before us").

DHS has not even tried to make this evidentiary showing. Indeed, DHS has apparently abandoned its only church-specific justification for the change in policy—that criminals were hiding in churches, Ex. 9—and instead makes general claims (at 32-34) about the problem of illegal immigration. The government argues (at 32) that its interest is compelling under RFRA because the test is "whether the government's interests would be undermined by denying the religious exemption requested," citing *O Centro*. Not only does *O Centro* not stand for the proposition that an interest is compelling if the government claims that it would be undermined by an exemption (a nonsensical standard), the Court in fact stated that "RFRA operates by mandating consideration, under the compelling interest test, of exceptions to 'rule[s] of general applicability.'" 546 U.S. at 436 (quoting 42 U.S.C. § 2000bb–1(a)). DHS's argument smacks of the reasoning the *O Centro* Court rejected—"If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Id.*

*Least restrictive means.* DHS's assertion (at 33-34) that it "reasonably determined" that the 2025 Policy would be "more effective" than the prior policy falls well short of establishing that it is the least restrictive means. "The least-restrictive-means standard is exceptionally demanding," *Burwell*, 573 U.S. at 728, and where there is a viable alternative means of meeting the compelling interest, "the government must show why, with evidence, it will not achieve its desired goal." *United States v. Broadfield*, 178 F.4th 1102, 1110 (7th Cir. 2026); *see also Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 41 (1st Cir. 2007) (in RLUIPA context, "[a] prison cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice").

Here, as the Court has already found, the Mayorkas Memo is an example of a viable alternative, and DHS has made no showing that it is (or was) unworkable or ineffective. PI Op. at 43-44. Indeed, missing entirely from DHS's argument is any shred of evidence in support of its bare assertions (at 32-34) that "the recent influx of aliens into the United States[] necessitated DHS's change in guidance" and that the Mayorkas Memo was "far less timely and effective than allowing those officials to rely on their common sense and discretion." *See also Phila. Yearly Meeting III*, 2026 WL 2409055, at *12 (government could not satisfy strict scrutiny where it did not "present *any* evidence … that the 2025 Policy is the least restrictive means of furthering that interest"). Even if these assertions *were* supported by evidence, the least-restrictive-means requirement does not automatically give way so that the government will be able to implement its preferred or ideal policy. *See Burwell*, 573 U.S. at 729-30 (discussing that RFRA may require creation of entirely new programs, modification of existing programs, and the expenditure of additional funds to accommodate religious beliefs).

### D. The policy violates the First Amendment.

DHS argues (at 36) that the 2025 Policy does not infringe on Plaintiffs' expressive association rights because it "discourag[es] attendance" but does not "order[] Plaintiffs to alter or forgo worship services or ministries nor prevent[] them from conducting those activities." To the contrary, as the Supreme Court has recently explained, government actions that "discourage reasonable individuals from associating with a group" may burden associational rights under the First Amendment. *First Choice*, 146 S. Ct. at 1124, 1130; *see also Am. Comm's Ass'n v. Douds*, 339 U.S 382, 402 (1950) ("Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions, or taxes.").

As DHS acknowledges, "significant" infringements on associational rights implicate the protections of the First Amendment. Cross-Mot. at 34 (quoting *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996)). Government policies, including law enforcement activity, that reasonably deter participation in religious association constitute "significant" infringements. *See Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007). In *Tabbaa*, CBP detained, searched, and questioned individuals who had attended a religious conference, and the government argued these actions did not burden the attendees' associational rights because CBP did not "order plaintiffs to refrain from associating with others at the [] Conference, nor did it prevent plaintiffs from doing so." *Id.* at 101. In rejecting this argument, the Second Circuit reasoned that "the prospect of being singled out for such extensive processing could reasonably deter others from associating at similar conferences." *Id.* at 102. Similarly, here, DHS's change in policy—and the ensuing enforcement actions at houses of worship—reasonably deters attendance and therefore significantly burdens Plaintiffs' expressive associational rights. *Phila. Yearly Meeting of Religious Soc'y of Friends v.*

*DHS*, 767 F. Supp. 3d 293, 321-26 (D. Md. 2025) (*"Phila. Yearly Meeting I"*).

DHS incorrectly characterizes the 2025 Policy (at 34) as "neutral." In fact, the policy "is intended to deprive churches (along with other sensitive locations) of substantial protection from immigration enforcement operations." *Phila. Yearly Meeting III*, 2026 WL 2409055, at *11. The predictable result of that policy has been to discourage attendance at places of worship. DHS vowed that as a result, "Criminals will no longer be able to hide in America's … churches to avoid arrest." Ex. 9. This government action was plainly and explicitly "directed at" places of worship. *Contra* Cross-Mot. at 35. For Plaintiffs, "who welcome immigrant worshipers and have locations in or near immigrant communities, DHS's statement emphasizing the rationale for this policy change shows that the threat of immigration enforcement at their houses of worship is real and substantial." *See Phila. Yearly Meeting III*, 2026 WL 2409055, at *10.

DHS's invocation (at 35-36) of *Lyng v. International Union* is inapposite. 485 U.S. 360 (1988). There, the Court concluded that it was "exceedingly unlikely" that the challenged statute would in actuality prevent individuals from associating, either with their households or with their unions. *Id.* at 365, 367. In contrast, Plaintiffs have presented extensive unrebutted evidence of the significant associational harms the 2025 Policy has caused. Moreover, the Court in *International Union* held that the government was not required to "furnish funds to maximize the exercise of" associational rights by extending benefits to workers on strike. *Id.* at 368. Plaintiffs here are not seeking to have the government subsidize their religious association—only to cease infringing their exercise of that right in violation of the First Amendment.

DHS cites no case law for its implausible suggestion (at 34-36) that only certain kinds of discouragement—like requiring disclosure of membership rolls—are cognizable under the First Amendment. *See First Choice*, 146 S. Ct. at 1122 ("Our cases have held that governments can

infringe freedom of association in varied ways."). And its argument that "the government simply could not operate" if it avoided discouraging attendance at houses of worship is belied by the fact that DHS did exactly that, for decades, without impeding its ability to enforce the law.

Finally, DHS does not separately argue that the policy satisfies exacting scrutiny, relying on its arguments regarding strict scrutiny. These arguments fail for the reasons set forth in Section I.C.2. *See also Phila. Yearly Meeting I*, 767 F. Supp. 3d at 326-28.

**E. The policy violates the Administrative Procedure Act.**

**1. The policy is final agency action.**

DHS disputes (at 20-23) that its 2025 Policy constitutes final agency action reviewable under the APA, solely on the grounds that it is not an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 156, 177-78 (quotation marks omitted). The agency agrees with Plaintiffs that this inquiry is a "pragmatic" one and that it can be answered by considering how, as a factual matter, "the agency has applied the guidance." Cross-Mot. at 21 (quoting *Sierra Club v. EPA*, 955 F.3d 56, 62 (D.C. Cir. 2020)); *see also* Mot. at 33. Yet DHS offers no evidence of its own that might support its position on these questions. Instead, it (a) repeats legal arguments that Plaintiffs refuted in their opening brief, largely without answering Plaintiffs' points, and (b) contests the Court's ability to consider two declarations from former agency officials. Neither approach defeats Plaintiffs' showing, based on the record now assembled at summary judgment, that the Court should revisit its earlier, preliminary assessment and conclude that the 2025 Policy is final agency action.

Plaintiffs' summary judgment materials buttress and expand on the preliminary injunction record, and demonstrate that the 2025 Policy determines rights or obligations by eliminating binding limits on DHS personnel's ability to undertake immigration enforcement operations in and

around sensitive locations, with clear legal consequences for agency personnel, Plaintiffs, and Plaintiffs' congregations. *See* Mot. at 34-37; *see also Phila. Yearly Meeting III*, 2026 WL 2409055, at *8, 11 (Mayorkas Memo "limited the circumstances under which enforcement activities at sensitive locations could occur" and provided "substantial protection from immigration enforcement operations"); *Phila. Yearly Meeting II*, 2026 WL 280089, at *3-6.

Yet DHS stands on its previous offerings, providing nothing new in response. It repeats (at 21) that the Mayorkas Memo was not a complete bar on enforcement at sensitive locations, "did not indicate that [it] was based on an interpretation of the INA," and did not limit the agency's statutory authority—but without offering any answer to Plaintiffs' arguments on these points, *see supra* 3-4; Mot. at 36-37. DHS dismisses as irrelevant (at 23) the fact that it formerly invited the public to report "violations" of the Mayorkas Memo policy—but overlooks its own sound concession just two pages earlier that courts should consider how "the agency has applied the guidance." *See also, e.g.*, *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (asking whether the agency action "is applied by the agency in a way that indicates it is binding" and "thus meet[s] the second prong of *Bennett*"); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000) ("If an agency acts as if a document issued at headquarters is controlling in the field" or "bases enforcement actions on the policies … in the document, … then the agency's document is for all practical purposes 'binding.'").

DHS appears to suggest (at 23) that enforcement actions at sensitive locations have skyrocketed not because of the 2025 Policy but because of increased enforcement generally—but fails to offer a scintilla of evidence that the wave of recent enforcement actions involved exigent circumstances or would otherwise have been allowed under the Mayorkas Memo. Finally, DHS says (also at 23) that the policy is unreviewable because it "explain[s] how the agency will exercise

its enforcement discretion"—but ignores that the agency did so in ways that bound its agents, and thus determined rights and obligations and created legal consequences. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 808 (2022) (agency policy that "bound DHS staff" was final agency action); *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) ("[A]n agency's adoption of a general enforcement policy is subject to review."); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) (an agency's "cabining of [its] prosecutorial discretion can in fact rise to the level of a substantive, legislative rule" subject to review).

Rather than address these flaws in its legal arguments, DHS focuses (at 22-23) on attacking the declarations of two former DHS officials describing the formulation and implementation of the Mayorkas Memo. Exs. 6, 7. The Court need not resolve any of these arguments to grant summary judgment to Plaintiffs, however, because although the declarations clearly support Plaintiffs' case, they are not essential to it. If the Court does address DHS's arguments, it should reject them.

DHS argues (at 22) that the declarations cannot be considered because they are outside the administrative record. *See generally City of Taunton, Mass. v. EPA*, 895 F.3d 120, 127 (1st Cir. 2018) ("[W]hen reviewing an agency's decision under the arbitrary and capricious standard, the focal point for judicial review should be the administrative record" (quotation marks omitted)). But it is well established that the Court retains discretion to look beyond the administrative record where, as here, doing so will "facilitate [its] comprehension of the record or the agency's decision." *City of Taunton*, 895 F.3d at 127; *see also Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097, 2025 WL 2281864, at *1 (D.R.I. Aug. 8, 2025) (applying this exception). Moreover, the declarations have relevance not only for Plaintiffs' arbitrary and capricious claim but for Plaintiffs' standing to challenge the 2025 Policy (for example, by demonstrating how much more restrictive the former policy was). The Court is not confined to the administrative record in

assessing its own Article III jurisdiction. *See, e.g.*, *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) ("When the petitioner's standing is not self-evident, … the petitioner *must* supplement the record" (emphasis added)).

DHS also claims (at 22 n.10) that certain statements in the declarations constitute "inadmissible expert testimony"—specifically, the declarants' statements that agents did not have discretion to ignore the Mayorkas Memo, Ex. 6 ¶ 7; Ex. 7 ¶ 13, and that the 2025 Policy represents a significant change from the Mayorkas Memo, Ex. 6 ¶ 11; Ex. 7 ¶ 20. But a fact witness may testify as to how a document was understood or implemented in practice without thereby offering prohibited expert legal opinion on the ultimate meaning of the document. *See Pa. State Univ. v. Vintage Brand, LLC*, 755 F. Supp. 3d 563, 585 (M.D. Pa. 2024) (prohibiting witness from "testify[ing] as to what the law is or what it requires" but allowing him to "testify as to his personal belief regarding … what he was legally required to do"); *L.V. Nagle & Assocs., Inc. v. Tubular Steel, Inc.*, 662 F. Supp. 3d 769, 773 (E.D. Mich. 2023) (declining to "preclude any witness with personal knowledge … from testifying about how the contract was executed or implemented"). At minimum, the Court can consider these statements as showing how high-ranking DHS officials themselves understood the Mayorkas Memo, which is relevant to assessing how "the agency has applied the guidance," *see* Cross-Mot. at 21. Indeed, DHS concedes as much (at 23), acknowledging that the declarations show that the agency "intended DHS officers to follow" the Mayorkas Memo. Furthermore, even if DHS were correct about the particular statements to which it objects, that would have no bearing on the Court's ability to consider the numerous *other*, plainly factual statements in the declarations about which the declarants had firsthand knowledge—for example, that agents would have received trainings on the Mayorkas Memo, Ex. 6 ¶ 10, and that ICE investigated allegations that its agents had "violated" the sensitive locations policy, Ex. 7 ¶ 9.

DHS falls back (at 22) on a request to depose the declarants and submit supplemental briefing if the Court intends to consider the declarations. That request is procedurally improper and substantively unjustified. DHS previously negotiated and jointly proposed a schedule under which the parties agreed to forgo discovery and proceed directly to summary judgment, ECF No. 86 at 2, knowing full well that its prior implementation of the Mayorkas Memo was a key point of dispute, *see, e.g.*, ECF No. 57 at 21. That DHS may now regret that strategic choice is no reason for the Court to unwind it or delay ultimate resolution of this case, particularly while many Plaintiffs are unprotected by the preliminary injunction.

Nor has DHS made any effort to comply with Rule 56(d), which requires that a nonmovant alleging that "facts are unavailable to [it]" must "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Such party must meet other requirements too, including but not limited to "show[ing] good cause for the failure to discover the necessary facts sooner" and "establish[ing] that the sought facts, if found, will influence the outcome of the pending motion." *Morrison v. Yum! Brands, Inc.*, 53 F. Supp. 3d 437, 440 (D. Mass. 2014) (quoting *Adorno v. Crowley Towing and Transp. Co.*, 443 F.3d 122, 127 (1st Cir. 2006), and listing additional requirements). DHS did none of these things. The Court therefore can readily dismiss the agency's belated and unjustified request for discovery.[4]

**2. The policy is not committed to agency discretion by law.**

DHS next seeks shelter (at 24-26) in the APA's exception for actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception, however, applies "quite narrowly," and

[4] If the Court were otherwise inclined to allow the depositions, Plaintiffs would prefer to simply withdraw reliance on the two declarations rather than delay proceedings for discovery and supplemental briefing—particularly given that Plaintiffs are entitled to summary judgment even without the declarations and many Plaintiffs continue to suffer ongoing irreparable injury.

only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). Meaningful standards sufficient to enable judicial review can come not only from statutes but from the agency itself: "[A]gencies … frequently cabin their own discretionary … determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions under the APA." *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 76-78 (D.D.C. 2018); *see also California v. Dep't of Educ.*, 132 F.4th 92, 97 (1st Cir.) ("applicable regulations cabin the Department's discretion"), *stay granted on other grounds*, 604 U.S. 650 (2025). For constitutional claims to be deemed unreviewable under this exception, the government must identify a clear statement by Congress of its intent to preclude review. *Webster v. Doe*, 486 U.S. 592, 603 (1988).

DHS identifies no clear statement of congressional intent to preclude review. And meaningful standards to guide that review can be found in RFRA and the First Amendment, as well as in DHS's own prior sensitive locations policy. RFRA broadly prohibits the government from burdening religious exercise, and by its terms "applies to all Federal law, *and the implementation of that law*, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a) (emphasis added). It and the First Amendment provide meaningful standards against which to judge the 2025 Policy. *Phila. Yearly Meeting II*, 2026 WL 280089, at *8 (so concluding in holding that "the 2025 Policy, as a general enforcement policy … , is not committed to agency discretion by law"). Indeed, DHS expressly acknowledges its obligations to "abide by … RFRA and the First Amendment when taking enforcement actions." Cross-Mot. at 11; *see also* Ex. 95 at 9 (reminding agencies that "agency-wide enforcement rules and priorities" must comply with RFRA and warning that officials

may be held liable in court for failing to do so). DHS cannot at the same time contend that, "effectively, there is no law to apply" here. Cross-Mot. at 24 (quotation marks omitted). So too, DHS's prior sensitive locations policy, which recognized the burdens on religious practice from unrestrained enforcement, constitutes a "binding polic[y] that provide[s] meaningful standards for a court to employ when reviewing agency decisions." *See Pol'y & Rsch.*, 313 F. Supp. 3d at 76-78. DHS therefore fails to fit this case into the exceedingly narrow exception it invokes.

None of DHS's cited authorities are to the contrary. Relying on *Arizona v. United States*, 567 U.S. 387, 396 (2012), and the Immigration and Nationality Act, it suggests (at 24-25) that no policy involving "enforc[ement of] the Nation's immigrations law" can be subject to APA review. That startling claim is contradicted by countless cases subjecting such policies to APA review. *See, e.g.*, *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 190-92 (D. Mass. 2025) ("*AAUP*"). It ignores that RFRA, the First Amendment, and the prior sensitive locations policy provide "law to apply" in judging the 2025 Policy. And it erroneously assumes that the mere grant of broad discretion is enough to foreclose judicial review. *But see Dep't of Com.*, 588 U.S. at 771 (noting that statute "confers broad authority on the Secretary" while still holding the Secretary's action reviewable); *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020) ("Nor does the fact that the statute leaves a great deal of discretion to the agency … make actions taken pursuant to it unreviewable.").

DHS next reprises (at 25) its erroneous reading of *United States v. Texas*, 599 U.S. 670 (2023). As explained, that case involved a novel challenge to alleged *under*-enforcement and is "categorically different" from this case. *See id.* at 684-85. It is simply not accurate to describe *Texas* as having "emphasized … that lawsuits like this one challenging agency immigration enforcement policies 'run up against the Executive's Article II authority to enforce federal law,'"

Cross-Mot. at 25 (quoting *Texas*, 599 U.S. at 678), as the decision itself confirms.

The remaining authorities that DHS musters (at 24-26) are similarly unavailing. Most do not involve the APA exception for actions "committed to agency discretion by law" at all, but instead stand for, at most, the proposition that individual enforcement decisions can involve discretion. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999); *JGE ex rel. Tasso v. United States*, 772 F. App'x 608 (10th Cir. 2019); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1986); *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800 F.2d 1514 (9th Cir. 1986). And *Heckler v. Chaney*, 470 U.S. 821 (1985), is worlds apart from this case because it: (1) concerned the reviewability of "single-shot" enforcement determinations, not general policies like the one here, *see id.* at 832, 833 n.4; *OSG Bulk Ships*, 132 F.3d at 812 (distinguishing *Heckler* on this basis); (2) involved "a decision *not* to institute enforcement proceedings," *Dep't of Com.*, 588 U.S. at 772 (emphasis added), a choice not implicated here; and (3) expressly reserved judgment on whether its holding would apply to a claim that the agency had acted contrary to constitutional right, 470 U.S. at 838. *See also Phila. Yearly Meeting II*, 2026 WL 280089, at *6-7 (distinguishing *Heckler* on similar grounds).

**3. The policy is unlawful under the APA.**

DHS does not dispute (at 28) that, if the 2025 Policy violates RFRA and the First Amendment, then it is contrary to law and constitutional right. *See also* Mot. at 37-38. DHS does dispute (at 26-28) that the policy is arbitrary and capricious, but it is unable to show that the policy meets even the basic standards of rational decisionmaking required by the APA.

As Plaintiffs have explained, Mot. at 38, DHS failed to provide any substantive explanation at all when it rescinded the Mayorkas Memo. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024) ("An agency action qualifies as 'arbitrary' or 'capricious' if it is not … reasonably explained." (quotation

marks omitted)). Nor can any rationale be gleaned from the meager administrative record, which only confirms that DHS acted without sound basis. *See* ECF Nos. 90-1, 90-3. Resisting this conclusion, DHS claims (at 27) that it "adequately explained its reasons." That "explanation," however, boils down to the conclusory assertion in the Huffman Memo that "[i]t is not necessary … to create bright line rules regarding where our immigration laws are permitted to be enforced." Ex. 8. To accept that kind of bare *ipse dixit* as "reasonable explanation" would render the APA's requirements a dead letter—"because" is not a reason. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." (quotation marks omitted)); *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 46 (D.R.I. 2025) ("[C]onclusory statements do not 'reasonably' explain agency action.").

That lack of reasoned explanation is even more glaring given that the agency was departing radically from a decades-long bipartisan consensus that immigration enforcement should and must be restrained at sensitive locations. As DHS admits, when an agency changes a policy, it must explain why "there are good reasons for [the change]." Cross-Mot. at 26 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). DHS is notably unable, however, to point to anything in its 2025 Policy identifying "good reasons" for the agency's new "no rules" approach toward houses of worship. Such "an abrupt reversal of course … with no explanation" is "quintessential arbitrary action." *See AAUP*, 802 F. Supp. 3d at 192.

The 2025 Policy is also arbitrary and capricious because DHS entirely ignored "an important aspect of the problem" before it: the obvious and significant harm its new policy would have on the exercise of fundamental rights of religion and association. Mot. at 38; *see also AAUP*, 802 F. Supp. 3d at 192 (faulting agency for failing to explain its new policy of "using statutes in new and constitutionally suspect ways" that burdened fundamental rights). DHS does not dispute

that these predictable harms to fundamental rights are an important aspect of the problem. Nor could it, especially when the administration itself recently reminded agencies of the importance of "consider[ing] RFRA when setting agency-wide enforcement rules and priorities." *See* Ex. 95 at 9. DHS can only observe (at 27) that "for decades" federal immigration authorities *did* take steps to consider these important interests, as reflected, for example, in the Mayorkas Memo. The fact that DHS once took steps to lessen burdens on religious practice does nothing to show that the agency adequately considered those interests when it abruptly changed course—just the opposite.

Relatedly, DHS was required to—and did not—consider the sizeable reliance interests that the prior sensitive locations policy had engendered. Mot. at 38-39. DHS appears to dispute (at 27-28) that it was under any obligation to consider these interests, citing irrelevant factual distinctions between this case and *DHS v. Regents of the University of California*, 591 U.S. 1 (2020). But that case emphasized a broadly applicable rule that "[w]hen an agency changes course, … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account" and that "[i]t would be arbitrary and capricious to ignore such matters." *Id.* at 30; *see also, e.g.*, *New York v. Trump*, 171 F.4th 1, 24 (1st Cir. 2026) (applying same rule in starkly different context). DHS's argument (at 28) that any reliance interests would be unreasonable, and therefore it did not have to consider them, is identical to an argument the agency made—and the Supreme Court squarely rejected—in *Regents*. *See* 591 U.S. at 30-32 (holding that whether reliance on prior policy was warranted is "surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to normal APA review"). The government simply repeats the same argument here, without noting that directly contrary Supreme Court precedent. *See also Woonasquatucket River Watershed Council v. Dep't of Agric.*, --- F.4th ----, 2026 WL 2279789, at *13 (1st Cir. Aug. 7, 2026) (rejecting

same argument as foreclosed by *Regents*). That dubious gambit does nothing to excuse the agency's conceded failure to consider reliance interests when adopting the 2025 Policy.

### F. The Court should enter a permanent injunction as well as declaring unlawful and vacating the 2025 Policy.

Plaintiffs' motion explained why the Court should enter a permanent injunction and declare unlawful and set aside the 2025 Policy, and why injunctive relief should apply even where DHS issues itself an administrative warrant. Mot. at 39-40. DHS fails to show why such relief is not appropriate and necessary. In addition, DHS has since revealed in communications with Plaintiffs' counsel that it reads the Court's preliminary injunction to authorize arrests in churches even outside of "true emergencies," *cf.* PI Op. at 61; the Court should clarify in its permanent injunction that such enforcement is authorized only in genuinely exigent circumstances.

#### 1. Permanent injunctive relief is needed to provide complete relief.

DHS's arguments against permanent injunctive relief lack merit. DHS asserts without elaboration (at 37) that vacatur would provide Plaintiffs with "complete relief," and therefore that an injunction is unnecessary. But further relief is appropriate where vacatur alone is not "sufficient to redress respondents' injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010) (cited in Cross-Mot. at 37); *see also* 5 U.S.C. § 703 (APA claimants may pursue "actions for declaratory judgments or writs of prohibitory or mandatory injunction"); 42 U.S.C. § 2000bb-1(c) (RFRA claimants may "obtain appropriate relief against a government"). Such is the case here. As the Court previously found, simply returning to the Mayorkas Memo would leave DHS free to carry out "law-enforcement operation[s] to enforce the immigration laws inside a church," even where no emergency exists, based only on supervisory approval. PI Op. at 61. An injunction is necessary to prevent that and similar unjustified intrusions on Plaintiffs' fundamental rights that could result if the Court limited its remedy to vacatur.

An injunction is also justified by administrability concerns. As the Court previously explained, an order that merely returned to the status quo ante could create challenges for the agency to implement and the Court to oversee, as needed. *Id.* at 59-61. A permanent injunction that provides the specificity required by Rule 65(d) resolves that issue and, in doing so, provides fuller protections for Plaintiffs. An injunction also prevents DHS from simply re-adopting the 2025 Policy in substantially similar form, which it might do if the Court's remedy were limited to vacatur. *See, e.g.*, *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024) ("Given that the Department has enacted similar guidance in the past and may attempt to do so again … , a broader injunction is necessary to provide complete relief."); *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 376-77 (N.D. Tex. 2021) (granting permanent injunction in RFRA case after agency re-adopted materially identical policy). For all these reasons, the requested injunction would have "meaningful practical effect independent of … vacatur." *Monsanto*, 561 U.S. at 165.

DHS next contends (at 38) that, if the Court does enter an injunction, the order should be limited to reinstating the Mayorkas Memo. But the Court already explained why it could not do so consistent with Rule 65(d). PI Op. at 59-61. DHS ignores that conclusion and gives the Court no reason to depart from it now. DHS is also incorrect that Plaintiffs have not alleged the need for an injunction that goes beyond the Mayorkas Memo. *See* Cross-Mot. at 38; *but see* Mot. at 39 (asking Court to "mak[e] permanent the bulk of the provisions the Court ordered in its preliminary injunction, which already has helped ameliorate the harms of Defendants' policy").

**2. The Court should clarify the meaning of "exigent circumstances."**

As the Court explained in its preliminary injunction opinion, it "can conceive of no circumstance, outside of a true emergency, in which a law-enforcement operation to enforce the immigration laws inside a church would be justifiable under the First Amendment and RFRA."

PI Op. at 61. Accordingly, the Court specified that Exigent Circumstances arise only when there is an "immediate threat to human life or safety." PI Order ¶ 1.j.

Since Plaintiffs filed their motion for summary judgment, undersigned counsel has learned through correspondence with government counsel that DHS takes the position that a person's simply fleeing on foot from DHS agents poses an "immediate threat to human life or safety" that would authorize immigration enforcement in or near Protected Areas, unless the person has previously been searched and found unarmed. Under this interpretation, DHS agents could follow a fleeing person into a church regardless of the agents' basis (or lack thereof) for trying to stop that person, and without any affirmative reason to believe the person is armed or dangerous. DHS essentially presumes that someone who flees is dangerous unless proven otherwise—a view that does not hold up even in the criminal context. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (flight is "not necessarily indicative of wrongdoing"); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (concluding that apparently unarmed burglar who fled on foot "pose[d] no immediate threat to the officer and no threat to others"). The mere fact that someone flees when approached by immigration agents is simply not a "true emergency," let alone one that threatens human life or safety. The Court should specify as much by clarifying in its permanent injunction that "exigent circumstances" require specific, affirmative reason to believe a person or situation poses an immediate threat to human life or safety, and that such standard is not met just because someone flees on foot when approached by immigration agents.

**3. The Court should declare unlawful and vacate the 2025 Policy.**

DHS does not specifically address and therefore has waived any opposition to Plaintiffs' request for declaratory relief. *See, e.g.*, *Brox v. Woods Hole*, 164 F.4th 37, 43 (1st Cir. 2026) (holding that arguments not raised in opposition brief are deemed waived; collecting cases).

With respect to vacatur, DHS argues (at 36-37) only that vacatur is barred by 8 U.S.C. § 1252(f)(1), which prohibits relief that would "enjoin or restrain the operation of" 8 U.S.C. §§ 1221-32. As explained immediately below, none of Plaintiffs' requested relief has any more than a collateral effect on the operation of Sections 1221-32, so the bar in Section 1252(f)(1) is not implicated at all. Even if it were, DHS fails to muster (and Plaintiffs have been unable to identify) a single case accepting DHS's claim that vacatur imposes a "restrain[t]" within the meaning of Section 1252(f)(1). *Cf.* Cross-Mot. at 37 n.13 (acknowledging that the Fifth and Ninth Circuits have rejected versions of this argument); *RAICES v. Mullin*, 174 F.4th 81, 119 (D.C. Cir. 2026) (also rejecting this argument). DHS's view, moreover, is foreclosed by *Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003), which squarely held that the word "enjoin" in Section 1252(f)(1) refers to "permanent injunctions" and the word "restrain" refers "to temporary injunctive relief," such as a stay of removal. *See also Brito v. Garland*, 22 F.4th 240, 250-52 (1st Cir. 2021) (reading Section 1252(f)(1) narrowly and holding it does not apply to declaratory relief even though it "can sometimes have much the same practical effect as injunctive relief").

**4. Injunctive relief should not carve out administrative warrants.**

Section 1252(f)(1) does not limit the Court's ability to enter Plaintiffs' requested injunction because that injunction would not affect DHS's authority to *issue* an administrative warrant under Section 1226(a), but only where such a warrant could be *executed* under Section 1357(a). *See* Mot. 39-40. "There is a clear distinction between the authority to issue warrants under § 1226(a) and the one to execute arrests under § 1357." *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 985 (C.D. Cal. 2024). DHS dismisses *Kidd* (at 39 n.15) as having ignored "Section 1357's unambiguous text." But it is DHS that ignores the statute's text, which expressly authorizes immigration agents to

"execute and serve any ... warrant." 8 U.S.C. § 1357(a).[5] Indeed, DHS's own regulations recognize the same distinction made in *Kidd*: They authorize officers "to exercise the power pursuant to [Section 1357(a)] to *execute* warrants of arrest ... *issued* under [Section 1226]." 8 C.F.R. § 287.5(e)(3) (emphasis added); *see also id.* § 287.5(e)(1) (authorizing officers to "exercise the power conferred by [Section 1357(a)] to execute a search warrant"). DHS cites this provision (at 39-40) but ignores its relevant language, even after Plaintiffs highlighted it, Mot. at 40.

DHS's cases do not help its argument. *Brito v. Garland* concerned Section 1226(a)'s express grant of discretion to the government "to 'continue to detain [a noncitizen]' pending removal or to 'release [them] on … bond … or … parole.'" 22 F.4th at 249 (quoting Section 1226(a)). The court held that an injunction that directly constrained that discretion (by imposing new requirements before the government could detain people pending removal) "restrains the operation of section 1226(a) by requiring something that the statute itself does not require." *Id.* at 250. As explained, however, Section 1226(a) confers authority to *issue* administrative warrants. The injunction requested here adds no new requirements to the exercise of that authority and so—unlike in *Brito*—does not restrain Section 1226's operation.

[5] It is irrelevant that Section 1357(a), as compiled in the U.S. Code, bears the subheading "Powers without warrant." While Section 1357(a) authorizes immigration agents to take certain actions without warrants, it also unambiguously authorizes them to "execute and serve … warrant[s]"—the point at issue here. The subheading is also not actually part of the text enacted by Congress but was added later by code editors. *See* Pub. L. No. 82-414, § 287(a), 66 Stat. 163, 233 (Jun. 27, 1952) (no subheading); *Detailed Guide to the United States Code Content and Features*, Office of the Law Revision Counsel at II.A—Headings, https://perma.cc/3PYJ-V3PA ("[I]n some cases, such as where there are no headings in the original act ..., the Code editors will provide or modify headings for the Code section."). Thus, even assuming any inconsistency between the subheading and the statutory authorization to execute warrants, the statutory authorization would control. *See United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("[T]he Code cannot prevail over the Statutes at Large when the two are inconsistent.").

*Abel v. United States*, 362 U.S. 217 (1960), is even further afield. That case, which addressed the distinction between administrative and judicial warrants, did not consider Section 1252(f)(1) at all—likely because it issued 36 years before Section 1252(f)(1) was even enacted, *see* Pub. L. No. 104-208, § 306(a), 110 Stat. 3009, 3009-611 (Sept. 30, 1996). And *Arizona v. United States*, 567 U.S. 387 (2012), is affirmatively helpful to Plaintiffs, not the government. That decision described Section 1226(a)—consistent with Plaintiffs' position and DHS's regulations—as empowering the government "*to issue* a warrant" for arrest pending removal proceedings. *Id.* at 407 (emphasis added). It separately discussed the "execut[ion]" of such warrants, *id.* at 408 (citing 8 C.F.R. § 287.5(e)(3)), which then as now distinguished between issuing warrants under Section 1226(a) and executing them under Section 1357(a).

Finally, *N.S. v. Dixon*, 141 F.4th 279, 289 (D.C. Cir. 2025), concerned an injunction that barred U.S. Marshals from making *any* immigration arrests, including but not only arrests pursuant to an administrative warrant. The breadth of that injunction distinguishes it from the relief sought here, which as explained would have no more than a collateral effect on the operation of Section 1226(a). The decision also addresses neither the distinction between issuing and executing warrants recognized by both *Kidd* and DHS's regulations, nor the express grant of authority in Section 1357(a) to execute warrants; it is therefore of limited persuasive value here. Further, DHS errs in describing (at 40) the decision as having "explained that 8 C.F.R. § 287.5(e)(3)" is authorized by 8 U.S.C. §§ 1226 and 1231. In fact, the decision said that of a different regulation—8 C.F.R. Part 236. *Dixon*, 141 F.4th at 289.

## II. The Court should deny DHS's motion to sever.

All Plaintiffs in this matter are properly joined, and DHS has provided no basis for severing the ten Plaintiffs it identifies.[6] In June, Plaintiffs amended their complaint and added these new parties, as well as the Southern New England Conference of the United Church of Christ. *See* First Amended Complaint ("FAC"), ECF No. 97; *see also* ECF No. 91 (adopting parties' jointly proposed schedule for Plaintiffs to file amended complaint); Fed. R. Civ. P. 15(a) (authorizing Plaintiffs in these circumstances to "amend [their] pleading once as a matter of course"). To keep proceedings on track to a prompt resolution and to avoid potentially duplicative motions practice, Plaintiffs did not seek a preliminary injunction for these additional Plaintiffs.

Joinder is appropriate here because all Plaintiffs "assert [the] right to relief jointly … with respect to … the same … occurrence" and there are "question[s] of law or fact common to all plaintiffs" in the action. Fed. R. Civ. P. 20(a)(1). All Plaintiffs assert identical claims challenging the same government policy, and all Plaintiffs seek identical relief. *See generally* FAC. Moreover, nine of the ten newly added plaintiffs DHS seeks to dismiss are regional bodies of the same national organization—the ELCA—to which five of the original plaintiffs belong.

DHS has not identified any plausible prejudice from the addition of these plaintiffs. It contends (at 6-8) that a permanent injunction that applies to those plaintiffs will be "burdensome," but that claim is unpersuasive. First, DHS complains (at 6) about alleged complexity stemming from Plaintiffs' "diverse religious practices," but the only example it can muster (citing, at 6, evidence from Plaintiffs DHS does *not* seek to sever) is that some Plaintiffs "participate in community outreach programs" and some may not. That is no obstacle to the Court fashioning

[6] These plaintiffs are District of Columbia Baptist Convention and the Metropolitan New York, Northwest Washington, Minneapolis Area, Delaware-Maryland, Metro D.C., Southeastern, Metropolitan Chicago, Pacifica, and Upstate New York Synods of the ELCA.

relief, as the existing preliminary injunction demonstrates. Nor would this supposed problem be solved by the relief DHS requests. Nine of the ten Plaintiffs it asks to sever are ELCA synods, and the tenth is a regional Baptist organization; their beliefs do not differ in any material way from the ELCA and Baptist Plaintiffs who would remain in this case even if DHS got its way.

Second, DHS suggests (at 6-7) that the Court may have difficulty policing what areas should be covered by a permanent injunction. But the Court already effectively dealt with this issue in its preliminary injunction by establishing a process by which Plaintiffs designate Protected Areas, with modifications to be negotiated by the parties in the first instance. *See* PI Order ¶¶ 7-9. That system has functioned without difficulty now for over six months. *See, e.g.*, ECF No. 96 (submitting revised list of locations after conferral and agreement of the parties). Moreover, DHS's claims (at 7) about the difficulty of "drawing the line between religious and non-religious conduct" make little sense when DHS has (correctly) made no attempt to draw such lines in its briefing. *Cf.* Ex. 95 at 5 ("Religious adherents must often draw lines in application of their religious beliefs, and government is not competent to assess the reasonableness of such lines"). Third, DHS's claim that it will be prejudiced if enjoined from violating these additional Plaintiffs' rights disregards that "the government is not harmed by an injunction enjoining it from implementing an unlawful or unconstitutional policy, because the government has no legitimate interest in following such a policy." PI Op. at 55. DHS, in short, has not come close to overcoming the "strong presumption in favor of the plaintiff's choice of forum." *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000).

In contrast, severance would substantially prejudice Plaintiffs. Under DHS's theory, the ten Plaintiffs the government focuses on would have to file in multiple different judicial districts, drastically expanding the number of lawsuits litigating the same issue, requiring a much greater expenditure of party and judicial resources, and allowing for the possibility of inconsistent

judgments. That would also come with significant delays in securing relief for these Plaintiffs for ongoing injuries, whereas this case is already on the cusp of final judgment.

Defendants hint darkly (at 8) at Plaintiffs' "motivation" for filing in this District, but it is hardly surprising that Plaintiffs all challenging the same federal government policy would prefer to pursue these efforts in a single case rather than in separate lawsuits in multiple judicial districts. Most Plaintiffs are regional bodies of the same national religious organization and are necessarily geographically distinct. Federal joinder rules aim "'to achieve judicial economies of scale by resolving related issues in a single lawsuit,' while at the same time preventing 'the single lawsuit from becoming fruitlessly complex or unending,'" and "seek[ing] to involve 'as many apparently concerned persons as is compatible with efficiency and due process.'" *Pujol v. Shearson/Am. Express*, 877 F.2d 132, 134 (1st Cir. 1989) (quoting *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969)). Adding the new plaintiffs achieves all of these goals: "concerned persons" are joined in a single action, economies of scale are gained by consolidating claims in one case, and there has been no delay or additional complexity from new claims or theories asserted by the new parties.[7]

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion for summary judgment, deny DHS's cross-motion for summary judgment, and deny DHS's motion to sever.

---

[7] While DHS claims it would be prejudiced by joinder of these ten Plaintiffs, it correctly does not contend that venue in this District is improper. DHS thus has waived any such claim. *See, e.g.*, *Brox*, 164 F.4th at 43. Such claim would, in any event, be both untimely under the Federal Rules, *see, e.g.*, *Plunkett v. Valhalla Inv. Servs., Inc.*, 409 F. Supp. 2d 39, 41 (D. Mass. 2006) (citing Fed. R. Civ. P. 12(h)); *Getty Petroleum Mktg., Inc. v. 2211 Realty, LLC*, No. 11-cv-40003, 2011 WL 2489988, at *3 (D. Mass. June 17, 2011) (same), and wrong on the merits, *see, e.g.*, *Sidney Coal Co. v. SSA*, 427 F.3d 336, 343-45 (6th Cir. 2005) (venue proper where at least one plaintiff resides in district); *Doe v. Trump*, 766 F. Supp. 3d 266, 273 n.4 (D. Mass. 2025) (same); *cf. Massachusetts v. Dep't of Educ*., 828 F. Supp. 3d 198, 202 (D. Mass. 2026) (resolving request for preliminary relief filed by 17 plaintiffs, only one of which resides in this District).

Dated: August 27, 2026

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl*
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Mark B. Samburg
Ayesha Khan*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
kfriedl@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
msamburg@democracyforward.org
akhan@democracyforward.org

Ryan Downer*
Madeleine Gates*
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org

Richard J. Leveridge*
Sonia W. Murphy*
Brandon A. Levey*
Samone Ijoma*
Brittney M. Welch*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Leveyb@gilbertlegal.com
Ijomas@gilbertlegal.com
Welchb@gilbertlegal.com

*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

On August 27, 2026, I served the foregoing on all parties by electronically filing it through the CM/ECF system.

*/s/ Kevin E. Friedl*
Kevin E. Friedl