**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

NEW ENGLAND SYNOD, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants

Civil Action No. 4:25-cv-40102-FDS

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE**

## TABLE OF CONTENTS


BACKGROUND .......... 1

LEGAL STANDARD .......... 6

ARGUMENT .......... 6

I. The HSI Investigations Were Not Immigration Enforcement Because They Were Planned and Performed to Enforce Criminal—Not Immigration—Laws. .......... 6

II. Plaintiffs' Interpretation of the Preliminary Injunction Is Overbroad. .......... 8

A. HSI agents have authority to enforce non-immigration laws. .......... 9

B. The University Baptist Church investigations were not undertaken "in part" to enforce immigration laws. .......... 10

C. It is speculative whether the Mayorkas Memorandum would have covered the investigation at University Baptist Church. .......... 12

D. RFRA does not prevent the undercover investigations at University Baptist Church. .......... 13

E. Plaintiffs' interpretation of the Preliminary Injunction would frustrate legitimate law enforcement activity. .......... 17

III. Plaintiffs Have Not Demonstrated They are Entitled to Attorney-Client Communications. .......... 18

IV. HSI Considered This Court's Preliminary Injunction. .......... 19

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

## Cases

*Alliance to End Repression v. City of Chicago*,
742 F.2d 1007 (7th Cir. 1984) .......... 16, 17, 18

*Bacchi v. Massachusetts Mut. Life Ins. Co.*,
110 F. Supp. 3d 270 (D. Mass. 2015) .......... 19

*Banco Do Brasil, S.A. v. 275 Washington St. Corp.*,
*No. CIV.A. 09-11343-NMG*, 2011 WL 3208027 (D. Mass. July 27, 2011) .......... 19

*Blattman v. Scaramellino*,
891 F.3d 1 (1st Cir. 2018) .......... 18

*Bostock v. Clayton County, Georgia*,
590 U.S. 644 (2020) .......... 11

*Hawkins v. Dep't of Health & Hum. Servs. for New Hampshire, Com'r*,
665 F.3d 25 (1st Cir. 2012) .......... 6, 19

*Horton v. California*,
496 U.S. 128 (1990) .......... 15

*Goya Foods, Inc. v. Wallack Mgmt. Co.*,
290 F.3d 63 (1st Cir. 2002) .......... 6

*McCullen v. Coakley*,
573 U.S. 464 (2014) .......... 16

*New Eng. Synod v. DHS*,
824 F. Supp. 3d 118 (D. Mass. 2026) .......... *passim*

*Open Software Found., Inc. v. U.S. Fid. & Guar. Co.*,
191 F.R.D. 325 (D. Mass. 2000) .......... 18

*Presbyterian Church (U.S.A.) v. United States*,
752 F. Supp. 1505 (D. Ariz. 1990) .......... *passim*

*Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989) .......... 13

*United States v. Aguilar*,
883 F.2d 662 (9th Cir. 1989) .......... 14

*United States v. Knotts*,
460 U.S. 276 (1983) .......... 15

*United States v. Mayer*,
503 F.3d 740 (9th Cir. 2007) .......... 14

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947) .......... 6, 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579–8 (1952) .......... 10

**Statutes**

6 U.S.C. § 111 .......... 9
6 U.S.C. § 203 .......... 9
8 U.S.C. § 1357 .......... 9, 10
8 U.S.C. §§ 1101–1537 .......... 7
8 U.S.C. §§ 1151–1363a .......... 7
8 U.S.C. §§ 1401–1504 .......... 7
8 U.S.C. §§ 1521–24 .......... 7
8 U.S.C. §§ 1531–37 .......... 7
18 U.S.C. § 111 .......... 7
18 U.S.C. § 115 .......... 7
18 U.S.C. § 372 .......... 7
18 U.S.C. § 373 .......... 7
18 U.S.C. § 1361 .......... 7
18 U.S.C. § 2261A .......... 7
18 U.S.C. § 2510 .......... 9
18 U.S.C. § 3052 .......... 9
19 U.S.C. § 1589a .......... 9
42 U.S.C. § 2000bb-2 .......... 17
42 U.S.C. § 2000cc-5 .......... 17

**Administrative Materials**

90 Fed. Reg. 8443 (Jan. 20, 2025) .......... 10
90 Fed. Reg. 47225 (Sept. 30, 2025) .......... 10

**Other Authorities**

Homeland Security Investigations, *What We Investigate*,
https://perma.cc/AD2M-J5LW .......... 10

Homeland Security, *Cyber Crime Cases: How ICE's Cyber Crimes Center Identifies Child Victims*, https://perma.cc/L77L-LEN5 .......... 10

## INTRODUCTION

The Court should deny Plaintiffs' Motion For Order to Show Cause. The investigation at University Baptist Church was not an Immigration Enforcement Action as defined by the Preliminary Injunction. Plaintiffs' interpretation of the Preliminary Injunction is overbroad and unsupported. Plaintiffs have not shown they are entitled to attorney-client communications. Furthermore, Defendants considered the Preliminary Injunction and reasonably determined it did not apply to the criminal investigations at University Baptist Church.

## BACKGROUND

**The Preliminary Injunction.** The Court issued a Preliminary Injunction on February 13, 2026. PI Or., ECF No. 75 (hereafter "PI Or."). In relevant part, the Preliminary Injunction forbids Defendants from taking an Immigration Enforcement Action In a Protected Area absent Exigent Circumstances, ¶ 2, and from taking an Immigration Enforcement Action Near a Protected Area absent Exigent Circumstances or Prior Approval, *id.* ¶ 3. The Court defined the following terms:

- Defendants are the United States Department of Homeland Security ("DHS") and all of its officers, agents, employees, and appointees. *See id.* ¶ 1(b).

- Immigration Enforcement Action is "any action by Defendants that is planned, conducted, undertaken, or executed, in whole or in part, to enforce the immigration laws of the United States, including any arrest, seizure, search, interrogation, questioning, interview, or investigation." *Id.* ¶ 1(i).

- Protected Area means "Places of Worship, Adjacent Protected Facilities, and Adjacent Protected Areas." *Id.* ¶ 1(f); *see also id.* ¶¶ 1(c), (d), (e).

- Near a Protected Area means "any location within 100 feet of any doorway, gate, or other clearly demarcated entrance to any Protected Area." *Id.* 1(h).

- Exigent Circumstances means "an immediate threat to human life or safety." *Id.* ¶ 1(j).

- Prior Approval means "approval by a supervisory law enforcement official at ICE or CBP headquarters in Washington, D.C. For purposes of this Preliminary Injunction, Prior Approval of an Immigration Enforcement Action shall only be given on an individualized basis, after consideration of the relevant facts and circumstances, and only after consideration of ways to minimize the possibility that the Immigration Enforcement Action will prevent, restrain, or discourage individuals from accessing the relevant Place of Worship." *Id.* ¶ 1(k).

The Court issued the Preliminary Injunction to protect Plaintiffs' religious practice under the Religious Freedom Restoration Act ("RFRA"). *New Eng. Synod v. DHS*, 824 F. Supp. 3d 118, 168 (D. Mass. 2026). It determined the 2025 Guidance likely violated RFRA because it could impose a substantial burden on Plaintiffs' religious exercise and was not the least restrictive means to further the government's compelling interest in immigration enforcement. *Id.*

**The Investigation at University Baptist Church.** DHS Homeland Security Investigations ("HSI") is a component of DHS Immigrations and Customs Enforcement ("ICE") and a Defendant in the above-captioned lawsuit. *See* Zappone Decl. ¶ 1. On February 11, 2026, HSI began Project Whipple Shield (hereafter the "Project"). The Project investigated individuals and organized networks who allegedly exploited incidents of demonstrations and civil unrest during Operation Metro Surge in the Minneapolis, MN area to engage in acts of violence, destruction of property, intimidation of federal officers and employees, and attempts to impede federal operations in violation of Title 18 of the U.S. Code. *Id.* ¶ 4. One of those groups was an organization calling itself "Twin Cities Direct Action" ("TCDA") which later changed its name to "Direct Action Minnesota" ("DAMN"). *Id.* The Project sought to investigate suspected criminal activity while continuing to safeguard the right of peaceful demonstrators and the public. *See, e.g.*, Ex. D at 1. The Project's purpose was not to enforce the immigration laws of the United States. Zappone Decl. ¶ 5. HSI will not use any materials or evidence obtained from Project Whipple Shield to enforce immigration laws. *Id.* ¶ 21.

The investigations at and in the vicinity of University Baptist Church sought evidence sufficient to indict Cam Kennedy, a.k.a. Olive Knite (hereafter "Kennedy"). *See id.* ¶ 6; *see also* Ex. D–G. Kennedy, a self-described revolutionary anarchist, had discussed operating a blockade on his street that stops ICE vehicles, Government's Consolidated Response to Defendant's Motion for Discovery under Rule 16, ECF No. 118-1 at 19 (hereafter "ECF No. 118-1"). He posted various messages on Facebook advocating violence against ICE agents. *Id.* at 25–6. He purchased a trailer and rented a 10-foot U-Haul in preparation to block the federal Whipple Building in Minneapolis. *Id.* at 34 n.12. At an April 18, 2026 speaking event, he discussed using shields to block one entrance of the Whipple Building. *Id.* He further discussed raising funds for various blockades of the Whipple Building. *Id.*

Kennedy was known to be one of the leaders of a group calling itself "Left Jab" that claimed to practice mixed martial arts and boxing. Zappone Decl. ¶ 6. Kennedy was encouraging members of DAMN that were involved in protest activity to attend the regularly scheduled "Left Jab" group trainings which were held in the basement of University Baptist Church. *Id.* These trainings prepared members to participate in "de-arrest" and "swarm" tactics. *Id.* De-arrest and swarm tactics are well-known tactics of "anti-fascist" affinity groups. *Id.* ¶ 7. They involve having multiple people "swarm" and physically "thwart" law enforcement personnel who are attempting to conduct a lawful arrest through overwhelming force. *Id.* They are characterized by direct physical and assaultive confrontations with law enforcement personnel—such as breaking handcuffs or zip ties or physically opening and assisting arrested persons to escape from secured police vehicles. *Id.*

On March 7, 2026, Kennedy sent a message to a chat group of DAMN members in which he posted a link to an online fundraiser for "Left Jab." He then stated that Left Jab was an "*anti-fascist Mixed Martial Arts training class"* that meets every Sunday afternoon and Monday night. *Id.* ¶ 8. On April 12, 2026, at approximately 10:30 AM, HSI agents began to surveil Kennedy at his last known address. *Id.* ¶ 9. Failing to observe Kennedy, agents attempted to locate him at a regularly scheduled

"Left Jab" training and departed for University Baptist Church at approximately 12:10 PM. *Id.* University Baptist Church is a Protected Area under the Preliminary Injunction. Am. Protected Areas List, ECF No. 96-1 at 160[1] (hereafter "ECF No. 96-1"). Agents observed three vehicles in the parking lot of the library located directly across the street from the Church, took photos of the vehicles, and ran registration checks on those vehicles. Zappone Decl. ¶ 9. The library parking lot is not a Protected Area. *See* ECF No. 96-1 at 160. Agents could not confirm whether the parking lot was not Near a Protected Area. PI Or. ¶ 1(h) (defining "Near a Protected Area as "within 100 feet of any doorway, gate, or other clearly demarcated entrance" to a Protected Area). Agents observed the four occupants of the three vehicles, joined by one other individual who was dropped off in front of the church, enter the basement of University Baptist Church and four of those five individuals depart after approximately two hours. Zappone Decl. ¶ 9. None of the individuals was Kennedy. *Id.*

On April 19, 2026, at approximately 11:45 AM, HSI agents began surveillance in the vicinity of University Baptist Church in anticipation of Kennedy holding a possible meeting at approximately 12:30 PM. *Id.* ¶ 11. Agents believed the purpose of this meeting was to plan acts of violence against federal officers and employees. *Id.* Agents took photos of seven vehicles located in the library parking lot across from the Church. *Id.* At approximately 2:35 PM–3:07 PM, agents took a video of 11 individuals departing from the church and checked the library parking lot to determine which vehicles had left. *Id.* HSI performed registration checks on those vehicles. *Id.* Agents terminated the surveillance at 3:12 PM. *Id.* The agents did not observe Kennedy. *Id.*

On May 28, 2026, a HSI agent attended a "Left Jab" meeting, a meeting for physical training which includes training to obstruct officers when arrested, at approximately 7:05 PM in the downstairs gymnasium of the Church. *Id.* ¶ 13. HSI suspected the event was organized to gather and train individuals to commit acts of violence against federal officers and employees. *Id.* The agent recorded

[1] The Protected Areas List does not contain page numbers. Defendants use ECF's blue pagination in the top-right corner.

the event via concealed body-worn audio recorder. *Id.* During part of the training, the agent noticed Kennedy was seated upstairs and on his phone. Ex. F at 2. Following the training, the agent saw a Signal message sent by Kennedy at 9 PM advertising a "De-arrest SWARM training," hosted by Left Jab in June. *Id.* The agent terminated the surveillance after approximately two hours. *Id.*

On June 11, 2026, at approximately 7:00 PM, HSI agents observed Kennedy entering University Baptist Church to attend another Left Jab meeting/training. Zappone Decl. ¶ 17. The agents recorded a video of Kennedy arriving at University Baptist Church and took three photos of him parking in the library parking lot across the street. *Id.* The agents terminated surveillance at approximately 7:12 PM. *Id.* HSI surveilled suspects at or in the vicinity of University Baptist Church only during the four investigatory actions referenced above. *Id.* ¶ 19.

Prior to the investigation, HSI agents discussed whether it would violate this Court's Preliminary Injunction. *Id.* ¶¶ 10, 14. The agents determined the investigative activity would not violate the Preliminary Injunction as the investigation has no nexus to immigration enforcement and no Immigration Enforcement Actions were to be undertaken, investigated, planned, or anticipated. *Id.*

**Plaintiffs' Motion For Order To Show Cause.** Plaintiffs filed their motion on August 20, 2026, after a meet-and-confer with Defendants. *See* ECF No. 117-4. Plaintiffs request the following relief: competent evidence documenting: (1) all other enforcement operations at or near University Baptist Church; (2) the steps Defendants have taken to disseminate information about the Preliminary Injunction, the list of protected locations, and the restrictions on carrying out immigration enforcement actions at those locations; and (3) the steps Defendants took to ensure the specific enforcement actions at and near University Baptist Church complied with the Preliminary Injunction. ECF No. 117-8. Plaintiffs filed a Notice of Supplemental Development on August 23, 2026, alerting the Court of the United States Attorney's Office for the District of Minnesota's argument why this

Court's Preliminary Injunction does not suggest officers went beyond legal boundaries during the investigation at University Baptist Church. ECF No. 118 at 1; *see also id.*, Ex. A at 34.

## LEGAL STANDARD

"To prove civil contempt, a movant must show that (1) the alleged contemnor had notice of the order, (2) 'the order was clear and unambiguous,' (3) the alleged contemnor 'had the ability to comply with the order,' and (4) the alleged contemnor violated the order." *Hawkins v. Dep't of Health & Hum. Servs. for New Hampshire, Com'r*, 665 F.3d 25, 31 (1st Cir. 2012). "[T]he movant must make this demonstration with clear and convincing evidence." *Id.* Good faith is not a defense to contempt in the First Circuit, *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir. 2002), but when considering contempt, courts "may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947).

## ARGUMENT

### I. The HSI Investigations Were Not Immigration Enforcement Because They Were Planned and Performed to Enforce Criminal—Not Immigration—Laws.

The Preliminary Injunction states: "Absent Exigent Circumstances, Defendants shall not take Immigration Enforcement Action In a Protected Area. Absent either Exigent Circumstances or Prior Approval, Defendants shall not take Immigration Enforcement Action Near a Protected Area." PI Or., ECF No. 75 ¶¶ 2–3. An Immigration Enforcement Action is defined as "any action by Defendants that is planned, conducted, undertaken, or executed, in whole or in part, to enforce the immigration laws of the United States, including any arrest, seizure, search, interrogation, questioning, interview, or investigation." *Id.* ¶ 1(i).

Title 8 of the U.S. Code contains the Nation's immigration laws. *See generally*, 8 U.S.C. §§ 1101–1537. It largely governs immigration, *see id.* §§ 1151–1363a, nationality and naturalization, *see id.* §§ 1401–1504, refugee assistance, *see id.* §§ 1521–24, and alien terrorist removal procedures, *see id.* §§ 1531–37. Title 18, in contrast, contains the main body of federal criminal laws. *See generally*, 18 U.S.C. §§ 1–6005. It defines federal crimes, *see id.* §§ 1–2725, lays out criminal procedure, *see id.* §§ 3001–3772, governs prisons and prisoners, youth offenders, and immunity of witnesses, *see id.* §§ 4001–6005. Project Whipple Shield's purpose was to identify and disrupt individuals and networks who were engaging in acts of violence, destruction of property and intimidation of federal officers and employees—all Title 18 offenses. *See, e.g.*, Ex. D–G; *see also* Zappone Decl. ¶ 4. It is not to enforce the immigration laws of the United States. Zappone Decl. ¶ 5. In fact, Project Whipple Shield did not execute *any* immigration enforcement actions under Title 8. *Id.* HSI *will not* use any materials or evidence obtained from Project Whipple Shield to enforce immigration laws. *Id.* ¶ 21.

The indictments stemming from Project Whipple Shield's investigations show they were intended to enforce criminal—not immigration—laws. The indictment contained eight counts, all pertaining to criminal violations under Title 18. *See* Indictment, ECF No. 1, *USA v. Sant, et al.*, Case No. 0:26-cr-00115 (D. Minn. June 11, 2026) (Count 1—Conspiracy to Impede or Injure a Federal Officer, Violation of 18 U.S.C. § 372; Count 2—Solicitation to Commit a Crime of Violence, Violation of 18 U.S.C. § 373; Count 3—Interstate Threats, Violation of 18 U.S.C. § 115(a)(1)(B); Count 4—Interstate Stalking, Violation of 18 U.S.C. § 2261A(1)(B); Count 5—Interstate Stalking, Violation of 18 U.S.C. § 2261A(1)(B); Count 6—Assault on a Federal Officers, Violation of 18 U.S.C. § 111(a)(1); Count 7—Destruction of Government Property, Violation of 18 U.S.C. § 1361; Count 8—Assault on a Federal Officer, Violation of 18 U.S.C. § 11(a)(1)). And none of the indicted suspects are aliens, further showing the Project Whipple Shield's purpose of enforcing criminal laws.

This purpose extended to the investigations at University Baptist Church. On April 12, 2026, at approximately 10:30 AM, HSI agents began to surveil a non-alien suspect, Cam Kennedy, a.k.a. Olive Knite, at his last known address. Ex. D at 2. Failing to observe the suspect, agents attempted to locate him at a regularly scheduled "Left Jab" training and departed for University Baptist Church at approximately 12:10 PM. Zappone Decl. ¶ 9. Agents believed the suspect was planning a meeting at University Baptist Church to plan acts of violence against federal officers and employees. *See id.* ¶¶6–8; ECF No. 118-1 at 19, 25–6, 34 n.12. On April 19, 2026, at approximately 11:45 AM, HSI agents again began surveillance in the vicinity of University Baptist Church, anticipating that Kennedy may possibly hold another meeting. Zappone Decl. ¶ 11. Agents believed the purpose of this meeting was to train and plan "de-arrest" acts or other forms of violence against members of federal law enforcement Based upon Kennedy's prior statements at DAMN meetings. *Id.* On May 28, 2026, a HSI agent attended a "Left Jab" meeting/training at approximately 7:05 PM in the downstairs gymnasium of University Baptist Church. Ex. F at 2. HSI suspected Kennedy organized the event to gather and train individuals to commit acts of violence against federal officers and employees. Zappone Decl. ¶¶ 13–4, 16–7. And on June 11, 2026, at approximately 7:00 PM, HSI agents observed Kennedy entering University Baptist Church to attend another Left Jab meeting/training. Ex. G at 4. Agents again believed the purpose of this meeting was to plan acts of violence against federal officers and employees. *See supra* at 2–5. In sum, HSI investigated suspected criminal activity, as contained in Title 18 of the U.S. Code. It did not attempt to enforce immigrations laws under Title 8 during those investigations.

## II. Plaintiffs' Interpretation of the Preliminary Injunction Is Overbroad.

Plaintiffs do not dispute Defendants undertook the investigations at University Baptist Church to enforce criminal, as opposed to immigration, laws. *See* Pls.' Show Cause Brief, ECF No. 117 at 7–10 (hereafter "ECF No. 117"). Plaintiffs instead muster three arguments in response: first, that DHS

has no authority to enforce non-immigration laws, *see id.* at 7–8; second, the investigations enforced immigration laws "in part" because they were undertaken to protect federal immigration agents, *id.* at 8–9; and third, the Mayorkas Memorandum would have prevented the investigations, *id.* at 9–10. None of these arguments are persuasive. Plaintiffs' interpretation would further overstep RFRA's bounds and frustrate legitimate law enforcement.

**A. HSI agents have authority to enforce non-immigration laws.**

HSI has authority to "make an arrest . . . for any offense against the United States" and "perform any other law enforcement duty that the Secretary [] may designate." 19 U.S.C. § 1589a. Though the language of that statute authorizes customs officers subject to the direction of the Secretary of the Treasury, the Treasury Department transferred those functions to DHS. *See* 6 U.S.C. § 203(1); *see also* 6 U.S.C. § 111(b)(1)(D) (explaining DHS's mission includes "carry[ing] out all functions of entities transferred to the Department[]"). HSI's authority to investigate suspected criminal activity largely mirrors the Federal Bureau of Investigation's ("FBI") authority to investigate and enforce the criminal laws of the United States. *Compare* 19 U.S.C. § 1589a *with* 18 U.S.C. § 3052 (FBI agents "may . . . make arrests without warrant for any offense against the United States committed in their presence, or . . . if they have reasonable grounds to believe that the person to be arrested has committed or is committing" a felony offense); *see also* 18 U.S.C. § 2510(7) (defining "Investigative or law enforcement officer" as "any officer of the United States . . . who is empowered by law to conduct investigations of or to make arrests for offenses enumerated" in Title 18). Contrary to Plaintiffs' contention, *see* ECF No. 117 at 7, 8 U.S.C. § 1357 does not limit HSI's authority, since it lays out arrest authority only when the officer is performing duties related to "the enforcement of immigration laws[.]" 8 U.S.C. § 1357(a)(5).

Plaintiffs highlight that HSI describes its enforcement mission as investigating "transnational crime and violations of the customs and immigration laws of the United States." Homeland Security

Investigations, *What We Investigate*, https://perma.cc/AD2M-J5LW. But that same webpage states "ICE's investigations are diverse and wide-ranging[,]" and it "conduct[s] federal criminal investigations . . . into, out of and *through* the United States." *Id.* (emphasis added). One area for which HSI investigates purely domestic criminal laws unrelated to customs enforcement is child sexual exploitation. "[I]n 2014 alone [HSI] was responsible for making possible the arrests of more than 2,300 child predators and the rescues of more than 1,000 victims." Homeland Security, *Cyber Crime Cases: How ICE's Cyber Crimes Center Identifies Child Victims*, https://perma.cc/L77L-LEN5. HSI's mission is not confined to customs and transnational crime.

Plaintiffs also argue the President assigned HSI's "primary mission[:]" to enforce "the [Immigration and Nationality Act] and other Federal laws related to illegal entry and unlawful presence of aliens[.]" ECF No. 117 at 8 (quoting Exec. Order 14159, *Protecting the American People Against Invasion*, § 4, 90 Fed. Reg. 8443, 8444 (Jan. 20, 2025)). There are three flaws with this argument. First, the Executive Order is policy guidance, not a binding legal pronouncement. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–8 (1952). Second, nothing in the order can "be construed to impair or otherwise affect[] the authority granted by law to" HSI. 90 Fed. Reg. 8447 (Jan. 29, 2025). And third, a further Executive Order—National Security Presidential Memorandum NSPM-7—directed "[a]ll Federal law enforcement agencies with investigative authority" to investigate, "within all lawful authorities, individuals engaged in political violence or lawlessness . . . prioritize[ing] crimes such [as]. . . assaulting Federal officers or employees[.]" 90 Fed. Reg. 47225, 47227 (Sept. 30, 2025). In sum, HSI has the authority to investigate suspected criminal activity under Title 18 of the U.S. Code.

### B. The University Baptist Church investigations were not undertaken "in part" to enforce immigration laws.

Plaintiffs argue the investigations were "undertaken at least 'in part' to enforce immigration laws[]" because they were meant to protect federal immigration officers and facilitate immigration operations. ECF No. 117 at 8 (citation omitted). Plaintiffs lean heavily on the Preliminary Injunction's

language that an Immigration Enforcement Action means actions taken "in whole *or in part*, to enforce the immigration laws." PI Or. ¶ 1(i) (emphasis added). Defendants interpreted the Preliminary Injunction's "in part" language to mean they could not perform an action at a Protected Area if enforcing immigration laws was a reason or a justification for the action. *Cf. Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020) (explaining an action is "in part" due to prohibited discrimination if it is one reason justifying the action, even where multiple justifications may be present).

Defendants previously explained why immigration enforcement was not a reason or justification for Project Whipple Shield and the investigations at University Baptist Church. *Supra* at 7–9. Plaintiffs disagree pointing to the fact that the indictment stemming from the investigations charges the *Sant* defendants with conspiring to prevent DHS and ICE agents from discharging their duties. ECF No. 117 at 9. But at best, that shows the *Sant* defendants' motivations for allegedly conspiring to, and with respect to certain defendants, attacking federal agents. It does not show that immigration enforcement was a reason or justification for the investigation at University Baptist Church. *See Bostock*, 590 U.S. at 659 (explaining an action is "in part" based on prohibited conduct if it is one reason for the decision). Project Whipple Shield was intended to protect federal officers and employees. *Supra* at 7. For example, had the *Sant* defendants targeted FBI or IRS agents, HSI would still have investigated the suspects and their activities at University Baptist Church. The federal agency the officers belonged to was simply not a factor in the decision to investigate the suspects and their activities at University Baptist Church.

Consider the following situation. Defendants wish to remove a certain alien. Defendants then suspect the alien has committed a Title 18 offense, and so Defendants additionally wish to criminally prosecute him. Regardless of whether the criminal prosecution succeeds, Defendants will remove the alien once the prosecution is complete. Defendants surveil and arrest the alien at one of Plaintiffs' places of worship. No Exigent Circumstances, PI Or. ¶ 1(j), or Prior Approval, *id.* ¶ 1(k) exists. This

is a violation of the Preliminary Injunction. There are two motivations to detain the alien: (1) to criminally prosecute him; and (2) to remove him from the country. Even though Defendants' first wish to criminally prosecute the alien, one motivation to detain him is removal. In other words, Removal under Title 8 is a justification for the surveillance and arrest even though it is one reason among many. Contrast the investigations at University Baptist Church. Though the *Sant* defendants were suspected of interfering with the execution of immigration laws, enforcing immigration laws was not a justification for their surveillance and arrest. *Supra* at 7. The government would have performed the same investigation had it suspected the individuals of conspiring to assault non-immigration officers or conspiring to interfere with non-immigration laws. Because enforcing immigration laws is not a motivation for the surveillance at University Baptist Church, Defendants did not carry out the investigations to enforce immigration laws "in part."

Plaintiffs' interpretation of the Preliminary Injunction boils down to this: Defendants have executed an Immigration Enforcement Action so long as there is an articulable nexus between a law enforcement action and immigration enforcement generally. *See* ECF No. 117 at 8. Defendants do not believe the Court intended such a broad sweeping injunction. Furthermore, such an injunction is inconsistent with the Preliminary Injunction's justification—RFRA. *See infra* at 13–18.

### C. It is speculative whether the Mayorkas Memorandum would have covered the investigation at University Baptist Church.

Plaintiffs argue the Mayorkas Memorandum would have prevented the investigations here despite the fact they were not undertaken to enforce immigration laws. *See* ECF No. 117 at 9–10. The Court should give this argument little consideration. The Mayorkas Memorandum was a guidance document. *See New Eng. Synod*, 824 F. Supp. 3d at 162. The Court expressly noted the Mayorkas Memorandum "permitted immigration officers to conduct operations inside churches, and on church property, either in exigent circumstances or with supervisory approval[.]" *Id.* at 168. It is entirely speculative whether a different administration would have considered the criminal investigation at

University Baptist Church to be covered by the Mayorkas Memorandum. Furthermore, it is similarly speculative whether a different administration would have granted supervisory approval for the investigation under the Mayorkas Memorandum's guidance. In any event, although the Court's Preliminary Injunction "largely tracks the contours of" the Mayorkas Memorandum, it did not "return matters [] to the *status quo ante*, but impose[d] a new set of restrictions." *New Eng. Synod*, 824 F. Supp. 3d at 167. Plaintiffs' citation to the Mayorkas Memorandum, therefore, is inapposite.

### D. RFRA does not prevent the undercover investigations at University Baptist Church.

The Court issued the Preliminary Injunction to protect Plaintiffs' religious practice under RFRA. *New Eng. Synod*, 824 F. Supp. 3d at 168. It determined the 2025 Guidance likely violated RFRA because it imposed a substantial burden on Plaintiffs' religious exercise and was not the least restrictive means to further the government's compelling interest in immigration enforcement. *Id.* at 155–58. A similar situation arose in *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989), *remanded to* 752 F. Supp. 1505, 1507 (D. Ariz. 1990). There, as the Court discussed in its Preliminary Injunction opinion, *see New Eng. Synod*, 824 F. Supp. 3d at 140, various churches claimed the government violated their First Amendment rights of free exercise, speech, belief, and association when Immigration and Naturalization Service ("INS") undercover agents recorded their worship services as part of a criminal investigation.[2] 870 F.2d at 520–1. On remand, the district court analyzed Plaintiffs' First Amendment claim under a two-part test: first, whether the government had a compelling interest; and second, whether the investigation was the least restrictive means available to achieve the compelling interest, *id.* at 1513, the same test under RFRA. *See New Eng. Synod*, 824 F. Supp. 3d at 155–58. The court quickly concluded the government had "a compelling state interest,

[2] The INS agents were investigating possible unlawful activities related to the Sanctuary Movement, "a loose association of religious activists . . . aiding refugees from Central and South America by bringing them into" the United States. *Presbyterian Church*, 752 F. Supp. at 1508 n.1.

based on boarder security and national sovereignty to conduct an investigation into the alleged unlawful activities[.]"752 F. Supp. 2d at 1514. It then rejected the plaintiffs' contention that undercover surveillance was not the least restrictive means available. *Id.* at 1515. The plaintiffs had argued "the government could have 'tailed' particular suspects, used trained law enforcement personnel to conduct witness interviews, or issued grand jury subpoenas to conduct [the] investigation[.]" *Id.* The court rejected this suggestion, explaining such a requirement "would hold the government's criminal surveillance operations hostage if potential subjects in the criminal investigation chose religious or political meetings as a venue to engage in illegal activity." *Id.* The court further accepted the government's argument that it could not "effectively gather the quality or quantity of evidence necessary, or validate evidence" without the undercover surveillance. *Id.* In sum, the court determined that the government had met its burden to show the undercover operation at a place of worship was a compelling interest, and the least restrictive means of furthering that interest. *Id.*

The district court constrained its holding in two ways: (1) "the government's investigation must be conducted in good faith;" and (2) the government must scrupulously adhere "to the scope of the defendant's invitation to participate in the organization." *Id.* (citing *United States v. Aguilar*, 883 F.2d 662, 705 (9th Cir. 1989)). Good faith means the investigation was not conducted to abridge First Amendment freedoms. *Aguilar*, 883 F.2d at 705. Alternatively, "the government can satisfy [good faith] by showing that its interests in pursuing legitimate law enforcement obligations outweigh any harm to First Amendment interests." *United States v. Mayer*, 503 F.3d 740, 752 (9th Cir. 2007). Defendants meet both parts of the *Presbyterian Church* test.

First, the HSI investigations were conducted in good faith. Kennedy had discussed operating a blockade on his street that stops ICE vehicles. ECF No. 118-1 at 19. He posted various messages on Facebook advocating violence against ICE agents. *Id.* at 25–26. He purchased a trailer and rented a 10-foot U-Haul in preparation to block the federal Whipple Building in Minneapolis. *Id.* at 34 n.12.

He discussed using shields to block one entrance of the Whipple Building. *Id.* He further discussed raising funds for various blockades of the Whipple Building. *Id.* On February 17, 2026, at a DAMN meeting, a HSI agent learned Kennedy was planning de-arrest and swarm trainings during Left Jab meetings at University Baptist Church. Zappone Decl. ¶¶ 6, 16–7. He then stated that Left Jab was an "*anti-fascist Mixed Martial Arts training class"* that meets every Sunday afternoon and Monday night. *Id.* ¶ 8. Agents surveilled University Baptist Church on April 12, April 19, May 28, and June 11 because they believed Kennedy was organizing Left Jab meetings to plan acts of violence against federal officers and employees. *Id.* ¶¶ 9, 11, 13, 17. They did not surveil University Baptist Church to enforce immigration laws, *see supra* at 7–9, nor did they intend to burden Plaintiffs' religious exercise. *See* Zappone Decl. ¶ 4–5.

Second, HSI agents scrupulously adhered to the scope of the invitation. Three of the four investigatory operations occurred on public roads and parking lots—no invitation was required.[3] *See United States v. Knotts*, 460 U.S. 276, 281 (1983) ("A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."). And the HSI agent adhered to the scope of the invitation to attend the Left Jab meeting on May 28. *See* Ex. F at 2. She attended the activity, participated in the activity, did not leave the activity area, and left once the meeting ended. *See id.*; *see also* Zappone Decl. ¶¶ 13–16. During part of the training, the agent noticed the suspect was seated upstairs and on his phone. *See id.* ¶ 15. But this activity occurred within plain view, and so the agent's observation did not violate University Baptist Church's invitation. *See Horton v. California*, 496 U.S. 128, 133 (1990). In sum, HSI's surveillance occurring at and in the vicinity of University Baptist Church comported with the test laid out in *Presbyterian Church*. 752 F. Supp. at 1515.

[3] Defendants recognize the Preliminary Injunction restricted Immigration Enforcement Actions Near a Protected Area absent Prior Approval. PI Or. ¶ 3; *see also id.* ¶¶ 1(h), (i), (k). The Preliminary Injunction is immaterial to whether the suspects had a reasonable expectation of privacy on the public thoroughfares to University Baptist Church.

The Seventh Circuit considered another analogous case in *Alliance to End Repression v. City of Chicago*, 742 F.2d 1007 (7th Cir. 1984). There, the plaintiffs brought suit alleging the FBI's Chicago office had conducted investigations of certain groups, not because the groups posed an actual or potential threat to domestic security, but because the FBI disliked their political views.[4] *Id.* at 1009. The parties settled the case signing an agreement which provided "The FBI shall not conduct an investigation solely on the basis of activities protected by the First Amendment[.]" *Id.* at 1010. The FBI later issued new guidance allowing investigations into "statements advocat[ing] criminal activity or indicat[ing] an apparent intent to engage in crime, particularly crimes of violence," *id.* (citation modified). Plaintiffs sought an injunction against these guidelines arguing they were inconsistent with the consent decree. *Id.* The Seventh Circuit disagreed. It first found the consent decree impermissibly tied the FBI's hands to such an extent that the FBI abandoned its duty to protect public safety. *Id.* It then opined that the settlement agreement should be limited so that it affirmed only protections which the Constitution already afforded, and the government's interest in properly circumscribed good faith investigations outweighed the plaintiffs' First Amendment concerns. *Id.* at 1016–17. And finally, the Court opined that the settlement agreement was intended to protect inoffensive groups and individuals, not those with violent aims. *Id.* at 1018.

Here too, the Preliminary Injunction is properly confined to prohibiting Immigration Enforcement Actions at Protected Areas where immigration enforcement is a justification for the action. The United States has a duty to investigate potential crimes, including at locations where suspects may use a Protected Area to cover their activities. Plaintiffs' religious exercise is protected by granting them the full protections of the Constitution and RFRA, nothing more. And finally, the

[4] Though the Preliminary Injunction is based on RFRA—not the First Amendment—government action targeting specific speech content, such as the FBI's investigations into groups it politically disagreed with, is subject to strict scrutiny which requires the restriction be "the least restrictive means of achieving a compelling state interest[,]" *McCullen v. Coakley*, 573 U.S. 464, 478 (2014), a substantially similar test to RFRA. *See New Eng. Synod*, 824 F. Supp. 3d at 155–58.

Preliminary Injunction was intended to protect religious communities—not criminal suspects advocating violence against federal officers. Plaintiffs' interpretation of the Preliminary Injunction oversteps RFRA's bounds, and so the Court should deny Plaintiffs' motion.

### E. Plaintiffs' interpretation of the Preliminary Injunction would frustrate legitimate law enforcement activity.

At the preliminary injunction hearing, the Court asked whether Plaintiffs "have a legitimate interest in being a sanctuary from law enforcement? In other words, not during the service itself by 24-7 serving as a sanctuary where people can be protected from law enforcement?" Defs.' Cross MSJ, Ex. A, ECF No. 115-1 Oral Hr'g Tr. 28:20–23. At the time, Plaintiffs explicitly disclaimed seeking such an injunction, *id.* at 29:9–17, but now it appears they have changed their minds. Plaintiffs argue that any law enforcement action at a Protected Area is an Immigration Enforcement Action as long as there is an articulable nexus to immigration enforcement, even if immigration enforcement was not a justification for the action. ECF No. 117 at 8. Plaintiffs have posted signs claiming that *no* federal agents are permitted on the premises unless they have a warrant. *See* ECF No. 117-6, Ex. B. Plaintiffs argue the Left Jab meeting, a training for de-arrest and swarm tactics, *see* Zappone Decl. ¶¶ 6–8, 16–7, is entitled to the same RFRA protections as a worship service. *See* ECF No. 117 at 3–4; *see also* Pls.' MSJ, ECF No. 111, Ex. 73 ¶ 11 (seeking protection for events like "Cribbage, Mahjong, various book clubs, self-defense classes, and other neighborhood groups"); Defs.' Cross MSJ, ECF No. 115 at 7–8. The term "religious exercise" under RFRA "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. 2000cc-5(7); *accord id.* at 2000bb-2(4). Plaintiffs have failed to explain why the Left Jab classes are part of their religion. *See* ECF No. 117. Even if they were, the government's interest in investigating these kinds of law-obstruction activities is compelling. *See Presbyterian*, 752 F. Supp. at 1514; *All. to End Repression*, 742 F.2d at 1010. And undercover investigations are the least restrictive means to further that compelling interest where, as here, the investigation is conducted in good faith and properly circumscribed. *See Presbyterian*, 752

F. Supp. at 1515; *All. to End Repression*, 742 F.2d at 1016–7; *see also supra* at 15–6. Plaintiffs' arguments throughout this litigation show they are not satisfied with the protections the RFRA or the Preliminary Injunction affords—Plaintiffs urge the Court to broaden the scope of the injunction so that their places of worship are effectively turned into sanctuaries. The Court should reject that request.

### III. Plaintiffs Have Not Demonstrated They are Entitled to Attorney-Client Communications.

Plaintiffs seek "the steps Defendants have taken to disseminate to their agents information about the preliminary injunction, the list of protected locations, and the restrictions on carrying our [*sic*] immigration enforcement actions at those locations[.]" ECF No. 117-8 at 1. To the extant Plaintiffs seek assurance that Defendants have disseminated the Preliminary Injunction and Plaintiffs' lists of protected areas, Defendants affirm they have done so. Zappone Decl. ¶¶ 2–3. To the extent Plaintiffs seek "restrictions on carrying our [*sic*] immigration enforcement actions[,]" ECF No. 117-8 at 1, those restrictions are contained within the plain language of the Preliminary Injunction. *See* Ex. A. Nevertheless, Plaintiffs' request for "restrictions" seems to ask the Court to order Defendants to disclose their attorneys' instructions directing DHS agents on how to apply the Preliminary Injunction. *See* ECF No. 117-8 at 1. Such communications are protected by the attorney-client privilege.

"The attorney-client privilege protects the confidential communications between client and attorney for the purpose of obtaining legal advice." *Open Software Found., Inc. v. U.S. Fid. & Guar. Co.*, 191 F.R.D. 325, 327 (D. Mass. 2000). Plaintiffs ostensibly seek privileged attorney-client communications, i.e., communications explaining the Preliminary Injunction—giving legal advice—between the attorneys and their clients. The attorney-client privilege is not absolute. For example, it can be waived if the client or attorney discloses the information to a third party, *see Blattman v. Scaramellino*, 891 F.3d 1, 4 (1st Cir. 2018), or if "a party injects certain claims or defenses into the case which implicate . . . the communications of counsel." *Bacchi v. Massachusetts Mut. Life Ins. Co.*, 110 F.

Supp. 3d 270, 275 (D. Mass. 2015). But Plaintiffs have not suggested either of these exceptions, or any exception for that matter, applies. *See* ECF No. 117 at 5–10.

## IV. HSI Considered This Court's Preliminary Injunction.

If the Court determines the investigations at University Baptist Church violated the Preliminary Injunction, then it should not hold Defendants in contempt. As noted above, "[t]o prove civil contempt, a movant must show that (1) the alleged contemnor had notice of the order, (2) 'the order was clear and unambiguous,' (3) the alleged contemnor 'had the ability to comply with the order,' and (4) the alleged contemnor violated the order." *Hawkins*, 665 F.3d at 31 (citation omitted). Defendants reasonably understood the Preliminary Injunction to prohibit them from taking any actions in Protected Areas where enforcement of the Nation's immigration laws as set forth in Title 8 of the U.S. Code was a justification or a reason for the action. *See supra* at 11–2. If this interpretation was incorrect, the order was not "clear and unambiguous[.]" *Hawkins*, 665 F.3d at 31.

Defendants' good faith attempts[5] to abide by the Preliminary Injunction further demonstrate Plaintiffs' requested order is unwarranted. Courts "may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future." *United Mine Workers of Am.*, 330 U.S. at 303. Defendants did not willfully or deliberately defy the court's order because they discussed whether the investigations at University Baptist Church would violate the injunction, and determined in good faith they would not. Zappone Decl. ¶¶ 10, 15. The consequences of the

[5] Pleading a good faith attempt to abide by the Preliminary Injunction does not waive the attorney-client privilege. *See Bacchi*, 110 F. Supp. 3d at 275); *see also Banco Do Brasil, S.A. v. 275 Washington St. Corp.*, No. CIV.A. 09-11343-NMG, 2011 WL 3208027, at *3 (D. Mass. July 27, 2011) ("The mere fact [a party] believes that it acted in good faith under its lease agreement, and that its counsel was involved in the process, does not constitute a waiver of the attorney-client privilege.").

investigations at University Baptist Church are also measured since the RFRA does not prevent undercover investigations at places of worship. *See supra* at 13–7. Public interest weighs in favor of Defendants since RFRA's protections give way to good faith, circumspect undercover investigations. *Id.* And, finally, the importance of deterring similar investigations in the future is minimal for the same reasons. *Id.* The Court should not hold Defendants in contempt.

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Show Cause, ECF No. 117.

Dated: August 20, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

KRISTINA A. WOLFE
Assistant Branch Director
Federal Programs Branch

*/s/ Richard C. Giles*
RICHARD C. GILES
Trial Attorney (WY Bar No. 8-7222)
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St., NW, Room 11404
Washington, D.C. 20530
(202) 616-8482
Richard.C.Giles@usdoj.gov

*Counsel for Federal Defendants*