**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

**New England Synod, Evangelical Lutheran Church in America,** *et al.*,

Plaintiffs,

v.

**Department of Homeland Security,** *et al.*,

Defendants.

**Case No. 4:25-cv-40102-FDS**

**REPLY IN SUPPORT OF MOTION FOR ORDER TO SHOW CAUSE**

DHS's opposition concedes that it carried out multiple enforcement operations at University Baptist Church, including sending an ICE agent into the church itself to surveil those inside. DHS argues that this did not violate the preliminary injunction because the surveillance was done to enforce criminal laws rather than immigration-related ones. This argument is sophistry: Even in DHS's telling, its immigration agents surveilled the church to investigate people believed to be thwarting immigration agents' ability to enforce the immigration laws as part of a massive immigration enforcement operation. That investigation was plainly taken at least "in part" to enforce the immigration laws. DHS's other arguments are wrong, beside the point, or both. The Court should hold Defendants in civil contempt and take appropriate remedial action.

## I. DHS concedes the material facts of its violations.

DHS's opposition confirms the key facts as laid out in Plaintiffs' motion. DHS acknowledges that ICE agents conducted surveillance operations at University Baptist Church on at least four occasions, including on Sundays, watching the church for hours, recording and photographing people as they came and went, running registration checks on those individuals'

vehicles, and recording their home addresses, *see* Ex. 2 at 10-11. The agency further acknowledges that it sent an undercover ICE agent into the church to surveil and record those inside. DHS concedes that its agents were aware they were surveilling a church, that University Baptist Church was properly designated as a Protected Area, that its operations cannot be justified by the "Exigent Circumstances" or "Prior Approval" exceptions in the Court's order, and that the ICE agents were operating without any warrant. These facts establish that Defendants violated the preliminary injunction.

DHS appears to quibble with certain details of whether its agents carried out operations "Near a Protected Area" when they surveilled the exterior of the church, including from an adjacent library parking lot, on Sunday, April 12; Sunday, April 19; and Thursday, June 11. ECF No. 125 ("Opp.") at 4. Its arguments are meritless. DHS points out that the parking lot "is not a Protected Area." *Id.* But that is irrelevant to whether it is *Near* a Protected Area—*i.e.*, "within 100 feet of any doorway, gate, or other clearly demarcated entrance to any Protected Area." ECF No. 75 ("PI Order") ¶ 1(h); *see also id.* ¶ 3 (restricting enforcement actions Near a Protected Area). As Plaintiffs have shown, Ex. 3, the parking lot—as well as the street and sidewalk in front of the church—is well within 100 feet of the church's main entrance on 13th Avenue SE. DHS cannot dispute that geographic reality. *See Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013) ("We have taken judicial notice of—and drawn our distance estimates from—images available on Google Maps, 'a source whose accuracy cannot reasonably be questioned, at least for the purpose of determining' general distances." (quoting *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012))), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

DHS alleges—without evidentiary support—that the ICE agents "could not confirm whether the parking lot was not Near a Protected Area." Opp. at 4. DHS notably does not claim the agents even tried. It also does not address the other nearby areas from which the agents surveilled the church. Nor is it plausible that the agents could have been unaware that the public ways immediately in front of the church, and the parking lot immediately adjacent, were sufficiently near the church doors to trigger the injunction's protections. *See* Ex. 2 at 12-15 (photographs taken by agents showing their proximity to the church building); Ex. 3. And given that the agents conducted multiple planned operations at the church over the course of several months, they had plenty of time to resolve any uncertainty. In any event, even if DHS had introduced any evidence to put this question in doubt, the agents' subjective knowledge whether they were conducting surveillance within 100 feet of the church entrance would be irrelevant to whether Defendants violated the preliminary injunction order, which does not distinguish between knowing and merely negligent violations. *See* PI Order ¶ 12 ("Violations of this preliminary injunction may subject Defendants and all other persons bound by this Order to sanctions and penalties, including contempt of court."); *see also Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir. 2002) ("The law is firmly established in this circuit that good faith is not a defense to civil contempt.").

Relevant to this point, DHS's reports of investigation refer to the library parking lot as being located "directly across the street from the church." Ex. 2 at 3. DHS's opposition and the Zappone declaration uncritically repeat this language. Opp. at 4; Zappone Decl. ¶¶ 9, 17. In fact, the Arvonne Fraser Library parking lot is located immediately next to the church, separated by a small driveway. Ex. 3. DHS's failure to confirm so straightforward a fact, one with direct bearing on whether its actions were conducted Near a Protected Area and to which its declarant testified

in a sworn statement, undermines the credibility of DHS's other factual assertions and further supports the inference that the agency is now merely offering post hoc excuses for conduct undertaken in violation of the preliminary injunction.

The error in the declaration—DHS's sole evidentiary offering—underscores the fact that the declaration appears to reflect little direct, firsthand knowledge and is instead largely derivative of the reports of investigation. Zappone does not claim to have witnessed any of the operations at University Baptist Church himself. Instead, he states, "I make this declaration upon my review of available reports, seized evidence, and direct conversations with the Agents involved." Zappone Decl. ¶ 5. The bulk of the declaration merely repeats statements set forth in the reports.

Even if the facts were as DHS describes them, that would itself raise troubling questions about DHS's compliance with the Court's order. The declaration fails to show that DHS took seriously its obligations to comply with the preliminary injunction before carrying out operations at the church. Paragraphs 10 and 14 state that, prior to the April 12 and May 28 operations (but apparently not before the other two), "HSI agents discussed this Court's preliminary injunction and determined the investigative activity would not violate the Court's order." Thus, the evaluation and decision whether the operations would violate the preliminary injunction appears—in DHS's own telling—to have been conducted solely by the agents who would themselves carry out those operations, without consultation with superiors or agency counsel. Its version of events reinforces the inference that DHS lacks a reliable method of internally coordinating its compliance with the Court's order, *see* ECF No. 118 at 3, and raises the alarming prospect that the agency relies on informal, undocumented conversations between the officers on the ground to ensure compliance. That it was the same agents who were about to conduct the enforcement actions deciding whether those actions complied with the order only amplifies the risk of future violations.

Moreover, an agency taking seriously its obligations under the Court's preliminary injunction order could be expected to somewhere document so important a decision as the determination that an enforcement action *at a designated Protected Area* did not run afoul of the order. Yet no such discussion is reflected in the relevant reports of investigation, which were compiled by the agents involved but contain no reference at all to the preliminary injunction or the list of Protected Areas. *See* Ex. 2 at 2-8 (April 12); Ex. 1 (May 28). And DHS has not come forward with any other contemporaneous documentation that such discussions ever took place. Nor did DHS offer a sworn statement from any of the HSI agents allegedly involved in the discussion, instead submitting a single declaration from an employee who does not claim any direct, firsthand knowledge of the discussion, whose temporary assignment to the HSI office in St. Paul ended in June, and who appears to have signed the declaration from Arizona. Zappone Decl. ¶ 1. This is not persuasive evidence. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

## II. ICE's operations at the church were "Immigration Enforcement Actions."

With the material facts of the surveillance operations not in dispute, DHS can offer only one argument why its actions did not violate the preliminary injunction order: That those actions did not constitute "Immigration Enforcement Action[s]" as defined in the order. PI Order ¶ 1(i). DHS disputes the commonsense conclusion that enforcement actions conducted by "immigration officers," *see* 8 C.F.R. § 287.5(e)(1)(iv), (2)(xxxviii) (listing certain "immigration officers" including "Special agents" and "Assistant Special Agents in Charge"), to investigate an alleged conspiracy to "[p]revent[] the enforcement of federal immigration law," Ex. 5 ¶ 7(a), were enforcement actions taken at least "in part" to enforce the federal immigration laws, PI Order ¶ 1(i). Its efforts fail to persuade.

To start, DHS fails to establish that the ICE agents who conducted the relevant enforcement actions at University Baptist Church were properly empowered with general law enforcement authority to conduct investigations having no connection to immigration law. It cites a statute providing that "officer[s] of the customs" may, "[s]ubject to the direction of the Secretary of the Treasury [now DHS Secretary]," "perform … any law enforcement duty that the Secretary … may designate." 19 U.S.C. § 1589a (cited by Opp. at 9). But it provides no evidence that the Secretary designated these agents to perform any such duties. *Cf.* Zappone Decl. ¶ 1 (claiming to be "empowered by law as a customs officer under 19 U.S.C. § 1589a to conduct investigations of, and to make arrests for, offenses against the United States").

Indeed, the authority of immigration agents to make arrests "for any felony cognizable under the laws of the United States" is carefully delineated by statute and regulations to apply only "if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest." 8 U.S.C. § 1357(a)(5); *accord* 8 C.F.R. § 287.5(c)(4)(B); *see also United States v. Santos-Portillo*, No. 7:18-cr-10, 2019 WL 3047427, at *5 (E.D.N.C. May 31, 2019) (rejecting argument that Section 1589a authorizes agents to make arrests outside the circumstances allowed by DHS's own regulations). DHS's interpretation of Section 1357 as applying "only when the officer is performing duties related to 'the enforcement of immigration laws,'" Opp. at 9, reads the provision exactly backwards and strips it of any effect. *See also Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." (quoting *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974))).

More to the point, whatever the scope of the ICE agents' authority, their enforcement actions at the church were plainly taken at least "in part" to enforce the federal immigration laws,

PI Order ¶ 1(i). As DHS's own reports of investigation reveal, the agents were seeking to investigate alleged efforts to "intimidat[e] … federal [immigration] officers and employees" and to "impede federal [immigration] operations." *See, e.g.*, Ex. 1 at 2. Even the name of the investigation—Project Whipple Shield—makes clear its immigration-related purposes.[1] Consistent with that clear purpose, the *Sant* indictment charges defendants with a conspiracy to prevent DHS and ICE agents from carrying out their duties and to "[p]revent[] the enforcement of federal immigration law by force, intimidation, and threats." Ex. 5 ¶¶ 1, 7(a). Like the indictment, DHS's opposition itself extensively describes "de-arrest" and "swarm" tactics and trainings allegedly pursued by the *Sant* defendants and that make clear the investigation's central purpose to investigate alleged resistance to DHS's ability to enforce the immigration laws.

Seeking to resist that obvious conclusion, DHS tries to draw a line between "the Nation's immigration laws," which it says are found in Title 8 of the U.S. Code, and "the main body of federal criminal laws" in Title 18. Opp. at 7. That distinction falls apart immediately. Title 18 contains some "immigration laws," *see, e.g.*, 18 U.S.C. § 1425 (procurement of citizenship or naturalization unlawfully); *id.* § 1546 (fraud and misuse of visas, permits, and other documents), and Title 8 defines some crimes, *see, e.g.*, 8 U.S.C. § 1253 (failure to depart after final removal order); *id.* § 1326 (reentry of removed noncitizens). In any case, the fact that the *Sant* indictment ultimately charged crimes only under Title 18 is no answer to Plaintiffs' point that an investigation carried out by immigration officers to enable the enforcement of immigration laws by "shield[ing]"

---

[1] The B.H. Whipple Federal Building just outside of Minneapolis served as an immigration detention center and headquarters for thousands of immigration agents during Operation Metro Surge earlier this year. *See, e.g.*, Nicholas Bogel-Burroughs, *The Out-of-the-Way Building at the Center of Minnesota's Immigration Drama*, N.Y. Times (Jan. 23, 2026), *available at* https://perma.cc/58ML-CV9U.

other immigration officers in the conduct of their duties is undertaken at least "in part" to enforce immigration law.

DHS further protests that a different investigation, one involving alleged interference with FBI or IRS agents, would not constitute an "Immigration Enforcement Action" under the Court's order. Opp. at 11. That's not this investigation, however, and DHS provides no sound reason to think that either HSI or any other DHS component would be involved in that hypothetical investigation in the first place. Presumably the FBI would lead an investigation into interference with its own agents, and that agency's policy—unlike the one challenged here—requires its agents, "when essential investigative activity may impact" protected First Amendment rights of religion, to carry out such investigative activity "in a manner that avoids the actual—and the appearance of—interference with religious practice *to the maximum extent possible*." FBI, *Domestic Investigations and Operations Guide* § 4.2.2 (Feb. 27, 2024) (emphasis added), *available at* https://perma.cc/Q394-5Y4V. DHS's appeal to what might be the purposes of other, hypothetical investigations involving other, non-party agencies simply has no bearing on the reasons for its several enforcement actions at University Baptist Church.

Likewise, DHS's description of a different hypothetical action in which it sought to detain someone both to enable his criminal prosecution and his removal does not demonstrate that DHS's conduct at the church was not meant at least in part to enforce immigration law. *See* Opp. at 11-12. While the hypothetical action DHS describes would be covered by the Court's preliminary injunction order, so too are the actions that DHS carried out at University Baptist Church.

Finally, DHS calls it "speculative" whether the Mayorkas Memo would have applied to its actions at the church. *Id.* at 12-13. But DHS fails to support that claim with any evidence or legal argument. And it simply ignores contrary language in the Mayorkas Memo, such as the memo's

statement that it applies broadly to "the execution of our enforcement responsibilities" and its reference to "law enforcement action[s]" generally. Pls.' SJ Ex. 5 at 2, 3. DHS calls it "similarly speculative whether a different administration would have granted supervisory approval for the investigation under the Mayorkas Memo[]," Opp. at 13, but the relevant point is that DHS's actions at University Baptist Church would have fallen within the coverage of the Mayorkas Memo just as they do the preliminary injunction.

## III. DHS's claims about RFRA and its alleged compelling interests are both irrelevant and incorrect.

DHS's opposition devotes significant space to arguing that the Religious Freedom Restoration Act would not have prohibited its actions here, and that to bar these actions "would frustrate legitimate law enforcement activity." *Id.* at 13-18. These arguments, however, merely attempt to relitigate matters the Court correctly decided when it issued the preliminary injunction. *See, e.g.*, ECF No. 74 ("PI Op.") at 39-44, 59-61 (explaining why injunction is necessary to prevent harm from violations of RFRA); *id.* at 55-56 (explaining why injunction does not frustrate legitimate law enforcement activity). More to the point, these claims have no relevance under the applicable standard here, which asks whether: "(1) the alleged contemnor had notice of the order, (2) the order was clear and unambiguous, (3) the alleged contemnor had the ability to comply with the order, and (4) the alleged contemnor violated the order." *Hawkins v. HHS*, 665 F.3d 25, 31 (1st Cir. 2012). Whether or not specific enforcement actions would violate RFRA is simply a different question from whether those actions violated the Court's order, which the Court entered not in response to any particular enforcement action but to DHS's broad policy governing such actions. The Court therefore need not spend long with DHS's arguments on these points.

To the extent it considers these arguments, the Court should reject the government's claim to a compelling interest, and pursuit of the least restrictive means, in conducting the four operations

at University Baptist Church. The indictment in *United States v. Sant*—which DHS describes as the "culminat[ion]" of its investigation, Zappone Decl. ¶ 5—does not appear to reflect any information gleaned from the four enforcement actions at University Baptist Church. Indeed, the indictment was filed on June 11, Ex. 5 at 2, the same day as the last known enforcement action at the church, Ex. 2 at 20-21 (reflecting that surveillance of the church continued until 7:12 pm that day), and therefore that action could not have played any role in the indictment.

Further, the indictment discusses "de-arrest" discussions and trainings attended by the defendants that were *not* held inside churches. *See* Ex. 5 ¶¶ 110, 142. DHS has not explained why its investigative interests could not have been satisfied through the alternative means of targeting these other gatherings instead. And even if the government had documented some compelling need to infiltrate University Baptist Church in particular, it has made no effort to show why it could not have advanced those interests without violating the injunction, such as by seeking a warrant, securing Prior Approval from officials in Washington, or simply conducting its surveillance further from the church. And because DHS had so many readily available alternative options, its claim that Plaintiffs' position "would frustrate legitimate law enforcement activity" cannot be credited. *See* Opp. at 17-18; *cf.* PI Op. at 56 (describing some of the "many other means by which to enforce the nation's immigration laws" left available by the preliminary injunction).

A few other points warrant addressing. DHS accuses Plaintiffs of changing course from the preliminary injunction stage and now seeking to turn houses of worship into "sanctuar[ies]" immune from law enforcement. Opp. at 17. That mischaracterizes Plaintiffs' consistent position: that houses of worship are legally entitled to sensible protections, which have long been in place and which "did not absolutely prohibit immigration enforcement at houses of worship but did significantly restrict it based on a recognition of the effect that was going to be produced on

fundamental rights by having totally unrestrained enforcement." ECF No. 115-1 (PI H'ring Tr.) at 29. DHS veers even further off course in seeking to turn this dispute into a question of whether the class that ICE infiltrated inside the church was "part of [Plaintiffs'] religion" and urging that the preliminary injunction "was intended to protect religious communities—not criminal suspects." Opp. at 17. Under the clear and unambiguous terms of the preliminary injunction order, however, the first question is entirely irrelevant. DHS does not argue otherwise. (Tellingly, it also makes no attempt to defend the erroneous interpretation of the injunction as turning on these kinds of considerations that the government advanced in *Sant*. *See* ECF No. 118 at 3.) Plaintiffs also are not asking the Court to enforce the preliminary injunction for the benefit of the *Sant* defendants; they are seeking to ensure that the government complies with the preliminary injunction's protection so that they and their members can exercise their fundamental rights of religion and expressive association free of substantial burden by the government.

**IV. The Court should hold Defendants in contempt and order appropriate relief.**

Because Defendants had notice of the order, the order was clear and unambiguous, Defendants had the ability to comply with the order, and Defendants violated the order, the Court should hold them in civil contempt and order appropriate remedies. *See Hawkins*, 665 F.3d at 31.

DHS asks that, if "the Court determines the investigations at University Baptist Church violated the Preliminary Injunction, then it should not hold Defendants in contempt." Opp. at 19. But a district court has "no general discretion to excuse civil contempt." *Potter v. District of Columbia*, 126 F.4th 720, 725 (D.C. Cir. 2025). DHS points to the factors from *United States v. United Mine Workers of America*, 330 U.S. 258, 303 (1947) (discussing willfulness, seriousness of consequences, the "necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts" as factors a court may consider "in

imposing a fine for criminal contempt") (cited by Opp. at 19-20). But while the Court may consider those factors in crafting an appropriate sanction, they cannot immunize DHS from a contempt finding as an initial matter.

What is more, the factors weigh against DHS. DHS alleges its own good faith, but refuses to share the compliance instructions given to its agents or provide relevant details about the HSI agents' "discuss[ion]" of whether their enforcement actions would violate the Court's order. *See* Opp. at 18-19; Zappone Decl. ¶¶ 10, 14. The "consequences of the investigations at University Baptist Church" are not "measured," *contra* Opp. at 19-20—those investigations have left congregants "shocked and upset" by the "complete violation of [their] sacred space," Lubke Decl. ¶ 15. And as the Court has already noted, "there is a strong public policy favoring protection of the freedom of religion." PI Op. at 55-56 (citing *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.")). Finally, given DHS's troubling lack of adequate internal method for complying with the preliminary injunction, *see* ECF No. 117 ("Mot.") at 10-11; ECF No. 118 at 3; *supra* at 5, the importance of deterring similar violations going forward could not be clearer.

DHS incorrectly suggests that the only relief Plaintiffs seek for DHS's contempt is the disclosure of information concerning DHS's lack of compliance. Opp. at 5 ("Plaintiffs request the following relief…"). To the contrary, Plaintiffs merely stated in their motion that such information "may aid the Court in its resolution of this issue." Mot. at 10. That remains the case. First, as explained, DHS has failed to adequately document the steps it took to ensure compliance with the preliminary injunction order before carrying out enforcement operations at University Baptist Church. Second, DHS resists having to disclose the interpretation of the Court's order that it shared with DHS personnel, citing attorney-client privilege. Opp. at 18-19. But DHS has failed to provide

any facts to show that the privilege would apply in the first place (such as by demonstrating that the instructions were from an attorney, or were provided as part of a confidential exchange for the purpose of obtaining legal advice). Third, DHS's declarant states that "HSI surveilled criminal suspects at or near the Church only during the four investigatory actions referenced above," but does not "confirm or deny that there are additional investigations at other locations on the protected locations list" (and DHS's opposition ignores this question entirely). Zappone Decl. ¶¶ 19, 20. The Court should require DHS to disclose, at minimum, whether it has conducted operations in or near any other Protected Area.

The Court should also consider appropriate remedies if it finds Defendants in contempt. The Court has wide latitude in crafting such relief. *See Goya Foods*, 290 F.3d at 77 ("A trial court has wide discretion in its choice of sanctions" for civil contempt.). Plaintiffs respectfully submit that the Court may wish to consider the following options at this stage:

1. Issuing an order declaring that the four enforcement actions at or near University Baptist Church violated the Court's preliminary injunction and clarifying that its preliminary injunction covers actions like those at University Baptist Church;
2. Requiring DHS to provide notice of said order to all of its officers, agents, employees, and appointees and reminding them of their obligations under the preliminary injunction, and to file a copy of that notice with the Court;
3. Requiring each DHS officer, agent, employee, and appointee who participated in or was aware of any of the four enforcement actions at or near University Baptist Church to receive additional training on how to comply with the Court's preliminary injunction from a Court-designated instructor using training materials submitted to and approved by the Court;

4. Requiring DHS to provide notice of those training materials to all of its officers, agents, employees, and appointees and to make those training materials publicly available;
5. To determine the scope of the violation and whether further clarification is necessary, requiring DHS to produce all documents related to its investigations at or near University Baptist Church as a part of Project Whipple Shield;
6. To determine the scope of the violation and whether further clarification is necessary, requiring DHS to produce records of any enforcement actions that have actually occurred at or near or were planned to occur at or near any other Protected Area since the preliminary injunction issued;
7. Requiring DHS to designate an officer who is tasked with overseeing Defendants' compliance with the preliminary injunction order, filing regular status reports attesting under penalty of perjury to Defendants' continued compliance with the order, and answering the Court's questions regarding Defendants' compliance with the order.

## CONCLUSION

For all these reasons, the Court should hold Defendants in civil contempt and take appropriate remedial action.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl*
J. Sterling Moore*
Sarah Goetz*
Andrew Bookbinder*
Mark B. Samburg
Ayesha Khan*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090

Ryan Downer*
Madeleine Gates*
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org

Richard J. Leveridge*

Sonia W. Murphy*
Brandon A. Levey*
Samone Ijoma*
Brittney M. Welch*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Leveyb@gilbertlegal.com
Ijomas@gilbertlegal.com
Welchb@gilbertlegal.com

Fax: (202) 796-4426
kfriedl@democracyforward.org
smoore@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
msamburg@democracyforward.org
akhan@democracyforward.org

*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

On August 31, 2026, I served the foregoing on all parties by electronically filing it through the CM/ECF system.

*/s/ Kevin E. Friedl*
Kevin E. Friedl