**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

NEW ENGLAND SYNOD, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants

Civil Action No. 4:25-cv-40102-FDS
Leave to file granted on April 22, 2026

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR CROSS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

ARGUMENT .......... 1

I. The Attempt to Join the Extra Ten Plaintiffs is Prejudicial .......... 1

II. Plaintiffs Lack Standing .......... 4

III. APA Review is Unavailable .......... 12

IV. The 2025 Guidance Does Not Violate the APA .......... 15

V. The 2025 Guidance Does Not Violate RFRA .......... 16

VI. The 2025 Guidance Does Not Violate Plaintiffs' Expressive Association Rights .......... 18

VII. Any Relief Should be Narrowly Tailored .......... 20

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

### CASES

*Abel v. United States*,
362 U.S. 217 (1960) ........ 22

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
138 F.4th 1102 (9th Cir.),
*rev'd and remanded sub nom. Mullin v. Al Otro Lado*, 146 S. Ct. 2079 (2026) ........ 21

*Arevalo v. Ashcroft*,
344 F.3d 1 (1st Cir. 2003) ........ 24, 25

*Arizona v. Evans*,
514 U.S. 1 (1995) ........ 4

*Arizona v. United States*,
567 U.S. 387 (2012) ........ 22

*Banco Popular de Puerto Rico v. Greenblatt*,
964 F.2d 1227 (1st Cir. 1992) ........ 3

*Bhd. of R.R. Trainmen v. Balt. & O.R. Co.*,
331 U.S. 519 (1947) ........ 20

*Biden v. Texas*,
597 U.S. 785 (2022) ........ 21

*Bowen v. Roy*,
476 U.S. 693 (1986) ........ 16

*Box v. Planned Parenthood of Ind. & Ky., Inc.*,
587 U.S. 490 (2019) ........ 3

*Brito v. Garland*,
22 F.4th 240 (1st Cir. 2021) ........ 21

*Brown v. Trs. of Bos. Univ.*,
891 F.2d 337 (1st Cir. 1989) ........ 25

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ........ 18

*Caniglia v. Strom*,
593 U.S. 194 (2021) ........ 23

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ........ 25

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........................................................................ 6

*City of Taunton, Mass. v. EPA*,
895 F.3d 120 (1st Cir. 2018) ........................................................................ 13

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................ 4, 5, 10, 11

*Colon-Cabrera v. Esso Standard Oil Co.,*
*(P.R.)*, 723 F.3d 82 (1st Cir. 2013) ........................................................................ 3

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ........................................................................ 12

*Department of Homeland Security v. Regents of the University of California,*
591 U.S. 1 (2020) ........................................................................ 16, 17, 18

*DHS v. New York*,
589 U.S. 1173 (2020) ........................................................................ 3

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025) ........................................................................ 9

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002) ........................................................................ 15

*D.V.D. v. DHS*,
No. 26-1212, 2026 WL 2797801 (1st Cir. Sept. 18, 2026) ........................................ 24, 25

*FCC v. Fox TV Stations, Inc.*,
556 U.S. 502 (2009) ........................................................................ 15

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ........................................................................ 4, 11

*Fridley Pub. Sch. Dist., Indep. Sch. Dist. 14 v. Mullin*,
No. 26-cv-1023, 2026 WL 1244043 (D. Minn. May 6, 2026) ........................................ 11, 13

*Fulton v. City of Philadelphia, Pa.*,
593 U.S. 522 (2021) ........................................................................ 18

*Garland v. Aleman*,
596 U.S. 543 (2022) ........................................................................ 21

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ........................................................................ 17, 18

*Graham v. Connor*,
490 U.S. 386 (1989) ....................24

*Gutierrez-Rodriguez v. Cartagena*,
882 F.2d 553 (1st Cir. 1989)....................12

*Heckler v. Chaney*,
470 U.S. 821 (1985) ....................14

*In re Cargill, Inc.*,
66 F.3d 1256 (1st Cir. 1995)....................3

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ....................22

*Laird v. Tatum,*
408 U.S. 1 (1972) .................... 4, 5

*Lange v. California*,
594 U.S. 295 (2021) ....................2, 23, 24

*Libby Welding Co. v. United States*,
444 F. Supp. 987 (D.D.C. 1977)....................10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................... 6, 9, 10, 11, 12

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988) .................... 16, 17

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ....................17

*Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*,
297 U.S. 129 (1936) ....................22

*Mennonite Church USA v. DHS*,
778 F. Supp. 3d 1 (D.D.C. 2025) .................... 11, 12, 13, 14

*Mullin v. Al Otro Lado*,
146 S. Ct. 2079 (2026)....................21

*Mullin v. Doe*,
146 S. Ct. 2121 (2026)....................19

*Murthy v. Missouri*,
603 U.S. 43 (2024) ....................11

*N.S. v. Dixon*,
141 F.4th 279 (D.C. Cir. 2025) ............ 22, 23

*New England Synod v. DHS*,
824 F. Supp. 3d 118 (D. Mass. 2026) ............ *passim*

*Nielsen v. Preap*,
586 U.S. 392 (2019) ............ 22

*Nieves-Villanueva v. Soto-Rivera*,
133 F.3d 92 (1st Cir. 1997) ............ 14

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025) ............ 6, 8, 9, 10, 11

*Patrick Collins, Inc. v. Does 1-38*,
941 F. Supp. 2d 153 (D. Mass. 2013) ............ 2

*Penalbert-Rosa v. Fortuno-Burset*,
631 F.3d 592 (1st Cir. 2011) ............ 7, 8

*Perez v. Volvo Car Corp.*,
247 F.3d 303 (1st Cir. 2001) ............ 6

*Philadelphia Yearly Mtg. of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*,
767 F. Supp. 3d 293 (D. Md. 2025),
*aff'd*, --- F.4th ---, 2026 WL 2409055 (4th Cir. Aug. 18, 2026) ............ 4

*Philadelphia Yearly Mtg. of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.,*
--- F.4th ---, 2026 WL 2409055 (4th Cir. Aug. 18, 2026) ............ 4, 5, 13, 17, 19

*Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989) ............ 2, 5, 11, 23

*Pujol v. Shearson/Am. Express*,
877 F.2d 132 (1st Cir. 1989) ............ 2, 3

*Pullman's Palace-Car Co v. Cent. Transp. Co*,
171 U.S. 138 (1898) ............ 3

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
490 U.S. 477 (1989) ............ 5

*Specht v. Jensen*,
853 F.2d 805 (10th Cir. 1988) ............ 14

*Spratt v. R.I. Dep't of Corr.*,
482 F.3d 33 (1st Cir. 2007) ............ 18

*St. Mary Cath. Par. in Littleton, Colo. v. Roy*,
154 F.4th 752 (10th Cir. 2025) ........................................................................................18, 19, 20

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .........................................................................................................................11

*Trump v. California*,
609 U.S. ---, 2026 WL 2473573 ( Aug. 24, 2026)..................................................................................5

*Union of Concerned Scientists v. Wheeler*,
954 F.3d 11 (1st Cir. 2020)................................................................................................................14

*United Presbyterian Church in the U.S.A. v. Reagan*,
738 F.2d 1375 (D.C. Cir. 1984) ...........................................................................................................5

*United States Postal Serv. v. California*,
No. 26A305, 2026 WL 2687160 (U.S. Sept. 14, 2026) ..........................................................................5

*United States v. Aguilar*,
883 F.2d 662 (9th Cir. 1989)..............................................................................................................23

*United States v. Cianci*,
378 F.3d 71 (1st Cir. 2004)...................................................................................................................7

*United States v. Estes*,
985 F.3d 99 (1st Cir. 2021)...................................................................................................................7

*United States v. Matta-Quinones*,
621 F. Supp. 3d 264 (D.P.R. 2022) .......................................................................................................6

*United States v. Mendoza*,
464 U.S. 154 (1984) ..............................................................................................................................4

*United States v. Rivera-Hernandez*,
497 F.3d 71 (1st Cir. 2007)...................................................................................................................6

*United States v. Texas*,
599 U.S. 670 (2023) ............................................................................................................................10

*United States v. Wogan*,
938 F.2d 1446 (1st Cir. 1991) ............................................................................................................25

*Welsh v. Wisconsin*,
466 U.S. 740 (1984) ............................................................................................................................23

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
No. 1:25-CV-00097-MSM-PAS, 2025 WL 2281864 (D.R.I. Aug. 8, 2025)................................ 13, 14

**STATUTES**

18 U.S.C. § 3559(a) ....................23

28 U.S.C.A. § 1332(d)(5)(B) ....................2

8 U.S.C. § 1325(a) ....................23

8 U.S.C. § 1357(a) ....................20

**RULES**

Fed. R. Civ. P. 20 ....................1

Fed. R. Civ. P. 23(a)(1) ....................2

Fed. R. Civ. P. 56(a) ....................7

Fed. R. Civ. P. 56(c) .................... 6, 10

Fed. R. Evid. 803(3) ....................6

**REGULATIONS**

8 C.F.R. § 287.5(e) ....................22

**OTHER AUTHORITIES**

1 Weinstein's Evidence Manual § 16.04 (2022) ....................8

DHS, *Form I-200 Warrant for Arrest of Alien*, https://www.ice.gov/sites/default/files/documents/Document/2017/I-200_SAMPLE.PDF...21

## INTRODUCTION

Plaintiffs' entire argument is built upon a fundamental misunderstanding. They read the 2025 Guidance's direction to continue to exercise discretion as an invitation to "have at it." Pls.' Reply at 4, ECF No. 121 (hereafter "ECF No. 121"). It is not; and this misunderstanding dooms their argument. It means Plaintiffs cannot show standing because their claimed injuries rely upon the mistaken assumption that the 2025 Guidance directs imminent immigration enforcement at their places of worship. It means there is no Administrative Procedure Act (APA) review and no cognizable substantial burden under the First Amendment or Religious Freedom Restoration Act (RFRA). It defeats their proposed permanent injunction which finds no support in the Constitution. Finally, the Court should reject the attempts to further this misunderstanding by severing the new Plaintiffs.

## ARGUMENT

### I. The Attempt to Join the Extra Ten Plaintiffs is Prejudicial.

Plaintiffs argue Defendants have not identified any plausible prejudice because the Court can fashion relief to cover Plaintiffs' diverse religious practices. ECF No. 121 at 38–39 (citing Fed. R. Civ. P. 20). But the Court recently encountered the exact problem Defendants highlighted in their opening brief during the Plaintiffs' Motion to Show Cause. *See, e.g.*, 9/4/2026 Hr'g, ECF No. 129. There, Plaintiffs claimed a martial arts class, hosted in Minneapolis, organized by a criminal defendant, that trained individuals (not even congregants) on how to assault federal agents was due the same religious protections under RFRA as communal worship. *See* Pls.' Show Cause Reply at 9, ECF No. 128 (hereafter "ECF No. 128"). Similarly, Plaintiffs identify a separate hot-pursuit incident in Los Angeles to argue the Court should expand the injunction to categorically ban such chases unless there is a "specific, affirmative reason to believe . . . [there is] an immediate threat[.]" ECF No. 121 at 33. These are exactly the sort of "mini-trials" presenting unique arguments, by individuals outside the Court's venue, that courts within the First Circuit have found frustrate the purpose of permissive joinder. *See,*

*e.g.*, *Patrick Collins, Inc. v. Does 1-38*, 941 F. Supp. 2d 153, 164 (D. Mass. 2013). Adding the extra ten Plaintiffs would open the door to more "mini-trials" and further burden the Court.

Plaintiffs' solution—that the Court enter a permanent injunction covering *all* the conduct at issue, ECF No. 121 at 39—is no answer. Every "mini-trial" presents its own unique facts which require evaluation on a case-by-case basis because whether a particular circumstance involves exigencies, or whether the purpose of an enforcement action is to enforce immigrations laws, necessarily turns on the individual facts of each case. *See Lange v. California*, 594 U.S. 295, 299 (2021); *see also Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989). The Court will be stuck adjudicating these disputes across the country, as it is currently doing with respect to an alleged violation of the preliminary injunction order in Minnesota.

Plaintiffs argue joining the extra Plaintiffs is consistent with the purpose of federal joinder rules because they aim "to achieve judicial economies of scale by resolving related issues in a single lawsuit…" ECF No. 121 at 40 (citing *Pujol v. Shearson/Am. Express*, 877 F.2d 132, 134 (1st Cir. 1989)). Plaintiffs stretch *Pujol* beyond its breaking point. There, the plaintiffs sought to introduce *one* additional plaintiff who was *indispensable* to the underlying action. *Pujol*, 877 F.2d 133. Here, Plaintiffs propose adding ten additional regional bodies representing thousands of places of worship and hundreds of thousands of members. *See, e.g.*, Ex. 55 ¶ 7; Ex. 16 ¶ 5; Ex. 37 ¶ 9; Ex. 39 ¶ 6; Ex. 36 ¶ 6; Ex. 38 ¶ 7; Ex. 71 ¶ 7. And Plaintiffs do not even attempt to argue these bodies are indispensable to the action. ECF No. 121 at 38. Furthermore, though Rule 20 seeks to further judicial efficiency, *see Pujol*, 877 F.2d at 134, it was not meant as an end run around the other rules of civil procedure, such as a Class Action, *see* Fed. R. Civ. P. 23(a)(1) (Class Action is the proper vehicle where a group of plaintiffs is "so numerous that joinder of all members is impactable"), or federal statutes, *see* 28 U.S.C.A. § 1332(d)(5)(B) (100 plaintiffs or more is sufficiently numerous to certify a class). Taken together, Plaintiffs' joinder request here bears no resemblance to the narrow addition approved in *Pujol* and instead attempts to sidestep frameworks designed to govern cases with numerous potential plaintiffs.

Plaintiffs additionally argue joinder is appropriate here because "nine of the ten newly added [P]laintiffs are regional bodies of the [ELCA]." ECF No. 121 at 38. That response raises more questions than answers. Why did these regional bodies wait until *after* the Court issued the preliminary injunction to join this suit? The First Circuit considers "the length of time the applicant knew or reasonably should have known that its interest was imperiled before it moved" to join[1] a lawsuit and the "idiocratic circumstances which, fairly viewed, militate for or against" joinder. *Banco Popular de Puerto Rico v. Greenblatt*, 964 F.2d 1227, 1231 (1st Cir. 1992). Here, the newly added Plaintiffs waited almost 18 months before bringing their claims, *see* Am. Compl., ECF No. 97, despite other regional bodies in their same organization bringing suit nearly a year earlier. *See* Compl., ECF No. 1. Plaintiffs also sought to join this lawsuit after the Court had already held the original Plaintiffs were "likely to succeed on the merits of their RFRA claim." *New England Synod v. DHS*, 824 F. Supp. 3d 118, 160 (D. Mass. 2026). The implication is that the newly added Plaintiffs waited to see which way the wind would blow before deciding to join this suit. *See* ECF No. 121 at 40 (explaining the newly added Plaintiffs want to join this action which "is already on the cusp of final judgment."). The First Circuit has held such tactics "nourish the impression that the courts," will be susceptible to judge-shopping and so have held the "equities counsel restraint." *In re Cargill, Inc.*, 66 F.3d 1256, 1264 (1st Cir. 1995).

Finally, Plaintiffs argue they will be prejudiced because they "would have to file in multiple different judicial districts, drastically expanding the number of lawsuits . . . requiring a much greater expenditure of party and judicial resources, and allowing for the possibility of inconsistent judgments." ECF No. 121 at 39–40. As an initial matter, "the mere prospect of future litigation" does not constitute prejudice. *Pullman's Palace-Car Co v. Cent. Transp. Co*, 171 U.S. 138, 146 (1898); *see also Colon-Cabrera v. Esso Standard Oil Co. (P.R.)*, 723 F.3d 82, 87 (1st Cir. 2013). Furthermore, the possibility of "inconsistent" judgments is desirable because it allows diverse opinions from multiple courts to weigh in on this issue. *See, e.g.*, *DHS v. New York*, 589 U.S. 1173, 1176 (2020) (Gorsuch, J., concurring); *Box*

[1] *Banco* explained the necessary factors ruling on the timeliness of a motion to intervene—not join. 964 F.2d at 1231. Nevertheless, the First Circuit considers both intervention and joinder under the same framework of judicial efficiency. *Pujol*, 877 F.2d at 134; *see also* ECF No. 121 at 40.

*v. Planned Parenthood of Ind. & Ky., Inc.*, 587 U.S. 490, 496 (2019) (Thomas, J., concurring) (declining to review an issue "because further percolation may assist our review of this issue of first impression"); *Arizona v. Evans*, 514 U.S. 1, 24 n.1 (1995) (Ginsburg, J., dissenting) ("when frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement"); *United States v. Mendoza*, 464 U.S. 154, 160 (1984) (explaining systems that "freez[e] the first final decision rendered on a particular legal issue[]" "substantially thwart the development of important questions of law"). Plaintiffs themselves are the beneficiaries of this system in that they have cited the Fourth Circuit or District of Maryland's opinions on these same issues—*Phil. Yearly I, II, & III*—no less than 30 times. *See generally*, ECF No. 121. Thus, Plaintiffs' alleged prejudices are not prejudicial at all. The Court should sever the additional Plaintiffs.

## II. Plaintiffs Lack Standing

***Plaintiffs Do Not Demonstrate Injury-in-Fact.*** Plaintiffs claim the 2025 Guidance caused four types of cognizable injury: (1) decreased attendance; (2) decreased revenue; (3) chill to First Amendment exercise by "being compelled to close off worship spaces[;]" and (4) lost time and money devoted to security upgrades. *Id.* at 4. None of these injuries are cognizable. *See* ECF No. 115 at 9. As an initial matter, Plaintiffs' "chilling effect" and lost time and money injuries are directly foreclosed. *New England Synod*, 824 F. Supp. 3d at 142-43; *see also FDA v. All. for Hippocratic Med.* ("*Alliance*"), 602 U.S. 367, 384, 390 n.3 (2024); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 419 (2013); *Laird v. Tatum,* 408 U.S. 1, 11 (1972). And Plaintiffs' alleged decreased revenue does not identify a separate injury from reduced attendance. *Philadelphia Yearly Mtg. of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 313–315 (D. Md. 2025) ("*Phil. Yearly I*"), *aff'd*, --- F.4th ---, 2026 WL 2409055 (4th Cir. Aug. 18, 2026). Plaintiffs' standing thus rests on decreased attendance.

Decreased attendance is not cognizable here. Plaintiffs allege that their members suffer a subjective chill regarding their religion and associational rights, i.e., the 2025 Guidance deters

attendance by causing fear of surveillance, interrogation, or arrest, in or near places of worship. Pls.' Cross MSJ at 30–31, ECF No. 111 (hereafter "ECF No. 111"). In other words, Plaintiffs allege the subjective chill *causes* reduced attendance. *Id. Clapper* directly forecloses this theory. 568 U.S. at 419; *see also Laird,* 408 U.S. at 11; *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984); *but see Presbyterian Church*, 870 F.2d at 522 ("The alleged effect on the churches is not a mere subjective chill on their worship activities; it is a concrete, demonstrable decrease in attendance at those worship activities."). The Fourth Circuit's finding that Plaintiffs could likely demonstrate an injury surpassing subjective chill, *Philadelphia Yearly Meeting of Religious Society of Friends v. DHS*, --- F.4th ---, 2026 WL 2409055, at *7 n.6 (4th Cir. Aug. 18, 2026) ("*Phil. Yearly III*"), overlooks *Clapper's* language that self-inflicted injuries which are the product of the subjective chill—here, staying home due to fear of immigration enforcement at a place of worship—are not traceable to the Defendants unless there is "a threat of certainly impending" enforcement action. *Clapper*, 568 U.S. at 418.

The Supreme Court also recently reaffirmed this principle in *Trump v. California*, 609 U.S. ---, 2026 WL 2473573, at *2 ( Aug. 24, 2026). There, States brought suit to oppose an Executive Order regarding election integrity, namely a direction to "create and distribute State Citizenship Lists . . . to 'prioritize' investigation and prosecution of those who . . . issu[e] ballots to ineligible voters. . . ."[2] *Id.* at *2–4. The Supreme Court first explained these measures were "internal directive[s]" which imposed "no obligations on the [plaintiffs], so they 'suffer no concrete harm'" and thus lack standing. *Id.* at *2. As in *Trump v. California*, Plaintiffs' true source of injury is the downstream effects of an action immigration officers *might* take in the future. 2026 WL 2473573, at *2 (U.S. Aug. 24, 2026). The Supreme Court rejected this theory of injury explaining plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears[.]" *Id.* at *3. And the hypothetical harm Plaintiffs fear—an immigration enforcement action at a place of worship—is far from certainly

[2] The Court recently denied the application for stay in the related litigation *United States Postal Serv. v. California*, No. 26A305, 2026 WL 2687160 (U.S. Sept. 14, 2026), holding the government was unlikely to succeed on the merits. The Court did not overturn *Trump v. California* and so its holdings regarding standing are still applicable. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).

impending. Even where Plaintiffs can point to law[3] enforcement activity at a place of worship, ECF No. 121 at 9 n.2, they cannot show certainly impending injury because standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (mem.) (Kavanaugh, J. concurring). So even allegations of past law enforcement activities do not establish that Plaintiffs themselves are sufficiently likely to "again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Plaintiffs, further, have failed to satisfy their burden showing reduced attendance "through specific facts[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of [Fed. R. Civ. P.] 56(c)[.]" *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) (citation omitted). Plaintiffs' 60 "straightforward factual statements" are insufficient because they are based on undefined discussions with unnamed persons at unspecified times. *See, e.g.*, Ex. 39 ¶ 27; Ex. 38 ¶ 27; Ex. 37 ¶ 16; Ex. 16 ¶¶ 20–21. Even where Plaintiffs present specific numbers, *see, e.g.*, Ex. 88 ¶ 11; Ex. 73 ¶ 6, or the testimony of specific pastors, *see, e.g.,* Ex. 25 ¶ 6, those statements do not show the 2025 Guidance caused the decline because they indicate general immigration enforcement is the cause of Plaintiffs' reduced attendance. *See infra* at 9–12.

Plaintiffs argue their statements are not hearsay because they fit the then-existing state of mind exception. ECF No. 121 at 7 (citing Fed. R. Evid. 803(3)). "To be admissible under the state-of-mind exception, 'a declaration ... must mirror a state of mind, which, in light of all the circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time.'" *United States v. Rivera-Hernandez*, 497 F.3d 71, 81 (1st Cir. 2007). It does not "encompass statements of memory or belief to prove the fact remembered or believed[.]" *United States v. Matta-Quinones*, 621 F. Supp. 3d 264, 267 (D.P.R. 2022) (citation modified). A pastor's statement that members fear "La Migra" at places of worship, Ex. 77 ¶ 24, or that they are "afraid of immigration

[3] Defendants maintain the surveillance at University Baptist Church was not an immigration enforcement action. *See* ECF No. 125 at 6–8.

enforcement at the building," Ex. 74 ¶ 4, is untethered from any temporal proximity. Plaintiffs' case, *United States v. Estes*, supports this argument. There, the victim called 911 and relayed the defendant currently had a loaded gun in his pocket, was pointing it at her, was probably going to shoot her, and that she was scared. 985 F.3d 99, 102-03 (1st Cir. 2021). In contrast, Plaintiffs' statements generally assert fear of immigration enforcement during a highly publicized prioritization in enforcement, not some temporal fear at their places of worship. *See* ECF No. 115 at 11 n.7.

Plaintiffs' statements are thus more akin to the hearsay statements in *United States v. Cianci*, 378 F.3d 71 (1st Cir. 2004). There, the defendant, after he had been charged with conspiracy, offered a taped statement where he made assertions that he did not tolerate corruption. *Id.* at 106. The Court held the timing of statement placed doubts on the statements' probative value into the defendants' state of mind. *Id.* The Court additionally opined the contents of the statement—that the defendants' associates were "honest as the day is long[]" and that previous pay-offs were "gratuitous"—made their accuracy especially suspect because they were "to a large extent 'self-serving' attempts to cover tracks already made." *Id.* Similarly here, Plaintiffs take great pains to clarify their members are afraid of immigration enforcement actions at places of worship specifically. *See, e.g.*, Ex. 67 ¶ 20 ("[Two people] confirmed that they did not come specifically due to fears of I.C.E."). The Court should view these statements with suspicion. Thus, Plaintiffs' statements fail to satisfy Rule 803(3)'s requirements and should be regarded as the same kind of unreliable hearsay the First Circuit has declined to credit.

Plaintiffs also argue their statements are not conclusory because they are "straightforward factual statements[.]" ECF No. 121 at 5. But the First Circuit has held that factual statements which are "so threadbare or speculative that they fail to cross 'the line between conclusory and the factual[]'" are inadequate. *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 595 (1st Cir. 2011).[4] There, the First Circuit found a statement containing "nothing beyond speculation" that "the governor or his chief of

[4] *Penalbert-Rosa* discussed the sufficiency of factual allegations at the motion to dismiss stage—not summary judgment. 631 F.3d at 595. Nevertheless, it's reasoning that that threadbare factual assertions are inadequate absent more specific factual assertions is equally applicable to summary judgment because summary judgment requires "the movant shows that there is no genuine dispute as to any material fact[.]" Fed. R. Civ. P. 56(a).

staff participated in the decision to dismiss Peñalbert[]" was insufficient. *Id.* at 596. Here too, Plaintiffs' declarations contain speculation and uncertainty; either as to whether an incident was an immigration enforcement action at all, *see, e.g.*, Ex. 20 ¶ 11; Ex. 19 ¶ 8, or as to why their members are not attending, *see, e.g.*, Ex. 77 ¶ 25; Ex. 52 ¶ 17; Ex. 70 ¶ 6. These speculative, unsupported assertions fall well short of the factual specificity the First Circuit requires.

Plaintiffs claim the declarations "describe[] multiple specific incidents of ICE enforcement near [] church[es.]" ECF No. 121 at 6. But these specific incidents underscore Defendants' argument—Plaintiffs' members fear immigration enforcement in the community generally and not at places of worship because the "multiple specific incidents" occur in the community at large and not at places of worship. *See, e.g.*, Ex. 25 ¶ 7–9; Ex. 23 ¶ 6; Ex. 24 ¶ 9; Ex. 27 ¶ 5; Ex. ¶ 42 ¶¶ 38–39; Ex. 78 ¶ 9; Ex. 82 ¶¶ 5–6. Plaintiffs' argument that the Mayorkas Memorandum would have covered public streets and corners around places of worship, ECF No. 121 at 8–9, is speculative. The Mayorkas Memorandum explicitly left the determination of what constitutes "near" to the individual officers' discretion based on multiple factors. Ex. 5 at 3. This Court opined 100 feet was a reasonable benchmark. *New England Synod*, 824 F. Supp. 3d at 167. None of Plaintiffs' declarations show the enforcement actions occurred within 100 feet of a place of worship. *See, e.g.*, Ex. 90; Ex. 91; Ex. 92; Ex. 93; *see also* City of Chicago, *Street and Site Plan Design Standards* 2 (2007) (stating block dimensions in Chicago are 660 feet by 330 feet).

Plaintiffs' statements are additionally inadmissible because they express a mistaken belief that Defendants will perform an immigration enforcement action at their places of worship. *See, e.g.*, Ex. 77 ¶ 24; Ex. 74 ¶ 4. This belief is lack foundation, *see infra* at 9–10, shows Plaintiffs' alleged reduced attendance is a non-cognizable self-inflicted injury, *see supra* at 4–6, and firmly renders the statements hearsay because the "exclusion of statements of . . . belief is justified on the ground that the dangers of improper perception, faulty memory and deliberate misstatement are far greater when the statement is being used to prove a past fact rather than a future act." 1 Weinstein's Evidence Manual § 16.04

(2022). Finally, Plaintiffs argue that the Court should consider their declarations because they can be offered in admissible form at trial. ECF No. 121 at 8 (citation omitted). But Defendants argue Plaintiffs' evidence is unconvincing, even if admissible. *See* ECF No. 115 at 11. Live testimony at trial will not change its probative value. In sum, Plaintiffs' declarations show that Plaintiffs' factual assertions are either hearsay, conclusory, irrelevant, or do not show causation. *See infra* at 9–12.

***Plaintiffs Do Not Establish Causation.*** Plaintiffs disclaim their obligation to establish the causal chain by averring "specific facts[,]" *Lujan*, 504 U.S. at 561 (citation omitted), asking the Court to draw a "commonsense inference[]" that attendance would decline in response to the 2025 Guidance. ECF No. 121 at 11 (quoting *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 120-21 (2025)). As an initial matter, Plaintiffs overstate *Diamond's* language. *See* ECF No. 121 at 10. There, the Supreme Court did not hold that courts can rely *solely* on inferences; it explained "commonsense [] inferences . . . *combined* with" the declarations from the parties were sufficient to show predictability. *Id.* at 120 (emphasis added). Furthermore, Plaintiffs' declarations show general immigration enforcement is the cause of Plaintiffs' reduced attendance—not the 2025 Guidance. *See* ECF No. 115 at 13–14.

Plaintiffs attempt to lower their burden for proving causation by claiming fear of immigration enforcement in the general community "does not undermine Plaintiffs' showing" of causation. ECF No. 121 at 12. But this argument goes far afield from the scope of this case. Plaintiffs must show their alleged injury is "fairly traceable to the challenged action[,]" i.e., the rescission of the Mayorkas Memorandum and the implementation of the 2025 Guidance. *Lujan*, 504 U.S. at 560. Plaintiffs' reading that the Mayorkas Memorandum would have covered immigration enforcement actions throughout the community, blocks away from sensitive locations, is plainly overbroad. *See supra* at 8. Furthermore, by claiming causation through immigration enforcement actions throughout the community, Plaintiffs bring a broad, programmatic attack on the Executive's immigration enforcement policies generally, a tactic which—besides presenting "obvious difficulties insofar as proof of causation or redressability"—the Supreme Court has opined is "rarely if ever appropriate for federal-court

adjudication." *Lujan*, 504 U.S. at 568 (citation omitted); *see also United States v. Texas*, 599 U.S. 670, 676-77 (2023). The Court should thus find that Plaintiffs' members' general fear of immigration enforcement in the community is insufficient to support causation.

Plaintiffs' remaining arguments are unpersuasive. First, Plaintiffs argue the 2025 Guidance caused their injuries because it took away the "measure of security" their members felt while at places of worship. ECF No. 121 at 13. But this undermines Plaintiffs' argument that they have established an injury-in-fact because it demonstrates that Plaintiffs' reduced attendance is premised on their members' subjective chill, i.e., their members' fear of potential immigration enforcement actions. *See supra* at 4–6. Also, as this Court earlier opined, the Mayorkas Memorandum did not have binding legal consequences. *New England Synod*, 824 F. Supp. 3d at 162–63. To the extent Plaintiffs were under the misimpression that the Mayorkas Memorandum shielded them altogether from immigration enforcement at places of worship, any such reliance was unreasonable and mistaken under a plain reading of the guidance. *See Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977). Second, Plaintiffs argue the Court should accept Plaintiffs' declarations as true since Defendants have not submitted a counter-factual declaration. ECF No. 121 at 13. But Plaintiffs—not Defendants—bear the burden of establishing each element of standing. *Lujan*, 504 U.S. at 561. Further, as Defendants have pointed out, and as they are permitted to do so under the Federal Rules, Plaintiffs' evidence does not set forth specific facts, let alone sufficient facts to establish standing. *See supra* at 6–9; ECF No. 115 at 9–13; Fed. R. Civ. P. 56(c)(1)(B).

Third, Plaintiffs incorrectly quote Defendants as arguing "that Plaintiffs cannot challenge a policy that does not directly 'regulate, constrain, or compel [them.]'" ECF No. 121 at 13 (quoting ECF No. 115 at 17). The full quotation reads that "plaintiffs cannot establish standing based on the alleged chilling effect of a policy that 'does not regulate, constrain, or compel. . .'" ECF No. 115 at 17 (quoting *Clapper*, 568 U.S. at 419). As explained above, harm caused by "subjective chill" is not cognizable. *See supra* at 4–6. Fourth, Plaintiffs argue they do not need to show an "imminent" threat of enforcement

because they have identified ongoing harms, i.e., reduced attendance. ECF No. 121 at 13. But that argument again overlooks the fact that reduced attendance is self-inflicted. *See supra* at 4–6. Finally, Plaintiffs argue their theory of causation is not too attenuated because the 2025 Guidance's effects "were clear and direct," ECF No. 121 at 14. Not true. The causal chain here is "murky[,]" *Murthy v. Missouri*, 603 U.S. 43, 69 n.8 (2024), because the 2025 Guidance does not direct enforcement at places of worship, Ex. 8; it coincides with a widely publicized general prioritization in immigration enforcement, *see* DHS Admin. Rec. at 7–21, ECF No. 90; *cf. Murthy*, 603 U.S. at 69 n.8; it does not grant DHS any new or expanded authority as DHS guidance has consistently permitted immigration enforcement actions at sensitive locations, *see New England Synod*, 824 F. Supp. 3d at 162–63; *see also Mennonite Church USA v. DHS*, 778 F. Supp. 3d 1, 11 (D.D.C. 2025), *appeal filed,* No. 25-5209 (D.C. Cir. June 5, 2025); *Fridley Pub. Sch. Dist., Indep. Sch. Dist. 14 v. Mullin*, No. 26-cv-1023, 2026 WL 1244043 (D. Minn. May 6, 2026); and, even if reduced attendance was predictable (which it is not), the causation requirement rules out "distant (even if predictable) ripple effects." *Alliance*, 602 U.S. at 383.

Plaintiffs argue that reduced attendance is not a distant ripple effect. ECF No. 121 at 14. Their argument, however, is belied by a walk through the steps in the causal chain: (1) Defendants issue the 2025 Guidance; (2) Plaintiffs' members discover the 2025 Guidance, *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 434 (2021); (3) Plaintiffs' members know the 2025 Guidance implicates places of worship, *see id.*; (4) Plaintiffs' members interpret the direction "officers should continue to use [] discretion along with a healthy dose of common sense[,]" Ex. 8, to mean officers *will* target places of worship, *Clapper*, 568 U.S. at 411; (5) Plaintiffs' members believe their place of worship will be subject to an *immediate* enforcement action, *see, e.g.*, *id.*; (6) Plaintiffs' members choose not to attend due to the perceived threat at the place of worship as opposed to the threat of enforcement generally, *see Lujan*, 504 U.S. at 560; and (7) enough members stay home so that Plaintiffs can show a "demonstrable decrease in attendance[,]" *Presbyterian Church*, 870 F.2d at 522. This seven-step chain is highly attenuated. *Cf. Alliance*, 602 U.S. at 386–87 (alleging a three-step causal chain); *accord Clapper*, 568 U.S.

at 410 (alleging a five-step causal chain). Furthermore, three steps in this chain are not reasonable: the interpretation that the 2025 Guidance means DHS *will* take enforcement actions at places of worship; the belief that the member's place of worship is threatened by an *immediate* enforcement action; and the decision not to attend because of the threat of enforcement at the place of worship specifically rather than the threat of enforcement generally. The 2025 Guidance does not direct enforcement at places of worship. Ex. 8. And Plaintiffs' declarations show their members fear immigration enforcement generally—not just at their places of worship. *See supra* at 9–10. Thus, Plaintiffs' chain is not only highly attenuated, but also not reasonable. *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 569 (1st Cir. 1989) (explaining causation requires reasonability in the damages context).

***Plaintiffs' Requested Relief Will Not Redress their Alleged Injury.*** As with the first two elements of standing, Plaintiffs' declarations fail to provide specific details establishing their purported injuries are redressable despite the fact the preliminary injunction has been in place for nearly a year. *See* Prelim. Inj. Order, ECF No. 74; *see also* ECF No. 115 at 19; *supra* at 6–9. At bottom, redressability depends upon the "unfettered choices" of Plaintiffs' congregants. *Lujan*, 504 U.S. at 562. Because the 2025 Guidance does not target places of worship, because the Mayorkas Memorandum did not prohibit immigration enforcement at places of worship, and because any judicial relief, including rescinding the 2025 Guidance, could not categorically preclude enforcement actions in or near Plaintiffs' places of worship, *see* ECF No. 115 at 19–20, it is speculative that Plaintiffs' congregants would return to services if the 2025 Guidance were vacated or permanently enjoined. "[R]edressability [that] requires speculat[ion]," is insufficient. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006).

## III. APA Review is Unavailable

***The 2025 Guidance Does Not Have Direct and Appreciable Legal Consequences.*** Plaintiffs offer no reason why the Court should revisit its earlier holding that the recission of the Mayorkas Memorandum did not carry binding legal consequences. *See* ECF No. 115 at 22–23. The Court previously rejected Plaintiffs' argument that the text of the Mayorkas Memorandum was legally

binding, *compare* ECF No. 111 at 34 *with New England Synod*, 824 F. Supp. 3d at 162–63. The Court also previously rejected Plaintiffs' argument that DHS's website portal to submit complaints made the Mayorkas Memorandum binding. *Compare* ECF No. 111 at 35 *with New England Synod*, 824 F. Supp. 3d at 163. And Plaintiffs disclaim the only new evidence they proffer—the declarations of two former DHS officials. ECF No. 121 at 24; *see id.* at 26 n.4.

Two other district courts have also opined that the Mayorkas Memorandum did not create legally enforceable rights and thus its recission via the 2025 Guidance similarly did not create legal consequences. *See Fridley*, 2026 WL 1244043, at *12; *Mennonite Church*, 778 F. Supp. 3d at 11. For its part, the Fourth Circuit did not directly consider whether the 2025 Guidance carried appreciable legal consequences. *See Phil. Yearly III*, 2026 WL 2409055, at *8, 11. Nevertheless, it opined that rescinding the 2025 Guidance "would not completely prevent immigration enforcement actions at or near . . . [places] of worship." *Id.* at *8; *see also id.* at *15 (Agee, J., concurring). Thus, the Court should not read *Phil. Yearly III* to imply that either the Mayorkas Memorandum or the 2025 Guidance was binding.

Despite disclaiming the former DHS officials' declarations, Plaintiffs nevertheless argue the Court should consider these statements because they will "facilitate [its] comprehension of the record of the agency's decision." ECF No. 121 at 24 (citing *City of Taunton, Mass. v. EPA*, 895 F.3d 120, 127 (1st Cir. 2018)). Facilitating comprehension, by itself, is not a reason to consider the statements. *City of Taunton* laid out two well-defined examples where extra-record evidence was appropriate. First, in "agency decisions involving 'highly technical, environmental matters,'" and, second, upon "a 'strong showing of bad faith or improper behavior[.]'" 895 F.3d at 127; *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 2281864, at *1 (D.R.I. Aug. 8, 2025) (applying same standard). Plaintiffs have not argued that either exception applies here, *see* ECF No. 121 at 24–25, and so the declarations are not properly before the Court. Plaintiffs further argue the Court may consider the declarations because they boost Plaintiffs' standing arguments "by demonstrating how much more restrictive the former policy was[.]" *Id.* But whether the Mayorkas

Memorandum was "restrictive" is besides they point—it did not prohibit enforcement actions in or near sensitive locations. Ex. 5 at 3–4. Indeed, it provided that enforcement could occur in or near sensitive locations with headquarters approval. *Id.* Thus, any injury, including the purported reduction in attendance, is speculative and not certainly impending. *See supra* at 4–9.

Furthermore, the former officials' statements will not facilitate the Court's comprehension of the Mayorkas Memorandum or the 2025 Guidance. Whether the Mayorkas Memorandum and, by extension, the 2025 Guidance, carried binding legal consequences is a purely legal question. "In our legal system, purely legal questions . . . [are] exclusively the domain of the judge." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997). Indeed, one reason why legal opinions are disfavored is because "the judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial." *Id.* at 100. Plaintiffs' statements present such a danger. At best, they merely regurgitate Plaintiffs' legal arguments (which this Court already rejected). *Compare* ECF No. 111 at 34–35 *with* Ex. 6 ¶ 6 *and* Ex. 7 ¶ 12. At worst, they are prejudicial because they use "the mystique inherent" in their former positions to tell the Court how to rule. *See Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988). The Court should thus exclude the statements.

***The 2025 Guidance is Committed to Agency Discretion.*** Plaintiffs argue the 2025 Guidance is not committed to agency discretion because the First Amendment, RFRA, and the Mayorkas Memorandum provide "meaningful standard[s] against which to judge [Defendants'] exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *see also* ECF No. 121 at 8. Beginning with the Mayorkas Memorandum, that document cannot provide an independent standard to judge agency discretion since it does not carry legal consequences and has been superseded. *See supra* at 12–14; *New England Synod*, 824 F. Supp. 3d at 162–63; DHS Admin R. at 1. Moving on to RFRA and the First Amendment—the question of whether meaningful standards exist to judge an agency's exercise of discretion is grounded in the underlying statute and its implementing regulations. *See Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18 (1st Cir. 2020) (holding the underlying statute provided

the standards for meaningful review); *see also Drake v. FAA*, 291 F.3d 59, 71 (D.C. Cir. 2002) (holding the court may only review the challenged FAA decisions "if the operative statute provides clear guidelines by which to do so"). And Plaintiffs have no response to Defendants' argument that the Immigration and Nationality Act ("INA") does not place restrictions on enforcement actions at places of worship beyond incorrectly asserting Defendants claim "that no policy involving 'enforcement of the Nation's immigrations law' can be subject to APA review." ECF No. 121 at 28; *see* ECF No. 115 at 31 (explaining Congress granted DHS broad discretion to enforce immigration laws).

Finally, Plaintiffs argue Defendants' precedent merely shows "the proposition that [only] individual enforcement decisions can involve discretion." ECF No. 121 at 29. This argument, again, demonstrates Plaintiffs' fundamental misunderstanding of the 2025 Guidance. The 2025 Guidance disclaimed the need for "bright line rules[,]" Ex. 8, and Plaintiffs' case challenges the agents' individual exercise of discretion. *See* ECF No. 121 at 2 ("[the 2025 Guidance] threw out . . .the Mayorkas Memo[randum], expressly disclaiming . . . the need for "bright line rules" to cabin individual discretion. . . . [and] imposed no substantive limitations on those employees' decisionmaking."). Defendants' precedents clearly show Courts give due deference to the Executive's exercise of discretion in the immigration context. *See* ECF No. 115 at 25–26; *see also* ECF No. 121 at 28–29. Thus, Defendants' precedent is applicable beyond just individual enforcement decisions.

## IV. The 2025 Guidance Does Not Violate the APA

Plaintiffs argue DHS failed to explain its reasoning for rescinding the Mayorkas Memorandum ECF No. 121 at 29 (citation omitted). Not true. The Huffman Memorandum explained "officers frequently apply enforcement discretion[,]" that "law enforcement officers should continue to use that discretion[,]" and that it was not necessary "to create bright line rules regarding where our immigration laws are permitted to be enforced." Ex. 8. Even if Plaintiffs disagree with DHS's conclusion, its analytical path is clear. *Cf. FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

Plaintiffs also argue the record shows Defendants did not sufficiently consider reliance interests, i.e., the effect switching from the Mayorkas Memorandum to the 2025 Guidance would have on religious practice. ECF No. 121 at 30–31. Again, not true. The Supreme Court in *Department of Homeland Security v. Regents of the University of California* laid out the necessary steps to identify and consider reliance interests: "[1] assess whether there were reliance interests, [2] determine whether they were significant, and [3] weigh any such interests against competing policy concerns." 591 U.S. 1, 33 (2020) ("*Regents*"). Defendants conducted such an analysis. Defendants considered the previous three decades of Sensitive Locations Guidance, including the rationale that DHS should "refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area." *See* ICE Admin. Rec. at 1–67. DHS determined, to the extent there were any reliance interests, they were not significant. *See* Ex. 8. DHS is entitled to determine the reliance interests are either unjustified or due little weight. *Regents*, 591 U.S. at 32. Finally, DHS weighed the reliance interests against competing policy concerns—the Executive's prioritization of immigration enforcement—and concluded that prioritizing enforcement outweighed any reliance interests. *See* DHS Admin Rec. at 7–21.

As addressed next, the 2025 Guidance is not contrary to law.

## V. The 2025 Guidance Does Not Violate RFRA

***The 2025 Guidance Does Not Substantially Burden Religion.*** Plaintiffs first argue they have proven a substantial burden. ECF No. 121 at 16. Defendants, again, renew their arguments to the contrary. *See supra* at 4–9. Plaintiffs next attempt to confine *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) and *Bowen v. Roy*, 476 U.S. 693 (1986) to "'internal' procedures." ECF No. 121 at 16. But neither *Lyng* nor *Bowen* were so confined. *See Lyng,* 485 U.S. at 450–51 ("incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not impose a substantial burden); *Bowen*, 476 U.S. at 699 ("Never . . . has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further

his or her spiritual development or that of his or her family."). Indeed, the conduct in *Lyng* was building a public road—a far cry from an internal government procedure. 485 U.S. at 442. Neither does Plaintiffs' suggestion that *Lyng* is only applicable to cases where the government uses federal lands, ECF No. 121 at 17, hold water since *Lyng* explicitly rejected the argument that "land-use cases" are different from "purely internal" government practice. 485 U.S. at 456 (explaining that the Constitution, and RFRA, bars any "substantial external effect" on religious exercise).

The Fourth Circuit's finding that similar plaintiffs were likely to succeed on their RFRA claim, *Phil. Yearly III*, 2026 WL 2409055, at *9, respectfully, is incorrect. The Fourth Circuit relied on *Mahmoud v. Taylor*, 606 U.S. 522, 557 (2025) to hold the 2025 Guidance "'implicates direct, coercive interactions' between government agents and churchgoers." *Phil. Yearly III*, 2026 WL 2409055, at *11. This reasoning fails because: (1) previous guidance did not prohibit enforcement in or near places of worship, *see supra* at 12–15; (2) the 2025 Guidance does not direct enforcement at *any*—let alone Plaintiffs'—places of worship, *see id.*; and (3) the 2025 Guidance *internally* directs agents—not churchgoers—to use their "commonsense[.]" Ex. 8. Thus, the 2025 Guidance is distinguishable from the mandatory exposure to "LGBTQ+-inclusive" storybooks in *Mahmoud*. 606 U.S. at 557.

***The 2025 Guidance Represents a Compelling Government Interest.*** Plaintiffs do not argue enforcing immigration laws is not a compelling interest, but they maintain Defendants' position is an impermissible categorical approach. *See* ECF No. 121 at 17–18 (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal ("O Centro")*, 546 U.S. 418, 430–31 (2006)). In *O Centro*, the Supreme Court stated RFRA requires courts to "look[] beyond broadly formulated interests . . . and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." 546 U.S. at 431. The Court need look no farther than Plaintiffs' recent Motion to Show Cause to see how Defendants' uncontested strong interest—law enforcement, *see New England Synod*, 824 F. Supp. 3d at 157—would be adversely affected by granting an exemption to Plaintiffs. There, Plaintiffs argued an undercover criminal investigation into a non-alien suspected of hosting martial arts training with the express

purpose to assault federal agents was a violation of this Court's preliminary injunction and, by implication, RFRA. *See* Pls.' Show Cause Reply at 9, ECF No. 126-1. Providing a specific exemption to Plaintiffs in this instance will endanger federal agents and frustrate legitimate law enforcement interests by providing suspected criminals who wish to harm federal agents "sanctuary" from which they can plan their crimes or avoid arrest. Plaintiffs' arguments in their Motion to Show Cause highlight Defendants' particular interests and show how those interests would be undermined by denying a religious exemption to Plaintiffs. *See O Centro*, 546 U.S. at 431 (citation omitted).

***The 2025 Guidance is the Least Restrictive Means.***[5] Plaintiffs continue to argue the Mayorkas Memorandum is a less restrictive means to enforce immigrations laws at places of worship. ECF No. 121 at 19. But Defendants only need to consider alternatives that work "equally well." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 731 (2014). The Mayorkas Memorandum does not work "equally well" to enforce immigration laws. *See* ECF No. 115 at 33–34. Defendants explicitly considered and rejected the Mayorkas Memorandum. *See* DHS Admin. Rec. at 2–6. Contrary to Plaintiffs' assertion, Defendants are not required to enforce immigration laws *only* pursuant to the Mayorkas Memorandum. *See Regents*, 591 U.S. at 33; *see also Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 41 (1st Cir. 2007) (explaining the government satisfies least restrictive means test if it demonstrates that it considered and rejected the efficacy of less restrictive measures).

## VI. The 2025 Guidance Does Not Violate Plaintiffs' Expressive Association Rights

Neutral and generally applicable government action does not create a significant burden on associational rights. *See St. Mary Cath. Par. in Littleton ("St. Mary") v. Roy*, 154 F.4th 752, 765 (10th Cir. 2025), *cert. granted sub nom. St. Mary Cath. Par., Littleton, Colo. v. Roy*, 224 L. Ed. 2d 496 (Apr. 20, 2026). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia, Pa.*, 593 U.S. 522, 533 (2021). General applicability requires, "where the State has in place a system of individual exemptions,

[5]For similar reasons, Defendants maintain the 2025 Guidance also satisfies exacting scrutiny under the First Amendment expressive association analysis.

it may not refuse to extend that system to cases of religious hardship without compelling reason." *St. Mary*, 154 F.4th at 768 (citation modified). The 2025 Guidance is neutral because it revoked the Mayorkas Memorandum for *all* sensitive locations—religious or secular. Ex. 8. And it is generally applicable because it did not create exemptions for secular locations while withholding those same exemptions for places of worship. *See id.*

Plaintiffs disagree. Quoting the Fourth Circuit, Plaintiffs argue the 2025 Guidance is not neutral or generally applicable because it was "intended to deprive churches (along with other sensitive locations) of substantial protection from immigration enforcement operations." ECF No. 121 at 21 (citing *Phil. Yearly Meeting III*, 2026 WL 2409055, at *11). Respectfully, that argument is incorrect. First, even the Fourth Circuit implicitly recognized the 2025 Guidance was neutral and generally applicable because it revoked the Mayorkas Memorandum for *all* sensitive locations, not just places of worship. *Phil. Yearly III*, 2026 WL 2409055, at *11 (stating the 2025 Guidance was "intended to deprive churches (*along with other sensitive locations*) of substantial protection") (emphasis added).

Second, the Fourth Circuit based its finding on the statement that "[c]riminals will no longer be able to hide in America's schools and churches to avoid arrest[]" which, it argued, demonstrated Defendants were targeting places of worship. *Phil. Yearly III*, 2026 WL 2409055, at *10. Setting aside the tenuous link between a single statement implicating *all* sensitive locations and the conclusion Defendants are targeting a particular place of worship (much less Plaintiffs), *see supra* at 9–12, the statement does not show targeting. The Supreme Court recently considered an analogous situation in *Mullin v. Doe*, 146 S. Ct. 2121, 2138 (2026) where it considered whether certain statements regarding Haitian immigrants displayed racial animus; in other words, whether they impermissibly targeted Haitians based on race. The Court held the statements did not because one could "identify a strong, race-neutral explanation of the[ ] statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' [] policies." *Id.* at 2139. Similarly, here, the Fourth Circuit's cited statement states "[t]he [Huffman Memorandum] rescinds the Biden

Administration's guidelines for [ICE and CBP] . . ." and it "empowers the brave men and women in CBP and ICE to enforce our immigration laws. . ." Ex. 9 at 1. This statement clearly identifies the present administration's antipathy toward the Mayorkas Memorandum and its general stance on immigration; it does not demonstrate targeting. In sum, the 2025 Guidance is neutral and generally applicable, and so it does not burden Plaintiffs' expressive association rights.

Contrast *St. Mary* where the Tenth Circuit considered whether a nondiscrimination requirement that preschools must "provide eligible children an equal opportunity to enroll and receive preschool services regardless of[,]" among other things, the child's parents' "sexual orientation [or] gender identity" violated the Free Exercise Clause by forcing Catholic schools to admit the children of same-sex or transgender parents. 154 F. 4th at 757, 759. The Tenth Circuit held it did not because the nondiscrimination requirement applied "to all preschools regardless of whether they are religious or secular." *Id.* at 765. It rejected the Catholic schools' arguments that the restrictions targeted religion by characterizing their beliefs as "stigmatiz[ing] and bullying[]" explaining these issues were raised "only to demonstrate the reasoning behind the nondiscrimination requirement and concerns about admissions policies that violate the requirement." *Id.* at 766. Similarly here, the statement "criminals will no longer be able to hide in America's schools and churches to avoid arrest" demonstrate DHS's reasoning and the concerns it sought to address. Defendants have not been intolerant of religious beliefs and have not restricted certain practices because of their religious nature. *See id.* at 768. As such, the 2025 Guidance is neutral as required by the First Amendment.

## VII. Any Relief Should be Narrowly Tailored.

***Section 1252(f)(1) Bars Plaintiffs' Requested Injunction.*** Plaintiffs first argue the heading of 8 U.S.C. § 1357(a)—Powers without a warrant—is irrelevant because the subheading is not part of the enacted text. ECF No. 121 at 36 n.5. But headers may be used for "interpretative purposes . . . when they shed light on some ambiguous word or phrase." *Bhd. of R.R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 529 (1947). Sections 1357(a) and 1226(a) contain an ambiguity: § 1357(a) grants wide

power to act *without* warrants and to execute *any* warrant while § 1226(a) grants authority to arrest *pursuant* to an administrative warrant. In this situation, § 1357(a)'s header provides insight that arrests pursuant to an administrative warrant fall under § 1226(a).

Even assuming Plaintiffs' statutory interpretation is correct, § 1357(a) is not "collateral" to § 1226(a). Section 1252(f)(1) prohibits orders which "require officials to take actions that (in the Government's view) are not required by [a covered statute] and to refrain from actions that (again in the Government's view) are allowed by [a covered statute]." *Garland v. Aleman*, 596 U.S. 543, 551 (2022). "One clear lesson of *Aleman* is that § 1252(f)(1) prohibits courts from awarding injunctive relief that directly adds a new procedural step to the Government's operation of covered provisions." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1125 (9th Cir.), *rev'd and remanded sub nom. Mullin v. Al Otro Lado*, 146 S. Ct. 2079 (2026). Requiring a judicial warrant to perform an immigration enforcement action at a place of worship adds procedural steps. Under an administrative warrant, Defendants' officers have to fill out form I-200. *See* DHS, *Form I-200 Warrant for Arrest of Alien*, https://www.ice.gov/sites/default/files/documents/Document/2017/I-200_SAMPLE.PDF. Under a judicial warrant, Defendants' have to write an affidavit showing probable cause, have it reviewed by a prosecutor, and then present it under oath to a judge. Plaintiffs' proposed injunction adds *three* procedural steps, and so it is barred by § 1252(f)(1).

Plaintiffs' attempts to dismiss the case law are unpersuasive. Begin with *Brito v. Garland*, 22 F.4th 240 (1st Cir. 2021). There, the First Circuit opined the that an injunction which only "bears upon <u>agency practice</u> . . . and not upon <u>statutory requirements</u>[]" is a "distinction without a difference" in the context of § 1226(a). *Id.* at 249 (emphasis in original). This reasoning directly refutes Plaintiffs' argument that DHS's regulations recognize § 1357(a) is the source of authority to execute administrative warrants (which, to be clear, they do not). ECF No. 121 at 35–36. Furthermore, § 1357(a) does not require warrants to be executed under its auspices because it states "an officer or employee . . . *may* execute and serve *any* [] warrant[.]" *See Biden v. Texas*, 597 U.S. 785, 802 (2022) ("the

word 'may' *clearly* connotes discretion.") (citation omitted) (emphasis in original). In any event, Plaintiffs' cited regulation, 8 C.F.R. § 287.5(e)(1, 3), details the offices empowered to serve warrants provided they have completed training. It should not be read to cabin Defendants' statutory authority because it would defeat Congress' clear purpose in limiting injunctive relief over Defendants' ability to arrest deportable aliens. *See Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936) (explaining that a regulation which operates out of harmony with a statute "is a mere nullity").

Move on to *Abel v. United States*, 362 U.S. 217, 232 (1960), which Plaintiffs attack as too old to be useful. ECF No. 121 at 37. But *Abel* described § 1226(a)'s predecessor as "giving authority to the Attorney General or his delegate to arrest aliens pending deportation proceedings under an administrative warrant[;]" a view the Supreme Court has endorsed multiple times when interpreting § 1226(a). *See Nielsen v. Preap*, 586 U.S. 392, 397 (2019) (stating § 1226(a) "sets out the general rule regarding [an alien's] arrest and detention" and that it "empowers [DHS] to arrest and hold an alien"); *see also Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) (same). Plaintiffs contend *Arizona v. United States*, 567 U.S. 387, 407–08 (2012) supports their position, but they ignore the Court's finding that § 1357(a) applies where "no federal warrant has been issued[.]"

Finally, Plaintiffs attempt to distinguish *N.S. v. Dixon* based on the breadth of the injunction, ECF No. 121 at 37, but ignore *Dixon's* clear holding, "[a]n injunction that restrains the Government from carrying out an arrest . . . pursuant to an [administrative warrant] clearly affects provisions to which § 1252(f)(1) applies." *N.S. v. Dixon*, 141 F.4th 279, 289 (D.C. Cir. 2025). And "[m]ore specifically, § 1226(a) addresses a civil immigration arrest made pursuant to a warrant." *Id.* At bottom, Plaintiffs are trying to distract the Court from common sense—an injunction prohibiting Defendants from relying on administrative warrants enjoins the operation of the statute that permits the issuance, and arrest pursuant to, administrative warrants. Such an injunction is, thus, barred by § 1252(f)(1).

***Plaintiffs' Requested Clarification of "Exigent Circumstances" is Self-Defeating.*** Plaintiffs represent Defendants "take[] the position that a person's simply fleeing on foot from DHS

agents poses an 'immediate threat to human life or safety' that would authorize immigration enforcement in or near Protected Areas, unless the person has previously been searched and found unarmed." ECF No. 121 at 34. That misstates Defendants' position. *See* Ex. A, Meet and Confer Email. Defendants maintain "certain fleeing suspects create public safety risks by increasing the likelihood of physical force against the suspects, accidental injuries to bystanders, property damage, and harm to officers or agents. The safety risk is magnified if the officers did not search the suspects to seize any weapons before they fled." *Id.* Precedent supports this position.

Pursuit of a fleeing misdemeanor[6] suspect may involve exigencies allowing warrantless entry into the home based on the particular facts of the case. *Lange*, 594 U.S. at 299. "When it comes to the Fourth Amendment, the home is the first among equals." *Id.* at 303 (citation omitted). Whereas places of worship carry less Fourth Amendment protection. *See Presbyterian Church*, 870 F.2d at 527; *United States v. Aguilar*, 883 F.2d 662, 702 (9th Cir. 1989) (explaining religious services do not carry an expectation of privacy if they are offered to the public); *see also Caniglia v. Strom*, 593 U.S. 194, 198 (2021) ("The very core of [the Fourth Amendment] is the right of a man to retreat into his own home") (citation omitted). Nevertheless, *Lange* is instructive and holds that the touchpoint for the analysis is totality of the circumstances "such as imminent harm to others, a threat to the officer himself, destruction of evidence, or escape[.]" 594 U.S. at 308. Other factors *Lange* considered is the gravity of the offense, *id.* at 306, and the tempo of the chase, *id.* at 307 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 104 (1984)). True, suspects "may flee for innocuous reasons and in non-threatening ways." *Id.* The Court opined several atypical non-emergency situations—such as a man with a mental disability who retreated "in a hurried manner" to his nearby home after officers asked him about "fidgeting with a mailbox," or a teenager "driving without taillights" who did not stop for the police but drove two

[6] An alien's first improper entry into the United States is a misdemeanor; subsequent improper entries are felonies. *Compare* 8 U.S.C. § 1325(a) ("for the first commission of any such offense, [the alien shall] be fined under Title 18 or imprisoned nor more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under Title 18, or imprisoned not more than 2 years, or both.") *with* 18 U.S.C. § 3559(a)(5, 7) ("An offense . . . is classified if the maximum term of imprisonment authorized is— . . . less than five years but more than one years, as a Class E felony; . . . six months or less but more than thirty days, as a Class B misdemeanor[]").

blocks to his parents' house, ran inside, and hid in the bathroom—were not exigent circumstances justifying warrantless entry into the home. *Id.* 307–08 (citations omitted). But the Court ultimately opined that a suspect's flight justifies warrantless entry "in a great many cases[,]" and the totality of the circumstances "will in many, if not most, cases allow warrantless home entry." *Id.* at 308.

Turning to the present case, Defendants do not argue that "someone who flees is dangerous unless proven otherwise[.]" ECF No. 121 at 34. But in determining whether hot-pursuit constitutes an exigent circumstance, officers may consider whether the suspect is a felon, *see Lange*, 594 U.S. at 304–06, whether the suspect presents an immediate harm to others "judged from the perspective of a reasonable officer on the scene," *Graham v. Connor*, 490 U.S. 386, 396 (1989), the potential for destruction of evidence, the tempo of the chase, and the possibility of escape. *Id.* at 308. If the Court were to find in favor of Plaintiffs and grant their requested clarification to "exigent circumstances," then the order *must* also unambiguously permit officers to consider the totality of the circumstances.

***The Court Should Limit Any Relief to Narrowly Align with the Mayorkas Memorandum.*** Defendants reassert their position that § 1252(f)(1) bars vacatur. *See* ECF No. 115 at 36–37. Contrary to Plaintiffs' suggestion, the First Circuit did not foreclose this argument in *Arevalo v. Ashcroft*, 344 F.3d 1 (1st Cir. 2003)—in fact it endorsed it. There, the First Circuit held § 1252(f)(2) only targets the act of enjoining, while § 1252(f)(1) expands its prohibition to enjoining or restraining. *See id.* at 7. The First Circuit opined "this linguistic shift makes it appear likely that Congress intended the words 'enjoin' and 'restrain' to have different meanings[]" and the "most sensible way to give operative effect to both words . . . is to treat the word 'enjoin' as referring to permanent injunctions and the word 'restrain' as referring to temporary injunctive relief (such as a stay)." *Id.* This reasoning casts doubt on the First Circuit's recent holding that that vacatur is barred by §1252(f)(1). *D.V.D. v. DHS*, No. 26-1212, 2026 WL 2797801 at *19 (1st Cir. Sept. 18, 2026). In *D.V.D.*, the First Circuit based its conclusion on § 1252(f)(1)'s caption and statutory text, finding neither mentioned vacatur, and reasoned that "Congress knows how to be specific when it wants to bar remedies beyond

injunctive relief." *Id.* at *19. *Arevalo*, which the *D.V.D.* court did not consider at all, 2026 WL 2797801 at *19, directly refutes this reasoning. *See Arevalo*, 344 F.3d at 7. Furthermore, "prior panel decisions are binding upon newly constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent." *United States v. Wogan*, 938 F.2d 1446, 1449 (1st Cir. 1991). Thus, *Arevalo*, which was decided before *D.V.D*, controls and demonstrates § 1252(f)(1) bars vacatur.

Plaintiffs argue further injunctive relief is necessary for three reasons: (1) because "returning to the Mayorkas Memo[randum] would leave DHS free to" continue immigration enforcement actions at places of worship; (2) because Plaintiffs require greater specificity than the Mayorkas Memorandum; and (3) because DHS may "re-adopt" the 2025 Guidance in substantially similar form. ECF No. 121 at 33. Begin with Plaintiffs' third concern that DHS may re-adopt the 2025 Guidance; this cannot support a permanent injunction because "a party's unsubstantiated fears of what the future may have in store" cannot constitute irreparable harm. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Move onto Plaintiffs' first and second concerns. These concerns are adequately met by entering a permanent injunction tailored to the Mayorkas Memorandum as the Court has done already. *See* Prelim. Inj. Order, ECF No. 75. Plaintiffs cannot use administrability concerns or subjective fears of what the future holds to justify relief greater than their asserted injury. *See Brown v. Trs. of Bos. Univ.*, 891 F.2d 337, 361 (1st Cir. 1989) ("An injunction should be narrowly tailored to give only the relief to which plaintiffs are entitled") (citation omitted); *see also* ECF No. 121 at 33 (stating the current preliminary injunction has already ameliorated the alleged harms of the 2025 Guidance) (citation omitted). In short, Plaintiffs' speculative concerns cannot support expanding the injunction beyond what their own asserted injuries would warrant.

## CONCLUSION

For these reasons, and the reasons in Defendants' opening memorandum, the Court should grant Defendants' motion to sever the newly added Plaintiffs that do not reside in the district and grant Defendants' motion for summary judgment.

Dated: September 24, 2026

Respectfully submitted,
BRETT A. SHUMATE
Assistant Attorney General
Civil Division

KRISTINA A. WOLFE
Assistant Branch Director
Federal Programs Branch

*/s/ Richard C. Giles*
RICHARD C. GILES
Trial Attorney (WY Bar No. 8-7222)
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St., NW, Room 11404
Washington, D.C. 20530
(202) 616-8482
Richard.C.Giles@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

On September 24, 2026, I served the foregoing on all parties by electronically filing it through the CM/ECF system.

*/s/ Richard Cody Giles*
Richard Cody Giles